

1

1              IN THE UNITED STATES DISTRICT COURT

2           IN AND FOR THE DISTRICT OF DELAWARE

3                  - - -

4  SRI INTERNATIONAL,          :      CIVIL ACTION
                          :

5         Plaintiff      :
                          :

6       vs.            :
                          :

7  INTERNET SECURITY SYSTEMS, INC.  :
  and SYMANTEC CORPORATION,      :

8                          :
         Defendants     :     NO. 04-1199 (SLR)

9                  - - -

10                      Wilmington, Delaware

11                      Wednesday, May 17, 2006
                      10:00 o'clock, a.m.

12                  - - -

13

14  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge
                   - - -

15

16  APPEARANCES:

17          FISH & RICHARDSON, P.C.
          BY:  JOHN F. HORVATH, ESQ.

18             -and-

19          FISH & RICHARDSON, P.C.
          BY:  HOWARD G. POLLACK, ESQ.

20             (Silicon Valley, California)

21              Counsel for Plaintiff SRI International

22

23

24                      Valerie J. Gunning
                      Official Court Reporter

25

2

1  APPEARANCES (Continued):

2          POTTER, ANDERSON & CORROON
           BY:  RICHARD L. HORWITZ, ESQ.
3

4                  -and-

5
           KING & SPALDING
6          BY:  THERESA MOEHLMAN, ESQ.
                (New York, New York)
7

8               Counsel for Defendant Internet Security
                Systems, Inc.
9

10
           MORRIS, JAMES, HITCHENS & WILLIAMS
11         BY:  RICHARD K. HERRMANN, ESQ.

12                 -and-

13

14         DAY CASEBEER MADRID & BATCHELDER LLP
           BY:  PAUL S. GREWAL, ESQ.
15              (Cupertino, California)

16              Counsel for Defendant Symantec Corporation
17

18                 - - -

19

20

21

22

23

24

25

3

1

2                           P R O C E E D I N G S

3

4                (Proceedings commenced in the courtroom,

5       beginning at 10:00 a.m.)

6

7                THE COURT:  All right.  I appreciate your coming

8       in today.  I was getting rather tired of your e-mails, so I

9       decided that I needed to talk to you in person, because

10      apparently you've got a couple of issues on your plate.

11               As usual, I will start with plaintiff's counsel

12      and let them tell me what they think is on their mind, and

13      then we'll go to defendants' counsel for their response and

14      also to identify their issues.

15               MR. POLLACK:  Good morning, your Honor.

16               THE COURT:  Good morning.

17               MR. POLLACK:  Howard Pollack, from Fish &

18      Richardson, representing SRI.

19               We have two issues that have been raised in

20      e-mails to the Court.  The first one has to do with a report,

21      a report filed by a patent law expert, Mr. Coonin, on behalf

22      of Symantec, and we believe that Mr. Coonin's report is

23      squarely within your guidelines as to the kind of testimony

24      that this Court will not hear in patent cases and we'd like

25      to have that issue addressed.

4

1          The other issue that we have raised is with
2    regard to a document that was used at a deposition in the
3    case of Symantec invention disclosure form document that was
4    used in a deposition, and a couple weeks later Symantec asked
5    for it back, claiming that it was privileged and it had been
6    inadvertently disclosed, and we believe that we are entitled
7    to get that document and use it in the case, that it's not
8    privileged, and even if it were, that the privilege, any
9    privilege that applied, was waived by virtue of the way it
10   was produced and used during the course of discovery.
11          So those are the two issues that we'd like to
12   raise with the Court.  I can treat them in whatever order and
13   I'm happy to provide some discussion or actually answer any
14   questions, whatever the Judge would like.
15          THE COURT:  Well, I don't have any questions.
16   It seems to me before you discuss, I would like to
17   hear defendants' take on this and then have you respond,
18   because I pretty much have your position vis-a-vis your
19   e-mails.
20          MR. POLLACK:  Okay.  With regard to -- if you
21   just would indulge me just a minute, I think it's pretty
22   clear that the expert issue is pretty clear.  The Court has
23   not had the opportunity actually to see the report.  I have
24   copies of it.  It's actually not that long and I can provide
25   them to you, but we actually think it is more appropriate for

1   them to go first on that issue since the way we read the

2   guidelines, it's kind of their burden to show extraordinary

3   circumstances to submit that information.

4           I would like to have the opportunity to discuss

5   the disclosure form issue for a couple of minutes, but I

6   think we should treat them one at a time.  It would probably

7   make most sense.  So if we treat the expert issue first, then

8   I'd ask for a couple minutes to talk about the disclosure

9   form, if that would be okay.

10          THE COURT:  All right.  Thank you.

11          And let's hear about Mr. Coonin.  I have not had

12  a patent law expert on the stand for a couple of years now,

13  so I think you've got an uphill battle to convince me that

14  this individual's testimony is appropriate.

15          MR. GREWAL:  Good morning, your Honor.  My name

16  is Paul Grewal, on behalf of defendant, Symantec

17  Corporation.

18          I appreciate your guidelines, your Honor, and the

19  burden which they impose on Symantec in this matter.

20          If I may address specifically the issue of Mr.

21  Coonin's testimony as it relates to extraordinary

22  circumstances.  Your Honor, we fully concede that the

23  guidelines and the video to which the guidelines refer

24  provide for the general background information for the jury

25  on issues relating to patent procedure, office practice and

6

1   the like, and we fully concede that Mr. Coonin's testimony

2   should not and will not overlap with the information provided

3   in that video.

4          What we are concerned about, your Honor, however,

5   addresses a much more specific issue, separate and apart from

6   the background information that is addressed in Mr. Coonin's

7   report, and it was provided as context for the specific issue

8   I wish to address.  And this issue concerns, your Honor, the

9   plaintiff's position that certain prior art references were

10  before the patent examiner during the prosecution of the '203

11  patent, one of the four patents that have been asserted

12  against Symantec in this litigation.

13          In response to our interrogatories, your Honor,

14  SRI took the position -- I have the pleadings here if your

15  Honor would like to review them directly.  SRI took the

16  position that references that were presented to the examiner

17  during the prosecution of a predecessor patent in this

18  family, the '338 patent, were, in fact, considered by the

19  examiner during later prosecution.  In particular, later

20  prosecution of the '203 patent.

21          They took this position, your Honor, in

22  their interrogatory responses based upon evidence in the

23  record, the file wrapper, during the prosecution of the

24  '203 patent, and it's their position, your Honor, that

25  markings in that record, in that file wrapper, confirm

1    that the examiner did not have before him -- I'm sorry --

2    the examiner did have before him certain references that

3    were presented in an IDS statement during the prosecution

4    of the first patent, '338.

5              We respectfully, your Honor, have a different

6    view, and we believe that the file wrapper shows and

7    will confirm that, in fact, these references that were

8    presented during the prosecution of the first patent,

9    the '338 patent, were, in fact, never considered by the

10   examiner during the prosecution of the second patent.

11   And here's my dilemma, your Honor.  My dilemma is this:

12   We have -- we have, as evidence of our position, file

13   wrapper indications, search note indications during the

14   prosecution of the '203 patent, and Mr. Coonin, as an

15   expert in Patent Office procedure, will provide his

16   specialized knowledge as to the meaning of that evidence

17   and what it indicates as to what the examiner had before

18   him during the prosecution of the '203.

19              This is not, your Honor, an issue that can

20   be addressed by our technical experts.  This is not an

21   issue, your Honor, that is addressed at all in the video.

22   And it is an issue, your Honor, that goes to the very heart

23   of one of the major issue in this case, which is whether or

24   not particular references were, in fact, considered during

25   prosecution of one of the four patents.

1          And so we offer Mr. Coonin based on his

2     experience to address that narrow issue and provide in his

3     report broader context for his discussion of that particular

4     issue.  Absent testimony from Mr. Coonin or someone like Mr.

5     Coonin, your Honor, frankly, we are at a loss as to how to

6     rebut that argument that the plaintiffs had made, and if they

7     hadn't taken this position in their interrogatory responses,

8     we would not have to face this dilemma, but having taken that

9     position, we think it's entirely appropriate that we offer

10    expert testimony that falls squarely within Rule 702 that

11    would allow him to provide specialized knowledge on this

12    issue.

13          THE COURT:  All right.  Thank you very much.

14          MR. POLLACK:  Your Honor, I'm a little confused

15    as to why they feel they need an expert to address something

16    that's apparent on the face of the documents themselves.  The

17    jury can read the documents.

18          It seems to me that what they're trying to do is

19    they are trying to get an expert to testify that the examiner

20    in this particular case failed to follow the rules, because

21    this particular issue, the issue that they are pointing to,

22    and just as an aside, this issue is treated in two paragraphs

23    of Mr. Coonin's 20-page report, so this idea that he's got

24    something in there that's background for context I don't

25    think is really quite accurate.

9

1          Most of his report is about Patent Office

2   procedure.  In fact, a lot of his report talks about the

3   standards for patentability.  There are issues about what

4   anticipation means, what obviousness means, et cetera.

5   There's a whole section on the Patent Office's search

6   procedures, where he goes through what he calls several tiers

7   of searching and criticizes the examiner for the kinds of

8   searching he did, all of which is in the report, none of

9   which was just raised by defendants' counsel.

10          But on this one point about whether or not

11  references that were on -- considered in the parent were

12  considered in the child application, the continuation

13  application, '203, that issue is the subject of rules.  It's

14  the subject of rules that if they believe are at issue, they

15  can ask the Court to instruct the jury about, and the facts

16  about what the examiner did are plain on the face of the

17  reference -- I'm sorry -- on the file history.

18          So this idea that they need an expert to explain

19  to the jury what, in this case, the absence of a notation in

20  the file history means strikes me as not extraordinary

21  circumstances, but, rather, an attempt to have somebody

22  dressed up as an expert, try to argue to the jury that the

23  examiner made a mistake and did not follow the rules that he

24  is presumed to have applied.

25          THE COURT:  All right.  And you bring it to

1    my attention now because you don't want to go to the

2    trouble of deposing this witness as opposed to bringing in

3    a motion in limine or addressing it in a summary judgment

4    context?

5            MR. POLLACK:  Yes.  We don't feel it's

6    appropriate that we should go to the expense of taking

7    the deposition, preparing for trial and not knowing until

8    the pretrial conference whether or not this witness is

9    going to testify.  It's a substantial amount of work for

10   our client to pay for and to do when we don't believe

11   that there is any reason that this witness should ever

12   testify.

13           THE COURT:  All right.  Let's hear from

14   defense counsel again, and basically, the question is

15   whether -- obviously, I have not seen the report, but if,

16   in fact, we're talking about two paragraphs that are critical

17   because of an argument that the plaintiff is making, are

18   we at a point where we can say that's the only testimony

19   this witness would be offered for and so any discovery

20   that goes forward from this point on would focus just on

21   those two paragraphs or are you still contending that the

22   entirety of the report is admissible and significant and,

23   therefore, we have not -- you are not willing to limit

24   any of this?

25           MR. GREWAL:  Your Honor, to the extent the

1  report provides broader context and background untethered

2  to this particular argument we're making, we fully accept

3  that Mr. Coonin's testimony should be so limited.  In fact,

4  if plaintiffs were to take his deposition, they would learn

5  that.

6              And as your Honor pointed to earlier, there is a

7  procedure, a motion in limine procedure, adopted by the Court

8  in the scheduling order that would allow the parties to fully

9  address that to the extent we wish to go forward with

10 anything outside of those boundaries at trial.  But as far as

11 Mr. Coonin testifying specifically as to this issue, we would

12 invite your Honor to look at the report and to address the

13 specific issue that we're most focused on and most concerned

14 about.

15             This is exactly why, your Honor, we think this

16 procedure of e-mail requests to solve this problem isn't

17 appropriate in this context.  Your Honor has not even had a

18 chance to look at the report, and we think that if you do,

19 you'll see that this particular issue does require expert

20 testimony, your Honor, because, again, we have no basis to

21 rebut the issue that they've put into play by virtue of their

22 interrogatory response.

23             THE COURT:  Well, Mr. Pollack has indicated that

24 what you're really trying to do is argue that this examiner

25 didn't follow the rules based on an absence of notation.

1   That's what my notes say.  I mean, is that basically what you

2   what your argument is?

3          MR. GREWAL:  What we're basically arguing,

4   your Honor, is this:  That, number one, these prior art

5   references were not included in the IDS statements submitted

6   in connection with the prosecution of this child

7   application.  That's point number one.

8          THE COURT:  And that can be demonstrated through

9   the file wrapper?

10         MR. GREWAL:  That's right, your Honor.

11         Nevertheless, point number two is that, as Mr.

12  Pollack points out, there are indicia in the file wrapper

13  which -- I'm sorry.  If I may correct myself, as Mr. Pollack

14  points out, the rules suggest that the examiner ought to

15  consider applications -- I'm sorry -- references which were

16  presented during the prosecution of the parent.  The problem

17  here, your Honor, is the file wrapper shows that that just

18  did not happen.  That as one of specialized knowledge would

19  understand and can explain to the jury, the examiner should

20  have indicated that these references were considered during

21  the prosecution of the child, and that's just not the case.

22  And abssent expert testimony to explain the physical evidence

23  to the jury, the jury is going to be in no position to

24  understand the significance of that evidence.

25         It's no different, your Honor, than an expert

1    looking at tire tracks and looking at the height of a stop

2    sign at the sight of a car wreck.  Sure, the jury can look at

3    the physical evidence themselves and make certain

4    determinations on their own, but the specialized knowledge of

5    the expert is going to help them understand the significance

6    of that, and it's just that narrow issue that we're focused

7    on and it would be made clear to your Honor if you would look

8    at the report and consider it in the context of the

9    interrogatory responses and in the context of the information

10    obtained in the file wrapper.

11              THE COURT:  All right.  Thank you.  All right.  I

12    am going to think about that for a minute.

13              Let's move on to the second issue.

14              MR. POLLACK:  Your Honor, just in the report, if

15    you do get a chance to look at it or would like to see it,

16    the paragraph that we're talking about, just for the record,

17    is Paragraph 77, where this issue -- I mean, the entirety of

18    this issue is addressed by Mr. Coonin.

19              Turning to the issue of the disclosure form,

20    which was marked during the deposition of a Mr. Geiger as

21    Exhibit 52, first, the significance of this document,

22    the reason that we are asking for it and believe that

23    it's evidence that we cannot get anywhere else is that

24    this is -- it's a technical document written by Symantec's

25    engineers about the first of the accused products, and

14

1    it's a document describing the technology.  And without

2    going into any details, essentially discussing whether

3    the technology in that particular product is new and

4    potentially patentable.

5            It's a technical analysis.  It's not a legal

6    analysis.  It is an important document because it's dated

7    many years after the patents in suit in this case have been

8    filed, and it's, we believe, directly contrary to positions

9    that defendants want to take about the validity of the

10   patents, and therefore is extremely relevant, and it would be

11   inequitable to allow Symantec to cover up this information,

12   this relevant factual information, under a claim of

13   privilege.

14            I want to address the waiver issue first because

15   I think it's more clear-cut.  Symantec, itself, in a very

16   similar circumstance, took the position with regard to a

17   document that was marked during the deposition of one of

18   SRI's witnesses that the document that was already used in

19   the Abramson deposition, and I'm reading from a letters from

20   Symantec's counsel dated March 27th, 2006, the document

21   already used in the Abramson deposition that SRI did not

22   object to during the deposition, with regard to this

23   document, Symantec considers any privilege objection to have

24   been waived and we will not be deleting this document,

25   meaning they will not consider it privileged.

1        In this case, similar circumstance, a document

2   was marked and discussed in detail during the deposition of

3   Mr. Geiger.  No objection was raised.  Now, Symantec, in its

4   e-mail response, suggested that they did not appreciate the

5   fact that the document was privileged at the time and so any

6   waiver was inadvertent.

7        Well, I think that that is, again, not entirely

8   a clear discussion of what happened.  This document,

9   this disclosure form, related to what Symantec calls

10  its Patent Committee.  The issue of the Patent Committee,

11  the topic of the Patent Committee, actually came up

12  first in a March 2nd deposition of a Mr. Toronto, which

13  Mr. Grewal defended.

14       Mr. Toronto testified during that deposition

15  that the Patent Committee accepts patent proposals

16  from Symantec employees and makes recommendations as to

17  whether or not to file patent applications based on those

18  proposals.

19       He testified that the proposals do not come

20  from attorneys.  He testified that he did not know that there

21  were any attorneys on the Patent Committee.  And during this

22  deposition, when Mr. Toronto was asked about whether or

23  not the Patent Committee reviewed prior art, at that point,

24  Mr. Grewal objected and objected on the grounds of work

25  product, instructed not to answer, which Mr. Toronto didn't,

1  and we took exception because we felt that the work of the

2  Patent Committee as has been described was not legal

3  analysis.

4          But that happened all on March 2nd.

5          Mr. Geiger's deposition took place five days

6  later, on March 7th.  Again, Mr. Grewal defended.  That

7  witness, Mr. Geiger testified again about the Patent

8  Committee.  He said that any inventor, anyone who wishes to

9  submit a concept or an invention, whether in regard to

10  current work they're doing or on just a general idea, can

11  submit a proposal to the review committee.  The review

12  committee will then decide whether or not Symantec wishes to

13  pursue the proposal.

14          We then marked this Exhibit 52.  The witness

15  identified it because his name appeared in it.  He testified

16  in detail about it, including -- there's a line item on the

17  form about what prior work is known, and the witness

18  testified about what he knew about prior work, and what he

19  believed he discussed related to the exhibit, again, without

20  objection.

21          He also testified that he, with regard to this

22  particular form, he didn't know what happened to it

23  subsequent to it being sent to the committee.

24          So having been sensitized to the issue of the

25  Patent Committee, having direct questions being asked of the

1  witness five days earlier about the workings of the Patent

2  Committee, et cetera, for Symantec to now claim that the

3  discussion that went on at Mr. Geiger's deposition and

4  allowing the testimony, allowing the document to be reviewed

5  and examined, was somehow an inadvertent act on their part,

6  it seems to us that it can't have been inadvertent, that if

7  they had any belief that the Patent Committee was a legal

8  committee or doing legal work, that they were on notice and

9  should have at least raised the issue during the deposition

10 or investigated before the deposition, after the first issue

11 came up.

12         Two weeks after Mr. Geiger's deposition, we got,

13 for the first time, in a March 21st letter, an assertion that

14 this document, among others like it, were inadvertently

15 produced.  The very next day after we got that letter,

16 another Symantec witness, Mr. Kanaki, volunteered in

17 deposition that his belief that the job of the Patent

18 Committee was to make recommendations to Symantec's legal

19 department.  He did not testify that there were lawyers

20 on the Committee, but what he said was his understanding

21 was that the Patent Committee's work was intended to be

22 done so they would make recommendations to the legal

23 department.

24         So under the circumstances -- and then he was

25 instructed not to answer any further questions about the

1  workings of the Patent Committee.

2          So we think under the circumstances, in view of

3  both Symantec's own position on waiver and the facts of what

4  occurred with regard to this particular document, that if it

5  was privileged, any privilege was waived.

6          And just briefly, I don't believe any privilege

7  does attach to this document because -- for several reasons.

8          One, there is no specific testimony that this

9  particular document was created for any purpose other than to

10  describe the technology for a technical analysis.

11          There's no evidence other than vague testimony

12  about generally the Committee working with lawyers that this

13  is a legal process at all rather than a technical evaluation

14  or a business evaluation.

15          The Patent Committee appears to be undertaking

16  a technical business task, which inventions are technically

17  meritorious enough to warrant the dollars spent on patent

18  prosecution.

19          The fact that the forms are later communicated to

20  the legal department once the recommendation is made that we

21  should pursue it does not turn the forms into legal documents

22  or the intent of them or the purpose of them being legal

23  communications.

24          And although there's a representation made

25  that a lawyer sits on this Patent Committee, we don't have

1  any evidence in the record that that is the case.  The

2  witnesses were asked.  None of them could identify a lawyer

3  being a member of the Committee.

4       So we don't think that these are forms that are

5  like invention forms that are addressed in other cases, where

6  the intent is for the inventors to write up the technology

7  for the purpose of the attorneys to write the patent

8  applications.  That does not appear to be the purpose of

9  these forms.  Rather, the purpose of these forms appears to

10  be the inventors suggesting to a technical committee that

11  their ideas have merit from a technical sense and the company

12  should spend money to pursue patent coverage for those ideas,

13  not to communicate those ideas to lawyers for the purposes of

14  writing patent applications.

15       So for those reasons, we don't believe that these

16  forms are privileged at all, but even if they were, again,

17  given the facts that we have here, we believe that those --

18  any privilege was waived by use of the form in the

19  deposition.

20       THE COURT:  All right.

21       MR. POLLACK:  And we're just seeking that

22  particular form given the waiver issues and we're not seeking

23  production of all of them because, fundamentally, we don't

24  think that it's necessary to trouble the Court going through

25  all of them.

1          THE COURT:  All right.  Thank you very much.

2          Mr. Grewal?

3          MR. GREWAL:  As a preliminary matter, your Honor,

4    I find it ironic that Mr. Pollack cites to a March 26th

5    letter exchanged between the parties on this issue and others

6    and this emergency request for leave was filed on May 4th.

7    In terms of timeliness, your Honor, over a month passed

8    between when this issue was joined between the parties and

9    when the Court was requested to step in and try to resolve

10   this issue.

11         As to the point Mr. Pollack makes about the

12   evidence in the record and the lack of evidence in the record

13   as to the legal advice that is sought by virtue of these

14   patent disclosure forms and invention disclosure forms, the

15   reason, your Honor, we don't have that evidence in the record

16   is, again, under this procedure that plaintiffs have

17   invoked.  I'm in no position to offer your Honor, for

18   example, a declaration from Symantec and legal counsel inside

19   Symantec that would make clear exactly how this patent

20   procedure works inside the company and the fact that these

21   invention disclosure forms, in fact, are submitted

22   specifically for the purpose of seeking legal advice and fall

23   squarely within the attorney/client.

24         Now, if I may begin, your Honor, with the issue

25   of privilege and whether it attaches to each of these

1    documents, I understand from counsel that he has conceded

2    that three of the four documents are no longer in issue and

3    there's only one document now before the Court.

4              As to the question of whether privilege attached

5    to that document, your Honor, Federal Circuit in 2000

6    resolved this issue squarely in a case called In re Spalding,

7    your Honor. And I have copies if your Honor would like to

8    see them and I have copies for counsel as well.

9              Mr. Pollack talked about the fact that in our

10   case these invention disclosures are technical documents,

11   that they describe technology, that they discuss potential

12   patentability and that they comprise a technical analysis.

13   Each of those points was presented to the Magistrate Judge in

14   the Spalding case and the Magistrate Judge granted the motion

15   to compel.

16             And on a writ of mandamus, your Honor, the

17   Federal Circuit reversed, finding that invention disclosure

18   forms were entitled to precisely the type of protection, the

19   attorney/client protections that we're seeking invoking in

20   this case.

21             The fact is, your Honor, if you look at the

22   Spalding decision, you will see that the Court held that

23   because these invention disclosure forms are submitted

24   specifically for the purpose of seeking legal counsel on

25   patent, on patentability, that they fall within the

22

1  privilege, and we would ask again, your Honor, to look at

2  that decision, apply it to the facts here, with a proper

3  record before your Honor, and you'll see that the privilege

4  clearly applies.

5          Let's talk about waiver for a second, your

6  Honor.

7          One thing Mr. Pollack did not address at all was

8  this issue of inadvertent disclosure in the context of the

9  protective order.

10         As we indicated to you in our brief response to

11 the e-mail, Paragraph 20 of the protective order, which SRI

12 agreed to, which your Honor ordered and which Symantec signed

13 on to, provides for the return of information that was

14 produced inadvertently.

15         This protection in Paragraph 20, your Honor,

16 supersedes whatever background case law may apply otherwise,

17 and this protection, your Honor, in Paragraph 20 is not

18 limited simply to documents which may slip through the cracks

19 of a multi-hundred thousand or multi-million-page production,

20 as was the case here.  It also applies, your Honor, to all

21 discovery, which inadvertently was produced through no fault

22 of counsel.

23         Your Honor, if you had the documents to look

24 at in front of you, you would see that on the face of these

25 documents, there are no clear indicia that the documents

23

1    were, in fact, entitled to the attorney/client.

2            Mr. Pollack talks about a March 2nd deposition of

3    an Ed Toronto, your Honor.   That deposition did not address

4    the document that we're talking about here at all.   He talks

5    about other depositions that discuss the broad workings of

6    the patentability -- I'm sorry -- of the Symantec Patent

7    Review Committee.   Again, those don't address the document at

8    all.

9            The only deposition where this became an issue,

10   your Honor, was the Robert Geiger deposition.   And in that

11   deposition, counsel did pose questions to Mr. Geiger about a

12   form which he was not the author of, and he responded to the

13   best of his ability without disclosing the fact that, in

14   fact, this document was submitted to Symantec's legal

15   counsel, that is a Committee comprised not only of technical

16   managers, but also legal counsel specifically for the purpose

17   of patentability.

18           And when we discovered this, your Honor,

19   when we were put on notice of this issue, we undertook

20   a good-faith investigation.   Rather than simply just

21   asserting the privilege and demanding destruction of the

22   document immediately, we did what we believed the order

23   required us to do:  Was to complete an investigation to

24   establish the privilege in fact properly applied to the

25   document, and two weeks later, your Honor, 14 days later,

24

1    we made the request after we concluded that, in fact, the

2    privilege did apply.

3              Now, to understand how Paragraph 20 applies here,

4    your Honor, and to understand how the language ought to apply

5    in this particular circumstance, I think it's also important

6    to understand the context, the broader context and a broader

7    course of conduct between the parties.  The fact of the

8    matter is, your Honor, is that Symantec is not the only party

9    here to invoke Paragraph 20 and to have sought the return of

10   documents that were inadvertently produced.  SRI has done

11   that and Mr. Pollack points to the fact that during a

12   deposition of Mr. Abramson, documents were used to which SRI

13   asserted a privilege.

14             Yes, we had some discussion back and forth about

15   that issue, but at the same time, your Honor, Symantec agreed

16   that Paragraph 20 applied.  And we only ask that Paragraph 20

17   apply both ways.  We're just seeking a common rule here, your

18   Honor:  Apply to both sides.  And we think that if you look

19   at Spalding, you will see that the privilege clearly applies,

20   and if you look at Paragraph 20, you'll see that the parties

21   have already agreed that this type of inadvertent production

22   ought not be taken advantage of.

23             THE COURT:  All right.  Thank you very much.

24             MR. POLLACK:  Your Honor, just one quick last

25   point.

1          On the back and forth, in fact, the -- Symantec

2    took the position that the document used during Mr.

3    Abramson's deposition, privilege was, in fact, waived

4    because of it, it was not inadvertent, and with regard

5    to that document, SRI dropped its request to have it

6    returned.

7          So we do think that the inadvertence rule

8    should be applied to both parties and that in this

9    particular case, inadvertence means that through no fault

10   of counsel or the party, a document was produced that

11   nobody appreciated at the time a privilege might even apply.

12   And I don't think that that is true here.  I don't think that

13   it can be said that Symantec didn't appreciate that there

14   were these documents related to this Patent Committee, and if

15   they had a belief that the actions of the Patent Committee

16   were entirely privileged, which I don't believe they are

17   given what the witnesses have said about what their

18   understanding of what the Patent Committee does, then they

19   had the obligation to diligently pursue those privileges and

20   they didn't.

21         And so I don't think that that is the kind

22   of inadvertence the protective order is designed to

23   protect against and I believe that that is the position

24   that Symantec took when they felt it suited them when

25   they said the privilege had been waived with the document

1    used with Mr. Abramson and they want to have it differently

2    now.

3              THE COURT:  And in what regard or what respects

4    is this Exhibit 52 different in substance than the kind

5    of privilege documents recognized in the In re Spalding

6    case?

7              MR. POLLACK:  The Spalding case, your Honor, and

8    I have it right here, in that case, the Court found that the

9    inventors directly submitted that form to the legal

10   department, that they knew when they were submitting it, it

11   was being submitted to the lawyers for the purposes of the

12   lawyers preparing a patent application.  That's a different

13   situation from what I believe we have here in view of what

14   the inventors have testified.  I mean, the witnesses

15   have testified.

16             The ideas that this is being submitted to

17   a review committee for the purposes of evaluating whether

18   Symantec even wants to pursue getting lawyers involved

19   or spending legal fees, filing a patent application,

20   in the Spalding case and in most cases, the IDS's are

21   prepared, already a decision has been made to seek patent

22   protection.

23             And that is the purpose, is to facilitate

24   that that's not the situation, I believe, we have here.

25   It is a situation where it's simply a technical description

1    of the technology and the inventors saying, hey, we think

2    this is valuable from a business standpoint, a technical

3    standpoint.  We don't know whether, you know, the lawyers

4    are going to agree or not, but we think this is what we

5    should pursue.

6              I don't think -- I think that's a business

7    purpose.  It's not a legal purpose.  And, therefore, it's

8    different from the kinds of forms that are addressed in the

9    Spalding case and the facts of the continuity of where it

10   goes are different.

11             THE COURT:  And at this point, you believe that

12   your recitation of the record is sufficiently clear to have

13   me make that decision?

14             MR. POLLACK:  Yes, your Honor.  I mean, I was

15   quoting from the deposition testimony of Mr. Geiger and

16   Mr. Toronto, and we can submit those deposition excerpts, but

17   I believe I've accurately captured what they testified to

18   about the Committee, and I understand that Symantec has

19   suggested I think they want to supplement the record, and if

20   your Honor agrees, then we can respond to that.  But I think

21   that you should have everything you need at this point and we

22   cannot, except the form itself, we cannot submit that because

23   we gave it back.

24             THE COURT:  All right.  Thank you very much.

25             MR. GREWAL:  Your Honor --

1          THE COURT:  Yes?

2          MR. GREWAL:  -- just for your reference, the

3    Spalding case is 203 F. 3rd 800.  I have a copy, if you would

4    like to have a hard copy as well.

5          Just very briefly, your Honor, the record is

6    not complete at all.  You have representations from counsel.

7    You have a couple of 150 word e-mails exchanged.  There has

8    been no declaration submitted, no deposition testimony

9    submitted.

10          THE COURT:  Well, okay.  You're here, though,

11    and your client is paying for you to be here and to be

12    articulate.

13          So according to Mr. Pollack, the difference

14    between the form and issue here and the forms discussed by

15    the Federal Circuit in In re Spalding is the fact that this

16    Patent Committee is kind of an intermediary between the legal

17    department and the inventors and that it, in fact, is not

18    making a legal decision, it's making a business decision

19    about whether it's worth the investment to send it to the

20    legal department and that that sets it apart.

21          So my first question is whether, from a factual

22    standpoint, that description of the purpose of the Patent

23    Committee is an accurate one.  And if it is, whether, in

24    fact, legally, that should be an important distinction that

25    takes it out of the protection of In re Spalding.

1        MR. GREWAL:  Your Honor, as a factual matter,

2    this Committee that we're talking about includes and has

3    included at all relevant times counsel, counsel who are there

4    to direct the preparation and submission of patent

5    applications to the U.S. PTO.  So as a factual matter, your

6    Honor, counsel has been involved in this Committee for all

7    the relevant time periods.

8        So we do think this falls squarely within

9    Spalding.

10       As to the substance of the invention disclosure

11   forms themselves, I'm sorry your Honor has to play blind

12   man's bluff with this because if your Honor could see these

13   in camera or upon submission, you will see that this is

14   not simply a recitation of business opportunities or

15   technical opportunities for the company.  There are

16   discussions about things like conception.  There are

17   discussions about things like prior art.  There are

18   discussions about things like who, in fact, might claim

19   inventorship if the application were submitted.  This is

20   an invention disclosure form just like the one that was

21   submitted in Spalding, your Honor.

22       THE COURT:  All right.  Well, I think I will need

23   to take a look at the document in camera and I will make a

24   decision based on my reading of In re Spalding.

25       MR. GREWAL:  Thank you, your Honor.

1              THE COURT:  All right.  I believe that defendants
2    have some issues as well?
3              MS. MOEHLMAN:  Your Honor, Theresa Moehlman, from
4    King & Spalding, for ISS.
5              Our issues are relatively simple, and the
6    question in our e-mail is whether, after fact discovery
7    closed, and after our expert reports on invalidity were
8    due, SRI should then be able to add 33 new claims with
9    respect to the '203 and '615 patents to this lawsuit,
10   more than doubling the number they originally asserted
11   for these patents.
12             And to provide you with a little bit of history,
13   August 1st we received interrogatory responses from SRI.
14   They assert 12 claims of each patent.
15             November 18th, when contention interrogatories
16   were due, the same claims were asserted and the infringement
17   charts addressed those claims and those claims only.
18             Fact discovery comes.  Fact discovery closes
19   March 31st.  Again, no supplementation, no notice.
20             April 21st, our expert reports are due.  No word
21   from SRI.
22             A week later, April 28th, they submit to us
23   their expert reports on infringement in which they assert
24   these additional 33 claims, so that is more than double.
25             Now, their first argument was, these new claims

1    are not substantially different from the originally asserted

2    claims, but that's not true.  They have limitations that we

3    never focused on because they were never asserted.

4              For example, they include limitations on virtual

5    private networks.  We never focused on that during fact

6    discovery.  We instructed our experts.  They were not part of

7    the case, relying on their asserted claims.

8              Next, SRI says it needed to confirm its basis

9    to assert these claims at depositions that took place

10   in April.  Well, that's not true either, because if you

11   take a look at the product documentation on ISS's website

12   before this lawsuit was even filed, these features were

13   present.

14             SRI then comes back and says, no harm, no foul.

15   Well, big harm here.  Our expert reports are done.  They're

16   more than doubling the number of claims.  To go back and

17   rewrite this is an enormous task.  And we have expert

18   depositions coming up.  We have claim construction briefing

19   and summary judgment motions coming up.  And, moreover, we

20   can't go back and reopen fact discovery to address these new

21   issues.

22             So now is the time to narrow the issues,

23   not expand them so drastically, so we're seeking the

24   Court to preclude them from adding these claims at

25   this

1    late date.

2            And there's a related issue that has come

3    up.  We are having trouble scheduling our expert depositions

4    and we propose dates to them.  There's a two-and-a-half-week

5    period to schedule expert depositions.  And if you will

6    remember, this was a renegotiated schedule.  At the time

7    I saw it, I told Mr. Pollack he was not leaving very

8    much time for expert depositions given the travel

9    involved.

10           He said, no, no, no.  That's how we want to

11   proceed.

12           So we offered them dates and they said, we can't

13   take either one.  We have two experts.  We can't take either

14   one.  We can take four of Symantec's experts, but none of

15   yours.

16           So we said, well, you know, our experts relied on

17   this.  They planned their schedules around this time,

18   reserving the time.  And they came back and they said, well,

19   the counsel that they want to take it has a conflict.  We

20   would like to schedule it during the briefing period for

21   claim construction and summary judgment.

22           Now, in most cases, I would try to accommodate

23   circumstances like this, but I can't do it in this

24   case without prejudicing my client given the briefing

25   schedule.

33

1          So we have proposed several options to them:

2     Take it during the time frame and take it with a different

3     attorney.  They have three partners and a slew of other

4     attorneys on this case.

5          Forego it, or postpone it until after the

6     briefing schedule and at a time when my experts can do it

7     without bothering their schedules.

8          And they have yet to respond.

9          THE COURT:  All right.  Thank you very much.

10          MR. GREWAL:  If I may, your Honor, on behalf

11     of defendant Symantec, this is, strictly speaking, ISS's

12     request for relief.  We certainly support their position,

13     but just to be clear for the record, we have not made this

14     request.  We believe this issue is best addressed pursuant to

15     the expert motions schedule or, alternatively, motion in

16     limine schedule that your Honor has already set.

17          THE COURT:  You are talking about the new claims

18     or the deposition schedule?

19          MR. GREWAL:  We don't have a problem with

20     depositions, your Honor.  We've scheduled them with SRI.

21     We, too, however, have been the recipient of these additional

22     claims.  They've offered these same number of claims against

23     Symantec, and while we've raised our objections in letters

24     to counsel and communication with counsel, again, we believe

25     the right way to handle this is, again, through motion

34

1    practice under the schedule the Court has set out.

2            THE COURT:  All right.

3            MR. POLLACK:  New claims.  Defendants' counsel

4    cites the number 33 as if that's going to carry a lot of

5    weight, a lot of claims.  In fact, it's not a lot of new

6    claims.  In fact, it's almost no new claims since all the

7    limitations that are addressed and these additional claims

8    have been addressed in the context of other claims that were

9    asserted.

10           The reasons that the additional claims were

11   added, and what they relate to, your Honor, are simply

12   where in the network the accused sensor functionality is

13   present.

14           The patents relate to sensing intrusions

15   on networks and some of the claims refer to where

16   specifically in the network the sensor is deployed:

17   At a gateway, at a router, in a VPN.  It's not -- they

18   are not the substance of what the sensors do, but, in

19   fact, where they are deployed.

20           Counsel says, well, you could tell from

21   their website that these features are present.  Well,

22   that's not technically true because in order to know

23   where they're deployed, one needs to know from a matter

24   of direct infringement where, in fact, users are deploying

25   them, and to do that, we need to take depositions of third

1  parties, which we didn't identify until after the document

2  discovery.  Those depositions occurred in April, after

3  the March deadline that's cited here.  And we needed

4  those third-party depositions to, in fact, determine that,

5  in addition to ISS inducing people to put these sensors

6  in their network in accordance with the claims, people, in

7  fact, did.  And so those depositions occurred in April, the

8  last of which was two days before our expert reports were

9  due.

10           And so there was new discovery that prompted

11  us to say, yes, in fact, now we can assert these

12  claims.

13           The -- so the topic of where the sensors are

14  deployed had been asserted already in Claim 6, which was a

15  Marusch claim that said at a gateway router or proxy server.

16  The quote unquote new claims are independent claim sets, each

17  of which specify gateway and then separate set for router and

18  a third set for proxy server.  So effectively, the

19  limitations were already in play when their experts did their

20  reports and, in fact, their experts did opine on that

21  limitation.

22           The other limitations have to do with having a

23  plurality of these sensors in multiple domains.  Again, those

24  claims had been already addressed by their experts in the

25  context of the '212 patent, which had those same limitations,

1    which, in fact, hadn't even been asserted against ISS.    But

2    it's important for the Court to remember that ISS had a

3    declaratory judgment action and has always maintained a D.J.

4    action on these patents, including two patents that were

5    originally not asserted against ISS, and their experts opined

6    on all of these limitations in the context of those patents

7    as well.

8             And on the last point, the VPN point that counsel

9    raised, again, that was a limitation that was in the '338

10   patent that is addressed in their experts report in the

11   context of that other patent.

12            So we don't see any prejudice at all to these

13   claims being added at this point because they are simply

14   repackaging of limitations that have already been addressed

15   in their experts' reports.    And expressly Symantec's expert

16   himself said in his report that the claims are substantially

17   similar to other asserted claims, and so it strikes us as

18   we're unsure as to why there's any prejudice here to us

19   adding the claims at the point in time we did.

20            We did supplement our interrogatory responses

21   in the time in the scheduling order for some limitation, and

22   after we confirmed what customers were, in fact, doing with

23   ISS's products, which was necessary for an allegation of

24   direct infringement.

25            Just briefly on this issue of scheduling

37

1    expert depositions, when we agreed to the schedule for

2    two-and--a half weeks, we didn't expect we'd have seven

3    experts on the defendants' side.  SRI has one technical

4    expert.  Defendants have offered seven experts.  The fact

5    that we can't do -- oh, and they've asked for three days with

6    our expert, which we've agreed to give them.

7                So the fact that we can't cover all of those

8    depositions in two-and-a-half weeks shouldn't come as a

9    surprise to anyone.  What came as a surprise is that instead

10   of getting one expert from each defendant, we got multiple

11   experts.

12               We've done our best to try to work this

13   out.  We've asked for dates in early June, just after the

14   close -- discovery closes June 2nd.  We asked for dates the

15   following two weeks.  We actually got a date for one of

16   Symantec's experts that week, which we were going to take

17   the deposition.

18               ISS has refused.  We can take it later.  They

19   want to wait until August.  You know, our position is that we

20   think that we can wait until after opening briefs are done

21   and summary judgments, but that to the extent that they rely

22   on their experts in their summary judgment motions, we should

23   be entitled to take those depositions before our responses

24   are due, and that's really our position.

25               We're happy to take them whenever as long as we

38

1    can take them within, you know, more than a couple days

2    before our summary judgment responses are due.  We think

3    having one lawyer on their side defend the depositions

4    shouldn't put too much of a crimp in their ability to prepare

5    their briefs.  But we're still working on that, but that's

6    our current position.

7              THE COURT:  All right.  A couple of questions:

8    Regardless of whether claims are substantially similar,

9    whatever that means, how many total claims would you be

10   intending to present to a jury at this point?

11             MR. POLLACK:  Fewer than are in our expert

12   reports, your Honor.

13             THE COURT:  Well, that's not the question.  Just

14   add it for me.  What, in your mind --

15             MR. POLLACK:  In my mind, practically speaking --

16             THE COURT:  Not practically speaking.  I'm asking

17   a simple question:  How many claims were at issue before you

18   added these 33 new claims?

19             MR. POLLACK:  As to ISS or as to Symantec,

20   because there were far fewer additional claims.

21             There are about, I think, a hundred claims at

22   issue in the four patents.  Only a hundred claims.

23             MR. GREWAL:  It's more than a hundred, your

24   Honor.

25             MR. POLLACK:  Is it more than a hundred?

1              MR. GREWAL:  Yes.

2              MR. POLLACK:  It's probably a dozen independent

3     claims and dependent claims of those.

4              THE COURT:  All right.  Now, if, in fact, these

5     are substantially similar, the question is, in my mind, what

6     do they add to the case?  In other words, there's no way that

7     these claims will be going to a jury.  And it is not usual in

8     my practice to have a party add new claims after the close of

9     fact discovery, and, in fact, after expert discovery is

10    over.  That's highly unusual.  I can't recall that that has

11    ever happened without the parties agreeing to it.  I

12    certainly can't recall it ever happening without the party

13    who seeks to add the claims alerting their colleagues on the

14    other side of the aisle during fact discovery that certain

15    discovery is being taken for the purpose of adding these

16    claims so that, in fact, everyone understands that and

17    discovery is a fair and open process.

18              I don't know how discovery can be said to

19    be a fair and open process if no one was alerted to

20    all of this.

21              MR. POLLACK:  Your Honor, and I hate to

22    bring up a sore point, but to remind the Court, long

23    after the document discovery was closed, ISS produced

24    three million pages of documents.

25              We were here several months ago, asking

1  for relief to extend the discovery schedule, which was

2  denied.  So we were working like crazy to get the

3  discovery done.

4          The March 31st date is a paper date.  All

5  the parties agreed to extend the deposition discovery

6  as to ISS through April 21st.  So that is the real

7  date.  We were still taking depositions by agreement

8  in late April and everybody knew that that was the

9  situation and they knew that this new document discovery

10  was unusual, that we objected to it, but that we were

11  doing our best to deal with it.

12          And so the fact of the matter is this is

13  not a situation where, months after the close of discovery,

14  a party is raising claims for the first time.  We did not

15  have this discovery until days before our expert reports

16  were due.  So we did -- I mean, we worked as fast as possible

17  to do the evaluation and get it done.

18          On your first point, I think it's important

19  to say that we intend to pare down our list of claims,

20  asserted claims.  We did not want to prejudice our ability

21  by not putting them in our expert report and not

22  supplementing, the act to use these claims.

23          Some of the claims are in independent form,

24  and as your Honor knows, there are advantages to having

25  similar subject matter in independent form that's claimed

1   somewhere else in dependent form, and so while the

2   limitations are the same, the form of the claim is

3   important.  So it may be important for us to have an

4   independent claim to assert rather than a dependent claim,

5   but we are mindful of the fact that it's a four-patent case,

6   that juries have human patience and we will pare down these

7   claims to have a much more abbreviated list at the time of

8   the pretrial.

9               But we do not want to prejudice our client's

10  ability now by not raising these claims and providing them

11  in our expert reports, claims that were the subject

12  of discovery up through the third week of April at this

13  point.

14              So we are mindful of the number of claims and

15  how many claims can realistically be brought and we intend

16  to pare them down, but we don't want to basically limit our

17  ability to do so by not having them there in the first

18  place.

19              MR. GREWAL:  Your Honor, if I may?

20              THE COURT:  All right.

21              MR. GREWAL:  I think I can shed light on this

22  issue by pointing to the simple fact, your Honor.  This whole

23  notion of the late document production on the part of one

24  defendants is a complete red herring, your Honor.  The fact

25  of the matter is that those same claims that Mr. Pollack

1    seeks to add to this case at this very late date are being
2    asserted against Symantec.  The document production wasn't an
3    issue for Symantec and so how can the claims be justified on
4    that basis?
5            The second point, your Honor, is, as you pointed
6    out, the first time we learned about this, your Honor, the
7    first time learned about these new claims was in the
8    expert reports, after fact discovery had closed.  And so how
9    were we to go back and re-do fact discovery, re-do
10   depositions of inventors, other people at SRI, on the basis
11   of these new claims when we were never put on notice of
12   them?  And that applies to both defendants, your Honor,
13   equally.
14           MS. MOEHLMAN:  Your Honor, I just have two
15   responses, if that's okay.
16           The first response is that if they are
17   substantially similar and it's just a repackaging, then
18   they don't need to add them.  They have the issues and
19   it can just be left alone.
20           The second point is that you need to address
21   each limitation of each claim as they are asserted.  So
22   they are asking us to now go back and address all these these
23   new claims and they are just representing, well, we have no
24   intention of actually getting them to trial, but we're going
25   to make you go through the motions of dealing with each claim

43

1   and each limitation, and we submit that they are different

2   limitations in these claims.

3           They were on notice and they had a basis to

4   assert these claims.  Buy Mr. Pollack's reasoning, he could

5   assert no claims against us until he took customer

6   depositions.  And if that was the case, then they should

7   have been serving deposition notices on customers long

8   before they did.

9           So, in any event...

10          THE COURT:  All right.  Mr. Pollack, a couple

11  of things.  It seems to me as though 33 claims -- I'm not

12  inclined to make the defendants go forward with discovery on

13  33 new claims.

14          MR. POLLACK:  Your Honor, can I just briefly

15  address that point?  I apologize for interrupting.

16          33 new claims.  If you look at their expert

17  reports, all of these claims are dealt with, and, in fact,

18  the claims that are dealt with that were originally asserted,

19  90 percent of the way they are dealt with is, see Claim X.

20  This is all just cross-referencing.  They do not have to go

21  back and address these claims anew.

22          Their experts will simply say, oh, yes, I

23  addressed this issue in Claim, you know -- '212 Patent,

24  Claim 4.  See that discussion.  That's all that they will

25  need to do.  It's not, we need to reopen fact discovery, we

44

1   need to take depositions of the inventors again.  I mean, all

2   of the limitations, all of these aspects were already

3   addressed in discovery.  So I just don't think it's fair to

4   say that they have to do a whole new work.

5          I mean, we don't even think they need to

6   supplement their reports.  In depositions, their experts will

7   say, yes, that's right.  That's the same limitation as this

8   one over here.  It's treated the same way.

9          Now, we disagree on merits, the prior art shows

10  these things, but that's a completely different issue.  If

11  it's in the nature of cross-referencing, and, again, I --

12  what I explained was the reason it's important is that it's

13  the difference between independent versus dependent claims.

14  It's not that there are added limitations that were never

15  addressed before.  It's simply the form in which they are

16  claimed.

17         And if you look at the '615 patent in particular,

18  which is where the bulk of the number of claims come from,

19  the claims are simply repeated.  There's, like, five claim

20  sets.  They're repeated with one difference:  Where the

21  sensor is located.  That's it.  I mean, all the other

22  limitations are exactly the same.  It's not a reopening of

23  discovery, in our view.

24         THE COURT:  Well, clearly, that's what it is.

25  I mean, I understand your view.  The question is:  How in

45

1   the world do I make a determination about what discovery
2   would have been like had these been raised during real
3   discovery when they were supposed to be raised, and that is
4   clearly a difficult task for a judge at this point.
5           So what I'm saying to you regardless of what your
6   argument is, is that I'm not inclined to allow 33 new claims
7   at this stage of the proceeding.  Now, if -- especially when
8   what you're trying to do is repackage and juggle and we're
9   going through all of this for a strategic purpose.
10          So what I'm saying to you is, if there are one or
11  two of these new claims that are truly significant and truly
12  important, I am willing to discuss one or two.  I am not
13  willing to discuss 33.  So we need to focus our discussion to
14  that level of --
15          MR. POLLACK:  Fair enough, your Honor.  I
16  appreciate that, and we can look at the claims and pick the
17  one or two and have discussions with counsel about those, and
18  hopefully reach an agreement without troubling you again on
19  that.
20          THE COURT:  All right.  Now, with respect to the
21  experts, I want to talk to the defendants for a moment about
22  the need for seven experts and why we're going through expert
23  discovery with seven experts, again, looking forward to trial
24  and thinking that that is highly unusual.  And before we
25  increase costs on everyone's part and have Daubert motions on

1    every one of the experts, which is the new fad in patent

2    litigation, I have concluded, why seven?  Who needs seven

3    experts?  Three or four per side?

4                    MR. GREWAL:  Your Honor, to address that issue,

5    let's review, if we can, for just a moment, what we face here

6    in this case.  We have in our case, your Honor, four that

7    patents have been asserted against us, by Mr. Pollack's own

8    admission, that are well into the hundred, well over a

9    hundred claims have now been asserted against us.

10                    This is a broad case, your Honor.  Two

11    co-defendants, multiple lines of products, multiple prior art

12    references.  And so we have offered, each defendant has

13    offered a subset of experts to address the particular

14    issues.  Of course, each company's products are very

15    different.  That requires two experts --

16                    THE COURT:  I would say you each need your

17    own experts, but, generally, it sounds like, are we talking

18    about an expert each for infringement, an expert each on

19    validity and an expert each on damages, and then you have

20    this Mr. Coonin as well?

21                    MR. GREWAL:  Well, your Honor, we've talked about

22    Mr. Coonin and we certainly each have a noninfringement

23    expert.  We also each have an invalidity expert and Symantec

24    has offered additional, an additional noninfringement

25    expert.  Actually, two additional noninfringement experts to

1   address very prior art references.

2           We appreciate, your Honor, just as the claims are

3   going to have to be narrowed for trial, the scope of them is

4   going to have to be narrowed for trial as well.

5           All we're trying to do at this point, your Honor,

6   is cover all the bases that have been thrown against us.  If

7   we had a better understanding, for example, as to what claims

8   were going to go forward at trial, perhaps we might not have

9   to address all of these separate issues using different

10  experts and bringing to bear different expertise.

11          But it's certainly our understanding that that

12  will not likely be necessary at trial.  We're simply trying

13  to prepare at this point, as best we can, given the breadth

14  of the claims and the breadth of the products that have been

15  accused of infringement.

16          MS. MOEHLMAN:  Your Honor, if I could speak on

17  behalf of ISS, ISS has two technical experts.  We have one

18  who has a commercial background and one who has a research

19  background and so we are able to cover all of the prior art

20  that's out there and our noninfringement.  So I just wanted

21  to point out that they keep lumping defendants together and

22  as if we share seven experts.  We have two.

23          MR. POLLACK:  And, your Honor, the seven isn't

24  even damages experts, because you bifurcated damages, so

25  we're just talking liability.

48

1             THE COURT:  All right.  And, Mr. Pollack,

2    refresh my recollection about the whole expert deposition

3    schedule.

4             MR. POLLACK:  Yes.

5             THE COURT:  And I don't seem to have --

6             MR. POLLACK:  We are actually starting

7    expert depositions tomorrow and defendants will be

8    taking plaintiff's one technical expert the following

9    week.

10            The dates that we asked for for Symantec's

11   experts were the weeks of June 5th and 12th.

12            Claim construction briefs are due the 9th

13   and opening summary judgment briefs are due the 16th.

14            We, as I mentioned earlier, I believe responsive

15   summary judgment briefs are due July 7th, I believe, and

16   so we just are asking to get the depositions done maybe by

17   June 30th.

18            MR. GREWAL:  Your Honor, when Mr. Pollack

19   referred to Symantec's depositions those weeks in June,

20   I believe he was intending to refer to ISS.  We have

21   scheduled all of our expert depositions.

22            MR. POLLACK:  Yes.  I'm sorry.  We are

23   just trying to get the two ISS experts.  All of

24   Symantec's experts have been scheduled with the exception

25   of Mr. Coonin, but the four others have been scheduled and

1   we're just talking about ISS's two experts, and we've given

2   them dates in June and we'd like to get them done before the

3   end of June.  And if they want to wait until after the 16th,

4   which is when their opening summary judgment briefs are due,

5   we can accommodate that, I believe, and I believe we've

6   submitted dates between the 19th and 30th.

7               THE COURT:  And when were the weeks scheduled

8   that were all the expert depositions were supposed to go

9   forward?

10              MR. POLLACK:  The expert depositions were

11  supposed to conclude by June 2nd, so the weeks were

12  basically starting today and concluding the 2nd of June,

13  was the original expert time period.  And we've managed

14  to actually schedule one, two -- four, four of those

15  depositions to occur in that time period.

16              THE COURT:  All right.  Let's hear once more

17  from Ms. Moehlman.

18              So you've said that your experts made

19  themselves available for this period from today through

20  June 2nd?

21              MS. MOEHLMAN:  That's right.

22              THE COURT:  And that Mr. Pollack is the

23  one who can't, or his firm can't accommodate that,

24  and --

25              MS. MOEHLMAN:  And yet they're able to schedule

50

1    four of Symantec's.

2            So there's a question of fairness here, too.  Why

3    is one defendant getting so prejudiced for being time

4    crunched?  But Mr. Horwitz may have come up with a little bit

5    of a solution, and the question I have is:  If they are not

6    filing summary judgment motions, I may not be so tied up

7    responding to summary judgment motions.

8            So are you planning to file summary judgment

9    motions?

10            MR. POLLACK:  We're certainly not planning to

11    file multiple summary judgment motions, which I expect to get

12    from defendants, so if we do file summary judgment motions,

13    they will be very narrow and probably only one.

14            MS. MOEHLMAN:  Well, I'm not sure that helps me,

15    but I guess I will have to see what comes down the pike.

16            So, I mean, we had offered original dates.  They

17    don't want to take it.  We asked them to swap out some of

18    Symantec's experts.  They have said in letters to us they

19    don't need these depositions for claim construction or

20    summary judgment briefing, so why not wait until after the

21    schedule clears a little bit and there is a break

22    afterwards.

23            It's just that I need to make sure my expert

24    schedules can be accommodated because they plan their whole

25    summer according to that two and a half weeks.

1          So...

2          THE COURT:  And, Mr. Pollack, despite the fact

3    that you say you don't need these experts deposed for

4    purposes of summary judgment, are you just saying you just

5    want them before you have to -- well --

6          MR. POLLACK:  Well, what we're saying is that we

7    don't need the experts before opening summary judgment briefs

8    or claim construction briefs are due.  What we're saying is

9    that if we get summary judgment motions from defendants that

10   are based in part on their experts' opinions, then certainly

11   we would like to take those depositions before we have to

12   oppose those summary judgment motions.

13         THE COURT:  Right.  And how many lawyers do you

14   have on your team on this case?

15         MR. POLLACK:  We have several, and I, in fact, am

16   completely booked and it's Mr. Scherkenbach's schedule.  He's

17   going to be taking the ISS depositions and he has offered

18   several dates that have not been accepted.  And, you know,

19   we're going back and forth.

20         And so --

21         THE COURT:  And these dates are within that

22   originally scheduled period or outside the originally

23   scheduled period?

24         MR. POLLACK:  They are now outside the originally

25   scheduled period.

1          THE COURT:  What does that mean?

2          MR. POLLACK:  We had talked about some dates

3    originally within that period, but those dates didn't work

4    for -- they had originally proposed two dates for their

5    experts, I think the 22nd and 24th, and then we proposed some

6    dates in the first week of June, which didn't work, and back

7    and forth.

8          What we had asked for was the first week, first

9    full week of June, which apparently didn't work.  I mean,

10   that's the back and forth that has occurred.

11         And, you know, on top of this, we're talking

12   about one day each with their experts and they are taking

13   three with ours, which, again, we've agreed to.  It seems

14   like the Symantec experts maybe had more flexibility, which

15   is why it was easier to schedule them.

16         MS. MOEHLMAN:  Every date that was proposed to us

17   was during the week before claim construction or during the

18   week before summary judgment motions.  So that is the dates

19   that they offered to us.  And, quite frankly, it's not one

20   day, it's two days because of the travel and because of going

21   up and explaining what a deposition is and preparing somebody

22   for that process.

23         We had offered them dates, and, like I said,

24   during the time frame we were agreeing to swap out dates so

25   that they could at least take one of our experts during the

53

1   time frame.

2           So, you know, it's -- it is going back and

3   forth.  But I can show you the documentation that goes back

4   and forth to support the dates and what happened.

5           THE COURT:  So you are telling me that, although

6   the two-week period supposedly starts today, to June 2nd,

7   your two experts are still available, but you still can't

8   figure out how to get them deposed within this two-week

9   period?

10          MS. MOEHLMAN:  They told us they were unwilling

11  to take them during the period.  That's why I needed to bring

12  it up with you.  That was what came back at us, and that

13  they -- that they needed to postpone them.

14          So we are willing to work with them within

15  the two-and-a-half-week period.  We're just being told

16  that that is not an option for them.  That's where the

17  problem is.

18          THE COURT:  Well, Mr. Pollack, I don't know

19  where to go from here.  It seems to me as though we've got

20  the period set aside.  We have experts who are available and

21  had you come from a big firm.

22          MR. POLLACK:  Yes, your Honor, I understand that,

23  but we have specific lawyers that have been working on

24  specific issues and their schedules cannot accommodate the

25  requests.  And we have -- we have literally expert

54

1    depositions where travel is involved every single day

2    starting tomorrow.

3             THE COURT:  I know.  That's why you get paid the

4    big bucks, though.

5             MR. POLLACK:  Right.  We will be prejudiced if

6    our lawyer who was preparing for that portion of the case

7    cannot take the deposition.

8             THE COURT:  I want his schedule.  If you are

9    saying Mr. Scherkenbach is the only one who can do this, I

10   not only want his schedule but I want to know when his

11   schedule got filled because, obviously, if you all are so

12   thinly manned at this point, that only one person can do this

13   job, he should have been ready to do this job.

14            MR. POLLACK:  Your Honor, to remind you, again,

15   not to bring up sore subjects --

16            THE COURT:  It's not a sore subject.  I don't

17   want to hear about.  I made my decision.  You have to live

18   with it.

19            You are telling me you can't live with this

20   because you've got one person who is booked to do other

21   things than to do his obligations with respect to this

22   defendant.  Correct?

23            MR. POLLACK:  That other person has had his

24   schedule -- had his schedule filled.  The two days this month

25   that we offered his schedule were not accepted.

1          THE COURT:  All right.  And why -- the 22nd

2    and the 24th, next week?  Why weren't they accepted?

3          MS. MOEHLMAN:  I don't believe that that

4    is the case.  I mean, what days are you telling me

5    that --

6          MR. POLLACK:  Those days that were offered

7    are no longer available.  So the issue is, I can get you

8    Mr. Scherkenbach's schedule.  We've offered them dates in

9    June and we don't understand why those dates in June can't be

10   accommodated.

11         And if what you are telling me is we have to find

12   a lawyer to do it in the next two weeks, I will find a lawyer

13   to do it, but our client will be prejudiced.

14         THE COURT:  Well, I don't believe your client

15   will be prejudiced because you've got lots of really fine

16   lawyers and I don't really want to hear that.

17         MR. POLLACK:  Well, I appreciate it.

18         THE COURT:  But what I want to see, I want to

19   see -- well, unfortunately, I'm going to the Federal Circuit

20   conference tomorrow, so by the end of the day, you need to

21   e-mail me the experts' availability through -- I don't have

22   my calendar --

23         MS. MOEHLMAN:  Through the period, June 2nd?

24         THE COURT:  Well, what day is June 2nd?

25         MR. GREWAL:  Friday, your Honor.

1    MS. MOEHLMAN:  Yes.  And that's the close of

2    expert discovery and then the briefing period starts.

3    THE COURT:  Well, and you're saying, Ms.

4    Moehlman, that you have so few lawyers that only one person

5    can be briefing your opening briefs while someone else -- you

6    can't afford a lawyer to be briefing and a lawyer to be

7    deposing?

8    MS. MOEHLMAN:  During that time frame.  I mean,

9    these are important briefs, so it's not -- you know, and,

10    your Honor, like I said, I mean, it's not -- we have a week

11    to do it and we're trying to meet the schedule, so a schedule

12    that they negotiated.  And so it's not a question for us of

13    one day during the week; it's a question of somebody taking

14    two-and-a-half days to get where they need to get, prepare

15    the witness and defend them.

16    So it's not -- you know, that's -- that's half

17    the time of the briefing.

18    THE COURT:  Well, nevertheless, for purposes

19    of argument, I want your witnesses' availability through

20    June 9th, your availability, or whoever would be available

21    to depose these folks, and I need Mr. Scherkenbach's

22    schedule.  And, unfortunately, if you all can't work

23    it out, then I will have to make that decision.

24    MR. POLLACK:  Your Honor, just one last point.

25    If -- I mean, our feeling is that if it can't be done

1  before the 9th because the schedules do not permit, we

2  would rather have the lawyer that we choose take it in July,

3  after the briefing is done, than for somebody who's not as

4  familiar with the subject matter to take those depositions

5  early.

6          So I will just put that out there.  I think that

7  we should be able to manage it, and Mr. Scherkenbach is

8  actually on a plane today, so I can't get him on the phone

9  right now.  But we'll get you his schedule by the end of the

10  day and we should be able to work it out.

11          THE COURT:  All right.  Well, unfortunately, my

12  concern is that as soon as I say fine, schedule them after

13  briefing, your client will cry foul when the defendant relies

14  on expert testimony and you have not had the opportunity to

15  depose the expert.

16          MR. POLLACK:  Well, if they don't rely on

17  anything that's not in their reports, they just cite the

18  reports, we're okay with that because we know what their

19  expert is going to say in their report.

20          THE COURT:  But we know that there's always

21  reference to an affidavit.  I don't think I've ever seen a

22  report.  It's always done in an affidavit form, which may or

23  may not be exactly consistent with the report.

24          Now, if you can work out the fact that they

25  will only be reciting to the report, but that still gives

1    me pause because the fact that something is said does not

2    necessarily --

3              MR. POLLACK:  We'll get you the schedules through

4    the 9th and we will try to work it out so we're done

5    fighting.

6              THE COURT:  All right.  So at this point, what I

7    am due from you so that I can make decisions is -- I'm still

8    thinking about Mr. Coonin.  And as I understand that issue,

9    there's no indicia on the file wrapper of the -- what is the

10   later patent?

11             MR. GREWAL:  The '203 patent, your Honor.

12             THE COURT:  The '203 patent, that the examiner

13   reviewed certain prior art references that were identified in

14   review in connection with the parent patent, the '338; is

15   that correct?

16             MR. GREWAL:  That's correct, your Honor.

17             THE COURT:  And so the plaintiff is suggesting

18   that the examiner did review it because the rules suggest he

19   should have or demand that he or she review, and the

20   defendant is arguing through this expert testimony that the

21   examiner couldn't have, wouldn't have, something, based on

22   this examiner's particular experience.

23             MR. GREWAL:  That is right, your Honor.  Mr.

24   Coonin will testify simply that based on his review of the

25   evidence and the file wrapper, the examiner did not review

59

1   this reference.  Now, he can point to specific evidence in

2   that record to offer that opinion.  That's all we're talking

3   about and that's made clear in the report, your Honor, which

4   we can provide to you, if it would assist you.

5              THE COURT:  I guess it would assist me to see

6   the report in the first instance.  And then I am going

7   to look at Document or Exhibit 52, the disclosure form,

8   to see whether, in my estimation, it is more or less

9   distinguishable from the documents reviewed by the Federal

10  Circuit in In re Spalding.

11             And with respect to the new claims, plaintiff

12  is going to pare that down to something more narrow.  And if

13  you all can't agree they really don't add a significant

14  burden, then I will take a look at those.

15             And I will get your schedules by the end of the

16  day and hopefully will get something out to you if you can't

17  work it out.

18             All right.  Thank you very much, counsel.

19             MR. GREWAL:  Thank you, your Honor.

20             (Court recessed at 11:20 a.m.)

21                    -  -  -

22

23

24

25

B

# FISH & RICHARDSON P.C.

500 Arguello Street
Suite 500
Redwood City, California
94063-1526

Telephone
650 839-5070

Facsimile
650 839-5071

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

**FR**

ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

BY FACSIMILE AND U.S. MAIL

May 22, 2006

Paul S. Grewal
Day Casebeer Madrid & Batchelder, LLP
20300 Stevens Creek Boulevard, Suite 400
Cupertino, California 95014
Facsimile: (408) 873-0220

Theresa A. Moehlman
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
Facsimile: (212) 556-2222

Re:   SRI International Inc. v. Internet Security Systems, Inc., et al.
       USDC-D. Del. - C. A. No. 04-1199 (SLR)

Dear Paul and Theresa:

I write to follow up on the discussion during last week's hearing regarding SRI's asserted claims. In view of the Court's comments, SRI suggests the following compromise. SRI will no longer seek to assert any claims of the '203 patent against ISS beyond those asserted in SRI's earlier interrogatory responses. To be clear, SRI is presently asserting '203 claims 1-2, 4-6, 12-13 and 15-17 as to ISS and claims 1-9, 11-20 and 22 as to Symantec. As such, SRI believes there should no longer be any dispute as to the asserted claims of the '203 patent.

With regard to the '615 patent, SRI will withdraw the claims added in Dr. Kesidis' infringement reports except for claims 74 and 78. As discussed at the hearing, SRI believes it is appropriate to add these claims as they were added in response to discovery from third-parties which occurred late in the fact discovery period. In addition, the subject matter recited in these claims has already been addressed by your experts in their invalidity reports in the context of other previously asserted claims. To be clear, SRI would be asserting '615 claims 1-2, 4-6, 13-14, 16-18, 74 and 78 as to ISS and claims 1-10, 12-21, 23, 34-41, 43, 44-51, 53, 74 and 78 as to Symantec. As to Symantec, I note that this reflects a reduction by 22 the number of '615 patent claims asserted in comparison with the original interrogatory responses.

Accordingly, the only claims SRI presently seeks to assert that were not previously identified in its interrogatory responses served back in November, 2005, are '615 patent claims 74 and 78. Please let me know as soon as possible if you will concede

FISH & RICHARDSON P.C.

Paul S. Grewal
Theresa A. Moehlman
May 22, 2006
Page 2

to the assertion of these two claims or if further discussion with the Court will be necessary.

Regards,

Howard G. Pollack

HGP/cms

50349931.doc



**DAY CASEBEER**
**MADRID & BATCHELDER LLP**

Renee DuBord Brown
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014
Telephone: (408) 342-4551
Facsimile: (408) 873-0220
rbrown@daycasebeer.com

**KING & SPALDING LLP**

Theresa Moehlman
1185 Avenue of the Americas
New York, NY 10036
Telephone: (212) 827-4397
tmoehlman@kslaw.com

May 30, 2006

**VIA FACSIMILE & U.S. MAIL**

Howard G. Pollack
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063

Re:    *SRI International, Inc., v. Internet Security Systems, Inc., and Symantec Corporation*

Dear Howard:

   This responds to your letter of May 22 concerning SRI's desire to add claims 74 and 78 to this lawsuit. These claims add the limitation of a Virtual Private Network (VPN) to the hierarchical monitoring system. This combination of elements has not been in issue previously and was not specifically investigated by the Defendants during fact discovery. The Defendants addressed the VPN elements in the context of the '338 patent claims relating to the disclosed statistical algorithm. Moreover, to the extent that Defendants' experts addressed the VPN element in the '338 patent context, SRI's expert, Professor Kesidis, provided no response.

   Given the late date, SRI should not be allowed to add new subject matter that cannot be fully investigated during discovery. Thus Defendants object to the addition of these claims.

                              Sincerely,

**DAY CASEBEER**
**MADRID & BATCHELDER LLP**

Renee Brown

TAM:mp

**KING & SPALDING LLP**

RDB for
Theresa Moehlman

Theresa Moehlman