F

Westlaw.

148 F.3d 379                                                                                    Page 1
148 F.3d 379, 49 Fed. R. Evid. Serv. 1007
**(Cite as: 148 F.3d 379)**

**C**

**Briefs and Other Related Documents**

United States Court of Appeals,
Fourth Circuit.
David R. HAWKINS, Plaintiff-Appellant,
v.
Andrea L. STABLES, Defendant-Appellee.
**No. 97-1684.**

Argued May 6, 1998.
Decided July 1, 1998.

Former husband sued former wife, alleging she had disclosed information obtained during illegal wiretap on his home telephone. The United States District Court for the Eastern District of Virginia, James R. Spencer, J., entered judgment for wife after bench trial. Husband appealed. The Court of Appeals, Williams, J., held that wife could not establish attorney-client privilege as to whether her divorce attorney told her to take illegal wiretap off former husband's home telephone, in light of wife's response to that question during her deposition.

Reversed and remanded.

West Headnotes

**[1] Federal Courts ☜754.1**
170Bk754.1 Most Cited Cases
Appellate court reviews attorney-client privilege determinations by district
courts under a two-fold standard of review; if the district court's ruling rests on findings of fact, appellate court reviews for clear error, but if the district court's decision rests on legal principles, appellate court applies the de novo standard of review.

**[2] Witnesses ☜198(1)**
410k198(1) Most Cited Cases
Attorney-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.

**[3] Witnesses ☜198(1)**
410k198(1) Most Cited Cases

When the attorney-client privilege applies, it affords confidential communications between lawyer and client complete protection from disclosure.

**[4] Witnesses ☜198(1)**
410k198(1) Most Cited Cases
Attorney-client privilege impedes the full and free discovery of the truth, and thus, the privilege is to be narrowly construed, and recognized only to the very limited extent that excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.

**[5] Witnesses ☜198(1)**
410k198(1) Most Cited Cases
Attorney-client privilege applies only if (1) asserted holder of privilege is or sought to become client; (2) person to whom communication was made (a) is member of bar or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) communication relates to fact of which attorney was informed (a) by his client (b) without presence of strangers (c) for purpose of securing primarily either (i) opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for purpose of committing crime or tort; and (4) privilege has been (a) claimed and (b) not waived by client.

**[6] Witnesses ☜222**
410k222 Most Cited Cases
Burden is on the proponent of the attorney-client privilege to demonstrate its applicability.

**[7] Witnesses ☜205**
410k205 Most Cited Cases
Attorney-client privilege does not protect all aspects of the attorney-client relationship, but protects only confidential communications occurring between the lawyer and his client.

**[8] Witnesses ☜219(3)**
410k219(3) Most Cited Cases
Former wife could not establish attorney-client privilege as to whether her divorce attorney told her to take illegal wiretap off former husband's home telephone, as wife responded to that question during her deposition without objecting by stating that she never had discussion of matter with her attorney, which both waived her privilege and provided

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

148 F.3d 379

148 F.3d 379, 49 Fed. R. Evid. Serv. 1007

**(Cite as: 148 F.3d 379)**

Page 2

probative evidence that no privilege existed on subject of phone tap.

**[9] Witnesses** ☞217

410k217 Most Cited Cases

**[9] Witnesses** ☞219(3)

410k219(3) Most Cited Cases

Client is the holder of the attorney-client privilege, and can waive it either expressly or through conduct.

**[10] Witnesses** ☞219(3)

410k219(3) Most Cited Cases

As a general rule, implied waiver occurs when the party claiming the attorney-client privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege, as such a disclosure vitiates the confidentiality that constitutes the essence of the attorney-client privilege.

**[11] Witnesses** ☞219(3)

410k219(3) Most Cited Cases

Disclosure of confidential information to individual not embraced by attorney-client privilege not only waives the privilege as to the specific information revealed, but also waives the privilege as to the subject matter of the disclosure.

**\*380 ARGUED:** Neil Kuchinsky, Colonial Heights, Virginia, for Appellant. Peter Dean Eliades, Hopewell, Virginia, for Appellee.

Before ERVIN, WILKINS, and WILLIAMS, Circuit Judges.

Reversed and remanded by published opinion. Judge WILLIAMS wrote the opinion, in which Judge ERVIN and Judge WILKINS joined.

**\*381 OPINION**

WILLIAMS, Circuit Judge:

David Hawkins appeals the district court's ruling barring Andrea Stables's attorney from testifying on the grounds of attorney-client privilege. He claims that the privilege was impliedly waived when Stables answered a question regarding advice the lawyer had given her during a deposition. We agree that the district court misapplied the law of privilege and must be reversed. The law of attorney-client privilege places the burden of proof on the proponent of the privilege. The district court, however, assumed that the privilege applied and placed the

burden of proof on the opponent of the privilege. Because the proponent, Stables, testified under oath that no confidential communication had occurred, it is impossible for her to meet the burden of proof. We, therefore, reverse the decision of the district court and remand for further proceedings consistent with this opinion.

I.

David Hawkins and Andrea Stables are former spouses. They divorced in February of 1993. Hawkins alleges that in January 1996, Stables began to visit Hawkins's house and converse with Robin Cox, his girlfriend. Hawkins further alleges that during these conversations, Stables revealed to Cox that during a period from May through October 1991, before Hawkins and Stables had separated, she had placed a wire tap on the home telephone and recorded Hawkins's phone conversations. Cox reported that during the conversations she had with Stables, Stables stated that she had gleaned "damaging" information about Hawkins from the phone tap.

II.

As a result of the conversations that occurred between Stables and Cox, Hawkins filed a complaint on December 31, 1996, in the district court under 18 U.S.C.A. § 2520 (West Supp.1998), claiming that Stables had disclosed information obtained during an illegal wiretap and requesting statutory damages of $10,000. [FN1] At a deposition on March 20, 1997, Stables answered many questions, including the following:

> FN1. 18 U.S.C.A. § 2520 states in pertinent part:
> (a) [A]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate.
> (b) [A]ppropriate relief includes--
> (1) such preliminary and other equitable or declaratory relief as may be appropriate;
> (2) damages under subsection (c) and punitive damages in appropriate cases; and
> (3) a reasonable attorney's fee and other litigation costs reasonably incurred.
> (c) Computation of damages.--
> ....
> (2) [T]he court may assess as damages whichever is the greater of--
> (A) the sum of the actual damages suffered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

148 F.3d 379                                                                                                                      Page 3
148 F.3d 379, 49 Fed. R. Evid. Serv. 1007
**(Cite as: 148 F.3d 379)**

by the plaintiff and any profits made by the violator as a result of the violation; or
(B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

Q: Is it true or not that Larry Diehl, in his capacity as your [divorce] attorney, told you to take a wiretap off the phone at the marital residence?
A: No, sir. Because I wouldn't have discussed that with him, since it didn't happen. So, therefore, he would have no need to make mention of that to me.
(J.A. at 119-A5--119-A6.) Although Stables was represented by counsel during the deposition, no objection on the ground of attorney-client privilege was lodged.

The case proceeded to a one-day bench trial which was held on May 19, 1997. During her trial testimony Stables indicated that she considered any conversation she had with her divorce attorney, Diehl, to fall within the attorney-client privilege, and she refused to waive the privilege. Nevertheless, because evidence of the existence of the wiretap on Hawkins's phone was scant, Hawkins called Diehl as a witness because it was possible that Diehl could corroborate the existence of the phone tap. Hawkins's trial counsel asked Diehl whether Stables's trial testimony, reiterating her deposition testimony, had been truthful. Stables's counsel raised an objection to the question, and Diehl refused to answer the question on the ground that **\*382** the attorney-client privilege protected the information from disclosure, and Virginia disciplinary rules regarding revelation of client confidences required that he not divulge that information. In response to the objection and Diehl's refusal to testify, Hawkins's counsel argued that Stables's deposition testimony waived the privilege. The district court, however, ruled that the attorney-client privilege had attached to the communication between Stables and Diehl and that it had not been waived.

After the close of the evidence, the district court issued a Memorandum Opinion addressing Hawkins's claim in which it determined that Hawkins had failed to prove his case by a preponderance of the evidence. More specifically, the district court determined that Cox was a biased witness with a weak memory and that no other evidence had been presented during the course of the trial to buttress Hawkins's contention that any wiretap had existed during his marriage to Stables.

Hawkins filed a timely notice of appeal. On appeal

he asserts that the district court erred when it ruled that Diehl's testimony fell under the protection of the attorney-client privilege. [FN2]

> FN2. Hawkins also asserts three other assignments of error in his brief: (1) that Diehl was ethically bound to notify the district court if Stables had committed perjury; (2) that the district court misconstrued the testimony of David Hawkins, Jr.; and (3) that the district court's opinion is not supported by the evidence. Based upon our disposition of the attorney-client privilege issue, however, we need not address these issues because they may become moot on remand.

III.
A.
[1] We review attorney-client privilege determinations by district courts under a two-fold standard of review. *See Better Gov't Bureau v. McGraw,* 106 F.3d 582, 601 (4th Cir.1997), *cert. denied,* 522 U.S. 1047, 118 S.Ct. 689, 139 L.Ed.2d 635 (1998). If the district court's ruling below rests on findings of fact, we review for clear error. *See id.* If, however, the district court's decision rests on legal principles, we apply the de novo standard of review. *See id.* Here, the district court did not hinge its conclusion on factual findings; therefore, we review the decision de novo.

A proper analysis of privilege questions must begin with a determination of the applicable law. Federal Rule of Evidence 501 addresses that issue:
Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.
Fed.R.Evid. 501; *see also Jaffee v. Redmond,* 518 U.S. 1, 8, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996).

The current matter is a civil case based upon a federal cause of action, 18 U.S.C.A. § 2520 (West

148 F.3d 379
148 F.3d 379, 49 Fed. R. Evid. Serv. 1007
**(Cite as: 148 F.3d 379)**

Page 4

Supp.1998). Therefore, following the mandate of Rule 501, we must apply "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501.

[2][3][4] "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law," *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *see also United States v. Aramony,* 88 F.3d 1369, 1389 (4th Cir.1996), *cert. denied,* 520 U.S. 1239, 117 S.Ct. 1842, 137 L.Ed.2d 1046 (1997), and "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out," *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). The protection of "full and frank" **383 communication between lawyer and client "encourages observance of the law and aids in the administration of justice." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). Therefore, when the privilege applies, it affords confidential communications between lawyer and client complete protection from disclosure. *See United States v. (Under Seal),* 748 F.2d 871, 874 (4th Cir.1984) (stating that attorney-client privilege protects from revelation the substance of confidential client communications), *vacated in part on other grounds,* 757 F.2d 600 (4th Cir.1985). The privilege, however, " 'impedes [the] full and free discovery of the truth.' " *In re Grand Jury Proceedings,* 727 F.2d 1352, 1355 (4th Cir.1984) (alteration in original) (quoting *Weil v. Investment/Indicators, Research & Management,* 647 F.2d 18, 24 (9th Cir.1981)); *see also United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (noting that the privilege stands "in derogation of the search for truth"). Therefore, the attorney-client privilege is to be narrowly construed, *see United States v. Oloyede,* 982 F.2d 133, 141 (4th Cir.1993) (noting narrow construction of privilege); *In re Grand Jury Subpoenas,* 902 F.2d 244, 248 (4th Cir.1990) (same); *In re Grand Jury Proceedings,* 727 F.2d at 1355 (same), and recognized "only to the very limited extent that ... excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth," *Trammel,* 445 U.S. at 50, 100 S.Ct. 906 (internal quotation marks omitted).

[5][6] This Circuit has adopted the "classic test" for determining the existence of attorney-client privilege:

"The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

*United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982) (quoting *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358-59 (D.Mass.1950)). "The burden is on the proponent of the attorney-client privilege to demonstrate its applicability." *Jones,* 696 F.2d at 1072.

### B.

After reviewing the record of the bench trial that occurred in this matter, it is obvious that the requisite elements of the attorney-client privilege were not fully examined by the district court or by counsel. The district court assumed from opening arguments onward that any conversation that had occurred between Diehl and Stables regarding a phone tap was privileged. The district court interrupted Hawkins's counsel during his opening statement and said, "[Y]ou have got a problem ... if the discussion ... of the wiretapping took place with the lawyer and he said take it off the line, that would remain privileged." (J.A. at 22-23.) Later, when Diehl had taken the stand to give testimony, the district court stated, "[t]he issue before us is whether or not there is any reason for the Court to pierce this privilege that exists and has not been waived." (J.A. at 66.) Hawkins's counsel, too, assumed that the privilege applied, and argued in response to the objections at trial only that the privilege had been waived.

The district court misplaced the burden in this case. The burden of proving that a communication falls under the attorney-client privilege rests on the proponent of the privilege. *See Jones,* 696 F.2d at 1072. Here, rather than requiring Stables to prove the elements of the attorney-client privilege, the district court assumed that it applied, and placed the burden on Hawkins to disprove its applicability. This realignment of the burden of proof not only harmed Hawkins's case below, but it also harms Stables's case on appellate review.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

148 F.3d 379                                                                                    Page 5
148 F.3d 379, 49 Fed. R. Evid. Serv. 1007
(Cite as: 148 F.3d 379)

[7] As is clear from Circuit precedent, the attorney-client privilege does not protect *384 all aspects of the attorney-client relationship, it protects only confidential communications occurring between the lawyer and his client. For the privilege to apply, "the communication claimed to be privileged must have been made in confidence." 26 Charles Alan Wright & Kenneth W. Graham, Jr., _Federal Practice and Procedure § 5722 at 514-15_ (1992) (internal quotation marks omitted).

Although there is generalized evidence contained in the record that Stables communicated with Diehl regarding her divorce, there was no specific evidence presented that they ever had a conversation, much less a confidential communication, regarding a possible wiretap. Indeed, if Stables's deposition and trial testimony are credited, there is evidence on the record that no communication on this subject ever occurred.

[8][9][10][11] Although the question asked during the deposition clearly elicited information regarding confidential communications Stables may have had with Diehl, and was objectionable on its face on the ground of attorney-client privilege, neither Stables nor her attorney asserted an objection. In response to the question, Stables simply stated that she never had a discussion of the matter with her attorney. By answering the question as she did, Stables both waived her privilege and provided probative evidence that she had had no conversation with her attorney on the subject of a phone tap. [FN3] Without a communication, there is nothing to which the privilege can attach. Based on her own testimony, Stables cannot meet her burden of proof. [FN4]

FN3. Stables never claimed during trial that the failure to raise an objection was an error, or that her deposition testimony was incorrect. Instead, she reiterated that no communication on that subject had occurred. Stables asserted the attorney-client privilege only to the extent that it would prevent Diehl from testifying.

FN4. Proof of the attorney-client privilege requires that the proponent make a showing on multiple issues. Even if Stables could produce sufficient evidence to convince the district court on remand that she and Diehl had a confidential conversation regarding a phone tap, the attorney-client privilege would not apply because her testimony

during deposition and trial waived it. The client is the holder of the attorney-client privilege, _see In re Grand Jury Proceedings, 727 F.2d 1352, 1355-56 (4th Cir.1984)_ (noting that the client must claim the privilege), and can waive it either expressly, or through conduct, _see_ Richard L. Marcus, _The Perils of Privilege: Waiver and the Litigator,_ 84 Mich. L.Rev. 1605, 1615-1626 (1986). The latter type of waiver is referred to as "implied waiver." _See generally,_ 26 Charles Alan Wright & Kenneth W. Graham, Jr., _Federal Practice and Procedure § 5722_ (1992). As a general rule, implied waiver occurs when the party claiming the privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege. _See Sheet Metal Workers Int'l Assoc. v. Sweeney, 29 F.3d 120, 125 (4th Cir.1994)_ (noting that any voluntary disclosure to a third party waives the privilege); _United States v. Oloyede, 982 F.2d 133, 141 (4th Cir.1993)_ (same); _In re Martin Marietta Corp., 856 F.2d 619, 623 (4th Cir.1988)_ (same); _In re Grand Jury Proceedings, 727 F.2d at 1357_ (same); _United States v. Jones, 696 F.2d 1069, 1072 (4th Cir.1982)_ (same). Such a disclosure vitiates the confidentiality that constitutes the essence of the attorney-client privilege. _See_ Wright & Graham, _supra_ at § 5722. Furthermore, such a disclosure not only waives the privilege as to the specific information revealed, but also waives the privilege as to the subject matter of the disclosure. _See Sheet Metal Workers Int'l Assoc., 29 F.3d at 125; Oloyede, 982 F.2d at 141; In re Martin Marietta Corp., 856 F.2d at 623; In re Grand Jury Proceedings, 727 F.2d at 1357; Jones, 696 F.2d at 1072._ Therefore, under our precedents, Stables waived the privilege as to the subject matter of the phone tap. Because the privilege had been impliedly waived by Stables, Hawkins was entitled to question Diehl regarding the alleged wiretap. _See, e.g., In re Martin Marietta, 856 F.2d at 623._

Subject matter waiver is limited to "other communications relating to the same subject matter." _Jones, 696 F.2d at 1072._ In this case, the subject matter revealed related to the wiretap. Thus, on remand Diehl's testimony should be limited to the wiretapping issue. Stables's subject matter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

148 F.3d 379
148 F.3d 379, 49 Fed. R. Evid. Serv. 1007
**(Cite as: 148 F.3d 379)**

Page 6

> waiver does not open up the possibility of a fishing expedition of all confidential communications that she had with Diehl during the course of the divorce representation.

IV.

Because we conclude that the district court committed prejudicial error when it disallowed Diehl's testimony on the subject of the alleged phone tap, we reverse the judgment of the district court and remand this case for further proceedings consistent with this opinion.

*REVERSED AND REMANDED.*

148 F.3d 379, 49 Fed. R. Evid. Serv. 1007

**Briefs and Other Related Documents (Back to top)**

• 1997 WL 33492428 (Appellate Brief) Brief of Appellee (Nov. 19, 1997)

• 1997 WL 33492427 (Appellate Brief) Brief of Appellant (Sep. 22, 1997)

• 97-1684 (Docket) (May. 28, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

G

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
**(Cite as: 2000 WL 1466495 (D.Kan.))**

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Kansas.
IMC CHEMICALS, INC., f/k/a North American
Chemical Company, Plaintiff,
v.
NIRO INC., Defendant and Third-Party Plaintiff,
v.
DEC INTERNATIONAL, INC., Third-Party
Defendant.
**No. CIV.A. 98-2348-JTM.**

July 19, 2000.

MEMORANDUM AND ORDER

WAXSE.

*1 Before the Court is Niro Inc's (Niro) Motion to Compel Discovery (doc. 83). Pursuant to Fed.R.Civ.P. 37(a), defendant seeks an order to compel plaintiff IMC Chemicals, Inc. (IMC) to produce two documents identified at Glenn Whitmire's (Whitmire) deposition and any other documents currently withheld from discovery on grounds of attorney-client privilege that relate to plaintiff's interpretation or understanding of the contract at issue in this case. It further seeks an order to compel counsel for plaintiff, Bruce Campbell (Campbell), to fully answer deposition questions relating to his communications with plaintiff concerning the negotiation and consummation of the contract. Plaintiff opposes the motion.

On February 8, 2000, the Court conducted a scheduling conference in this case. Plaintiff IMC appeared through counsel Floyd R. Finch and Chris Gramling. Defendant and third-party plaintiff Niro appeared through counsel James K. Logan, Jefferson V. Wright, and E. Hutchinson Robbins. Third-party defendant DEC International, Inc. (DEC) appeared through counsel David Easton and Spencer J. Brown. Due to unusual circumstances, the Court addressed the necessity for further briefing on the motion. The parties "agreed to inform the Court in writing by February 25, 2000, whether it should make its ruling

upon the motion [ ] from the current briefing or whether the parties desire to supplement the briefing." (Second Revised Scheduling Order ¶ c, doc. 169.) Niro has specifically indicated that the current briefing is adequate. (Letter from Wright to Judge Waxse of 2/25/00.) No other party provided further information. The Court will thus rule on the motion on the current briefing, except that it will assume that plaintiff has no intention to call Campbell to testify at trial. That assumption is consistent with statements made at the scheduling conference. Furthermore, Niro stated in its letter to the Court that "IMC has indicated that it no longer intends to call" Campbell as a witness. (*Id.*)

Plaintiff refuses to produce two documents identified at the deposition of Whitmire and other documents on grounds of attorney-client privilege. It also refuses to allow Campbell to answer deposition questions it views as encroaching upon privileged communications. Defendant contends plaintiff has waived the privilege in each instance. The parties appear to agree that, in the absence of waiver, the attorney-client privilege would protect against disclosure. Defendant suggests that plaintiff has waived the privilege because: (1) plaintiff has placed its and its attorneys' interpretation of the contract at issue; (2) Campbell testified as to privileged matters; and (3) Whitmire, a former employee of plaintiff, produced privileged documents. Plaintiff denies waiver of the privilege. Accordingly, the Court will undertake the fact-intensive inquiry necessary to determine whether plaintiff has waived the privilege.

1. Relevant Factual Background

1. General Facts

*2 Diversity of citizenship provides the sole basis for subject matter jurisdiction over this case. (Third Am. Compl. ¶ 4, doc. 192.) Plaintiff is a Delaware corporation that manufactures soda ash and boron products. (*Id.* ¶ 1.) Until May 1, 1998, Plaintiff was known as North American Chemical Company (NACC). (*Id.*) Its principal place of business is either Trona, California or Overland Park, Kansas. (*Compare id. with* Answer of Niro to Third Am. Compl. ¶ 1, doc. 67, [hereinafter Answer to Third Am. Compl.].) Defendant is a Maryland corporation with its principal place of business in Columbia, Maryland. (Third Am. Compl. ¶ 2.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
**(Cite as: 2000 WL 1466495 (D.Kan.))**

Plaintiff asserts claims for breach of contract, fraudulent inducement to contract, reckless misrepresentation, and professional negligence. (*Id.* ¶¶ 157-87.) The claims arise out of an agreement between the parties signed April 2, 1993. (*Id.* ¶¶ 37-38, 43.) Plaintiff alleges the agreement was "for the design, engineering, and fabrication of fluid bed drying systems." (*Id.* ¶ 7; *see also* ¶ 53.) It further alleges that the agreement "is ambiguous and requires extrinsic proof to determine its meaning." (*Id.* ¶ 174.) Defendant admits that it and Plaintiff entered into an agreement on April 2, 1993, and contends that the agreement obligated plaintiff "to purchase a series of ten dryers in six phases, or pay Niro an agreed-upon cancellation charge ." (Answer to Third Am. Compl ¶ 24.) It further contends that the agreement speaks for itself. (*Id.* ¶ 37.)

1. Facts Relating to Deposition of Bruce Campbell

Plaintiff identified one of its attorneys, Bruce Campbell, as a potential fact witness with respect to the relevant contract. Defendant subsequently noticed his deposition for February 15, 1999 (*see* Notice to Take Dep., doc. 63), and deposed him on that date (Dep. of Campbell *passim,* attached as Ex. D to Mem. Opp'n to Mot. Compel, doc. 86, [hereinafter Mem. Opp'n] ). Plaintiff filed no motion to prohibit or otherwise limit the deposition. The record reflects no agreement or stipulation between the parties limiting the deposition. Floyd Finch represented the interests of plaintiff at the deposition. Throughout the deposition, he objected to perceived attempts to invade the attorney-client privilege. (*See* Ex. E, attached to Mem. Opp'n (listing thirty-two assertions of the privilege appearing between pages 13 and 145 of the deposition transcript).) The following discussion took place early in the deposition:

Defense Now, prior to your deposition, we had a brief discussion about why you counsel: are here today. But we might as well put that on the record. What is your understanding of why Mr. Finch and NACC designated you as a fact witness in this case?

Campbell: I guess--first of all, I didn't know Mr. Finch proposed me as a witness.

Finch: Well, I told these lawyers that I anticipated that you would be a witness on the subject matter of the contract.

*3 Campbell: Okay.

Finch: Specifically, as you were here earlier and heard with regard to Section VII of the contract, tell him your understanding of why you're here.

Campbell: I guess I assumed that--I guess I am

here because of having had involvement in the drafting of this, even though my firm did not draft the contract. It was really drafted by Niro. We made comments to it, however, some of which were accepted. And that's why, at least to my understanding, I guess that's why I would be here, and just to explain, you know, how some of the changes that occurred in the various drafts came about.

(Dep. of Campbell at 19-20.) Mr. Finch later specifically noted that he anticipated Campbell would only testify about "the language of the contract and particularly a paragraph." (*Id.* at 55.) As previously indicated, plaintiff has now decided not to call Campbell to testify at trial.

During his deposition, Campbell acknowledged that he made changes to the contract proposed and drafted by Niro. (*Id.* at 20.) When asked about plaintiff's intent "with respect to the purchase plan as a whole," Mr. Finch objected on grounds of attorney-client privilege and Campbell stated that "everything [he] knew about the project came from the client." (*Id.* at 50.) Campbell provided no further answer to the inquiry. (*Id.* ) He later testified that his client "asked ... [him to] read the contract and make comments." (*Id.* at 79.)

Campbell testified that "the single biggest point" of his proposed changes "is in Section VII" of the contract. (*Id.* at 87-88.) With respect to that Section, he testified that "we wanted to add language that put some sort of a performance guarantee in here ... we wanted to make sure that we got a warranty ... that would cover us in the event anything would go wrong. And in fact, I can specifically recall proposing this language that's here." (*Id.* at 88.) He testified that he suggested to his client that Section VII contain the following sentence: "And all equipment delivered hereunder shall be in conformance with the technical description that follow." (*Id.* at 92-93.) Before an assertion of the attorney-client privilege, he testified that he suggested the sentence, because he was concerned "that the terms and conditions in the microprint [FN1] page ... were typically very vender [sic] friendly and the thing that Glenn and--." (*Id.* at 93.) After the objection, he testified that he was trying to make sure we incorporated some sort of performance guarantee, warranty, whatever term you want to use, that would tie in all of the technical specifications to the agreement, and to the extent anything was inconsistent without trying to go through the microprint and renegotiate every line in there, this was sort of an override clause, if you will, that was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

Page 3

proposed and accepted by Niro apparently.

> FN1. The term "microprint" is Campbell's shorthand for an attachment to the contract entitled, "General Terms and Conditions."

(*Id.*)

Campbell also testified that it was his "understanding ... that the technical aspects" of the contract "were okay with my client." (*Id.* at 94.) He proposed a performance guarantee to make those technical aspects controlling. (*Id.*) In response to an inquiry asking about the length of such guarantee, he testified:

*4 My intent was as follows: In the microprint, as I recall, there was a one-year warranty. That was unacceptable. So essentially my intent was, as long as legally possible, which, you know, as a corporate or contract guy, I would say would be probably as long as whatever the expected life-span of the machine would be. I wouldn't go so far as to say perpetual, but certainly as long as the machines were supposed to operate.

(*Id.* at 96-97.) When asked to be more specific, he testified that he expected the guarantee would cover twenty years. (*Id.* at 97.)

Campbell further testified that he "proposed" the following language in discussions with his client: "In the event of a conflict between the terms and conditions." (*Id.* at 97.) He intended this language to be "an override ... just to say that if there was any conflict this, which was what I would call the specifically negotiated part of the agreement, would govern over whatever might be in the boilerplate." (*Id.* at 98.) The "idea" was to write a "performance guarantee and a 20-year service life into th[e] contract." (*Id.* at 98-99.)

With respect to Paragraph V of the microprint, he testified that he personally intended that the language he added to Section VII would obviate anything in the microprint "that would be inconsistent ... with what we wrote in specifically with the override." (*Id.* at 105-06.) He also testified to the following: "[T]he intent was to override" the twelve month warranty of Paragraph V. (*Id.* at 106.) Paragraph V would not apply "to the extent any piece of equipment didn't comply with the technical description in the contract." (*Id.* at 106-07.) "[T]he service life of the equipment" was "of importance to [his] client." (*Id.* at 117.) He did not propose specific language relating to the service life of the equipment, because "[t]he intention was that the machines would survive for a,

whatever their normal life-span would be, and they would be free from defects and they'd be consistent with these specifications." (*Id.* at 117-18.) The language he added to Section VII would "appear to" obviate the second to last sentence of Paragraph V of the microprint. (*Id.* at 120.) It would also obviate Paragraph VI of the microprint relating to "Damages", because "the intent in putting the specific language we did was to override anything like this." (*Id.* at 123-24.)

During cross-examination by counsel for third-party defendant DEC, Campbell reiterated that his intent with respect to the language added to Section VII was to "override anything to the contrary in the microprint contract." (*Id.* at 152-53.) He stated: "We put in some very broad language ... to provide the warranty that my client wanted." (*Id.* at 157.)

1. Facts Relating to Production of Documents by Glenn Whitmire

Glenn Whitmire left the full-time employ of plaintiff on December 31, 1993. During 1994 plaintiff retained him as a consultant. He signed a consultant agreement that provided:

*5 You recognize that all records and copies of records relating to our operations, investigations and business made or received by you during the period of this AGREEMENT are and shall be our property exclusively, and you shall keep the same at all times in your custody and subject to your control, and shall surrender the same at the termination of this AGREEMENT if not before.

(Agreement Between Harris Chem. Group, Inc. & Whitmire, ¶ 8 [hereinafter Consultation Agreement], attached as Ex. A to Mem. Opp'n.) The Consultation Agreement became effective December 11, 1993, and, in the absence of an early termination or extension, was to continue in effect through December 31, 1994. (*See id.* ¶ 13 .) The record reflects no early termination or extension. Plaintiff is a subsidiary of Harris Chemical Group, Inc., the entity with which Whitmire entered into the Consultation Agreement. (*See* Letter from Hassan to Whitmire of 12/5/97, attached as part of Ex. B to Mem. Opp'n.)

Upon ending his employment with plaintiff, Whitmire retained several documents belonging to plaintiff. During the course of other litigation in late 1997, plaintiff learned of such retention and demanded their return. (*Id.*) Plaintiff received no reply to its demand. (Letter from Hassan to Whitmire of 12/19/97, attached as part of Ex. B to Mem.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

Opp'n.) Plaintiff thus gave Whitmire until December 23, 1997, to reply. (*Id.*) Whitmire advised Plaintiff that his attorney would reply shortly. (Fax from Whitmire to Hassan of 12/23/97, attached as part of Ex. B to Mem. Opp'n.)

On January 7, 1998, counsel for Whitmire informed plaintiff that Whitmire had retained no documents in contravention of the Consultation Agreement, but he would return the documents he did retain at the conclusion of then pending litigation. (Letter from Andreesen to Hassan of 1/7/98, attached as part of Ex. B to Mem. Opp'n.) On January 22, 1998, plaintiff again demanded return of its documents. (Letter from Hassan to Andreesen of 1/22/98, attached as part of Ex. B to Mem. Opp'n.) As of February 9, 1998, plaintiff had received no response to the letter of January 22. (Letter from Hassan to Andreesen of 2/9/98, attached as part of Ex. B to Mem. Opp'n.) From the materials submitted to the Court, it appears nothing further happened with regard to reacquiring the documents retained by Whitmire, until he produced two of them at his deposition.

On February 8, 1999, defendant noticed Whitmire's deposition. (Notice to Take Dep. & Subpoena Duces Tecum, doc. 62.) A subpoena commanded Whitmire to appear for deposition and produce documents. (Subpoena in a Civil Case, attached to *id.*) During his deposition, he produced two documents to which plaintiff's counsel promptly objected on the basis of attorney-client privilege and which plaintiff's counsel withdrew from discovery. Whitmire testified in his deposition about how he came to have the documents in his possession:

> When I moved to Somerset, PA, at the end of September, it was like early October when I got there, I got a call from my former secretary saying that they [plaintiff] needed the office and they [plaintiff] had gathered up all the papers and didn't know what to do with them and she said she was sending them to me.

*6 (Dep. of Whitmire, at 54, attached as Ex. C to Mot. Compel; *see also,* Dep. of Whitmire, at 66.) He also testified that when the shipment occurred he was still an employee of Harris Chemical Group. (*Id.* at 55.) He testified that he moved to Pennsylvania in the fourth quarter of 1993. (Dep. of Whitmire, at 10-11, attached as Ex. B to Reply Mem. Supp. Mot. Compel, doc. 93.)

1. Attorney-Client Privilege

The attorney-client privilege "has become one of the most complex and therefore, litigated privileges."

Paul R. Rice, *Attorney-Client Privilege: Continuing Confusion About Attorney Communications, Drafts, Pre-Existing Documents, and the Source of the Facts Communicated,* 48 Am.U.L.Rev. 967, 968 (June 1999). In federal court, Fed.R.Evid. 501 governs the determination of what is privileged. *ERA Franchise Sys., Inc. v. Northern Ins. Co.,* 183 F.R.D. 276, 278 (D.Kan.1998). The Rule provides as follows:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed.R.Evid. 501.

In cases in which diversity of citizenship provides the basis for federal jurisdiction, "state law supplies the rule of decision on privilege" by operation of Fed.R.Evid. 501. *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.,* 136 F.3d 695, 699 (10th Cir.1998). When "state law provides the rule of decision, state privilege law will apply." *Hinsdale v. City of Liberal,* 961 F.Supp. 1490, 1493 (D.Kan.) (Reid, Mag. J.), *aff'd,* 981 F.Supp. 1378 (D.Kan.1997). To determine which state's substantive law of privilege applies, the Court engages in a choice-of-law analysis and employs the choice-of-law principles of the forum state. *Tartaglia v. Paul Revere Life Ins. Co.,* 948 F.Supp. 325, 326 (S.D.N.Y.1996).

A. Choice of Law

Plaintiff does not suggest the applicability of any particular state law in its motion and supporting briefs. Other than two state cases--one from North Carolina and one from New York--plaintiff relies upon federal cases from various jurisdictions. In response to the motion, defendant suggests the applicability of Kansas law, citing one case and one statute from Kansas. It also cites numerous federal cases from various other jurisdictions. In its briefing on the present motion, plaintiff neither expressly contests nor embraces the applicability of Kansas law. The pleadings and other papers filed in this case, however, indicate the potential applicability of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

Page 5

laws of two other states. In its Third Amended Complaint plaintiff alleges that California law provides the rule of decision. (Third Am. Compl. ¶ 6.) Defendant denies that allegation in its amended answer, but suggests no alternate governing state law. (Answer to Third Am. Compl. ¶ 6.) In addition, a choice-of-law provision within the contract at issue designates the laws of Maryland as applicable to the contract dispute. (*See* General Terms & Conditions, attached as part of Ex. A to Mem.Supp.Mot. Compel [hereinafter Mem.Supp.] attached to Mot.Compel, doc. 83; *see also,* Dep. of Campbell at 104-05, 125-26.)

*7 Viewing these matters collectively, an apparent dispute exists as to the controlling law. Despite that appearance, the Court finds no need to further address the matter. The parties do not raise a conflicts of law question in their briefs. Defendant, furthermore, specifically suggests the applicability of Kansas law. Plaintiff makes no attempt to contest its applicability. Although both parties mostly cite federal cases, this Court has noted a general lack of conflict between the federal law of attorney-client privilege and that of Kansas. *See ERA Franchise Sys., Inc. v. Northern Ins. Co.,* 183 F.R.D. 276, 278 n. 1 (D.Kan.1998); *Hiskett v. Wal-Mart Stores, Inc.,* 180 F.R.D. 403, 405 (D.Kan.1998); *Marten v. Yellow Freight Sys., Inc.,* No. Civ.A. 96-2013- GTV, 1998 WL 13244, at *4-6 (D.Kan. Jan. 6, 1998). The Supreme Court of Kansas, furthermore, has cited *ERA Franchise* with approval, including that portion which indicates a lack of conflict between federal and Kansas law. *See Cypress Media, Inc. v. City of Overland Park,* 268 Kan. 407, 423, 997 P.2d. 681, 692 (2000). In addition, this Court does not view the citation of two state cases by plaintiff to suggest the applicability of the laws of North Carolina or New York to this dispute about privilege. Nothing indicates that the laws of those states have any direct applicability here.

"Where the parties fail to raise the issue of choice of law, the Court need not raise the issue *sua sponte,* and the parties are deemed to have acquiesced in the application of the law of the forum ." *Keles v. Yale Univ.,* 889 F.Supp. 729, 733 (S.D.N.Y.1995), aff'd, 101 F.3d 108 (2d Cir1996); *see also, GBJ Corp. v. Eastern Ohio Paving Co.,* 139 F.3d 1080, 1085 (6th Cir.1998) (holding that the court "need not address choice of law questions *sua sponte* "). Courts are not obliged to investigate whether a conflict of law issue exists, when the parties present no conflict between the laws of potentially interested states. In Kansas, moreover, "[t]he general rule is that the law of the

forum applies unless it is expressly shown that a different law governs, and in case of doubt, the law of the forum is preferred." *Shutts v. Phillips Petroleum Co.,* 235 Kan. 195, 221, 679 P.2d 1159, 1181 (1984), rev'd in part on other grounds, 472 U.S. 797 (1985); *Grimmett v. Burke,* 21 Kan.App.2d 638, 652, 906 P.2d 156, 166 (1995); *Gray v. Amoco Prod. Co.,* 1 Kan.App.2d 338, 341, 564 P.2d 579, 583 (1977), rev'd in part on other grounds, 223 Kan. 441, 573 P.2d 1080 (1978); *see also, Koch v. Koch Indus., Inc.,* 2 F.Supp.2d 1416, 1420 n. 3 (D.Kan.1998) (quoting *Gray,* 1 Kan.App.2d 338, 564 P.2d 579). Consequently, the Court will apply the substantive law of Kansas to determine the scope and applicability of the attorney-client privilege in this case. In view of the general lack of conflict between federal and Kansas law of attorney-client privilege, the Court will at times utilize federal case law when it appears consistent with the Kansas law of privilege.

B. Kansas Law of Attorney Client Privilege

*8 K.S.A. 60-426(a) sets forth the general rule of Kansas regarding the attorney-client privilege: "Subject to K.S.A. 60-437, and except as otherwise provided by subsection (b) of this section communications found by the judge to have been between lawyer and his or her client in the course of that relationship and in professional confidence, are privileged...." Subsection (b) sets forth five exceptions to the general rule--all of which are inapplicable here. Subsection (c) defines client, communication, and lawyer. K.S.A. 60-437 deals with waiver of the privilege by contract or disclosure.

"The lawyer-client privilege protects confidential communications, that is, communications between a lawyer and his client made in professional confidence. That is the essence of K.S.A. 60-426(a)." *State v. Breazeale,* 11 Kan.App.2d 103, 105, 713 P.2d 973, 975 (1986). Although the courts of Kansas have at times stated "that the attorney-client privilege attaches to communications related to the giving or receiving of legal advice," such statements add no "element to the statutory definition but rather ... aid in its interpretation and explanation." *Cypress Media, Inc. v. City of Overland Park,* 268 Kan. 407, 421, 997 P.2d. 681, 690 (2000).

*State v. Maxwell,* 10 Kan.App.2d 62, 691 P.2d 1316 (1984) accurately summarizes the manner in which Kansas courts consider the attorney-client privilege. *See Cypress,* 268 Kan. at 418, 997 P.2d. at 689 (citing *Maxwell* with approval). *Maxwell* summarizes the general rule regarding the privilege as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

(1) Where legal advice is sought (2) from a professional legal advisor in his capacity as such, (3) communications made in the course of that relationship (4) made in confidence (5) by the client (6) are permanently protected (7) from disclosures by the client, the legal advisor, or any other witness (8) unless the privilege is waived.

10 Kan.App.2d at 63, 691 P.2d at 1319 (citing 8 John Henry Wigmore, *Wigmore on Evidence* § 2292 (McNaughton rev.1961)).

Courts should read the summary espoused in *Wigmore,* however, in conjunction with the "modern" view of privilege expressed in *McCormick on Evidence:*

At the present time it seems most realistic to portray the attorney-client privilege as supported in part by its traditional utilitarian justification, and in part by the integral role it is perceived to play in the adversary system itself. Our system of litigation casts the lawyer in the role of fighter for the party whom he represents. A strong tradition of loyalty attaches to the relationship of attorney and client, and this tradition would be outraged by routine examination of the lawyer as to the client's confidential disclosures regarding professional business.

1 Kenneth S. Broun, et al., *McCormick on Evidence* § 87 (John W. Strong Gen. Ed., 5th ed.1999) (cited with approval in *Cypress,* 268 Kan. at 418, 997 P.2d at 689).

The focal point of the protection afforded by the attorney-client privilege lies with "communications" between attorneys and their clients. Although it protects disclosure of such communications, "it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn Co. v. United States,* 449 U.S. 383, 395-96 (1981).

*9 [T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, "What did you say or write to the attorney?" but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Id.* (quoting *Philadelphia v. Westinghouse Electric Corp.,* 205 F.Supp. 830, 831 (E.D.Pa.1962)). The privilege "does not protect disclosure of underlying facts other than the substantive content of communications." *Mike v. Dymon, Inc.,* No. Civ.A. 95-2405-EEO, 1996 WL 674007, at *11 (D.Kan. Nov. 14, 1996).

The term " 'communication' includes advice given by the lawyer in the course of representing the client and includes disclosures of the client to a representative, associate or employee of the lawyer incidental to the professional relationship." K.S.A. 60-426(c)(2). This "means a statement transmitting information between a lawyer and his [or her] client." *State v. Breazeale,* 11 Kan.App.2d 103, 105, 713 P.2d 973, 975 (1986) (citing *State v. Newman,* 235 Kan. 29, 40, 680 P.2d 257, 265 (1984)). The definition of communication is not limited to the examples set forth in the statute. *Id.* at 105, 713 P.2d at 974-75. To limit it to the listed examples "would exclude, *inter alia,* communications from client to lawyer ... a result which could not have been intended ." *Cypress,* 268 Kan. at 419, 997 P.2d at 690.

"The facts under which the attorney-client privilege may be claimed will necessarily differ in most cases, so any attempt to adopt a bright-line rule [as to its applicability] is inadvisable." *Id.* at 421, 997 P.2d at 690. Several well-settled principles, nevertheless, exist to guide courts in determining whether the privilege applies in a particular context.

In the confines of an attorney-client relationship, the privilege protects confidential communications by a client to obtain legal advice. *State v. Maxwell,* 10 Kan.App.2d 62, 63, 691 P.2d 1316, 1319 (1984). It also protects "any communication from an attorney to his client made in the course of giving legal advice ... without the qualification that the communications must contain confidential matters revealed by the client earlier to the attorney." *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1370-71 (10th Cir.1997) (applying federal and Kansas law). "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States,* 449 U.S. 383, 390 (1981). In short, the privilege protects confidential communications made between clients and their attorneys in order to obtain legal assistance from the attorney in his or her capacity as a legal advisor. The privilege does not apply, however, "to every interaction between attorney and client." *Cypress,* 268 Kan. at 421, 997 P.2d at 690. Nor does it "unqualifiedly ... exist[ ] only where advice is given or received." *Id.* "Not every communication between an attorney and client is privileged, only confidential communications which involve the requesting or giving of legal advice." *Burton v. R.J. Reynolds Tobacco Co.,* 175 F.R.D. 321, 327 (D.Kan.1997) (citing *Fisher v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

Page 7

*United States,* 425 U.S. 391, 403 (1976); *United States v. Olano,* 62 F.3d 1180 (9th Cir.1995)). There must be a connection between "the subject of the communication and the rendering of legal advice" for the attorney-client privilege to shield the communication from disclosure. *Id.* at 327-28.

*10 Courts should strictly confine the privilege "within the narrowest possible limits consistent with the logic of its principle ." *Cypress,* 268 Kan. at 418, 997 P.2d. at 689 (citation and internal quotation marks omitted). Narrow construction does not mean, however, that courts "narrow it, contrary to the weight of the existing body of caselaw." *Swidler & Berlin v. United States,* 524 U.S. 399, 410 (1998). The privilege "is so sacred and compellingly important that the courts must, within their limits, guard it jealously." *Cypress,* 268 Kan. at 418, 997 P.2d at 689 (quoting *Klitzman, Klitzman & Gallagher v. Krut,* 744 F.2d 955, 960 (3d Cir.1984)). It, nevertheless, "applies only where necessary to achieve its purpose. Accordingly, it protects only those disclosures--necessary to obtain informed legal advice--which might not have been made absent the privilege." *Id .* at 418, 997 P.2d at 689 (quoting *Fisher v. United States,* 425 U.S. 391, 403 (1976)). The privilege also serves to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Jaffee v. Redmond,* 518 U.S. 1, 11 (1996) (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981)).

The attorney-client privilege, furthermore, provides no protection for communications for which it has been waived. "It has long been the law that a client may waive protection of the [attorney-client] privilege, either expressly or impliedly." *United States v. Stewart,* 51 F.Supp.2d 1147,1151 n. 3 (D.Kan.1999). With respect to a corporation, such as plaintiff, "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348-49 (1985). A mere employee of a corporation "cannot waive the corporation's privilege." *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1371 (10th Cir.1997) (quoting *United States v. Chen,* 99 F.3d 1495, 1502 (9th Cir.1996)). "Only the *client* can waive the privilege." *State v. Maxwell,* 10 Kan.App.2d 62, 64, 691 P.2d 1316, 1320 (1984).

In *ERA Franchise Systems, Inc. v. Northern Ins. Co.*

*of New York,* 183 F.R.D. 276 (D.Kan.1998), this Court explained the burden of establishing the attorney-client privilege:

> Parties objecting to discovery on the basis of the attorney-client privilege bear the burden of establishing that it applies. They must make a "clear showing" that the asserted objection applies. To carry the burden, they must describe in detail the documents or information to be protected and provide precise reasons for the objection to discovery. They must provide sufficient information to enable the court to determine whether each element of the asserted privilege is satisfied. A claim of privilege fails upon a failure of proof as to any element. A "blanket claim" as to the applicability of a privilege does not satisfy the burden of proof.

*11 183 F.R.D. at 278-79 (citations omitted). The Supreme Court of Kansas has adopted this language as its position regarding the burden to establish the privilege. See *Cypress,* 268 Kan. at 425-26, 997 P.2d. at 693 (quoting the above paragraph with citations).

As the party resisting discovery, plaintiff has the burden to support its objections. With respect to an objection of attorney-client privilege, that burden includes showing that it has not waived the privilege. *See Johnson v. Gmeinder,* 191 F.R.D. 638, 642 (D.Kan.2000) (holding that the absence of waiver is "one of the eight essential elements that must be established under Kansas law").

1. Waiver of Privilege by Testimony of Campbell (Selective Disclosure)

Plaintiff argues that the testimony provided by Campbell did not waive its privilege because he did not disclose the content of any privileged communication. It claims he merely testified as to "an historical fact--that he drafted language in the contract" and that fact was already known to defendant. It argues that such testimony reveals no confidential communications between it and Campbell. Citing *United States v. Buljubasic,* 808 F.2d 1260 (7th Cir.1987), it suggests that a party does not waive its attorney-client privilege by stating facts that outsiders already know or could deduce. Defendant knew that counsel for plaintiff had "advised" Whitmire to make changes to the contract. (*See* Dep. of Shaw at 200, attached as Ex. F to Mem. Opp'n.)

For the testimony of Campbell to constitute a waiver of the attorney-client privilege, it had to have disclosed the substance of privileged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

communications. See *Aquinaga v. John Morrell & Co.,* 112 F.R.D. 671, 683 (D.Kan.1986) (applying Kansas law). "[I]f only unprivileged information is revealed there cannot be a waiver." *Cypress Media, Inc. v. City of Overland Park,* 268 Kan. 407, 424, 997 P.2d. 681, 692-93 (2000). The privilege, furthermore, does not permit clients to withhold the underlying facts they communicated to their attorney. *Upjohn Co. v. United States,* 449 U.S. 383, 396 (1981). It protects only the underlying communications. *Id.* The fact that a party had communications with its attorney is not privileged. *Burton v. R.J. Reynolds Tobacco Co.,* 177 F.R.D. 491, 499 (D.Kan.1997) (applying Kansas law of privilege). Revelation of the "general topic of discussion" between attorney and client, furthermore, does not waive the privilege, unless such revelation also reveals the substance of a protected communication. *Id.* In addition, the privilege does not protect "the activities of an attorney" as they are not communications. *Id.*

The Court agrees with the principle enunciated in *Buljubasic* that "[a] client does not waive the privilege by stating *facts* that outsiders already know or could deduce. Only revelation of portions of communications that are private between attorney and client waives the privilege concerning the residue of the communication." 808 F.2d at 1268 (emphasis added). In this instance, however, the attorney deponent divulged specific privileged communications between himself and his client. (*See* Dep. of Campbell at 88, 92-93, 97.) He revealed more than the mere fact that communications took place and more than general topics of discussion. Certainly, his testimony revealed much more than his activities as attorney for plaintiff.

*12 Campbell testified that he "proposed" certain language be added to the contract here at issue. That of itself might not divulge privileged communications. Campbell, however, disclosed more than the mere fact that he proposed unspecified language—he divulged the specific language he proposed to his client. By doing so, he revealed privileged communications. Testimony that reveals the specific nature of the services provided or the specific legal advice given to the client falls within the scope of the privilege. *See In re Indep. Serv. Orgs. Antitrust Litig.,* No. Civ.A. MDL-1021, 1999 WL 450906, at *3 (D.Kan. May 24, 1999) (holding the same with respect to disclosed documents). In addition, Campbell revealed more than facts already known to defendant. [FN2] His testimony essentially discloses his legal advice that plaintiff modify the proposed contract with specific proposed language.

Such advice is confidential and privileged.

FN2. For purposes of this motion the Court assumes defendant did not know the specific language proposed by Campbell to Whitmire. Plaintiff refers to deposition testimony of Fred Shaw to support the proposition that defendant already knew the information provided by Campbell. Shaw testified that Whitmire wanted certain changes to the contract. (Dep. of Shaw at 200.) Counsel then asked: "Did he ever tell you why he wanted changes made?" To which Shaw responded: "He said their counsel advised him to make these changes ." (*Id.*) The Court does not view this as sufficient to demonstrate knowledge of the specific privileged communications disclosed by Campbell. To the extent defendant in fact already knew the privileged information disclosed by Campbell, then according to the testimony of Shaw, Whitmire disclosed privileged communications, which itself raises questions of waiver.

Campbell, furthermore, appears to disclose his client's intent regarding proposed changes and its interpretation of contractual provisions in light of that intent. Plaintiff tries to limit the testimony to the personal intent and interpretation of Campbell. Although the testimony is at times unambiguously limited to Campbell's intent and interpretation, at other times it discloses an intent jointly held with his client. At still other times, Campbell generically refers to "the intent," which neither limits itself to his intent alone nor suggests a joint intent.

Despite the variance in the testimony, the Court finds enough testimony to conclude, at the very least, that Campbell revealed the intent of its client when he testified that (1) "*we* wanted to add language that put some sort of a performance guarantee in here ... *we* wanted to make sure that sure that *we* got a warranty ... that would cover *us* in the event anything would go wrong" (Dep. of Campbell at 88 (emphasis added)); (2) he was trying "to make sure *we* incorporated some sort of performance guarantee...." (*Id.* at 93 (emphasis added)); and (3) "*We* put in some very broad language ... to provide the warranty that *my client wanted* " (*Id.* at 157 (emphasis added)). The italicized words appear to reveal both Campbell's intent and the intent of his client. Campbell also testified that the one-year warranty in the microprint "was unacceptable." (*Id* . at 96.) This appears to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

reveal that his client found such a short warranty unacceptable.

When Campbell disclosed more than his own personal intent and interpretation of the contract, he effectively disclosed the intent and interpretation of his client and thus disclosed the substance of attorney-client communications. [FN3] "If an attorney knows about a subject through a client's communications, discovery of that knowledge would necessarily reveal the content of the client's previous communications." Paul R. Rice, *Attorney-Client Privilege: Continuing Confusion About Attorney Communications, Drafts, Pre-Existing Documents, and the Source of the Facts Communicated*, 48 Am.U.L.Rev. 967, 994 (June 1999). In such instances discovery *from* the attorney discloses the content of the client's communications. An attorney cannot disclose facts learned only through confidential communications with his client without divulging communications protected by the attorney-client privilege. The disclosures by Campbell regarding the intent and interpretation of the contract therefore divulged the substance of privileged communications.

> FN3. If such knowledge came through non-privileged communications, then Campbell could freely testify to the intent of plaintiff without fear of waiver. There is nothing in the record, however, to indicate that Campbell's knowledge of his client's intent came from any source other than privileged communications.

*13 To fully comprehend the scope of the preceding paragraph, one must keep in mind that Campbell is plaintiff's attorney. When attorneys speak they must take extreme care not to disclose the substance of privileged attorney-client communications. If their knowledge of a particular subject comes *only* from the client through privileged communications, then they must refrain from discussing that subject outside the confidential attorney-client relationship. To do otherwise would effectively disclose privileged communications. The attorney-client privilege is intended to protect the client from such disclosure.

Counsel for plaintiff apparently agrees that answering a question which asks Campbell whether he proposed specific language to the client would invade the attorney-client privilege. (*See* Dep. of Campbell at 117.) He even goes so far as to admit that either he or Campbell may have "inadvertently" waived the privilege, but maintains that they had no ability to waive the privilege on behalf of their client. (*Id.* at 118.) In light of this admission, the Court must address whether the disclosure of privileged communications by Campbell waived the privilege of plaintiff.

Under Kansas law, it is well-settled that only clients can waive the privilege. *See State v. Maxwell*, 10 Kan.App.2d 62, 64, 691 P.2d 1316, 1320 (1984). They can do so, however, either expressly or impliedly. While the disclosure by Campbell does not expressly waive the privilege, it might impliedly do so. K.S.A. 60-437 sets forth two statutory waiver provisions and provides in relevant part:

A person who would otherwise have a privilege to refuse to disclose or to prevent another from disclosing a specified matter has no such privilege with respect to that matter if the judge finds that such person or any other person while the holder of the privilege has ... (b) without coercion, or without any trickery, deception, or fraud practiced against him or her, and with knowledge of the privilege, made disclosure of any part of the matter or consented to such a disclosure made by anyone.

Thus, in the absence of coercion, trickery, deception or fraud, clients waive the attorney-client privilege when they disclose any part of known privileged matter or consent to such disclosure by anyone else. In this case, there is no evidence that defendant used coercion, trickery, deception, or fraud to obtain privileged information. The potential applicability and existence of the privilege, furthermore, was known by all parties when Campbell testified. Whether K.S.A. 60-437(b) removes the cloak of protection generally afforded by the attorney-client privilege thus hinges upon whether plaintiff consented to the disclosure of privileged communications.

In *Maxwell*, the Kansas Court of Appeals addressed whether a client waives the attorney-client privilege when his attorney discloses privileged communications. 10 Kan.App.2d at 63-66, 691 P.2d at 1320-21. In that case, three defendants retained one attorney and confided in him. One defendant, Johnny Ray Maxwell, later obtained new counsel to represent him at trial. His original counsel subsequently disclosed to an assistant district attorney and the newly-retained attorney of Maxwell privileged information obtained in the joint representation of the three defendants. The court held there was no waiver of the privilege. *Id.* at 64-65, 691 P.2d at 1320-21. It stated:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

**\*14** When information is disclosed within the confines of the attorney-client relationship, this imposes upon the attorney a general duty not to disclose this information. Accordingly, if an attorney *violates* his duty of confidentiality, this cannot be said to waive his client's privilege. This principle has been codified in K.S.A. 60-426(a)(3)(iii). *Id.* at 64, 691 P.2d at 1320. The court went on to state that, in the absence of consent by the client, disclosure by the attorney breaches the attorney-client relationship. *Id.* at 664, 691 P.2d at 1321.

Campbell thus breached his duty of confidentiality, unless plaintiff consented to his disclosure of privileged communications. Nothing of record indicates that plaintiff gave such consent prior to the **deposition**. That plaintiff allowed its attorney to testify indicates no intent to **waive** the attorney-client **privilege**. *See Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1552 (10th Cir.1995) (stating that "the mere fact that [defendant] designated a lawyer, pursuant to Fed.R.Civ.P. 30(b)(6), as its corporate representative at one **deposition**, is a wholly insufficient ground to hold that [it] **waived** its attorney-client **privilege**"). Plaintiff, furthermore, asserted the privilege numerous times at the deposition. From the materials before the Court it appears that it asserted the objection well before Campbell disclosed any privileged communications. Accordingly, the Court finds that when Campbell disclosed the privileged communications, the disclosures occurred without the consent of his client. Such disclosure thus breached the attorney-client relationship. The disclosure did not, however, waive the attorney-client privilege under *Maxwell*. Furthermore, pursuant to K.S.A. 60-426(a)(3)(iii), plaintiff would have the right to prevent any witness from disclosing the privileged matters learned as a result of the breach of the attorney-client relationship.

1. Procedural Waiver

A. Failure to Object

Although the breach of confidentiality by Campbell does not itself waive the privilege, the Court nevertheless finds the privilege waived. Campbell breached the attorney-client relationship during his deposition. Mr. Finch represented the interests of plaintiff at the deposition. His failure to timely object to the questioning or to take reasonable measures to halt the disclosure of privileged communications waived the privilege. The Court could perhaps consider the failure to object or halt the testimony as

a ratification or an after-the-fact consent of the disclosure, thus nullifying the breach by Campbell. The Court, however, need not go that far to resolve the present dispute.

The failure to timely object is a procedural defect governed by federal law. [FN4] "A failure to properly assert a privilege, as a matter of federal procedure, can result in a waiver of the privilege. This is true although a waiver might not result under state law.... State law is superseded by federal procedure." *Cunningham v. Connecticut Mut. Life Ins.*, 845 F.Supp. 1403, 1408 (S.D.Cal.1994) (citations omitted). "Failure to timely assert an objection, even one of privilege, constitutes a waiver of such objection." *Mackey v. IBP, Inc.*, 167 F.R.D. 186, 200 (D.Kan.1996). Waiver of the objection essentially equates to waiver of the privilege. Through the inaction of counsel the client is deemed to have impliedly waived the privilege. "The nature of the trial process is such that an attorney, and not the client, must have the immediate and ultimate responsibility of deciding if and when to raise objections." *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D.Cal.1978).

> FN4. The Court notes that even under Kansas procedural law courts may find waiver of the attorney-client privilege for a failure to timely object. *See Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, 417, 430, 997 P.2d. 681, 689, 696 (2000) (finding K.S.A. 60-437 inapplicable, but nevertheless, suggesting that waiver may result from the failure to submit an adequate privilege log); *Calver v. Hinson*, 267 Kan. 369, 380, 982 P.2d 970, 978 (1999) (affirming lower court's finding that untimely objection of attorney-client privilege was waived).

**\*15** Courts may hold parties to the actions and inactions of their chosen counsel. *See, e.g., Starlight Int'l, Inc. v. Herlihy*, 181 F.R.D. 494, 497- 98 (D.Kan.1998) (discussing whether the court should find waiver merely due to inadvertence or mistake of counsel); *Smith v. Alyeska Pipeline Serv. Co.*, 538 F.Supp. 977 (D.Del.1982) (holding that party waived privilege when an attorney acting on his behalf voluntarily sent information to opposing party), *aff'd*, 758 F.2d 668 (Fed.Cir.1984); *Perrignon*, 77 F.R.D. at 459 (holding that party waived attorney-client privilege through disclosure of privileged conversations at depositions); *Cypress*, 268 Kan. at 430-31, 997 P.2d. at 696 (affirming order that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
**(Cite as: 2000 WL 1466495 (D.Kan.))**

directed a party to produce unredacted copies of billing statements for failure to provide a privilege log demonstrating the applicability of claimed privileges); *Meyer v. Meyer*, 209 Kan. 31, 39, 495 P.2d 942, 949 (1972) (holding that "parties are bound by the admissions, appearances, and actions of their counsel acting on their behalf"). "Any other notion would be wholly inconsistent with our system of representative litigation." *Link v. Wabash R.R.*, 370 U.S. 626, 634 (1962) (making statement in context of sanctions). In the context of waiver or other procedural consequences, neither carelessness nor ignorance of counsel constitute grounds for relief for the client. *Security Nat'l Bank v. John Deere Co.*, 927 F.2d 519, 520-21 (10th Cir.1991). The rule of waiver "does not concern punishment for improper conduct, but rather just the procedural consequences of proper, if perhaps unintended, litigation actions or decisions." *Id.* at 521. There is "nothing unfair about requiring a party to be bound by the actions of [its] attorney-agent." *Pelican Prod. Corp. v. Marino*, 893 F.2d 1143, 1147 (10th Cir.1990).

Counsel for plaintiff, Mr. Finch, did not prevent the disclosure of privileged information. As legal representative and agent for plaintiff, it was his responsibility to do so. "A client waives the attorney-client privilege ... by failing to assert it when confidential information is sought in legal proceedings." *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir.1999). "Failure to assert the privilege objection correctly can mean the privilege is waived.... In the deposition context ... the objection should ordinarily be asserted when a question seeking privileged material is asked." 8 Charles Alan Wright et al., *Federal Practice and Procedure* § 2016.1, at 228-29 (2d ed.1994) (footnote omitted). Courts may find the attorney-client privilege waived when a party fails to object to "all questions designed to elicit information about privileged communications" and fails to halt responses to such questions. *Nguyen*, 197 F.3d at 206-07. This waiver principle is distinct from waiver associated with "selectively disclosing confidential communications." *Id.* at 207.

Plaintiff has the burden to show it did not waive the privilege. It has not carried that burden. Although Campbell's breach of the attorney-client relationship did not waive the privilege under the substantive Kansas law of privilege, plaintiff's failure to timely object to the particular questions and failure to instruct Campbell not to answer, which resulted in answers revealing privileged communications, did waive the privilege as a matter of federal procedure. Through the testimony of Campbell, plaintiff

disclosed privileged communications between it and its attorney concerning the negotiation of and the intent behind the contract at issue here. Disclosure about contract negotiations "constitutes a complete waiver of the attorney-client privilege as to communications relating to the negotiation and implementation of [the contract]." *United States v. Skeddle*, 989 F.Supp. 905, 909-10 (N.D.Ohio 1997). Disclosure about the intent and interpretation of the contract likewise waives the attorney-client privilege with respect to all communications relating to such matters.

**\*16** Although *Skeddle* [FN5] based its finding of waiver on federal substantive law of privilege, rather than federal procedural law, the scope of waiver remains the same. The type of waiver, *i.e.* substantive or procedural, does not determine the proper scope of waiver. Fairness determines the proper scope. When a party or its attorney discloses privileged communications upon deposition, fairness generally dictates that the privilege is waived as to all communications related to the disclosed matters.

> FN5. The Court notes that *Skeddle* appears consistent with the substantive law of privilege in Kansas. Under the statutory waiver principles set forth in K.S.A. 60-437, the attorney-client privilege is lost if there is disclosure of "any part" of the privileged matter. "[I]f a privilege is waived as to a part of the subject matter, so that it has lost its confidential character, the waiver must, in justice, apply to the whole of the matter. No picking and choosing is permitted." *State v. Spears*, 246 Kan 283, 287, 788 P.2d 261, 264 (1990) (quoting 1 *Gard's Kansas Code Civ. Proc.2d Annot.* § 60-437 (1979)). The Court sees no reason why the courts of Kansas would apply a different scope of waiver to non-statutory principles of waiver.

**B. Inadvertent Disclosure**

Plaintiff suggests that if Campbell disclosed any privileged matter, the disclosure was inadvertent. In some instances, inadvertent disclosure of documents may justify not enforcing waiver of a privilege. *E.g.*, *Wallace v. Beech Aircraft Corp.*, 179 F.R.D. 313, 316 (D.Kan.1998); *Monarch Cement Co. v. Lone Star Indus., Inc.*, 132 F.R.D. 558, 560 (D.Kan.1990). Courts determine whether conduct justifies forfeiting a privilege on a case-by-case basis.

A case-by-case "analysis serves the purpose of the attorney-client privilege, the protection of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

Page 12

communications which the client fully intended would remain confidential, yet at the same time will not relieve those claiming the privilege of the consequences of their carelessness if the circumstances surrounding the disclosure do not clearly demonstrate that continued protection is warranted."
*Apex Mun. Fund v. N-Group Sec.*, 841 F.Supp. 1423, 1433 (S.D.Tex.1993) (citation omitted).

In making this case by case analysis, the Courts consider the following five factors:
1) the reasonableness of the precautions taken to prevent inadvertent disclosure; 2) the time taken to rectify the error; 3) the scope of discovery; 4) the extent of disclosure; and 5) the overriding issue of fairness.
*Wallace*, 179 F.R.D. at 314.

In the context of production of documents, the courts look to the same factors to decide whether a party waives an objection of privilege by not asserting it in a timely and proper manner. *Mike v. Dymon, Inc.*, No. 95-2405-EEO, 1996 WL 674007, at *10 (D.Kan. Nov. 14, 1996). Although this Court has not applied these factors in the context of inadvertent disclosure through deposition testimony, the factors nevertheless appear pertinent to whether the Court should enforce the waiver. In the current context, the limited scope of the discovery generally favors enforcing a waiver. Giving deposition testimony is far different than producing boxes of documents that contain a few overlooked privileged documents. In the context of deposition testimony, there should generally be no occasion for a party or its attorney to "overlook" a question that might invade the attorney-client privilege. The limited scope of discovery surrounding the disclosure by Campbell favors enforcing the waiver.

Furthermore, when a deponent who has knowledge of privileged communication provides deposition testimony, the representatives for the privilege-holder must remain ever vigilant to timely assert a claim of privilege to any inquiry that may elicit disclosure of privileged matters. Upon hearing such an inquiry, it is incumbent upon such representatives to prevent the disclosure of privileged communications. They may object and direct the deponent not to answer such inquiries. They may halt the deposition to determine whether a responsive answer will indeed disclose privileged communications, and, if it does, they may then assert an objection of privilege and instruct the witness not to answer, or move for a protective order under Fed.R.Civ.P. 30(d)(3).

*17 In this instance, Campbell revealed privileged communications without contemporaneous objection by counsel or any other representative for plaintiff. That counsel had objected to earlier and subsequent inquiries does not remove or reduce his obligation to protect the privileged communications of his client. Counsel must object to each inquiry that might foreseeably elicit disclosure of such communications. That counsel may have stressed to the witness the importance of not divulging privileged matters is an insufficient precaution, even in conjunction with objections of privilege to other questions. Parties and their representatives must take reasonable precautions to assure that they may properly assert the privilege. In this instance, plaintiff and its counsel failed to do so.

Plaintiff appears to have consented to the deposition of Campbell. It did not move to prohibit or limit the deposition under Fed.R.Civ.P. 26(c). Once the deposition began, it did not halt the disclosure of privileged communications or halt the deposition to make a motion under Fed.R.Civ.P. 30(d)(3). Although its attorney objected on grounds of attorney-client privilege numerous times, the deponent, nevertheless, revealed privileged information. The Court finds that plaintiff and its counsel took insufficient precautions to protect the attorney-client privilege.

The time taken to rectify the error, moreover, is crucial in the context of oral testimony. The failure to promptly object generally precludes a later objection. A failure to timely object that results in disclosure of privileged communications cannot be easily undone. Counsel asserted no objection to many of the inquiries that resulted in the disclosure of privileged communications. Occasionally, he would assert an objection of privilege and Campbell would still disclose privileged communications. At that point, counsel should have halted the disclosure. Counsel cannot simply let a deponent divulge privileged communications over an objection and then try to avoid waiver on the basis of inadvertent disclosure. In the context of deposition testimony, a contemporaneous objection is usually necessary to justify not enforcing the waiver. If the deponent discloses confidential communications, notwithstanding a timely objection, the privilege-holder must take reasonable steps to halt the disclosure. Neither plaintiff nor its counsel took such reasonable steps.

The extent of disclosure also favors enforcing the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

Page 13

waiver. While the extent of disclosure may have been initially limited to those individuals present at the deposition, it expanded to the general public with the briefing on the current motion. Both parties attach to their briefing the portion of the deposition transcript in which Campbell reveals the privileged communications. Plaintiff took no steps to prohibit or limit further disclosure by defendant. It took no steps to file its attachments under seal. As an attachment to plaintiff's brief, it is available for viewing by the general public.

*18 Fairness likewise supports enforcing waiver on the facts before the Court. Parties must jealously guard their privileges lest they lose them. As noted above, plaintiff made no attempt to prohibit the deposition of its attorney. It made no attempt to limit the deposition, other than through contemporaneous objections of counsel. It did not halt the deposition to seek protection from questions that might elicit privileged matters. It took inadequate steps to protect the privilege. Its attorney failed to object to all questions intruding into privileged areas. The attorney failed to stop the witness from disclosing privileged communications. It appears fair to hold plaintiff to the actions and inactions of its chosen counsel. The law requires a certain amount of certainty. When counsel permits a witness to divulge privileged communications without a contemporaneous objection of privilege or reasonable steps to halt the disclosure, the client generally loses the privilege. That the disclosure may have been "inadvertent" does not save the privilege.

Plaintiff has waived the attorney-client privilege by permitting its attorney to testify upon deposition about privileged communications. "Once a client or his attorney waives the privilege, the scope of that waiver is *defined* roughly by the subject matter of the communication disclosed. This, however, is only the first step. Thereafter, it is *refined* by the standard of fairness." Paul R. Rice, *Attorney-Client Privilege: Continuing Confusion About Attorney Communications, Drafts, Pre-Existing Documents, and the Source of the Facts Communicated,* 48 Am.U.L.Rev. 968, 1004 (June 1999) (footnotes omitted).

Fairness dictates that plaintiff disclose all communications between it and Campbell relating to its intention and interpretation of the contract at issue in this lawsuit. Campbell divulged that, in communications with his client, he proposed specific language for inclusion in the contract. He revealed a mutual intent of his and his client regarding inclusion

of a performance guarantee or warranty that would cover plaintiff. It appears unfair to allow plaintiff to disclose these things through testimony of its attorney without permitting defendant access to all communications relating to its intention and interpretation.

"[A] client's offer of his own or his attorney's testimony as to a specific communication constitutes a waiver as to all other communications on the same matter [because] 'the privilege of secret communication is intended only as an incidental means of defense, and not as an independent means of attack, and to use it in the latter character is to abandon it in the former.' "

*Nguyen v. Excel Corp.,* 197 F.3d 200, 207 n. 19 (5th Cir.1999) (quoting *United States v. Woodall,* 438 F.2d 1317, 1324 (5th Cir.1970) (en banc)). "[T]he confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *United States v. Ryans,* 903 F.2d 731, 741 n. 13 (10th Cir.1990) (quoting *In Re Sealed Case,* 877 F.2d 976, 980 (D.C.Cir.1989)).

## V. "At Issue" or Implied Waiver

*19 Plaintiff has waived the attorney-client privilege for communications between it and Campbell by permitting him to testify upon deposition about privileged communications. In addition, defendant suggests plaintiff also has waived the privilege with respect to all matters relating to the negotiation, drafting, and interpretation of the contract by placing its and its attorneys' interpretation at issue in this case.

## A. Applicability of Implied Waiver Theory

In support of its position, defendant relies on the so-called "at issue" or implied waiver principle. *See WLIG-TV, Inc. v. Cablevision Sys. Corp.,* 879 F.Supp. 229, 234 (E.D.N.Y.1994) (recognizing that both names refer to the same principle). Although there has been no definitive test utilized in Kansas state courts to ascertain whether a privilege has been impliedly waived, this Court recently undertook the task of predicting how the Kansas Supreme Court would address the implied waiver issue if confronted. *See Simmons Foods, Inc. v. Willis,* 191 F.R.D. 625, 633-34 (D.Kan.2000) ("If there is no applicable statute or if the Kansas Supreme Court has not

Not Reported in F.Supp.2d                                                      Page 14
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
**(Cite as: 2000 WL 1466495 (D.Kan.))**

spoken on an issue, this Court must determine how it believes the Kansas Supreme Court would rule if confronted with the question") (citing *Frontier Refining Inc., v. Gorman Rupp Co., Inc.,* 136 F.3d 695, 700 (10th Cir.1998) (noting in a *de novo* review of a district court's determination of state law that the appellate court must predict how the state court would resolve the issue.)) [FN6]

> FN6. In making a determination of state law, courts "may look to 'other state-court decisions, well-reasoned decisions from other jurisdictions, and any other available authority to determine the applicable state law.' " *See Frontier Refining,* 136 F.3d at 700 (quoting *Burns v. International Ins. Co.,* 929 F.2d 1422, 1424 (9th Cir.1991)).

In *Simmons,* this Court used the analysis in *Frontier Refining* as a guide. *Simmons,* 191 F.R.D. at 634 (citing *Frontier Refining,* 136 F.3d at 699 (limiting its discussion to the three approaches generally utilized by courts to determine whether an implied waiver has occurred.)) The first approach discussed by the *Frontier Refining* court is the "automatic waiver" rule, which provides that a litigant automatically waives the privilege upon assertion of a claim, counterclaim, or affirmative defense that raises as an issue a matter to which otherwise privileged material is relevant. *Id.* The second approach discussed by the *Frontier Refining* court is a test which finds waiver only when the material to be discovered is both relevant to the issues raised in the case and either vital or necessary to the opposing party's defense of the case. *Id.* The third approach discussed in *Frontier Refining* is a theory which provides for waiver of the attorney-client privilege if, and only if, "the litigant directly puts the attorney's advice at issue in the litigation." *Id.*

As the Tenth Circuit apparently concluded in *Frontier Refining,* and as this Court concluded in *Simmons,* the court need only consider the three general approaches set forth to determine which rule a state court would apply. *Id.* "Although other approaches may exist, there is no reason to address them, as neither the parties nor the courts of Kansas suggest their applicability." *Id.* "It would be a daunting task, furthermore, to attempt a fully encompassing analysis of all existing approaches." *Id.*

*20 Before addressing these three general approaches to waiver, however, the Court must determine which party carries the burden of proof with respect to establishing whether waiver has occurred. It is well settled that the party seeking to invoke the attorney-client privilege has the burden to establish applicability of the privilege. *See, e.g., Peat, Marwick, Mitchell & Co. v. West,* 748 F.2d 540, 542 (10th Cir.1984), *cert. denied,* 469 U.S. 1199 (1985); *Johnson v. Gmeinder,* 191 F.R.D. 638, 642 (D.Kan.2000) (citations omitted). The party asserting the privilege must establish all elements of the immunity/privilege. *Johnson,* 191 F.R.D. at 642 (citations omitted).

With respect to the attorney-client privilege, one of the eight essential elements that must be established under Kansas law is that the privilege has not been waived. [FN7] *ERA Franchise Systems, Inc. v. Northern Ins. Co. of New York,* 183 F.R.D. 276, 278 (D.Kan.1998) (citing *State v. Maxwell,* 10 Kan.App.2d 62, 63, 691 P.2d 1316, 1319 (1984); K.S.A. 60 426(c)(2)). In other words, the burden to establish that waiver has not occurred remains with the party who is asserting the attorney-client privilege. *Johnson,* 191 F.R.D. at 642. In light of this, it is plaintiff who carries the ultimate burden to establish that the attorney-client communications are protected by the privilege and it is plaintiff who has the burden to establish that it has not waived such privilege. Because the parties do not appear to dispute that the communications at issue here are, in fact, privileged, the Court will proceed directly to the three general approaches to waiver.

> FN7. In a diversity case such as this, Kansas law governs any attorney-client privilege asserted and the scope of that privilege. See *ERA Franchise Systems, Inc.,* 183 F.R.D. at 278.

*1. Automatic Waiver*

This Court already has determined that the Kansas Supreme Court would reject the "automatic waiver" rule:

> The rule "has been roundly criticized in the circuits, does not adequately account for the importance of the attorney-client privilege to the adversary system, and is more applicable to constitutional, rather than attorney-client, privileges." [*Frontier Refining,* 136 F.3d] at 700. The Supreme Court of Kansas has emphasized the importance of the attorney-client privilege to the administration of justice. *Wallace, Saunders, Austin, Brown & Enochs, Chtd. v. Louisburg Grain Co.,* 250 Kan. 54, 63, 824 P.2d 933, 940 (1992). It cautioned that "[t]he privilege should not be set

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

aside lightly." *Id.* The automatic waiver rule is inconsistent with that philosophy.

*Simmons,* 191 F.R.D. at 634. For the reasons stated in *Simmons,* this Court again concludes that Kansas would not adopt the "automatic waiver" rule. *Id.*

The Court thus has two competing approaches to waiver from which to choose. The Tenth Circuit and this Court in *Simmons* found no need to choose between them, because waiver was not established under the more liberal approach, *i.e.,* the three-prong test enunciated in *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash.1975) (evaluating the need for discovery against the importance of the privilege.) *Frontier Refining, Inc.,* 136 F.3d at 701; *Simmons,* 191 F.R.D. at 634. If waiver is not found under the more liberal *Hearn* test, there is no need to address the anticipatory waiver test. *Id.* As discussed below, however, the Court finds application of both the *Hearn* test and the anticipatory waiver test result in implied waiver of the attorney-client privilege with respect to all communications relating to the formation and interpretation of the contract at issue in this case. Given implied waiver of the attorney-client privilege results upon application of both theories, the Court will not then undertake the task of predicting which of the two waiver approaches the Kansas Supreme Court would adopt if confronted.

*2. Implied Waiver Pursuant to the Hearn Test*

**\*21** Defendant claims plaintiff waived the attorney-client privilege in relying on evidence from its attorney to prove intent with regard to interpretation of the language in the contract at issue. More specifically, defendant contends plaintiff voluntarily injected into this lawsuit its attorneys' interpretation of the terms of the contract. Conversely, plaintiff claims that although it intends to offer evidence at trial to clarify the meaning of ambiguous terms of the contract, this evidence neither touches upon nor discloses any confidential communication between attorney and client.

Pursuant to the test enunciated in *Hearn,* the Court must find each of the following conditions to establish implied waiver of the attorney-client privilege: (1) the party asserting the privilege affirmatively acted in a manner that resulted in the assertion of the privilege; (2) through the affirmative act, that party placed the protected information at issue by making it relevant to the case; and (3) application of the privilege would deny the opposing party access to information vital to its defense. 68 F.R.D. at 581. For privileged information to be

"vital," it must be otherwise unavailable from any other source. *Frontier Refining,* 136 F.3d at 701 (citing *Hearn,* 68 F.R.D. at 581).

Plaintiff initially identified Campbell as a fact witness in this case. (Dep. of Campbell at 20.) Although plaintiff subsequently decided not to call Campbell as a trial witness (Letter from Wright to Judge Waxse of 2/25/00), Campbell was deposed as a fact witness and testified about his intent and the intent of plaintiff with regard to verbiage included in the contract. (Dep. of Campbell at 87-102.) By identifying its attorney as a witness and revealing its intent to introduce extrinsic evidence regarding interpretation of the contract by its attorney, plaintiff affirmatively acted in a manner that resulted in the assertion of the privilege: Plaintiff's intention to introduce extrinsic evidence of its interpretation of the terms of the contract apparently motivated plaintiff to list Campbell as a fact witness; listing Campbell as a fact witness led to Campbell's deposition; and Campbell's deposition in turn led to assertions of attorney-client privilege. Given this domino effect, the affirmative acts of plaintiff have placed protected communications at issue by making them relevant to the case. The unanswered question now becomes whether application of the privilege would deny defendant access to information vital to its defense.

Because plaintiff has the burden of establishing the attorney-client privilege has not been waived, *Johnson,* 191 F.R.D. at 642, it is plaintiff who has the burden to show that application of the privilege would not deny defendant access to vital information. *See id.* To that end, plaintiff must demonstrate that information relevant to its intent and its interpretation of the contract is available without disclosing privileged attorney-client communications.

**\*22** Plaintiff maintains that access to privileged communications between it and Campbell is not vital to defendant's case because the information sought is available from a non-privileged source: plaintiff's non-legal personnel. The Court is not persuaded by plaintiff's argument. Campbell already has testified about his intent and the intent of his client in modifying the proposed contract. Defendant cannot properly defend Plaintiff's claim of ambiguity with regard to the terms of the contract without fully exploring all matters relating to negotiation, drafting, and interpretation of the contract-including discovery of communications between plaintiff and Campbell regarding the contract. This information does not appear to available without disclosing privileged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

communications.

Based on this discussion, application of the *Hearn* test results in an implied waiver of the attorney-client privilege with respect to all communications relating to the formation and interpretation of the contract at issue in this case. It is now necessary to apply the more rigid anticipatory waiver test to the facts presented. [FN8]

> FN8. If there has been implied waiver under the more rigid anticipatory waiver test as well, it is unnecessary for the Court to determine which of the two waiver approaches the Kansas Supreme Court would adopt if confronted.

*3. Implied Waiver Pursuant to the Anticipatory Waiver Test*

The third approach identified in *Frontier Refining* is a theory that provides for waiver of the attorney-client privilege if, and only if, "the litigant directly puts the attorney's advice at issue in the litigation." As opposed to the *Hearn* test, which takes into account whether the information sought is vital to a party's case, the anticipatory waiver test merely assesses "whether the privilege holder has committed himself to a course of action that will require the disclosure of a privileged communication." *See Smith v. Kavanaugh, Pierson & Talley,* 513 So.2d 1138, 1146 (La.1987) (holding implied waiver occurs when the privilege holder pleads a claim or defense in such a way that he will inevitably be forced to draw upon a privileged communication at trial in order to prevail). The anticipatory waiver theory does not depend solely on the relevance of the privileged material, or on the adversary's need, no matter how strong, for the communication. *Id.* Instead, the focus is on the privilege holder, and the sole concern is whether the privilege holder has "committed himself to a course of action that will require the disclosure of a privileged communication." *Id.*

To be sure, parties may not use the attorney-client privilege as both a shield and a sword. *United States v. Workman,* 138 F.3d 1261, 1263 (8th Cir.1998); *FDIC v. Wise,* 139 F.R.D. 168 (D.Colo.1991). Parties "may not use the privilege to prejudice [their] opponent's case or to disclose some selected communications for self-serving purposes." *Case v. Unified Sch. Dist. # 233,* No. Civ.A. 94-2100-GTV, 1995 WL 358198, at * 2-3 (D.Kan. June 2, 1995) (quoting *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991)), *clarified on reconsideration,*

1995 WL 477705 (D.Kan.Aug.11, 1995). A party may implicitly waive the privilege when it asserts "a claim that in fairness *requires* examination of protected communications." *Id.* (quoting *Bilzerian,* 926 F.2d at 1292). Even if a party does not attempt to use a privileged communication, it "may waive the privilege if [it] asserts a factual claim the truth of which can only be assessed by examination of a privileged communication." *Bowne of N.Y. City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 488 (S.D.N.Y.1993).

**\*23** In disputes involving the interpretation of a contract, a party asserts the attorney-client privilege "merely as a shield when it does not plan to offer extrinsic evidence of its own." *Medtronic, Inc. v. Intermedics, Inc.,* 162 F.R.D. 133, 135 (D.Minn.1995). In this instance, however, plaintiff intends to offer extrinsic evidence about its interpretation of the contract. Such reliance places the protected information at issue. Fairness requires examination of the protected communications. When a party already has disclosed some privileged information relating to its intent with regard to a contract and such party intends to rely upon extrinsic evidence to support its interpretation of the contract, it has waived the attorney-client privilege attached to intent and interpretation thereof. *Id.*

After reviewing the law and the facts presented, the Court finds that plaintiff directly placed its attorney's advice regarding negotiation, drafting and interpretation of the contract at issue when it introduced into this case extrinsic evidence of plaintiff's intentions--and the intentions of plaintiff's attorney--during the negotiation and drafting stage of the contract. By doing so, plaintiff necessarily committed itself to a course of action that would require disclosure of privileged communications with regard to these issues. Defendant proffered a contract to plaintiff. Plaintiff in turn went to its attorney and sought advice and comment. The attorney drafted proposed changes to the contract that were incorporated into the final version. On these facts, it appears reasonable to conclude that plaintiff's claim of contract ambiguity does not merely place plaintiff's own state of mind at issue. It also places plaintiff's reliance upon the advice of its counsel at issue. [FN9]

> FN9. Plaintiff, furthermore, is a corporation. The state of mind of a corporate entity cannot generally be ascertained merely by examining the state of mind of one individual. Rather, a corporation's state of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mind must be ascertained through examination of all relevant materials and individuals. Although examination of privileged matters is generally precluded by the attorney-client privilege, the privilege must fall when the party directly places the privileged matters at issue.

Based on the discussion above, the Court finds that application of both the *Hearn* test and the anticipatory waiver test results in an implied waiver of the attorney-client privilege with respect to all communications relating to the formation and interpretation of the contract at issue in this case. Given that implied waiver of the attorney-client privilege results upon application of both theories, the Court will not undertake the task of predicting which of the two waiver approaches the Kansas Supreme Court would adopt if confronted.

B. Scope of Implied Waiver Theory

The Court next determines the scope of plaintiff's implied waiver. The "at issue" waiver principle provides that, "the attorney-client privilege is waived only to the extent that waiver is necessary to prevent the shield from being used as a sword. One must consider the nature of the sword and the extent of the wounds the litigant claiming the privilege seeks to inflict with it." *SEC v. H.K. Freeland & Co.,* No. 91 Civ. 7986(CSH), 1992 WL 110748, at *1 (S.D.N.Y. May 12, 1992). In this case, plaintiff intends to challenge the contract at issue with extrinsic evidence of its intent and interpretation. It thus appears necessary to enforce the waiver against all attorney-client communications relating to interpretation of the contract by plaintiff and its attorneys, the intent behind the contract, and the negotiation and drafting of the contract. [FN10]

> FN10. That plaintiff currently does not intend to call Campbell as a witness regarding the contract may be a factor to consider, but it is not a determinative one. The factor, furthermore, is essentially immaterial in view of the testimony already provided by Campbell.

VI. Waiver by Production of Documents

*24 Defendant also asserts that plaintiff waived the attorney-client privilege when Whitmire produced two documents at his deposition. Producing privileged documents during discovery can waive the attorney-client privilege. *Zapata v. IBP, Inc.,* 175

F.R.D. 574, 576-78 (D.Kan.1997); *see also,* K.S.A. 60-437(b) ("disclosure of any part" of a privileged matter waives the attorney-client privilege). In the absence of coercion, trickery, deception or fraud, clients waive the attorney-client privilege when they disclose any part of known privileged matter or consent to such disclosure by anyone else. K.S.A. 60-437. Once again, the issue is whether plaintiff consented to the disclosure of privileged communications.

In this instance, a former employee of plaintiff produced the documents. A former corporate employee cannot waive the privilege of the corporation. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 349 n. 5 (1985). "Any privilege resulting from communications between corporate officers and corporate attorneys concerning matters within the scope of the corporation's affairs and the officer's duties belongs to the corporation and not to the officer." *Roe v. United States (In re Grand Jury Subpoenas),* 144 F.3d 653, 658 (10th Cir.), *cert. denied sub nom., Anderson v. United States,* 525 U.S. 966 (1998). The privilege belongs to the client, not former employees of the client. Nothing in the record reveals that plaintiff gave Whitmire authority to waive its privilege. Furthermore, plaintiff's arguments suggest he had no such authority. In the absence of consent by plaintiff, the production of privileged documents by Whitmire did not constitute an express waiver of the privilege by plaintiff. Accordingly, the Court finds that plaintiff did not expressly waive the attorney-client privilege through the production by Whitmire.

If plaintiff fails to take adequate steps to insure the confidentiality of its documents, however, the corporation itself may impliedly waive the privilege with respect to documents retained by former employees. *See O'Leary v. Purcell Co.,* 108 F.R.D. 641, 644-46 (M.D.N.C.1985) (addressing the matter in terms of lost confidentiality rather than waiver of the attorney-client privilege); *see also State v. Myers,* 230 Kan. 697, 701, 640 P.2d 1245, 1248- 49 (1982) (finding the marital privilege waived and permitting a third-party to testify about a privileged communication that had fallen "into the hands of the third-party inadvertently and without the consent or connivance of the addressee-spouse").

Citing *Zapata, supra,* and *Monarch Cement Company v. Loan Star Industries, Inc.,* 132 F.R.D. 558 (D.Kan.1990), both parties undertake an analysis of five factors courts in the District of Kansas have employed to determine whether inadvertent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

disclosure of privileged documents works as a waiver of the attorney-client privilege. At first glance, the five-factor test appears inapplicable because Whitmire *deliberately* produced the two documents in question and not *inadvertently*. The viewpoint for determining inadvertence, however, is from the client's perspective. Whitmire's production of privileged documents is thus "best characterized as an 'inadvertent disclosure,' that is, 'a situation in which the client does not intend that the confidentiality of the communication be breached, but third parties nevertheless gain knowledge of its contents.' " *See Apex Mun. Fund v. N-Group Sec.,* 841 F.Supp. 1423, 1433 (S.D.Tex.1993) (citation omitted). The Court, furthermore, views the test as an appropriate basis for determining whether plaintiff impliedly waived its privilege when Whitmire produced the documents without consent of plaintiff.

**\*25** Although use of the five-factor test appears appropriate here, the Court must first determine whether the state courts of Kansas would apply it. As previously noted, Kansas substantive law of privilege applies here. The Court should not apply the test here if the state courts of Kansas would not apply it. [FN11]

> FN11. The present context differs from the earlier discussion about inadvertent disclosure because the Court was then considering the five-factor test in the context of a procedural waiver governed by federal law.

The Kansas state courts have never adopted the test. This Court, however, has applied the test many times. *See Wallace v. Beech Aircraft Corp.,* 179 F.R.D. 313, 316 (D.Kan.1998); *Zapata v. IBP, Inc.,* 175 F.R.D. 574, 576-78 (D.Kan.1997); *Steele v. First Nat'l Bank,* No. Civ.A. 90-1592-B, 1992 WL 123818, at \*1 (D.Kan. May 26, 1992); *Monarch Cement Co. v. Lone Star Indus., Inc.,* 132 F.R.D. 558, 560 (D.Kan.1990); *Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co.,* 133 F.R.D. 171, 172 (D.Kan.1989); *In re Wyoming Tight Sands Antitrust Cases,* No. 85-2349-S, 1987 WL 93812, at \*3-5 (D.Kan. Sept. 11, 1987). Of these cases, only *Steele* indicates that it applied the law of Kansas. *See* 1992 WL 123818, at \*1.

Were there no state cases addressing inadvertent disclosure, the Court would find *Steele* persuasive authority for applying the five-factor test in accordance with the laws of Kansas. The Court's research, however, has uncovered a Kansas Supreme Court opinion that addresses the effect of an inadvertent disclosure of a privileged document-- *State v. Myers,* 230 Kan. 697, 640 P.2d 1245 (1982). Even though *Myers* involves the marital privilege rather than the attorney-client privilege, the Court would be remiss in discounting it on that basis alone. Both privileges are intended to protect confidential communications. That similarity prompts at least some further consideration of the opinion.

In *Myers,* the court found the marital privilege waived and permitted testimony about a privileged communication that had fallen "into the hands of the third-party inadvertently and without the consent or connivance of the addressee-spouse." *Id.* at 701, 640 P.2d at 1248-49. The Kansas Supreme Court stressed that "so far as possible, the public interest would be best served by the requirement that all facts relevant to a litigated issue should be available to the court to the end that the truth may be ascertained." *Id.* at 701, 640 P.2d at 1248. While the case involves the marital privilege, it provides valuable insight into the Kansas Supreme Court's intolerance for arguments that inadvertent disclosure saves a privilege from waiver.

The Court could perhaps conclude from *Myers* that, in Kansas, inadvertent production provides no justification for not enforcing a waiver. This Court will not read *Myers* so expansively. Such an expansive reading ignores well-settled principles regarding the attorney-client privilege. Within their limits, the courts must "jealously" guard the attorney-client privilege. *Cypress Media, Inc. v. City of Overland Park,* 268 Kan. 407, 418, 997 P.2d. 681, 689 (2000). "The privilege should not be set aside lightly." *Wallace, Saunders, Austin, Brown & Enochs, Chtd. v. Louisburg Grain Co.,* 250 Kan. 54, 63, 824 P.2d 933, 940 (1992). An absolute rule regarding inadvertent production seems contrary to these principles. The Court thus concludes that the state courts of Kansas would apply the five-factor test as concluded in *Steele* and utilized by other federal courts in the District of Kansas. The test provides necessary safeguards for protecting the attorney-client privilege within the limits of the courts.

**\*26** In determining whether an inadvertent disclosure of documents results in a waiver of the attorney-client privilege, courts consider the following: (1) whether the party claiming privilege has taken precautions to prevent such disclosure and the reasonableness of the precautions; (2) the lapse of time before the party attempted to rectify the erroneous production; (3) the scope of discovery resulting in the disclosure; 4) the extent of disclosure;

Not Reported in F.Supp.2d                                                    Page 19
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
(Cite as: 2000 WL 1466495 (D.Kan.))

and 5) overriding issue of fairness. *Wallace v. Beech Aircraft Corp., 179 F.R.D. 313, 314 (D.Kan.1998)* (citing *Monarch Cement Co. v. Lone Star Indus., Inc., 132 F.R.D. 558 (D.Kan.1990))*; *Zapata v. IBP, Inc., 175 F.R.D. 574, 576-77 (D.Kan.1997)*. In the present context some of these factors take on more importance than others. The scope of the discovery essentially becomes a non-issue. The documents were voluntarily produced, albeit by an individual without authority to produce them. The Court is thus primarily concerned with the four remaining factors.

Defendant contends plaintiff failed to take reasonable precautions to prevent disclosure of the two documents produced by Whitmire. Plaintiff, on the other hand, contends that Whitmire wrongfully took and retained dozens of its documents in contravention of the Consultation Agreement he signed. Plaintiff further contends that it sent several letters to recover the documents after it learned in late 1997 that he possessed them. Citing *United States ex rel. Mayman v. Martin Marietta Corp., 886 F.Supp. 1243 (D.Md.1995)*, plaintiff suggests that a corporation does not waive the attorney-client privilege when a former employee wrongfully takes and retains corporate documents.

In *Mayman*, the court declined to find the attorney-client privilege waived on the facts before it. 886 F.Supp. at 1246. An individual retained documents of his employer upon termination of his employment and then lied about his possession of the documents. He signed an employment termination statement certifying that he had returned all property of his employer. The court found no failure to take reasonable precautions to preserve the confidentiality of the privileged document. It noted that the employer maintained the document in a secured building and everyone authorized to have access to it was legally obligated to maintain it as confidential. The court thus found the confidentiality breached only because of "unauthorized action of a trusted employee." *Id*.

*Mayman* differs significantly from the facts before this Court. Although Whitmire retained plaintiff's documents after his employment ended, he did not falsely inform plaintiff that he had returned all documents. He did not remove the documents from a secured building with limited access to the documents. Plaintiff itself sent the documents to Whitmire, when he moved to Pennsylvania in the fall of 1993. By its own terms, the Consultation Agreement imposed no duty upon Whitmire to return the documents since he did not receive them during the term of his consultation but only prior to entering into the Consultation Agreement. Thus, nothing of record indicates that Whitmire had any obligation to return plaintiff's documents after his employment was terminated.

**\*27** The Court finds limited, if any, precautions taken by plaintiff to assure the confidentiality of the documents kept by Whitmire. Later occurrences, furthermore, magnify the lack of initial precautions. In late 1997, three years after the consultation agreement with Whitmire ended, plaintiff learned that he still possessed some of its documents. It wrote four letters to him or his legal representative, two of which specifically demanded return of the documents. When Whitmire declined to return them, plaintiff took no further steps toward their recovery. One would expect more conscientious efforts to re-obtain the documents. Plaintiff instead permitted them to remain with Whitmire without any prohibition or limitation on their disclosure. That is not how one protects privileged documents.

The two documents remained with Whitmire until his deposition in February 1999. Upon their production at his deposition, plaintiff immediately objected on grounds of attorney-client privilege and withdrew them from discovery. Plaintiff took more than a year to re-obtain the documents after it had first learned that Whitmire still had them. It took over four years to reacquire them after Whitmire left its employ. Taking more than a year to rectify the error favors enforcing the waiver. *See Apex Mun. Fund v. N-Group Sec., 841 F.Supp. 1423, 1433 (S.D.Tex.1993)*.

In view of all of these circumstances, the Court cannot find that plaintiff took reasonable precautions to maintain the confidentiality of its documents. Even were the Court to excuse the initial failure to protect the documents from being removed from plaintiff's premises, the Court can find no acceptable reason for plaintiff not taking more aggressive steps to reacquire the documents after it learned that Whitmire still had them in late 1997. The extended period of time taken to retrieve the documents cuts against any claim of privilege. Furthermore, the Court finds nothing unfair about a party losing its privilege when it has taken insufficient steps to protect the confidentiality of its documents.

VII. Production of Documents Not Specifically Identified in the Motion

Defendant seeks an order to compel plaintiff to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)
**(Cite as: 2000 WL 1466495 (D.Kan.))**

Page 20

produce the two documents identified at Whitmire's deposition and any other documents currently withheld from discovery on grounds of attorney-client privilege that relate to plaintiff's interpretation or understanding of the contract at issue in this case. Although the Court finds the privilege waived with respect to plaintiff's intent and interpretation of the contract, it declines to compel document production in a general broad sweep. It compels production of documents only in response to legitimate requests for discovery. Although defendant attaches its first set of requests to the motion, (Niro Inc.'s First Request for Produc. of Docs. to IMC, attached as Ex. D to Mem. Supp.), it merely mentions them in a footnote. Except for the two documents identified in Whitmire's deposition, defendant identifies no specific documents it wants produced. Accordingly, the Court overrules the motion to the extent defendant seeks an order compelling production of unspecified documents withheld on the basis of attorney-client privilege.

VIII. Conclusion

**\*28** For the foregoing reasons, the Court sustains in part and overrules in part Niro Inc's Motion to Compel Discovery (doc. 83). Upon proper notice, plaintiff shall produce its attorney, Bruce Campbell, for deposition. Consistent with this Memorandum and Order, Campbell shall fully answer questions about communications with his client relating to his and his client's interpretation of the contract, the intent behind the contract, and the negotiation and drafting of the contract. Within twenty days of the date of this Order, plaintiff shall produce the two documents identified at the deposition of Glenn Whitmire. Although the Court finds that plaintiff has waived the attorney-client privilege as set forth herein, it orders no other production of documents on the present motion. Each party shall be responsible for its own costs and expenses incurred on the motion and subsequent briefing. The motion presented difficult issues regarding the attorney-client privilege, and both sides took legitimate positions.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2000 WL 1466495 (D.Kan.)

**Motions, Pleadings and Filings (Back to top)**

• 2:98cv02348 (Docket) (Aug. 07, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.