H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SRI INTERNATIONAL, INC.,
a California Corporation,

Plaintiff and
Counterclaim-Defendant,

v.

INTERNET SECURITY SYSTEMS, INC.,
a Delaware Corporation, INTERNET
SECURITY SYSTEMS, INC., a Georgia
Corporation, and SYMANTEC
CORPORATION, a Delaware Corporation,

Defendants and
Counterclaim-Plaintiffs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C. A. No.: 04-1199 (SLR)

**INVALIDITY EXPERT REPORT OF**

**L. TODD HEBERLEIN**

325439

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    QUALIFICATIONS ............................................................................................ 1

III.   METHODOLOGY AND BASES ....................................................................... 4

IV.    RELEVANT FIELD OF ART AND PERSON OF ORDINARY SKILL IN
       THE ART ........................................................................................................... 5

V.     THE SPECIFICATION OF THE PATENTS-IN-SUIT .................................... 5

       A.    INVENTORS' DESCRIPTION OF THEIR INVENTION ................................... 5

             1.    Written description of the patents-in-suit .............................. 7

             2.    The claims of the '338 patent................................................ 11

             3.    The claims of the '203 patent................................................ 13

             4.    The claims of the '212 patent................................................ 15

             5.    The claims of the '615 patent................................................ 16

       B.    COMPUTER SCIENCE CONCEPTS RELEVANT TO THE PATENTS............. 18

       C.    INTRUSION DETECTION METHODOLOGIES ........................................... 21

VI.    CLAIM LANGUAGE ....................................................................................... 22

VII.   LEGAL STANDARDS – ANTICIPATION AND OBVIOUSNESS .................... 23

VIII.  SUMMARY OF OPINIONS ............................................................................. 25

IX.    STATE OF THE RELEVANT ART AS OF THE FILING DATE .................... 27

       A.    HISTORY OF NETWORK MONITORING AND INTRUSION DETECTION ................... 27

             1.    SRI's history in intrusion detection ...................................... 33

             2.    UC Davis's history in intrusion detection............................. 36

             3.    Government systems' history in intrusion detection ............. 38

             4.    Commercial systems' history in intrusion detection............. 39

325439

X.  LACK OF NOVELTY ................................................................................... 39

    A.  PRIOR ART PUBLICATIONS AND SYSTEMS ............................................. 40

        1.  NSM ................................................................................................ 40

        2.  DIDS ............................................................................................... 49

        3.  ISM ................................................................................................. 57

        4.  GrIDS .............................................................................................. 61

        5.  JiNao ............................................................................................... 69

        6.  EMERALD 1997 ............................................................................. 76

            a.  CMAD and Conceptual Overview ........................................ 84

            b.  Live Traffic Analysis and Conceptual Design 1997 ............ 85

            c.  Emerald 1997, Intrusive Activity 1991, NIDES 1994 .......... 85

        7.  Network NIDES ............................................................................. 86

        8.  Frank Feather Thesis ...................................................................... 90

        9.  HP Open View and RFCs ............................................................... 96

        10. NetStalker ...................................................................................... 104

        11. NetRanger ...................................................................................... 106

        12. ISS RealSecure ............................................................................... 108

        13. Network Level Intrusion Detection .............................................. 109

        14. '750 Thompson patent .................................................................. 110

        15. Stake Out ........................................................................................ 111

        16. Automated Alarm System ............................................................. 112

XI. OBVIOUSNESS ........................................................................................ 113

    A.  SECONDARY CONSIDERATIONS ........................................................... 119

XII. INVENTORS' FAILURE TO DISCLOSE BEST MODE .................... 121

    A.  LEGAL STANDARD ................................................................................ 121

B.    DOCUMENTS REL UPON AND METHODOLOGY ...................................................121

C.    THE EXPERT SIGNATURE ENGINE, SRI'S BEST MODE FOR ANALYZING
NETWORK TRAFFIC DATA, WAS NOT DISCLOSED ................................................123

    1.    Expert systems ................................................................................124

    2.    SRI's P-BEST expert system .............................................................124

    3.    SRI had developed a fully-functional version of eXpert prior to
November 9, 1998 ............................................................................125

        a.    P-BEST inference engine and translator...............................127

        b.    Integration between P-BEST and other parts of eXpert .........127

        c.    Suite of P-BEST signatures for analyzing network traffic
data.....................................................................................128

    4.    eXpert was SRI's best mode for practicing signature detection
upon network traffic data .................................................................130

    5.    eXpert was SRI's best mode for analyzing network traffic data .......130

    6.    In the alternative, the combination of eXpert and estat was the
inventors' best mode for analyzing network traffic data ..................131

    7.    eXpert was not disclosed in the patents-in-suit..................................132

D.    ETCPGEN, SRI'S BEST MODE FOR PERFORMING NETWORK MONITORING, WAS
NOT DISCLOSED.........................................................................................134

E.    ERESOLVE, SRI'S BEST MODE FOR PERFORMING RESPONSE, WAS NOT
DISCLOSED .................................................................................................135

XIII.    **ENABLEMENT AND SUFFICIENT WRITTEN DESCRIPTION OF THE
PATENTS-IN-SUIT**.................................................................................136

A.    LEGAL STANDARD.......................................................................................136

B.    ANALYSIS OF ENABLEMENT / WRITTEN DESCRIPTION .......................................136

XIV.    **PUBLIC AVAILABILITY OF CERTAIN DOCUMENTS**.................................139

## I.     INTRODUCTION

1.     I, L. Todd Heberlein, am the President of Net Squared, Inc.

2.     I have been retained by counsel for Symantec Corporation as an expert witness in this action. If called to testify as to the truth of the matters stated herein, I could and would do so competently.

## II.     QUALIFICATIONS

3.     I received a Bachelor of Science degree in Computer Science and Math from the University of California, Davis in 1988, and a Masters of Science degree in Computer Science from the University of California, Davis in 1991.

4.     I was the primary developer of the first network-based intrusion detection system, the Network Security Monitor (NSM), at UC Davis in the late 1980s and early 1990s. The NSM processed network packets and applied anomaly and signature detection techniques to detect intrusive activity. The work began in 1988, and we published numerous papers describing the work in 1990, 1991, and 1994. By the mid-1990s the NSM was deployed at numerous organizations including UC Davis, the Air Force, the Department of Energy, NASA, and the Department of Justice. The Air Force deployed it at over 100 Air Force sites globally. Within the Air Force and at Lawrence Livermore National Laboratory, the NSM was usually deployed at the organization's gateway to the rest of the Internet.

5.     I was also one of the primary developers for the first hierarchical and distributed intrusion detection system, the Distributed Intrusion Detection System, (DIDS) which integrated NSM, host monitors for SunOS and VMS, and a centralized Director. DIDS was deployed at UC Davis and Lawrence Livermore National Laboratory in 1992. I have been told that the Air Force deployed DIDS at other locations at a later date.

325439

6.    From 1993 to 1995 I worked on a DARPA contract called Intrusion Detection for Large Networks, and in 1995 I presented results, including an initial fully distributed intrusion detection capability, to our DARPA Program Manager, Teresa Lunt. That work eventually became the Graph-based Intrusion Detection System (GrIDS). In addition to intrusion detection technology, I researched issues about the fundamental nature of computer vulnerabilities, and that work won a "best paper" award at the National Information Systems Security Conference in 1996.[1] The paper was also republished in a book by Dorothy and Peter Denning.[2]

7.    I founded Net Squared, Inc. in 1996. At Net Squared I performed research and development in computer security for numerous organizations including the Air Force, Lawrence Livermore National Laboratory, the Defense Advanced Research Projects Agency (DARPA), Office of Naval Research, the Intelligence Community, and the Federal Aviation Administration. At Net Squared I developed the Network Monitoring Framework (NMF), a library of network monitoring C++ objects, and Network Radar, a suite of network monitoring applications built on the NMF libraries. Network Radar tools were integrated into larger, hierarchical intrusion detection systems by the Air Force and Boeing, including EPIC, EPIC2, AIDE, AFED, and IDIP. Network Radar was deployed at UC Davis, the Air Force's Rome Research Laboratory, and during numerous Air Force exercises. From approximately 2002-2003 I also led a project called TrendCenter, which integrated and correlated intrusion detection alerts from unrelated organizations. As part of that effort I developed SANS' initial Internet Storm Center prototype.

---

[1] L. T. Heberlein, M. Bishop, "Attack Class: Address Spoofing," 19th National Information Systems Security Conference, Baltimore, MD, 22-25 Oct. 1996, pp. 371-377.
[2] D. Denning and P. Denning, INTERNET BESIEGED, COUNTERING CYBERSPACE SCOFFLAWS, 1st ed. (Oct. 3, 1997) at Chap. 10.

8.    In addition to traditional intrusion detection capabilities (anomaly detection and signature detection), I developed or help develop several other intrusion detection technologies.  For example, we profiled network services in NSM and DIDS, and that work was also part of a feature selection effort led by Jeremy Frank.[3]  The profiling of network services work, later based on a feed-forward back-propagation neural network, was also rolled into Network Radar's Non-Cooperative Service Recognition (NCSR) technology.

9.    I also did the initial work on network thumbprinting that was introduced in the 1992 Internetwork Security Monitor paper,[4] and I helped refine the thumbprinting technology that was published in a 1995 IEEE paper.[5]  Thumbprinting uses a multivariate statistical technique called principal component analysis to reduce a high dimensional object to a small dimensional object.  Vector distances of the lower dimensional objects were then used to determine if the objects were correlated.

10.    Both the NCSR and the thumbprinting work were also rolled into Network Radar, which was able to detect the earliest stages of the ILOVEYOU worm as it hit the Air Force's Rome Labs.

11.    A summary of my professional experience and publications are attached as Exhibit A.

12.    I receive compensation in the amount of $258.00 per hour for the time that I devote to this matter.  My compensation is not dependent in any way on the outcome of this matter.

---

[3] J. Frank , "Machine Learning and Intrusion Detection: Current and Future Directions," Proc. of the 17th National Computer Security Conference, October 1994.
[4] L.T. Heberlein, B. Mukherjee, K.N. Levitt., "Internetwork Security Monitor: An Intrusion-Detection System for Large-Scale Networks," Proc. 15th National Computer Security Conference, pp. 262-271, Oct. 1992.
[5] S. Staniford-Chen, and L.T. Heberlein, "Holding Intruders Accountable on the Internet," Proc. of the 1995 IEEE Symposium on Security and Privacy, Oakland, CA, 8-10 May 1995, pp. 39-49.

3

## III.    METHODOLOGY AND BASES

13.    In preparing my opinions and analysis of the art, I have thoroughly reviewed the entire specification and claims of U.S. Patents No. 6,321,338 (the '338 patent); 6,484,203 (the '203 patent); 6,708,212 (the '212 patent); and 6,711,615 (the '615 patent) (collectively, the patents-in-suit). I have also reviewed each of the prosecution histories and the Microfiche Appendix included with the patents-in-suit.

14.    I have also reviewed the expert reports of Mr. Daniel Teal and Mr. Frederick Avolio, and have indicated in my report instances where I have relied upon these reports.

15.    I have reviewed an extensive body of prior art publications and product documentation. I have also spoken directly with a number of individuals who I understand and believe to be personally knowledgeable with respect to the prior art embodiments discussed below. A list of the prior art publications and documentation I have reviewed and the individuals with whom I have spoken in forming the opinions set forth below is attached as Exhibit B.

16.    I have also compared each of the claims of the patents-in-suit with certain prior art publications and embodiments discussed below, and charts comparing the claims of the patents with those printed publications and embodiments are attached as Exhibits C-V.

17.    In general, my methodology of inquiry with respect to each of the principal prior art publications and embodiments relied upon in my opinions was as follows:

    a.    With regard to prior art publications, I reviewed each publication in detail.

    b.    With regard to product embodiments, I reviewed the marketing literature, product documentation and manuals relating to the prior art system to familiarize myself with the features, functions and capabilities of the system.

    c.    With regard to product embodiments, I typically also engaged in a lengthy conversation with at least one individual who was personally

knowledgeable of the facts relating to the development, marketing and history of the prior art embodiment. In this conversation I attempted both to challenge and to confirm my understanding of the facts that I had derived from my prior investigations.

d.  In general I have attempted to maintain a skeptical perspective with respect to the materials I have reviewed in order to satisfy myself that the bases for my opinions are well-founded and truly convincing to one skilled in the art.

## IV.  RELEVANT FIELD OF ART AND PERSON OF ORDINARY SKILL IN THE ART

18.    The patents-in-suit relate to the field of network monitoring, in particular network monitoring for the purpose of detecting suspicious or intrusive network activity. I have based this determination upon my examination of the patents-in-suit. For instance, the '338, '212 and '615 patents are all entitled "Network Surveillance." The '203 patent is entitled "Hierarchical Event Monitoring and Analysis." The '338 patent claims a "method of network surveillance." The '203, '212 and '615 patents claim an "enterprise network monitoring system." The patents-in-suit claim network monitoring for the purpose of detecting "suspicious network activity."

19.    In light of my opinion as to the field of art relevant to the patents-in-suit, I am of the opinion that one of ordinary skill in the art as of the filing date would have been someone with an undergraduate degree in Computer Science with at least three to five years experience in computer programming and network design with an emphasis in network monitoring technology and intrusion detection.

## V.  THE SPECIFICATION OF THE PATENTS-IN-SUIT

### A.  Inventors' description of their invention

20.    I have reviewed the specifications of all four of the patents-in-suit, including the written description and the claims. I have also reviewed the file histories of all four patents-in-suit. The patents-in-suit also include a Microfiche Appendix, which I

5

reviewed in detail. I have based the following description of the alleged inventions on these documents.

21.    The '203, '212 and '615 patents are all continuations of the '338 patent. I understand that this means that all four patents-in-suit are entitled to the filing date of the '338 patent, which is November 9, 1998. I also understand that as continuations, the '203, '212 and '615 patents may not add "new matter" or additional disclosures to the specification of the '338 patent. Although the "References Cited," "Abstract" and "Summary" sections of the four patents-in-suit differ in some respects, the Figures and "Detailed Description" sections are essentially identical and provide a common description of the alleged inventions. Because the most relevant portions of the written description of the four patents-in-suit share a common disclosure, I have cited only to the '338 patent in my description of the alleged inventions. However, this description applies to all four of the patents-in-suit.

22.    In addition, I understand that the patents' specification purports to incorporate-by-reference the information in A. Valdes and D. Anderson, "Statistical Methods for Computer Usage Anomaly Detection Using NIDES," Proceedings of the Third International Workshop on Rough Sets and Soft Computing, January 1995 ("*Statistical Methods*").[6] However, I also understand that SRI has admitted[7] that this publication is not "essential material," which is defined in the Manual of Patent Examining Procedures Section 608.01 (7th Ed., July 1998) as:

> "Essential material" is defined as that which is necessary to (1) describe the claimed invention, (2) provide an enabling disclosure of the claimed invention, or (3) describe the best mode (35 U.S.C. 112).

---

[6] '338 col. 5:43-49.

[7] *See* SRI International, Inc.'s Responses to Defendant Symantec Corporation's First Set of Requests for Admission [RFA No. 2].

23.    Because this publication cannot be relied upon to describe or enable the alleged inventions, I have not included a discussion of it in this description.

24.    Furthermore, I also understand that the patents' specification purports to incorporate-by-reference the information in P. Porras and A. Valdes, "Live Traffic Analysis of TCP/IP Gateways," Networks and Distributed Systems Security Symposium, March 1998 ("*Live Traffic Analysis*").[8] However, I also understand that SRI has admitted that this publication is not "essential material" as well.[9] Because this publication cannot be relied upon to describe or enable the alleged inventions, I have not included a discussion of it in this description.

### 1.    Written description of the patents-in-suit

25.    The common written description of the patents-in-suit describes a hierarchical scheme for the monitoring and analysis of networks for the purpose of intrusion detection.  An enterprise network is shown that contains different "domains."[10] Each domain "includes one or more computers offering local and network services that provide an interface for requests internal and external to the domain."[11]

26.    The enterprise network includes a set of "network monitors" for analyzing network activity.[12] These monitors are deployed in an "analysis hierarchy"[13] and include lowest-level "service monitors," as well as "domain monitors" and "enterprise monitors." The service monitors analyze network traffic / network packets handled by "network entities" such as gateways, routers, or firewalls.[14] The service monitors produce reports

---

[8] '338 col. 12:61-65.
[9] *See* SRI International, Inc.'s Responses to Defendant Symantec Corporation's First Set of Requests for Admission [RFA No. 4].
[10] *See* '338, Fig. 1 and accompanying description.
[11] '338 col. 3:17-20.
[12] '338 col. 3:32-35.
[13] '338 col. 3:33-34.
[14] '338 col. 3:42-45.

and disseminate them to other monitors via a subscription-based distribution scheme.[15]
Domain monitors receive reports from service monitors and distribute their own reports
to enterprise monitors.[16] In turn, enterprise monitors correlate reports across their set of
monitored domains.[17]

27.     . The written description states that both domain monitors and enterprise
monitors "correlate" reports. However, no description of how correlation is performed is
provided. The written description does not contain any algorithms for correlating reports,
nor does it provide detail on what types of reports may be correlated. The written
description does suggest that enterprise monitors should focus upon recognizing
commonalities in reports such as "the spreading of a worm or a mail system attack
repeated throughout the enterprise" but does not identify specific events or reports that
may identify such scenarios.[18]

28.     Figure 2 of the patents-in-suit illustrates a monitor. All of the monitors
(service, domain and enterprise) use the same monitor code-base.[19] Monitors are
configured for different tasks via a "resource object" shown in Figure 3 of the patents-in-
suit. The resource object is used to "tun[e] the generic monitor code-base to a specific
event stream."[20]

29.     Each monitor can analyze "event records that form an event stream."[21]
Event records are created from network traffic / network packets in a variety of different
ways, and packets may be selected for analysis based upon different criteria.[22] Each
monitor includes one or more analysis engines. Event records are forwarded to the

---

[15] '338 col. 3:55-65, *see also* col. 9:22-11:3.
[16] '338 col. 3:66-4:18.
[17] '338 col. 4:18-47.
[18] '338 col. 4:38-39.
[19] '338 col. 11:4-11.
[20] '338 col. 11:27-28.
[21] '338 col. 4:61-62.
[22] '338 col. 4:61-5:5.

analysis engines within a monitor for analysis.[23] "The analysis engines 22, 24 receive large volumes of events and produce smaller volumes of intrusion or suspicion reports that are then fed to the resolver."[24]

30.    Two different types of analysis engines are described: a "signature analysis engine" and a "statistical profiling," which perform different types of analysis on the data collected by the monitors.[25] The signature engine can perform threshold analysis, which detects when the number of occurrences of a specific event exceeds a preset level.[26] The signature engine uses abstract representations of known attacks to compare against incoming event streams.[27]

31.    The statistical engine performs statistical profile-based anomaly detection. In contrast to the signature engine, the algorithms used for the statistical profiling analysis require no prior knowledge of intrusive or exceptional activity.[28] The statistical engine uses "statistical measures to profile network activity indicated by an event stream."[29] Statistical measures are variables created from event records.[30] Four types of measures are described: categorical, continuous, intensity, and event distribution.[31]

---

[23] '338 col. 5:34-35.

[24] '338 col. 8:13-15.

[25] See '338 Fig. 2 and accompanying description at 4:48-53. Although the patents state "a monitor 16 may include additional analysis engines that may implement other forms of analysis" I have not found a description of any other type of analysis engine in the patents' written description.

[26] '338 col. 7:24-26, 7:45-55.

[27] '338 col. 7:23-42.

[28] '338 col. 6:57-58.

[29] '338 col. 5:36-38.

[30] "The profile engine 22 can use a wide range of multivariate statistical measures to profile network activity indicated by an event stream." '338 col. 5:36-38. "The monitor builds a statistical model of network activity from the network packets, for example, by building 68 long-term and short-term statistical profiles from measures derived from the network packets." '338 col. 12:47-53.

[31] '338 col. 5:49-6:37.

These measures are used to create a long-term statistical profile and a short-term statistical profile.[32]

32.    While the long-term statistical profile characterizes historical activity, the short-term statistical profile "characterizes recent activity."[33] The patents explain that both the long-term and the short-term profiles are "aged to adapt to changes in subject activity."[34] The short-term profile is periodically used to update the long-term profile and is then cleared. The short-term profile is compared to the long term profile to determine if recent activity is anomalous.[35]

33.    A monitor also includes a resolver for implementing a response policy (the patents also use the term "countermeasure" to mean the same thing as response).[36] The resolver invokes either passive or active types of responses, or countermeasures, such as report dissemination to other monitors or severing a communications channel.[37] A monitor also includes an application programmers' interface (API) to "encapsulat[e] monitor functions" and "eas[e] integration of third-party intrusion-detection tools."[38]

34.    The appendix to the patents-in-suit contains portions of the source code for the estat program. Estat was the inventors' embodiment for statistical profiling.[39] The estat code in the appendix is "generic" and not specific to reading network traffic – instead, the code would operate on any data provided in the correct format. The appendix also contains code for some basic infrastructure plumbing for communications between various code modules. In my opinion, the estat code contains no further description of

---

[32] '338 col. 6:38-50.
[33] '338 col. 6:44-47.
[34] '338 col. 6:38-52.
[35] '338 col. 6:38-7:3.
[36] '338 col. 4:55-56; 11:57 – 12:19.
[37] '338 col. 8:19-21; col. 12:7-19.
[38] '338 col. 4:57-60.
[39] Porras 30(b)(6) Tr. 171-173.

how to implement the alleged inventions other than to illustrate minor unclaimed software implementation details not relevant to the claimed inventions.[40]

### 2.    The claims of the '338 patent

35.    I understand that it is the claims of the patents-in-suit that define the alleged inventions.  In the following sections I have attempted to distill each patent's claims down to a representative claim for each patent, and a discussion of the additional limitations in other claims of each patent.

36.    I understand that SRI has asserted '338 claims 1-8, 10-19, 21, 24 and 25 against Symantec in this litigation.[41]  Claims 1, 21, 24 and 25 are all independent claims.

37.    Independent claims 1, 21 and 25 of the '338 patent are directed to a "method of network surveillance" and independent claim 24 is directed to a "computer program product."  Although claim 1 is a method claim and claim 24 is an apparatus claim, these two claims contain virtually identical limitations.  Thus, claim 1 is representative of the alleged invention claimed:

> 1. A method of network surveillance, comprising:
>
> receiving network packets handled by a network entity;
>
> building at least one long-term and at least one short-term statistical profile from at least one measure of the network packets, the at least one measure monitoring data transfers, errors, or network connections;
>
> comparing at least one long-term and at least one short-term statistical profile; and

---

[40] For example, one of the inventors, Mr. Valdes, testified that the estat code illustrates "software engineering aspects" such as speed and performance that would not be disclosed in the patents' specification.  Valdes Tr. 349.  The patents-in-suit do not require any particular speed or performance by the claimed system or method.

[41] Although SRI has not asserted the remaining '338 patent claims against Symantec, these claims are substantially similar to other asserted claims and I believe that these claims are similarly invalid for the reasons discussed in my report.

11

determining whether the difference between the short-term statistical profile and the long-term statistical profile indicates suspicious network activity.

38.    Independent claim 21 claims building "multiple short-term statistical profiles" but otherwise does not differ substantively from claim 1. Independent claim 25 requires "receiving packets at a virtual private network entity" and instead of separate "comparing" and "determining" limitations, claims "comparing at least one long-term statistical profile with at least one short-term statistical profile to determine whether the packets indicate suspicious network activity."

39.    Dependent claims 2-4 require particular types of "data transfers" be monitored:

- network packet data transfer commands (2),

- network packet data transfer errors (3),

- network packet data transfer volume (4).

40.    Dependent claims 5-7 require particular types of "network connections" be monitored:

- network connection requests (5),

- network connection denials (6),

- a correlation of network connections requests and network connection denials (7).

41.    Dependent claim 8 requires a particular type of "error" be monitored (error codes included in a network packet), and dependent claim 10 further requires that the "error code" of claim 8 comprise "an error code indicating a reason a packet was rejected."

42.    Dependent claims 11-12 and 16-17 require various different types of response:

12

- responding (11),

- responding comprises transmitting an event record to a network monitor (12),

- responding comprises altering analysis of the network packets (16),

- responding comprises severing a communication channel (17).

43.     Dependent claim 13 requires "transmitting the event record to a hierarchically higher network monitor."

44.     Dependent claim 14 requires "transmitting the event record to a network monitor that receives event records from multiple network monitors."

45.     Dependent claim 15 requires that the network monitor of claim 14 "correlates activity in the multiple network monitors based on the received event records."

46.     Dependent claim 18 requires that the network packets comprise TCP/IP packets.

47.     Dependent claim 19 requires that the network entity comprise a gateway, a router, or a proxy server.

### 3.     The claims of the '203 patent

48.     I understand that SRI has asserted '203 claims 1-22 (all of the claims) against Symantec in this litigation.

49.     The '203 patent contains two independent claims:  claim 1 to a "method of hierarchical event monitoring and analysis within an enterprise network" and claim 12 to an "enterprise network monitoring system."[42]  Although claim 1 is a method claim and

---

[42] *See* '203 patent claims 1 and 12.

13

claim 12 is a system claim, both contain virtually identical limitations. Thus, claim 1 is representative of the alleged invention claimed:

> 1. A computer-automated method of hierarchical event monitoring and analysis within an enterprise network comprising:
>
> deploying a plurality of network monitors in the enterprise network;
>
> detecting, by the network monitors, suspicious network activity based on analysis of network traffic data selected from the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet};[43]
>
> generating, by the monitors, reports of said suspicious activity; and
>
> automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors.

50.     Both claim 1 and claim 12 each have ten similar dependent claims, requiring:

- "correlating intrusion reports reflecting underlying commonalities" (2 and 13),

- "invoking countermeasures" (3 and 14),

- "network monitors include an API for encapsulation of monitor functions and integration of third-party tools (4 and 15),

- "the enterprise network is a TCP/IP network" (5 and 16),

- "network monitors are deployed at one or more of… {gateways, routers, proxy servers}" (6 and 17),

- deploying a "plurality of service monitors" among "multiple domains" (7 and 18),

- "receiving and integrating is performed by a domain monitor" (8 and 19),

---

[43] I understand that in order to invalidate this limitation, a prior art reference need only disclose one of the claimed "network traffic data" categories.

14

- "deploying a plurality of domain monitors within the enterprise network" (9 and 20),

- "receiving and integrating is performed by an enterprise monitor" (10 and 21), and

- wherein the domain monitors "establish peer-to-peer relationships with one another" (11 and 22).

### 4.    The claims of the '212 patent

51.    I understand that SRI has asserted '212 claims 1-24 (all of the claims) against Symantec in this litigation.

52.    The '212 patent contains two independent claims:  claim 1 to a "method for monitoring an enterprise network" and claim 14 to an "enterprise network monitoring system."[44]  Although claim 1 is a method claim and claim 14 is a system claim, both contain virtually identical limitations.  Thus, claim 1 is representative of the alleged invention claimed:

> 1. Method for monitoring an enterprise network, said method comprising the steps of:
>
> deploying a plurality of network monitors in the enterprise network;
>
> detecting, by the network monitors, suspicious network activity based on analysis of network traffic data, wherein at least one of the network monitors utilizes a statistical detection method;
>
> generating, by the monitors, reports of said suspicious activity; and
>
> automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors.

53.    Claims 1 and 14 of the '212 patent are very similar to the '203 independent claims, except that claims 1 and 14 of the '212 patent require only "analysis of network traffic data" without explicitly listing categories of such network traffic data.

---

[44] *See* '212 patent claims 1 and 14.

15

In addition, the '212 claims 1 and 14 require that "at least one of the network monitors utilizes a statistical detection method."

54.    Both claim 1 and claim 14 each have ten similar dependent claims, whose limitations are identical to the dependent claim limitations listed above for the '203 dependent claims. In addition, '212 independent claim 1 contains two additional dependent claim limitations:

- "at least one of the network monitors utilizes a signature matching detection method" (2), and

- "wherein the monitor utilizing a signature matching detection method also utilizes a statistical detection method" (3).

### 5.    The claims of the '615 patent

55.    I understand that SRI has asserted '615 claims 1-23, 34-53, 64-73, and 84-93 against Symantec in this litigation.[45] Claims 1, 13, 34, 44, 64, and 84 are all independent claims.

56.    Claim 1 to a "method of hierarchical event monitoring and analysis within an enterprise network" and claim 13 to an "enterprise network monitoring system"[46] both contain virtually identical limitations. Independent claims 34, 44, 64 and 84 all contain similar limitations to independent claims 1 and 13, with minor variations discussed below. Thus, claim 1 is representative of the alleged invention claimed:

> 1. A computer-automated method of hierarchical event monitoring and analysis within an enterprise network comprising:
>
> deploying a plurality of network monitors in the enterprise network;

---

[45] Although SRI has not asserted the remaining '615 patent claims against Symantec, these claims are substantially similar to other asserted claims and I believe that these claims are similarly invalid for the reasons discussed in my report.

[46] See '615 patent claims 1 and 13.

detecting, by the network monitors, suspicious network activity based on analysis of network traffic data selected from one or more of the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service protocols};[47]

generating, by the monitors, reports of said suspicious activity; and

automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors.

57.     Claims 1 and 13 of the '615 patent are virtually identical to claims 1 and 12 of the '203 patent, except that the '615 patent claims include two additional "network traffic data" categories: "network connection acknowledgments" and "network packets indicative of well-known network-service protocols."

58.     Unlike claims 1 and 13 of the '615 patent, independent claims 34, 44, 64 and 84 require only "analysis of network traffic data" without listing particular categories of network traffic data.  Each of these independent claims also includes an additional limitation:

- "at least one of the network monitors is deployed at a gateway" (34),

- "at least one of the network monitors is deployed at a router" (44),

- "at least one of the network monitors is deployed at a firewall" (64), and

- "at least one of the network monitors is deployed at one or more of the following facilities of the enterprise network: {gateways, routers, proxy servers, firewalls}" (84).

59.     Claim 1 has eleven dependent claims (2-12), claim 13 has ten dependent claims (14-23), and claims 34, 44, 64 and 84 each have nine dependent claims.  None of

---

[47] I understand that in order to invalidate this limitation, a prior art reference need only disclose one of the claimed "network traffic data" categories.

these dependent claims contain any new limitations not already encompassed by the '203 and '212 claims.

### B.     Computer science concepts relevant to the patents

60.     The patents-in-suit are targeted towards one of skill in the art of computer science, with some understanding of mathematical and statistical algorithms used in intrusion detection. Furthermore, the prior art discussed in this report is similarly targeted towards one of skill in the art of computer science. In order to be able to present the context of this work to a jury and explain the functionality of these systems, I may present at trial an explanation of certain important concepts in computer science.

61.     These topics may include: the fundamentals of important networking protocols such as IP, TCP, UDP, FTP, HTTP, Telnet, and SNMP; what a network packet or datagram is; how a packet sniffer works; how TCP connections work; and the benefits of using network packets as a data stream (including leveraging widespread use of Internet Standards or RFCs). I may also offer testimony on general network architectures including distributed architectures, peer-to-peer communications, client-server communications, and communications with remote agents. I may also offer testimony about the basic features and functionality of certain network infrastructure such as clients, servers, routers, firewalls, packet filters, proxy servers, gateways, bridges, switches, virtual private networks (VPNs) and end-nodes.

62.     Networked computers typically communicate using several standard network protocols. A protocol is a set of standard rules for data representation, signaling, data exchange and error detection. These protocols are typically depicted as being organized as a stack.[48] One of the key benefits of this stack-based design is that a

---

[48] *See* W. Richard Stevens, "TCP/IP Illustrated, Volume 1—The Protocols" (Addison-Wesley 1994) (TCP/IP Illustrated, Volume 1) at 2 (depicting a four-layer stack). Another

18

protocol at a given layer need not be concerned with protocols at layers not directly adjacent to it. For example, TCP, which is designed to be used with IP, need not be concerned with which link layer protocol is being used to transport IP data. This decoupling of protocols enables communications between heterogeneous networks. I am familiar with several protocols in each layer of the network, and at trial I may testify as to the operation of these protocols.

63.    Network communications typically occur via network packets. A network packet is a discrete unit of data crossing a network. Several network protocols—including TCP, IP, UDP, and ICMP—specify how to format network packets.[49] Network packets typically include a header portion and a data portion. An important concept in communicating via network packets is "encapsulation."[50] Typically, a packet of information formatted according to a protocol at a given layer is encapsulated within a packet formatted according to a protocol in the layer directly beneath it. For example, in order for an FTP client to send a command to an FTP server, the FTP command is encapsulated within the data portion of the TCP packet. The TCP packet is then encapsulated in the data portion of an IP packet. The IP packet is then encapsulated in the data portion of a packet formatted according to a link-layer protocol such as Ethernet. Thus, as information—such as an FTP command—is passed down the stack of protocols, each protocol in turn encapsulates the information it receives. It is this encapsulation that enables the decoupling of protocols mentioned earlier.

64.    The opposite operation—demultiplexing—occurs when the encapsulated network packet is received.[51] When the IP packet is received by the server, the IP

---

common depiction is the "OSI 7 Layer Model." *See* "OSI Seven-Layer Model," *available at* http://www.freesoft.org/CIE/Topics/15.htm.
[49] *See* TCP/IP Illustrated Volume 1 at 34 (IP packet format), 70 (ICMP packet format), 145 (UDP packet format), 255 (TCP packet format),
[50] *See* TCP/IP Illustrated Volume 1 at 9-10.
[51] *See* TCP/IP Illustrated Volume 1 at 11.

19

implementation on the server will extract the TCP packet from the IP packet by extracting the data portion of the IP packet and then send this extracted TCP packet to the TCP implementation. The TCP implementation will then likewise extract the FTP command from the TCP packet and send it to the FTP implementation.

65.     Because of the stack-based relationship between the protocols, concepts at one layer often have analogs at other layers. For example, the concept of an error has meaning at several layers of the stack. In the context of communications between an FTP client and an FTP server, the FTP protocol specifies error messages that are sent in response to syntax errors in FTP commands.[52] But FTP communications can also generate errors at other layers. If an FTP client sends a FTP command to an invalid IP address, an ICMP packet containing a "host unreachable" error code will be generated and sent to the client. Further down the stack, the transmission of an FTP command may cause a packet collision at the link layer, which is akin to an error. Likewise the concept of a session has meaning at multiple layers of the network stack. A session is a related communication between two systems for a given period of time.

66.     By 1997, the use of standard network protocols was already widespread. The prevalence of the TCP/IP protocol suite enabled communications between heterogeneous network devices. In other words, the TCP/IP protocol suite and related standard protocols served as the lingua franca of computer networks, such that a device wanting to communicate with heterogeneous devices on the network need only implement the standard network protocols.

67.     The nature of the TCP/IP protocol suite made network packets an ideal subject of analysis for intrusion detection systems.[53] By analyzing network packets, an

---

[52] See TCP/IP Illustrated Volume 1 at 424.
[53] See Mukherjee, Heberlein, and Levitt, "Network Intrusion Detection," IEEE Network May/June 1994 26-41, 33.

intrusion detection system could analyze a wide range of heterogeneous network entities without needing to understand the various entity-specific audit data formats. In other words, the analysis of network packets enabled intrusion detection systems to scale to monitor larger and more heterogeneous groups of computers.

68.    Packets travel over the network via a series of hops from one networked computer to another. Thus, packets sent between two remote computers typically pass through several intermediate network entities. Some of these entities specialize in moving and routing packets across the network. A router is an example of such a specialized entity.

69.    By 1997, the vast body of known malicious network-based attacks included attacks that targeted many of the protocol layers as well as several different types of network entities. At trial, I may testify regarding the operation of these attacks and efforts to thwart them.

### C.    Intrusion detection methodologies

70.    There are a variety of different methods for detecting computer intrusions. For example, the specification of the patents-in-suit refers to statistical profiles, statistical anomaly detection, signature matching detection, and threshold analysis. In addition, the intrusion detection field also uses terms such as "misuse detection," "rule-based detection," "expert systems," "heuristic detection," "specification based detection," "protocol anomaly detection," and numerous other terms. Often, the definitions for such terms are not well-defined in the field, or may occasionally be used to mean slightly different things.

71.    In general, I tend to characterize methods for detecting computer intrusions into two broad classes: anomaly-detection systems and misuse detection systems. One distinction that can be made between these two classes is that "anomaly

21

detection" typically does not require prior knowledge of what an attack may look like, but instead watches for deviations from normal behavior and flags it as anomalous, without necessarily having knowledge of whether the behavior is actually "bad" or not. Depending on the sensitivity of the system, this can lead to false positives on behavior that deviates from normal, but is not actually malicious. However, anomaly detection may in theory be able to detect "new" attacks that do not match any known attack pattern. By contrast, misuse-detection systems typically rely on some form of known bad or good behavior that they can try to detect.

72.    However, there are many different ways to characterize and categorize the different analysis methods that may be used for intrusion detection. At trial I may testify about some or all of these different analysis methods.

## VI.    CLAIM LANGUAGE

73.    I understand that the Court has not yet construed certain claim terms of the claims of the patents-in-suit. Since the Court has not yet issued a decision construing the claims of the patents-in-suit, I have been asked, for purposes of this analysis, to assume that the Court adopts the claim construction positions advanced by SRI. In certain instances I have also included a supplemental analysis in the event the Court adopts the claim construction positions advanced by Symantec or ISS.

74.    I understand that claim language is generally construed in accordance with its ordinary and customary meaning to those skilled in the relevant art as of the date of the invention. I also understand that claim terms should be given the meaning that is objectively discerned from the specification and/or the prosecution history by one of ordinary skill in the art as of the date of the invention, even if that meaning differs from the term's ordinary and customary meaning. Where no party has offered a construction for a particular claim term, I have relied upon the ordinary meaning of that term.

22

## VII.    LEGAL STANDARDS – ANTICIPATION AND OBVIOUSNESS

75.    I understand that a party challenging the validity of an issued United States patent bears the burden of proving invalidity by clear and convincing evidence.

76.    I understand that a patent claim is presumed valid unless it is shown by clear and convincing evidence that the claimed subject matter was not novel as of the date of invention, or even if novel, that the differences between the subject matter claimed and the prior art were such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art to which the subject matter pertains.

77.    I understand that a claimed invention is not novel if:

a.    the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

b.    the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

c.    the invention was described in a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent.[54]

78.    I understand that lack of novelty requires an invalidating prior art reference to disclose each and every limitation of the claimed invention, either expressly or inherently, in detail sufficient to enable one of ordinary skill in the art to practice the claimed invention without undue experimentation. I understand that inherency requires that a prior art reference necessarily functions in accordance with, or includes, the claimed limitation(s). I understand that to determine what a prior art reference discloses for the purposes of evaluating novelty, it is important and appropriate to read the reference in combination with the knowledge of those of ordinary skill in the art.

---

[54] 35 U.S.C. § 102.

23

79.    I understand that patent law distinguishes novelty from obviousness and that obviousness exists if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the claimed subject matter pertains.[55]

80.    I understand that in determining the obviousness of the claim(s) of a patent, one should consider:

    a.    the scope and content of the prior art relied upon by the party alleging invalidity of the patent;

    b.    the differences, if any, between each claim of the patent and the prior art; and

    c.    the level of ordinary skill in the pertinent art at the time the invention of the patent was made; and

    d.    whether the prior art enabled a person of ordinary skill in the art to make and use the invention claimed.

I understand that one must also consider such objective considerations as commercial success, long-felt but unresolved need, failure of others to solve the problem, acquiescence in the patent by others, and whether the same or similar inventions were made independently by others prior to or at about the same time as the invention claimed in the patent.

81.    I understand that the test of obviousness is whether the claimed invention, as a whole, would have been obvious to one of ordinary skill in the art as of the date of the invention in light of the prior art. To establish obviousness under this test, I understand that one must show by clear and convincing evidence that a person of ordinary skill in the art at the time of invention, confronted by the same problem as the inventor and with no knowledge of the claimed invention, would select the recited

---

[55] 35 U.S.C. § 103.

elements from the prior art and combine them in the claimed manner. In other words, one must avoid the use of hindsight and instead identify in the art prior to the invention some suggestion or motivation, before the invention itself was made, to make the new combination.

82.     I understand that the motivation to combine prior art references need not be expressly stated in the prior art, but that it may be found, for example, in the nature of the problem to be solved, or may come from the knowledge of those skilled in the art. The motivation, suggestion, or teaching to combine need not be explicit, it may be implicit from the prior art as a whole, rather than expressly stated in the reference itself. I further understand that the test for an implicit showing is what the combined teachings, knowledge of one of ordinary skill in the art, and the nature of the problem to be solved as whole would have suggested to those of ordinary skill in the art.

## VIII.  SUMMARY OF OPINIONS

83.     Based on my review of the materials listed in Exhibit B, as well as my experience, study and training in the field of computer science and intrusion detection over the course of my career, I have formed the following opinions regarding the lack of novelty of the inventions claimed in the patents-in-suit. For convenience, I have provided a summary of the claims that are rendered invalid as anticipated or obvious by each different prior art publication or system in Exhibit JJ.

- Prior to the filing date of the original application resulting in the patents-in-suit, the subject matter described in the claims listed in Exhibit JJ was described in the printed publications listed on Exhibits C-F and V regarding NSM, DIDS, ISM, GrIDS, and *Network Intrusion Detection 1994 (NID 1994)*; it was also known or used by others in the United States with regard to the

NSM, DIDS, and GrIDS systems; it was also known by others in the United States with regard to the ISM design.

- Prior to the filing date of the original application resulting in the patents-in-suit, the subject matter described in the claims listed in Exhibit JJ was described in the printed publications listed on Exhibits G-L and U regarding JiNao, *Emerald 1997* (both alone and in conjunction with *Intrusive Activity 1994* and *NIDES 1994*), *Emerald – Conceptual Design 1997*, *Live Traffic Analysis*, *Network NIDEs*, and the *Feather thesis*.

- Prior to the filing date of the original application resulting in the patents-in-suit, the subject matter described in the claims listed in Exhibit JJ was known or used by others in the United States with regard to the HP OpenView, NetStalker, NetRanger, and RealSecure systems; it was also described in the printed publication NetRanger User's Guide Version 1.3.1.

- Prior to the filing date of the original application resulting in the patents-in-suit, the subject matter described in the claims listed in Exhibit JJ was described in the printed publications listed in Exhibits Q, S, and T "Network Level Intrusion Detection," "Stake Out Network Surveillance White Paper," and "AIS." It was also described in an application for patent filed in the United States that issued as U.S. Patent 5, 825,750 as listed in Exhibit R. Furthermore, it was known or used by others in the United States with regard to the Stake Out system. It was also known by others in the United States with regard to the "Network Level Intrusion Detection" and "AIS" systems.

84.    Based on my review of the materials listed in Exhibit B, as well as my experience, study and training in the field of computer science and intrusion detection over the course of my career, I have formed the following opinions regarding the obviousness of the inventions claimed in the patents-in-suit:

- The difference, if any, between the prior art and the subject matter described in the patents-in-suit would have been obvious to one of skill in the art as of November 9, 1997. Exhibit JJ provides a list of the claims rendered obvious by each particular printed publication, patent or system, in light of the teachings of the references indicated in Exhibits C-V.

- The lack of government use and absence of a long-felt need satisfied only by the claimed inventions further demonstrates that the subject matter of the asserted claims would have been obvious to one of ordinary skill in the art as of November 9, 1997.

85.    Based on my review of the materials listed in Exhibit B, as well as my experience, study and training in the field of computer science and intrusion detection over the course of my career, I have formed the opinion that the patents-in-suit are invalid because the inventors failed to disclose their best mode.

## IX.    STATE OF THE RELEVANT ART AS OF THE FILING DATE

### A.    HISTORY OF NETWORK MONITORING AND INTRUSION DETECTION

86.    Network monitoring for the purpose of detecting suspicious activity has its roots in both the general-purpose computer monitoring field and the field of host-based intrusion detection. In general, computer management and security techniques are used to preserve the security and integrity of the volumes of data and applications that may reside on different computer systems. As computer networks have proliferated and the volume of data stored on computers has multiplied, the need for increased security for all these networks and data has continued to increase in importance.

87.    In the 1970s, most computers systems were centralized. Typically, a mainframe processor would be connected to a group of relatively dumb terminals

allowing for data communication with the mainframe. However, by the 1980s, significant changes had occurred in computer systems and data communications. Microprocessor computers appeared, offering significant price and performance advantages over mainframes. Communication capabilities between computers also increased significantly, due to the growth of local area networks (LANs) connecting the growing numbers of microprocessor-based computers. High-speed wide area networks (WANs) also emerged to link LANs together. Networks began to proliferate. In particular, the Internet, developed from U.S. Government research that began in 1969, became increasingly important in the 1980s.

88.     As networks proliferated, so did the need to manage those networks and monitor them for problems. By the late 1980s, the Internet Activities Board (IAB) recognized the need to monitor and manage the Internet, and began developing a set of standards to implement these goals. Like other Internet standards, these network management standards were documented as Request for Comments (RFCs). The first such standard, Simple Network Management Protocol (SNMP), has achieved widespread use as a tool to monitor the status of networks for suspicious activity such as network problems and faults. SNMP was designed to allow data from each individual piece of the network, such as routers and gateways responsible for directing network traffic, to communicate its status to centralized managers, creating a global view of the status of a network.

89.     A wide variety of different commercial network monitoring tools and systems, such as HP OpenView, have been developed since the early 1990s to assist network administrators in the increasingly complex task of monitoring the status of networks.

90.     The growth of the computer industry also led to growth in the field of computer security. Many different types of systems have been developed to try and solve

28

different problems related to computer security. For example, as detailed in the report of Frederick Avolio, beginning in the 1980s firewalls were developed to help block undesirable network traffic from networks. In addition, again beginning in the 1980s, so-called intrusion detection systems ("IDS") were designed to detect, and in some cases thwart, unwanted attempts to infiltrate or access a computer or computer network. An "intrusion" can refer to any type of anomalous, illicit, or prohibited activity. An intrusion may originate from an external threat, or misuse by an internal user.

91.    I am uncertain as to when the phrase "intrusion detection" was first coined, but intrusion detection as a field has grown in importance along with the growth of the more general computer security field. The first intrusion detection systems in the early 1980s naturally focused upon protecting the centralized, multi-user computer systems that existed at the time. These early intrusion detection systems typically used audit-based analysis sources (often referred to as "host-based" systems because the source of the data is internal to each host being monitored). An audit trail is a record showing who has accessed a computer system and what operations have been performed during a given period of time. An audit trail may track basic operating system functions, such as system calls and processes performed, or it may track application usage or data access.[56] I will attempt to provide a brief history of how the intrusion detection field progressed along with the growth of computer networking generally to eventually include network-centric analyses as well as host-based data sources.

92.    The United States government, including the various branches of the military, has been involved since the dawn of the computer security field in funding research to protect computers and computer data.[57] The initial development of computer

---

[56] *See* S. Garfinkel and G. Spafford, PRACTICAL UNIX & INTERNET SECURITY at 289-92 (O'Reilly and Assoc. 2nd ed. 1996).
[57] Much of my own research and work, as well as much of the other research and systems addressed in this report, was partly or wholly funded by the U.S. government. The