IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SRI INTERNATIONAL, INC., a California Corporation,<br><br>       Plaintiff and<br>       Counterclaim Defendant,<br><br>   v.<br><br>INTERNET SECURITY SYSTEMS, INC., a Delaware corporation, INTERNET SECURITY SYSTEMS, INC., a Georgia corporation, and SYMANTEC CORPORATION, a Delaware corporation,<br><br>       Defendants and<br>       Counterclaim-Plaintiffs. | Civil Action No. 04-CV-1199 (SLR)<br><br>**FILED UNDER SEAL**<br>**[REDACTED VERSION]**<br>THIS DOCUMENT CONTAINS MATERIALS WHICH ARE CONFIDENTIAL OR RESTRICTED CONFIDENTIAL - SOURCE CODE AND COVERED BY A PROTECTIVE ORDER. THIS DOCUMENT SHALL NOT BE MADE AVAILABLE TO ANY PERSON OTHER THAN THE COURT AND OUTSIDE COUNSEL OF RECORD FOR THE PARTIES |

## OPENING BRIEF IN SUPPORT OF SYMANTEC'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899-2306
Tel: (302) 888-6800
Fax: (302) 571-1751

*Attorneys for Defendant and Counterclaim-Plaintiff Symantec Corporation*

OF COUNSEL:

Lloyd R. Day, Jr. (*pro hac vice*)
Robert M. Galvin (*pro hac vice*)
Paul S. Grewal (*pro hac vice*)
Day Casebeer Madrid & Batchelder LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014
Tel: (408) 873-0110
Fax: (408) 873-0220

Michael J. Schallop (*pro hac vice*)
Symantec Corporation
20330 Stevens Creek Blvd.
Cupertino, CA 95014
Tel: (408) 517-8000
Fax: (408) 517-8121

Original Dated: June 16, 2006
Redacted Version: June 23, 2006

# TABLE OF CONTENTS

PAGE NO.

I.    STATEMENT OF THE CASE...............................................................................1

II.   SUMMARY OF THE ARGUMENT ....................................................................4

III.  STATEMENT OF FACTS ....................................................................................4

    A.    Background Regarding Symantec's Accused Products............................4

    B.    Undisputed Material Facts ......................................................................6

IV.   SYMANTEC IS ENTITLED TO SUMMARY JUDGMENT OF
    NON-INFRINGEMENT.........................................................................................7

    A.    Legal Standard ........................................................................................7

    B.    Symantec Does Not Infringe Any Asserted Claim of the
        '338 Patent Because Symantec's Accused Products Do Not
        Practice the "Statistical Profile" Limitations Under Either
        SRI or Defendants' Proposed Constructions. .........................................8

        1.    SRI's expert conceded that the accused Flow Alert
            process does not infringe the '338 claims.....................................10

        2.    SRI has failed to articulate any credible alternative
            theory of infringement for the '338 claims
            supported by admissible evidence. ...............................................12

    C.    Symantec Does Not Infringe Any Asserted Claim of the
        '212 Patent or Claim 7 of the '615 Patent Because
        Symantec's Accused Products Do Not Practice the
        "Statistical Detection Method" Limitation Under Either
        SRI or Defendants' Proposed Constructions. .......................................21

    D.    Symantec Does Not Infringe Any Asserted Claim of the
        '212, '203 or '615 Patents Based on the Combination of
        Use of Its SGS Products with Its Manager Products Under
        Either SRI or Defendants' Proposed Constructions Because
        There Is No Evidence That Those Products Have Been
        Used Together In An Infringing Manner...................................................24

        1.    Symantec cannot directly infringe based on its
            customers' alleged combination of the accused SGS
            Products with Manager Products. ..................................................24

2.    Symantec is not liable for indirect infringement based on its SGS or Manager Products activities, because there is no evidence of direct infringement by any third party. .............................................................25

3.    Symantec is also not liable for contributory infringement because the accused SGS Products have substantial non-infringing uses..............................................29

E.    Symantec Does Not Infringe Any Asserted Claim of the '212, '203, and '615 Patents Because There Is No "Network Monitor" or "Hierarchical Monitor" In the Accused Products and Product Combinations Under Defendants' Proposed Construction. ........................................................30

V.    CONCLUSION................................................................................................31

# TABLE OF AUTHORITIES

PAGE NO.

CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................... 8

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*,
   216 F.3d 1042 (Fed. Cir. 2000) .......................................................... 17

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
   418 F. Supp. 2d 1021 (S.D. Ind. 2006) .............................................. 20

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
   424 F.3d 1293 (Fed. Cir. 2005) ..................................................... 24, 25

*Dynacore Holdings Corp. v. U.S. Phillips Corp.*,
   363 F.3d 1263 (Fed. Cir. 2004) ............................................. 25, 26, 28

*Horowitz v. Fed. Kemper Life Assurance Co.*,
   57 F.3d 300 (3d Cir. 1995) ................................................................ 7

*Joy Technologies, Inc. v. Flakt, Inc.*,
   6 F.3d 770 (Fed. Cir. 1993) ............................................................. 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ....................................................................... 7, 8

*McKesson Info. Solutions LLC v. The Trizetto Group, Inc.*,
   2006 U.S. Dist. LEXIS 16086 (D. Del. 2006) ................................... 8

*Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*,
   803 F.2d 684 (Fed. Cir. 1986) ......................................................... 25

*Novartis Corp. v. Ben Venue Labs, Inc.*,
   271 F.3d 1043 (Fed. Cir. 2001) ............................................ 7, 17, 18, 19

*Pa. Coal Ass'n v. Babbitt*,
   63 F.3d 231 (3d Cir. 1995) ................................................................ 8

*Penn. Dental Ass'n v. Med. Serv. Ass'n.*,
   745 F.2d 248 (3d Cir. 1984) ............................................................ 17

*Shaw v. Strackhouse*,
   920 F.2d 1135 (3d Cir. 1990) .......................................................... 17

*Techsearch L.L.C. v. Intel Corp.*,
   286 F.3d 1360 (Fed. Cir. 2002) ......................................................... 7

## TABLE OF AUTHORITIES (CONT'D)

PAGE No.

STATUTES

35 U.S.C. § 271(a) ......................................................................................... 24

35 U.S.C. § 271(b) ......................................................................................... 25

35 U.S.C. § 271(c) .................................................................................... 25, 29

RULES

Fed. R. Civ. P. 56(c) ................................................................................... 7, 26

Fed. R. Civ. P. 56(e) ......................................................................................... 8

## I.    STATEMENT OF THE CASE

After months of reviewing documents, taking depositions, and preparing expert reports, SRI International, Inc. ("SRI") is still searching for evidence to support its claim that Symantec Corporation ("Symantec") infringes the patents-in-suit.  But the time for such investigation has long since passed.  SRI's failure to develop coherent theories of infringement supported by admissible evidence is understandable because Symantec simply does not infringe SRI's patents under even SRI's proposed claim constructions.  By this motion for summary judgment, Symantec seeks to hold SRI accountable for its failure of proof and put an end to this case.

SRI sued Symantec for infringement of four patents relating to the monitoring and surveillance of computer networks for intrusion detection.[1]  These four patents claim priority from the same application, share almost identical written descriptions, and all issued without any office actions, rejections, or amendments.  The claims of the '338 patent are directed to a particular statistical algorithm for detecting suspicious network activity.  The claims of the '203 and '615 patents focus on methods and systems for deploying a hierarchy of network monitors that can generate and receive reports of suspicious network activity.  The '212 patent claims combine both the use of statistical detection methods and a hierarchical architecture of network monitors.

SRI has accused Symantec of infringing 90 claims of the patents-in-suit.[2]  Two

---

[1]    All referenced exhibits are attached to the Declaration of Paul S. Grewal.  The four patents-in-suit are United States Patent Nos. 6,321,338 ("the '338 patent") [Ex. A], 6,708,212 ("the '212 patent") [Ex. B], 6,484,203 ("the '203 patent") [Ex. C], and 6,711,615 ("the '615 patent") [Ex. D].

[2]    SRI has accused Symantec of infringing: '338 claims 1-2, 4, 11-13, 18-19, 24; '212 claims 1-11, 13-22, 24; '203 claims 1-9, 11-20, 22; and '615 claims 1-10, 12-21, 23, 34-41, 43-51, 53.  Defendants are currently contesting SRI's belated attempt to add '615 claims 74 and 78.

groups of Symantec products are alleged to infringe. The first group includes ManHunt 3.0, Symantec Network Security 4.0, Symantec Network Security 7100 Series, and iForce IDS ("the ManHunt Products"). SRI has accused the ManHunt Products of infringing all four patents-in-suit.

The second group comprises the combination of Symantec Gateway Security ("SGS") products, including the SGS 5400, 5600 and 1600 Series, with the "Manager Products" – Incident Manager 3.0 and Security Information Manager 9500 Series. SRI has accused SGS 5400 Series products when used in combination with one of the Manager Products as infringing the asserted claims of the '212, '203, and '615 patents. SRI has accused the SGS 5600 and 1600 Series when used in combination with one of the Manager Products as infringing the asserted claims of the '203 and '615 patents (except '615 claim 7).

But at the deposition of SRI's expert, Dr. Kesidis, it became clear that SRI's allegations were not supported by evidence. Dr. Kesidis quickly retreated from the opinion expressed in his expert report as to why the ManHunt Products allegedly infringed the '338 claims.[3] While he offered a new infringement theory at his deposition, Dr. Kesidis conceded that he did not know whether anyone had ever used the ManHunt Products in the particular way that he alleged was infringing and that he had not verified whether the ManHunt Products, as sold by Symantec, were even capable of performing the claimed step.[4] When asked whether it was more likely than not that the ManHunt Products actually performed the claimed steps, Dr. Kesidis admitted he simply "did not

---

[3] *See* Kesidis Tr. 443:25-445:11, 447:20-448:8, 466:6-12 [Ex. E].

[4] *See* Kesidis Tr. 467:15-469:12 [Ex. E].

know."[5]

While SRI claims that use of the SGS products only infringes the '202, '615, and '212 claims when these products are used in combination with one of the Symantec Manager Products, Dr. Kesidis could not identify a single Symantec customer who used the allegedly infringing combination.[6] Nor is there any proof that Symantec itself used this combination of products in the manner that SRI contends to be infringing. Absent proof of any direct infringement, Symantec cannot be liable for direct infringement with respect to these claims, nor can it be liable for inducing infringement or contributory infringement.

SRI's infringement theory with respect to the statistical detection method claims of the '212 patent is also fatally flawed. While the parties dispute the proper construction of the term "statistical detection method," there is no dispute that the patent specification and the claims distinguish between "statistical detection methods" and "signature detection methods."[7] At his deposition, Dr. Kesidis admitted that a method of detecting suspicious network activity using a fixed threshold reflecting a ratio of observed network activity (*e.g.,* percentage of failed login attempts compared to total login attempts) was a signature detection method, not a statistical detection method.[8] Since SRI's infringement theory for the '212 patent rests on the SGS 5400 Series and ManHunt Products using similar fixed thresholds to detect "flood attacks," the accused functionality is simply not a "statistical detection method" based on Dr. Kesidis' admissions.

---

[5] *See* Kesidis Tr. 468:25-469:12 [Ex. E].

[6] *See* Kesidis Tr. 545:21-546:9 [Ex. E].

[7] *See* Kesidis Tr. 487:3-490:10 [Ex. E].

[8] *See* Kesidis Tr. 487:3-490:10 [Ex. E].

Finally, if the Court adopts Defendants' constructions for the terms "network monitor" and "hierarchical monitor," none of the accused Symantec products would infringe the claims of the '203, '615, and '212 patents because it is undisputed that Symantec's products do not have hierarchical monitors sharing a common, generic code base.

Because SRI cannot point to admissible evidence sufficient to raise a genuine issue of material fact with respect to Symantec's infringement of the patents-in-suit, summary judgment should be granted in favor of Symantec.

## II.    SUMMARY OF THE ARGUMENT

1.    Symantec does not infringe any asserted claim of the '338 patent because Symantec's accused products do not practice the "statistical profile" limitations under either SRI or Defendants' proposed constructions.

2.    Symantec does not infringe any asserted claim of the '212 patent or claim 7 of the '615 patent because Symantec's accused products do not practice the "statistical detection method" limitation under either SRI or Defendants' proposed constructions.

3.    Symantec does not infringe any asserted claim of the '212, '203, or '615 patents based on the combination of use of its SGS Products with its Manager Products under either SRI or Defendants' proposed constructions because there is no evidence that those products have been used together in an infringing manner.

4.    Symantec does not infringe any asserted claim of the '212, '203, and '615 patents because there is no "network monitor" or "hierarchical monitor" in the accused products and product combinations under Defendants' proposed construction.

## III.    STATEMENT OF FACTS

### A.    Background Regarding Symantec's Accused Products

Since the 1990's, Symantec has developed and sold highly-advanced network intrusion detection systems ("NIDS"). Symantec's NIDS products, which include the accused ManHunt Products, have been sold and used throughout the United States by major corporations and other organizations to protect their computer networks and core

business functions by detecting both known and unknown attacks. Other Symantec products, such as the accused Symantec Gateway Security products, also provide intrusion detection functionality along with other computer security features, such as antivirus and firewall capabilities.

The NIDS components relevant to this motion are: (1) the ManHunt Products' Flow Alert mechanism; (2) the SGS 5400 Series and ManHunt Products' "flood detection" mechanism; (3) the ManHunt Products' Analysis Framework; and (4) separate event management products, specifically Symantec's Incident Manager 3.0 and Security Information Manager 9500 Series.

The ManHunt Products' Flow Alert mechanism generates messages, sometimes referred to as "events," when it observes a new network traffic flow that meets user-specified criteria, or signatures, known as "flow alert rules."[9] The flood detection engine in the sensor component of the SGS 5400 Series and ManHunt Products similarly generates events when it identifies Denial of Service ("DoS") attacks, such as SYN Flood attacks, in which an attacker sends a succession of requests to a target system in an attempt to overwhelm that system's capacity for handling such requests.[10]

The ManHunt Products' Analysis Framework receives and organizes the events generated by various other components of the ManHunt Products, including the sensors and, depending on configuration, the Flow Alert mechanism. The SGS Products detect suspicious behavior in similar ways, but do not have an Analysis Framework. The accused Incident Manager and Security Information Manager products can be configured to receive and organize network security events from a wide variety of Symantec and

---

[9]  *See generally* Hansen Decl. ¶¶ 46-52 [F].

[10]  *See generally* Hansen Decl. ¶¶ 88-91 [F].

third party products, including certain SGS products.

**B.    Undisputed Material Facts**

1.    The ManHunt Products' method of generating Flow Alerts does not infringe the '338 asserted claims.[11]

2.    The SGS 5400 and ManHunt Products' method of detecting Denial of Service flood attacks, such as SYN Flood attacks, does not utilize a "statistical detection method" under Defendants' proposed construction.[12]

3.    In the context of the patents-in-suit, detection methods consisting of rudimentary, fixed thresholds are signature detection methods, not "statistical detection methods."[13]

4.    The SGS Products can be and are used without using the Manager Products.[14]

5.    SRI does not contend that the SGS Products infringe any asserted claims when used apart from a combination with one of the Manager Products.[15]

6.    SRI can point to no evidence that any Symantec customer has used the SGS Products in combination with one of the Manager Products.[16]

7.    The ManHunt Products' Analysis Framework does not share the same generic code base as the ManHunt Products' sensors.[17]

8.    The Manager Products do not share the same generic code base as the

---

[11]    *See* Kesidis Tr. 442:9-443:7, 443:25-445:23, 447:16-448:8, 450:7-11, 466:6-12 [Ex. E]; Hansen Decl. ¶¶ 42-62 [Ex. F].

[12]    *See* Kesidis Rep. ¶¶ 21, 64-69, Ex. C thereto at 9-10, 17 (infringement allegations based on SRI's proposed construction of "statistical detection method") [Ex. G]; Kesidis Tr. 487:3-490:10, 483:3-484:1, 493:12-494:13, 501:18-502:20 [Ex. E]; Hansen Decl. ¶¶ 87-95 [Ex. F]; Hansen Tr. 84:16-20 [Ex. H]; Hernacki Tr. 65:3-68:11, 77:11-22, 95:15-25 [Ex. I]; Bennett Tr. 36:17-37:21, 139:7-20, 140:21-142:2, 142:25-143:21, 180:14-181:4, 191:17-192:14 [Ex. J].

[13]    *See* Kesidis Tr. 487:3-490:10, 483:3-484:1, 493:12-494:13, 501:18-502:20 [Ex. E].

[14]    *See* Kesidis Tr. 422:8-20 [Ex. E]; Lev Tr. 41:14-19 [Ex. K]; Van Es Tr. 26:9-21, 101:5-102:1, 112:9-113:4 [Ex. L].

[15]    *See* Kesidis Rep. ¶¶ 4, 48, 52, 116, 207 [Ex. G]; Kesidis Tr. 422:2-20 [Ex. E].

[16]    *See* Kesidis Tr. 422:21-24, 544:21-550:14 [Ex. E]; Kesidis Rep. ¶¶ 59-61 [Ex. G]; Hansen Decl. ¶¶ 113-115 [Ex. F]; Van Es Tr. 26:9-21, 101:5-102:1, 112:9-113:4 [Ex. L].

[17]    *See, e.g.*, Kesidis Tr. 568:7-12 [Ex. E].

SGS Products.[18]

## IV.    SYMANTEC IS ENTITLED TO SUMMARY JUDGMENT OF NON-INFRINGEMENT

### A.    Legal Standard

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

In a patent case, "[s]ince the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of noninfringement may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs, Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001); *see also Techsearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is also appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). If the accused infringer demonstrates an absence of material fact, the patent owner then

---

[18] *See, e.g.*, Kesidis Tr. 568:14-18 [Ex. E].

"must come forward with 'specific facts showing that there is a genuine issue for trial.'"
*Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).

Although a court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995), the mere existence of some evidence in support of the nonmoving party is not sufficient for denial of a motion for summary judgment. "[T]here must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue." *See McKesson Info. Solutions LLC v. The Trizetto Group, Inc.*, 2006 U.S. Dist. LEXIS 16086, at *6 (D. Del. 2006) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

> **B.     Symantec Does Not Infringe Any Asserted Claim of the '338 Patent Because Symantec's Accused Products Do Not Practice the "Statistical Profile" Limitations Under Either SRI or Defendants' Proposed Constructions.**

Claim 1 of the '338 patent is representative of the '338 independent claims asserted against Symantec.    The parties dispute the meaning of the following claim language:

> 1.     A method of network surveillance, comprising:
> receiving network packets handled by a network entity;
>
> ***building at least one long-term and at least one short-term statistical profile from at least one measure of the network packets,*** the at least one measure monitoring data transfers, errors, or network connections;
>
> comparing at least one long-term and at least one short-term statistical profile; and
>
> ***determining whether the difference between the short-term statistical profile and the long-term statistical profile indicates suspicious network activity.***

SRI, in its infringement expert report, does not allege that Symantec infringes the '338 asserted claims under Defendants' proposed construction of these disputed terms.[19]    Nor

---

[19] *See* Kesidis Rep. ¶¶ 21, 231-50, and Ex. F thereto [Ex. G].

has SRI provided any proof sufficient to establish a genuine issue of material fact whether Symantec infringes the '338 claims under Defendants' proposed construction. For example, SRI has offered no explanation or evidence that some part of the accused ManHunt Products corresponds to the claimed "short-term statistical profile," if that term is construed to mean "an *exponentially aged probability distribution* of recently observed activities," as urged in the Joint Opening Claim Construction Brief of Defendants ISS and Symantec.[20]   Therefore, if the Court were to adopt Defendants' proposed construction for any of the disputed '338 claim terms, there would be no genuine issue of material fact that Symantec does not infringe the '338 claims.

But even if none of Defendants' proposed constructions for these disputed claim terms are adopted, summary judgment of non-infringement is still appropriate, for the reasons discussed below.

The only Symantec products accused of infringing the '338 asserted claims are the ManHunt Products.[21]   SRI has not accused other Symantec products, such as the SGS or Manager Products, of infringing the '338 asserted claims because those other products do not include the particular software component which SRI alleged practices the '338 claims — the "Flowchaser subsystem."

SRI's theory of how the "Flowchaser subsystem" might practice the limitations of the '338 asserted claims was set forth in the infringement report of SRI's expert, Dr. Kesidis.  In his report, Dr. Kesidis opined that the "Flowchaser subsystem" infringed the '338 asserted claims by generating "Flow Alerts" (sometimes referred to as "netflow alerts"):

---

[20]   *See* Joint Opening Claim Construction Brief of Defendants ISS and Symantec at 30-35 [D.I. 267].

[21]   *See* Kesidis Rep. ¶¶ 3-4, 232 [Ex. G].

The Flowchaser subsystem generates long-term statistical profiles regarding, for example, volumes of data transferred, numbers of network connections, and connection source and destination data. Flowchaser then generates short-term statistical profiles reflecting the same statistical measures, but over a shorter period of time. The Flowchaser subsystem generates a Flow Alert if the short-term profile differs significantly from the long-term profile, for example in the case of an inordinately high level of traffic.[22]

In his expert report, Dr. Kesidis did not allege that any component of the ManHunt Products other than the "Flowchaser subsystem" infringed the '338 asserted claims.[23]

### 1.    SRI's expert conceded that the accused Flow Alert process does not infringe the '338 claims.

After initially identifying the generation of Flow Alerts by the "Flowchaser subsystem" as the basis for the infringement opinion in his expert report, Dr. Kesidis retreated from this opinion during his deposition. Dr. Kesidis' reversal is not surprising, given that Symantec's expert had convincingly demonstrated the factual flaws underlying Dr. Kesidis' assertions.

In response to SRI's allegations that the ManHunt Products' method of generating Flow Alerts infringes the '338 asserted claims, Symantec's expert, Dr. Hansen, provided in his expert report a detailed technical description of how the Flow Alert process actually works, which for the sake of brevity Symantec does not repeat here.[24] Dr. Hansen also explained why the ManHunt Products' method of generating Flow Alerts does not infringe the '338 asserted claims, under either party's construction of the disputed limitations.[25]

SRI has not challenged the accuracy of Dr. Hansen's technical description of

---

[22] Kesidis Rep. ¶ 43 [Ex. G]; *see also* Kesidis Rep. ¶¶ 235, 237, 239, 244-46 and Ex. F thereto at 2-5 [Ex. G].

[23] *See* Kesidis Rep. ¶¶ 43, 231-250, and Ex. F thereto [Ex. G].

[24] *See* Hansen Decl. ¶¶ 46-57 [Ex. F].

[25] *See* Hansen Decl. ¶¶ 43-45, 58-65, 68-72 [Ex. F].

10

Flow Alerts.  In fact, after having read Dr. Hansen's report,[26] SRI's expert conceded during his deposition that the ManHunt Products' method of generating Flow Alerts did not satisfy the limitations of '338 claim 1, calling such a theory a "stretch" that was contrary to his opinion:

> Q.  But you would agree that a capital "F," capital "A" "Flow Alert" refers to something –
>
> A.  I understand the point you are making, yeah.  The flow alert that— that expression as used in Manhunt documentation has to do with the—an indication of an initial packet from what—my recollection, an initial packet arriving, being observed by flow chaser as being a member of a— of a flow that it's configured to monitor.
>
> Q.  By the user?  Configured to monitor by the user, correct?
>
> A.  Right.  Could be configured monitored by the user.
>
> Q.  And you would agree that a flow alert in that context, in the context of Manhunt, would not constitute a satisfaction of the step in '338, claim one, determining whether the difference between a short-term statistical profile and the long-term statistical profile indicates suspicious network activity?
>
> . . . .
>
> THE WITNESS:  That the arrival of a single packet satisfies the condition of a—is—and is a member of a flow, an initial single packet is a member of a flow.
>
> (Reviewing document(s).)
>
> I mean possibly in some really, you know, degenerate way where the—you know, the long-term profile is basically zero.  But I'm—you know, that's a stretch.
>
> And in a degenerate way, if the long-term profile is—is known to be zero, and you make an observance of a single packet—*but, you know, again, a long-term profile known to be zero is in my opinion not really statistical.*  It's more like a—so I think possibly in some degenerate way, *but I would tend to say no to that hypothetical question.*[27]
>
> . . . .
>
> THE WITNESS:  I believe that flow chaser—just give me one second.
>
> (Reviewing document(s).)

---

[26]  Kesidis Tr. 345:2-7 [Ex. E].

[27]  Kesidis Tr. 443:25-445:11 (emphasis added) [Ex. E].

Flow chaser is a process that interfaces with the—the flow data store. For example, it—it can issue, using capital letters, a "Flow Alert" when a packet arrives that—when an initial packet arrives of a—of a flow that it's configured to monitor.

BY MR. GALVIN:

Q. But that functionality, right, doesn't have anything do with this limitation? You are not alleging that that functionality satisfies—

A. No.[28]

Since SRI's own expert has now conceded that the Flow Alert process — the only functionality of the ManHunt Products specifically identified in SRI's expert report as infringing — does not infringe the '338 asserted claims, Symantec is entitled to summary judgment that its accused ManHunt Products do not infringe the '338 claims.

> **2.    SRI has failed to articulate any credible alternative theory of infringement for the '338 claims supported by admissible evidence.**

After acknowledging that the ManHunt Products' Flow Alert process does not infringe the '338 asserted claims, SRI's expert suggested, contrary to the express language of his expert report, that he never intended to accuse the Flow Alert process of infringing the '338 claims in the first place. According to Dr. Kesidis, the Flow Alerts addressed in his expert report refer to something else:

Q. Okay. If you turn to paragraph forty-three of your report—back to forty-three, same report. The last sentence of that paragraph states, "The [F]low chaser subsystem generates a [F]low [A]lert if the short-term profile differs significantly from the long-term profile, for example, in the case of an inordinately high level of traffic."

Do you see that?

A. I do, yes.

Q. Is that still your opinion, that that is how Manhunt operates?

A. I seem to recall the—and I have "Flow Alert" in capital letters, and I—I mean I should possibly not have used the capital letters in—in this

---

[28] Kesidis Tr. 447:20-448:8 [Ex. E]; *see also* Kesidis Tr. 466:6-12 (admitting that "the flow alert that's specifically mentioned in Manhunt documentation . . . is not germane to the determining step of claim one of '338") [Ex. E].

report.

. . . .

What I'm referring to there is a flow alert more generally speaking, so I shouldn't have capitalized it, would be a result of flow chaser querying the FDS for, for example, a particular attribute of the short- and long-term—or particular attributes of the short- and long-term statistical profiles of a given flow stored in the FDS, and from that basing a flow alert, an alert associated with a particular flow.[29]

. . . .

Q. And under the heading "Infringement Analysis," your first sentence states, "The net flow alert process in the Manhunt group of products takes the difference it determines exists between the particular statistical elements it is tracking and compares the difference to a threshold or series of thresholds that can be configured by user."

Where—in what component of Manhunt does the net flow alert process reside?

. . . .

THE WITNESS:  So what I was referring to there, I think the—I think I would clarify that by removing the definite article to begin with at the beginning of that sentence in "Infringement Analysis," refer to as—as "a net flow alert process."  And in my opinion that process could take place in the flow chaser sensor.[30]

Dr. Kesidis' re-interpretation of his expert report is not credible because, irrespective of capitalization, there are no other flow alerts or flow alert processes associated with the accused ManHunt Products:

Q. Have you ever seen the terms "flow alert" or "net flow alert" used to describe an event or alert other than one of the these capital "F," capital "A," "Flow Alerts" that you have just described?

. . . .

THE WITNESS:  Seen mention—you mean seen mention in the documentation?

BY MR. GALVIN:

Q. Yes.

A. Provided by Manhunt?  Provided by Symantec?  No.[31]

---

[29] Kesidis Tr. 442:9-443:16 [Ex. E].

[30] Kesidis Tr. 446:9-25 [Ex. E].

[31] Kesidis Tr. 445:13-23 [Ex. E].

. . . .

> Q. Dr. Kesidis, have you seen any Symantec documentation describing a net flow alert process, other than the process that generates capital "F," capital "A," "Flow Alerts"?
>
> A. No.[32]

SRI's new infringement theory, explained for the first time by Dr. Kesidis during his deposition, is mere speculation, lacking any credible support in the record. In a nutshell, SRI's new infringement theory appears to be that some part of the ManHunt Products can query the FlowChaser Data Store ("FDS") to obtain long-term and short-term information about a particular network traffic flow which it then compares, and if the difference between this long-term and short-term information somehow indicates suspicious network activity, a flow alert (i.e., an alert associated with this particular flow) is generated.[33] But during his deposition, Dr. Kesidis repeatedly admitted that SRI's new infringement theory is based on unverified inferences drawn from high-level documents which, by themselves, do not establish that the accused ManHunt Products practice the '338 asserted claims.

For example, Dr. Kesidis admitted that he was not aware of any source code that supported the assumptions underlying SRI's new infringement theory:

> Q. So you have not seen any source code that would confirm your presumption that a module of Manhunt, like the analysis framework, actually calls this query search function; is that correct?
>
> A. That—that's correct, yes.[34]

He admitted that he had not conducted any experiments to confirm the assumptions underlying SRI's new infringement theory:

---

[32] Kesidis Tr. 450:7-11 [Ex. E].

[33] *See* Kesidis Tr. 441:22-442:8; 443:8-16; 448:9-449:16; 466:21-467:14 [Ex. E].

Q. And if—and you have not through an experiment by actually using the product demonstrate (sic) that the—a Manhunt module actually calls this function, correct?

. . . .

THE WITNESS: No.[35]

He admitted that the documents cited in his expert report do not confirm the assumptions underlying SRI's new infringement theory:

Q. Let me just ask a question. Does this document [Ex. M] that you cited establish or support your opinion that Manhunt determines whether the difference between the short-term statistical profile and the long-term statistical profile indicates suspicious network activity?

. . . .

THE WITNESS: I would say no.[36]

. . . .

Q. Sure. Is this document [Ex. N] standing alone a sufficient basis in your opinion to support an opinion from you that the Syman—Symantec's Manhunt product determines whether the difference between a short-term statistical profile and the long-term statistical profile indicates suspicious network activity?

. . . .

THE WITNESS: Only the—again, it's the same answer: Only to the extent that I'm making inferences from that sentence. But otherwise, no.

BY MR. GALVIN:

Q. That it's a possible inference you can draw, but it doesn't establish a satisfaction of the limitation; is that fair?

A. It—it certainly doesn't flesh out the details of that limitation. I—certainly not.[37]

. . . .

Q. This document [Ex. O] by itself does not establish that Manhunt performs the determining step of '338, claim one, correct?

---

[34] Kesidis Tr. 452:2-6 [Ex. E]; *see also* Kesidis Tr. 468:16-24 ("A. I have never seen an -- I didn't check whether those queries are in fact employed by any module in the analysis framework in escrow.") [Ex. E].

[35] Kesidis Tr. 452:7-13 [Ex. E]; *see also* Kesidis Tr. 468:11-14 (agreeing that he "did not conduct such experiments or describe them in [his] expert report") [Ex. E].

[36] Kesidis Tr. 455:2-9 [Ex. E].

[37] Kesidis Tr. 461:4-20 [Ex. E].

A. I agree.[38]

Dr. Kesidis admitted that he would have no basis to refute evidence contradicting SRI's new theory:

Q. And if a Symantec employee were to tell you and—and—that the code—the Manhunt code does not call this function, would you have any basis for refuting that?

. . . .

THE WITNESS: That an existing Manhunt code build doesn't call this function? I'd have no basis to refute that, no.[39]

He admitted that, even if the ManHunt Products could function as assumed under SRI's new theory, he was not aware of any evidence that Symantec or its customers had actually used those products in a manner which satisfied every limitation of the '338 asserted claims:

Q. But sitting here today, while it may be possible Manhunt performs the determining step, you do not know in fact whether Manhunt—any customer has used Manhunt to perform that step, correct?

A. That's correct.

Q. And you do not know sitting here today whether anyone at Symantec has ever used Manhunt to perform that determining step, correct?

A. Also correct, yes.[40]

Dr. Kesidis could not even confirm that the ManHunt Products were *capable* of performing the step he alleged was infringing:

Q. Sitting here today, you do not know whether Manhunt is even capable of being configured to perform this determining step without the addition of new programming code?

. . . .

THE WITNESS: I think what you are—you are raising the question as to whether I verified that the analysis framework does indeed call—

---

[38] Kesidis Tr. 463:13-16 [Ex. E].

[39] Kesidis Tr. 452:15-22 [Ex. E].

[40] Kesidis Tr. 467:15-23 [Ex. E].

16

does indeed employ some of the queries in—that are described in Exhibit 17, and *I have not verified that, so I don't know.*

. . . .

Q.  Sitting here today, *do you believe it is more likely than not that the analysis framework actually implements the queries in a way that satisfies the determining step of claim one of the '338?*

*A.  I really don't know.  I really don't know.*  Like I said, I really didn't—I really didn't examine the analysis framework code in escrow with this particular functionality in mind.  And that's why I don't make direct reference to—to code; why I rely on the specification—I'm sorry—Exhibit 17 (indicating).

Q.  Okay.

*A.  So the answer is I don't know.*[41]

An expert's conclusory opinions are not sufficient to preclude summary judgment of non-infringement: "the expert must set forth the factual foundation for his opinion . . . in sufficient detail for the court to determine whether that factual foundation would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the nonmovant." *Novartis Corp.*, 271 F.3d at 1051 (*quoting Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1047-48 (Fed. Cir. 2000)).  Specifically, "the Third Circuit has demanded that the factual predicate of an expert's opinion must find some support in the record, and has emphasized that mere 'theoretical speculations' lacking a basis in the record will not create a genuine issue of fact." *Id.* (*citing Penn. Dental Ass'n v. Med. Serv. Ass'n.*, 745 F.2d 248, 262 (3d Cir. 1984)).  "[W]here an expert's opinion is predicated on factual assumptions, those assumptions must also find some support in the record." *Id.* (*citing Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990)).  Under these legal standards, SRI's new infringement theory and the related opinions declared by Dr. Kesidis during his deposition are insufficient as a matter of law to preclude summary judgment of non-

---

[41] Kesidis Tr. 467:24-469:12 (emphasis added) [Ex. E].

infringement as to the '338 asserted claims.

First, SRI and its expert, Dr. Kesidis, have failed to clearly identify the components or functionality of the ManHunt Products that allegedly practice the various limitations of the '338 asserted claims. Since he has retreated from his original opinions, Dr. Kesidis has not even identified which part of the accused ManHunt Products corresponds to the claimed "short-term statistical profile," or which part of the ManHunt Products performs the step of "building at least one . . . short-term statistical profile from at least one measure of the network packets." At different times during his deposition, Dr. Kesidis accused entirely different parts of the ManHunt Products of performing the step of "determining whether the difference between the short-term statistical profile and the long-term statistical profile indicates suspicious network activity."[42] Discovery has closed. Expert reports have been submitted. The time for SRI to identify its infringement theories has come and gone. *See Novartis Corp.*, 271 F.3d at 1054 (explaining that, under Federal Circuit and Third Circuit law, "it was [the patent owner's] obligation to set forth the detailed basis of its evidence such that the district court could evaluate whether it could support a finding of infringement by a reasonable fact-finder"). SRI's failure to identify a coherent infringement theory for the '338 patent is not surprising, since Symantec's ManHunt Products simply do not practice the methods of the '338 asserted claims.

Second, Dr. Kesidis failed to verify the factual assumptions underlying his new infringement theory, and simply presumed that the ManHunt Products used certain

functionality in an allegedly infringing manner.

**REDACTED**

SRI's new infringement theory is "no more than theoretical speculation raising, at best, a 'metaphysical doubt as to the material facts.'" *Novartis Corp.*, 271 F.3d at 1054 (quoting *Matsushita*, 475 U.S. at 586).

Third, not only do the factual assumptions underlying SRI's new infringement theory lack any affirmative support in the record, they are demonstrably false.

**REDACTED**

---

[42] *Compare* Kesidis Tr. 441:22-442-3, 449:3-9, 451:11-15, 466:21-467-14 (stating hypothesis that the ***analysis framework*** might be able to query the FDS), *with* 442:4-8, 443:8-16, 446:19-25 (stating hypothesis that the ***flow chaser sensor*** might be able to query the FDS), *with* 447:2-448:22 (stating hypothesis that the ***flow chaser process*** might be able to query the FDS), *with* 459:9-10 (stating hypotheses that "it's possible using ***flow chaser technology*** to practice the claim one of '338") (emphasis added) [Ex. E].

[43] *See supra* note 42 and accompanying text.

[44] Ex. O.

[45] *See* Kesidis Tr. 441:22-442:8, 443:8-16, 448:9-449:16, 466:21-467:14 [Ex. E].

# REDACTED

Thus, even if some of these queries could be used as part of an infringing method (which they cannot), to avoid summary judgment of non-infringement SRI would need to establish at least one instance where the ManHunt Products have been used in an infringing manner. *See Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 773-75 (Fed. Cir. 1993); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 418 F. Supp. 2d 1021, 1039-42 (S.D. Ind. 2006). There is no such evidence in the record.[50]

Finally, it is not even clear whether SRI's own expert believes that the accused ManHunt Products practice each and every limitation of the asserted '338 claims under SRI's new theory:

> Q.  Sitting here today, do you believe it is more likely than not that the analysis framework actually implements the queries in a way that satisfies the determining step of claim one of the '338?
>
> A.  *I really don't know. . . .*[51]

Thus, SRI's own expert has admitted that Symantec's accused ManHunt Products

---

[46] Ex. O at SYM_P_0134097.

[47] *See* Bennett Decl. ¶ 7 [Ex. P]; Suzuki Decl. ¶ 7 [Ex. Q]; *see also* Hernacki Tr. 89:2-4 **REDACTED** [Ex. I]; Hansen Decl. ¶¶ 53-58 [Ex. F].

[48] *See* Bennett Decl. ¶ 8 [Ex. P]; Suzuki Decl. ¶ 8 [Ex. Q]; *see also* Hansen Decl. ¶ 53 n.28 [Ex. F]; Hansen Tr. 119:14-120:12 [Ex. H].

[49] *See* Bennett Decl. ¶ 8 [Ex. P]; Suzuki Decl. ¶ 8 [Ex. Q]; *see also* Hansen Decl. ¶ 53 n.27 [Ex. F]; Hansen Tr. 121:12-23 [Ex. H].

[50] *See, e.g.*, Kesidis Tr. 467:15-23 [Ex. E].

[51] Kesidis Tr. 468:25-469:4 (emphasis added) [Ex. E].

do not infringe under the original theory presented in SRI's expert report. And his new infringement theory is not clearly articulated and is based on unverified factual assumptions which are contradicted by the evidence, so much so that SRI's expert will not even assert that the theory is more likely than not to be true. On this record, Symantec is entitled to judgment as a matter of law that its accused ManHunt Products do not infringe the asserted '338 claims.

C.    **Symantec Does Not Infringe Any Asserted Claim of the '212 Patent or Claim 7 of the '615 Patent Because Symantec's Accused Products Do Not Practice the "Statistical Detection Method" Limitation Under Either SRI or Defendants' Proposed Constructions.**

SRI has accused Symantec's SGS 5400 Series and ManHunt Products of infringing '615 claim 7 and the '212 asserted claims.[52] Every one of these claims requires deployment of at least one network monitor that utilizes a "statistical detection method."

A key premise of SRI's infringement theory for these claims is that the SGS 5400 Series and ManHunt Products' method of detecting Denial of Service ("DoS") flood attacks, such as SYN Flood attacks, utilizes a "statistical detection method" under SRI's proposed construction.[53] SRI's infringement report does not assert that the accused flood detection method is a "statistical detection method" under Defendants' proposed construction.[54] Therefore, if the Court were to adopt Defendants' proposed construction of this disputed claim term, there would be no genuine issue of material fact that

---

[52]    *See* Kesidis Rep. ¶¶ 3-4 [Ex. G]. SRI has admitted that Symantec's SGS 5600 and 1600 Series products do not perform "statistical detection." *See* Kesidis Rep. ¶¶ 4, 52 n.10, 142 [Ex. G]; Kesidis Tr. 341:13-342:1 [Ex. E].

[53]    *See* Kesidis Rep. ¶¶ 21, 65-66, 69, 81, 83, 142, and Ex. C thereto at 6-9, 17 [Ex. G]. SRI has not alleged that any other part of the accused products utilizes a "statistical detection method."

[54]    *See* Kesidis Rep. ¶¶ 21, 64-69, and Ex. C thereto at 9-10, 17 [Ex. G].

Symantec's accused products do not infringe the '212 asserted claims or '615 claim 7.

But even if the Court does not adopt Defendants' proposed construction of "statistical detection method," summary judgment of non-infringement is still appropriate for these claims. It is undisputed that the patents distinguish between "statistical" and "signature" detection methods.[55] For example, this distinction is expressly made in claim 3 of the '212 patent [Ex. B]: "The method of claim 2, wherein the monitor utilizing a signature matching detection method also utilizes a statistical detection method."[56] Any reasonable construction of the term "statistical detection method" must exclude signature detection methods.

SRI's expert, Dr. Kesidis, admitted during his deposition that detection methods consisting of simple, fixed thresholds—for example, generating an alert if the number of occurrences of a particular event exceeds the threshold value X, where X is a fixed number or a fixed percentage of all events—are signature detection methods, not statistical detection methods:

> Q. Let's stick with the failed logins. So I take it you would agree, based on the specification, that a technique that identifies suspicious activity by setting a threshold, let's say three failed logins, would be a signature detection technique?
>
> . . . .
>
> THE WITNESS: It's what the patent would—again, reading column 7, it's what the patent specification would call a rudimentary, inexpensive signature analysis technique that involves a threshold.
>
> BY MR. GALVIN:
>
> Q. And in—that example would not be a statistical detection method, correct?
>
> . . . .

---

[55] See Kesidis Tr. 487:3-490:10 [Ex. E].

[56] See also '338 patent at 7:23-8:12 (describing the signature analysis capabilities of the signature analysis engine) and 5:36-7:22 (describing the statistical analysis capabilities of the statistical profiling engine) [Ex. A].

THE WITNESS:  If it's generating a report as a result of the three failed login attempts and calling that report a report of suspicious activity, it would not be termed a statistical method, right.

. . . .

Q.    . . . . Suppose instead of just counting three failed logins as my signature detection method, suppose I decided to set a threshold that stated that if the number of failed logins exceeds 5 percent of the total number of logins in a given period of time, I will flag that as suspicious activity.  Is that a statistical detection method or a signature detection method as described and claimed in the patents in suit?

. . . .

THE WITNESS: . . . .

So I still think that's rather rudimentary, so I would say it satisfies a signature—I'm just reading this paragraph here.  I would still classify that as a rudimentary threshold test.

BY MR. GALVIN:

Q.  So it would not be a statistical detection method?

A.  No.  In and of itself, I wouldn't call it a statistical detection method.  But again, I'm speaking generally here.  Yeah.  I wouldn't—I wouldn't call it, in that specific example.[57]

# REDACTED

---

[57] Kesidis Tr. 487:3-490:10 [Ex. E]; *see also* Kesidis Tr. 483:3-484:1, 493:12-494:13, 501:18-502:20 [Ex. E].

[58] *See* Hansen Decl. ¶¶ 87-95 [Ex. F]; Hansen Tr. 84:16-20 [Ex. H]; Hernacki Tr. 65:3-68:11, 77:11-22, 95:15-25 [Ex. I]; Bennett Tr. at 36:17-37:21, 139:7-20, 140:21-142:2, 142:25-143:21, 180:14-181:4, 191:17-192:14 [Ex. J].

[59] *See* Hansen Decl. ¶ 91 [Ex. F].

**REDACTED**

Since even Dr. Kesidis concedes that the patent specification teaches that comparing a count or ratio to a fixed numerical threshold is a signature detection method, not a statistical detection method, there is no genuine issue of material fact precluding summary judgment that the SGS 5400 Series and ManHunt Products do not infringe '615 claim 7 and the '212 asserted claims.

**D.      Symantec Does Not Infringe Any Asserted Claim of the '212, '203 or '615 Patents Based on the Combination of Use of Its SGS Products with Its Manager Products Under Either SRI or Defendants' Proposed Constructions Because There Is No Evidence That Those Products Have Been Used Together In An Infringing Manner.**

**1.      Symantec cannot directly infringe based on its customers' alleged combination of the accused SGS Products with Manager Products.**

To prove direct infringement under 35 U.S.C. § 271(a), a plaintiff must establish by a preponderance of the evidence that each and every limitation — or an equivalent thereof — of one or more claims of the patent appears in or is performed by an accused device. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005). SRI has contended that the SGS Products infringe various asserted claims, but only in combination with one or more Manager Products. However, SRI can point to no evidence establishing that Symantec itself has successfully deployed and used an accused SGS product in combination with an accused Manager Product in the precise manner that SRI contends to be infringing.[61] No reasonable juror could therefore find

---

[60] *See* Hansen Decl. ¶¶ 88-90 [Ex. F].

**REDACTED**


102:1, 112:9-113:4 [Ex. L].

that Symantec "itself makes or uses the entire claimed apparatus" or performs the entire claimed method based on its SGS and Manager Product activities. *Cross Med. Prods.,* 424 F.3d at 1311-12. Accordingly, the Court should grant Symantec summary judgment of no direct infringement with respect to the SGS and Manager Products.

> ### 2.    Symantec is not liable for indirect infringement based on its SGS or Manager Products activities, because there is no evidence of direct infringement by any third party.

Symantec is not liable for indirectly infringing any asserted claims of the '212, '203, or '615 patents — either by inducing infringement under 35 U.S.C. § 271(b) or for contributory infringement under 35 U.S.C. § 271(c). Liability for indirect infringement requires proof of direct infringement. *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687 (Fed. Cir. 1986) ("Absent direct infringement of the patent claims, there can be neither contributory infringement, nor inducement of infringement."). Absent identified instances of direct infringement of the claims of the patents-in-suit by some party using the combination of an SGS Product and a Manager Product, Symantec can have no liability for inducement of infringement or contributory infringement based on those products. *Id.*; *see also Dynacore Holdings Corp. v. U.S. Phillips Corp.,* 363 F.3d 1263, 1274-76 (Fed. Cir. 2004).

Under the Federal Circuit's ruling in *Dynacore Holdings Corp. v. U.S. Phillips Corp.,* in order to establish Symantec's liability for indirect infringement based on the accused combination of an SGS Product with a Manager Product, SRI must prove direct infringement in one of two ways. First, SRI may identify a specific direct infringer and prove that such third party's use of the accused combination constitutes direct infringement of an asserted claim. The consequence for SRI of proceeding under this theory of indirect infringement is that SRI must "tie their claims for damages or

injunctive relief . . . to *the identified act.*" *Dynacore*, 363 F.3d at 1274 (emphasis in original). Alternatively, SRI may prove the necessary direct infringement more broadly (and therefore cast its claim for damages and injunctive relief more broadly) by demonstrating that Symantec's customers will inevitably and necessarily combine the SGS and Manager Products in such a way that infringes an asserted claim. *Id.* at 1274-76.

SRI has not properly demonstrated direct infringement under either of these approaches. Instead, SRI has done little more than "allege[] that a hypothetical direct infringement suffices to establish the defendant's broad vicarious liability across the entire category" of Symantec's customers, which the Federal Circuit has explicitly rejected as a means of establishing liability for indirect infringement. *Id.* at 1274. SRI simply avers that: an SGS Product "in combination with either of the Symantec managers, Symantec Incident Manager ("IM") or Symantec Security Information Manager ("SIM")" infringes various asserted claims;[62] Symantec "intend[s] and instruct[s]" its customers to combine the SGS and Manager products;[63] and when Symantec sells an SGS Product and a Manager Product to a single customer, that customer necessarily combines the two so that it is practicing one or more asserted claim.[64]

While SRI's naked averments may be sufficient to withstand a Rule 12(b)(6) motion, they are not sufficient to withstand a motion pursuant to Rule 56(c). In no expert infringement report, discovery response, or pleading has SRI identified *any* specific Symantec customer which it contends directly infringes an asserted claim of the '212, '203, or '615 patents by its deployment of an SGS Product in combination with one of

---

[62] *See, e.g.*, Kesidis Rep. ¶ 4 [Ex. G].

[63] *See, e.g.*, Kesidis Rep. at 5 of Ex. C thereto [Ex. G].

26

the accused Manager Products. Nor has SRI pointed to any evidence that would provide a factual basis for direct infringement of any specific claim by any identified Symantec customer's deployment of such a combination.

This failure by SRI to identify a specific direct infringer, and then to prove that infringement through deployment of an accused combination, is made plain by the deposition testimony of Dr. Kesidis. After acknowledging the "omission" of any specific direct infringer in his expert report,[65] Dr. Kesidis testified that he believed there was "at least one customer"[66] that in his opinion combined the SGS and Manager Products to practice at least one asserted claim.[67] Dr. Kesidis could not, however, identify the name of the customer that purportedly deployed the SGS and Manager Products together so as to infringe an asserted claim.[68] When asked about the evidence he relied on for his opinion, Dr. Kesidis insisted that the opinion "was based on a reading of a deposition,"[69] and when pressed, "guess[ed]" that it was the 30(b)(6) deposition of Carolyn Bardani on behalf of General Electric Company.[70] That deposition transcript, however, identifies GE as a customer of ISS, not Symantec, and indeed does not mention Symantec *at all*.[71]

In short, SRI's expert has performed no analysis as to whether any specific Symantec customer directly infringes any specific asserted claim by deploying a combination of an SGS and Manager Product, and has offered no opinion that any

---

[64]  *See* Kesidis Tr. 549:14-16 [Ex. E].

[65]  Kesidis Tr. 545:6-19 [Ex. E].

[66]  Kesidis Tr. 545:21-546:6 [Ex. E].

[67]  Kesidis Tr. 545:21-546:6 [Ex. E].

[68]  Kesidis Tr. 545:21-546:9 [Ex. E].

[69]  Kesidis Tr. 546:24-547:7 [Ex. E].

[70]  Kesidis Tr. 547:21-548:4 [Ex. E].

[71]  Bardani Tr. 17:22-18:2 [Ex. S].

customer actually does. His opinion regarding direct infringement by Symantec's customers through the combination of an SGS and Manager Product amounts to nothing more than a hypothesis that, because the SGS and Manager Products can be operated together in an allegedly infringing manner by a hypothetical Symantec customer, customers must surely do so. This "hypothetical" form of direct infringement fails as a matter of law.

Nor can SRI establish under the second *Dynacore* approach that Symantec's customers *necessarily* directly infringe any asserted claim if they deploy and use a combination of an SGS and Manager Product. SRI has not contended, with respect to any specific asserted claim, that Symantec customers *necessarily* combine an SGS Product with a Manager Product. Instead, it has contended only that unspecified Symantec customers *can* combine the products so as to infringe, and that Symantec encourages them to do so. These contentions fail to create a genuine issue of material fact, and do not as a matter of law establish that Symantec customers necessarily directly infringe by combining the products. *See, e.g., Dynacore*, 363 F.3d at 1274, 1276-77 (affirming summary judgment of non-infringement because plaintiff's "theoretical" proof of direct infringement failed to establish genuine issue of material fact that accused products necessarily infringe when used by a customer).

Moreover, it is undisputed that the SGS Products can be deployed apart from any combination with a Manager Product in a manner that does not directly infringe.[72] For example, at his deposition, Dr. Kesidis admitted that the SGS 5400 could be deployed by itself, and that such a deployment would not directly infringe any asserted patent.[73] Dr.

---

[72] *See* Kesidis Tr. 422:2-20 [Ex. E]; Kesidis Rep. ¶¶ 4, 48, 52, 116, 207 [Ex. G]; Lev Tr. 41:14-19 [Ex. K]; Van Es Tr. 26:9-21, 101:5-102:1, 112:9-113:4 [Ex. L].

[73] Kesidis Tr. 422:8-14 [Ex. E].

28

Kesidis further testified that he had not spoken to any Symantec customers regarding their deployment of any accused products.[74]

Because there is insufficient proof as a matter of law to establish direct infringement by a Symantec customer, the Court should enter summary judgment that Symantec is not liable for indirect infringement based on the alleged use of the combination of SGS and Manager Products by Symantec's customers.

### 3. Symantec is also not liable for contributory infringement because the accused SGS Products have substantial non-infringing uses.

Under 35 U.S.C. § 271(c), an entity is liable for contributory infringement if it "offers to sell or sells within the United States . . . a component of a patented machine, manufacture, combination or composition . . . knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use." In response to Symantec's interrogatories and in its expert infringement report, SRI has never provided any detailed explanation showing how Symantec could be liable for contributory infringement based on the sale of its SGS Products. In fact, with respect to the SGS 5400, SRI's expert, Dr. Kesidis, has conceded that his infringement opinion depends on its use in combination with the Manager Products, and that the SGS Products have non-infringing uses apart from any such combination.[75]  Summary judgment of no contributory infringement based on Symantec's manufacture or sale of the SGS or Manager Products should therefore be granted.

---

[74]    Kesidis Tr. 422:21-24 [Ex. E].

[75]    Kesidis Tr. at 422:2-20 [Ex. E]; *see also* Lev Tr. 41:14-19 [Ex. K]; Van Es Tr. 26:9-21, 101:5-102:1, 112:9-113:4 [Ex. L].

E.     **Symantec Does Not Infringe Any Asserted Claim of the '212, '203, and '615 Patents Because There Is No "Network Monitor" or "Hierarchical Monitor" In the Accused Products and Product Combinations Under Defendants' Proposed Construction.**

Each asserted claim of the '212, '203 and '615 patents includes the terms "network monitor" and "hierarchical monitor." As described in detail in Defendants' Joint Opening Claim Construction Brief, a "network monitor" is defined in the patent specification to require "*[g]eneric code* that can be dynamically configured and reconfigured with reusable modules that define the monitor's inputs, analysis engines and their configurations, response policies and output distribution for its report."[76] The term "hierarchical monitor" is described in the specification as "a *network monitor* that receives reports as input from one or more network monitors that are at a lower layer in the analysis hierarchy."[77]

SRI has neither alleged, nor provided a factual basis to support any contention, that any of the purported "hierarchical monitors" (e.g., the ManHunt Products' Analysis Framework) in the accused Symantec products share any "generic code" with the other monitors (e.g., the ManHunt Products' sensors) in the alleged hierarchy. Moreover, SRI's expert has admitted that the accused Symantec products do not include any such generic code:

> Q.   Dr. Kesidis, does the analysis framework of ManHunt share the same generic code base as the ManHunt sensors?
>
> . . . .
>
> THE WITNESS: Not to my knowledge, no.
>
> . . . .
>
> Q.   Does the SGS software share the same generic code base as Incident

---

[76] Joint Opening Claim Construction Brief of Defendants ISS and Symantec at 16 (emphasis added) [D.I. 267].

[77] Joint Opening Claim Construction Brief of Defendants ISS and Symantec at 19 (emphasis added) [D.I. 267].

Manager and Security Information Manager?

. . . .

    A.   THE WITNESS: Not to my knowledge, no.[78]

Thus, if the Court adopts Defendants' proposed construction of "network monitor" and "hierarchical monitor," summary judgment that Symantec does not infringe any asserted claims of the '212, '203 and '615 patents should be entered.

## V.   CONCLUSION

    For the reasons explained above, the Court should grant summary judgment that Symantec does not infringe any of SRI's asserted claims under 35 U.S.C. § 271.

Dated: June 23, 2006

                    By:       */s/Mary B. Matterer*
                      Richard K. Herrmann (#405)
                      Mary B. Matterer (#2696)
                      Morris, James, Hitchens & Williams, LLP
                      222 Delaware Avenue, 10th Floor
                      P.O. Box 2306
                      Wilmington, DE 19899-2306
                      Tel: (302) 888-6800
                      Fax: (302) 571-1751

                      *Attorneys for Defendant and Counterclaim-*
                      *Plaintiff Symantec Corporation*

OF COUNSEL:

Lloyd R. Day, Jr. (*pro hac vice*)
Robert M. Galvin (*pro hac vice*)
Paul S. Grewal (*pro hac vice*)
Day Casebeer Madrid & Batchelder LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014
Tel: (408) 873-0110
Fax: (408) 873-0220

Michael J. Schallop (*pro hac vice*)
Symantec Corporation
20330 Stevens Creek Blvd.
Cupertino, CA 95014
Tel: (408) 517-8000
Fax: (408) 517-8121

---

[78] Kesidis Tr. 568:6-18 [Ex. E].

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2006, I electronically filed the foregoing document,

**REDACTED VERSION OF OPENING BRIEF IN SUPPORT OF SYMANTEC'S**

**MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT,** with the Clerk of

the Court using CM/ECF which will send notification of such filing to the following:

John F. Horvath, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE 19801

Richard L. Horwitz, Esq.
David E. Moore, Esq.
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, DE 19801

Additionally, I hereby certify that on the 23rd day of June, 2006, the foregoing document

was served via email on the following non-registered participants:

Howard G. Pollack, Esq.
Michael J. Curley, Esq.
Fish & Richardson
500 Arguello Street, Suite 500
Redwood City, CA 94063
650.839.5070

Holmes Hawkins, III, Esq.
King & Spalding
1180 Peachtree Street
Atlanta, GA 30309-3521
404.572.4600

Theresa Moehlman, Esq.
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003
212.556.2100

_____/s/ Mary B. Matter_____
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com
*Counsel for Symantec Corporation*