# EXHIBIT A

471 U.S. 343, 85 L.Ed.2d 372

₃₄₃COMMODITY FUTURES TRADING COMMISSION, Petitioner

v.

Gary WEINTRAUB et al.

No. 84-261.

Argued March 19, 1985.

Decided April 29, 1985.

Officer and director of corporate debtor appealed from an order of the United States District Court for the Northern District of Illinois, Nicholas J. Bua, J., which affirmed a United States Magistrate's order that debtor's trustee in bankruptcy had authority to waive corporation's attorney-client privilege. The Court of Appeals, 7th Cir., 722 F.2d 338, reversed, and certiorari was granted. The Supreme Court, Justice Marshall, held that the trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to prebankruptcy communications.

Reversed.

1. Witnesses ⟺199(2)

Attorney-client privilege attaches to corporations as well as to individuals.

2. Witnesses ⟺198(1)

Both for corporations and individuals, the attorney-client privilege serves the function of promoting full and frank communications between attorneys and their clients; it thereby encourages observance of the law and aids in the administration of justice.

3. Corporations ⟺307
    Witnesses ⟺219(3)

As an inanimate entity, a corporation must act through agents; it cannot speak directly to its lawyers and, similarly, it cannot directly waive the attorney-client privilege when disclosure is in its best interest.

4. Witnesses ⟺199(2)

Attorney-client privilege for a corporation does not only cover communications between counsel and top management; under certain circumstances, communications between counsel and lower-level employees are also covered.

5. Witnesses ⟺219(3)

For solvent corporations, power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors; the managers, of course, must exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals.

6. Corporations ⟺397

Authority of corporate officers derives legally from that of the board of directors.

7. Witnesses ⟺199(2), 217, 219(3)

When control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well.

8. Witnesses ⟺219(3)

New managers installed as the result of a corporate takeover, merger, loss of confidence by shareholders, or simply normal succession may waive the attorney-client privilege with respect to communications made by former officers and directors.

9. Witnesses ⟺199(2), 217

Displaced corporate managers may not assert the corporate attorney-client privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.

10. Bankruptcy ⟺242(3)

Legislative history of Bankruptcy Code provision, stating that "Subject to any applicable privilege, after notice and a hearing, the court may order an attorney * * * that holds recorded information * * * relating to the debtor's property or financial affairs, to disclose such recorded information to the trustee", makes clear that Congress did not intend to give a corporate debtor's directors the right to assert the corporation's attorney-client privilege

COMMODITY FUTURES TRADING COM'N v. WEINTRAUB   1987
471 U.S. 343                     Cite as 105 S.Ct. 1986 (1985)

against the bankruptcy trustee; indeed, statements made by members of Congress regarding the effect of said provision specifically deny any attempt to create an attorney-client privilege assertable on behalf of the debtor against the trustee. Bankr. Code, 11 U.S.C.A. § 542(e).

**11. Bankruptcy ⚖=242(3)**

In regard to Bankruptcy Code provision relating to disclosure to the trustee of recorded information held by an attorney, accountant, or other person, the provision's "subject to any applicable privilege" language is merely an invitation for judicial determination of privilege questions. Bankr.Code, 11 U.S.C.A. § 542(e).

**12. Bankruptcy ⚖=242(3)**

Bankruptcy Code provision relating to disclosure to the trustee of recorded information held by an attorney, accountant or other person was not intended to limit the trustee's ability to obtain corporate information; the provision was intended to restrict, not expand, the ability of accountants and attorneys to withhold information from the trustee. Bankr.Code, 11 U.S.C.A. § 542(e).

**13. Bankruptcy ⚖=242(3)**

Because the attorney-client privilege is controlled outside of bankruptcy, by corporation's management, the actor whose duties most closely resemble those of management should control the privilege in bankruptcy, unless such a result interferes with policies underlying the bankruptcy laws.

**14. Bankruptcy ⚖=242(3)**

Bankruptcy Code gives the trustee wide-ranging management authority over the debtor, whereas the powers of the debtor's directors are severely limited; thus, the trustee plays the role most closely analogous to that of a solvent corporation's management, and the directors should not exercise the traditional management function of controlling the corporation's attorney-client privilege unless a contrary arrangement would be inconsistent with policies of the bankruptcy laws. Bankr.Code, 11 U.S.C.A. §§ 323, 343, 363(b), (c)(1), 521, 541, 547, 547(b)(4)(B), 548, 704(1, 2, 4).

**15. Bankruptcy ⚖=242(3)**

No federal interest would be impaired by the trustee in bankruptcy's control of a debtor corporation's attorney-client privilege with respect to prebankruptcy communications; on the other hand, vesting such power in the corporate directors would frustrate the Bankruptcy Code's goal of empowering the trustee to uncover insider fraud and recover misappropriated corporate assets. Bankr.Code, 11 U.S.C.A. §§ 547, 548, 704(4).

**16. Bankruptcy ⚖=118**

Fiduciary duty of a corporation's trustee in bankruptcy runs to shareholders as well as to creditors.

**17. Bankruptcy ⚖=345**

In bankruptcy, interests of the corporate debtor's shareholders become subordinated to the interests of creditors.

**18. Bankruptcy ⚖=242(3)**

In cases in which it is clear that the corporate debtor's estate is not large enough to cover any shareholder claims, the trustee in bankruptcy's exercise of the corporation's attorney-client privilege will benefit only creditors, but there is nothing anomalous in this result; rather, it is in keeping with the hierarchy of interests created by the bankruptcy laws. Bankr.Code, 11 U.S.C.A. § 726(a).

**19. Bankruptcy ⚖=664**

If a corporate debtor remains in possession, that is, if a trustee is not appointed, the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession; indeed, the willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.

**20. Witnesses ⚖=217**

Giving the trustee in bankruptcy of a corporate debtor control over the corporate attorney-client privilege will not have an undesirable chilling effect on attorney-client communications and does not dis-

**1988**  **105 SUPREME COURT REPORTER**  **471 U.S. 343**

criminate against insolvent corporations; the chilling effect is no greater than in the case of a solvent corporation and, by definition, corporations in bankruptcy are treated differently from solvent corporations.

**21. Bankruptcy ⟺242(3)**

Trustee of a corporation in bankruptcy has the power to waive corporation's attorney-client privilege with respect to prebankruptcy communications. Bankr.Code, 11 U.S.C.A. § 542(e).

*Syllabus* *

Petitioner filed a complaint in Federal District Court alleging violations of the Commodity Exchange Act by Chicago Discount Commodity Brokers (CDCB), and respondent Frank McGhee, acting as sole director and officer of CDCB, entered into a consent decree that resulted in the appointment of a receiver who was ultimately appointed trustee in bankruptcy after he filed a voluntary petition in bankruptcy on behalf of CDCB. Respondent Weintraub, CDCB's former counsel, appeared for a deposition pursuant to a subpoena *duces tecum* served by petitioner as part of its investigation of CDCB, but refused to answer certain questions, asserting CDCB's attorney-client privilege. Petitioner then obtained a waiver of the privilege from the trustee as to any communications occurring on or before the date of his initial appointment as a receiver. The District Court upheld a Magistrate's order directing Weintraub to testify, but the Court of Appeals reversed, holding that a bankruptcy trustee does not have the power to waive a corporate debtor's attorney-client privilege with respect to communications that occurred before the filing of the bankruptcy petition.

*Held:* The trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to prebankruptcy communications. Pp. 1990–1996.

(a) The attorney-client privilege attaches to corporations as well as to individuals, and with regard to solvent corporations the power to waive the privilege rests with the corporation's management and is normally exercised by its officers and directors. When control of the corporation passes to new management, the authority to assert and waive the privilege also passes, and the new managers may waive the privilege with respect to corporate communications made by former officers and directors. Pp. 1990–1991.

(b) The Bankruptcy Code does not explicitly address the question whether control of the privilege of a corporation in bankruptcy with respect to prebankruptcy communications passes to the bankruptcy trustee or, as respondents assert, remains with the debtor's directors. Respondents' contention that the issue is controlled by § 542(e) of the Code—which provides that "[s]ubject to any applicable privilege," the |344 court may order an attorney who holds recorded information relating to the debtor's property or financial affairs to disclose such information to the trustee—is not supported by the statutory language or the legislative history. Instead, the history makes clear that Congress intended the courts to deal with privilege questions. Pp. 1991–1992.

(c) The Code gives the trustee wide-ranging management authority over the debtor, whereas the powers of the debtor's directors are severely limited. Thus the trustee plays the role most closely analogous to that of a solvent corporation's management, and the directors should not exercise the traditional management function of controlling the corporation's privilege unless a contrary arrangement would be inconsistent with policies of the bankruptcy laws. Pp. 1992–1993.

(d) No federal interests would be impaired by the trustee's control of the corporation's attorney-client privilege with respect to prebankruptcy communications. On the other hand, vesting such power in the directors would frustrate the Code's goal of empowering the trustee to uncover

---

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

COMMODITY FUTURES TRADING COM'N v. WEINTRAUB    1989
471 U.S. 346            Cite as 105 S.Ct. 1986 (1985)

insider fraud and recover misappropriated corporate assets. Pp. 1993–1994.

(e) There is no merit to respondents' contention that the trustee should not obtain control over the privilege because, unlike the management of a solvent corporation, the trustee's primary loyalty goes not to shareholders but to creditors. When a trustee is appointed, the privilege must be exercised in accordance with the trustee's fiduciary duty to all interested parties. Even though in some cases the trustee's exercise of the privilege will benefit only creditors, such a result is in keeping with the hierarchy of interests created by the bankruptcy laws. Pp. 1994–1995.

(f) Nor is there any merit to other arguments of respondents, including the contentions that giving the trustee control over the privilege would have an undesirable chilling effect on attorney-client communications and would discriminate against insolvent corporations. The chilling effect is no greater here than in the case of a solvent corporation, and, by definition, corporations in bankruptcy are treated differently from solvent corporations. Pp. 1995–1996.

722 F.2d 338 (CA7 1984), reversed.

Bruce N. Kuhlik, Washington, D.C., for petitioner, pro hac vice, by special leave of Court.

₃₄₅David A. Epstein, Chicago, Ill., for respondents.

Justice MARSHALL delivered the opinion of the Court.

The question here is whether the trustee of a corporation in bankruptcy has the power to waive the debtor corporation's attorney-client privilege with respect to communications that took place before the filing of the petition in bankruptcy.

I

The case arises out of a formal investigation by petitioner Commodity Futures Trading Commission to determine whether Chicago Discount Commodity Brokers (CDCB), or persons associated with that firm, violated the Commodity Exchange Act, 7 U.S.C. § 1 et seq. CDCB was a discount commodity brokerage house registered with the Commission, pursuant to 7 U.S.C. § 6d(1), as a futures commission merchant. On October 27, 1980, the Commission filed a complaint against CDCB in the United States District Court for the Northern District of Illinois alleging violations of the Act. That same day, respondent Frank McGhee, acting as sole director and officer of CDCB, entered into a consent decree with the Commission, which provided for the appointment of a receiver and for the receiver to file a petition for liquidation under Chapter 7 of the Bankruptcy Reform Act of 1978 (Bankruptcy Code). The District Court appointed John K. Notz, Jr., as receiver.

Notz then filed a voluntary petition in bankruptcy on behalf of CDCB. He sought relief under Subchapter IV of Chapter 7 of the Bankruptcy Code, which provides for the ₃₄₆liquidation of bankrupt commodity brokers. 11 U.S.C. §§ 761–766. The Bankruptcy Court appointed Notz as interim trustee and, later, as permanent trustee.

As part of its investigation of CDCB, the Commission served a subpoena duces tecum upon CDCB's former counsel, respondent Gary Weintraub. The Commission sought Weintraub's testimony about various CDCB matters, including suspected misappropriation of customer funds by CDCB's officers and employees, and other fraudulent activities. Weintraub appeared for his deposition and responded to numerous inquiries but refused to answer 23 questions, asserting CDCB's attorney-client privilege. The Commission then moved to compel answers to those questions. It argued that Weintraub's assertion of the attorney-client privilege was inappropriate because the privilege could not be used to "thwart legitimate access to information sought in an administrative investigation." App. 44.

**1990**    **105 SUPREME COURT REPORTER**    **471 U.S. 346**

Even though the Commission argued in its motion that the matters on which Weintraub refused to testify were not protected by CDCB's attorney-client privilege, it also asked Notz to waive that privilege. In a letter to Notz, the Commission maintained that CDCB's former officers, directors, and employees no longer had the authority to assert the privilege. According to the Commission, that power was vested in Notz as the then-interim trustee. *Id.*, at 47–48. In response to the Commission's request, Notz waived "any interest I have in the attorney/client privilege possessed by that debtor for any communications or information occurring or arising on or before October 27, 1980"—the date of Notz' appointment as receiver. *Id.*, at 49.

On April 26, 1982, a United States Magistrate ordered Weintraub to testify. The Magistrate found that Weintraub had the power to assert CDCB's privilege. He added, however, that Notz was "successor in interest of all assets, rights and privileges of CDCB, including the attorney/client privilege at issue herein," and that Notz' waiver was therefore valid. App. to Pet. for Cert. 19a–20a. The District Court ⌊347⌋upheld the Magistrate's order on June 9. *Id.*, at 18a. Thereafter, Frank McGhee and his brother, respondent Andrew McGhee, intervened and argued that Notz could not validly waive the privilege over their objection. Record, Doc. No. 49, p. 7.[1] The District Court rejected this argument and, on July 27, entered a new order requiring Weintraub to testify without asserting an attorney-client privilege on behalf of CDCB. App. to Pet. for Cert. 17a.[2]

The McGhees appealed from the District Court's order of July 27 and the Court of Appeals for the Seventh Circuit reversed. 722 F.2d 338 (1984). It held that a bankruptcy trustee does not have the power to waive a corporate debtor's attorney-client privilege with respect to communications that occurred before the filing of the bankruptcy petition. The court recognized that two other Circuits had addressed the question and had come to the opposite conclusion. See *In re O.P.M. Leasing Services, Inc.*, 670 F.2d 383 (CA2 1982); *Citibank, N.A. v. Andros*, 666 F.2d 1192 (CA8 1981).[3] We granted certiorari to resolve the conflict. 469 U.S. 929, 105 S.Ct. 321, 83 L.Ed.2d 259 (1984). We now reverse the Court of Appeals.

⌊348⌋II

[1, 2] It is by now well established, and undisputed by the parties to this case, that the attorney-client privilege attaches to corporations as well as to individuals. *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Both for corporations and individuals, the attorney-client privilege serves the function of promoting full and frank communications between attorneys and their clients. It thereby encourages observance of the law and aids in the administration of justice. See, *e.g., Upjohn Co. v. United States, supra,* at 389, 101 S.Ct., at 682; *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980); *Fisher v.*

---

1. The Court of Appeals found that Andrew McGhee resigned his position as officer and director of CDCB on October 21, 1980. 722 F.2d 338, 339 (CA7 1984). Frank McGhee, however, remained as an officer and director. See n. 5, *infra*.

2. The June 9 order had not made clear that Weintraub was barred only from invoking the *corporation's* attorney-client privilege.

3. The Court of Appeals distinguished *O.P.M. Leasing*, where waiver of the privilege was opposed by the corporation's sole voting stockholder, on the ground that the corporation in *O.P.M. Leasing* had no board of directors in existence during the tenure of the trustee. Here, instead, Frank McGhee remained an officer and director of CDCB during Notz' trusteeship. 722 F.2d, at 341. The court acknowledged, however, a square conflict with *Citibank v. Andros*.

After the Court of Appeals' decision in this case, the Court of Appeals for the Ninth Circuit held that a bankruptcy examiner has the power to waive the corporation's attorney-client privilege over the objections of the debtor-in-possession. *In re Boileau*, 736 F.2d 503 (CA9 1984). That holding also conflicts with the holding of the Seventh Circuit in this case.

COMMODITY FUTURES TRADING COM'N v. WEINTRAUB   1991
471 U.S. 350                  Cite as 105 S.Ct. 1986 (1985)

*United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).

[3, 4] The administration of the attorney-client privilege in the case of corporations, however, presents special problems. As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers. Similarly, it cannot directly waive the privilege when disclosure is in its best interest. Each of these actions must necessarily be undertaken by individuals empowered to act on behalf of the corporation. In *Upjohn Co.,* we considered whether the privilege covers only communications between counsel and top management, and decided that, under certain circumstances, communications between counsel and lower-level employees are also covered. Here, we face the related question of which corporate actors are empowered to waive the corporation's privilege.

[5, 6] The parties in this case agree that, for solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors.[4] The managers, of ⌊349course, must exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals. See, *e.g., Dodge v. Ford Motor Co.,* 204 Mich. 459, 507, 170 N.W. 668, 684 (1919).

[7–9] The parties also agree that when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties. See Brief for Petitioner 11; Tr. of Oral Arg. 26. See generally *In re O.P.M. Leasing Services, Inc.,* supra, at 386; *Citibank v. Andros,* supra, at 1195; *In re Grand Jury Investigation,* 599 F.2d 1224, 1236 (CA3 1979); *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 611, n. 5 (CA8 1978) (en banc).[5]

The dispute in this case centers on the control of the attorney-client privilege of a corporation in bankruptcy. The Government maintains that the power to exercise that privilege with respect to prebankruptcy communications passes to the bankruptcy trustee. In contrast, respondents maintain that this power remains with the debtor's directors.

III

As might be expected given the conflict among the Courts of Appeals, the Bankruptcy Code does not explicitly address ⌊350the question before us. Respondents assert that 11 U.S.C. § 542(e) is dispositive, but we find reliance on that provision misplaced. Section 542(e) states:

"*Subject to any applicable privilege,* after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to disclose such re-

---

4. State corporation laws generally vest management authority in a corporation's board of directors. See, *e.g.,* Del.Code Ann. Tit. 8, § 141 (1983); N.Y.Bus.Corp.Law § 701 (McKinney Supp.1983–1984); Model Bus.Corp.Act § 35 (1979). The authority of officers derives legally from that of the board of directors. See generally Eisenberg, Legal Models of Management Structure in the Modern Corporation: Officers, Directors, and Accountants, 63 Calif.L.Rev. 375 (1975). The distinctions between the powers of officers and directors are not relevant to this case.

5. It follows that Andrew McGhee, who is now neither an officer nor a director, see n. 1, *supra,* retains no control over the corporation's privilege. The remainder of this opinion therefore focuses on whether Frank McGhee has such power.

corded information to the trustee." (emphasis added).

According to respondents, the "subject to any applicable privilege" language means that the attorney cannot be compelled to turn over to the trustee materials within the corporation's attorney-client privilege. In addition, they claim, this language would be superfluous if the trustee had the power to waive the corporation's privilege.

The statutory language does not support respondents' contentions. First, the statute says nothing about a trustee's authority to waive the corporation's attorney-client privilege. To the extent that a trustee has that power, the statute poses no bar on his ability to obtain materials within that privilege. Indeed, a privilege that has been properly waived is not an "applicable" privilege for the purposes of § 542(e).

Moreover, rejecting respondents' reading does not render the statute a nullity, as privileges of parties other than the corporation would still be "applicable" as against the trustee. For example, consistent with the statute, an attorney could invoke the personal attorney-client privilege of an individual manager.

[10, 11] The legislative history also makes clear that Congress did not intend to give the debtor's directors the right to assert the corporation's attorney-client privilege against the trustee. Indeed, statements made by Members of Congress regarding the effect of § 542(e) "specifically deny any attempt to create an attorney-client privilege assertable on behalf of the debtor against the trustee." *In re O.P.M. Leasing*₃₅₁ *Services, Inc.*, 13 B.R. 54, 70 (Bkrtcy. SDNY 1981) (Weinfeld, J.), aff'd, 670 F.2d 383 (CA2 1982); see also 4 Collier on Bankruptcy ¶ 542.06 (15th ed. 1985). Rather, Congress intended that the courts deal with this problem:

> "The extent to which the attorney client privilege is valid against the trustee is unclear under current law and is left to be determined by the courts on a case by case basis." 124 Cong.Rec. 32400 (1978)

(remarks of Rep. Edwards); *id.*, at 33999 (remarks of Sen. DeConcini).

The "subject to any applicable privilege" language is thus merely an invitation for judicial determination of privilege questions.

[12] In addition, the legislative history establishes that § 542(e) was intended to restrict, not expand, the ability of accountants and attorneys to withhold information from the trustee. Both the House and the Senate Report state that § 542(e) "is a new provision that deprives accountants and attorneys of the leverage that they ha[d], ... under State law lien provisions, to receive payment in full ahead of other creditors when the information they hold is necessary to the administration of the estate." S.Rep. No. 95–989, p. 84 (1978); H.R.Rep. No. 95–595, pp. 369–370 (1977), U.S.Code Cong. & Admin.News, 1978, pp. 5787, 5870, 6325–6326. It is therefore clear that § 542(e) was not intended to limit the trustee's ability to obtain corporate information.

IV

[13] In light of the lack of direct guidance from the Code, we turn to consider the roles played by the various actors of a corporation in bankruptcy to determine which is most analogous to the role played by the management of a solvent corporation. See *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Because the attorney-client privilege is controlled, outside of bankruptcy, by a corporation's management, the actor whose duties most closely resemble those of management₃₅₂ should control the privilege in bankruptcy, unless such a result interferes with policies underlying the bankruptcy laws.

A

The powers and duties of a bankruptcy trustee are extensive. Upon the commencement of a case in bankruptcy, all corporate property passes to an estate represented by the trustee. 11 U.S.C. §§ 323, 541. The trustee is "accountable for all property received," §§ 704(2), 1106(a)(1),

COMMODITY FUTURES TRADING COM'N v. WEINTRAUB   1993
471 U.S. 354                    Cite as 105 S.Ct. 1986 (1985)

and has the duty to maximize the value of the estate, see § 704(1); *In re Washington Group, Inc.*, 476 F.Supp. 246, 250 (MDNC 1979), aff'd *sub nom. Johnston v. Gilbert*, 636 F.2d 1213 (CA4 1980), cert. denied, 452 U.S. 940, 101 S.Ct. 3084, 69 L.Ed.2d 954 (1981). He is directed to investigate the debtor's financial affairs, §§ 704(4), 1106(a)(3), and is empowered to sue officers, directors, and other insiders to recover, on behalf of the estate, fraudulent or preferential transfers of the debtor's property, §§ 547(b)(4)(B), 548. Subject to court approval, he may use, sell, or lease property of the estate. § 363(b).

Moreover, in reorganization, the trustee has the power to "operate the debtor's business" unless the court orders otherwise. § 1108. Even in liquidation, the court "may authorize the trustee to operate the business" for a limited period of time. § 721. In the course of operating the debtor's business, the trustee "may enter into transactions, including the sale or lease of property of the estate" without court approval. § 363(c)(1).

[14] As even this brief and incomplete list should indicate, the Bankruptcy Code gives the trustee wide-ranging management authority over the debtor. See 2 Collier on Bankruptcy ¶ 323.01 (15th ed. 1985). In contrast, the powers of the debtor's directors are severely limited. Their role is to turn over the corporation's property to the trustee and to provide certain information to the trustee and to the creditors. §§ 521, 343. Congress contemplated that when a trustee is appointed, he assumes control of the business, and |353the debtor's directors are "completely ousted." See H.R.Rep. No. 95-595, pp. 220-221 (1977).[6]

In light of the Code's allocation of responsibilities, it is clear that the trustee plays the role most closely analogous to that of a solvent corporation's management. Given that the debtor's directors retain virtually no management powers, they should not exercise the traditional management function of controlling the corporation's attorney-client privilege, see *supra*, at 1991, unless a contrary arrangement would be inconsistent with policies of the bankruptcy laws.

B

[15] We find no federal interests that would be impaired by the trustee's control of the corporation's attorney-client privilege with respect to prebankruptcy communications. On the other hand, the rule suggested by respondents—that the debtor's directors have this power—would frustrate an important goal of the bankruptcy laws. In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors. See generally 11 U.S.C. §§ 704(4), 547, 548. It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files. To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets. The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own |354conduct. See generally *In re Browy*, 527 F.2d 799, 802 (CA7 1976) (*per curiam*).

Respondents contend that the trustee can adequately investigate fraud without controlling the corporation's attorney-client privilege. They point out that the privilege does not shield the disclosure of communications relating to the planning or commission of ongoing fraud, crimes, and ordinary

---

6. While this reference is to the role of a trustee in reorganization, nothing in the Code or its legislative history suggests that the debtor's directors enjoy substantially greater powers in liquidation.

torts, see, *e.g., Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933); *Garner v. Wolfinbarger,* 430 F.2d 1093, 1102–1103 (CA5 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971). Brief for Respondents 11. The problem, however, is making the threshold showing of fraud necessary to defeat the privilege. See *Clark v. United States, supra,* 289 U.S., at 15, 53 S.Ct., at 469. Without control over the privilege, the trustee might not be able to discover hidden assets or looting schemes, and therefore might not be able to make the necessary showing.

In summary, we conclude that vesting in the trustee control of the corporation's attorney-client privilege most closely comports with the allocation of the waiver power to management outside of bankruptcy without in any way obstructing the careful design of the Bankruptcy Code.

V

Respondents do not seriously contest that the bankruptcy trustee exercises functions analogous to those exercised by management outside of bankruptcy, whereas the debtor's directors exercise virtually no management functions at all. Neither do respondents seriously dispute that vesting control over the attorney-client privilege in the trustee will facilitate the recovery of misappropriated corporate assets.

Respondents argue, however, that the trustee should not obtain control over the privilege because, unlike the management of a solvent corporation, the trustee's primary loyalty goes not to shareholders but to creditors, who elect him and who often will be the only beneficiaries of his efforts. See 11 U.S.C. §§ 702 (creditors elect trustee), 726(a) (shareholders |355are last to recover in bankruptcy). Thus, they contend, as a practical matter bankruptcy trustees represent only the creditors. Brief for Respondents 22.

[16–18] We are unpersuaded by this argument. First, the fiduciary duty of the trustee runs to shareholders as well as to creditors. See, *e.g., In re Washington Group, Inc.,* 476 F.Supp., at 250; *In re Ducker,* 134 F. 43, 47 (CA6 1905).[7] Second, respondents do not explain why, out of all management powers, control over the attorney-client privilege should remain with those elected by the corporation's shareholders. Perhaps most importantly, respondents' position ignores the fact that bankruptcy causes fundamental changes in the nature of corporate relationships. One of the painful facts of bankruptcy is that the interests of shareholders become subordinated to the interests of creditors. In cases in which it is clear that the estate is not large enough to cover any shareholder claims, the trustee's exercise of the corporation's attorney-client privilege will benefit only creditors, but there is nothing anomalous in this result; rather, it is in keeping with the hierarchy of interests created by the bankruptcy laws. See generally 11 U.S.C. § 726(a).

[19] Respondents also ignore that if a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession. *Wolf v. Weinstein,* 372 U.S. 633, 649–652, 83 S.Ct. 969, 979–981, 10 L.Ed.2d 33 (1963). Indeed, the willingness of courts to leave debtors in possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Id.,* at 651, 83 S.Ct., at 980. Surely, then, the management of a debtor-in-possession |356would have to exercise control of the corporation's attorney-client privilege consistently with this obligation to treat all parties, not merely the shareholders, fairly. By the same token, when a trustee is appointed, the privilege must be

---

7. The propriety of the trustee's waiver of the attorney-client privilege in a particular case can, of course, be challenged in the bankruptcy court on the ground that it violates the trustee's fiduciary duties. Respondents, however, did not challenge the waiver on those grounds; rather, they asserted that the trustee never has the power to waive the privilege.

COMMODITY FUTURES TRADING COM'N v. WEINTRAUB     1995
471 U.S. 358                   Cite as 105 S.Ct. 1986 (1985)

exercised in accordance with the trustee's fiduciary duty to all interested parties.

To accept respondents' position would lead to one of two outcomes: (1) a rule under which the management of a debtor-in-possession exercises control of the attorney-client privilege for the benefit only of shareholders but exercises all of its other functions for the benefit of both shareholders and creditors, or (2) a rule under which the attorney-client privilege is exercised for the benefit of both creditors and shareholders when the debtor remains in possession, but is exercised for the benefit only of shareholders when a trustee is appointed. We find nothing in the bankruptcy laws that would suggest, much less compel, either of these implausible results.

VI

Respondents' other arguments are similarly unpersuasive. First, respondents maintain that the result we reach today would also apply to *individuals* in bankruptcy, a result that respondents find "unpalatable." Brief for Respondents 27. But our holding today has no bearing on the problem of individual bankruptcy, which we have no reason to address in this case. As we have stated, a corporation, as an inanimate entity, must act through agents. See *supra*, at 1991. When the corporation is solvent, the agent that controls the corporate attorney-client privilege is the corporation's management. Under our holding today, this power passes to the trustee because the trustee's functions are more closely analogous to those of management outside of bankruptcy than are the functions of the debtor's directors. An individual, in contrast, can act for himself; there is no "management" that controls a solvent individual's attorney-client privilege. If control over that privilege passes to a trustee, it must be ⌐357under some theory different from the one that we embrace in this case.

[20] Second, respondents argue that giving the trustee control over the attorney-client privilege will have an undesirable chilling effect on attorney-client communications. According to respondents, corporate managers will be wary of speaking freely with corporate counsel if their communications might subsequently be disclosed due to bankruptcy. See Brief for Respondents 37–42; see also 722 F.2d, at 343. But the chilling effect is no greater here than in the case of a solvent corporation, where individual officers and directors always run the risk that successor management might waive the corporation's attorney-client privilege with respect to prior management's communications with counsel. See *supra*, at 1991.

Respondents also maintain that the result we reach discriminates against insolvent corporations. According to respondents, to prevent the debtor's directors from controlling the privilege amounts to "economic discrimination" given that directors, as representatives of the shareholders, control the privilege for solvent corporations. Brief for Respondents 42; see also 722 F.2d, at 342–343. Respondents' argument misses the point that, by definition, corporations in bankruptcy are treated differently from solvent corporations. "Insolvency is a most important and material fact, not only with individuals but with corporations, and with the latter as with the former the mere fact of its existence may change radically and materially its rights and obligations." *McDonald v. Williams*, 174 U.S. 397, 404, 19 S.Ct. 743, 745, 43 L.Ed. 1022 (1899). Respondents do not explain why we should be particularly concerned about differential treatment in this context.

Finally, respondents maintain that upholding trustee waivers would create a disincentive for debtors to invoke the protections of bankruptcy and provide an incentive for creditors to file for involuntary bankruptcy. According to respondents, "[i]njection of such considerations into bankruptcy⌐358would skew the application of the bankruptcy laws in a manner not contemplated by Congress." Brief for Respondents 43. The law creates numerous incentives, both for and against the filing

**1996**  105 SUPREME COURT REPORTER  471 U.S. 358

of bankruptcy petitions. Respondents do not explain why our holding creates incentives that are inconsistent with congressional intent, and we do not believe that it does.

## VII

[21] For the foregoing reasons, we hold that the trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to prebankruptcy communications. We therefore conclude that Notz, in his capacity as trustee, properly waived CDCB's privilege in this case. The judgment of the Court of Appeals for the Seventh Circuit is accordingly reversed.

*It is so ordered.*

Justice POWELL took no part in the consideration or decision of this case.



471 U.S. 359, 85 L.Ed.2d 385

₃₅₉SCHOOL COMMITTEE OF the TOWN OF BURLINGTON, MASSACHUSETTS, et al., Petitioners

v.

DEPARTMENT OF EDUCATION OF the Commonwealth of MASSACHUSETTS et al.

No. 84–433.

Argued March 26, 1985.

Decided April 29, 1985.

Town brought suit against state and parents of learning disabled child seeking to reverse order of Massachusetts Bureau of Special Education Appeals in favor of private school placement and holding town's individualized education plan to be inadequate and inappropriate. The United States District Court for the District of Massachusetts found in favor of defendants on motion for summary judgment. On appeal, the Court of Appeals, 655 F.2d 428, vacated and remanded. On remand, the District Court, Rya W. Zobel, J., reversed finding of Massachusetts Bureau and held that town plan was inappropriate and transferred case and consolidated it with two others. The District Court, Bailey Aldrich, Senior Circuit Judge, sitting by designation, 561 F.Supp. 121, determined that reimbursement was available to town as prevailing party, and state and parents appealed, and town cross-appealed. The Court of Appeals, Bownes, Circuit Judge, 736 F.2d 773 affirmed in part, reversed in part, and remanded. Town filed petition for writ of certiorari. The Supreme Court, Justice Rehnquist, held that: (1) authority granted to court reviewing plan includes power to order school authorities to reimburse parents for their expenditures for private special education for child if court ultimately determines that private placement is proper, and (2) parental violation of the Act by changing the "then current educational placement" of child during pendency of proceedings to review challenged plan does not constitute waiver of parents' right to reimbursement.

Court of Appeals affirmed.

1. Schools ⚜159

Under Education of the Handicapped Act, grant of authority to court reviewing contested individualized education plan includes power to order school authorities to reimburse parents for their expenditures for private special education for child if court ultimately determines that private placement, rather than proposed individualized education plan, is proper under the Act. Education of the Handicapped Act, §§ 602 et seq., 615(e), as amended, 20 U.S.C.A. §§ 1401 et seq., 1415(e).

2. Schools ⚜148

Under provision of Education for the Handicapped Act directing that "[T]he court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party,

# EXHIBIT B

Government need prove beyond a reasonable doubt to convict Appellant are the three elements the court had previously listed. The court's reference to the three essential elements identified earlier in the instructions compounds the error of omitting to instruct on the "intent to distribute" element and detracts from the correct statement immediately preceding it. As we stated in *Smith v. United States*, 230 F.2d 935, 939 (6th Cir. 1956), "[t]he fact that one instruction is correct does not cure the error in giving another which is inconsistent with it." The court's instructions would permit the jury to convict Appellant for mere possession of a controlled substance which is not an offense under § 841(a)(1).[7] *Cf. United States v. White*, 390 F.2d 405, 407 (6th Cir. 1968). We believe that the instructions on intent were insufficient and created an erroneous impression in the minds of the jurors. *See United States v. Clark*, 475 F.2d at 248–49. Since "intent to distribute" is an essential element of § 841(a)(1), the Government retains the burden of proving that element beyond a reasonable doubt and on the basis of proper instructions. *See United States v. Clark*, 475 F.2d at 249. *See also United States v. Byrd*, 352 F.2d 570 (2d Cir. 1965). *Compare, United States v. Montiell*, 526 F.2d 1008, 1010–11 (2d Cir. 1975). *See generally Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). The failure to instruct on an essential element of an offense is "fundamental error," *United States v. King*, 521 F.2d 61, 63 (10th Cir. 1975), which cannot be cured by reference to the indictment or by reading the unexplained language of the statute to the jury. *See United States v. Natale*, 526 F.2d 1160, 1167 (2d Cir. 1975); *United States v. Bosch*, 505 F.2d 78, 82 (5th Cir. 1974). We conclude that the district court's failure to instruct on "intent to distribute", an essential element of an offense under 21 U.S.C. § 841(a)(1), was plain error and requires reversal of the convictions. The other issues raised by Appellant are without merit.

Reversed and remanded.

---

VELSICOL CHEMICAL CORPORATION, Petitioner-Appellant,

v.

Honorable James B. PARSONS, Chief Judge, United States District Court for the Northern District of Illinois, Respondent-Appellee.

Nos. 77–1433, 77–1434.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1977.

Decided July 29, 1977.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 26, 1977.

Corporation appealed from order of the United States District Court for the Northern District of Illinois, Eastern Division, James B. Parsons, Chief Judge, compelling member of corporation's outside law firm to testify before grand jury. The corporation also filed an original petition for writ of mandamus and/or prohibition. The Court of Appeals, Grant, Senior District Judge, held that: (1) where member of outside law firm told district court that he would comply with order granting government's motion to compel him to testify before grand jury and to produce documents, corporation had standing to intervene and Court of Appeals had jurisdiction to entertain corporation's appeal; (2) senior house counsel of corporation had authority to waive corporations attorney-client privilege as to outside law firm, and (3) where documents prepared by law firm in administrative proceedings were not prepared in anticipation of potential criminal litigation and focus of inquiry was to determine whether their preparation was attended by misconduct, government had adequate grounds to acquire the documents.

Affirmed.

---

7. Simple possession of a controlled substance is a violation of 21 U.S.C. § 844(a) (1970), which carries a maximum term on the first offense of one year imprisonment and a $5000 fine. *Compare*, 21 U.S.C. § 841(b), (c).

**672**  **561 FEDERAL REPORTER, 2d SERIES**

**1. Federal Courts ⟠546**

Where attorney had told district court that he would comply with order granting government's motion to compel him to testify before grand jury and to produce documents, client could not protect its rights in absence of appeal; thus client had standing to intervene and Court of Appeals had jurisdiction to entertain the client's appeal. 28 U.S.C.A. § 1291.

**2. Grand Jury ⟠36**

Corporate officer, who was senior house counsel, had authority to waive corporation's attorney-client privilege and was within his scope of authority when he testified before government counsel and grand jury, even though corporation had engaged outside counsel.

**3. Attorney and Client ⟠77**

That corporation has engaged outside counsel does not necessarily circumscribe or revoke authority of house counsel.

**4. Witnesses ⟠219(3)**

Corporate house counsel was agent of corporation with authority to waive attorney-client privilege as to outside counsel representing corporation.

**5. Grand Jury ⟠36**

Corporate house counsel's testimony before grand jury was of such nature as to effect a waiver of corporation's attorney-client privilege as to outside counsel representing corporation; thus, government had right to pursue investigation with respect to communications between corporation and outside counsel.

**6. Federal Courts ⟠556**

Portion of district court's order involving work product attorney-client privilege was appealable.

**7. Grand Jury ⟠36**

Where documents prepared by law firm in administrative proceedings were not prepared in anticipation of potential criminal litigation and focus of inquiry was to determine whether their preparation was attended by misconduct, work product rule did not preclude government from acquiring the documents in connection with criminal grand jury investigation. Fed.Rules Crim. Proc. rule 16(b)(2), 18 U.S.C.A.; Fed.Rules Civ.Proc. rule 26(b)(3), 28 U.S.C.A.

---

Vincent J. Fuller, John J. Buckley, Jr., Washington, D.C., Donald J. McLachlan, Chicago, Ill., for petitioner-appellant.

Samuel K. Skinner, U.S. Atty., Robert L. Herbst, Asst. U.S. Atty., Chicago, Ill., for respondent-appellee.

Before FAIRCHILD and CUMMINGS, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

In September 1975, the U.S. Attorney's office for the Northern District of Illinois initiated an investigation of Velsicol Chemical Corporation and several of its current and former employees and attorneys. The purpose of the investigation was to determine whether Velsicol and/or certain of its officers, employees, and attorneys withheld certain information from the United States Environmental Protection Agency which tended to show pesticides manufactured by Velsicol induced tumors and/or cancers in laboratory animals. Possible violations of 18 U.S.C. § 1001, 7 U.S.C. § 136d(a)(2) and 18 U.S.C. § 371 are within the scope of the investigation.

The key people involved in this appeal and mandamus action are Neil Mitchell, General Counsel of Velsicol; Bernant Lorant, an attorney in private practice and former employee of Velsicol; Harvey Gold, an employee of Velsicol; and three attorneys of the law firm of Sellers, Conner & Cuneo, Messrs. Robert L. Ackerly, Charles A. O'Connor and Joe G. Hollingsworth. Mitchell, Lorant and the Sellers law firm were jointly involved in the representation

---

* Senior District Judge Robert A. Grant of the United States District Court for the Northern District of Indiana is sitting by designation.

of Velsicol in administrative proceedings before the Environmental Protection Agency. Gold has submitted an affidavit to the Environmental Protection Agency which stated in part that "[a]ll relevant reports and advisory committee proceedings have been submitted to the Environmental Protection Agency and its predecessor agencies". A particular focus of the investigation is Gold's affidavit and a legal memorandum prepared by Mitchell and Lorant with assistance of counsel from the Sellers firm. These two documents were filed by Velsicol in 1973 in opposition to the EPA's motion for a discovery subpoena in an administrative proceeding concerning two pesticides. The Government maintains that the representations embodied in those two documents appear to be false because some of the reports on the pesticides reposed in Velsicol's files at the time the legal memorandum and affidavits were filed. After being notified that it, along with several individuals, was under investigation, Velsicol retained Williams, Connolly & Califano (now Williams & Connolly) to represent the corporation in the grand jury investigation. The same firm also represented some of the individual subjects of the investigation, including Mitchell and Lorant. During the early stages of the investigation, government counsel, Assistant United States Attorney Thomas Mulroy, met with Messrs. David Povich and Richard Cooper of the Williams firm. At that meeting, Povich told Mulroy that Velsicol would not assert its attorney-client privilege as to any conversations between Velsicol employees and Mitchell and Lorant. Povich also told the Government that Velsicol would exercise the attorney-client privilege with respect to any communication between Velsicol and its outside counsel, including the Sellers and Williams firms.

From October 1975 to the present, Mitchell and Lorant have appeared before government counsel and the grand jury on a number of occasions and have testified as to numerous communications. Some of these communications have entailed remarks with lawyers from the Sellers firm. Specifically, Mitchell appeared at a sworn deposition in October, 1975, and before the Grand Jury in February 1977, disclosing conversations he had on several subjects with attorneys of the Sellers firm. The Government argues that a waiver evolved out of this program.

On 9 February 1977, grand jury subpoenae were issued directing three attorneys of the Sellers firm to give testimony and produce documents relating to their representation of Velsicol in the on-going EPA proceedings previously mentioned. Velsicol filed a motion to intervene in the grand jury proceeding and motions to quash and for a protective order. Velsicol argued that the subpoena-requested documents and testimony protected against disclosure by the attorney-client privilege and the work product rule.

Mr. Ackerly appeared before the grand jury and refused to answer ten questions propounded by the Government on the grounds that the subject of the inquiries was protected by the attorney-client privilege. A claim was also made that some of the subpoenaed documents were at least in part protected by the work product rule. The Government then brought Mr. Ackerly before the district court on a motion to compel testimony and production of documents. The court continued any hearing on the motions until 21 April 1977. On that date the court granted Velsicol's motion to intervene and the Government's motion to compel Ackerly's testimony. All of Velsicol's remaining motions were denied.

Velsicol promptly filed a Notice of Appeal, claiming possible irreparable injury. Velsicol also filed a Petition for a Writ of Mandamus and/or Prohibition and this court granted the petitioner-appellant an immediate temporary stay on 25 April 1977, and, on 13 May 1977, continued that stay until the final resolution of the appeal and mandamus action.

*APPEALABILITY OF THE DISTRICT COURT COMPELLING TESTIMONY AND PRODUCTION OF DOCUMENTS*

A threshold determination to be made is whether the order of the district court is of

**674**  **561 FEDERAL REPORTER, 2d SERIES**

an appealable nature. Velsicol concedes that orders compelling production of documents and testimony pursuant to grand jury subpoenae duces tecum and ad testificandum are generally interlocutory, but argues that the situation here is governed by a limited category of cases where denial of immediate review would render impossible any review of individual claims. *Perlman v. United States*, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1917). Essentially, Velsicol stresses that appealability has been recognized where an intervenor may suffer irreparable injury because a third party (Ackerly) has been compelled to testify and produce. Basically the rationale behind the *Perlman* exception is that the second party (appealing party), who has not received the order or subpoena, should not be expected to rely on the recipient to risk contempt in order to exercise the intervenor-second party's rights. *See, United States v. Nixon*, 418 U.S. 683, 691, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

[1] The Government acknowledges that this is a third party scenario similar to that recognized by the *Perlman* exception but reasons that the *Perlman* exception does not apply here because Ackerly is Velsicol's lawyer and that therefore he can be expected to protect Velsicol's rights. It is one thing, however, for a lawyer to invoke the privilege when called to testify (as Ackerly did on 13 April 1977) and quite another to expect an attorney to defy a court order directing him to testify. Ackerly has told the district court that he will comply with the order and will not risk contempt (Appendix of Appellant-Petitioner, p. 92). The privilege will not again be invoked by Ackerly, nor should he be expected to resist the court's order.[1]

At this juncture it is clear Velsicol cannot protect its rights in the absence of an appeal. Velsicol had standing to intervene and this is a situation properly covered by the *Perlman* exception. We have jurisdiction to entertain the appeal under 28 U.S.C. § 1291. *See, United States v. Nixon, supra; United States v. Ryan*, 402 U.S. 530, 536, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971); *Matter of Grand Jury Impaneled January 21, 1975*, 541 F.2d 373, 377 (CA 3 1976).

*THE ISSUE OF WAIVER BY VELSICOL*

In granting the motion to compel, the district court concluded that there had been an intent on the part of Velsicol "to limit the disclosures" but "that that intent had been exceeded and exceeded under circumstances by which the corporation was bound" (Petitioner-Appellant Appendix, p. 98). Judge Parsons also determined that the waiver was "a general waiver" relating "primarily to subject matter" rather than merely to specific conversations (Appendix p. 85).

Velsicol makes a number of arguments as to why the district court ruling was erroneous. It is suggested that there was no corporate intent to waive and that Mitchell as a corporate officer did not possess the requisite authority to bind the corporation. Therefore, Velsicol concludes he was outside the scope of his authority.

[2, 3] It is generally recognized that a corporation acts through its officers. In the instant suit, Mitchell held the office of "Vice-President-Legal" (Appellant's brief, p. 4) and as such was senior house counsel. While we believe that a corporate officer must have authority to bind the corporation, the authority of different corporate officers will inevitably vary as to the positions held. Despite the protestations of Velsicol that Mitchell lacked authority to waive the corporation's attorney-client privilege, we are not persuaded his authority was so limited. Although we do not intend to define the precise authority of every Velsicol corporate officer, we have no

---

1. Mr. Ackerly's decision to comply with the district court's order was not inconsistent with the Code of Professional Responsibility. DR4–101(C)(2) of the Disciplinary Rules provides as follows:

    (C) A lawyer may reveal:

    (1) Confidences or secrets with the consent of the clients affected, but only after a full disclosure of them.
    (2) Confidences or secrets when permitted under Disciplinary Rules or *required by law or court order*. (Emphasis supplied.)

doubts that Mitchell was within the scope of his authority when he testified. The fact that the corporation has engaged outside counsel does not necessarily circumscribe or revoke the authority of house counsel.

Mitchell's status before the grand jury admittedly has several dimensions. As an individual, he is unquestionably a potential target. He also, however, is an agent of Velsicol and was employed as house counsel when he testified. Because the focus of the investigation is upon possible corporate misconduct within its own legal department, Velsicol is being represented by the Williams firm. While Mitchell's presence before the grand jury may be characterized as a client for purposes of determining attorney-client issues, vis-à-vis communications with outside counsel, he was nonetheless possessed of the office of house counsel of the corporation and as such was an agent of the client corporation with authority to waive the attorney-client privilege. Furthermore, as the Government has pointed out, Velsicol has never produced any corporate resolution or written document purporting to formalize its purported limited waiver of the privilege with regard to its own lawyers or outside counsel.

[4] Velsicol also reasons that the disclosures made by Mitchell were inadvertent because Velsicol did not intend to waive the privilege as to outside counsel. Appellant has cited several cases where courts have declined to find waivers where mistake or misapprehension was present. We do not find any indications, however, that Mitchell was operating under any misapprehension when he testified. Moreover, having concluded that Mitchell was an agent of the corporation with authority to waive the attorney-client privilege as to outside counsel, we are obligated to view his testimony as at least one manifestation of corporate intent. This is particularly true in this particular case where Mitchell, house counsel for Velsicol, was conferring with a Mr. Vincent Fuller (a member of Velsicol's outside counsel team from the Williams firm) during the course of his grand jury testimony in which the waiver occurred (Appendix E, p. 42).

Apparently Mitchell was consulting with Fuller to determine if he could answer particular questions before the grand jury (Appendix E, pp. 43–44). Fuller suggested at the hearing that Mitchell might have "violated the instructions given him by counsel for Velsicol" (Appendix E, p. 42).

Under these circumstances, we cannot accept Velsicol's thesis that Mitchell's testimony was inadvertent. Mitchell, an attorney himself, answered the questions propounded to him after consultation with outside counsel and Velsicol must accept the legal implications of that testimony. Moreover, the presence of Fuller at the grand jury questioning undermines Velsicol's contention that Mitchell was there in a merely noncorporate capacity. Having afforded Mitchell the benefit of outside counsel for his testimony, it does not seem reasonable that Velsicol should be allowed to disavow the content of that testimony. We have to accept the position that Mitchell was aware of the privilege involved and the surrounding circumstances. Accordingly, the relinquishment of the privilege embodied in his testimony cannot be characterized as inadvertent.

Appellant also maintains that Mitchell's disclosures to the grand jury were involuntary because they were compelled by a subpoena. Specifically, Velsicol asserts that "the grand jury was used to force Mitchell to make the disclosure" (Appellant's brief, p. 32). As pointed out above, however, Mitchell was in consultation with outside counsel during the course of his testimony. His situation is hardly analogous to Proposed Rule 512 of the Federal Rules of Evidence as suggested by the appellant. Mitchell was well aware of attorney-client privilege and certainly not "without opportunity to claim the privilege". Neither was he compelled to waive the privilege. Unlike Ackerly's posture, Mitchell was not under court order to testify about privileged communications.

[5] For reasons discussed above, we are of the opinion that Mitchell's testimony before the grand jury was of such a nature as to effect a waiver of Velsicol's attorney-

**676**        **561 FEDERAL REPORTER, 2d SERIES**

client privilege as to outside counsel. This being the case, the Government has the right to pursue the investigation with respect to communications between Velsicol and outside counsel as to the allegedly false memorandum and affidavit and to the carcinogenicity data in question. The district court properly granted the Government's motion to compel.

### THE WORK PRODUCT RULE AND THE SUBPOENAED DOCUMENTS

[6] Appellant maintains that the district court's order also violates the work product rule with respect to the subpoenaed documents. For purposes discussed earlier, we have determined that the portion of the order involving the work product privilege is appealable. The remaining question is whether the work product privilege is applicable to the documents in question here.

As both parties have pointed out, the work product rule evolved out of civil litigation (*Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)) and has been made applicable to criminal litigation by both statute (Rule 16(b)(2), F.R.Cr.P.)[2] and court decisions (*United States v. Nobles*, 422 U.S. 225, 236, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)). The doctrine has also been applied to grand jury proceedings. *In re Grand Jury Proceedings*, 473 F.2d 840 (CA 8 1974).

The application of the work product rule to grand jury investigations brings into conflict two vital policies: the public interest in the search for truth and the need to protect attorneys from unwarranted inquiries into their files and mental processes. The interests of society in both criminal and civil actions demand that "adequate safeguards assure the thorough preparation and presentation of each side of the case". *Nobles, supra,* 422 U.S. at 238, 95 S.Ct. at 2170.

The Government maintains that none of the subpoenaed documents were generated and prepared in connection with or anticipation of the grand jury inquiry because the Sellers firm did not and does not represent Velsicol in the criminal investigation. Appellant counters by arguing that the doctrine is not limited to prior litigation but also attaches in subsequent proceedings as well.

[7] In *Duplan Corp. v. Moulinage at Retorderie de Chavanoz*, 487 F.2d 480 (CA 4 1973), a case relied upon by appellant, the Fourth Circuit held that materials prepared in prior civil patent suits and protected by the work product doctrine continued to enjoy such protection in a subsequent patent suit with a new party. We are dealing here, however, with a criminal grand jury investigation into documents prepared in earlier administrative proceedings. The documents prepared by the Sellers firm were not prepared in anticipation of a potential criminal litigation. Moreover, the focus of inquiry is to determine if their preparation was attended by misconduct. Under these circumstances, we believe that the Government has shown adequate grounds to acquire the documents. The criminal dimension of the instant suit makes it clear to us that the policy considerations in the *Duplan Corp.*[3] case cannot be analogized to cover this situation.

> Neither does the language of Rule 16(b)(2) warrant so broad a reading. We believe that "the case" mentioned in Rule 16(b)(2) should be confined to the instant criminal investigation and not extended to documents prepared by a different law firm in prior adminis-

---

2. Rule 16(b)(2) of the Federal Rules of Criminal Procedure provides as follows:

    (2) Information Not Subject to Disclosure. Except as to scientific or medical reports, this subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents *made by the defendant, or his attorneys or agents in connection with the investigation or defense of the case,* or of statements made by the defendant, or by government or defense witnesses, or by pro-

    spective government or defense witnesses, to the defendant, his agents or attorneys. (Emphasis supplied.)

3. The court, in *Duplan Corp.*, properly noted that the appellees there could have overcome the limitation of the work product rule by a showing of "substantial need" or "undue hardship" pursuant to F.R.C.P. 26(b)(3). The doctrine is not an absolute one and must be weighed against the exigencies of the situation.

FAULKNER v. BALDWIN PIANO & ORGAN CO.  677
Cite as 561 F.2d 677 (1977)

trative proceedings. It is clear that documents prepared by the Williams firm are not being sought. Accordingly, we find no error in the ruling of the district court as it relates to the production of documents.

*THE MANDAMUS/PROHIBITION PETITION*

Having concluded that the district court order is appealable and having ruled upon the merits of the issues involved, we believe that the appellant's Petition for Writ of Mandamus and/or Prohibition no longer represents any justiciable issues. The Petition should be and hereby is dismissed on grounds of mootness.

For the reasons discussed above, the ruling of the district court is hereby AFFIRMED.



Alfred H. FAULKNER, Plaintiff-Appellant,

v.

BALDWIN PIANO & ORGAN CO. et al., Defendants-Appellees.

Nos. 76–1588 through 76–1596.

United States Court of Appeals, Seventh Circuit.

Heard April 25, 1977.

Decided Aug. 15, 1977.

As Modified on Denial of Rehearing and Rehearing En Banc Oct. 11, 1977.

Actions were brought to recover for alleged infringement of patent covering an electrical musical instrument. The United States District court for the Northern District of Illinois, Hubert L. Will, J., rendered summary judgment for defendants, and plaintiff appealed. The Court of Appeals, Cummings, Circuit Judge, held that: (1) claims 1, 12 and 13 of patent number 2,811,069 are invalid under the late claiming doctrine; (2) an amendment may not accomplish what a new patent application may not accomplish because of the statutory bar on patentability where a claimed invention is in public use more than one year prior to application and (3) absent showing of abuse of discretion trial court's refusal to award attorney's fees would not be overturned.

Judgments affirmed.

1. Patents ⟸328(2)

Claim 1 of patent number 2,811,069 for an electric musical instrument was invalid where amendment to enlarge such claim occurred more than one year after an electric organ on which the enlarged claim concededly could be read was first put into public use by virtue of its public demonstration at a music show. 35 U.S.C.A. §§ 102(b), 132.

2. Federal Civil Procedure ⟸2536, 2545

Where defendants' summary judgment motion was supported by unchallenged testimony, plaintiff was obligated to provide affidavits or other evidentiary vehicles to set forth specific facts showing a genuine issue of material fact; although plaintiff pointed to specific facts by highlighting a report, such report could not be considered where it was not referenced in plaintiff's opposition to the motion. Fed.Rules Civ. Proc. rule 56(e), 28 U.S.C.A.

3. Patents ⟸109

An amendment may not accomplish what a new application is not permitted to accomplish because of statutory bar to patentability where a claimed invention was in public use or on sale more than one year prior to application. 35 U.S.C.A. §§ 102(b), 132.

4. Patents ⟸75

Public exhibit and demonstration of electronic organ at music show more than one year prior to application of patent covering device allegedly infringed by the organ constituted a "public use" so as to bar