# EXHIBIT  C

SPRAGUE v. THORN AMERICAS, INC.    **1355**
Cite as 129 F.3d 1355 (10th Cir. 1997)

## C.

[11] Finally, Defendant argues that the patents of his predecessors in title expressly grant him easements in the access roads because they grant "said tract of Land with the appurtenances thereof." Defendant states the general rule that when land is granted with "appurtenances," the grantee receives that which is necessary for the use and enjoyment of the land, *see* Restatement of Property § 453 (1944), and asks what could be more important for the use and enjoyment of land than an easement for access.

Although difficult to discern from the parties' convoluted joint stipulation of facts, the Patruff Road may have existed at the time Defendant's predecessors took title to the Patruff Ranch from the government. The Centerfire Bog and Double J. Roads, however, do not appear to have existed, at least in their present form, at the time Defendant's predecessors took title from the government. We fail to see how Defendant's predecessors in title received express access easements over roads which did not exist at the time of the government's conveyance.

Nevertheless, even assuming all three access roads existed at the time of the government's patents, we do not believe the language "with the appurtenances thereof" sufficient to grant Defendant and his predecessors in title express easements over the access roads as against the government. We have already noted that unless a public grant explicitly conveys property, we will construe the grant in favor of the government. *Albrecht*, 831 F.2d at 198. More importantly, access easements amounting to property interests were not necessary for the use and enjoyment of the land, because, as we previously concluded in *Jenks I*, Defendant's predecessors in title had an implied license to use public lands for "unimpeded access to their property." *Jenks*, 22 F.3d at 1515.

Accordingly, the district court's injunction prohibiting Defendant's use of the access roads is DISSOLVED. The district court's judgment is AFFIRMED IN PART and VACATED IN PART. The cause is hereby RE-

MANDED to the district court for further proceedings consistent with this opinion.



Shelley A. SPRAGUE, Plaintiff–Appellant,

v.

THORN AMERICAS, INC. and Ed Kowalski, Defendants–Appellees.

No. 96–3021.

United States Court of Appeals, Tenth Circuit.

Nov. 24, 1997.

Employee sued her former employer and supervisor for gender discrimination and sexual harassment in violation of Title VII and the Kansas Acts Against Discrimination, constructive and retaliatory discharge, breach of contract, and violation of the Equal Pay Act. The United States District Court for the District of Kansas, Patrick F. Kelly, J., 1995 WL 767308, entered summary judgment in favor of employer. Employee appealed. The Court of Appeals, Holloway, Circuit Judge, held that: (1) employee failed to establish prima facie case of failure to promote because of her gender under Title VII; (2) employee failed to establish prima facie equal pay claim under Title VII; (3) employee occupied position and performed functions that were not substantially equal to those of better paid male coworkers, as required to establish prima facie claim under Equal Pay Act; (4) five separate incidents, over span of approximately 16 months, in which male coworker made unpleasant and boorish comments to female employee did not create hostile or abusive work environment in violation of Title VII; (5) employee failed to establish prima facie case of retaliatory or constructive discharge; and (6) legal memorandum prepared by employer's attor-

ney was protected by attorney-client privilege.

Affirmed.

**1. Federal Civil Procedure ⚬2554**

Employer's failure to include, in brief before district court, a separate argument or heading addressing employee's Title VII gender discrimination was not fatal to employer's motion for summary judgment on that claim, where Title VII claim was essentially raised and incorporated within employer's brief's discussion of alleged violations of Equal Pay Act, and employee did not object below that employer failed to address Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fair Labor Standards Act of 1938, § 6, as amended, 29 U.S.C.A. § 206.

**2. Civil Rights ⚬377.1**

In Title VII case, initial burden is on employee to make prima facie showing of discrimination by employer. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**3. Civil Rights ⚬378**

Only when employee makes prima facie showing of discrimination in violation of Title VII does burden shift to employer to articulate some legitimate, nondiscriminatory reason for questioned action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**4. Civil Rights ⚬153**

If employer accused of violating Title VII articulates some legitimate, nondiscriminatory reason for questioned action, employee must show that stated reason is actually pretext for prohibited discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**5. Civil Rights ⚬158.1**

To establish prima facie claim of discriminatory failure to promote under Title VII, employee was required to show that there were promotional opportunities available that were filled by males, that she was qualified for promotion, and that despite her qualifications she was not promoted. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**6. Civil Rights ⚬377.1**

Employee bears ultimate burden of establishing that employer intentionally discriminated against her in violation of Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**7. Civil Rights ⚬158.1**

Female employee failed to establish prima facie case of failure to promote because of her gender under Title VII; although employee alleged that she performed duties of assistant product manager but was not promoted to position of assistant product manager, employee's department was too small to warrant having assistant product manager position and there was no indication that employee purposely refused to create such position in effort to discriminate against women or deny employee promotional opportunities. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**8. Civil Rights ⚬161**

Female Title VII plaintiff establishes prima facie case of sex discrimination by showing that she occupies job similar to that of higher paid males. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**9. Civil Rights ⚬379**

Once female Title VII plaintiff establishes prima facie case of sex discrimination by showing that she occupies job similar to that of higher paid males, employer must articulate legitimate, nondiscriminatory reason for pay disparity; this burden is exceedingly light, and employer must merely proffer non-gender based reasons, not prove them. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**10. Civil Rights ⚬161**

Once employer advances non-gender based reason for pay disparity, female employee, under Title VII, must show that employer, regardless of proffered reasons, intentionally discriminated against her; employee must show that discriminatory reason more likely than not motivated employ-

SPRAGUE v. THORN AMERICAS, INC. 1357
Cite as 129 F.3d 1355 (10th Cir. 1997)

er to pay her less than males. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**11. Civil Rights ⟨⟩161**

Female employee failed to establish prima facie equal pay claim under Title VII; difference between employee's pay and what male coworkers were paid was consistent with different levels of importance, value, and depth of responsibility between departments. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**12. Labor Relations ⟨⟩1333**

To establish prima facie case under Equal Pay Act, employee has burden of proving that (1) she was performing work which was substantially equal to that of male employees considering the skills, duties, supervision, effort and responsibilities of jobs; (2) conditions where work was performed were basically the same; and (3) male employees were paid more under such circumstances. Fair Labor Standards Act of 1938, § 6(d)(1), as amended, 29 U.S.C.A. § 206(d)(1).

**13. Labor Relations ⟨⟩1511.1**

If prima facie case is established under Equal Pay Act, employer must undertake burden of persuading jury that there existed reasons for wage disparity which are described in the Act. Fair Labor Standards Act of 1938, § 6(d)(1), as amended, 29 U.S.C.A. § 206(d)(1).

**14. Labor Relations ⟨⟩1521.1**

If employer accused of violating Equal Pay Act does not persuade jury that there existed reasons for wage disparity which are described in the Act, employee prevails on prima facie case. Fair Labor Standards Act of 1938, § 6(d)(1), as amended, 29 U.S.C.A. § 206(d)(1)

**15. Civil Rights ⟨⟩161**
   **Labor Relations ⟨⟩1511.1**

Under Equal Pay Act, onus is on employer to establish that pay differential was premised on factor other than sex, while under Title VII employee must prove that employer had discriminatory intent. Fair Labor Standards Act of 1938, § 6, as amended, 29 U.S.C.A. § 206; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**16. Labor Relations ⟨⟩1333**

Female employee occupied position and performed functions that were not substantially equal to those of better paid male coworkers, as required to establish prima facie claim under Equal Pay Act; employee worked in department which produced less than one-tenth of the revenues of departments managed by coworkers, and tasks and functions employee performed were dissimilar in level of experience required and level of complexity in performing required functions. Fair Labor Standards Act of 1938, § 6(d)(1), as amended, 29 U.S.C.A. § 206(d)(1)

**17. Labor Relations ⟨⟩1333**

Equal Pay Act's "equal work" requirement is not construed broadly; rather, jobs must be substantially equal in terms of skill, effort, responsibility, and working conditions. Fair Labor Standards Act of 1938, § 6(d)(1), as amended, 29 U.S.C.A. § 206(d)(1)

**18. Civil Rights ⟨⟩167**

Not all workplace conduct that may be described as "harassment," affects term, condition, or privilege of employment within meaning of Title VII; rather, to prevail on hostile work environment sexual harassment claim, employee is required to show that unwelcome, sexually-oriented conduct was sufficiently severe or pervasive as to alter conditions of her employment and create abusive working environment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**19. Civil Rights ⟨⟩145**

In determining whether workplace harassment was sufficiently pervasive as to create hostile work environment under Title VII, court must consider variety of factors, including frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating, or mere offensive utterance, and whether it unreasonably interferes with employee's work performance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**20. Civil Rights ⚖145**

Whether complained of conduct is sufficiently pervasive as to create hostile work environment under Title VII must be determined from totality of circumstances, since no single factor is required. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**21. Civil Rights ⚖167**

Employee may prove existence of hostile work environment sexual harassment in violation of Title VII where sexual conduct has purpose or effect of unreasonably interfering with individual's work performance or creating intimidating, hostile, or offensive working environment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**22. Civil Rights ⚖145**

Title VII comes into play before harassing conduct leads to nervous breakdown; so long as environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**23. Civil Rights ⚖167**

Five separate incidents, over span of approximately sixteen months, in which male coworker made unpleasant and boorish comments to female employee did not create hostile or abusive work environment in violation of Title VII; after first three incidents, employee stated in writing that she believed coworker helped her in her work and that she was happy to work with him, and fourth incident occurred away from workplace. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**24. Master and Servant ⚖30(6.10)**

Employee failed to establish prima facie case of retaliatory discharge; employer only terminated employee when, after prolonged absence during which employee received full salary, employer refused employee's demands for new supervisor, better title, and higher salary.

**25. Master and Servant ⚖40(4)**

Evidence that, over span of approximately 16 months, male coworker made five unpleasant and boorish comments to female employee failed to show that reasonable person would have viewed employee's working conditions as intolerable, as required to support constructive discharge claim.

**26. Master and Servant ⚖31(2)**

Employee alleging constructive discharge must show that employer by its unlawful acts made working conditions so intolerable that reasonable person in employee's position would feel forced to resign.

**27. Federal Courts ⚖820**

Court of appeals reviews rulings related to discovery under abuse of discretion standard.

**28. Federal Civil Procedure ⚖1267.1, 1272.1**

Although discovery in discrimination cases should not be narrowly circumscribed, desire to afford broad discovery is not without limits and trial court is given wide discretion in balancing needs and rights of both plaintiff and defendant.

**29. Federal Courts ⚖416**

If state and federal privilege laws conflict, analytical solution must be worked out to accommodate conflicting policies embodied in state and federal laws.

**30. Witnesses ⚖199(2), 200**

Legal memorandum allegedly addressing employer's disparate treatment of women was protected by attorney-client privilege; memorandum was prepared for higher management by in-house counsel acting within scope of his employment and memorandum related to rendition of legal services and advice.

**31. Witnesses ⚖198(1)**

Attorney-client privilege exists to protect not only the giving of professional advice to those who can act on it but also giving of information to lawyer to enable him to give sound and informed advice.

**32. Witnesses ⟷198(1)**

Under Kansas law, attorney-client privilege protects attorney's communications to his client even if communications do not contain confidential matters revealed by client earlier to attorney. K.S.A. 60–426.

**33. Witnesses ⟷219(3)**

Power to waive corporate attorney-client privilege rests with corporation's management and is normally exercised by its officers and directors, hence, corporate employee cannot waive corporation's privilege.

---

M. Kathryn Webb, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS, for Plaintiff–Appellant.

Timothy B. Mustaine (Mary Kathleen Babcock with him on the brief), Foulston & Siefkin, Wichita, KS, for Defendants–Appellees.

Before BRORBY, HOLLOWAY and EBEL, Circuit Judges.

HOLLOWAY, Circuit Judge.

Plaintiff-appellant Shelley Sprague brought the present action against defendants, alleging gender discrimination and sexual harassment in violation of Title VII and the Kansas Acts Against Discrimination, K.S.A. § 44–1001, *et seq,* constructive and retaliatory discharge, breach of contract,[1] and violation of the Equal Pay Act. The United States District Court for the District of Kansas entered summary judgment against Sprague on each of her claims and this appeal followed, asserting error in the summary judgment ruling. Sprague also claims error in the district court's denial of her motion to compel. We have jurisdiction by virtue of 28 U.S.C. § 1291, and we affirm.

**I. Background**

Viewing the evidence in the light most favorable to the non-moving party, as we must when reviewing a grant of summary judgment, *Kaul v. Stephan,* 83 F.3d 1208,

1212 (10th Cir.1996), the essential facts are as follows:

Plaintiff-appellant, Shelley Sprague, began working for defendant-appellee, Thorn Americas, Inc., as a secretary in September 1989.[2] I Aplt.App. at 58 (statement of uncontroverted facts). While attending orientation Sprague was given an employee handbook, which she signed on September 7, 1989. By signing the handbook, Sprague acknowledged that her employment with Thorn was an "at will" relationship, which permitted either Sprague or Thorn to terminate her employment at any time, with or without cause. *Id.; see also* II Aplt.App. at 398–399, 407 (district court's Memorandum and Order granting summary judgment).

During the events forming the basis of this lawsuit, Sprague's title with Thorn was "Market Analyst." Aple. Supp.App. at 92. Until June 1992, Sprague's duties involved the entire range of Thorn's products and her supervisor was J.D. Henning. In June 1992, Sprague took on additional responsibilities as Market Analyst in the jewelry department and she was reassigned to defendant-appellee Ed Kowalski. Specifically, she conducted meetings for a jewelry task force charged with "[u]pdating the product, putting in a new assortment." I Aplt.App. at 116–17. She also recorded the minutes of these meetings. *Id.* at 116. These tasks were ones that were performed by Assistant Product Managers (APMs) for other departments. *Id.* at 139. However, some of the tasks that Sprague performed differed from those of the APMs because the APMs had more marketing experience and hence were given more discretion. *Id.*

Sprague last reported for work on September 24, 1993, and was terminated on November 1, 1993. *Id.* at 82. She continued to draw her full salary, however, until October 28. *See* Appellant's Reply Brief, Attachment A at 4 (letter from Douglas B. Westerhaus to M. Kathryn Webb). Between September 24 and November 1, Sprague indicated that she

---

1. Sprague does not appeal the district court's rejection of her implied contract claim and we will therefore not review this issue.

2. At the time Sprague was known as Shelley Rose. Additionally, Thorn did business as Rent–A–Center.

**1360**          **129 FEDERAL REPORTER, 3d SERIES**

would be willing to return to work if Kowalski were not her supervisor. Aple. Supp. App. at 85–86. She also sought to have her job description upgraded and to receive back pay back to mid-1992, when she began to perform tasks similar to those performed by the APMs, both of whom were male. *Id.* at 49, 52, 82. Thorn refused to keep Sprague in her position with a different supervisor and on November 1 deemed her to have abandoned her job and terminated her.

Sprague filed her original complaint in the district court on December 1, 1993. On the next day, she filed charges of discrimination with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission (EEOC), and she amended the charges on April 15, 1994. I Aplt.App. at 3. The EEOC issued a "Notice of Right to Sue" on May 23, 1994. *Id.* On November 8, 1994, Sprague filed her first amended complaint. Sprague raised several separate claims in her lawsuit. She contends that she should have been promoted to the position of an Assistant Product Manager and paid a salary commensurate with such position. Since both of Thorn's APM positions were occupied by males, she alleges that Thorn's failure to promote her and pay her at a rate equal to that of the male APMs constituted gender discrimination in violation of both the Equal Pay Act and Title VII. Sprague also brought a claim alleging hostile work environment sexual harassment, which is based on five incidents involving Mr. Kowalski, detailed later in Part III-C. Finally, Sprague asserts that she was subjected to constructive and retaliatory discharge.

The district court held that there were no genuine issues of material fact and that defendants were entitled to summary judgment. Memorandum and Order, II Aplt. App. at 396. *Sprague v. Thorn Americas,* No. 93–1478, 1995 WL 767308 (D.Kan. Dec. 18, 1995). The judge concluded that Sprague failed to present an actionable claim under the Equal Pay Act; the evidence revealed that Thorn did not have an assistant manager position in its jewelry department because that department constituted a relatively minor part of Thorn's business. The judge further stated that Sprague's job functions

were not substantially similar to those of the two males who acted as assistant managers of other departments and that Sprague merely performed some, but not all, of the functions of an assistant manager. With respect to Sprague's allegations of sexual harassment and hostile working environment, the judge stated the standard of liability to be that: "An employer may be liable for sexual discrimination when it permits the existence of an atmosphere so severe or pervasive in its offensiveness or hostility to reasonable workers that it alters the conditions of the employees' work environment. *Harris v. Forklift Systems,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986)." Memorandum and Order at 8–9. The judge identified the occurrences complained of and held that they did not establish a sexually hostile working environment. *Id.* The judge also held that Sprague failed to show that she was constructively discharged since Sprague offered no evidence that a reasonable person would have viewed the working conditions as intolerable.

With respect to Sprague's claim of retaliatory discharge, the district judge concluded that Sprague failed to demonstrate any action by Thorn which reflected wrongful adverse job action, other than terminating her after not returning to work for several months. The district court stressed that Sprague conceded that she was an "at will" employee and that the parties did not enter into any implied employment contract.

## II. Standard of Review

We review *de novo* the district court's grant of summary judgment, applying the same standard used by the district court. *Bohn v. Park City Group, Inc.,* 94 F.3d 1457, 1460 (10th Cir.1996). "Summary judgment is appropriate if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Williams v. Widnall,* 79 F.3d 1003, 1005 (10th Cir.1996) (quoting Fed.R.Civ.P. 56(c)). When applying this standard, we must "examine the factual record and reasonable inferences therefrom in the light most favor-

able to the non-moving/opposing party." *Kidd v. Taos Ski Valley, Inc.,* 88 F.3d 848, 851 (10th Cir.1996). If there is no dispute concerning a genuine issue of material fact, we then determine whether the district court correctly applied the substantive law. *Peck v. Horrocks Engineers, Inc.,* 106 F.3d 949, 951 (10th Cir.1997).

## III.  Analysis

[1]  We first examine whether the district court erred in granting summary judgment in favor of defendants on Sprague's claims of gender discrimination under Title VII, 42 U.S.C. § 2000e–2(a), and the Equal Pay Act (EPA), 29 U.S.C. § 206(d)(1).[3]  At the outset we note that with respect to her Title VII claim of gender discrimination, Sprague argues on appeal that defendants' motion for summary judgment did not specifically address this claim and that defendants produced no specific evidence to refute the claim. Sprague thus contends that the district court erred in granting summary judgment since defendants failed to meet their burden of showing that they were entitled to judgment on the claim of gender discrimination. Our independent review of the record also reveals that the district court did not precisely address Sprague's Title VII gender discrimination claim in the context of her employment privileges, denial of promotion, and rate of pay, although the district court did specifically address Sprague's EPA claim.

We are not persuaded by Sprague's procedural objection to the defendants' presentation of their position on the Title VII claim of gender discrimination. It appears from the record that defendants' motion for summary judgment did, in fact, address the issue of gender discrimination under Title VII, both in its discussion regarding sexual harassment as well as equal pay. I Aplt.App. at 52–89. Indeed, the issue of Sprague's gender and the discrimination and mistreatment she allegedly suffered as a result thereof, forms the basis of Sprague's entire action. Throughout their motion for summary judgment, defendants clearly and specifically con-

tested Sprague's assertions that she was deprived certain privileges of employment due to her gender.

Although we recognize that the Equal Pay Act and Title VII provide distinct causes of action and do not require precisely the same standard of proof, we are satisfied that defendants' arguments contained in their motion for summary judgment adequately addressed both Sprague's Title VII gender discrimination claim as well as her Equal Pay Act claim. We do not consider it fatal to defendants' motion for full summary judgment that defendants did not specifically include a separate argument or heading on Title VII "gender discrimination," when their argument against that gender discrimination claim by Sprague below was essentially raised and incorporated within defendants' discussion of the alleged violations of the Equal Pay Act in defendants' brief below. *See* I Aplt.App. at 31–35. Moreover, it appears from the record that Sprague did not raise any objection below that defendants failed to precisely challenge the Title VII gender discrimination claim in her response to defendants' motion for summary judgment.

In sum, we conclude that the issue regarding gender discrimination under Title VII was adequately presented to the district court and we further find that, in its order granting summary judgment, the district court necessarily concluded by implication that defendants' alleged failure to formally promote Sprague to assistant manager or pay her the salary commensurate with such a position did not violate Title VII.

## A.  Title VII Gender Discrimination Claim

Turning specifically to Sprague's Title VII gender discrimination claim, Sprague stated in her amended complaint that she was "discharged, discriminated against and treated differently by defendant [Thorn] with respect to compensation, terms, conditions and privi-

---

3.  We are mindful that the elements and burdens of proof differ under the Equal Pay Act and Title VII. *See Tidwell v. Fort Howard Corp.,* 989 F.2d 406, 409–10 (10th Cir.1993); *Meeks v. Computer* *Assoc. International,* 15 F.3d 1013, 1020 (11th Cir.1994). We therefore address these claims separately in our discussion.

**1362**　　　**129 FEDERAL REPORTER, 3d SERIES**

leges of her employment due to her sex, female, in violation of 42 U.S.C. § 2000e2(a)(1) and (2)." I Aplt.App. at 7. Sprague essentially contends that males who performed the duties of assistant managers were given the title and salary commensurate with such a position, while Sprague was denied a promotion to such title and salary because of her gender, even though she performed the same functions.

[2–4] "In a Title VII case, the initial burden is on the employee to make a *prima facie* showing of discrimination by the employer." *Nulf v. International Paper Co.,* 656 F.2d 553, 557 (10th Cir.1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). "Only when such a showing has been made does the burden shift to the employer to articulate 'some legitimate, nondiscriminatory reason' for the questioned action. If the employer meets this burden, the employee must show that the stated reason is actually a pretext for prohibited discrimination." *Id.* at 558 (quoting *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825).

[5, 6] We have recognized that the "elements of a prima facie case set forth in *McDonnell Douglas* have been applied to promotion cases." *Nulf,* 656 F.2d at 558 (citations omitted). In order to establish a *prima facie* claim of discriminatory failure to promote under Title VII, Sprague was required to "show that there were promotional opportunities available that were filled by males, that she was qualified for promotion, and that despite her qualifications she was not promoted." *Id.* And Sprague bears the ultimate burden of establishing that Thorn intentionally discriminated against her. *Tidwell v. Fort Howard Corp.,* 989 F.2d 406, 409 (10th Cir.1993); *see also Meeks v. Computer Associates International,* 15 F.3d 1013, 1019 (11th Cir.1994) (the *McDonnell Douglas* framework requires a Title VII plaintiff to establish an intent to discriminate on the part of her employer).

[7] We are not persuaded that Sprague established a *prima facie* case of failure to promote because of gender. As the record reveals, and the district court concluded,

Thorn "did not have an Assistant Manager position in its Jewelry Department, because that department formed such a small part of the company's business." *See* district court's Memorandum and Order at 10. It is indeed difficult for us to understand how Sprague can maintain that she was the victim of discrimination due to Thorn's refusal to promote her to the position of assistant manager of jewelry when such a position did not even exist. We therefore find it highly questionable whether promotional opportunities were even available with respect to Sprague's position. More importantly, Sprague failed to produce any evidence which shows that if such opportunities did, in fact, exist, Thorn intentionally gave such positions to males because of a gender preference. Further, there is no indication that Thorn purposely refused to create such a position in an effort to discriminate against women or deny Sprague promotional opportunities. We therefore conclude that Sprague failed to make a *prima facie* showing of intentional gender discrimination with respect to Thorn's refusal to promote her.

With respect to Sprague's Title VII equal pay claim, we earlier stated that "the equal pay/equal work concept applies to Title VII in the same way it applies to" the EPA. *Nulf,* 656 F.2d at 560. However, the Supreme Court in *County of Washington v. Gunther,* 452 U.S. 161, 168–71, 180–81, 101 S.Ct. 2242, 2247–49, 2253–54, 68 L.Ed.2d 751 (1981), determined that the EPA's requirement that a plaintiff prove equal work does not apply to Title VII. Rather, "a cause of action for discriminatory compensation based on sex could arise under Title VII even if a plaintiff did not allege unequal pay for equal work." *Plemer v. Parsons–Gilbane,* 713 F.2d 1127, 1132 (5th Cir.1983). *See also Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1527 (11th Cir.1992) (*Gunther* held that Title VII, 42 U.S.C. § 2000e–2(h), only incorporates the affirmative defenses of the EPA, not its prohibitory language requiring equal pay for equal work); *Loyd v. Phillips Brothers, Inc.,* 25 F.3d 518, 525 (7th Cir.1994) (even when jobs are not sufficiently similar to constitute "equal work" under the EPA, a Title VII claim for wage discrimination is not precluded; however, in an action under Title

VII, plaintiff must show an intent and actual desire to pay women less than men because of gender).

In *Tidwell*, 989 F.2d at 410, we acknowledged that our statement in *Ammons v. Zia Co.*, 448 F.2d 117 (10th Cir.1971), that Title VII required a showing of equal work, must be treated as substantially modified by the Supreme Court in *Gunther*. We also acknowledged that *Gunther* emphasized that the purpose of the Bennett Amendment was to incorporate into Title VII the four affirmative defenses of the EPA, but not the EPA equal work requirement. *Id.* at 411.

[8–10] Thus, "a female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males." *Meeks*, 15 F.3d at 1019. "Once a *prima facie* case is established, the defendant must articulate a 'legitimate, non-discriminatory reason for the pay disparity.' This burden is 'exceedingly light'; the defendant must merely proffer non-gender based reasons, not prove them." *Id.*, (quoting *Miranda*, 975 F.2d at 1529). Once the defendant advances such a justification, the plaintiff must show that the defendant, regardless of the proffered reasons, intentionally discriminated against her. *Id.*; *See also Tidwell*, 989 F.2d at 409. That is, "the plaintiff must show that 'a discriminatory reason more likely than not motivated [the employer] to pay her less.'" *Meeks*, 15 F.3d at 1019 (quoting *Miranda*, 975 F.2d at 1529).

[11] It is apparent from the record that Sprague failed to present genuine issues of material fact which would support her equal pay claim under Title VII. As the district court observed, Sprague contrasts her functions and pay in the jewelry department to those of the assistant product manager of electronics and the assistant product manager of furniture/appliances, both of whom are males. "However, the Electronics, Furniture/Appliances, and Jewelry Departments do not contribute equally to [Thorn's] revenues." *See* district court's Memorandum and Order at 5. While the electronics department comprises approximately 50% of revenues and the furniture/appliance department accounts for approximately 45% of revenues, the jewelry department only produces ap-

proximately 4% of revenues. *Id.* Thus, a difference in pay between Sprague and the assistant product managers is justifiable and is consistent with the different levels of importance, value, and depth of responsibility between the respective departments.

Thorn also suggests that these higher paid managers had much greater marketing experience than Sprague, had a greater array of responsibilities, and that Sprague did not perform all of the functions in the jewelry department that these managers performed in their respective departments. Additionally, the district judge noted that Sprague did not receive high marks by Thorn's review committee, and, as "a result of the review, Sprague was eventually placed on an action plan to be let go." *See* district court's Memorandum and Order at 6. Further, the district judge recognized that although Sprague contends that she began to do the work of assistant product manager for jewelry in 1992 or January of 1993, Sprague expressed a goal in January of 1993 of being promoted to assistant product manager in June of 1993, "a career goal which was surely unnecessary if she had already achieved this position." *Id.* at 4. "Nor does evidence cited by Sprague support the conclusion that she was a de facto Assistant Manager." *Id.*

Given the evidence presented to the district court, we find that Sprague failed to present a *prima facie* case of intentional gender discrimination. The evidence shows a legitimate basis for the difference in pay, and none of the evidence presented by Sprague reveals a desire on the part of Thorn to intentionally pay her less because of her gender. Since there is no genuine issue of material fact regarding Sprague's Title VII gender discrimination claim, summary judgment on that claim was appropriate.

### B. Equal Pay Act Claim

We now examine Sprague's claim under the EPA, 29 U.S.C. § 206(d)(1). The EPA provides that:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between

employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

**[12–15]** To establish a *prima facie* case under the EPA, Sprague "has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) the male employees were paid more under such circumstances." *Tidwell,* 989 F.2d at 409 (citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). "If a prima facie case is so established under the EPA the *defendant* must undertake the burden *of persuading* the jury that there existed reasons for the wage disparity which are described in the [EPA]." *Tidwell,* 989 F.2d at 409 (emphasis in original). If the defendant fails in this respect, the plaintiff will prevail on her *prima facie* case. *Id.* Thus, under the EPA, "the onus is on the employer to establish that the pay differential was premised on a factor other than sex. Under Title VII, however, the plaintiff must prove that the employer had a discriminatory intent." *Id.*

**[16]** Sprague contends that the district court erred in granting summary judgment on her EPA claim because there was a genuine issue of material fact as to whether she was paid less than two male employees for equal work in a job which required equal skill, effort, and responsibility and which was

performed under similar working conditions. However, we agree with the district court that Sprague failed to produce evidence that her job functions were substantially similar to those of the male assistant managers. "The uncontroverted evidence is that Sprague was not an Assistant Manager, and that at most, she performed only 'some' functions of an Assistant Manager." *See* district court's Memorandum and Order at 11. The district judge concluded that because Sprague did not demonstrate that she occupied substantially the same position or performed substantially the same tasks as the assistant managers, her EPA claim must fail. We agree.

Much of our analysis regarding Sprague's equal pay claim under Title VII applies here as well. As previously noted, Sprague worked in a department which produced less than one-tenth of the revenues of the departments managed by the male assistant managers. Such a substantial difference in revenues between Sprague's department and those departments managed by her male counterparts indicates that the tasks and functions performed by Sprague were quite dissimilar both in the level of experience required to adequately manage operations and the level of complexity in performing required functions. We are also persuaded that equal pay was not required due to the varied level of experience between Sprague and the male assistant managers, the somewhat poor review given to Sprague's performance, the recommendation that Sprague eventually be "let go," and the fact that no assistant manager position existed in the jewelry department.

**[17]** We do not construe the "equal work" requirement of the EPA broadly, and we have stated that failure to furnish equal pay for "comparable work" or "like jobs" is not actionable. *See, Nulf,* 656 F.2d at 560 (citing *Lemons v. City and County of Denver,* 620 F.2d 228, 229–30 (10th Cir.), *cert. denied,* 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980)). Rather, in order to prevail in such an EPA action, the jobs "must be 'substantially equal' in terms of 'skill,' 'effort,' 'responsibility,' and 'working conditions.'" *Nulf,* 656 F.2d at 560 (citing *Ammons v. Zia*

*Co.*, 448 F.2d at 120). We conclude that, based on the materials submitted by the parties, it is clear that Sprague occupied a position and performed functions that were not "substantially equal" to those of the male assistant managers. At most, Sprague's job functions were merely comparable to those of the assistant managers. Hence, the district court did not err in holding that no genuine issue of material fact existed and in granting summary judgment in favor of defendants on the EPA claim.

## C. Sexual Harassment

Sprague argues that the district court erred in granting summary judgment to defendants on her sexual harassment claim.[4] As discussed more fully below, Sprague alleges five separate incidents of allegedly sexually-oriented, offensive comments either directed to her or made in her presence in a sixteen month period. All such incidents involved Mr. Kowalski.[5] She further alleges that management was aware of at least three of these incidents, as well as a pattern of abuse directed toward other women by Kowalski, but that management refused to remedy the situation by placing her with a different supervisor.

It is beyond contention that Title VII prohibits sexual harassment in the workplace. *Harrison v. Potash, Inc.*, 112 F.3d 1437, 1442 (10th Cir.1997) (citations omitted); 42 U.S.C. § 2000e–2(a)(1). Further, in certain circumstances, the employer can be held liable for an employee's sexually offensive conduct which creates a hostile work environment. *Id.* at 1443. However, prior to addressing the issue of whether summary judgment was properly entered in favor of Thorn as Kowalski's employer, we must first examine the evidence to determine if a genuine issue of material fact exists as to whether Kowalski's alleged conduct created a hostile work environment within the meaning of Title VII.

[18–20] It is clear that not all "workplace conduct that may be described as 'harassment,' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Rather, in order to prevail on a hostile work environment sexual harassment claim, Sprague is required to show that the unwelcome, sexually-oriented conduct was sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment. *Hirase–Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir.1995) (quoting *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 575 (10th Cir.1990), and *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405–06). In determining whether Sprague made the requisite showing, we must consider a variety of factors, including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Moreover, whether the complained of conduct is sufficiently pervasive as to create a hostile work environment must be determined from the totality of the circumstances since no single factor is required. *Id.* at 23, 114 S.Ct. at 371.

[21, 22] "A plaintiff may prove the existence of hostile work environment sexual harassment in violation of Title VII 'where [sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidat-

---

4. In Sprague's complaint, she alleged hostile work environment harassment as well as *quid pro quo* sexual harassment. *See Harrison v. Potash*, 112 F.3d 1437, 1443 (10th Cir.1997), for a discussion regarding the distinction between these types of prohibited conduct. However, on appeal Sprague directs her argument solely to hostile work environment harassment and we therefore assume that Sprague has abandoned her *quid pro quo* claim. Hence, we will focus exclusively on whether the district court erred in

granting summary judgment against Sprague on her hostile work environment harassment claim.

5. We note, however, that Kowalski was not Sprague's supervisor with respect to the three incidents occurring prior to June 1992. Kowalski became Sprague's supervisor after Sprague's review in June 1992, at which she was told that she "would be working specifically for the product group under Ed [Kowalski]." Sprague Dep., I Aplt.App. at 114.

**1366**          **129 FEDERAL REPORTER, 3d SERIES**

ing, hostile, or offensive working environment.'" *Hirase-Doi*, 61 F.3d at 782 (quoting *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404–05) (internal quotations omitted). In *Harris*, the Supreme Court held that a plaintiff bringing a hostile Title VII work environment sexual harassment claim must establish both an objectively hostile or abusive work environment and a subjective perception by the plaintiff that the environment was abusive. But Title VII comes into play before the harassing conduct leads to a nervous breakdown, and a discriminatorily abusive work environment, even one that does not seriously affect the employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. *Harris*, 510 U.S. at 22, 114 S.Ct. at 371. "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, *Meritor*, . . . there is no need for it also to be psychologically injurious." *Id.* See also *Hirase-Doi*, 61 F.3d at 782.

[23]  As noted above, the conduct allegedly creating a hostile work environment consisted of five separate incidents involving Kowalski over a span of approximately sixteen months. On one occasion in April 1992, when Sprague entered Kowalski's office, he allegedly said, "Shelley, you really need to undo that top button." Sprague Deposition, I Aplt.App. at 119. Sprague also complained of an incident in February or March 1992 where an unknown person asked, "Hey, are the girls going down to aerobics," to which Kowalski allegedly replied, "Hey, you can't call them girls. You have to call them ladies." Aple. Supp.App. at 38. Another incident allegedly occurred in May 1992 when Sprague, Kowalski, and two other employees were standing in a hallway. Kowalski allegedly "brought up the subject about women and PMS and you know how they are at that time of the month. . . ." I Aplt.App. at 120. As the district court noted in its Memorandum and Order granting summary judgment for defendants, p. 9, in January 1993, after the first three incidents described above, "Sprague stated in writing that she believed Kowalski helped her in her work and that she was 'happy' to work with him."

On March 20, 1993, Sprague got married. Her wedding reception was at Crestview Country Club. I Aple. Supp.App. at 55. Sprague stated in her deposition that:

Ed [Kowalski] was there, and he put his arm around me and I caught him looking down my dress. And, you know, I looked at him, and he said 'well, you got to get it when you can.' I was so uncomfortable and I was so embarrassed that I didn't even tell my husband for a few weeks because he would have been extremely upset, and he was when he heard it.

I Aplt.App. at 125. Finally, a week before Labor Day in 1993, in discussing what to call "neck chains," Sprague testified that she had said "neck chains," and "Ed said, 'neck chains! That sounds kind of kinky.'" Aple. Supp.App. at 56.

From the record evidence respecting the five incidents, it appears to us that unpleasant and boorish conduct by Kowalski was shown, but that Sprague was not, in fact, subjected to such offensive comments or conduct as to create a "hostile or abusive" work environment. *Harris*, 510 U.S. at 22, 114 S.Ct. at 370–71. The incident at Sprague's wedding reception was the most serious, but it occurred at a private club, not in the workplace. Moreover, the conduct occurred sporadically over an extended period of some 16 months. Our review of the remarks allegedly made by Kowalski leads us to conclude that these remarks were not sufficiently severe or pervasive as to alter the condition of Sprague's employment and create an actionable hostile work environment.

In sum, considering Sprague's evidence concerning the five incidents at issue, the totality of the circumstances, and the standard of *Harris* and *Meritor*, which the district judge properly applied, there was not a showing by Sprague sufficient to avoid summary judgment on this claim. Sprague did not proffer evidence of sexual harassment sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.

### D.  Retaliatory and Constructive Discharge

[24]  Sprague contends that the district court erroneously granted summary judg-

ment in favor of defendants on her claims of retaliatory and constructive discharge. However, we feel that the record clearly supports the district court's ruling.

As set out more fully above, Sprague's last day of work with Thorn was Friday, September 24, 1993. On the following Monday, Sprague called in sick with a sinus headache, and she never returned to work. However, Sprague continued to draw her full salary until October 28. On October 1, 1993, Sprague, along with her attorney, went to Thorn and indicated that she would be willing to return to work if, (1) Kowalski were not her supervisor, and (2) she be given the title and salary of product manager, retroactive to June 1992. Thorn refused to accept Sprague's demands. Although Sprague was repeatedly urged to return to work by representatives of Thorn, on November 1, 1993, Thorn deemed her to have abandoned her job and therefore terminated her.

These facts hardly support a claim of retaliatory discharge. As the district court noted, Sprague's claim of retaliatory discharge is based largely on the fact that she hired an attorney and that Thorn refused to accept her conditions for returning to work. We have held that in order to establish a *prima facie* case of retaliatory discharge, a plaintiff must show: (1) she engaged in protected activity; (2) she subsequently suffered adverse action by the employer; and (3) there was a causal connection between the protected activity and the adverse action. *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208–09 (10th Cir.1997); *Archuleta v. Colorado Dep't of Institutions, Division of Youth Services*, 936 F.2d 483, 486 (10th Cir.1991). However, as the district court correctly recognized, Sprague failed to identify any action by Thorn, "other than her termination after not returning to work for several months, which supposedly reflects ... wrongful adverse job action." *See* district court's Memorandum and Order at 11. There is no indication that Thorn terminated Sprague because she attempted to engage in protected activity or because she exercised legal rights. On the contrary, the record supports the conclusion that Sprague was terminated because she refused to return to work after a period of prolonged absence. Thus, we conclude that Sprague failed to show that any genuine issue of material fact existed with respect to her retaliation claim, and summary judgment was therefore properly granted in favor of defendants.

[25, 26] Turning to Sprague's constructive discharge claim, we similarly conclude that Sprague failed to present material facts which support her claim. A plaintiff alleging constructive discharge must show that the employer by its unlawful acts made working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign. *Thomas v. Denny's Inc.*, 111 F.3d 1506, 1514 (10th Cir.1997) (citing *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir.1990)). We agree with the district court that Sprague offered no evidence such that a reasonable person would have viewed her working conditions as intolerable. Accordingly, the district court properly granted summary judgment in favor of defendants on this claim.

## E. Motion to Compel Discovery

### I

We lastly review the district court's denial of Sprague's motion to compel production of documents, particularly a memorandum prepared by in-house counsel Doug Westerhaus for management, and testimony by Westerhaus in response to 42 questions which he refused to answer on his counsel's advice and assertion of privilege.

Sprague took the deposition of Westerhaus on October 24, 1995. Following the deposition, on November 22, 1995, Sprague filed a motion to compel with a supporting memorandum, and she subsequently filed an addendum to the supporting memorandum on December 1, 1995. II Aplt.App. at 256, 258, 335. Sprague sought to compel the production of documents by Westerhaus relevant to the deposition inquiries, testimony by Westerhaus regarding 42 questions Westerhaus was instructed not to answer by defendants' counsel based on attorney-client and work product privileges, and, in particular, the production of a memorandum prepared by Westerhaus for Thorn's senior management,

**1368**          **129 FEDERAL REPORTER, 3d SERIES**

allegedly addressing disparate treatment of women at Thorn. On appeal, Sprague has focused her arguments mainly on the memorandum. *See, e.g.,* Appellant's Reply Brief at 10–12.

There was apparently no substantial argument below on Sprague's motion to compel. The motion was disposed of by the trial judge in his Memorandum and Order, which denied the motion to compel and granted the defendants' motion for summary judgment. II Aplt.App. at 396–408. The order states in part:

> The court has at hand the plaintiff's motion to compel the production of documents and testimony from Doug Westerhaus, an attorney employed by the defendant THORN Americas. The court finds that the motion to compel should be denied, since the matters sought to be discovered reflect privileged information and the plaintiff has failed to identify any actions by the defendant indicating a waiver of that privilege.

*Id.* at 396.

## II

[27, 28] We review rulings related to discovery under an abuse of discretion standard. *Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1520 (10th Cir.1995) (quoting *Johnson v. Thompson,* 971 F.2d 1487, 1497 (10th Cir. 1992), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993)). Although discovery in discrimination cases should not be narrowly circumscribed, the desire to afford "broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." *Gomez,* 50 F.3d at 1520 (quoting *Scales v. J.C. Bradford & Co.,* 925 F.2d 901, 906 (6th Cir.1991)).

This discovery issue turns on the claim of attorney-client privilege and attorney work product privilege. In addressing the issue,

we face consideration of both federal and Kansas law since both federal claims and state law pendent jurisdiction claims are asserted in the instant case.[6] The briefs of Sprague on appeal make no argument focusing on any distinction between federal and state law and cite only one federal case and Fed.R.Civ.P. 26(b)(5) with its provisions concerning the required procedure when a party withholds information, otherwise discoverable, by claiming privilege or protection of it as trial preparation material. Brief of Appellant at 26–27; Appellant's Reply Brief at 10–12. The defendants likewise make no assertion as to the applicability of federal as opposed to state law, or the reverse, in their brief before us, although they cite our *Gomez* opinion on the scope of review and *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), in support of their attorney-client privilege claim concerning the Westerhaus memorandum. Brief of Appellees at 28–29.

In *Motley v. Marathon Oil Co.,* 71 F.3d 1547 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1678, 134 L.Ed.2d 781 (1996), the plaintiff asserted both federal and state claims. We said that as to the state causes of action, a federal court should look to state law in deciding privilege questions, citing Fed.R.Evid. 501 and *White v. American Airlines, Inc.,* 915 F.2d 1414, 1424 (10th Cir. 1990). *Motley,* 71 F.3d at 1551. Rule 501 provides in part that in civil actions and proceedings, with respect to an element of a claim or defense as to which state law supplies the rule of decision, privilege of a witness or person, *inter alia,* shall be determined in accordance with state law. In *White v. American Airlines, Inc.,* 915 F.2d 1414 (10th Cir.1990), we applied Oklahoma law in deciding an attorney-client privilege question in a civil case based on a state cause of action, where the case had been removed to federal court. *Id.* at 1423–24.

---

6. In the Brief of Appellant at 1–2, plaintiff Sprague alludes to her several federal claims and also to her claims under the Kansas Acts Against Discrimination, K.S.A. § 44–1001, *et seq.* Sprague does not separately argue her state and federal claims and instead asserts general arguments of alleged errors in the rulings on her claims of sex discrimination, sexual harassment, violation of the Equal Pay Act, and retaliatory and constructive discharge. The standards governing sexual harassment claims under the Kansas statute are identical to those under Title VII in any event. *Ulrich v. K–Mart Corp.,* 858 F.Supp. 1087, 1091 n. 4 (D.Kan.1994); *see also Reber v. Mel Falley, Inc.,* 235 Kan. 562, 683 P.2d 1229, 1230–32 (1984).

[29] Here, with both federal claims and pendent state law claims implicated, we should consider both bodies of law under *Motley* and Fed.R.Evid. 501. If the privilege is upheld by one body of law, but denied by the other, problems have been noted. "In this situation, permitting evidence inadmissible for one purpose to be admitted for another purpose defeats the purpose of a privilege. The moment privileged information is divulged the point of having the privilege is lost." 3 *Weinstein's Federal Evidence,* § 501.02[3][b] (Matthew Bender 2d ed.) (citing *Perrignon v. Bergen Brunswig Corp.,* 77 F.R.D. 455, 458 (N.D.Cal.1978)). If such a conflict on the privilege exists, then an analytical solution must be worked out to accommodate the conflicting policies embodied in the state and federal privilege law.[7] Here, however, for reasons given below we are convinced that both federal and Kansas law support application of the attorney-client privilege. Therefore we need not articulate an analytical solution here for conflicts in attorney-client privilege rules.

We turn now to the consideration of the merits of the privilege claims here.

### III

[30] Plaintiff Sprague supported her motion to compel discovery with an affidavit of Ms. Melanie Owens which was attached to her memorandum in support of her motion to compel. II Aplt.App. 283–85. The principal facts are stated in the affidavit of Owens, who was employed by Thorn for some six years from early January 1990 until September 1995. Her affidavit states she filled the position of Manager of Compensation in the Human Resources Department during her employment with Thorn. Her responsibilities included developing and implementing salary range structures and incentive programs, evaluating jobs and placing them in a salary range, researching compensation schemes, *inter alia. Id.*

On July 12, 1995, at about 6:15 p.m. as Owens exited the building after work, she saw Doug Westerhaus in the parking lot. He was the staff attorney at Thorn responsible for the Human Resources Department. Westerhaus indicated he wanted to talk with Ms. Owens. During the course of their conversation, Westerhaus advised Ms. Owens, according to the affidavit, that he was concerned about the disparate treatment of women at Thorn, mentioning specific women employed at Thorn. The critical portion of the affidavit stated:

> 7. Westerhaus proceeded to inform me that he had sent a memorandum addressing the subject of the disparate treatment of women by the company to Mr. Dave Egan, Senior Vice President and General Counsel for THORN. Westerhaus said he intended to follow up on the subject of the memorandum with Egan and other members of senior management including Mr. Alan St. Clair, Vice President of Human Resources.

II Aplt.App. 283.

Owens' affidavit says that she told Westerhaus her department had been responsible for preparing historical data, including graphic analysis and backup information for the Legal Department that provided statistical support for the memorandum. West-

---

7. *See, e.g., Hancock v. Hobbs,* 967 F.2d 462, 466–67 (11th Cir.1992) (federal law applied rejecting psychiatrist-patient privilege claim in § 1983 case although pendent state law counts were asserted and conflicting state law might provide different result); *Hancock v. Dodson,* 958 F.2d 1367, 1372–73 (6th Cir.1992) (In federal question case involving a § 1983 claim, existence of pendent state law claims held not to relieve court of obligation to apply federal law of privilege); *United States v. Prouse,* 945 F.2d 1017, 1024 (8th Cir.1991) (Minnesota statutory privilege against use of test result from employer's drug or alcohol testing program not applied due to Fed.R.Evid. 501 instruction "to apply privileges in light of reason and experience"); *von Bulow v. von Bu-*

low, 811 F.2d 136, 141 (2d Cir.1987) (where federal RICO claim was asserted along with pendent state law claims and a diversity claim, it was held that federal law of privilege controlled question of journalist's privilege); *Wm. T. Thompson Co. v. General Nutrition Corp.,* 671 F.2d 100, 104 (3d Cir.1982) (when there are federal claims in a case also presenting state law claims, federal rule favoring admissibility rather than state law privilege is the controlling rule); *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058, 1061 and n. 3 (7th Cir.1981) (in federal antitrust suit with pendent state law claim, federal rule denying privilege applied to reject privilege claim under state Medical Studies Act).

erhaus said that he had reviewed that information, and that information made available to him indicated that women received disparate treatment at Thorn. Westerhaus commented on the fact that there were no women in executive level positions with the company, which amounted to disparate treatment. The affidavit continues with specific examples given by Westerhaus dealing with the allegedly disparate treatment. The conversation of Owens and Westerhaus lasted between 15 and 30 minutes. II Aplt. App. 284–85.

[31] We are persuaded that the critical memorandum of Westerhaus is protected by the attorney-client privilege. It was prepared for higher management by in-house counsel acting within the scope of his employment and, as paragraph 7 of the affidavit demonstrates, it related to the rendition of legal services and advice. As the Supreme Court has noted, "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. at 390, 101 S.Ct. at 683; *United States v. Amerada Hess Corp.*, 619 F.2d 980, 986 (3d Cir.1980) ("Legal advice or opinion from an attorney to his client, individual or corporate, has consistently been held by the federal courts to be within the protection of the attorney-client privilege"); *Natta v. Hogan*, 392 F.2d 686, 692–93 (10th Cir.1968) ("The recognition that privilege extends to statements of a lawyer to a client is necessary to prevent the use of the lawyer's statements as admissions of the client").

A dichotomy in treatment of the attorney-client privilege has been noted in several cases. In *Loftis v. Amica Mutual Insurance Co.*, 175 F.R.D. 5 (D.Conn.1997), the two general approaches were discussed. Under a narrower approach, the attorney-client privilege is held not to protect from disclosure a legal opinion and advice communicated in confidence by an attorney to his client where that opinion and advice do not reveal client confidences. *Id.* at 9–10. Predicting Connecticut law, *Loftis* held that the narrower approach should be applied and a letter

from counsel to the client was denied protection. *Id.* at 10.

*Loftis* noted, however, that some courts have held that the privilege protects communications from the lawyer, regardless of whether the lawyer's communications reveal confidences from the client, citing *United States v. Amerada Hess Corp.*, discussed above. *Id.* at 8–9. This broader approach has been applied in cases holding that any communication from an attorney to his client made in the course of giving legal advice is protected. *In re LTV Securities Litigation*, 89 F.R.D. 595, 602 (N.D.Tex.1981). The *LTV* opinion rejects the narrower view, pointing out that the predictability of confidence is central to the role of the attorney and that "[a]doption of such a niggardly rule has little to justify it and carries too great a price tag." *Id.* at 602. The *LTV* opinion concludes that a broader rule prevails in the federal courts, one that protects from forced disclosure any communication from an attorney to his client when made in the course of giving legal advice, citing our opinion in *Natta v. Hogan*, discussed earlier. *Id.* The distinction between the narrow and broad approaches was also noted in *Potts v. Allis–Chalmers Corp.*, 118 F.R.D. 597 (N.D.Ind.1987). The court there concluded that attorneys' communications to their clients are not uniformly privileged but that resolution of the conflict of case law was not necessary for decision in that case. *Id.* at 603.

[32] We are persuaded that our *Natta v. Hogan* opinion, 392 F.2d at 692–93, does represent an application of the broader rule, which was the view of the *LTV* opinion. We are further persuaded that under the wording of the statutory privilege in Kansas, K.S.A. § 60–426, the Kansas courts would apply the broader rule. That statute protects, *inter alia*, "communications found by the judge to have been between lawyer and his or her client in the course of that relationship and in professional confidence ...." § 60–426(a). Also K.S.A. § 60–426(c) defines "communication" to include "*advice given by the lawyer in the course of representing the client* and includes disclosures of the client to a representative, associate or employee of the lawyer...." (Emphasis added). In

*State of Kansas v. Breazeale,* 11 Kan.App.2d 103, 713 P.2d 973 (1986), the court held that the "lawyer-client privilege protects statements transmitting information between a lawyer and his client that are made in professional confidence." (Syllabus 1 by the court). Because of the breadth of the language of the Kansas statute and the opinion interpreting it, we are convinced that the Kansas courts favor the broader approach, namely protecting an attorney's communications to his client without the qualification that the communications must contain confidential matters revealed by the client earlier to the attorney.

One further argument of plaintiff Sprague against application of the privilege is that Westerhaus has not produced any facts establishing a basis for withholding the memorandum and that he therefore should be compelled to produce it, along with all other items described in the deposition subpoena. Brief of Appellant at 27. We disagree. Owens' affidavit, attached to the motion to compel of plaintiff Sprague, itself asserted the relationship of Westerhaus as an attorney, that the memorandum addressed the legal subject of allegedly disparate treatment of women by the company, and that the memorandum had been sent to members of senior management of Thorn. II Aplt.App. at 283–85. These circumstances properly supported application of the attorney-client privilege, unless there was a waiver or other special ground for disregarding the privilege. We will now discuss those questions as argued by Sprague.

[33] We are not persuaded by Sprague's contention that the attorney-client privilege was waived here. As the Supreme Court has noted, "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348–49, 105 S.Ct. 1986, 1990–91, 85 L.Ed.2d 372 (1985). Hence, "a corporate employee cannot waive the corporation's privilege." *United States v. Chen,* 99 F.3d 1495, 1502 (9th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 1429, 137 L.Ed.2d 538 (1997); *In re Claus von Bulow,* 828 F.2d 94, 100–101 (2d Cir.1987). Here there is no showing that the officers or directors of Thorn ever expressly or impliedly waived the attorney-client privilege of the corporation with respect to the memorandum as required by federal law. We must also consider the Kansas law on the attorney-client privilege since Sprague asserts both federal claims and Kansas pendent state law claims. Kansas affords protection by statute to the privilege, giving the same basic protection to communications between lawyer and client which we discussed in *Natta v. Hogan,* 392 F.2d at 692–93, in treating federal law on the attorney-client privilege. *See* K.S.A. § 60–426.[8] Further, the waiver of the privilege is confined to circumstances where the judge may find that the client (a person or corporation, directly or through an authorized representative) has waived the privilege in accordance with the conditions in the Kansas statutes. K.S.A. § 60–437. Here no such waiver satisfying the Kansas requirements is shown.

There remains the contention by plaintiff Sprague that the attorney-client privilege does not apply because of the crime or fraud exception. Brief of Appellant at 28. We have recognized that there is an exception under federal law that "the attorney-client

---

8. The Kansas attorney-client privilege is afforded by K.S.A. § 60–426, which provides in part:

  60–426. Lawyer-client privilege.
    (a) General rule. Subject to K.S.A. 60–437, and except as otherwise provided by subsection (b) of this section communications found by the judge to have been between lawyer and his or her client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege (1) if he or she is the witness to refuse to disclose any such communication, and (2) to prevent his or her lawyer from disclosing it, and (3) to prevent

any other witness from disclosing such communication if it came to the knowledge of such witness (i) in the course of its transmittal between the client and the lawyer, or (ii) in a manner not reasonably to be anticipated by the client, or (iii) as a result of a breach of the lawyer-client relationship. The privilege may be claimed by the client in person or by his or her lawyer, or if an incapacitated person, by either his or her guardian or conservator, or if deceased, by his or her personal representative.

**1372**          **129 FEDERAL REPORTER, 3d SERIES**

privilege does not apply where the client consults an attorney to further a crime or fraud." *Motley*, 71 F.3d at 1551 (quoting *In re Grand Jury Proceedings*, 857 F.2d 710, 712 (10th Cir.1988), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3214, 106 L.Ed.2d 565 (1989)). In Kansas there is also a statutory provision that the attorney-client privilege and others do not extend to a communication if there was sufficient evidence that the communication was sought to enable or aid the commission or planning "of a crime or a tort...." K.S.A. § 60–426(b).   *See Burton v. R.J. Reynolds Tobacco Co.*, 167 F.R.D. 134, 140–41 (D.Kan.1996); *In re A.H. Robins Co., Inc.*, 107 F.R.D. 2, 9 (D.Kan.1985).   However, Sprague points to no record evidence to support a contention that Westerhaus' advice was sought to perpetuate a crime, a fraud or a tort, and we have found none.

In sum, we are convinced that under federal and Kansas law the critical memorandum and information sought by the motion to compel are protected by the attorney-client privilege.   Since this privilege applies, it is unnecessary for us to consider the work product privilege.   We are persuaded that the district judge properly denied the motion to compel.

Accordingly, the judgment of the district court is AFFIRMED.



UNITED STATES of America, Plaintiff-Appellee,

v.

Kenneth Linden DOYLE, Defendant-Appellant.

No. 96–2235.

United States Court of Appeals, Tenth Circuit.

Nov. 24, 1997.

After his motion to suppress evidence was denied, defendant was convicted in the United States District Court for the District of New Mexico, Howard C. Bratton, J., of possession with intent to distribute more than five kilograms of cocaine and criminal forfeiture. Defendant appealed.   The Court of Appeals, Seymour, Chief Judge, held that: (1) officer had reasonable suspicion that defendant's entry into United States was illegal, justifying investigatory stop of defendant's vehicle; (2) officer had reasonable suspicion to continue questioning defendant and to request permission to search his car; and (3) defendant's consent to search was voluntary.

Affirmed.

**1. Criminal Law ⟐1144.12, 1158(4)**

When reviewing order granting or denying motion to suppress, Court of Appeals accepts trial court's findings of fact unless clearly erroneous and considers evidence in light most favorable to district court's determination.

**2. Criminal Law ⟐1139**

Ultimate determination of reasonableness under Fourth Amendment is conclusion of law that Court of Appeals reviews de novo. U.S.C.A. Const.Amend. 4.

**3. Aliens ⟐53.8**
**Arrest ⟐63.5(6)**

Border patrol officer had reasonable suspicion that defendant's entry into United States was illegal, justifying investigatory stop of defendant's vehicle, given sensor's detection of border intrusion, placement of sensor in area away from port of entry, timing of defendant's arrival at agent's location after sensor detection, absence of other traffic, and condition of vehicle, which appeared as though it had passed through brush like that located near sensor. U.S.C.A. Const.Amend. 4.

**4. Arrest ⟐63.5(6)**

Court analyzes Fourth Amendment challenges involving vehicle stops under principles applicable to investigative detentions. U.S.C.A. Const.Amend. 4.

# EXHIBIT  D

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Tei Fu CHEN; The Sunrider
Corporation, Defendants–
Appellants.**

No. 95–50228.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 15, 1995.

Decided Nov. 4, 1996.

Corporation and owners of corporation moved to quash government's subpoena of corporate counsel claiming attorney-client privilege. The United States District Court for the Central District of California, A. Andrew Hauk, J., denied motion and corporation and owners appealed. The Court of Appeals, Kleinfeld, Circuit Judge, held that: (1) counsel's communication with corporation was within attorney-client privilege; (2) former employee of corporation could not waive privilege; (3) government's improper disclosure to trial court of material protected by privilege was harmless error; (4) government made prima facie showing that legal advice was sought in furtherance of concealing corporation's income tax fraud, even though court found that attorneys were innocent; and (5) trial court did not abuse its discretion in denying motion to quash subpoena as sanction for improper disclosure.

Affirmed.

**1. Criminal Law ⟐1153(1)**

Court of Appeals reviews denial of motion to quash grand jury subpoena for abuse of discretion.

**2. Witnesses ⟐201(2)**

Although attorney-client privilege stands firm for client's revelations of past conduct, it cannot be used to shield ongoing or intended future criminal conduct.

**3. Witnesses ⟐200**

Attorneys' communications with client regarding client's disclosure to Customs Service of alleged undervaluation of imported products was within scope of attorney-client privilege even though attorneys were involved in making business decisions and acted as spokespersons for client to Customs Service where attorneys were employed for their legal knowledge to bring client in compliance with law.

**4. Witnesses ⟐200**

Communications between lawyer and client which enable lawyer to act as spokesperson for client in front of judge, jury or administrative agency are privileged.

**5. Witnesses ⟐200**

Client is entitled to hire lawyer, and have his secrets kept, for legal advice regarding client's business affairs.

**6. Witnesses ⟐200**

Attorney-client privilege applies to communications between lawyers and their clients when lawyers act in counseling and planning role, as well as when lawyers represent their clients in litigation.

**7. Witnesses ⟐200**

All communications with people who are lawyers are not ipso facto privileged, but rather, attorney-client privilege applies only when legal advice is sought from professional legal advisor in his capacity as such.

**8. Witnesses ⟐200, 222**

If person hires lawyer for advice, there is rebuttable presumption that lawyer is hired as such to give legal advice, whether subject of advice is criminal, civil, business, tort, domestic relations, or anything else; presumption is rebutted when facts show that lawyer was employed without reference to his knowledge and discretion in law.

**9. Witnesses ⟐219(3)**

Communications of corporation's former employee to government regarding discussions between corporation and corporate counsel did not waive corporation's attorney-client privilege as former employee lacked authority to waive privilege.

**10. Witnesses ⟜199(2)**

Attorney-client privilege applies to communications between corporate employee and counsel which are made at direction of corporate superiors in order to secure legal advice.

**11. Witnesses ⟜217, 219(3)**

Power to waive corporate attorney-client privilege rests with corporation's management and is normally exercised by its officers and directors; when control of corporation passes to new management, authority to assert and waive corporation's attorney-client privilege passes as well.

**12. Witnesses ⟜219(3)**

Corporation's former employee cannot waive corporation's attorney-client privilege.

**13. Grand Jury ⟜36.3(2)**

Government improperly disclosed material protected by attorney-client privilege to court in grand jury proceeding before court determined that government made prima facie showing of factual basis adequate to support good faith belief by reasonable person that in camera review of materials might reveal evidence to establish claim that crime-fraud exception applied.

**14. Witnesses ⟜201(2), 223**

To establish that attorney-client communication has lost its privilege under crime fraud exception, government must satisfy trial court that there is factual basis adequate to support good faith belief by reasonable person that in camera review of materials may reveal evidence to establish claim that crime fraud exception applies; if court decides question in favor of government, otherwise privileged material may be submitted for in camera examination.

**15. Criminal Law ⟜1166(10.10)**

Government's improper disclosure of material protected by attorney-client privilege to trial court before court determined that in camera review of material was proper was harmless error where court expressly disregarded privileged information in making its determination that crime-fraud exception applied.

**16. Grand Jury ⟜36.3(2)**

In grand jury investigation of corporation and its owners, government made prima facie showing that legal advice of corporate counsel was sought to conceal corporation's income tax fraud and, thus, crime-fraud exception to attorney-client privilege applied even though counsel did not know that their services were being used to trick Customs Service or Internal Revenue Service (IRS); evidence showed that corporation claimed low value of imported goods for Customs' purposes and high value of those goods for income tax purposes and sought to use attorneys to make fraudulent corrective disclosures to Customs Service to evade income taxes.

**17. Witnesses ⟜201(2)**

To invoke crime-fraud exception to attorney-client privilege, government has burden of making prima facie showing that communications were in furtherance of intended or present illegality and that there is some relationship between communications and illegality.

**18. Witnesses ⟜201(2)**

Mere allegations or suspicions by government are insufficient to invoke crime-fraud exception to attorney-client privilege.

**19. Witnesses ⟜201(2), 222**

Test for invoking crime-fraud exception to attorney-client privilege is whether there is reasonable cause to believe that attorney's services were utilized in furtherance of ongoing unlawful scheme; "reasonable cause" is more than mere suspicion but less than preponderance of evidence.

See publication Words and Phrases for other judicial constructions and definitions.

**20. Witnesses ⟜201(2)**

To invoke crime-fraud exception to attorney-client privilege, government must submit evidence that, if believed by jury, would establish elements of ongoing violation.

**21. Witnesses ⟜201(2)**

Lawyer's innocence regarding ongoing or planned illicit activity of his client does not preserve attorney-client privilege against

crime-fraud exception; privilege is client's so it is client's knowledge and intentions, not lawyer's, that are of paramount concern to application of crime-fraud exception.

**22. Grand Jury ⬤36.3(2)**

Court did not abuse its discretion in denying defendant's motion to quash government's subpoena of defendant's former attorneys to appear before grand jury as sanction for government's improper submission of privileged information to court where court did not consider privileged information in making its determination regarding subpoena.

**23. Criminal Law ⬤36.6**

It is within discretion of trial court to act in appropriate manner to discipline prosecutor if he subverted defendant's attorney-client relationship.

———————

Gary S. Lincenberg, Bird, Marella, Boxer, Wolpert & Matz, Los Angeles, CA, for defendants-appellants.

George B. Newhouse, Jr., Assistant United States Attorney, Los Angeles, CA, for plaintiff-appellee.

Appeal from the United States District Court for the Central District of California, A. Andrew Hauk, District Judge, Presiding. D.C. No. CR–95–00145–RG.

Before: T.G. NELSON and KLEINFELD, Circuit Judges, and WILKEN, District Judge.*

KLEINFELD, Circuit Judge:

This case deals with the scope of the crime-fraud exception to the attorney-client privilege, where the attorney is innocent of any wrongdoing or guilty knowledge.

## FACTS

Mr. Chen and his wife own Sunrider Corporation and operate TF Chen Products, Inc., a subsidiary of Sunrider. The companies manufacture health food and skin care products and import from Taiwan, Hong Kong, Japan, and other countries. The importation tariffs the companies pay depend on the price they declare they paid for the goods. Undervaluation may result in administrative, civil, and criminal penalties. A statutory procedure allows an importer to mitigate or avoid penalties by filing a disclosure statement before the Customs Service learns of the undervaluation independently. *See* 19 U.S.C. § 1592(c)(4).

Of course an importer also pays taxes on profits. The higher the cost of goods sold, then, other things being equal, the lower the level of income taxes. Thus, an importer saves money on tariffs to the extent the goods are cheap, but pays more in income tax. Conversely, the company saves money on taxes, but pays higher tariffs, to the extent its cost of goods is higher.

The Customs duties on the higher values are much less than the additional taxes which would be due based on the true values. Thus an importer can come out ahead by overpaying tariffs and underpaying income taxes, by overstating the cost of the goods imported.

Mr. and Mrs. Chen and Sunrider were indicted for conspiracy, tax evasion, and other crimes. The indictment alleged that Mr. and Mrs. Chen imported their inventory and paid tariffs based on the true invoiced price. Then Mr. Chen's sister, Jau Hwa, the comptroller of Sunrider, would prepare entirely fictional invoices on blank forms from Sunrider's Hong Kong affiliate, owned largely by the Chens and operated by Mrs. Chen's brother. The fake invoices purported to charge much higher prices for the goods. The fake invoices were then given to Sunrider's accountants to prepare trial balances, which were themselves given to Sunrider's tax preparers. Thus, tariffs would be paid on the true lower price of the goods, but taxes would be paid as though the goods had cost much more than they really did. Mr. Chen periodically instructed Jau Hwa to wire excess money to the Hong Kong affiliate's bank accounts, to maintain the fiction that

———————

* The Honorable Claudia Wilken, United States District Judge for the Northern District of California, sitting by designation.

Sunrider's payments were based on the fake invoices, not the real ones. Mr. and Mrs. Chen would subsequently recover the excess with the connivance of Mrs. Chen's brother. The government alleges that the Chens skimmed almost $90 million this way.

According to the indictment, the Chens eventually became concerned that IRS and Customs enforcement agents might communicate on their case and discover the difference in the claimed cost of their inventory. To protect themselves, they caused a disclosure to be made to Customs, purporting to acknowledge that they had understated their cost of goods imported. In the disclosure, they stated that the true cost of the goods was what they had reflected in their tax returns. Thus, the original Customs declarations were true, but the correcting disclosure was actually not a disclosure at all, but a fraud, intended to shield their tax evasion scheme. This scheme is entirely theoretical at this point, because nothing has yet been proven.

Mr. Chen's attorneys, Stein, Shostak, Shostak & O'Hara, filed a prior disclosure pursuant to 19 U.S.C. § 1592(c)(4) and section 162.74 of the Customs regulations stating that a review gave rise to the discovery that "certain charges relating to the imported products may not have been properly included in the entered value." A check for over $381,000 was enclosed with the disclosure. The law firm said that more money would be paid as more data were assembled revealing underpayments.

Jau Hwa eventually left Sunrider. She then gave the government materials she had taken from Sunrider's files, and gave a customs agent her account of events on which the indictment is based. The Customs agent filed an affidavit saying that according to Jau Hwa, "Marjorie Shostak [Sunrider's lawyer] proposed that Sunrider should file a disclosure with Customs." Though this affidavit does not say in so many words that Ms. Shostak knew that the disclosure would be false, and intended to hide a tax evasion scheme, the Assistant United States Attorney argued that the differences between the initial and supplemental invoices was "substantial enough to put any reasonable profes-sional on notice that this was, in all likelihood, a fraudulent scheme."

Joseph P. Cox had worked on the Sunrider matter for the Stein, Shostak firm; James D. Wilets was in-house Sunrider counsel. Both were subpoenaed before the Grand Jury. The Chens and Sunrider moved to quash these two subpoenas based on their attorney-client privilege. The government moved for an order allowing the subpoenas, and establishing that Sunrider's communications to the lawyers were not privileged because of the crime-fraud exception. The government included with its cross-motion the affidavits from Agent Diciurcio and from Jau Hwa, disclosing Sunrider's alleged communications with its lawyers.

Sunrider and the Chens opposed the government's cross-motion. Their declarations stated that, upon review of documents the government disclosed, they found that Jau Hwa had stolen a box of documents from Sunrider, including "privileged correspon-dence between Sunrider's general counsel and outside counsel," and that Jau Hwa had thus revealed attorney-client communications. The declarations and oppositions say that Jau Hwa had demanded millions of dollars as the company became successful, and when Mr. Chen would not pay, she left and started a competing company with another sister, while trying to damage Sunrider and lure away its customers. Papers were submitted to show that there was no tax evasion at all. The defense theory was that Sunrider had a more complex scheme for paying its suppliers than the government understood. The scheme, developed by Ernst & Whinney, provided for purchasing inventory by letters of credit cashed on shipment and a loan agreement for a remaining balance. The tariff underpayment resulted from using only the amount paid on the letter of credit, and leaving out the loan agreement, so there was no intent to evade income tax by overstating cost of goods sold.

Ms. Shostak filed a declaration that her firm was employed to avoid litigation by bringing Sunrider into compliance with the Customs laws, by voluntarily disclosing sup-plemental payments already reported to the IRS. Ms. Shostak countered the attack on

her professional integrity by the Assistant United States Attorney and stated that the accountants "consistently said that the payments to Paget were legitimately a part of the costs of the goods sold for tax purposes." She explained in detail the nature of the transactions and why her firm "saw nothing to suggest that a prior disclosure would further some alleged tax evasion scheme." She stated plainly that neither she nor any attorney to her knowledge had engaged in the conduct alleged by Jau Hwa, done anything to mislead Customs, or had any knowledge of or participation in any fraud on the government. Mr. Wilets and Mr. Cox also filed affidavits explaining what services they had performed on behalf of the Chens and Sunrider, stating that to the best of their knowledge neither they, the accountants, the Ernst & Young Customs group assisting with the prior disclosure, nor anyone else involved, including the Chens, had ever intended to further any tax evasion scheme or known about such a scheme. General counsel for Sunrider, Cynthia Muldrow, filed an affidavit establishing that no one had authorized Jau Hwa to take any documents with her when she left the corporation, or to disclose any attorney-client information to anyone outside Sunrider.

After considering all the evidence, the district judge made a finding of fact in favor of the attorneys regarding the government's imputation of wrongdoing on their part. He found "the attorneys are not involved in the involved crime," because there was not even a "prima facie case that these attorneys in any way participated in or joined the alleged criminal conspiracy." The judge stated that he was disregarding what Jau Hwa wrote in her affidavit regarding what Ms. Shostak supposedly told the Chens. The judge nevertheless denied the Chens' motions to quash the Grand Jury subpoenas, "provided the questioning is confined to matters concerning the disclosures which TFCP/Sunrider made to United States Customs in 1989-1990." The district judge expressly found a prima facie case establishing reasonable cause to believe that the Chens and Sunrider had used their lawyers to make false statements, albeit not known to the lawyers to be false, to the Customs Service:

The Court finds that the government has carried its burden of establishing a *prima facie* case that the Defendants utilized their attorneys in connection with the alleged conspiracy to make false statements to the United States Customs Service, and that under the crime-fraud exception, there is no valid attorney-client privilege attached to any communication or document made in furtherance of or relating to the said Disclosures which TFCP/Sunrider made to the United States Customs Service in 1989-1990. The Court specifically finds, based on the record before it, that there exists reasonable cause to believe that the attorneys' services, both by James D. Wilets, corporate counsel and by Joseph P. Cox of the Stein, Shostak firm, were utilized by Defendants in furtherance of their ongoing unlawful scheme. For that reason, no objection to answering the aforesaid questioning may be based upon the attorney-client privilege.

Because the government has not made out a prima facie case that these attorneys in any way participated in or joined the alleged criminal conspiracy, James D. Wilets and Joseph P. Cox do have the right not to disclose "opinion work product" as distinguished from "fact work product" in connection with their representation of Defendants.

## ANALYSIS

[1] We review denial of a motion to quash a Grand Jury subpoena for abuse of discretion. *In re Grand Jury Subpoenas,* 803 F.2d 493, 496 (9th Cir.1986), *opinion corrected,* 817 F.2d 64 (1987).

The attorney-client privilege is essential to preservation of liberty against a powerful government. People need lawyers to guide them through thickets of complex government requirements, and, to get useful advice, they have to be able to talk to their lawyers candidly without fear that what they say to their own lawyers will be transmitted to the government. *See United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 2625-26, 105 L.Ed.2d 469 (1989) ("clients [must] be free to 'make full disclosure to their attorneys' of

**1500**    **99 FEDERAL REPORTER, 3d SERIES**

past wrongdoings ... in order that the client may obtain 'the aid of persons having knowledge of the law and skilled in its practice' "); *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981) ("assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure").

Much of what lawyers actually do for a living consists of helping their clients comply with the law. *See Upjohn,* 449 U.S. at 392, 101 S.Ct. at 684 ("corporations ... 'constantly go to lawyers to find out how to obey the law' "). Clients unwittingly engage in conduct subject to civil and even criminal penalties. *See United States v. Weitzenhoff,* 35 F.3d 1275, 1293–95 (9th Cir.1993) (Kleinfeld, J. dissenting from order rejecting suggestion for rehearing *en banc*). This valuable social service of counseling clients and bringing them into compliance with the law cannot be performed effectively if clients are scared to tell their lawyers what they are doing, for fear that their lawyers will be turned into government informants. *See Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976) ("if the client knows that damaging information could ... be obtained from the attorney following disclosure ... the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice"). In our libertarian tradition, what is not prohibited is generally permitted, so lawyers' counseling regarding prohibitions necessarily and desirably educates clients as to their liberties:

Lawyers are constantly called upon to tell people, in advance of action or developed controversy, what their duties are to other people and to the government, and what the duties of others are to them. In the case of tightly defined requirements, such as the return and payment of taxes, this may call for close, meticulous guidance. For the most part, however, what are involved are prohibitions. Safe-side counselling is commonly the lawyer's task. When a continuing course of conduct is in question, this may require not only an informed appraisal of risk but the preparation of a plan of action to minimize it....

When people do not have duties, they have liberties. Counselling about the one is in some sense counselling about the other.... even a man's liberty of singing in the shower may come into question if a neighbor complains that it is a nuisance.

Henry M. Hart & Albert M. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law* 205–06 (Tent. ed. 1958).

[2] It is a truism that while the attorney-client privilege stands firm for client's revelations of past conduct, it cannot be used to shield ongoing or intended future criminal conduct. *Zolin,* 491 U.S. at 563, 109 S.Ct. at 2626. That principle is easily applied when a lawyer is retained to defend a client in a criminal prosecution or civil litigation relating to an entirely completed course of conduct. But it is difficult to apply when the lawyer's role is more in the nature of business planning or counseling or bringing the client into compliance for past wrongs, as opposed to simply defending the client against a charge relating to past wrongs. The act of bringing a client into compliance with the law ordinarily and properly engages the lawyer in an effort to assure the client is sanctioned no more harshly than the law requires. Because of the delicacy and importance of the attorney-client privilege in the counseling relationship, both the district court's task and ours are especially difficult when the United States Attorney insists upon using a person's own lawyer against him.

[3] The government argues without citation that "[w]here attorneys are involved in business decision-making, or, as Cox and Wilets acted here, as spokespersons for a company, they are clearly not acting as 'professional legal advisors.' " The government argues that this proposition takes the lawyers' planning for correcting understated customs declarations out of the privilege.

[4] The lawyers in this case were "spokespersons" only in the sense that, as lawyers, they communicated their clients' positions to the government agencies dealing with their clients. They were not engaged in a public relations business separate from

their law firm, as the government's term "spokespersons" may imply. For a lawyer to tell a judge, jury, or administrative agency, his client's position and the basis for it, that is, to be his client's spokesman, is a traditional and central attorney's function as an advocate. The communications between lawyer and client which enable a lawyer to perform this function are privileged. The government's argument implies that when a lawyer speaks on a client's behalf to a jury, the client forfeits his privilege for the attorney-client communications relating to the lawyer's statements on the client's behalf, obviously an untenable proposition.

[5, 6] The government's phrase, "involved in business decision-making," obscures the issue. A client is entitled to hire a lawyer, and have his secrets kept, for legal advice regarding the client's business affairs. This principle has long been the law:

> The principle we take to be this; that so numerous and complex are the laws by which the rights and duties of citizens are governed, so important is it that they should be permitted to avail themselves of the superior skill and learning of those who are sanctioned by the law as its ministers and expounders, both in ascertaining their rights in the country, and maintaining them most safely in the courts, without publishing those facts, which they have a right to keep secret, but which must be disclosed to a legal advisor and advocate, to enable him successfully to perform the duties of his office, that the law has considered it the wisest policy to encourage and sanction this confidence, by requiring that on such facts the mouth of the attorney shall be forever sealed.

*Hatton v. Robinson*, 31 Mass. (14 Pick) 416, 422 (1833) (Shaw, C.J.), cited in 8 John H. Wigmore, *Evidence* at 547 (McNaughton rev. ed. 1961). It is not true, and has not been true since the early nineteenth century, that the confidences of a client are "respected only when given for the purpose of securing aid in *litigation*." 8 Wigmore, *supra*, § 2291, at 559 (emphasis in original). "The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, ... as well as an

attorney's advice in response to such disclosures." *In re Grand Jury Investigation (Corporation),* 974 F.2d 1068, 1070 (9th Cir. 1992) (quotations and citation omitted). The attorney-client privilege applies to communications between lawyers and their clients when the lawyers act in a counseling and planning role, as well as when lawyers represent their clients in litigation. Indeed, the axiom that "every man knows the law" presupposes that everyone can find it out by consulting a lawyer, before being hauled into court for violating the law. 8 Wigmore, *supra,* § 2291 at 547–48 (citations omitted).

[7] That a person is a lawyer does not, *ipso facto,* make all communications with that person privileged. The privilege applies only when legal advice is sought "from a professional legal advisor *in his capacity as such.*" *Id.* § 2292 at 554 (emphasis added). For example, where a counterfeiter hired a man who was a lawyer to buy printing equipment for him, no privilege could be asserted because the lawyer was merely a "business agent" and not a "legal advisor." *United States v. Huberts,* 637 F.2d 630, 640 (9th Cir.1980). Likewise, lawyer-client communications were not privileged where the "clients did not approach him for legal advice and assistance, but rather with the aim of finding [investment opportunities]." *Liew v. Breen,* 640 F.2d 1046, 1050 (9th Cir.1981). A lawyer's account ledgers revealing a client's financial transactions with third parties, which did not reveal the client's communications with the lawyer, or the lawyer's advice, were not privileged. *In re Fischel,* 557 F.2d 209, 212 (9th Cir.1977).

[8] If a person hires a lawyer for advice, there is a rebuttable presumption that the lawyer is hired "as such" to give "legal advice," whether the subject of the advice is criminal or civil, business, tort, domestic relations, or anything else. But the presumption is rebutted when the facts show that the lawyer was "employed without reference to his knowledge and discretion in the law":

> A lawyer is sometimes employed without reference to his knowledge and discretion in the law—as where he is charged with finding a profitable investment for trust funds. So, too, one not a lawyer is some-

times asked for legal advice—as where a policeman or a clerk of court is consulted. It is not easy to frame a definite test for distinguishing *legal from nonlegal advice.* Where the general purpose concerns legal rights and obligations, a particular incidental transaction would receive protection, though in itself it were merely commercial in nature—as where the financial condition of a shareholder is discussed in the course of a proceeding to enforce a claim against a corporation. But apart from such cases the most that can be said by way of generalization is that a matter committed to a professional legal adviser *is prima facie so committed for the sake of the legal advice* which may be more or less desirable for some aspect of the matter, and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice.

8 Wigmore, *supra,* § 2296, at 566–67 (emphasis in original). Calling the lawyer's advice "legal" or "business" advice does not help in reaching a conclusion; it *is* the conclusion. That the lawyers were "involved in business decision-making," as the government puts it, is irrelevant. What matters is whether the lawyer was employed with or without "reference to his knowledge and discretion in the law," *id.,* to give the advice. In this case, the attorneys were employed for their legal knowledge, to bring their clients into compliance with the law in the least burdensome way possible (so far as the lawyers knew). Their communications with their clients were therefore within the scope of the attorney-client privilege.

[9–12] Appellants correctly argue that Jau Hwa, a past employee of Sunrider Corporation, lacked authority to waive the corporation's attorney-client privilege. The attorney-client privilege applies to communications between corporate employees and counsel, made at the direction of corporate superiors in order to secure legal advice. *Upjohn,* 449 U.S. at 390–394, 101 S.Ct. at 683–685. This "same rationale applies to the ex-employees." *In re Coordinated Pretrial Proceedings, etc.,* 658 F.2d 1355, 1361 n. 7 (9th Cir.1981). "[T]he power to waive the corporate attorney-client privilege rests with the corporation's management and is

normally exercised by its officers and directors." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 1991, 85 L.Ed.2d 372 (1985). "[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at 349, 105 S.Ct. at 1991. It follows *a fortiori* that since a corporate employee cannot waive the corporation's privilege, that same individual as an ex-employee cannot do so. An employee must generally keep an employer's confidences. *See* Restatement (Second) of Agency § 395 (1958). The uncontradicted evidence in the record established that Jau Hwa never was given any authority to waive the attorney-client privilege. Thus, Jau Hwa's disclosures of attorney-client communications could not and did not waive the privilege.

[13, 14] Appellants next argue that the government improperly submitted Jau Hwa's affidavit and Agent Diciurcio's affidavit, thereby disclosing to the judge material protected by the attorney-client privilege, before the court decided that such a disclosure should be made. They are correct. The Supreme Court established in *Zolin* that the parties seeking to strip attorney-client communications of their privilege under the crime-fraud exception must satisfy the court with some showing prior to judicial *in camera* review of the privileged material.

Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court. The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the

relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

*Zolin,* 491 U.S. at 572, 109 S.Ct. at 2631 (internal citation and quotations omitted). Thus there are two steps. First the government must satisfy the judge that there is "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies," and then if the judge decides this question in favor of the government, the otherwise privileged material may be submitted for *in camera* examination. *Id.* The government cannot show the otherwise privileged material to the judge unless and until the judge has made this preliminary judgment. In *Zolin,* the prosecutor thought that it was unduly cumbersome to approach the district court twice, first to make a showing that the judge should read the putatively privileged material in order to decide whether the crime-fraud exception applied, and second to decide whether the exception applied. The Supreme Court decided that, cumbersome or not, that is what the prosecutor had to do.

In the case at bar, the United States Attorney submitted Jau Hwa's disclosures of attorney-client communications, and Diciurcio's affidavit telling more about her disclosures, without first making a *prima facie* showing and obtaining the court's permission. This was incorrect under *Zolin.* Apparently, as in *Zolin,* the United States Attorney had one view of what procedure is appropriate, and the Supreme Court of the United States had another. As we previously explained in another case involving the same United States Attorney's Office, even if the office already has the putatively privileged material, the prosecutor still must go through the two-step procedure of *Zolin. United States v. De La Jara,* 973 F.2d 746, 749 (9th Cir.1992).

[15] But the district judge recognized that there was an incorrect submission. He disregarded what Jau Hwa said in making his decision that the crime-fraud exception applied, and expressly said he was disregarding it. Violation of the *Zolin* two-step procedure was therefore harmless. *See In re Grand Jury Investigation (Corporation),* 974 F.2d at 1073.

[16–20] What is left of the case is whether the government's showing, without Jau Hwa's disclosures, was adequate to invoke the crime-fraud exception. It was. "To invoke the crime-fraud exception successfully, the government has the burden of making a prima facie showing that the communications were in furtherance of an intended or present illegality and that there is some relationship between the communications and the illegality." *In re Grand Jury Proceedings (The Corporation),* 87 F.3d 377, 380 (9th Cir.1996) (internal quotations and alterations omitted). Mere allegations or suspicion by the government are insufficient. But proof beyond a reasonable doubt is not necessary to justify application of the crime-fraud exception. *Id.* at 381. The test for invoking the crime-fraud exception to the attorney-client privilege is whether there is "reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme." *Id.* (internal quotations and alterations omitted). Reasonable cause is more than suspicion but less than a preponderance of evidence. The government must submit "evidence that if believed by the jury would establish the elements of an ongoing violation." *United States v. Laurins,* 857 F.2d 529, 541 (9th Cir.1988).

In this case, there was reasonable cause to believe that the Chens and Sunrider were using attorneys' services to conceal income tax fraud. The government submitted copies of blank pre-signed invoices from Sunrider's supplier, which would facilitate the kind of fraud claimed by the government. The portions of Jau Hwa's affidavit other than her disclosures of attorney-client communications, tended to show, if true, that the company was claiming a low value of goods purchased for Customs purposes, a high value for income tax purposes, and was proposing to make a fraudulent corrective disclosure to

Customs in order to evade income taxes. The evidence, excluding the improperly submitted disclosures of attorney-client communications, further gave reasonable cause to believe that the Chens were using their lawyers to help prepare the paperwork for this fraudulent scheme, and using their prestige in the Customs bar to hide it.

[21] The district judge found that the lawyers in this case were innocent of any wrongful intent, and had no knowledge that their services were being used to trick the Customs Service or the IRS. But the lawyers' innocence does not preserve the attorney-client privilege against the crime-fraud exception. The privilege is the client's, so "it is the client's knowledge and intentions that are of paramount concern to the application of the crime-fraud exception; the attorney need know nothing about the client's ongoing or planned illicit activity for the exception to apply. It is therefore irrelevant ... that [the lawyers] may have been in the dark." *In re Grand Jury Proceedings (The Corporation)*, 87 F.3d at 381–82. *See also Laurins*, 857 F.2d at 540 ("this exception applies even where the attorney is unaware that his advice may further an illegal purpose").

[22, 23] Appellants argue that because the prosecutors should not have questioned Jau Hwa about privileged information she learned while employed by Sunrider, the judge should have quashed the subpoena as a sanction. It was "within the discretion of the district court to act in an appropriate manner to discipline [the prosecutor] if he subverted [ ] the attorney-client relationship." *United States v. Lopez*, 4 F.3d 1455, 1463 (9th Cir. 1993). Because use of her disclosures of attorney-client communications wound up being immaterial to the district judge's decision, there was no prejudice, so the district judge was within his discretion in denying appellants' motion for a broad sanction. *See id.* at 1464.

## CONCLUSION

The prosecution should have followed the two-step submission procedure in *Zolin*, and did not. But that error was harmless, because the judge disregarded the incorrectly

submitted attorney-client communications. The attorneys' lack of any guilty knowledge did not matter, because the privilege was the client's, and the client's misconduct sufficed to lose it, despite the lawyers' innocence of wrongdoing. The properly submitted materials established reasonable cause to believe that the Chens and Sunrider were using their lawyers as part of an ongoing scheme to evade taxes, so the district judge was within his discretion in allowing the government to compel disclosures under the crime-fraud exception.

AFFIRMED.



Mary FORSYTH; Marrietta Cade; Willie Andrews; Mary Lou Buehler; Helen Staves; Randolph Bratten; and Searle Auto Glass, Inc., d/b/a Best Glass Company, Plaintiffs–Appellants,

v.

HUMANA, INC., a Delaware corporation; Humana Health Insurance of Nevada, Inc., a Nevada corporation; and Does I through X, inclusive, Defendants–Appellees.

No. 94–16548.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 4, 1995.

Decided Nov. 5, 1996.

Employers and employees who contracted for group health coverage through employee benefit plans brought action against insurer and hospital under Employee Retirement Income Security Act (ERISA), Sherman Act, and Racketeer Influenced and Corrupt Organizations Act (RICO) for failing to disclose discount agreement and for failing to pass discounts along in form of reduced premiums or reduced copayments. Insurer