# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SRI INTERNATIONAL,
INC., a California
Corporation,

Plaintiff and
Counterclaim-Defendant

    v.                C.A. No. 04-1199 (SLR)

INTERNET SECURITY
SYSTEMS, INC., a
Delaware Corporation,
INTERNET SECURITY
SYSTEMS, INC., a
Georgia Corporation,
and SYMANTEC
CORPORATION, a Delaware
Corporation,

Defendants and
Counterclaim-Plaintiffs

_____

VIDEOTAPED ORAL DEPOSITION OF

DANIEL M. TEAL

May 24, 2006

_____

REPORTED BY:  SUSAN P. MILLER, RDR, CRR, CBC

Page 24

1    I do know that they received some funding from the

2    U.S. Government for their research.

3        Q.    Does the U.S. Government fund work on

4    research that's directed to problems that have

5    already been solved?                          08:32:48

6        A.    I cannot comment on if the

7    U.S. Government is funding problems that have

8    already been solved.

9        Q.    Does that seem reasonable to you?

10               MS. BROWN:  Objection, calls for      08:32:58

11    speculation.

12        A.    Again, it all depends upon how you define

13    if the problem is solved or not.  Again, I do not

14    know if the government is funding problems that have

15    already been solved.  It also depends:  Has the      08:33:14

16    problem been solved?  I'm not aware.  If you could

17    point out a specific problem that I could answer --

18    I mean, that's a very vague question.

19        Q.    (BY MR. MILLER)  You say that NetRanger

20    solved the problems that EMERALD purportedly solved,  08:33:29

21    but did it several years earlier.  Isn't that your

22    opinion?

23               MS. BROWN:  Objection, vague.

24        A.    I produced -- we sold NetRanger several

25    years prior to publication of the EMERALD paper as    08:33:48

Page 25

 1   it was a successful product.  The U.S. government,

 2   it was whether they funded EMERALD, if they thought

 3   NetRanger may have solved it, that was up to them.

 4        Q.    (BY MR. MILLER)  So you think the

 5   government funded EMERALD work to the tune of          08:34:08

 6   millions of dollars when they could have gone out

 7   and bought a commercial NetRanger product.  That

 8   makes sense to you?

 9             MS. BROWN:  Objection, vague, calls

10   for speculation.  Also, lacks foundation, vague as    08:34:21

11   to what you mean by "the EMERALD project."

12        Q.    (BY MR. MILLER)  Do you understand the

13   question?

14        A.    I would like to point out that the

15   U.S. Government did purchase NetRanger systems.  You   08:34:31

16   know, if they continued funding the EMERALD project,

17   that may have been another part of the

18   U.S. Government.

19        Q.    Okay.  Let's try to answer my question.

20   Does it make sense to you that the government would    08:34:45

21   have funded EMERALD research if your commercial

22   NetRanger product already solved the problems that

23   the EMERALD research was directed to?

24             MS. BROWN:  Objection, vague as to

25   "EMERALD research."                                   08:34:59

Page 26

1      A.     Let me point out, NetRanger was a

2  successful commercial product.  The U.S. Government

3  purchased it.  They may have funded EMERALD for

4  continued research for doing things in a different

5  way, maybe, that...                              08:35:17

6              Going ahead and dealing with, for

7  example, statistical detection, which in 1997 was

8  not viable for commercial systems.

9      Q.     (BY MR. MILLER)  Statistical anomaly

10 detection was not viable for commercial systems;  08:35:43

11 that's your opinion?

12     A.     In my opinion, in 1997, I was not aware

13 of any statistical anomaly detection system that

14 would have worked in a commercial setting.

15     Q.     Before becoming involved in this lawsuit, 08:36:06

16 had you ever heard anyone say that SRI's work in the

17 intrusion detection field was not of high quality?

18     A.     That depends upon the definition of "high

19 quality."  Are you talking about high quality for a

20 research project, or high quality for a          08:36:27

21 commercial-grade product that could be sold on the

22 open market?

23     Q.     Let's start with commercial -- I'm sorry.

24 Let's start with research project.

25     A.     I am aware that SRI produced, you know,  08:36:41

1    for the IDES project and the NIDES project research

2    systems that were used in limited research settings.

3    They probably tested it at one site.  Other than

4    that, I cannot comment on -- you know, they may not

5    have tested it at all.  I do not know if they tested    08:37:05

6    it at one or more sites.

7                    I never used the IDES system.  I

8    never used the NIDES system.  I never used the

9    EMERALD system.  They presented lots of papers at

10   computer security conferences on the research that    08:37:23

11   they performed.

12       Q.    Did you ever hear anybody criticize or

13   speak negatively of SRI's work in the intrusion

14   detection field?

15                    MS. BROWN:  Objection, calls for    08:37:33

16   speculation.

17       A.    I have never heard individuals in the

18   computer security field comment negatively on the

19   IDES or any other research project, to my

20   recollection.  They were research projects.  It    08:37:56

21   depends upon comment negatively -- I never heard

22   anyone say that, "Oh, this cannot be used for a

23   commercial system," although that was my opinion.

24   But I never heard anyone say that at a conference.

25       Q.    (BY MR. MILLER)  Did you ever hear anyone    08:38:14

Page 28

1    say anything negative about SRI's research in the

2    intrusion detection field?

3        A.    I can't remember anyone saying anything

4    negative about SRI's research.

5        Q.    Do you recall ever hearing anyone say        08:38:30

6    that SRI was taking credit for work that was not

7    done by SRI?

8        A.    I could not comment on that.  I don't

9    remember anyone saying, you know, that SRI's taking

10   credit for other people's work at those research       08:38:50

11   conferences.

12       Q.    Why did you keep the IDES, NIDES and

13   EMERALD articles in your files?

14       A.    I keep lots of files just because I am --

15   I do work in the computer security field, and I keep   08:39:18

16   files just to have them.

17       Q.    You keep files on useless work?

18       A.    I keep files -- well, that depends upon

19   if I believe -- in terms of useless work, I may have

20   stuff, but it depends upon -- in which case it was     08:39:35

21   presented at a research conference, I kept copies of

22   it.  I have proceedings from lots of technical

23   conferences.  So I just have a habit of keeping all

24   the papers, or as many papers as I can keep, from

25   technical conferences or, you know, research           08:39:57

1   projects that were presented at the conferences.

2      Q.    In your invoice, you note that you spent

3   five hours preparing documents to produce in

4   response to SRI's subpoena to you.

5      A.    Yes, I spent approximately five hours      08:40:17

6   searching through everything.

7      Q.    So what did you do in the five hours?

8      A.    In the five hours, I spent at least an

9   hour going through all of the conference proceedings

10  that I've had.  May have been more time than that.   08:40:35

11  I also spent time researching -- you know, getting

12  all of the files for WheelGroup Corporation and

13  NetRanger that were also requested by the subpoena.

14  That took probably more time than going through all

15  of my files looking for papers regarding SRI.        08:40:59

16     Q.    Were there any papers relating to

17  WheelGroup or NetRanger that you didn't produce?

18     A.    I produced all of the files that were

19  requested, everything except source code to

20  NetRanger.                                           08:41:20

21     Q.    You have the source code for NetRanger?

22     A.    I have some source code for NetRanger.

23     Q.    Which source -- for which version of

24  NetRanger do you have source code?

25     A.    I have source code for Version 1.0; some    08:41:36

1    internal research versions for the time frame

2    between 1.0 and 2.0, not complete, but some of the

3    source.  I have source code for some of the

4    versions -- you know, for, basically, 2.0;

5    basically, test stuff.  I did not maintain the          08:42:01

6    complete set of source code, for example, for 1.3 or

7    2.0.

8        Q.    I noticed in some of your documents

9    actually attached to your report that WheelGroup did

10   consulting for its customers.  Is that correct?        08:42:23

11       A.    Yes, WheelGroup did do consulting for

12   some of our customers.

13       Q.    Do you have any documents relating to

14   that consulting work in your files?

15       A.    I believe I produced a number of            08:42:36

16   documents in regards to the subpoena for that

17   consulting work.  I don't remember exactly which

18   ones.  I was just finding files and copying them

19   over.  Those files were produced a long time ago.  I

20   did not read them in response to providing them for    08:42:56

21   the subpoena.

22       Q.    They were produced, meaning they were

23   created a long time ago?

24       A.    They were created when WheelGroup -- over

25   10 years ago.                                           08:43:10

1      Q.    When you were reviewing the documents for

2   production, do you recall any documents that

3   reflected or depicted a customer's network

4   architecture?

5      A.    I don't specifically recall.  There may    08:43:31

6   have been.

7      Q.    If there was such a document in your

8   files --

9      A.    If there was -- there may have been a

10   document.  There may not have.  I do not know if    08:43:40

11   there was a document that depicted a customer's

12   architecture.

13      Q.    If there was such a document, you would

14   have produced it?

15      A.    If there was a document with a customer's   08:43:49

16   network architecture, I would have produced it.

17      Q.    You mentioned previously that there may

18   have been some testing of IDES and NIDES.  Are you

19   aware of any testing of the EMERALD system, any of

20   the EMERALD systems?                                08:44:11

21      A.    I am not aware of any testing of the

22   EMERALD systems.  I read those papers a long time

23   ago.  They may have referred to it.  They may not.

24   I do not remember.

25      Q.    You looked for a paper regarding Lincoln    08:44:32

Page 60

1    question is yes?

2                    MS. BROWN:  Objection, asked and

3    answered.

4        A.    Yes, you could provide, an API allows

5    you -- you could do that.                          09:23:22

6        Q.    (BY MR. MILLER)  You could transform from

7    one form --

8        A.    Yeah.  Yeah.  Yeah.  It depends upon a

9    definition of what you're trying to do with the

10   transforming more at the technical level, but...   09:23:31

11       Q.    So just let me ask the question more

12   cleanly and you can answer it:  Can an API allow the

13   system to transform data from one form into another

14   form?

15                   MS. BROWN:  Objection, vague as to   09:23:43

16   whether you're speaking generally or in the context

17   of the patents.

18       A.    The answer is yes.  And based on that

19   definition, my NetRanger system did that.

20                   MR. MILLER:  Let's take a break.     09:23:56

21                   THE VIDEOGRAPHER:  We're off the

22   record at 9:23 a.m.  This is the end of Tape No. 1.

23                   (Recess taken at 9:23 a.m.)

24                   THE VIDEOGRAPHER:  Stand by, please.

25   We're back on the record at 9:34 a.m.  This is the   09:34:42

Page 61

1    beginning of Tape No. 2.

2        Q.    (BY MR. MILLER)   Back in September,

3    approximately September of last year when you first

4    skimmed the patents-in-suit, what were your

5    impressions?                                    09:34:55

6        A.    My impressions?  My initial impression is

7    that the patent -- you know, based on the face of

8    it, that I'd already done lot of that with

9    NetRanger.  A lot, maybe all of it.  I don't

10   remember.  I mean, in which case I had my NetRanger   09:35:14

11   system out there, and I saw this was filed long

12   after we were selling NetRanger on the market.

13       Q.    Is there anything described by the

14   patents-in-suit that you don't believe you invented?

15            MS. BROWN:  Objection, calls for a     09:35:28

16   legal conclusion.  Are you speaking of claims or the

17   description?  It's vague.  Are you going to place

18   the patent in front of the witness?

19       A.    The -- I don't remember my thoughts at

20   the time.  What I do remember in the patent is the   09:35:44

21   patents, one of them, did cover signature detection,

22   misuse detection, okay, which is what NetRanger did;

23   did it very well.

24            The patents also address statistical

25   anomaly detection, which NetRanger did not do and   09:35:58

Page 62

1    did not do for commercial reasons because in my

2    opinion, and it's still my opinion today, that

3    statistical analysis is more for research-type

4    products rather than a commercial product.

5         Q.    (BY MR. MILLER)  Are you familiar with    09:36:14

6    Symantec's products?

7         A.    I am not familiar with Symantec's

8    intrusion detection products.  I did not look at

9    them in regards to this case.

10        Q.    Were you asked to take a look at    09:36:24

11   Symantec's intrusion detection products?

12        A.    I was not asked to take a look at

13   Symantec's intrusion detection products.

14        Q.    Do you know whether Symantec's intrusion

15   detections include any statistical anomaly    09:36:36

16   detection?

17        A.    I do --

18              MS. BROWN:  Objection, calls for

19   speculation.

20        A.    I do not know if they include it or not.    09:36:42

21        Q.    (BY MR. MILLER)  Do you know whether ISS'

22   products include statistical anomaly detection?

23        A.    I --

24              MS. BROWN:  Objection, calls for

25   speculation.    09:36:54

Page 63

1          Mr. Teal, you have to just pause and

2    let me get my objections on the record, please.

3    Okay.

4                THE WITNESS:  Okay.

5        A.    No, I do not know if they include        09:36:58

6    statistical detection or not.  It also depends upon

7    what you define as "statistical detection."  For

8    example, some misuse detection might be construed as

9    statistical detection.

10               "Statistical detection" over the        09:37:11

11   years has seemed to have had many different

12   meanings, and it's a very broad term, and it appears

13   to -- it can mean many different things.

14       Q.    (BY MR. MILLER)  In the context of the

15   '212 patent, what do you believe it means?  If you'd  09:37:22

16   take a look at Exhibit E to your report.

17       A.    For the '212 patent -- for which part of

18   Exhibit E?

19       Q.    Take a look at page 57 of Exhibit E to

20   your report.  Are you there?                         09:37:57

21       A.    Yes.  I see page 57.

22       Q.    Okay.  And you understand that page 57 is

23   addressing claim 1 of SRI's '212 patent?

24       A.    At page 57, it says, "See '203, claim 1."

25       Q.    Okay.  Do you understand that page 57 is  09:38:29

Page 64

```
 1   addressing claim 1 of the '212 patent, or not?

 2       A.    I don't understand your question because

 3   I'm looking at page 57 and on there, in my expert

 4   report, I say, "See '203, claim 1."

 5       Q.    Did you prepare this claim chart,          09:38:49

 6   Exhibit E?

 7       A.    The draft of this claim chart was

 8   produced by my legal counsel, upon discussions with

 9   myself, and I reviewed it claim-by-claim with the

10   legal counsel.                                       09:39:01

11       Q.    Do you recognize any claim of the '212

12   patent on page 57?

13             MS. BROWN:  Objection, vague as to

14   "recognize."  Are you going to place the '212 patent

15   in front of him, Counsel?  Are you asking him to     09:39:13

16   make a comparison?

17       A.    There, for the '212 claim number, going

18   through, after reviewing the claim in '212, I

19   reference and said we've already covered this in

20   '203, claim 1.                                       09:39:38

21       Q.    (BY MR. MILLER)  Okay.  Do you recognize

22   claim 1 of the '212 patent on page 57?

23             MS. BROWN:  Objection, vague as to

24   "recognize."

25       A.    On the '212, the only difference is where  09:39:50
```

Page 66

1      A.    Yes.

2      Q.    And you say that a statistical detection

3 method could be any of the three proposed

4 constructions?

5      A.    That is correct.                        09:41:21

6      Q.    In your -- in reaching your conclusions

7 as to whether or not that limitation, "Wherein at

8 least one of the network monitors uses a statistical

9 detection method" -- in analyzing whether or not

10 that limitation was present in the prior art, did    09:41:38

11 you use one of these three constructions, your own

12 construction, or something else?

13                MS. BROWN:   Objection, asked and

14 answered.

15     A.    I used all three constructions for my    09:41:51

16 answer.

17     Q.    (BY MR. MILLER)   Earlier today you

18 mentioned that you're a named inventor on a number

19 of patents?

20     A.    Yes.                                     09:42:10

21     Q.    Do you know how many?

22     A.    Five patents, to my knowledge.

23     Q.    These are all patents that are assigned

24 to Cisco?

25     A.    That is correct.   Cisco does -- is the    09:42:21

Page 67

1    assignee for those five patents.

2        Q.    Were any of the five patents on which

3    you're listed as a named inventor filed before the

4    SRI patents-in-suit?

5                MS. BROWN:  Objection, calls for      09:42:37

6    speculation.

7        A.    I do not know the dates of when they were

8    filed and if it was before or after the SRI patents.

9        Q.    (BY MR. MILLER)  When were the SRI

10   patents-in-suit filed?                            09:42:46

11               MS. BROWN:  Objection, calls for

12   speculation.  You haven't placed the patents in

13   front of him.

14       A.    I don't remember the exact dates that the

15   SRI patents were filed.                           09:42:55

16               (Exhibit 463 marked/introduced.)

17       Q.    (BY MR. MILLER)  Mr. Teal, the reporter

18   has placed before you Exhibit 463, which is

19   identified as TEA_17 through 34.  It's U.S. Patent

20   630,668.  Do you recognize this document?         09:43:28

21       A.    Yes, that is one of my patents.

22       Q.    And your name is there on the front,

23   Daniel M. Teal?

24       A.    That is me, yes.

25       Q.    Why didn't you tell the Patent Office    09:43:40

Page 68

1    about any of SRI's work in intrusion detection?

2         A.    For the --

3              MS. BROWN:   Objection, lacks

4    foundation.

5         Q.    (BY MR. MILLER)   Okay.  Did you tell the    09:43:53

6    Patent Office about any of SRI's work in intrusion

7    detection during the prosecution of this patent?

8         A.    I do not -- I do not know, because I did

9    not contact the Patent Office.  I was working with

10   Cisco Systems' law firm.  I do not remember their    09:44:06

11   name.  This was a number of years ago.  They may

12   have provided it, they may have not.  I gave a

13   number of papers in support of the work for this

14   patent.  I do not remember the list of all the

15   papers that I presented.    09:44:25

16        Q.    Take a look at the first couple of pages

17   of the patent.

18        A.    Okay.

19        Q.    So page 18, page 19, page 20, page 21 --

20   I'm referring to the TEA numbers on there.    09:44:44

21        A.    Oh, the TEA numbers.  Okay.

22        Q.    Yeah.  So it's like the first --

23        A.    Okay.

24        Q.    -- four pages of the patent.

25        A.    Uh-huh.    09:44:51

Page 69

1       Q.    Actually, first five pages of the patent.

2             You see a whole bunch of prior art

3    references identified there?

4       A.    Yes, I do.

5       Q.    Do you see any SRI documents identified    09:45:01

6    there?

7       A.    I would have to read through all the

8    listings.  There's a number of them here.  If

9    there's some you'd like to point out to me --

10      Q.    I can't.  I'll represent to you I don't    09:45:12

11   see any SRI publications.

12             (Witness reviewing document(s).)

13      A.    So none there.  And, more than likely, I

14   probably did not, you know, provide any of the SRI

15   papers because they deal with statistical detection,  09:45:34

16   which is not a commercially viable solution; and at

17   Cisco, we did not depend upon statistical detection.

18   So, therefore, in my opinion, the SRI documents were

19   irrelevant for my patents.

20      Q.    (BY MR. MILLER)  The SRI research was not    09:45:55

21   material to the NetRanger work or the Cisco

22   products?

23      A.    They told me what not to do.

24      Q.    Okay.  Is it your testimony that the SRI

25   documents don't discuss statistical analysis at all?  09:46:04

Page 70

```
 1                   I'm sorry.  Withdrawn.

 2                   Is it your testimony that the SRI

 3   documents don't discuss signature analysis at all?

 4                   MS. BROWN:  Objection, lacks

 5   foundation, vague as to which document you're          09:46:16

 6   referring to.

 7        A.   At the -- I do not remember at the time

 8   that I was providing information in support of this

 9   patent.  And just for the record, I left Cisco soon

10   after providing initial stuff, so I don't know, you    09:46:35

11   know, that whole process after I left.

12                   I was not aware -- I do not remember

13   if there was SRI documents.  I do not remember SRI

14   having signature analysis in their work.

15        Q.   (BY MR. MILLER)  Are you aware, as you       09:46:56

16   sit here today, whether, for example, the EMERALD

17   '97 paper that you cite to in your report discusses

18   signature analysis?

19        A.   I do not remember the whole contents of

20   that paper.  It may have.  It may have not.           09:47:09

21        Q.   You had the EMERALD '97 paper back in --

22   before -- at least before December of 1998, right?

23                   MS. BROWN:  Objection, calls for

24   speculation.

25        A.   I may have had a copy of it.                09:47:27
```

Page 71

1      Q.    (BY MR. MILLER)  Why didn't you tell the

2   Patent Office about NetRanger when you filed this

3   application for this '668 patent?

4                  MS. BROWN:  Objection, lacks

5   foundation.                                    09:47:42

6      A.    Again, I did not talk to the Patent

7   Office, so I do not know if the law firm told the

8   Patent Office about NetRanger or not.  I can't

9   provide an answer on that.

10      Q.    (BY MR. MILLER)  Do you know whether the   09:47:57

11   Patent Office told the -- withdrawn.

12                  Do you know whether the law firm

13   told the Patent Office about the SPOCK paper that

14   you reference in your report?

15      A.    I do not know if the law firm told the   09:48:07

16   Patent Office about our SPOCK paper.

17      Q.    What about the AFIWC assessment of

18   NetRanger that you reference in your report?  Did

19   the law firm tell the Patent Office about that?

20                  MS. BROWN:  Objection, calls for   09:48:20

21   speculation.

22      A.    I do not know if the law firm provided

23   that paper to the Patent Office.

24      Q.    (BY MR. MILLER)  You think NetRanger,

25   SPOCK or AFIWC would be relevant to the          09:48:31

Page 99

1    wasn't confidential.  Is that correct?

2                    MS. BROWN:  Objection, calls for

3    speculation.

4        A.    I do not remember if I said it was

5    confidential at that time or not, you know, in which    10:19:55

6    case I remembered a DoD SPOCK report.  I do not

7    remember exactly when I provided, for example, the

8    press release concerning the DoD SPOCK report.  I

9    had to go through and find a copy of that.  I don't

10   remember the exact date that I obtained it from    10:20:15

11   Jerry Lathem.

12       Q.    (BY MR. MILLER)  All I'm trying to find

13   out from you, sir, is about when you told the

14   Symantec lawyers that you didn't believe the DoD

15   SPOCK report was --    10:20:31

16       A.    It was probably in the September time

17   frame.

18       Q.    I didn't get my whole question out, so I

19   need reask it, for the record.

20       A.    Okay.    10:20:37

21       Q.    So about when did you tell the Symantec

22   lawyers that you did not believe the DoD SPOCK

23   report was confidential?

24                    MS. BROWN:  Objection, calls for

25   speculation, asked and answered.    10:20:48

Page 100

1    A.    I do not remember exactly when I told

2    Symantec's lawyers that I thought that it was

3    confidential [sic].  It may have been in September

4    when I was discussing with it, and I have it on my

5    hours right here.  I don't remember the exact time.    10:21:01

6    Q.    (BY MR. MILLER)  Did you mean to say "not

7    confidential"?

8    A.    That makes it, yeah, not confidential,

9    yes.

10   Q.    Under "September 21," who's the former    10:21:13

11   NetSolve employee that you called?

12   A.    The former NetSolve employee was an

13   individual by the name of Bob Gallen.

14   Q.    G-O-W-E-N?

15   A.    G-A -- no, Gallen, G-A-L -- how does he    10:21:38

16   spell his last name?  G-A-L-L-E-N, I believe.

17   Q.    Thank you.

18         Did you do any work on this case and

19   not bill for your time?

20   A.    I would agree, yes, to that answer.    10:21:55

21   Q.    How many hours did you work on the case

22   and not bill?

23   A.    I do not know the exact number of hours I

24   did not bill.  Again, I wasn't really doing this for

25   the money.  I just wrote it down, what I remembered,    10:22:11

Page 101

1    because I figured they'd probably like an invoice

2    from me at some point.

3         Q.    Can't give me a ballpark?

4         A.    Could have been 10 hours.  Could have

5    been 20 hours.  I do not know.                    10:22:22

6         Q.    Did you do any activities that aren't

7    noted on your time sheet?

8                   MS. BROWN:  Objection, vague as to

9    "activities."  Calls for speculation.

10        A.    Yeah.  I mean, I don't remember doing   10:22:39

11    everything through here.  The only individuals that

12    I remember talking to were the ones that I had

13    listed in my expert report or people -- you know,

14    Bob Gallen at NetSolve, Todd Heberlein in April, I

15    know, in going through and preparing the expert     10:23:09

16    report, answering questions and so on.

17        Q.    (BY MR. MILLER)  Under "September 20,"

18    you have, "Canned database queries used in

19    NetRanger."  What does that mean?

20        A.    Those were SQL scripts that were provided  10:23:39

21    to customers with NetRanger that they could use

22    stand-alone or the customers could modify to query a

23    SQL database for generating and -- you know, lists

24    of events, trying to correlate, as the example that

25    I gave previously of looking that I have an attack   10:24:00

Page 102

1    coming from a single source address, if I could

2    write the SQL query such that if I want to find the

3    number one source address that's attacking my

4    network among all my multiple sensors.

5                    That way, we know SQL queries would    10:24:15

6    cover sequel queries based on space, which would be

7    IP addresses; time, when events occurred; and type.

8    You know, the types of alarms, i.e., all ping

9    sweeps, port sweeps, that sort of thing.

10       Q.    Okay.  So the query is a question to the    10:24:28

11   system?

12       A.    Yes.

13       Q.    Is that a fair characterization?

14       A.    A query is you are -- not so much a

15   question.  It is going through the information that    10:24:38

16   is in the system to produce a subset of data, and

17   that's sorted in a useful manner.

18       Q.    And then it generates a report?

19       A.    It depends upon what you define by

20   "report."  The output to SQL queries would be    10:24:56

21   outputted in -- could be in ASCII format.  You could

22   then put it into a file that you could put onto a

23   piece of paper that could be construed as a report.

24                    You could take the output from the

25   SQL queries and feed that into shell scripts, if you    10:25:11

Page 103

1    wanted to do further customization.  You could take

2    the output from the SQL queries and use that as

3    feedback doing -- you know, additional -- as

4    feedback, if you wanted to do additional queries.

5        Q.    Using the NetRanger system, what could a    10:25:23

6    user do with a SQL report?

7             MS. BROWN:  Objection, calls for

8    speculation, vague.

9        A.    They could do just about anything that

10   they wanted to.  The key thing, one of the things    10:25:37

11   that the customers liked about the NetRanger system

12   is that we would produce all of the events that were

13   generated by the NSX sensors and you could put them

14   into an Oracle database, whether you had it go

15   directly -- the system was so configurable, I could    10:25:56

16   put them into an Oracle database directly from the

17   NSX sensor, I could do it directly from a first-tier

18   Director, I could do it directly from a second-tier

19   Director.  It all depends upon how the customer

20   wanted to configure the system.                         10:26:11

21             Once you generated all of these

22   events, customers could then use them for historical

23   purposes.  They could use them to query for just

24   about anything that they wanted.  I mean, that's the

25   power of the system.  We generated events.  You        10:26:23

Page 104

1    know, we had timestamps of when an event occurred,

2    type of event --

3         Q.    (BY MR. MILLER)  We've gone down that

4    list.

5         A.    Okay.                                    10:26:29

6         Q.    A human operator would look at the

7    output.

8               MS. BROWN:  Objection, vague as to

9    "output," calls for speculation.

10        A.    You could have a human operator look at   10:26:39

11   the output.  It was not required.  It depends upon

12   how you ran the SQL queries.

13        Q.    (BY MR. MILLER)  Are you aware of any

14   deployment of NetRanger where a machine further

15   processed the output of a query to perform automatic  10:26:53

16   correlation?

17        A.    To the best of my recollection, I believe

18   that the IBM emergency response services and

19   NetSolve in their business models had automated SQL

20   queries running on the system to generate stuff.     10:27:19

21        Q.    They had the queries automated.  I'm

22   talking about processing, further processing of the

23   query to do correlation.  Are you aware of any

24   deployment where the queries were further processed

25   automatically by a computer to perform correlation?  10:27:38

1          MS. BROWN:  Objection, vague,

2     incomplete hypothetical, calls for speculation.

3          A.     From that, I am aware that IBM and

4     NetSolve had separate scripts that could run.  It is

5     the best of my recollection that they could take the      10:27:55

6     output from that and run it through scripts, which

7     could then be automated as to -- I do not have

8     copies of those scripts.  I do not have copies of

9     the SQL queries that they ran.

10               I am aware that they liked using the      10:28:13

11     NetRanger system because it's so configureable, they

12     could do things like that.

13          Q.    (BY MR. MILLER)  Did Mr. Gallen provide

14     you with any -- any information to support your

15     view?                                              10:28:27

16          A.     Mr. Gallen --

17               MS. BROWN:  I'll just caution the

18     witness, you need to wait until he finishes the

19     question.

20               THE WITNESS:  Okay.  I'm sorry.      10:28:33

21               MS. BROWN:  Just slow down there.

22     Can you reask the question, please?

23               MR. MILLER:  Sure.

24          Q.    (BY MR. MILLER)  Did Mr. Gallen tell you

25     that NetSolve utilized a system that would      10:28:41

Page 106

1    automatically take data provided in response to a

2    query and perform machine-driven correlation on that

3    data?

4         A.    I do not remember Mr. Gallen telling me

5    that when I talked to him in September.  Mr. Gallen    10:29:05

6    was not on -- a technical employee.  He was in

7    their -- -- I believe their sales or their biz-dev

8    department at NetSolve.  This is based upon my

9    recollection from over 10 years ago when NetSolve

10   was using the NetRanger product, so...              10:29:26

11        Q.    Based on your recollection from over 10

12   years ago when NetSolve was using the NetRanger

13   product, do you know of any specific example where

14   NetSolve took the output of a SQL query and had a

15   computer automatically process the data to perform    10:29:46

16   correlation?

17              MS. BROWN:  Objection, asked and

18   answered.

19        A.    I cannot remember a specific example.  I

20   remember people liked our system because they could   10:29:59

21   do that with it.

22        Q.    (BY MR. MILLER)  Can you remember a

23   specific example of the same data-processing done by

24   IBM?

25        A.    I cannot remember a specific example of    10:30:14

Page 169

1        Q.      Which part of NetRanger corresponds to

2    the claimed hierarchical monitor?

3        A.      That would be the NetRanger Director.

4        Q.      Can NSX sensor correspond to the

5    hierarchical monitor that's claimed?              12:42:04

6        A.      The NSX sensor does not relate to the

7    hierarchical monitors.

8        Q.      Does NSX sensor report directly to

9    HP OpenView?

10                MS. BROWN:  Objection, vague as to      12:42:32

11    "directly."

12        A.      NSX sensor is configured to send event

13    records, alarm records -- I use the terms

14    interchangeably -- to the NetRanger Director to a

15    piece of software that would take those messages and   12:42:51

16    on that Director platform, insert them into

17    HP OpenView.

18        Q.      (BY MR. MILLER)  So the answer to my

19    question is:  No, NSX sensor does not report

20    directly to HP OpenView, correct?                12:43:18

21                MS. BROWN:  Objection, misstates

22    testimony.  Also, vague.

23        A.      The NSX sensor is sending alarms to the

24    Director, which is then received by the system

25    management interface daemon, which puts them into   12:43:33

Page 170

1    HP OpenView.

2        Q.    (BY MR. MILLER)   Okay.   Can NSX sensor

3    send alarms to HP OpenView without going through

4    Director?

5        A.    The NSX sensor sends alarms through the      12:43:48

6    SMI daemon, okay?  It does not send it directly into

7    HP OpenView.   It sends them through that daemon into

8    HP OpenView.

9        Q.    Is the daemon in Director?

10       A.    The system management interface is on the    12:44:08

11   NetRanger Director.

12       Q.    So the answer to my question, can NSX

13   sensor send alarms to HP OpenView without going

14   through Director is no, right?

15       A.    I'm trying to understand your question       12:44:27

16   where you state, can it send it without going

17   through the Director.

18       Q.    Right.   If the daemon is part of Director

19   and it has -- the event record has to go through the

20   daemon to get to HP OverView, then the answer to my   12:44:40

21   question is no, correct?

22       A.    It has to go through the daemon, but it

23   depends upon what you are defining as a director.

24   If you are talking about the entire computer system

25   with the operating system, the daemon, HP OpenView,   12:44:54

Page 171

1    the answer is yes, it sends it directly there.  If

2    you are talking about the HP OpenView software

3    application by itself, then the answer is it does

4    not send it directly to that; it sends it to the

5    Director platform.  It all depends upon your          12:45:09

6    definition of what the Director is.

7        Q.    What, in your view, does "automatically"

8    mean in the context of the claim limitation

9    "automatically receiving and integrating reports of

10   suspicious activity by one or more hierarchical      12:45:31

11   monitors"?

12       A.    "Automatically" would mean without user

13   intervention.

14       Q.    How is "integrating" different from

15   "correlating," as claimed?                            12:45:49

16       A.    That is a very good question.  And, to be

17   honest, in times I have used the two terms,

18   "integrate" and "correlate," similarly in speaking

19   about NetRanger.

20       Q.    For purposes of your analysis of the        12:46:09

21   validity of the claims of the patents-in-suit, did

22   you use the terms "integrating" and "correlating"

23   interchangeably?

24            MS. BROWN:  Objection, vague.

25       A.    I do not remember if I did.  I will state   12:46:25

Page 172

1    that on this part here, you know, I have in my

2    report that the NetRanger Director received and

3    integrated alarms from a plurality of NSX sensors.

4        Q.    (BY MR. MILLER)  You're pointing to

5    something when you state "here."  What were you      12:46:44

6    pointing to?

7        A.    I'm pointing to, on page 12, we have

8    under the column "NetRanger (public use or sale),"

9    right there in that box, it says, "The NetRanger

10   Director received and integrated alarms from a       12:46:57

11   plurality of NSXs," so they're integrating them.

12       Q.    What do you mean by "integrate" in that

13   context?

14       A.    In that context, the NetRanger Director,

15   which would include the SMI daemon, HP OpenView, for 12:47:14

16   example, that the alarms would come, you know, from

17   the NSX sensor, through the SMI daemon, into

18   HP OpenView, where it would then create an internal

19   database record inside of HP OpenView that would

20   then be used internally by open view to generate an  12:47:36

21   icon on the screen.

22             If you had another event that was

23   similar to the first one and that similarity may

24   depend upon the different type of event, it may go

25   into the same data structure, it may create a new    12:47:53

```
 1    data structure for yet another icon, or it may just

 2    increment the count on the original icon.

 3         Q.    Which of those various actions do you

 4    believe constitutes integration, as claimed?

 5              MS. BROWN:  Objection, vague.        12:48:23

 6         Q.   (BY MR. MILLER)  I'm sorry.  I should

 7    have said "integrating, as claimed."

 8              MS. BROWN:  I'll also object that

 9    it's compound.

10         Q.   (BY MR. MILLER)  I'm going to repeat the  12:48:40

11    question so it's clean for the record.

12         A.    Okay.

13         Q.    Which of the various actions that you

14    defined a moment ago do you believe constitutes

15    integrating as "integrating" is used in the claims  12:48:49

16    of the patents-in-suit?

17         A.    I would state that it would be the

18    example of where the Director received two events

19    that would be displayed and -- stored in the same

20    data structure and displayed on the same icon on the  12:49:08

21    screen.

22         Q.    That icon that's displayed on the screen

23    that can represent more than one event is called an

24    alarm set icon?  Turn to page 15, top of the page.

25         A.    Yes.                                12:49:48
```

Page 174

1      Q.    It says right there, "By default, if two

2   or more alarms are received that are alike in all

3   respects except for timestamp and sequence number,

4   nrdirmap will represent these alarms with a single,"

5   quote, "'alarm set,'" unquote, "icon." Do you see      12:50:08

6   that?

7      A.    Yes, I do.

8      Q.    That's integration, in your opinion, as

9   claimed by the patents-in-suit?

10     A.    For -- yes, I use that definition for      12:50:16

11  these claims with the integration.  You're

12  displaying them to the user, so that is my

13  definition that I used.

14     Q.    Your answer was not completely clear.

15  This is -- this functionality, the one I just read,      12:50:38

16  do you believe that that is integration, as it is

17  claimed in the patents-in-suit?

18          MS. BROWN:  Objection, asked and

19  answered.

20     A.    I would answer yes, because "integration"      12:50:55

21  is a very broad term, and I believe that this would

22  be included under the term of "integration" as I

23  defined it for the claims in this suit.

24     Q.    (BY MR. MILLER)  Okay.  As you defined it

25  for the claims in this suit, what is the definition      12:51:14

Page 251

1    data set that would then be provided as an icon.

2    That was WheelGroup Soft Word that did that work.

3    It ran within -- inside of HP OpenView.

4                    HP OpenView has an extensible

5    interface for third -- you know, for other          14:59:29

6    applications to plug into.

7        Q.    Okay.  Do you understand what it means to

8    combine references for an obviousness analysis?

9                    MS. BROWN:  Objection, calls for a

10   legal conclusion.                                    14:59:39

11       A.    I do not know what you mean by "combining

12   references for obvious analysis."

13       Q.    (BY MR. MILLER)  Okay.  Your attorney's

14   objection makes a good point.  Do you plan to

15   provide any legal conclusions to the jury in this    15:00:27

16   matter?

17                    MS. BROWN:  Objection, the document

18   speaks for itself.  His opinions are expressed in

19   the document.

20                    MR. MILLER:  I'd like the witness to  15:00:41

21   speak for himself.

22       Q.    (BY MR. MILLER)  Do you plan to provide

23   any legal conclusions to the jury in this matter?

24                    MS. BROWN:  Objection, vague as to

25   the phrase "legal conclusions."                      15:00:48

Page 252

1      A.     Legal conclusions of what type?

2      Q.     (BY MR. MILLER)  Regarding the validity

3  of the claims of the patents-in-suit.

4      A.     I would state that the claims, as

5  mentioned in my expert report, are not valid based        15:01:07

6  upon the NetRanger system, and everything is

7  documented in the expert report.

8      Q.     And you don't know what an obviousness

9  analysis is?

10                MS. BROWN:  Objection, lacks              15:01:26

11  foundation.  The document speaks for itself.  I'll

12  just object further, the witness hasn't offered an

13  obviousness opinion with regards to HP OpenView, so

14  you're outside the bounds of the expert report,

15  Counsel.                                                 15:01:41

16                MR. MILLER:  You're coaching.  You

17  know it.

18      A.     As right here in the report -- and,

19  again, I am not a lawyer -- it states in the report,

20  "To establish obviousness under this test, one must     15:01:52

21  show clear and convincing evidence that a person of

22  ordinary skill in the art at the time of the

23  invention, confronted by the same problem as the

24  inventor and with no knowledge of the claimed

25  invention, would select the recited elements from       15:02:06

Page 253

1    the prior art and combine them in the claimed

2    manner."

3        Q.    (BY MR. MILLER)   Okay.  Are you doing

4    that with NetRanger and HP OpenView?  Are you

5    performing an obviousness analysis as to any claim    15:02:15

6    of the patents-in-suit by combining HP OpenView,

7    which you say is a third-party product, and

8    NetRanger?

9                 MS. BROWN:   Objection, the document

10   speaks for itself.                                     15:02:28

11       A.    I would point out in my expert report,

12   right here, "It would have been obvious to one of

13   ordinary skill to combine statistical profiling

14   methods for anomaly detection," and it's described,

15   "with NetRanger if a commercial grade was             15:02:56

16   available."  I don't see where I'm talking about

17   HP OpenView when I'm stating this here.

18       Q.    (BY MR. MILLER)   Okay.  So is the answer

19   to my question yes or no?

20                 MS. BROWN:   Objection, asked and        15:03:15

21   answered.

22       A.    I believe I already stated that for

23   HP OpenView...

24                 I do not fully understand what you

25   mean by "obviousness analysis of the claim in the     15:05:04

Page 254

```
 1    patents-in-suit by combining HP OpenView, which you

 2    say is a third-party product, and NetRanger."

 3        Q.    (BY MR. MILLER)  You just don't

 4    understand the question?

 5        A.    I'm trying to understand what you're        15:05:20

 6    trying --

 7        Q.    Do you know what "anticipation" is?

 8              MS. BROWN:  Objection, calls for a

 9    legal conclusion.

10        A.    I do not know what "anticipation" from a    15:05:31

11    legal term is.

12        Q.    (BY MR. MILLER)  How did you go about

13    determining whether or not the claims of the

14    patents-in-suit were invalid?

15        A.    I discussed each of the claims with my      15:05:48

16    legal counsel, going through, reading the claim,

17    trying to understand what each term meant, which

18    is -- they were very broad.  They could mean any

19    number of different things.

20              It was made aware to me at the time         15:06:07

21    that those terms -- that there was a joint

22    construction statement with a number of those terms

23    in it.  The definition of those terms was not, at

24    this time -- at the time we were doing it, you know,

25    fully specified as to which definition would be      15:06:21
```

Page 255

1    used.

2              So going through and looking at the

3    NetRanger system that I had, which looked awfully

4    similar, upon first cursory review of the patent,

5    it's like, this is my NetRanger system, with the          15:06:44

6    exception that, you know, they're talking about

7    statistical analysis, which NetRanger did not do.

8         Q.    Did you -- were you told that there's a

9    restriction or requirement that everything be taught

10   by one reference, all aspects of the claim be taught       15:07:04

11   by a single reference to do anticipation?

12              MS. BROWN:  Objection, lacks

13   foundation.

14        Q.    (BY MR. MILLER)  Were you told that?

15        A.    I do not remember being told that.              15:07:17

16        Q.    Did you apply that test for anticipation,

17   that all of the elements claimed by each claim

18   needed to be in one single reference?

19              MS. BROWN:  Objection, vague as to

20   "reference."  Are you speaking to a document or to          15:07:30

21   the product?

22              MR. MILLER:  Renee, you're coaching

23   the witness.  We all know what we're talking about.

24              MS. BROWN:  He does not know what

25   you mean by "reference," and I'm telling you the           15:07:42

Page 256

1    term is vague.

2              MR. MILLER:  You just -- and there

3    is a precise objection that you can state.

4              MS. BROWN:  The term "reference" is

5    vague --                                      15:07:43

6              MR. MILLER:  Thank you.  You've

7    stated your objection.

8              MS. BROWN:  -- and I'm asking you to

9    clarify it.

10      Q.    (BY MR. MILLER)  Sir, do you understand   15:07:48

11   the question or not?

12      A.    My understanding, when I looked at the

13   claims, there was the supporting documentation, you

14   know, in the patent.  You know, the claims are the

15   last piece on the end.  Look at that, I didn't just   15:08:16

16   look at the claims by themselves.

17              We had lengthy discussions over the

18   claims, some of the information -- you know, the

19   information that was in the patent.  We may have

20   discussed other references that were included and   15:08:34

21   referenced by the patents.  I don't remember which,

22   what those references are.

23      Q.    To determine whether any of the claims

24   were invalid, did you compare the claims to the

25   prior art?                                     15:08:55

SHARI MOSS & ASSOCIATES    (415) 402-0004

Page 257

1           MS. BROWN:  Objection, vague.

2      A.    I compared the claims primarily to the

3  NetRanger system.

4      Q.    (BY MR. MILLER)  When you say you

5  compared the claims to the NetRanger system, what,        15:09:13

6  precisely, did you compare the claims to?  I want to

7  know exactly what you mean by "NetRanger system."

8      A.    I compared the claims to all of my

9  knowledge, to NetRanger, being the original author,

10  architect, original coder of the NetRanger system,        15:09:43

11  being a founder of WheelGroup, going through the

12  user's manuals, refreshing my memory, going through

13  all the documentation that we've discussed here

14  today; and going through that, to me, it was

15  apparent there were the -- when I reached those        15:10:04

16  conclusions, that's why I said NetRanger was already

17  doing what I stated NetRanger was already doing.

18      Q.    Based on your knowledge of the product as

19  a coder of the product, correct?

20      A.    Correct, based upon my knowledge as the        15:10:22

21  inventor of the system, of the NetRanger system --

22      Q. .  Based on all of the documents taken

23  together?

24      A.    Based on all of the documents taken

25  together.                                                15:10:37

Page 258

1      Q.    Okay.

2      A.    You know, that also includes my memories

3   of customers using the system.

4      Q.    I see.  So undocumented memories of

5   customer applications of NetRanger, that was          15:10:58

6   included as well?

7              MS. BROWN:  Objection, calls for

8   speculation.

9      Q.    (BY MR. MILLER)  You included

10  undocumented recollections of NetRanger deployments   15:11:05

11  by NetRanger customers in your invalidity analysis?

12             MS. BROWN:  Objection, calls for

13  speculation.  The document speaks for itself, if

14  you'd care to point him to anything that you are

15  alleging is in the expert report.                     15:11:23

16     A.    For the undocumented memories that we

17  were discussing goes back to those SQL queries,

18  which we have already discussed.

19     Q.    (BY MR. MILLER)  Okay.  If you could turn

20  to Exhibit D of your report, and if you could turn    15:11:41

21  to page 74986 of Exhibit 464 as well.  My question,

22  sir, is this:  Is there a difference between

23  Figure 1.6 in Exhibit 464 and the first page of your

24  Exhibit D?

25             MS. BROWN:  Objection, the document       15:12:35

Page 259

1    speaks for itself.

2        A.    Are you asking me if this is the exact

3    same image both in the user's manual and on this

4    architecture?

5        Q.    (BY MR. MILLER)  Yeah.  Is there a          15:12:49

6    difference between the two?

7        A.    You know, the pictures look the same.

8        Q.    Okay.  Where is the next page of

9    Exhibit D to your report found in the 1.3.1 manual?

10            MS. BROWN:  Objection, lacks              15:13:13

11    foundation.

12        Q.    (BY MR. MILLER)  You wouldn't dispute my

13    representation that it is not in the manual, would

14    you?

15        A.    No, if you do not find it in the manual.   15:13:27

16        Q.    You state that one Director could report

17    up to a higher Director, higher-tier Director, at

18    page 38 of your report?

19        A.    Yes, that is true.

20        Q.    Is what's described here at the top of     15:13:49

21    74986, which refers to Figure 1.6 -- is it

22    incorrect?  It says, "In addition to providing

23    performance benefits and fault tolerance,

24    distribution hierarchies can simplify system

25    management.  For example, local Director machines    15:14:09

Page 280

1      Q.    (BY MR. MILLER)   Then you go on --

2                MS. BROWN:   Mr. Teal was in the

3     middle of a sentence, and he's entitled to finish

4     his sentence, if he wishes to.

5      Q.    (BY MR. MILLER)   Then you go on to say      15:49:50

6     that commercial-grade anomaly detection software did

7     not exist in 1997, right?

8      A.    I had not seen, or was aware of, any

9     commercial-grade software, based upon the

10    definition that is -- I had not seen any commercial   15:50:09

11    customers of ours using it.  To my knowledge, none

12    of our sales forces encountered any product using

13    statistical anomaly detection.

14               The only products in 1997 that we

15    encountered, to my recollection, is the ISS          15:50:22

16    RealSecure product.

17     Q.    I'm not trying to trick you, sir.  You

18    say it would be obvious to combine NetRanger with

19    statistical anomaly detection if commercial

20    statistical anomaly detection existed, right?        15:50:38

21     A.    That's what I'm stating.

22     Q.    And you say commercial-grade statistical

23    anomaly detection software didn't exist in 1997,

24    right?

25     A.    Yes, that's what I state.                      15:50:49

Page 281

1      Q.    So if commercial-grade statistical

2   anomaly detection software did not exist in 1997,

3   then the combination of statistical anomaly

4   detection software and NetRanger would not have been

5   obvious in 1997.  Is that a fair conclusion to draw?  15:51:04

6                  MS. BROWN:  Objection, lacks

7   foundation.

8      A.    I specifically said commercial-grade

9   software.

10     Q.    (BY MR. MILLER)  Yeah.                    15:51:17

11     A.    It's a different answer if you are

12  building a research system, mainly because, based

13  upon my experience, people building research

14  systems, the more engines, analysis engines and so

15  forth you had, the better Ph.D. thesis it would       15:51:32

16  appear, the better papers you could present.

17                  I was interested in building a

18  commercial-grade product and not a research-type

19  product.

20     Q.    That does not answer my question, so let   15:51:51

21  me try again.  You said it would be obvious to

22  combine NetRanger and statistical anomaly detection,

23  but only if a commercial-grade version of

24  statistical anomaly detection software existed,

25  right?                                             15:52:08

Page 282

1          MS. BROWN:  Objection --

2     Q.    (BY MR. MILLER)  That's what you say in

3  paragraph 60.

4     A.    Yes, that is what I state.  I state right

5  here that we would combine it if commercial-grade     15:52:15

6  software implementing such anomaly detection had

7  existed in 1997.

8     Q.    Okay.  Then you go down to paragraph 61

9  and you say commercial-grade statistical anomaly

10  detection software didn't exist, right, in 1997?     15:52:29

11     A.    Yes, I state right here in my report that

12  I do not believe that commercial-grade system for

13  statistical anomaly detection existed in 1997 that

14  was suitable for inclusion in NetRanger.

15     Q.    So isn't the condition that you establish  15:52:50

16  in paragraph 60 not satisfied; in essence, the

17  combination of NetRanger and statistical anomaly

18  detection would not be obvious?

19          MS. BROWN:  Objection, lacks

20  foundation.                                           15:53:06

21     A.    In there, I was referring to the

22  existence that NetRanger is a commercial-grade

23  system.  I did not -- in fact, I tried to use

24  another engine in the early development phases of

25  NetRanger.  It didn't work well.  It didn't meet     15:53:35

Page 283

1    what I needed for a commercial-grade product, so,

2    therefore, I did not use it.  I was -- if there had

3    been a commercial-grade statistical anomaly

4    detection system, I may have included it in

5    NetRanger in 1997.                           15:54:02

6        Q.    (BY MR. MILLER)  Okay.  But, sir, you're

7    not answering my question.  You set up a condition

8    for obviousness in paragraph 60.  Isn't that true?

9              MS. BROWN:  Objection, lacks

10   foundation.                                  15:54:16

11       Q.    (BY MR. MILLER)  You see what you say

12   there?

13       A.    Basically, I'm stating that if you're

14   building a commercial-grade system -- I mean --

15       Q.    You say, it would have been obvious to   15:54:37

16   one of ordinary skill at the time to combine a

17   statistical profiling method for anomaly detection

18   such as those described in statistical methods in

19   EMERALD 1997 with the NetRanger system, if, "if"

20   commercial-grade software implementing such an      15:55:00

21   anomaly detection system had existed in 1997.

22   That's what you say in your report.  Is that true or

23   not?

24       A.    That is correct.  That is what I state in

25   my report.                                   15:55:11

Page 284

1      Q.     You go on to say that that

2    commercial-grade software did not exist.  You say

3    that in paragraph 61, right?

4      A.     That is correct.

5      Q.     So, then, there's no way on earth that it   15:55:19

6    would be obvious to combine the two, based on what

7    you say in paragraph 60.

8             MS. BROWN:  Objection, lacks

9    foundation, misstates the expert report,

10   paragraph 61 in particular.                          15:55:34

11     Q.     (BY MR. MILLER)  Go ahead and explain it

12   to me, sir.

13     A.     In 61, I state, the first sentence, which

14   is, "However, the needs of a commercial system such

15   as NetRanger were very different than a research     15:55:45

16   system.  In particular, when performing real-time

17   network intrusion detection" --

18     Q.     You've got to go slower for her.

19     A.     Okay.

20            -- "it was of paramount importance          15:56:03

21   that the software analyzing the network traffic run

22   quickly in order to be able to keep up with the

23   incoming stream of network packets."

24     Q.     You can go faster.

25     A.     "WheelGroup actually investigated adding    15:56:22

Page 290

1    wanted it to.

2              THE VIDEOGRAPHER:  We've got five

3    minutes left on the tape.

4        Q.    (BY MR. MILLER)  Did you ever try to

5    improve upon Mr. Smaha's software?              16:05:46

6        A.    Do you define as improving his software

7    in particular, or writing my own signatures to do

8    what his did?

9        Q.    I thought that you had characterized his

10   software as anomaly detection.  Did you ever try to   16:06:07

11   write your own commercially viable and sound

12   statistical anomaly detection engine?

13       A.    I did not.  As I previously stated, I

14   found that I could detect all the signatures that I

15   needed with signature analysis.              16:06:26

16       Q.    Isn't the shortcoming of signature-based

17   analysis that a person intent on misuse can simply

18   design an attack that there is no signature for?

19              MS. BROWN:  Objection, calls for

20   speculation, incomplete hypothetical.           16:06:44

21       A.    That is correct.  If you have an attack

22   where there is no signature in the engine, just like

23   antivirus engines, that is one of the shortcomings

24   of a signature misuse engine.

25       Q.    (BY MR. MILLER)  And that's one of the   16:07:02

Page 291

1    alleged strengths of a statistical anomaly detection

2    engine, is that it can detect attacks that have

3    never been seen before.

4         A.     I would state that it might be able to

5    detect attacks that have never been seen before.          16:07:15

6    The fundamental problem that I had seen in using

7    statistical detection methods is, of course,

8    training, you establish profiles.  If the attacker

9    is already in the network, he becomes part of the

10   profile.  Trying to get your operators at your          16:07:37

11   commercial companies to be able to configure and

12   train the system properly for their environment had

13   a lot of shortcomings.  It was hard to do.

14        Q.    If it could be done, would it have -- if

15   an appropriate statistical anomaly detection engine    16:08:01

16   could have been created, would it have improved

17   NetRanger?

18             MS. BROWN:  Objection, calls for

19   speculation, incomplete hypothetical.

20        A.     If you could have built a commercially      16:08:19

21   reliable straight anomaly detection engine, it would

22   have improved NetRanger.  As I stated before, I do

23   not believe -- I was not aware of any such thing

24   that existed that could be included to NetRanger in

25   1997.                                                    16:08:42

Page 292

1        Q.    (BY MR. MILLER)  And you didn't attempt

2   to design and build your own statistical anomaly

3   detection engine that would meet all the

4   requirements that you've laid out that would be

5   commercially viable -- commercial-grade, I'm          16:08:54

6   sorry -- even though it would improve NetRanger?

7        A.    I did not take the time.  Again, as I

8   just previously stated, it is very hard to design a

9   commercial-grade statistical anomaly detection

10  engine that could be used, you know, by companies on  16:09:16

11  a regular basis.

12              THE VIDEOGRAPHER:  I need to change

13  tapes.  We're off the record at 4:09 p.m.  This is

14  the end of Tape No. 6.

15              (Recess taken at 4:09 p.m.)           16:09:33

16              THE VIDEOGRAPHER:  Stand by, please.

17  We're back on the record at 4:11 p.m.  This is the

18  beginning of Tape No. 7.

19       Q.    (BY MR. MILLER)  Mr. Teal, what test did

20  you apply in determining or in reaching your          16:11:24

21  conclusion that it would be obvious to combine the

22  teachings of Statistical Methods and EMERALD '97

23  with NetRanger to render obvious the claims of the

24  '212 patent?

25       A.    I would refer you to my report,          16:11:56

Page 293

1  paragraph 56, where I state, "I understand that one

2  must show by clear and convincing evidence that a

3  person of ordinary skill in the art at the time of

4  invention, confronted by the same problem as the

5  inventor and with no knowledge of the claimed        16:12:24

6  invention, would select the recited elements from

7  the prior art and combine them in the claimed

8  manner."

9      Q.    What is your suggestion for a motivation

10 to combine those references?                          16:12:44

11     A.    You know, I state, "In other words, one

12 must avoid the use of hindsight and instead identify

13 in the art prior to the invention some suggestion or

14 motivation, before the invention itself was made, to

15 make the new combination," and I'll refer you to      16:13:24

16 paragraph 61 where, while designing NetRanger I

17 attempted to put in another engine, and it didn't

18 work.  And, at that time, I was not aware of these

19 patents.

20             I was aware of prior art regarding        16:13:47

21 different statistical anomaly detection engines,

22 signature analysis engines, and that is why, when I

23 was designing NetRanger, where I attempted to

24 combine the two engines in one product.

25     Q.    Where is the suggestion or motivation to    16:14:09

Page 294

1    combine NetRanger with EMERALD or statistical

2    analysis, the NIDES paper, in any document relating

3    to NetRanger?

4                    MS. BROWN:   Objection, calls for a

5    legal conclusion.                                    16:14:26

6        A.    On there, I chose NetStalker from

7    Haystack Labs for my initial attempt to combine

8    them.   It was an engine.   We knew Steve Smaha.   As I

9    previously stated, I did not know the individuals at

10   SRI very well.   Maybe if I had known them, I might    16:14:50

11   have contacted them.   I do not know.

12       Q.    (BY MR. MILLER)  My question was:   Where

13   is the suggestion or motivation to combine NetRanger

14   with the EMERALD 1997 paper or the NIDES paper

15   provided in any of the NetRanger documentation?      16:15:09

16       A.    I am implying that since I attempted to

17   include one engine, it could just as well have been

18   the EMERALD or the NIDES engine that I had tried to

19   produce.

20       Q.    But I'm asking you where in any of the     16:15:28

21   NetRanger papers it provides any suggestion or

22   motivation to combine NetRanger with the SRI

23   statistical engine.

24                    MS. BROWN:   Objection, if you'd like

25   to point him to some place in his expert report      16:15:42

Page 295

1   where you're claiming he stated this, it's outside

2   the scope of his expert report.  It's not in here.

3        Q.   (BY MR. MILLER)  I'll point you to the

4   paragraph that you read to me, paragraph 56.  "In

5   other words, one must avoid the use of hindsight and   16:15:59

6   instead identify in the art prior to the invention

7   some suggestion or motivation, before the invention

8   itself was made, to make the new combination."

9             MS. BROWN:  That statement --

10       Q.   (BY MR. MILLER)  So please provide me       16:16:15

11  with the suggestion or motivation found in NetRanger

12  to combine it with the SRI work.

13            MS. BROWN:  Counsel, as you've just

14  pointed out, paragraph 56 doesn't refer to

15  NetRanger.  It refers to the prior art.             16:16:28

16            MR. MILLER:  Your objection is

17  noted.  Okay.  Your objection is noted.

18       A.   You know, in there, I am not stating with

19  regards to NetRanger in paragraph 56.  I state in

20  paragraph 61 that I attempted to integrate the      16:16:50

21  statistical analysis engine in NetRanger --

22       Q.   (BY MR. MILLER)  So --

23       A.   -- and did not do so.

24       Q.   I'm sorry.

25            Other than your purported attempt to   16:17:02