**EXHIBIT 23**

**DEFENDANTS' PROPOSED JURY INSTRUCTIONS**

**TABLE OF CONTENTS**

Defendants' Proposed Preliminary Instructions

Defendants' Proposed General Instructions, Nos. 1.0 – 1.15

Defendants' Proposed Instructions on Infringement, Nos. 2.0 – 2.7

Defendants' Proposed Instructions on Validity, Nos. 3.0 – 3.11

Defendants' Proposed Instructions on Deliberation and Verdict, Nos. 4.0 – 4.3

## PRELIMINARY JURY INSTRUCTIONS

Members of the jury:

Now that you have been sworn, I have the following preliminary instructions for guidance on your role as jurors in this case.

The Parties

SRI is the owner of four United States Patents. U.S. Patent number 6,321,338, which I will refer to as "the '338 patent"; U.S. Patent number 6,484,203, which I will refer to as "the '203 patent"; and U.S. Patent number 6,711,615, which I will refer to as the "the '615 patent"; and U.S. Patent number 6,708,212, which I will refer to as "the '212 patent." The lawyers and witnesses may refer to the patents by their last three numbers. The '212 patent is no longer in suit, but may be referred to by the lawyers and witnesses.

The '338 patent, the '203 patent, and the '615 patent may be referred to as the "patents-in-suit against ISS." SRI contends that ISS makes, uses, sells or offers to sell products that infringe the '203, '615, and '338 patents, or induces its customers to use those products.

SRI contends that Symantec makes, uses, sells or offers to sell products that infringe the '203 and '615 patents, or induces its customers to use those products. I have already determined that Symantec does not infringe the '338 patent. The '203 patent and the '615 patent may be referred to as the "patents-in-suit against Symantec."

Defendants, Symantec and ISS, deny that they infringe the patents-in-suit and allege that the patents-in-suit are invalid.

You will be given notebooks that have a copy of these instructions and have paper for you to take notes if you choose to during the trial.

Burden of Proof

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In a patent case such as this, there are two different burdens of proof that are used. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence."[1]

SRI must prove its claims of patent infringement by a preponderance of the evidence. When a party has the burden of proof by a preponderance of the evidence, it means that you must be persuaded that what the party seeks to prove is more probably true than not true.

Defendants' claim that the patents-in-suit are invalid requires a second burden of proof standard called the clear and convincing standard, which is higher than the first standard. When a party has the burden of proof by clear and convincing evidence, it means that the evidence must produce in your mind a firm belief and conviction that it is highly probable that the matter sought to be established is true.

You may have heard of a burden of proof that is used in criminal cases called "beyond a reasonable doubt." That requirement is the highest burden of proof. It does not apply to a patent case such as this one, and you should, therefore, put it out of your mind.

I will give you detailed instructions on the law at the end of the case.

Duty of Jury

It will be your duty to find what the facts are from the evidence as presented at the trial. You, and you alone, are the judges of the facts. You will have to apply those facts to the law as I

---

[1] Defendants' contest the application of the clear and convincing standard in this case. As discussed in Proposed Pretrial Order Exhibit 6, Defendants request that the jury be instructed that the burden of proof has either been reduced or has been already met to some extent, because of the lack of deference owed the PTO's grant of the patents in light of their subsequent rejection during reexamination.

will instruct you at the close of the evidence. You must follow that law whether you agree with it or not.

You are the judges of the facts. I will decide which rules of law apply to this case.

Nothing I say or do during the course of the trial is intended to indicate what your verdict should be.

<u>Evidence</u>

The evidence from which you will find the facts will consist of the testimony of witnesses, and documents and other things admitted into evidence. In addition, the evidence may include certain facts as agreed to by the parties or as I instruct you.

Certain things are not evidence.

1.      Statements, arguments, and questions by lawyers are not evidence. Objections to questions are not evidence. Lawyers have an obligation to their clients to make an objection when they believe testimony or exhibits being offered into evidence are not admissible under the rules of evidence. You should not be influenced by a lawyer's objection or by my ruling on the objection. If I sustain or uphold the objection, and find the matter is not admissible, you should ignore the question or other item of evidence. If I overrule an objection and allow the matter in evidence, you should treat the testimony or item of evidence as you would any evidence. If I instruct you during the trial that some item of evidence is admitted for a limited purpose, you must follow that instruction and consider that evidence for that purpose only. I will instruct you further during the trial if this happens.

2.      Anything you see or hear outside the Courtroom is not evidence and must be disregarded. You are to decide this case solely on the evidence presented here in the courtroom.

In judging the facts, it will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject.

<u>Conduct of the Jury</u>

Although you are not to talk about the case with anyone else, you are permitted to talk to each other, when everyone is in the jury room, about the technology at issue in this case. You may write questions down and give them to _____, my courtroom deputy. The courtroom deputy will give the questions to me and I will pass them along to the attorneys, who may or may not try to incorporate your questions into their examinations.

Even though you may talk to each other about the technology, you should not reach any conclusions as to the issues presented until all the evidence is in and you have been given your final instructions.

Finally, you must only consider the evidence presented in the courtroom. Do not read or listen to anything touching on this case that is not admitted into evidence. By that I mean, if there may be a newspaper article or radio or television report relating to this case, do not read the article or watch or listen to the report. In addition, do not try to do any independent research or investigation on your own on matters relating to the case.

The proceedings during trial will be transcribed by court reporters; however, it is not the practice of this Court to make the trial transcripts available to jurors. You must rely on your own recollection of what testimony was presented and how credible that testimony was.

If you wish, you may take notes in the binders we have provided. The binders will be collected each time you leave the courtroom. Keep in mind that your notes are for your own personal use—they are not to be given or read by anyone else.

Finally, please wear your juror identification tags everyday, so that the parties can avoid engaging you in conversation, thereby bringing your impartiality into question.

<u>Course of the Trial</u>

The trial will now begin. The attorneys have three opportunities to talk to you during the trial. The first opportunity is the opening statement. During the opening statements, the attorneys will introduce their respective stories to you. As I've already instructed, however, what the lawyers say is not evidence. It is up to you to determine whether the evidence — the testimony of the witnesses and the admitted documents — supports what the lawyers say in their opening statements. The second opportunity that the lawyers have to talk to you is during transition statements. Lawyers are permitted to make transition statements whenever they call a witness to the stand, to introduce the witness and to briefly explain the relevance of the witness's anticipated testimony. Finally, after all the evidence is in, the lawyers will offer closing arguments to summarize and interpret the evidence for you, and to tie the evidence to their story. I will then give you instructions on the law and describe for you the matters you must resolve.

You will then retire to the jury room to deliberate on your verdict.

You should generally expect that we will start the trial each morning at _____ and finish at _____, with _____ breaks, and one _____ lunch break. I time my civil trials, meaning each party is given a certain number of hours in which to present its evidence. This assures that trials will be completed on a predictable basis. This system can only work, however, if you, as jurors, report to the courtroom on a punctual basis as well.

## CHARGE TO THE JURY

## GENERAL INSTRUCTIONS

## 1.0 INTRODUCTION

**See joint set of proposed instructions, "1.1 INTRODUCTION."**

## 1.1 JURORS' DUTIES

**See joint set of proposed instructions, "1.2 JURORS' DUTIES."**

**DEFENDANTS' PROPOSED INSTRUCTION NO. 1.2**

## 1.2 BURDENS OF PROOF

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In a patent case such as this, there are two different burdens of proof that are used. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence."

SRI must prove its claims of patent infringement by a preponderance of the evidence. When a party has the burden of proof by a preponderance of the evidence, it means that you must be persuaded that what the party seeks to prove is more probably true than not true.

Defendants' claim that the patents-in-suit are invalid requires a second burden of proof standard called the clear and convincing standard,[2] which is higher than the first standard. When a party has the burden of proof by clear and convincing evidence, it means that the evidence must produce in your mind a firm belief and conviction that it is highly probable that the matter sought to be established is true.

You may have heard of a burden of proof that is used in criminal cases called "beyond a reasonable doubt." That requirement is the highest burden of proof. It does not apply to a patent case such as this one, and you should, therefore, put it out of your mind.

I will now give you some background about the nature of this case and the issues you will be deciding. For each issue, I will instruct you as to the burden of proof that will apply.

---

[2] Defendants' contest the application of the clear and convincing standard in this case. As discussed in Proposed Pretrial Order Exhibit 6, Defendants request that the jury be instructed that the burden of

**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 7.1.

---

proof has either been reduced or has been already met to some extent, because of the lack of deference owed the PTO's grant of the patents in light of their subsequent rejection during reexamination.

## 1.3 EVIDENCE DEFINED

**See joint set of proposed instructions, "1.4 EVIDENCE DEFINED."**

**DEFENDANTS' PROPOSED INSTRUCTION NO. 1.4**

**<u>1.4 DEMONSTRATIVES</u>**

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room for your deliberations. The remainder of the exhibits (including charts, exemplars and animations) were offered to help illustrate the testimony of the various witnesses. These illustrative exhibits, called demonstratives, have not been admitted, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard and the documents that were admitted into evidence when you saw the demonstratives that is the evidence in the case.

**AUTHORITIES**

*ACS v. Medtronic*, C.A. No. 98-80 (SLR) (Charge to the Jury, February 17, 2005, "Demonstrative Exhibits").

## 1.5 CONSIDERATION OF EVIDENCE

**See joint set of proposed instructions.**

## <u>1.6 DIRECT AND CIRCUMSTANTIAL EVIDENCE</u>

**See joint set of proposed instructions.**

## 1.7 CREDIBILITY OF WITNESSES

**See joint set of proposed instructions.**

## 1.8 NUMBER OF WITNESSES

**See joint set of proposed instructions.**

## 1.9 EXPERT OF WITNESSES

**See joint set of proposed instructions.**

## 1.10 DEPOSITION OF WITNESSES

**See joint set of proposed instructions.**

**DEFENDANTS' PROPOSED INSTRUCTION NO. 1.11**

**1.11 THE PARTIES**

Plaintiff is SRI International, Inc., which I have referred to as "SRI."  SRI is a California corporation with its primary offices in Menlo Park, California.

SRI claims to be the owner of U.S. Patent No. 6,321,338, which I will refer to as "the '338 patent," U.S. Patent No. 6,484,203, which I will refer to as "the '203 patent," and U.S. Patent No. 6,711,615, which I will refer to as "the '615 patent."

One Defendant is Symantec Corporation, a Delaware Corporation (referred to as "Symantec").  Symantec is a company that is engaged in the development and/or sale of network security products.

The second Defendant is Internet Security Systems, Inc., a Delaware Corporation, and Internet Security Systems, Inc., a Georgia corporation (collectively, referred to as "ISS"). ISS is engaged in the development and/or sale of network security products.

Both Symantec and ISS are entitled to a trial on the merits.

**AUTHORITIES**

Delaware Jury Instruction 2.1 (adapted to fit this case); *Syngenta Seeds, Inc. v. Monsanto Co.*, C.A. No. 02-1331-SLR (Charge to the Jury, December 10, 2004, "The Parties") (adapted to fit this case).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 1.12**

**<u>1.12 CLAIMS IN GENERAL</u>**

As I told you at the beginning of the trial, the claims of a patent are the numbered sentences at the end of the patent. The claims describe the invention made by the inventor and describe what the patent owner owns and what the patent owner may prevent others from doing. Claims may describe products, such as machines or chemical compounds, or processes for making or using a product.

Claims are usually divided into parts or steps, called "limitations." For example, a claim that covers the invention of a table may recite the tabletop, four legs and the glue that secures the legs to the tabletop. The tabletop, legs and glue are each a separate limitation of the claim.

There are two types of claims at issue in this case -- system claims and method claims. A system claim recites a system having certain claimed limitations. A method claim recites a series of steps that must be performed.

**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 7 (adapted to fit this case).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 1.13**

## 1.13 DEPENDENT AND INDEPENDENT CLAIMS

There are two different types of claims in a patent. The first type is called an "independent" claim. An independent claim does not refer to any other claim of the patent. An independent claim is read alone to determine its scope.

The second type, a "dependent" claim, refers to at least one other claim in the patent and, thus, incorporates whatever that other claim says. Accordingly, to determine what a dependent claim covers, you must read both the dependent claim and the claim or claims to which it refers.

For example, claim 1 of the '203 patent is an independent claim. You know this because claim 1 does not refer to any other claims. Accordingly, the words of this claim are read by themselves in order to determine what the claim covers.

On the other hand, claim 2 is a dependent claim. If you look at claim 2, it refers to claim 1. Therefore, to determine what claim 2 covers, you must consider both the words of claims 1 and 2 together.

**AUTHORITIES**

Delaware Jury Instruction 3.3 (adapted to fit this case); *IMX v. LendingTree* ("Dependent and Independent Claims") (adapted to fit this case).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 1.14**

**1.14 OPEN ENDED OR "COMPRISING" CLAIMS**

Several claims of the patents-in-suit use the transitional term "comprising." "Comprising" is interpreted the same as "including" or "containing." In patent claims, comprising means that the claims are open ended. This means that the claim is not limited to products that include only what is in the claim and nothing else.

If you find that the accused products include all of the limitations in any of the asserted claims that use the term "comprising," the fact that they may also include additional elements or components is irrelevant. The presence of additional elements or components does not mean that the method or product does not infringe a patent claim.

Similarly, if you find that the prior art includes all of the limitations in any of the asserted claims that use the word "comprising," the fact that it may also include additional elements is irrelevant.

**AUTHORITIES**

Delaware Jury Instruction 3.11 (adapted to fit this case); *Syngenta Seeds v. Monsanto* ("Open Ended or 'Comprising' Claims") (adapted to fit this case).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 1.15**

## 1.15 CLAIM CONSTRUCTION

In deciding whether or not the claims of the patents-in-suit are infringed or invalid, the first step is to understand the meaning of the words used in the patent claims.

It is my job as Judge to determine what the patent claims mean and to instruct you about that meaning.  You must accept the meanings I give you and use them when you decide whether or not the patents are infringed, and whether or not the patents are invalid.  The claims of the patents must be interpreted the same way for the purposes of determining infringement and invalidity.

You must ignore any different interpretation given to these terms by the witnesses or attorneys.

If I have not provided a specific definition for a given term, you are to use the ordinary meaning of that term.  I instruct you that the following claim terms have the following definitions:

1.    **"Network"**: A collection of software and/or hardware interconnected by communication links for sharing information.

2.    **"Packet"**: A group of data bytes which represents a specific information unit with a known beginning and end.

3.    **"Event"**:  An action or occurrence detected by software.

4.    **"Network monitors"**: Software and/or hardware that can collect, analyze and/or respond to data.

5.    **"Deploying a plurality of network monitors"**:  Configuring and/or installing two or more network monitors.  Consistent with the above construction of "Network monitor," software is configured and hardware is installed.

6.    **"Hierarchical event monitoring [and analysis]"**:  Network monitors, arranged in two or more levels, interoperate in order to analyze and respond to network activity.

7.    **"Hierarchical monitor/hierarchically higher network monitor"**:  A network monitor that receives data from at least one network monitor that is at a lower level in the analysis hierarchy.

8.    **"Service monitor"**:  A network monitor that provides local real-time analysis of network packets transmitted by a network entity, such as a gateway, router, firewall or proxy server.

9.    **"Domain monitor"**:  A network monitor that receives and analyzes data from service monitors.

10.    **"Enterprise monitor"**:  A network monitor that receives and analyzes data from domain monitors.

11.    **"Peer-to-peer relationship"**:  A relationship between two or more network monitors at the same level in an analysis hierarchy which allows the monitors to share data.

12.    **"Automatically receiving and integrating reports of suspicious activity"**:  Without user intervention, receiving reports of suspicious activity and combining those reports into a different end product; i.e., something more than simply collecting and reiterating data.

13.    **"Correlating/correlates"**:  Combining the reports to reflect underlying commonalities.

14.    **"Responding . . . /invoking countermeasures"**:  Taking an action in response, including both passive and active responses.

15.    **"Building at least one long-term and at least one short-term statistical profile from at least one measure of the network packets"**:  Generating at least two separate data structures, one a statistical description representative of historical network activity, and one a statistical description of recent network activity, where the statistical descriptions are based on at least one measure of the network packets and are generated through the use of statistical analysis; i.e., something more than simply collecting and retrieving data.

The specification incorporates by reference a specific statistical analysis technique disclosed in "A. Valdes and D. Anderson, 'Statistical Methods for Computer Usage Anomaly Detection Using NIDES', Proceedings of the Third International Workshop on Rough Sets and Soft Computing, January 1995." ('338 patent, col. 5, 11. 41-49) Although the court acknowledges that the specification also indicates that the "profile engine can use a wide range of multivariate statistical measures to profile network activity indicated by an event stream" ('338 patent, col. 5, 11. 37-39), nevertheless, the court concludes that the specification and referenced article require that some manipulation of the data take place; i.e., generating a "statistical" profile means more than collecting and retrieving data.

16.    **"Determining whether the difference between the short-term statistical profile and the long-term statistical profile indicates suspicious network activity"**:  Using the result of the comparison to decide whether the monitored activity is suspicious.

17.    **"A statistical detection method"**:  A method of detecting suspicious network activity by applying one or more statistical functions in the analysis of network traffic data.  This method is not a signature matching detection method.

18.    **"A signature matching detection method"**:  A method of detecting suspicious network activity by comparing observed network traffic data to known patterns.

19.    **"A virtual private network"**:  A network that uses encryption to securely transmit network packets via a public network.

20.    **"Firewall"**: An interface between two networks that enforces a security policy.

21.    **"Proxy server"**: A server that mediates communication between a client application, such as a Web browser, and a real server. It handles requests to the real server to see if it can fulfill the requests itself; if not, it forwards the requests to the real server. The proxy server can serve as a firewall component.

22.    **"API"**:  The interface between the application software and the application platform, across which all services are provided.

## AUTHORITIES

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 7.1; *IMX v. LendingTree* ("Claim Construction") (adapted to fit this case); *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 384-391 (1996); *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1267 (Fed. Cir. 2001); *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed. Cir. 2001); *SciMed Life Systems, Inc. v. Advanced Cardiovascular Sys.,* 242 F.3d 1337, 1341 (Fed. Cir. 2001); *AFG Indus., Inc. v. Cardinal IG Co.,* 239 F.3d 1239, 1244-45 (Fed. Cir. 2001); *Hill-Rom Co. v. Kinetic Concepts, Inc.,* 209 F.3d 1337, 1340-41 (Fed. Cir. 2000); *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1304-06 (Fed. Cir. 1999); *Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 988-90 (Fed. Cir. 1999); *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1455-56 (Fed. Cir. 1998); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1581-84 (Fed. Cir. 1996); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc); *Rival Co. v. Sunbeam Corp.,* 987 F. Supp. 1167, 1171 (W.D. Miss. 1997) aff'd without op., 185 F.3d 885 (Fed. Cir. 1999); *Minuteman Int'l, Inc. v. Critical-Vac Filtration Corp.,* No. 95C 7255, 1997 WL 187326, at *2 (N.D. Ill. April 11, 1997).

## INFRINGEMENT BY DEFENDANTS

**DEFENDANTS' PROPOSED INSTRUCTION NO. 2.0**

## 2.0 PLAINTIFF'S CONTENTIONS—DIRECT INFRINGEMENT

**Symantec proposes the following:**

In this case, SRI alleges two groups of Symantec products directly infringe.

The first group consists of the "ManHunt Products" (which are specifically, ManHunt 3.0, Symantec Network Security 4.0, Symantec Network Security 7100 Series, and iForce IDS). SRI alleges that Symantec's manufacture, use, sale, or offer to sell the ManHunt Products directly infringes claims 1, 2, 4, 6, 12, 13, 15 and 17 of the '203 patent and claims 1, 2, 4, 13, 14 and 16 of the '615 patent.

The second group comprises a combination of the Symantec Gateway Security Products, or "SGS Products" (which are specifically, SGS 5400, 5600, and 1600 Series) combined with the "Manager Products" (specifically, Incident Manager 3.0 and the Security Information Manager 9500 Series). Regarding the combinations, SRI alleges that Symantec's manufacture, use, sale, or offer to sell a SGS Product in combination a Manger Product directly infringes one or more of the following: claims 1, 2, 4, 6, 12, 13, 15 and 17 of the '203 patent and claims 1, 2, 4, 13, 14 and 16 of the '615 patent. Remember that only the claims of a patent can be infringed. You must compare the above claims of the '615 and '203 patents, as I have defined them, to the accused products, and determine whether or not there is infringement. You should not compare Symantec's products with any specific example set out in the patents-in-suit, or with SRI's product or process. The only correct comparison is with the language of the claim itself, as I have explained its meaning to you.

SRI has the burden of proving, by the preponderance of the evidence standard, that Symantec has infringed at least one of the asserted claims either literally or under the doctrine of equivalents.

**ISS proposes the following:**

In this case, SRI contends that ISS has infringed claims 1, 2, 4, 6, 12, 13, 15, and 17 of the '203 patent, and claims 1, 2, 4, 13, 14, and 16 of the '615 patent by making, using, selling, or offering for sale the SiteProtector SecurityFusion Module 2.0 product (including later versions) in combination with certain ISS sensors. With respect to the '203 and '615 patents, the accused ISS sensors are certain RealSecure agents (Network, Guard, Server and Desktop series) and certain Proventia agents (A, G, M, Server and Desktop series) (collectively referred to as the "ISS Sensors").

SRI also contends that ISS has infringed claims 1, 4, 5, 11, 12, 13, and 24 of the '338 patent by making, using, selling, or offering for sale the Proventia Network Anomaly Detection System (or "Proventia ADS") product operating in standalone mode.

Remember that only the claims of a patent can be infringed. You must compare the asserted patent claims of the '615, '203, and '338 patents, as I have defined them, to the accused products, and determine whether or not there is infringement. You should not compare ISS's products with any specific example set out in the patents-in-suit, or with SRI's product or process. The only correct comparison is with the language of the claim itself, as I have explained its meaning to you.

SRI has the burden of proving, by the preponderance of the evidence standard, that ISS has infringed at least one of the asserted claims either literally or under the doctrine of equivalents.

**AUTHORITIES**

35 U.S.C. §§ 271-281 (1984 & Supp. 2001); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293 (Fed. Cir. 2005); *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 36 (1997); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 644 (1999); *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1330 (Fed. Cir. 2001); *Payless Shoesource, Inc. v. Reebok Int'l Ltd.,* 998 F.2d 985, 990 (Fed. Cir. 1993); *Atl. Thermoplastics Co. v. Faytex Corp.*, 974 F.2d 1299, 1300 (Fed. Cir. 1992); *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991); *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867 (Fed. Cir. 1985).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 2.1**

## 2.1 PATENT INFRINGEMENT GENERALLY—DIRECT INFRINGEMENT

A patent owner has the right to stop others from using the invention covered by its patent claims during the life of the patent.  If any person makes, uses, sells or offers to sell what is covered by the patent claims without the patent owner's permission, that person is said to infringe the patent.  This type of infringement is called "direct infringement."  In addition to enforcing a patent against a direct infringer, a patent owner also has the right to enforce the patent against those who are known as "indirect infringers."

You must consider each claim individually and must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by the parties. I will first discuss direct infringement.

Whether or not Symantec or ISS knew that what it was doing was an infringement does not matter.  A person may be found to be a direct infringer of a patent even if he or she believes in good faith that what he or she is doing is not an infringement of any patent, and even if he or she does not even know of the patent.

**Symantec proposes the following language specific to Symantec:**

To prove direct infringement based on Symantec's Manager Products operating in combination with Symantec's SGS Products, SRI must establish that Symantec itself has deployed these separate products together to form the claimed system or to perform the claimed method.  Merely selling two separate, non-infringing products to a customer who might combine these products to form an allegedly infringing system is not an act of direct infringement.

SRI has the burden of proving, by the preponderance of the evidence standard, that Symantec has infringed at least one of the asserted claims either literally or under the doctrine of equivalents.

### ISS proposes the following language specific to ISS:

To prove direct infringement based on ISS's SiteProtector SecurityFusion Module 2.0 product operating in combination with the ISS Sensors, SRI must establish that ISS itself has deployed these separate products together to form the claimed system or to perform the claimed method.  Merely selling two separate, non-infringing products to a customer who might combine these products to form an allegedly infringing system is not an act of direct infringement.

SRI has the burden of proving, by the preponderance of the evidence standard, that ISS has infringed at least one of the asserted claims either literally or under the doctrine of equivalents.

**AUTHORITIES**

35 U.S.C. §§ 271-281 (1984 & Supp. 2001); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293 (Fed. Cir. 2005); *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 36 (1997); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 644 (1999); *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1330 (Fed. Cir. 2001); *Payless Shoesource, Inc. v. Reebok Int'l Ltd.,* 998 F.2d 985, 990 (Fed. Cir. 1993); *Atl. Thermoplastics Co. v. Faytex Corp.*, 974 F.2d 1299, 1300 (Fed. Cir. 1992); *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991); *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867 (Fed. Cir. 1985).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 2.2**

<u>**2.2 LITERAL INFRINGEMENT**</u>

There are two ways in which a patent claim may be directly infringed.  First, a claim may be literally infringed.  Second, a claim may be infringed under what is called the "doctrine of equivalents," which I will address shortly.

For an accused product or method to literally infringe an asserted claim, the subject matter of the claim must be found in the accused product or method.  In other words, an asserted claim is literally infringed if the accused product or method includes each and every limitation in the patent claim.  Literal infringement must be determined with respect to each asserted claim individually by comparing the accused product or method to each of the asserted claims.  If the accused product or method omits any single limitation recited in a given claim, that product or method does not literally infringe that claim.  You must determine literal infringement with respect to each asserted claim and each accused product or method individually.

<u>**Symantec proposes the following language specific to Symantec:**</u>

In determining whether any Symantec ManHunt Product, or a Symantec Manager Product operating in combination with a SGS Product literally infringes any asserted claim, you should take the following steps:

First, you should determine the scope of the asserted claim by reading the claim language, limitation by limitation, as those limitations have been construed by the court or, if they have not been specifically construed, according to their ordinary meaning; and

Second, you should compare the accused product or system, element by element, to each of the limitations of the asserted claim.

If you find each and every limitation of the asserted claim in the accused product or system, you must return a verdict of literal infringement as to that claim.

If you did not find each and every limitation of the asserted claim in the accused product or system, you may not return a verdict of literal infringement as to that claim.

You must repeat the above analysis with every asserted claim.

Remember the question is whether the accused product or system infringes any of the asserted claims, and not whether the accused product or system is similar or even identical to an SRI product or method. Accordingly, you must be certain to compare the accused product or system with the claims it is alleged to infringe and not with any product or method of SRI.

Finally, to hold Symantec liable for infringement on the method claims, SRI must prove actual use of the infringing method by someone. A method claim is not infringed by the sale of a device that is merely capable of being used in an infringing manner. Actual use of each of the claimed steps must be shown. This same rule applies to indirect infringement, which I will tell you about a little later.

**ISS proposes the following  language specific to ISS:**

In determining whether ISS's SiteProtector SecurityFusion Module 2.0 product operating in combination with the ISS Sensors or ISS's Proventia ADS product (operating in standalone mode) literally infringe any asserted product or system claim, you should take the following steps:

First, you should determine the scope of the asserted claim by reading the claim language, limitation by limitation, as those limitations have been construed by the court or, if they have not been specifically construed, according to their ordinary meaning; and

Second, you should compare the accused product or system, element by element, to each of the limitations of the asserted claim.

If you find each and every limitation of the asserted claim in the accused product or system, you must return a verdict of literal infringement as to that claim.

If you did not find each and every limitation of the asserted claim in the accused product or system, you may not return a verdict of literal infringement as to that claim.

You must repeat the above analysis with every asserted claim.

Remember the question is whether the accused product or system infringes any of the asserted claims, and not whether the accused product or system is similar or even identical to an SRI product or method. Accordingly, you must be certain to compare the accused product or system with the claims it is alleged to infringe and not with any product or method of SRI.

Finally, to hold ISS liable for infringement of the method claims, SRI must prove actual use of the infringing method by someone. A method claim is not infringed by the sale of a device that is merely capable of being used in an infringing manner. Actual use of each of the claimed steps must be shown. This same rule applies to indirect infringement, which I will tell you about a little later.

**AUTHORITIES**

*IMX v. LendingTree* ("Literal Infringement") (adapted to fit this case); *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1322 (Fed. Cir. 2005); *In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002); *Joy Technologies, Inc. v. Flakt, Inc.,* 6 F.3d 770, 773-75 (Fed. Cir. 1993); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.,* 953 F.2d 1360, 1374 (Fed. Cir. 1991); *Met-Coil Systems Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687 (Fed. Cir. 1986); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,* 418 F. Supp. 2d 1021, 1040 (D. Ind. 2006).

## 2.3 DOCTRINE OF EQUIVALENTS

**See joint set of proposed instructions, "3.9 DOCTRINE OF EQUIVALENTS."**

**DEFENDANTS' PROPOSED INSTRUCTION NO. 2.4**

## 2.4 SITUATIONS WHERE RESORT TO DOCTRINE OF EQUIVALENTS IS NOT PERMITTED

Resort to the doctrine of equivalents to find infringement is not permitted if you find that the defendants are merely practicing what was in the prior art prior to the patented invention or that which would have been obvious in light of what was in the prior art. This is because a patent owner should not obtain, under the doctrine of equivalents, coverage which he could not have lawfully obtained from the Patent Office. Accordingly, to find infringement under the doctrine of equivalents you must find that the patent owner has proven that he could have obtained from the Patent Office a hypothetical patent claim, similar to the existing claim, but broad enough to literally cover the accused device or method.

**AUTHORITIES**

Delaware Jury Instruction 3.10 (first paragraph).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 2.5**

**2.5 PLAINTIFF'S CONTENTIONS—INDIRECT INFRINGEMENT**

**Symantec proposes the following:**

In this case, SRI alleges two groups of Symantec products indirectly infringe.

The first group consists of the "ManHunt Products" (which are specifically, ManHunt 3.0, Symantec Network Security 4.0, Symantec Network Security 7100 Series, and iForce IDS). SRI alleges that Symantec induced its customers to infringe claims 1, 2, 4, 6, 12, 13, 15 and 17 of the '203 patent and claims 1, 2, 4, 13, 14 and 16 of the '615 patent, by the customers' use of the ManHunt Products.

The second group comprises a combination of the Symantec Gateway Security Products, or "SGS Products" (which are specifically, SGS 5400, 5600, and 1600 Series) combined with the "Manager Products" (specifically, Incident Manager 3.0 and the Security Information Manager 9500 Series). Regarding the combinations, SRI alleges that Symantec knowingly induced its customers to infringe one or more of the following: claims 1, 2, 4, 6, 12, 13, 15 and 17 of the '203 patent or claims 1, 2, 4, 13, 14 and 16 of the '615 patent by the customers' use of a SGS Product in combination with a Manager Product.

**ISS proposes the following:**

In this case, SRI alleges that ISS knowingly induced its customers to use the SiteProtector SecurityFusion Module 2.0 product in combination with the ISS Sensors in a manner that infringes claims 1, 2, 4, 6, 12, 13, 15, and 17 of the '203 patent, and claims 1, 2, 4, 13, 14, and 16 of the '615 patent. In addition, SRI alleges that ISS induced its customers to use the Proventia Network Anomaly Detection System (or "Proventia ADS") product operating in standalone mode in a manner that infringes claims 1, 4, 5, 11, 12, 13, and 24 of the '338 patent.

**DEFENDANTS' PROPOSED INSTRUCTION NO. 2.6**

**<u>2.6 INDIRECT INFRINGEMENT</u>**

As I have told you, in addition to enforcing a patent against a direct infringer, a patent owner may also enforce the patent against indirect infringers. There are two types of indirect infringement -- inducing infringement and contributory infringement. Of the two, only inducing infringement is at issue in this case. You will receive instruction on inducement after this general instruction.

**<u>Symantec proposes the following language specific to Symantec:</u>**

In general, to prove indirect infringement of the system and method claims-at-issue by Symantec's ManHunt Products, or by a Symantec Manager Product operating in combination with a SGS Product, SRI must establish either that (1) Symantec customers necessarily infringe, or (2) a specific Symantec customer made or used the accused combination.

**<u>ISS proposes the following language specific to ISS:</u>**

In general, to prove indirect infringement of the system and method claims-at-issue by ISS's SiteProtector SecurityFusion Module 2.0 product operating in combination with the ISS Sensors, or by ISS's Proventia ADS operating in standalone mode, SRI must establish either that (1) ISS's customers necessarily infringe, or (2) a specific ISS customer made or used the accused combination or product in the manner alleged to be infringing.

**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 8.12; *Dynacore Holdings Corp. v. U.S. Philips Corp.,* 363 F.3d 1263 (Fed. Cir. 2004); *Aro Mfg. Co.* v. *Convertible Top Replacement Co.*, 365 U.S. 336, 340-41 (1961); *Arthur A. Collins, Inc.* v. *N. Telcom Ltd.*, 216 F.3d 1042, 1049 (Fed. Cir. 2000); *Porter* v. *Farmers Supply Serv., Inc.*, 790 F.2d 882, 884-86 (Fed. Cir. 1986).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 2.7**

## 2.7 INDUCING INFRINGEMENT

The act of encouraging or inducing others to infringe a patent is called "inducing infringement."

**Symantec proposes the following language specific to Symantec:**

In this case, SRI accuses Symantec of knowingly inducing Symantec's customers to infringe the asserted claims of the '203 and '615 patents by use of the ManHunt Products, or by use of a Manager Product in combination with a SGS Product.

SRI must prove that Symantec purposefully caused, urged or encouraged its customers to infringe the patents-in-suit. Inducing infringement cannot occur unintentionally. This is different from direct infringement, which, as I've just told you, can occur unintentionally. Thus, in order to prove inducement, SRI must prove by the preponderance of the evidence standard that Symantec knew of the patents-in-suit and encouraged or instructed its customers to use the ManHunt Products, or a Manager Product in combination with a SGS Product in a manner that infringes the patents-in-suit. SRI must also prove by the preponderance of the evidence standard that a Symantec customer infringed the patent. Symantec can be an inducer even if Symantec thought that what it was encouraging or instructing the customer to do was not an infringement.

In addition, there can be no inducing infringement unless someone is directly infringing the patent. To prove direct infringement by an Symantec customer, SRI must by the preponderance of the evidence standard that a Symantec customer performed each and every step of a claimed method or made or used a system that satisfied each and every limitation of a claimed system. If the Symantec customer omitted a single step or limitation recited in a claim, then you must find that the customer did not directly infringe that claim. You must consider

each of the patent claims separately. Thus, in order to prove that Symantec induced Symantec's customers to infringe, SRI must prove by the preponderance of the evidence standard that a Symantec customer has directly infringed at least one of the asserted claims of the '203 or '615 patents.

Since SRI asserts that Symantec induced patent infringement, SRI must prove four things by the preponderance of the evidence standard:

First, Symantec encouraged or instructed a customer on how to use the ManHunt Products, or a Manager Product in combination with a SGS Product in a manner that you, the jury, find infringes the asserted claims of the '203 or '615 patents.

Second, Symantec knew of the '203 or '615 patents

Third, Symantec knew or should have known that its encouragement or instructions would cause direct infringement.  In other words, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that Symantec had knowledge of the direct infringer's activities.

Fourth, the customer infringed either the '203 or '615 patents by making or using either the ManHunt Products, or a Manager Products in combination with a SGS Product in a manner that you, the jury, find infringes the asserted claims of the '203 or '615 patents

If, and only if, you are persuaded of each of these four things may you find that Symantec induced patent infringement.

**ISS proposes the following language specific to ISS:**

In this case, SRI alleges that ISS knowingly induced its customers to use the SiteProtector SecurityFusion Module 2.0 product in combination with the ISS Sensors in a manner that infringes claims 1, 2, 4, 6, 12, 13, 15, and 17 of the '203 patent, and claims 1, 2, 4,

13, 14, and 16 of the '615 patent.  In addition, SRI alleges that ISS induced its customers to use

the Proventia Network Anomaly Detection System (or "Proventia ADS") product operating in

standalone mode in a manner that infringes claims 1, 4, 5, 11, 12, 13, and 24 of the '338 patent.

SRI must prove that ISS purposefully caused, urged or encouraged its customers to

infringe the patents-in-suit.  Inducing infringement cannot occur unintentionally.  This is

different from direct infringement, which, as I've just told you, can occur unintentionally.  Thus,

in order to prove inducement, SRI must show by the preponderance of the evidence standard that

ISS knew of the patents-in-suit; and that ISS encouraged or instructed its customers to use the

SiteProtector SecurityFusion Module 2.0 product in combination with the ISS Sensors in a

manner that infringes the asserted claims of the '203 and '615 patents, or to use Proventia ADS

operating in standalone mode in a manner that infringes the asserted claims of the '338 patent.

SRI must also prove by the preponderance of the evidence standard that ISS thought that what it

was encouraging or instructing the customer to do was an infringement.  SRI must also prove by

the preponderance of the evidence standard that what ISS encouraged or instructed its customer

to do is what you find to be an infringement of the patent.

In addition, there can be no inducing infringement unless someone is directly infringing

the patent.  To prove direct infringement by an ISS customer, SRI must by the preponderance of

the evidence standard that an ISS customer performed each and every step of a claimed method

or made or used a system that satisfied each and every limitation of a claimed system.  If the ISS

customer omitted a single step or limitation recited in a claim, then you must find that the

customer did not directly infringe that claim.  You must consider each of the patent claims

separately.  Thus, in order to prove that ISS induced ISS's customers to infringe, SRI must prove

by the preponderance of the evidence standard that an ISS customer has directly infringed at least one of the asserted claims of the '203, '615, and '338 patents.

Since SRI asserts that ISS induced patent infringement, SRI must prove four things by the preponderance of the evidence standard:

First, ISS knew of the '203, '615, or '338 patents.

Second, ISS encouraged or instructed a customer on how to use the SiteProtector SecurityFusion Module 2.0 product in combination with the ISS Sensors in a manner that you, the jury, find infringes the asserted claims of the '203 or '615 patents, or how to use Proventia ADS operating in standalone mode in a manner that you, the jury, find infringes the asserted claims of the '338 patent.

Third, ISS knew or should have known that its encouragement or instructions would likely result in the customer doing that which you find to be an infringement of the '203, '615, or '338 patents. In other words, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that ISS had knowledge of the direct infringer's activities.

Fourth, the customer directly infringed either the '203, '615, or '338 patents.

If, and only if, you are persuaded of each of these four things may you find that ISS induced patent infringement.

**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 3.1.2, 8.12.1; Delaware Jury Instruction 2.2 (adapted to fit this case); Model Patent Jury Instructions for the Northern District of California ("3.10 Inducing Patent Infringement, No. 3); *IMX v. LendingTree* ("Plaintiff's Contentions") (adapted to fit this case); 35 U.S.C. § 271(b) (1984); *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006); *Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1261 (Fed. Cir. 1999); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1311-12 (Fed. Cir. 1998); *Insituform Techs., Inc. v. Cat Contracting, Inc.,* 161 F.3d 688, 695 (Fed. Cir. 1998); *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.,* 72

F.3d 872, 876 n.4 (Fed. Cir. 1995); *Joy Techs., Inc. v. Flakt, Inc.,* 6 F.3d 770, 774-76 (Fed. Cir. 1993); *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553-54 (Fed. Cir. 1990); *Hewlett-Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1468-69 (Fed. Cir. 1990).

## INVALIDITY

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.0**

### 3.0 AFFIRMATIVE DEFENSE OF INVALIDITY GENERALLY

Only a valid patent may be infringed.  For a patent to be valid, the invention claimed in the patent must be new, useful and nonobvious.  A patent cannot take away from people their right to use what was known or what would have been obvious when the invention was made.  The terms "new," "useful" and "non-obvious" have special meanings under the patent laws.  I will explain these terms to you as we discuss Defendants' grounds for asserting invalidity.

The invention claimed in a patent must also be adequately described.  In return for the right to exclude others from making, using, selling or offering for sale the claimed invention, the patent owner must provide the public with a complete description in the patent of the invention and how to make and use it.

Defendants have challenged the validity of the claims of the patents-in-suit on a number of grounds.  Although the patents-in-suit were granted by the Patent and Trademark Office, it is your job to determine whether or not the legal requirements for patentability were met; that is, it is your job to determine whether or not the patents are invalid.

I will now explain to you Defendants' grounds for invalidity in detail.  In making your determination as to invalidity, you should consider each claim separately.

**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 10.1 (explaining that the instruction on the presumption of validity is omitted because instructing the jury on the presumption in addition to informing it of the clear and convincing burden of proof may cause the jury confusion) (citing Fed. R. Evid. 301; *DMI, Inc. v. Deere & Co.,* 802 F.2d 421, 427 (Fed. Cir. 1986); *Avia Group Int'l, Inc. v. L.A. Gear Cal.,* 853 F.2d 1557, 1562 (Fed. Cir. 1988)); *see also American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed. Cir. 1984) ("When an attacker, in sustaining the burden imposed by [35 U.S.C.] § 282, produces prior art or other evidence not considered in the PTO, there is, however, no reason to defer to the PTO so far

as its effect on validity is concerned."); *Morton Int'l v. Cardinal Chem. Co.,* 5 F.3d 1464, 1471-2 (Fed. Cir. 1993); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed. Cir. 1983).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.1**

## 3.1 PRIOR ART

Under the patent laws, a person is entitled to a patent only if the invention claimed in the patent is new and not obvious in light of what came before. That which came before is referred to as the "prior art." Defendants must prove by the clear and convincing standard that these items are prior art. In order to do so, Defendants must prove that the items fall within one or more of the different categories of prior art recognized by the patent laws. These categories include:

First, anything that was publicly known or used in the United States by someone other than the inventor before the inventor made the invention.

Second, anything that was in public use or on sale in the United States more than one year before the application for the patent was filed. In this case, that means anything that was in public use or on sale in the United States before November 9, 1997.

Third, anything that was patented or described in a printed publication anywhere in the world before the inventor made the invention, or more than one year before the application for the patent was filed.

Fourth, anything that was invented by another person in this country before the inventor made the invention, if the other person did not abandon, suppress or conceal his or her prior invention.

Fifth, anything that was described in a patent that issued from a patent application filed in the United States or certain foreign countries before the inventor made the invention.


**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 10.6 (adapted to fit this case).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.2**

**<u>3.2 PRIOR ART – DATE OF INVENTION</u>**

Many of the different categories of prior art refer to the date at which the inventor made

the invention.  This is called the "date of invention."  In this case, the date of invention is

November 9, 1998, the date the application was filed.

**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 10.6.1.

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.3**

<u>**3.3 PRIOR ART – PRIOR KNOWLEDGE OR PUBLIC USE**</u>

The prior public use of a claimed invention may be prior art to the patent claims under two different circumstances. The first is where the invention was known to or used by someone other than the inventors before the date of invention by the inventors on the patent. In this case, that date would be November 9, 1998. The second is where the invention was publicly used more than one year before the application for the patent was filed. In this case, that date would be November 9, 1997.

In both circumstances, the public use must have been in the United States. Prior public use or knowledge of the claimed invention outside the United States is not prior art to a patent claim.

Use or knowledge by someone other than the inventors may be prior art if it was before the date of invention by the inventor on the patent, or more than one year before the filing of the application for the patent. In either case, a prior use by someone other than the inventors or the patent owner will not be prior art unless it was public. Private or secret knowledge or use by another is not prior art.

If the prior use was more than one year before the filing date of the application for the patent, then the date of invention for the patent claims is irrelevant. A public use more than one year before the patent application was filed will be prior art regardless of the date of invention.

A prior use more than one year before the application filing date by the inventors or the patent owner will be prior art if it was for commercial purposes, even if it was done in secret.

**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 10.6.4; *Woodland Trust* v. *Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998); *Lockwood* v. *Am. Airlines, Inc.*, 107 F.3d 1565, 1570 (Fed. Cir. 1997).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.4**

## 3.4 PRIOR ART – ON-SALE OR OFFERED FOR SALE

The sale or offer for sale in the United States of a product may be prior art to a patent claim covering the product or a method of making the product if the product was sold or offered for sale more than one year before the application for the patent was filed. In this case, that date is November 9, 1997. The date of invention for the patent claims is irrelevant to this category of prior art. If the sale or offer for sale of a product is more than one year before the patent application was filed, then the product or method of making it may be prior art, regardless of the date of invention.

If the sale or offer for sale was of a product or system, then it may be prior art regardless of who made the offer.

In order for there to be an offer for sale, two requirements must be met. First, the product must have been the subject of a commercial offer for sale. Second, the product must be "ready for patenting."

Even a single offer for sale to a single customer may be a commercial offer, even if the customer does not accept the offer.

An invention is ready for patenting if the product offered for sale has been developed to the point where there was reason to expect that it would work for its intended purpose. The product may be ready for patenting even if it is not ready for commercial production, or has not been technically perfected.

**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 10.6.5 (adapted to fit this case); *Pfaff* v. *Wells Elecs., Inc.*, 525 U.S. 55 (1998); *Space Systems/Loral, Inc.* v. *Lockheed Martin Corp.*, 271 F.3d 1076, 1080 (Fed. Cir. 2001); *Scaltech, Inc.* v. *Retech/Tetra, LLC*, 269 F.3d 1321 (Fed. Cir. 2001); *Group One, Ltd.* v. *Hallmark Cards, Inc.*, 254 F.3d 1041, 1046-47 (Fed. Cir.

2001); *Robotic Vision Sys., Inc.* v. *View Eng'g, Inc.*, 249 F.3d 1307 (Fed. Cir. 2001); *Monon Corp.* v. *Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257-61 (Fed. Cir. 2001); *Vanmoor* v. *Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000); *STX, LLC* v. *Brine, Inc.*, 211 F.3d 588, 590 (Fed. Cir. 2000); *Zacharin* v. *United States*, 213 F.3d 1366, 1370 (Fed. Cir. 2000); *Brasseler, U.S.A.I, L.P.* v. *Stryker Sales Corp.*, 182 F.3d 888, 889 (Fed. Cir. 1999); *Cont'l Plastic Containers* v. *Owens Brockway Plastic Prods., Inc.*, 141 F.3d 1073, 1077 (Fed. Cir. 1998); *D.L. Auld Co.* v. *Chroma Graphics Corp.*, 714 F.2d 1144, 1147 (Fed. Cir. 1983); *W.L. Gore & Assocs., Inc.* v. *Garlock, Inc.*, 721 F.2d 1540, 1548-50 (Fed. Cir. 1983).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.5**

### 3.5 PRIOR ART – PRINTED PUBLICATION

Printed publications from anywhere in the world are prior art if the printed publications were published, either before the inventors made the claimed invention or more than one year before the application for the patent was filed. A "printed publication" does not actually have to be printed on paper, but may also be, for example, a website posting.

A document is a printed publication if it was reasonably accessible to that portion of the public most likely to use it. It is not necessary that the publication be available to every member of the public. Thus, publications may include not only such things as books, periodicals or newspapers, but also publications that are not as widely available to the public, such as trade catalogues, journal articles, scholarly papers, or website postings that are distributed or available to those skilled in the field of the invention.

The date that a printed publication becomes prior art is the date that it becomes available to the public under the standard I described above.

If a printed publication was published more than one year before the application for the patent was filed, then that publication will be prior art, regardless of the date of invention for the patent claims. The date of invention is irrelevant to this category of prior art.

**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 10.6.7; *Mahurkar* v. *C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996); *N. Telecom, Inc.* v. *Datapoint Corp.*, 908 F.2d 931, 936-37 (Fed. Cir. 1990); *In re Cronyn*, 890 F.2d 1158, 1159-61 (Fed. Cir. 1989); *Constant* v. *Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1568-69 (Fed. Cir. 1988); *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986); *Mass. Inst. of Tech.* v. *AB Fortia*, 774 F.2d 1104, 1108-09 (Fed. Cir. 1985); *In re Wyer*, 655 F.2d 221, 225 (C.C.P.A. 1981).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.6**

<u>3.6 CORROBORATION OF TESTIMONY</u>

Where a witness's testimony alone is asserted to invalidate a patent, corroboration of the witness's testimony is required. You must evaluate all the pertinent evidence so that a sound determination of the credibility of the testimony may be reached.

In situations where contemporaneous documentation and credible testimony is offered by the party challenging validity, that testimony is corroborated. It is not required that every point be corroborated by evidence having a source totally independent of the witness.

**AUTHORITIES**

*Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1349 (Fed. Cir. 2003) ("Whether the asserted identity of the product with the claimed invention has been sufficiently corroborated, either by documentary or testimonial evidence, is generally measured under a 'rule of reason' standard. Under this analysis, '[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of [the evidence] may be reached.' (citations omitted)); *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1367 (Fed. Cir. 1999); *Knorr v. Pearson*, 671 F.2d 1368, 1374 (C.C.P.A. 1982) ("[t]he law does not impose an impossible standard of 'independence' on corroborative evidence by requiring that every point [necessary to prove invalidity] be corroborated by evidence having a source totally independent of the [witness]."); *AdvanceMe Inc. v. RapidPay, LLC*, 509 F. Supp. 2d 593, 609 (E.D. Tex. 2007) ("Where a party seeks to prove facts through the use of contemporaneous documents, no corroboration is required."); *AdvanceMe Inc. v. RapidPay, LLC*, 509 F. Supp. 2d 593, 610 (E.D. Tex. 2007) (holding the patent was invalid as obvious and anticipated based on oral testimony by multiple witnesses and by contemporaneous documentation).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.7**

**3.7 PRIOR ART REFERENCES AND PRIOR PUBLIC USE**

Defendants contend that the asserted claims of the patents-in-suit are anticipated by the following prior art publications and systems or products:

- P. Porras and A. Valdes, "Live Traffic Analysis of TCP/IP Gateways," ("*Live Traffic*" various versions);

- P. Porras and P. Neumann, "EMERALD: Event Monitoring Enabling Responses to Anomalous Live Disturbances," Proceedings of the 20th National Information Systems Security Conference, pp. 353-365, October 9, 1997 ("*Emerald 1997*");

- D. Anderson, T. Frivold, and A. Valdes, "Next-generation Intrusion Detection Expert System (NIDES) A Summary," Computer Science Laboratory, SRI-CSL-95-07, May 1995 ("*Network NIDES*");

- Y. Frank Jou et al., "Architecture Design of a Scalable Intrusion Detection System for the Emerging Network Infrastructure," Technical Report CDRL A005, Dept. of Computer Science, North Carolina State University, April 1997 ("*JiNao Report*");

- Y. Frank Jou and S. Felix Wu, "Scalable Intrusion Detection for the Emerging Network Infrastructure, IDS Program Review," SRI, July 1997 ("*JiNao Slides*");

- L. Todd Heberlein et al., "A Network Security Monitor," Proc. 1990 IEEE Computer Society Symposium on Research in Security and Privacy, pp. 296-304, May 1990 ("*NSM 1990*");

- L.T. Heberlein, B. Mukherjee, K.N. Levitt, "Internetwork Security Monitor," Proc. of the 15th National Computer Security Conference, pp. 262-271, October 1992 ("*ISM 1992*");

- B. Mukherjee, L.T. Heberlein, K.N. Levitt, "Network Intrusion Detection," IEEE Network, Vol. 8 No. 3, pp. 26-41, June 1994 ("*NID 1994*");

- Steven R. Snapp et al., "Intrusion Detection Systems (IDS): A Survey of Existing Systems and a Proposed Distributed IDS Architecture," CSE-91-7, Feb. 1991 ("*DIDS Feb. 1991*");

- Steven R. Snapp et al., "DIDS (Distributed Intrusion Detection System) – Motivation, Architecture, and An Early Prototype," Proc. 14th National Computer Security Conference, pp. 167-173, October 1991 ("*DIDS Oct. 1991*");

- S. Staniford-Chen et al., "GrIDS – A Graph Based Intrusion Detection System for Large Networks," 19th National Information Systems Security Conference, pp. 361-370, October 1996 ("*GrIDS 1996*");

- Steven Cheung et al., "The Design of GRIDS: A Graph-Based Intrusion

Detection System," Technical Report, UC Davis Department of Computer Science, Davis California, May 14, 1997 ("*GrIDS 1997*");

- "NetStalker, Installation and User's Guide, Version 1.0.2" (May 1996);

- "RealSecure Release 1.0 for Windows NT 4.0 A User's Guide and Reference Manual";

- "NetRanger User's Guide Version 1.3.1," WheelGroup Corporation, 1997 ("*NetRanger Manual*");

- Network Security Monitor ("NSM");

- Distributed Intrusion Detection System ("DIDS");

- Graph-based Intrusion Detection System ("GrIDS");

- NetRanger;

- ISS RealSecure;

- NetStalker.

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.7.1**

### 3.7.1 "EMERALD 1997" AND THE '212 PATENT

You may hear reference to SRI's '212 patent during the testimony. The '212 patent has been held to be invalid. It has been determined that the Porras and Neumann 1997 reference discloses and enables every limitation of every claim of the '212 patent. You will therefore not be asked to make any determination regarding infringement or invalidity of the '212 patent.

The fact that the '212 patent has been held to be invalid does not mean that any of SRI's other patents are invalid. You must make an independent and separate analysis of each of the other patents based upon their particular claims.

However, because the '212 patent contains the same specification and some of the same claim limitations as the patents-in-suit, wherever one of these common limitations is present in any of the patents-in-suit, you must find that the Porras and Neumann 1997 reference discloses and enables such limitations. The relevant limitations include the following:

1) "monitoring an enterprise network"

2) "deploying a plurality of network monitors in the enterprise network"

3) "detecting, by the network monitors, suspicious network activity based on analysis of network traffic data"

4) "generating, by the monitors, reports of said suspicious activity"

5) "automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors"

6) [ADDITIONAL LIMITATIONS TO BE DETERMINED BASED ON FINAL SET OF REPRESENTATIVE CLAIMS]

Wherever one of these common limitations is present in any of the asserted claims, you must

find that the Porras and Neumann 1997 reference discloses and enables those limitations.

**AUTHORITIES**

*See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319-20 (Fed. Cir. 2007) (finding dependent claims of a patent invalid because they contained exactly the same language as claims in a related patent found to be invalid in a prior appeal in the same case under the "law of the case doctrine"); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1060-62 (Fed. Cir. 2005) (noting that the district court adopted a jury instruction on anticipation indicating established facts and legal issues removed from dispute); *Century Wrecker Corp. v. E.R. Buske Mfg. Co.*, 898 F. Supp. 1334, 1348-49 (N.D.  Iowa 1995) (finding it proper to advise the jury of the court's pre-trial decision on infringement with an appropriate limiting instruction*); Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) ("A patent is invalid for anticipation when the same device or method, having all the elements contained in the claim limitations, is described in a single prior art reference.  An anticipating reference must describe the patented subject matter with sufficient clarity and detail to establish that the subject matter existed in the prior art and that such existence would be recognized by persons of ordinary skill in the field of the invention.").

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.7.2**

### 3.7.2 "SELECTED FROM" CLAIMS

Some of the asserted claims use the language "network traffic selected from the following categories...."  If you find that a prior art device or method includes at least one of the listed categories of network traffic set forth in the patent claim, then this limitation is present in that prior art device or method.  In addition, if more than one of the listed categories of network traffic are present, then this limitation is also present.

**AUTHORITIES**
*Peters v. Active Manufacturing Co.*, 129 U.S. 530, 537 (1889)("That which infringes, if later, would anticipate, if earlier."); *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1312 (Fed.Cir.2001).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.8**

## 3.8 ANTICIPATION/LACK OF NOVELTY

A person cannot obtain a patent on an invention if someone else has already made the same invention. In other words, the invention must be new. If an invention is not new, we say that it was "anticipated" by the prior art. An invention that is "anticipated" by the prior art is not entitled to patent protection. A party challenging the validity of a patent on the basis of "anticipation" must prove anticipation by the clear and convincing standard. Defendants' burden to show anticipation is more easily carried when the prior art relied on by Defendants was not before the patent examiner during examination of the patent.

In order for a patent claim to be anticipated by the prior art, each and every limitation of the claim must be present within a single item of prior art, whether that prior art is a publication, a prior patent, a prior invention, a prior public use or sale, or some other item of prior art. You may not find that the prior art anticipates a patent claim by combining two or more items of prior art.

A printed publication or patent will not be an anticipation unless it contains a description of the invention covered by the patent claims that is sufficiently detailed to teach a skilled person how to make and use the invention without undue experimentation. However, the description used in an item of prior art does not have to be in the same words or use the same terminology as the patent. What is required is that a person skilled in the field of the invention reading the printed publication or patent would be able to make and use the invention using only an amount of experimentation that is appropriate for the complexity of the field of the invention and for the level of expertise and knowledge of persons skilled in that field. In deciding whether or not a single item of prior art anticipates a patent claim, you should consider that which is expressly stated or present in the item of prior art, and also that which is inherently present. Something is

inherent in an item of prior art if it is always present in the prior art or always results from the practice of the prior art, and if a skilled person would understand that to be the case.

Anticipation by a prior public use or sale does not need to teach a skilled person how to make and use the invention without undue experimentation.   It is not necessary for a prior art system to teach a skilled person how to make and use the invention.  The fact that it was used or on sale is sufficient.

A prior public use by another may anticipate a patent claim, even if the use was accidental or was not appreciated by the other person.  Thus, a prior public use may anticipate an invention even if the user did not intend to use the invention, or even realize he or she had done so.

In this case, Defendants contend the claims-at-issue are invalid because they are anticipated by prior public use, prior knowledge, prior sale, prior patenting, and prior printed publications.

If you find that Defendants have proven that by clear and convincing evidence that the claims-at-issue are anticipated, then you must find that the claims are invalid.

**AUTHORITIES**

Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 10.8; *Ecolochem, Inc.* v. *S. Cal. Edison Co.*, 227 F.3d 1361, 1367-70 (Fed. Cir. 2000); *Atlas Powder Co.* v. *IRECO Inc.*, 190 F.3d

1342, 1346 (Fed. Cir. 1999); *Abbot Labs.* v. *Geneva Pharms., Inc.*, 182 F.3d 1315, 1318 (Fed. Cir. 1999); *Finnegan Corp.* v. *Int'l Trade Comm'n*, 180 F.3d 1354, 1364 (Fed. Cir. 1999); *American Hoist & Derrick Co.* v. *Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984); *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440, 1444 (Fed. Cir. 1984); *C.R. Bard, Inc.* v. *M3 Sys., Inc.*, 157 F.3d 1340, 1349 (Fed. Cir. 1998); *W.L. Gore & Assocs., Inc.* v. *Garlock, Inc.*, 721 F.2d 1540, 1548 (Fed. Cir. 1983); *DataQuill Ltd. v. Handspring, Inc.*, 2003 WL 737785, *7 (N.D. Ill. 2003); *In re Epstein*, 32 F.3d 1559, 1567-68 (Fed. Cir. 1994).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.9**

<u>**3.9 OBVIOUSNESS**</u>

Defendants also contend that the asserted claims are invalid as being obvious.  In order to be patentable, an invention must not be obvious to a person of ordinary skill in the art at the time the invention was made.  That is because granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may deprive prior inventions of their value or utility.

The issue is not whether the claimed invention would be obvious to you as a layperson, to me as a judge, or to a genius in the art, but whether it would have been obvious to one of ordinary skill in the art at the time it was made.

In determining obviousness or nonobviousness of the asserted claims, the following steps should be taken by you:

First, you should determine the scope and content of the prior art;

Second, you should identify the differences, if any, between each asserted claim of the patents-in-suit and the prior art;

Third, you should consider the level of ordinary skill in the pertinent art at the time the invention of each asserted claim was made; and

Fourth, you should consider objective evidence of both obviousness and nonobviousness, if any.

Against this background, you will then make your decision as to whether the subject matter of the asserted claims would have been either obvious or nonobvious to a person of ordinary skill in the pertinent art.

**AUTHORITIES**

*IMX v. LendingTree* ("Obviousness"); *Callaway Golf Co. v. Acushnet Co.* ("Objective Criteria Concerning Non-Obviousness (Secondary Considerations)"); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.9.1**

### 3.9.1 SCOPE AND CONTENT OF THE PRIOR ART

As I just instructed you, in arriving at your decision on the issue of whether or not the asserted claims are obvious to one of ordinary skill in the art, you must first determine the scope and content of the prior art. This means that you must determine what prior art is reasonably pertinent to the particular problem the inventor faced. The scope and content of the prior art includes references that would be considered by a person with ordinary skill in the art to solve a particular problem. A person of ordinary skill in the art knows of all such references.

The prior art in this case includes all prior art listed in the instruction titled "Prior Art References and Prior Public Use" and all other prior art presented at trial.

**AUTHORITIES**

*IMX v. LendingTree* ("Scope and Content of the Prior Art").

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.9.2**

<u>**3.9.2 DIFFERENCES OVER THE PRIOR ART**</u>

In reaching your conclusion as to whether or not the claimed invention was obvious, you should consider any difference or differences between the prior art and the claimed invention. When doing so, each claim must be considered in its entirety and separately from the other claims.

Although it is proper for you to note any differences between the claimed invention and the prior art, you must still determine the obviousness or nonobviousness of the invention as a whole.

**AUTHORITIES**

*IMX v. LendingTree* ("Differences Over the Prior Art").

### 3.9.3 LEVEL OF ORDINARY SKILL IN THE ART

See joint set of proposed instructions, "4.10.3 LEVEL OF ORDINARY SKILL."

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.9.4**

## 3.9.4 OBJECTIVE CRITERIA CONCERNING OBVIOUSNESS

## (SECONDARY CONSIDERATIONS)

In making your decision as to the obviousness or nonobviousness of the asserted claims of each patent-in-suit, you must consider the following objective evidence which may tend to show nonobviousness of the claims at issue:

1.      Commercial success or lack of commercial success of products covered by the asserted claims;

2.      A long felt need in the art that was satisfied by the invention of the asserted claims;

3.      The failure of others to make the invention;

4.      Copying of the invention by others in the field;

5.      Unexpected results achieved by the invention;

6.      Praise of the invention by Defendants or others in the field;

7.      The taking of licenses under the patent by others; and

8.      Other evidence tending to show nonobviousness or obviousness.

There must be a nexus or connection between the evidence showing any of these factors and the inventions of the asserted claims if this evidence is to be given weight by you in arriving at your conclusion on the obviousness issue.  For example, if commercial success is due to advertising, promotion, salesmanship or the like, or is due to features of the product other than those described in the asserted claims, then any commercial success may have no relation to the issue of obviousness.

In your determination of obviousness, then, you must consider whether SRI has demonstrated not only that such secondary considerations exist, but also whether SRI has proven that there is a sufficient nexus or connection between the considerations and the claimed invention — in other words, whether the claimed inventions of the patents-in-suit contributed to these secondary considerations rather than the considerations being due to other factors.

The existence of secondary considerations does not control the obviousness determination.  Where there is a strong case of obviousness, it cannot be overcome by secondary considerations.

In this case, SRI has the burden of proving any secondary consideration issues by a preponderance of the evidence, meaning that it is more probably true than not true.


**AUTHORITIES**

*See IMX v. LendingTree* ("Objective Criteria Concerning Obviousness (Secondary Considerations)"); *Callaway Golf Co. v. Acushnet Co.* ("Objective Criteria Concerning Non-Obviousness (Secondary Considerations)"); Model Patent Jury Instructions for the Northern District of California ("4.3b Obviousness (Alternative 1)"); *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997); *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007); *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008); *Muniauction, Inc. v. Thomson Corp.*, 2008 WL 2717689, at *7 (Fed. Cir. 2008).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.9.5**

### 3.9.5 OBVIOUSNESS -- HINDSIGHT AND THE SUGGESTION TO COMBINE OR MODIFY

A critical step in analyzing the patentability of claims pursuant to the obviousness analysis is casting the mind back to the time of invention.  Close adherence to this methodology is important to avoid the temptation to rely on hindsight; that is, to consider an invention obvious because of what we now know instead of what was known by people of skill in the art at the time of invention.

In determining whether the asserted claims would have been obvious to a person of ordinary skill in the art and, therefore, are invalid, you should not apply any rigid test or formula.  Rather, you may consider the common sense of a person of ordinary skill in the art to determine whether the claimed invention is truly innovative, or merely a combination of known elements to achieve predictable results.

A single prior art reference can satisfy the obviousness inquiry if there is a sufficient implicit or express suggestion or motivation to modify the teachings of that reference.  However, a patent claim composed of several elements is not proved obvious merely by demonstrating that each of its elements was independently known in the prior art.  In evaluating whether such a claim would have been obvious, you may consider whether Defendants have identified a reason that would have prompted a person of ordinary skill in the field to combine the elements or concepts from the prior art in the same way as in the claimed invention.  There is no single way to define the line between true inventiveness on one hand (which is patentable) and the application of common sense and ordinary skill to solve a problem on the other hand (which is not patentable). For example, market forces or other design incentives may be what produced a change, rather than true inventiveness. You may consider whether the change was merely the

predictable result of using prior art elements according to their known functions, or whether it was the result of true inventiveness. You may also consider whether there is some teaching or suggestion in the prior art to make the modification or combination of elements claimed in the patent. Also, you should consider whether the innovation applies a known technique that had been used to improve a similar device or method in a similar way. You may also consider whether the claimed invention would have been obvious to try, meaning that the claimed innovation was one of a relatively small number of possible approaches to the problem with a reasonable expectation of success by those skilled in the art.

**AUTHORITIES**

Model Patent Jury Instructions for the Northern District of California ("4.3b Obviousness (Alternative 1)"); *Callaway Golf Co. v. Acushnet Co.* ("Objective Criteria Concerning Non-Obviousness (Secondary Considerations)").; *In re Kotzab*, 217 F.3d 1365 (Fed. Cir. 2000).

## 3.9.6 INDEPENDENT INVENTION BY OTHERS

See joint set of proposed instructions, "4.10.11 INDEPENDENT INVENTION BY OTHERS."

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.10**

### 3.10 WRITTEN DESCRIPTION

Every patent specification must contain a written description of the inventions claimed in the patent. The purpose of the written description requirement is to make sure that, at the time the application for the patent was originally filed, the inventor had possession of the invention as claimed in the issued patent. Requiring an adequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation. Put another way, satisfaction of the description requirement insures that subject matter presented in the form of a claim subsequent to the filing date of the application was sufficiently disclosed at the time of filing so that date of invention can fairly be held to be the filing date of the application.

The written description requirement is satisfied if a person of ordinary skill in the field, reading the patent application as originally filed, would recognize that the application for patent adequately described the invention that is ultimately claimed in the issued patent. To satisfy the written description requirement, the words, structures, figures, and diagrams in the patent specification must fully set forth the claimed invention. It is not sufficient if the disclosure, when combined with the knowledge in the art, would lead one to speculate as to modifications that the inventor might have envisioned, but failed to disclose. The application must describe the invention in a manner that is commensurate with the scope of subject matter as it is claimed in the issued patent. Each claim of a patent must be separately analyzed for compliance with the written description requirement.

Sometimes a written description may fail to disclose details concerning the preferred embodiment. If the undisclosed details were the only known way of carrying out the claimed

invention, then the failure to disclose such details was not merely the failure to disclose one example of the claimed invention. It was a failure to disclose the actual teaching of the patent.

Incorporation by reference provides a method for integrating material from certain other documents into a patent specification by citing such material in a manner that makes clear what specific material is being made part of the patent specification as if it were explicitly contained therein. To incorporate material by reference, the patent specification must identify with detailed particularity both the specific material that is being incorporated from the other document and where that material is contained in the referenced document.

For purposes of adequately describing the teachings necessary to practice the claimed invention, a patent application may not simply incorporate materials by reference if the materials incorporated by reference are not generally available to the public. Nor may a patent applicant rely on incorporation by reference to disclose materials that are essential to understanding the teachings of the patent unless the incorporation by reference specifically refers to essential materials found in a U.S. patent or an allowed U.S. patent application.

**AUTHORITIES**

Model Patent Jury Instructions for the Northern District of California 4.2a; *Chiron Corp.* v. *Genentech, Inc.*, 363 F.3d 1247 (Fed. Cir. 2004); *Enzo Biochem, Inc.* v. *Gen-Probe Inc.*, 285 F.3d 1013, 1018 (Fed. Cir. 2002); *Turbocare Div. of Demag Delaval Turbomachinery Corp.* v. *General Elect. Co.*, 264 F.3d 1111, 1118 (Fed. Cir. 2001); *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282-83 (Fed. Cir. 2000); *Tronzo* v. *Biomet Inc.*, 156 F.3d 1154, 1158-60 (Fed. Cir. 1998); *Gentry Gallery, Inc.* v. *Berkline Corp.*, 134 F.3d 1473, 1478-80 (Fed. Cir. 1998); *Lockwood* v. *Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997); *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1562 (Fed. Cir. 1991); *Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1455 -56 (Fed. Cir. 1984); *General Elec. Co. v. Brenner*, 407 F.2d 1258, 1261-62, 159 USPQ 335, 337 (D.C. Cir. 1968).

**DEFENDANTS' PROPOSED INSTRUCTION NO. 3.11**

## 3.11 BEST MODE

If one or more of the inventors knew of a best way, or "mode," of making, using and/or practicing any of the inventions claimed in the patents-in-suit at the time the application for the patent was filed, then the patent specification must contain a description that is sufficient to enable a person of ordinary skill in the art to identify and practice that best mode of the invention.  This is called the "best mode" requirement.

The purpose of the best mode requirement is to ensure that the public obtains a complete disclosure of the best mode of making, using or practicing an invention known to the inventor.  The best mode requirement prevents an inventor from obtaining a patent while, at the same time, withholding from the public his or her preferred way of making or using the claimed invention.

In deciding whether the inventors in this case fulfilled their obligation to disclose the best mode, you must separately address two questions:

(1)   As of the date the patent application was filed on November 9, 1998, did the inventors contemplate a way—or mode—of making, using, or practicing the claimed invention that they preferred or considered to be better than any other mode?

If, as of the date the patent application was filed on November 9, 1998, you find that none of the inventors contemplated the use of a best mode for making, using, or practicing any of the inventions claimed in any of the claims-in-suit – you should stop there.  The patent cannot be invalid for failure to disclose a mode that none of the inventors contemplated as their best mode when the application was filed.  If, however, as of the date the application for patent was filed, you find that one or more of the inventors contemplated the use of a best mode for making, using or practicing any of the inventions claimed in the claims-in-suit, then you must consider the next question.

(2)   Does the patent specification describe the invention in a manner sufficient to enable a person of ordinary skill in the art to identify, make, use and practice the best mode

contemplated by the inventors?  This question is objective.  It depends, not on what the inventors thought or understood, but rather on what a person of ordinary skill in the art would have understood and learned by reading the patent specification at the time the application for patent was filed.

A patent describes the best mode if a person of ordinary skill in the art would have been able to practice or implement the best mode without undue experimentation by reading the patent specification when it was filed.  The appropriate question is not whether the inventors referred to the best mode.  Rather, the appropriate question is whether the inventors' disclosure was adequate to enable one skilled in the art to make, use and practice the best mode contemplated by the inventors.

Finally, it is not necessary that the inventors have an intent to conceal their best mode. Specific intent to deceive or conceal is not required.

**AUTHORITIES**
Federal Circuit Bar Ass'n Model Patent Jury Instruction No. 10.4; *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365 (Fed. Cir. 2001); *Eli Lilly & Co. v. Barr Labs., Inc.*, 222 F.3d 973, 980-84 (Fed. Cir. 2000); *N. Telecom Ltd.* v. *Samsung Elecs. Co.*, 215 F.3d 1281, 1285-89 (Fed. Cir. 2000); *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535-37 (Fed. Cir. 1987); *United States Gypsum Co. v. Nat'l Gypsum Co.*, 74 F.3d 1209, 1212, 1215-16 (Fed. Cir. 1996); *Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 790 (Fed. Cir. 1995); *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1049-52 (Fed. Cir. 1995); MPEP 608.01(v); *Transco Prods. v. Performance Contracting, Inc.*, 38 F.3d 551, 559 n. 10 (Fed. Cir. 1994); *Envirex, Inc. v. FMC Corp.*, 1993 WL 572321, *13-14 (E.D. Wis. 1993); *Christianson v. Colt Industries Operating Corp.*, 609 F. Supp. 1174, 1179-83 (N.D. Ill. 1985); *White Consol. Industries, Inc. v. Vega Servo-Control, Inc.*, 214 U.S.P.Q. 796, 824-26 (S.D. Mich. 1982), *aff'd*, 713 F.2d 788 (Fed. Cir. 1983).

## **DELIBERATION AND VERDICT**

### **4.0 INTRODUCTION**

**See joint set of proposed instructions, "7.1 INTRODUCTION."**

## 4.1 UNANIMOUS VERDICT

**See joint set of proposed instructions, "7.2 UNANIMOUS VERDICT."**

## 4.2 DUTY TO DELIBERATE

**See joint set of proposed instructions, "7.3 DUTY TO DELIBERATE."**

## 4.3 COURT HAS NO OPINION

**See joint set of proposed instructions, "7.4 COURT HAS NO OPINION."**