# EXHIBIT A

1         - VOLUME H -

2     IN THE UNITED STATES DISTRICT COURT

3     IN AND FOR THE DISTRICT OF DELAWARE

4           - - -

5

6  SRI INTERNATIONAL, INC., a : CIVIL ACTION
  California corporation,  :
             :
7  Plaintiff and     :
  Counterclaim-Defendant,  :
8            :
    vs.       :
9            :
  INTERNET SECURITY SYSTEMS, :
10 INC., a Delaware    :
  Corporation, INTERNET  :
11 SECURITY SYSTEMS, INC., a :
  Georgia Corporation, and :
12 SYMANTEC CORPORATION, a  :
  Delaware Corporation,  :
13           :
  Defendants and     :
14 Counterclaim-Plaintiffs. : NO. 04-1199 (SLR)

15

16           - - -

17        Wilmington, Delaware
          Friday, September 12, 2008
18        9:20 o'clock, a.m.

19

           - - -
20

  BEFORE: HONORABLE SUE L. ROBINSON, U.S.D.C.J., and a jury
21

           - - -
22

23

         Valerie J. Gunning and
24        Brian P. Gaffigan,
         Official Court Reporters
25

1789

Smaha - cross

1  published early enough to be prior art; is that right?

2  A.    I'm not offering an opinion as to whether it was

3  published from a legal point of view.

4  Q.    Right.

5  A.    I'm not a lawyer.

6  Q.    But on that issue, you personally never saw a copy of

7  the Live Traffic paper before November 10th, 1997; right?

8  A.    I never saw any Live Traffic papers before I got

9  involved with this case, to my knowledge.

10  Q.    All right. So, obviously, you didn't access Live

11  Traffic during the time it might have been on SRI's FTP

12  server; right?

13  A.    No, but I used their FTP server very frequently.

14  Q.    Very frequently?

15  A.    Yeah.

16  Q.    And you didn't access the Live Traffic paper; right?

17  A.    I wasn't looking at their project work in 1997, which

18  I think was the time in question.

19  Q.    Okay. Ji Nao, let's go on to that.

20  A.    Sure.

21  Q.    Now, that one you had not read any of the Ji Nao

22  papers prior to --

23  A.    Totally new material for me.

24  Q.    Right. You had never attended a conference where Ji

25  Nao was presented before; right?

1790

Smaha - cross

1  A.    That's right.

2  Q.    Now, we already looked at, in your report, at the

3  depositions you considered before forming your opinions.

4  You didn't read Mr. Jou's deposition of before forming your

5  opinions in the case; right?

6  A.    I'm not sure.

7  Q.    This is, again, on Page 51.

8  A.    No, guess not.

9  Q.    Okay. He was the architect of the system; is that

10  right? The Ji Nao system?

11  A.    I guess he was the PI, principal investigator.

12  Q.    All right. And you didn't have an opportunity to look

13  at any source code for the Ji Nao system, obviously; right?

14  A.    No, I did not.

15  Q.    All right. Now, you said on direct that Ji Nao

16  analyzed packets; right?

17  A.    That's right.

18  Q.    And you acknowledged that the paper refers repeatedly

19  to analyzing audit records, doesn't it?

20  A.    Right, in the description of the statistical

21  algorithm.

22  Q.    And for the '338 patent, that's what's relevant, isn't

23  it? What the statistical algorithm is analyzing?

24  A.    That's right.

25  Q.    Okay. Just for reference, Mr. Smaha, you may already

1791

Smaha - cross

1  have one. I'm going to hand you DTX-51, which is another

2  copy of the paper. Okay?

3  A.    We kill a lot of trees here.

4        (Mr. Scherkenbach handed an exhibit to the

5  witness.)

6  BY MR. SCHERKENBACH:

7  Q.    I just wanted to take a look. This is already in

8  evidence. If we were to highlight all the references to

9  audit records and audit record data in the statistical

10  analysis discussion in Ji Nao, we'd be highlighting quite a

11  bit of material, wouldn't we?

12  A.    I counted 20-something in that Section 4.1.3.1.

13  Q.    Right. So that material starts at Page 19?

14  A.    It goes to Page 25.

15  Q.    And it goes to Page 25?

16  A.    That's right.

17  Q.    And pretty much every page, there's a reference to

18  audit records, isn't there?

19  A.    There is.

20  Q.    Yes. Now, did you say on direct that you thought --

21  your explanation for this was you thought Mr. Jou was just

22  interchangeably using the terms "packet" and "audit record;"

23  is that right?

24  A.    Yes. My basis for that was looking at, I think it was

25  on Page 21 or 22, he's got instances of the term "audit

1792

Smaha - cross

1  record" and instances of the term "packet" in the same

2  paragraph, referring to the same variables in the equations.

3  Q.    But you never talked to him, did you?

4  A.    I read the paper. That's what it says in the paper.

5  Q.    You never talked to him as to whether he actually was

6  using the terms interchangeably?

7  A.    No, I never met Dr. Jou.

8  Q.    And you didn't read his deposition on this issue, have

9  you did you?

10  A.    I have read the depositions and I heard it in court.

11  I think you had some excerpts read.

12  Q.    You say you've read the depositions. Is that another

13  one you did after we took your deposition in the case?

14  A.    Certainly. I read all of the depositions, to my

15  knowledge.

16  Q.    All right. Let's talk about, finally, your

17  infringement opinion. Okay?

18        Now, this one, you filed a second expert report

19  after the one we've been looking at that was called a

20  rebuttal report; is that right?

21  A.    I filed three reports. There was an invalidity

22  report, and then there was a rebuttal report on

23  infringement, and then there was a supplemental rebuttal

24  report, which I think is the one you're referring to.

25  Q.    Well, actually, I'm going to talk about all of them.

1793

Smaha - cross

1   A.   Okay.

2   Q.   I was just trying to go forward in time.

3   A.   Got it.

4   Q.   So after your validity report, the next one you filed

5   was called a rebuttal report?

6   A.   That's right.

7   Q.   In that report, you had various opinions of

8   noninfringement; is that right?

9   A.   That's right.

10  Q.   All right. And that report was filed May 2006. Does

11  that sound about right?

12  A.   I think that's right.

13  Q.   All right. And prior to filing that initial

14  noninfringement report, you had talked to a number of Arbor

15  Networks employees; right?

16  A.   Yes. I talked with three of them.

17  Q.   Right. Doug Song; right?

18  A.   Doug Song.

19  Q.   One of the founders of Arbor, Mr. Jahanian; right?

20  A.   Mm-hmm. That's right.

21  Q.   And let me just deal with the two of them together.

22  You had had a joint phone call with the two of them?

23  A.   That's right.

24  Q.   And Mr. Song at that time was the chief, maybe still

25  is, the chief security architect for Arbor; right?

---

1794

Smaha - cross

1   A.   That's what he said.

2   Q.   Okay. And the substance of that phone call you had --

3   this is before filing your initial noninfringement report --

4   was to understand in detail how Heuristic No. 8 operated in

5   the Proventia ADS; right?

6   A.   That's correct.

7   Q.   All right. And we agree that the dispute on

8   infringement with respect to the '338 patent is about

9   Heuristic No. 8; right?

10  A.   I don't know if it has been stipulated or agreed

11  upon, but it sounds like a reasonable conclusion to me.

12  Q.   All right. And that heuristic in particular has to do

13  with the ADS product's ability to create and compare user

14  bandwidth profiles; is that right?

15  A.   I think it's called, at the marketing level, it's

16  called rate-based profiling and in the underlying code, I

17  think it's just called Heuristic No. 8.

18  Q.   Okay. Rate-based profiling. That's fine.

19       All right. And you talked about those profiles,

20  the rate-based profiles, at some length in your rebuttal

21  report; right?

22  A.   That's right.

23  Q.   Okay. Now, in addition to Mr. Song and Mr. Jahanian,

24  you talked to a third Arbor employee before you filed that

25  first report?

---

1795

Smaha - cross

1   A.   That's right.

2   Q.   Scott Dawson?

3   A.   Scott Dawson.

4   Q.   All right. And he was the technical product manager

5   at Arbor?

6   A.   I'm not sure that was his job title. I thought he had

7   a different job title, but, you know, you could correct me.

8   Q.   You recall he was an engineering person?

9   A.   I thought he was an engineering person rather than a

10  product manager, but, you know, I forget that detail.

11  Q.   All right. So he was a technical person?

12  A.   Yes.

13  Q.   Okay. And, again, the substance of your call with him

14  was to find out how the Proventia ADS product worked; right?

15  A.   That's right.

16  Q.   All right. And let me hand you -- oh, I think you

17  already have it. Your rebuttal report is attached to what I

18  just gave you.

19  A.   Got them. Thank you.

20  Q.   Okay. Turn to Page 207 of your rebuttal report.

21  A.   Yes.

22  Q.   And you'll agree, at the time you filed your initial

23  report on infringement, you said the Proventia ADS method

24  uses a fixed threshold to compare the short-term and

25  long-term profiles; right?

---

1796

Smaha - cross

1   A.   That's what I wrote here, yes.

2   Q.   So at the time of your initial report, you didn't

3   dispute that the Proventia ADS had a short-term statistical

4   profile, did you?

5   A.   Actually, I did dispute it.

6   Q.   You just didn't put it in your report?

7   A.   Well, actually I did put it in the report.

8   Q.   Well, why don't you find for me, for us, in the

9   section of your report that deals with noninfringement,

10  beginning on Page 24 and continuing over to Page 28, where

11  you do say it didn't have a short-term statistical --

12  A.   Page 25.

13  Q.   Go ahead. Tell me.

14  A.   First paragraph.

15  Q.   Yes?

16  A.   It says none of the activities of the PNADS collector

17  resemble --

18  Q.   Wait. Where are you?

19  A.   The top paragraph on Page 25.

20  Q.   Yes. Go ahead.

21  A.   None of the activities of the PNADS collector

22  resemble, "building at least one long-term and at least one

23  short-term statistical profile."

24  Q.   Use your construction of the phrase; right? Using

25  your construction, not the Court's construction of the

**1797**

Smaha - cross

1 phrase, "building at least one long-term and at least one
2 short-term statistical profile?"
3 A.    Yes.  There was not a Court construction as of this
4 date, I believe.
5 Q.    All right.  And the construction you relied on in the
6 passage you just read is not the one the Court adopted, is
7 it?
8 A.    That's correct.
9 Q.    Right.  So let me repeat my question.  You did not
10 opine in your original report that the -- under the correct
11 construction, that the Proventia product lacked a short-term
12 statistical profile?
13 A.    I didn't have a correct construction at the time.  The
14 claim construction came out after my report.  It would have
15 been -- it would have been a Star Trek movie to figure out
16 how to accomplish that.
17 Q.    You didn't offer any opinion of noninfringement under
18 the right construction at that time, did you?
19 A.    There wasn't a correct construction available at the
20 time.
21 Q.    The reason you gave, you referred to a supplemental
22 report.  You filed a third report in the case?
23 A.    That's right.
24 Q.    And in that report, you say there's no short-term
25 statistical profile; is that right?

**1798**

Smaha - cross

1 A.    I say it in there as well, yes.
2 Q.    Right.
3 A.    So I say it in both places.
4 Q.    And you filed that report, it was in October of 2006,
5 about four months after your initial report?
6 A.    That's correct.
7 Q.    Okay.  And in that report --
8        MR. SCHERKENBACH:  Actually, do we have the
9 supplemental report?
10 BY MR. SCHERKENBACH:
11 Q.    That's included, too.  So you already have it.
12 A.    I have it.  The little red tab there.
13 Q.    When you filed it, you gave reasons why you were
14 filing that report; correct?
15 A.    That's right.
16 Q.    And your reasons were that you had read Mr. Song's
17 deposition transcript; right?
18 A.    That's right.
19 Q.    And that you had talked with him again on October 4th,
20 2006; is that right?
21 A.    October 5th, yes.
22 Q.    October 5th.  Okay.
23 A.    Right.
24 Q.    Nothing about getting a new claim construction from
25 the Court; right?

**1799**

Smaha - cross

1 A.    That's right.
2 Q.    And, in fact, it's true, Mr. Smaha, that the claim
3 construction that the Court issued, that came after you
4 changed your opinion on short-term statistical profile;
5 right?
6 A.    Well, I suppose it's important to let you know that
7 the change in opinion was because I found out after my --
8 after my rebuttal report was filed that the three guys at
9 Arbor Networks had given me technically inaccurate
10 information.  I wanted to make sure that I had technically
11 accurate information, so I published the supplemental
12 report.  They apparently hadn't been looking at the code,
13 the references.  And I was relying on their information.
14 Q.    So that they got it wrong?
15 A.    That's right.
16 Q.    Okay.  Now, did I understand you today to say that you
17 have reviewed code for the Proventia product?
18 A.    I have not.  I have been on the phone with people who
19 walked through it, line by line.  And, you know, it's
20 possible that during one of the live sessions, I saw a
21 printout of the function that does this.  I really don't
22 recall.
23 Q.    And these conversations about walking through the code
24 line by line, that came after your deposition, I take it?
25 A.    After my deposition and before the supplemental

**1800**

Smaha - cross

1 report.  I wanted to make sure I had completely accurate
2 information to the best of my ability.
3 Q.    All right.  Finally, while we're on the subject of
4 your reports and we mentioned some charts, there were
5 actually quite a number of claim charts attached to your
6 expert reports; right?
7 A.    That's right.
8 Q.    And including charts for the references you've
9 discussed today, so RealSecure, Ji Nao, EMERALD '97; is that
10 right?
11 A.    Right.
12 Q.    Okay.  The charts that you attached to your reports
13 were originally provided to you by the lawyers; right?
14 A.    Well, let's see.  The way I recall it, the word
15 "processing templates" are things that I build.  They
16 provided the templates with some -- with the claim
17 information and what they thought might be interesting text
18 to look at.  I got rid of most of their text, kept some of
19 it, and put text in that I thought would be more appropriate
20 and, you know, we spent a lot of time with red pens.
21 Q.    You got rid of most of what they gave you?
22 A.    I'd say I got rid of a very large portion, but I can't
23 tell you exactly.
24 Q.    All right.  Now, I think we already established that
25 you filed your validity report on April 21st of 2006?

Smaha - redirect

1 gone wrong before and got an adequate explanation of why the
2 information was wrong, and tried to get the accurate stuff
3 so I could report back here on that.
4           MR. WEINGAERTNER: No further questions, Mr.
5 Smaha.
6           THE WITNESS: Thank you.
7           MR. WEINGAERTNER: Thank you.
8           THE COURT: All right. You may step down.
9 Thank you very much.
10          (Witness excused.)
11          THE COURT: And as soon as our witness steps
12 down, we'll take our luncheon recess. Let him get off the
13 stand first.
14          All right. We'll recess for lunch. Thank you.
15          (The jury was excused for a luncheon recess.)
16          THE COURT: All right. I don't believe that any
17 of the deposition designations are relevant, so I am
18 excluding those.
19          With respect to the interrogatories, if you care
20 to give me at the end of the lunch break what has been
21 established as a nexus before that, I will take a look at
22 it.
23          All right. With respect to, I just heard the
24 witness say something about RealSecure practicing automatic
25 correlation. So, as I recall, if there was a demonstrative

1 (Afternoon session began at 1:15 p.m.)
2           MR. HORWITZ: Your Honor, if I could raise one
3 point before the jury comes back in. In Mr. Smaha's
4 cross-examination by Mr. Scherkenbach, Mr. Scherkenbach got
5 into the situation discussing Mr. Smaha has opinions and how
6 they differed from your claim construction, which, of
7 course, did not come until after his opinions. And that's
8 the way things work in this court, given the way the
9 schedule works.
10          In my experience, that is not something that
11 lawyers typically bring out during cross-examination at
12 trial because of the way things unfold. We think it was
13 inappropriate for that to occur, and we think that your
14 Honor should tell the jury that when you did your claim
15 construction, you did things that were -- you did not agree
16 with either side in total. It's just not fair.
17          MR. SCHERKENBACH: My response to that -- two
18 responses.
19          Number one, the witness said that he filed his
20 supplemental response because, in part, a new claim
21 construction. That's false and I will show that was false.
22          Number two, while we're on the subject of not
23 fair, intimating that our one-hour deposition, limited to
24 the subject matter of his supplemental report somehow gave
25 us an opportunity to ask him about apparently all this work

1810

1812

1 about that, I think it is --
2           MR. HAWKINS: RealSecure is the prior art
3 system. Infusion, which is the demonstrative, is the
4 accused system. That's the difference. This witness didn't
5 talk about Fusion at all, your Honor. Correlation is the
6 claim term.
7           THE COURT: Right. Right.
8           MR. SCHERKENBACH: The issue, your Honor, is
9 that the later system, which does correlate, is so described
10 by RealSecure. The early system, which does not correlate,
11 in our view, is not described as correlating, and that
12 contrast is fair game, with all due respect, and it's
13 critical to us showing that this man's opinions can be
14 impeached.
15          This has nothing to do with infringement of the
16 Fusion.
17          THE COURT: I agree. All right.
18          MR. GREWAL: Your Honor, I know you are working
19 on the jury instructions. I had asked for some case law on
20 the "capable of" issue. I just wanted to give you a case
21 cite.
22          THE COURT: All right.
23          (Mr. Grewal handed documents to the Court.)
24          MR. GREWAL: Thank you.
25          (Luncheon recess taken.)

1 he had done since the filing of his initial report, that's
2 unfair.
3           THE COURT: All right. So the witness said that
4 his supplemental response was due to the new claim
5 construction?
6           MR. SCHERKENBACH: In part, I believe he did.
7           MR. HORWITZ: Your Honor, I will defer to my
8 colleague, but I think that was just a tactic that was bad,
9 to be able to talk about his opinion in relation to --
10          MR. SCHERKENBACH: It was unprompted. I asked
11 him why -- I mean, we asked him in his original -- in his
12 follow-up deposition, excuse me, why he filed a supplemental
13 report. And he said in the supplemental report why he filed
14 it.
15          He said he had read Mr. Song's deposition and he
16 had talked to Mr. Song on the telephone. And that's what I
17 was trying to establish with him on the stand when he
18 volunteered, oh, and, of course, a new claim construction
19 came out. And I just wanted to be accurate and I understood
20 I had to update my opinions in view of that.
21          He pointed to the claim construction as one
22 reason he supplemented, so that's fair game, and that's why
23 I asked him the question.
24          MR. HORWITZ: Your Honor, I think it still would
25 be fair to tell the jury that you do claim constructions

1813

1 after expert reports are submitted and that, in fact, your
2 claim construction was not entirely consistent with either
3 sides' requests. Basically, they are trying to use that
4 brief exchange to discredit the experts opinions and that's
5 prejudicial.
6          MR. SCHERKENBACH: And experts aren't entitled
7 to submit new reports after claim construction.
8          THE COURT: Well, you know, this is the thing.
9 I know that I do my process the way I do my process, and
10 that means that experts need to do probably twice the work,
11 because they have to address opposing claim construction as
12 well as their propounded claim construction. And if the
13 Court disagrees with their propounded claim construction and
14 goes with the other claim construction, then, theoretically,
15 they have addressed it and they're not left in the lurch
16 where they have not offered any opinion.
17          I, frankly, don't know whether the claim
18 construction we are talking about is one where this witness
19 did not opine on the opposing party's claim construction,
20 just opined on his own and whether I just embrace the
21 defendants' or whether I changed it, to some extent.
22          So let me think about it. I am certainly not
23 going to offer anything at the moment. If I do anything, it
24 will be in the context of claim construction in terms of how
25 I go about construing claims, but I'm not going to do that

1814

1 unless you all give me the -- I, frankly, can't follow
2 what's happening here. If you all want to give me his
3 expert report and in terms of this particular claim
4 construction -- I don't know.
5          MR. SCHERKENBACH: Well, our representation
6 would be, your Honor, that the report he filed offered
7 opinions using his claim construction, period. That he
8 had a very complicated view of what statistically analyzing
9 meant and how the comparison had to be done, all of which
10 was rejected by your Honor. He did not offer any opinions
11 under the alternative claim construction, so that's the
12 situation we're in.
13          We will also be happy to, when we get the
14 transcript, point out to you that independent of the scope
15 of report issue, he did open the door on this issue by
16 saying why he filed his supplemental report.
17          Again, he pointed to your claim construction
18 having come out, which was not true.
19          THE COURT: I guess I'm losing -- and what was
20 the import of all of this? Because he filed a supplemental
21 response according to you because he talked to someone else?
22 I mean, is that the --
23          MR. SCHERKENBACH: Well, right. So before his
24 initial report, he had talked to everybody he needed to talk
25 to. And he, we believe, said in his report there was a

1815

1 short-term statistical profile. Four months later, he files
2 a supplemental report in which he says there is not, based
3 on talking more to the same people. Okay? That's what we
4 were trying to establish.
5          He said, I believe, on direct, that one of the
6 reasons he supplemented was also because the claims had been
7 construed and he hadn't had a chance to consider them, and
8 so he was just trying to, you know, give his latest best
9 view of things.
10          In fact, your Honor's claim construction came
11 out eight days after his supplemental report, so he couldn't
12 possibly have been relying on that.
13          MR. HAWKINS: And, your Honor, just so the
14 record is complete on this, the record would show that
15 in his initial expert report, the sentence that Mr.
16 Scherkenbach was pointing to was a statement that the ADS
17 product had a short-term profile, not a short-term
18 statistical profile, which is the words in the claims.
19          The record will also show that it was SRI that
20 took the deposition of Mr. Song, an Arbor Networks witness
21 in August of 2006 after the close of discovery. It was in
22 response to that deposition followed by a subsequent
23 telephone conversation that Mr. Smaha had with Mr. Song
24 where additional clarity as to the operation of the ADS
25 product was obtained, both in the deposition and in the

1816

1 telephone conversation.
2          So as reflected in the evidence itself, in the
3 expert report, what necessitated the need for the
4 supplemental report was the new technical information, not
5 the Court's claim construction.
6          The witness may have been confused in terms of
7 timing as to when the Court's construction came out on
8 cross-examination and may have, whether it was baited or
9 whether it was volunteered, the idea of claim construction,
10 but the fact is that the report only addressed the technical
11 information that came from the deposition and from other
12 sources.
13          THE COURT: All right. Well, I guess as soon as
14 the Court Reporters can give me a transcript of the relevant
15 testimony, I will figure out if there's anything I need to
16 do. Thank you.
17          MR. HAWKINS: Thank you.
18          THE COURT: Are we ready to bring the jury in?
19          (The jury entered the courtroom and took their
20 seats in the box.)
21          THE COURT: Thank you, ladies and gentlemen.
22          MR. GALVIN: Your Honor, at this time, Symantec
23 rests its case.
24          THE COURT: All right. Mr. Hawkins?
25          MR. HAWKINS: And, your Honor, ISS rests its

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SRI INTERNATIONAL, INC., a California )
Corporation, )
                           )
        Plaintiff, )
                           )
    v. )
                           )
INTERNET SECURITY SYSTEMS, INC., )    Case No. 04-1199-SLR
a Delaware corporation, INTERNET )
SECURITY SYSTEMS, INC., a Georgia )    **[CONTAINS CONFIDENTIAL**
corporation, and SYMANTEC )    **INFORMATION]**
CORPORATION, a Delaware corporation, )
                           )
        Defendants. )

---

### SUPPLEMENTAL REBUTTAL EXPERT REPORT OF STEPHEN E. SMAHA

On May 16, 2006, I submitted a rebuttal expert report. Based on discovery from third party Arbor Networks that took place after I wrote my report, including a review of the August 14, 2006 deposition transcript of Douglas Song and a discussion with Mr. Song on October 5, 2006, I hereby supplement my rebuttal report as follows.

As I wrote in my rebuttal expert report, the PNADS Collector in standalone mode can generate NetFlow information from network packets retrieved from a tap. If PNADS received data in this tap mode, it would not "receive network packets handled by a network entity." I understand from Mr. Song's testimony that the PNADS collector also could be configured to receive its data from a "span port." [Song Dep. Tr. at pp. 43-46] Mr. Song observed that although this configuration would not be useful in real cases [Song Dep. Tr. p. 45, line 16 to p. 46, line 7], it is physically possible to use this configuration.

I understand from Mr. Song's deposition transcript and my discussion with him on

October 5, 2006 that the processing algorithm for PNADS collects its data for each traffic filter

from measurements of the number of bits seen for a particular traffic filter over successive

periods of 120 seconds. To implement heuristic #8, described on page 24 of my rebuttal report,

the 2 minute sample is compared to a composite score consisting of a percentage times the

weighted sum of the baselines. In my opinion, this current traffic data (2 minute sample) is not

a short term profile under either party's construction. I note that Dr. Kesidis, in his report of

May 16, 2006, stated of NSM ["A Network Security Monitor", ISS04149-57 at ISS04153;

SYM_P 0604553-69 at SYM_P 0604565], "The current traffic matrix was not a short-term

profile as required by the claims of the '338 patent" (his report page 24, section 56). I further

note that NSM disclosed storing in its current traffic matrix the current number of packets and

the number of bytes transmitted for each network connection, and that PNADS stores in its

current traffic sample the current number of bits transmitted for each traffic filter.

As I stated in my rebuttal report, PNADS heuristic #8 is implemented by creating and

maintaining baselines for each configured traffic filter. I further understand from Mr. Song's

deposition transcript and my discussion with him on October 5, 2006 that PNADS stores a

moving average in the 30 minute bins for the most recent Day, Week, and Continuous

measurements, where each baseline consists of a static number of 30 minute time bins per

timeframe (1 for Continuous Baseline, 48 for Day Baseline, 336 for Week Baseline). A

composite score is calculated to compare against the current 2 minute snapshot. The composite

score is a percentage times the weighted sum of the averages from the Day, Week, and

Continuous bins. In my rebuttal report (e.g., p. 25, pp.30-31), I referred to storing the mean and

standard deviation in the bins. I understand from Mr. Song's deposition that the mean and

standard deviation are not computed and that the moving average is the metric. I confirmed this with Mr. Song on October 5, 2006. In my opinion, this moving average is not a probability distribution and therefore would not be a statistical profile under Defendants' construction. I believe SRI's construction of the statistical profile as a statistical description is vague and depending on what SRI means by this term, a moving average may not qualify.

Further, as I stated at my deposition (e.g., p. 245), there were typographical errors concerning the algorithm used in heuristic # 8 for PNADS. As I describe on p. 27 of my rebuttal report, PNADS uses a fixed threshold in the comparison of the current traffic snapshot against the composite score from the baselines. On p. 24, I failed to edit the portion where I described this comparison as determining whether the current traffic rates exceed the composite score by "more than 5 standard deviations" to indicate that a fixed threshold is used instead of standard deviations.

I reserve the right to amend or supplement this statement based on further discovery, proceedings and preparation in this action, including the Court's rulings on claim construction and on the pending summary judgment motions.

Dated: October 9, 2006

_____
Stephen E. Smaha

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


SRI INTERNATIONAL,   : NO. 04-1199-SLR
INC., a California   :
corporation,   :
Plaintiff   :
   :
   vs.   :
   :
INTERNET SECURITY   :
SYSTEMS, INC., a   :
Delaware corporation,   :
INTERNET SECURITY   :
SYSTEMS, INC., a   :
Georgia corporation,   :
and SYMANTEC   :
CORPORATION, a   :
Delaware corporation,   :
Defendants   :

\*   \*   \*

SEPTEMBER 9, 2008

\*   \*   \*


     Deposition of STEPHEN E. SMAHA taken at

the law offices of Fish & Richardson, 919 North

Market Street, Suite 1100, Wilmington,

Delaware, commencing at 2:01 p.m. before Debbie

Leonard, Registered Merit Reporter, Certified

Realtime Reporter.


\*   \*   \*
VERITEXT NATIONAL COURT REPORTING COMPANY
KNIPES COHEN
1801 Market Street - Suite 1800
Philadelphia, PA 19103

Page 22

```
 1        STEPHEN E. SMAHA
 2        MR. WEINGAERTNER: Objection.
 3   Asked and answered.
 4        THE WITNESS: I think you need
 5   to repeat the question, because I'm
 6   getting a little lost here.
 7   BY MR. CARLSON:
 8    Q.   Okay.  And I -- I ask that you
 9   two do not speak over each other's statements.
10        MR. WEINGAERTNER: I'm allowed
11   to interpose an objection, which I will
12   continue to do if I need to.
13   BY MR. CARLSON:
14    Q.   Is it your opinion -- strike
15   that.
16        When you wrote your rebuttal
17   report, was it your understanding that the
18   PNADS method used a short-term profile?
19        MR. WEINGAERTNER: Objection.
20   Asked and answered.  You've asked it
21   about four or five times now, correct?
22        THE WITNESS: I described it as
23   a profile, yes.  I described the
24   short-term entity -- I used the word
25   "profile" to describe the short-term
```

Page 23

```
 1        STEPHEN E. SMAHA
 2   entity in this paragraph on page 27.
 3   BY MR. CARLSON:
 4    Q.   Now, did you ever change your
 5   opinion? Actually, before you answer that, do
 6   you still agree with the opinion that you set
 7   forth in your rebuttal report?
 8    A.   If -- I guess, as you probably
 9   notice, in the supplemental report I described
10   the process differently.
11    Q.   Let's just stick with my
12   question.
13    A.   Uh-huh.
14    Q.   Is it still your opinion that
15   the PNADS method uses a fixed threshold to
16   compare the short-term and long-term profiles?
17    A.   No.
18    Q.   Did you change your opinion?
19    A.   I did.
20    Q.   Let's talk about what prompted
21   this change in your opinion.
22        MR. WEINGAERTNER: Is there a
23   question pending?
24        MR. CARLSON: Not yet.
25   BY MR. CARLSON:
```

Page 24

```
 1        STEPHEN E. SMAHA
 2    Q.   Why did you change your opinion?
 3    A.   I received additional
 4   information about the way the software actually
 5   worked that required me, as a matter of
 6   technical fact, to change the description of
 7   how it operated.
 8    Q.   Okay.
 9    A.   My objective in filing the
10   supplemental report was to be technically
11   accurate and to describe things as I knew them
12   to be.
13    Q.   What did you learn that prompted
14   the change in your opinion?
15        MR. WEINGAERTNER: Let the
16   record reflect that counsel is banging
17   the table while questioning the
18   witness.
19        MR. CARLSON: Let the record
20   reflect I tapped my pen on the table.
21        THE WITNESS: I had two
22   additional sets of information that
23   came in to me.  They were referred to
24   in the supplemental report.
25        One of them was a description --
```

Page 25

```
 1        STEPHEN E. SMAHA
 2   one of them was the deposition
 3   transcript -- actually, I guess there's
 4   three.
 5        There was a document called a
 6   declaration, I believe, dated sometime
 7   in July, I believe it was, from Doug
 8   Song where he described in more detail
 9   how things worked in the PNADS.
10   BY MR. CARLSON:
11    Q.   And what else?
12    A.   And there was a telephone -- he
13   had a deposition, which I don't recall the date
14   of his deposition.  I believe it was August,
15   but you can probably correct that.
16    Q.   Yeah.  I'll give you a copy of
17   it.  Let's mark as Exhibit 623 a copy of the
18   transcript of the deposition of Douglas Song.
19             * * *
20        (Exhibit 623 marked for
21   identification.)
22             * * *
23   BY MR. CARLSON:
24    Q.   What -- why don't you take a
25   minute, if you want, and show me where in this
```

7 (Pages 22 to 25)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000        888-777-6690

0b6a0d30-9419-40b3-96bc-1938eb4f6720