# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SRI INTERNATIONAL, INC.,<br>a California Corporation,<br><br>       Plaintiff,<br><br>    v.<br><br>INTERNET SECURITY SYSTEMS, INC.,<br>a Delaware Corporation,<br>INTERNET SECURITY SYSTEMS, INC.,<br>a Georgia Corporation, and<br>SYMANTEC CORPORATION,<br>a Delaware Corporation,<br><br>       Defendants. | Civil Action No. 04-CV-1199 (SLR) |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTIONS FOR POST TRIAL RELIEF REGARDING INVALIDITY OF THE '203 AND '615 PATENTS

Richard K. Herrmann (#405)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
Tel: (302) 888-6800
Fax: (302) 571-1751
rherrmann@morrisjames.com

OF COUNSEL:

Robert M. Galvin (*pro hac vice*)
Paul S. Grewal (*pro hac vice*)
Renee DuBord Brown (*pro hac vice*)
Geoffrey M. Godfrey (*pro hac vice*)
DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014
Tel: (408) 873-0110
Fax: (408) 873-0220
*Attorneys for Defendant Symantec Corporation*

Richard L. Horwitz (#2246)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
Fax: (302) 658-1192
dmoore@potteranderson.com

OF COUNSEL:

Holmes J. Hawkins III (*pro hac vice*)
Natasha H. Moffitt (*pro hac vice*)
Charles A. Pannell, III (*pro hac vice*)
KING & SPALDING, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Tel: (404) 572-2600
Fax: (404) 572-5134

*Attorneys for Defendants*
*Internet Security Systems, Inc. (Del. corp.)*
*Internet Security Systems, Inc. (Ga. corp.)*

Dated: November 17, 2008

# TABLE OF CONTENTS

I.      NATURE AND STAGE OF THE PROCEEDINGS ...................................................1

II.     DEFENDANTS SHOULD BE GRANTED JUDGMENT OF
        INVALIDITY ON ALL OF THE ASSERTED CLAIMS OF THE
        '203 AND '615 PATENTS AS A MATTER OF LAW ..............................................1

        A.      Summary of the Argument ............................................................1

        B.      Judgment as a Matter of Law Legal Standard ................................5

        C.      Jury Verdict of No Obviousness is Incorrect as a Matter of Law...................6

                1.      Background Regarding the Unusual Posture of the
                        *Emerald 1997* Reference ....................................6

                2.      Obviousness is a Legal Issue for the Court and Requires
                        Added Scrutiny Due to the Unusual Situation Presented
                        in this Case........................................................................7

                3.      No Legitimate Dispute over Factual Underpinnings of
                        Obviousness........................................................................8

                4.      *Emerald 1997* Combined with *Intrusive Activity 1991*
                        Rendered the Claims Obvious ........................................10

                        a)      No Dispute that *Intrusive Activity 1991*
                                Disclosed Several of the Claimed Categories of
                                Network Traffic ....................................10

                        b)      Only Dispute Was Whether There Was a
                                Motivation to Combine..........................................12

                        c)      SRI's Attempt to Read Additional Limitations
                                into the Claims Does Not Create a Factual
                                Dispute About Motivation to Combine ................14

                5.      *Emerald 1997* Combined with the Knowledge of One
                        of Ordinary Skill in the Art Rendered the Claims
                        Obvious........................................................................17

                        a)      SRI's Expert's Argument Was Unclear and Not
                                Credible........................................................19

                6.      Weak Secondary Considerations Cannot Overcome the
                        Strong Case of Obviousness ....................................19

i

a)     Legal Standards for Secondary Considerations of Obviousness.................................................................. 19

b)     Commercial Success .............................................................. 20

c)     Praise for the Patented Invention ........................................... 23

D.     Jury Verdict of No Anticipation Was Not Supported by Substantial Evidence ................................................................... 25

    1.     Legal Standard for Anticipation ...................................... 25

    2.     *Emerald 1997* Anticipated the '615 Claims ..................... 25

       a)     *Emerald 1997* Disclosed and Enabled Use of "well-known network service protocols" ............................. 25

    3.     RealSecure Anticipated All of the Claims .......................... 28

       a)     Correlation is a Form of Integration and It Was Undisputedly Met ................................................................ 29

       b)     No Reasonable Jury Could Find That the RealSecure Activity Tree Was Not a "Different End Product" As the Court Has Construed Integration ........................................................................ 30

       c)     SRI's Arguments to the Contrary Are Based on Post Hoc Limitations Not Supported By the Claims or Claim Constructions ............................................. 33

          (1)     SRI's "Meaningful" Integration Limitation is Not Supported by the Claims and is an Indefinite Limitation ..................... 33

          (2)     There is No Requirement That Integration Performed by the Hierarchical Monitor Must Automatically Detect System-Wide Attacks ......................................................... 35

          (3)     There is No Evidence or Requirement That Report Integration Occur Over a Certain Time Period or that the RealSecure Product Work Flawlessly ....................... 35

    4.     *Live Traffic* Anticipated All of the Claims ....................... 36

       a)     The Undisputed Facts Regarding *Live Traffic* ..................... 36

             b)    The *Live Traffic* Trial Record Refuted Any Inferences Drawn in Favor of SRI During Summary Judgment ................................................ 37

      5.   *DIDS 1991* Anticipated All of the Claims ........................................ 41

             a)    Background on DIDS and Undisputed Facts ........................ 41

             b)    SRI's Arguments Regarding Enablement Did Not Create Substantial Evidence ........................... 42

             c)    SRI's Additional Argument Regarding Scalability Was Irrelevant Because There is No Such Limitation in the Claims ................................. 45

III.   IN THE ALTERNATIVE TO JUDGMENT AS A MATTER OF LAW, DEFENDANTS SHOULD BE GRANTED A NEW TRIAL ON THE VERDICTS AGAINST THEM, ON SEVERAL ALTERNATIVE GROUNDS ................................................................... 46

    A.   New Trial Legal Standards ............................................................ 46

    B.   The Verdict Was Against the Clear Weight of the Evidence, and Manifest Injustice Would Result if a New Trial is Not Granted................................................................................................ 47

    C.   The Court's Refusal to Admit Relevant Evidence and Provide Appropriate Jury Instructions Merits a New Trial ......................... 48

      1.   Refusal to Admit the Reexaminations was Prejudicial Error ................................................................................. 48

      2.   Refusal to Revise the Burden of Proof Standard for Invalidity was Prejudicial Error ........................................ 50

      3.   Refusal to Instruct the Jury Regarding the Law of the Case Was Prejudicial Error ................................................. 53

    D.   The Court's Incorrect and Prejudicial Revision of Claim Construction Merits a New Trial ................................................... 55

      1.   The Court's Revised Claim Construction is Incorrect ...................... 55

      2.   The Revised Claim Construction Effectively Precluded One of Defendants' Invalidity Arguments ......................... 56

      3.   The Court's Unfair Surprise in Revising the Claim Construction During Trial Was Prejudicial Error ............. 57

IV.   CONCLUSION .......................................................................................... 60

**Cases**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000) ........................................................ 47

*Agrizap, Inc. v. Woodstream Corp.*,
520 F.3d 1337 (Fed. Cir. 2008) ................................................... 8, 20

*Allied Chem. Corp. v. Daiflon, Inc.*,
449 U.S. 33 (1980)............................................................................ 46

*Alza Corp. v. Mylan Labs., Inc.*,
464 F.3d 1286 (Fed. Cir. 2006) ....................................................... 20

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
725 F.2d 1350 (Fed. Cir. 1984) ....................................................... 51

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ....................................................... 29

*Amoco Corp. v. Exxon Chem. Co.*,
No. C87-242A, 1987 U.S. Dist. LEXIS 14196  (N.D. Ga. 1987) ................................. 52, 53

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
310 F. Supp. 2d 638 (D. Del. 2004)................................................. 47

*Ashland Oil v. Delta Resins & Refractories*,
776 F.2d 281 (Fed. Cir. 1985) ......................................................... 19

*Asyst Tech. v. Emtrak*,
C-98-20451-JF (N.D. Cal. 2007)..................................................... 50

*Becton Dickinson & Co. v. Tyco Healthcare Group LP*,
No. 02-1694 GMS, 2006 WL 890995 (D. Del. Mar. 31, 2006) .......................................... 57

*Bhaya v. Westinghouse Elec. Corp.*,
709 F. Supp. 600 (E.D. Pa. 1989) .................................................... 47

*Brady v. Chem. Constr. Corp.*,
740 F.2d 195 (2d Cir. 1984) ............................................................ 57

*Callaway Golf Co. v. Acushnet Co.*,
Civ. No. 06-091-SLR, 2008 WL 4850755 (D. Del. Nov. 10, 2008) ................................. 29

*Comcast Cable Commc'ns Corp. v. Finisar Corp.*,
571 F. Supp. 2d 1137 (N.D. Cal. 2008) ........................................... 13

*Consolidated Edison Co. v. NLRB*,

305 U.S. 197 (1938) ...................................................................................................... 5

*Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*,
   851 F.2d 1387 (Fed. Cir. 1988) ........................................................................... 19, 21

*Dystar Textilfarben GmbH v. C.H. Patrick Co.*,
   464 F.3d 1356 (Fed. Cir. 2006) ..................................................................................... 7

*E.I. Du Pont de Nemours & Co., v. Phillips Petroleum Co.*,
   656 F. Supp. 1343 (D. Del. 1987)......................................................................... 50, 53

*Eaton Corp. v. Rockwell Int'l Corp.*,
   No. 97-421-JJF, 2001 U.S. Dist. LEXIS 17054 (D. Del. Oct. 10, 2001) ........................... 57

*Elan Pharms., Inc. v. Mayo Found.*,
   346 F.3d 1051 (Fed. Cir. 2003) .................................................................................. 43

*Eli Lilly and Co. v. Aradigm Corp.*,
   376 F.3d 1352 (Fed. Cir. 2004) .................................................................................... 5

*Finch v. Hercules Inc.*,
   941 F. Supp. 1395 (D. Del. 1996)............................................................................... 47

*Fineman v. Armstrong World Indus., Inc.*,
   980 F.2d 171 (3d Cir. 1992) ................................................................................. 47, 48

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966)................................................................................................... 7, 8

*Group One Ltd. v. Hallmark Cards, Inc.*,
   407 F.3d 1297 (Fed. Cir. 2005) .................................................................................. 12

*Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*,
   777 F. Supp. 330 (D. Del. 1991) ................................................................................. 19

*IMX, Inc. v. Lendingtree*,
   469 F.Supp.2d 203 (D. Del. 2007)............................................................................... 48

*In re Clay*,
   966 F.2d 656 (Fed. Cir. 1992) ................................................................................... 16

*In re DBC*,
   No. 2008-1120, 2008 WL 4764340, (Fed. Cir. Nov. 3, 2008) .......................................... 21

*In re Etter*,
   756 F.2d 852 (Fed. Cir. 1985) ................................................................................... 52

*In re Huang*,
   100 F.3d 135 (Fed. Cir. 1996) ................................................................................... 21

*In re Icon Health and Fitness, Inc.*,
496 F.3d 1374 (Fed. Cir. 2007) ...................................................................... 15

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006) ......................................................................... 7

*In re Klofenstein*,
380 F.3d 1345 (Fed. Cir. 2004) ...................................................................... 37

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ...................................................................... 49

*Jansen v. Rexall Sundown, Inc.*,
342 F.3d 1329 (Fed. Cir. 2003) ...................................................................... 40

*Key Pharms. v. Hercon Lab. Corp.*,
161 F.3d 709 (Fed. Cir. 1998) ........................................................................ 55

*KSR Int'l Co. v. Teleflex Inc.*,
127 S. Ct. 1727 (2007)................................................. 3, 8, 12, 17, 18, 51, 52

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
485 F.3d 1157 (Fed. Cir. 2007) ...................................................................... 20

*Lind v. Schenley Indus., Inc.*,
278 F.2d 79 (3d Cir. 1960) .............................................................................. 48

*Link v. Mercedes-Benz of N. Am., Inc.*,
788 F.2d 918 (3d Cir. 1986) ........................................................................... 47

*Lucent Techs., Inc. v. Newbridge Networks Corp.*,
168 F. Supp. 2d 181 (D. Del. 2001)........................................................... 46, 59

*McQueeney v. Wilmington Trust Co.*,
779 F.2d 916 (3d Cir. 1985) ........................................................................... 47

*Minnesota Mining and Mfg. Co. v. Chemque, Inc.*,
303 F.3d 1294 (Fed. Cir. 2002) ...................................................................... 43

*Muniauction, Inc. v. Thomson Corp.*
532 F.3d 1318 (Fed. Cir. 2008) ................................................................... 8, 18

*New Hampshire v. Maine*,
532 U.S. 742 (U.S. 2001)................................................................................ 55

*Newell Cos. v. Kenney Mfg. Co.*,
864 F.2d 757 (Fed. Cir. 1988) ........................................................................ 20

*Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*,
424 F.3d 1347 (Fed. Cir. 2005) ...................................................................... 43

*Oakley, Inc. v. Sunglass Hut Int'l,*
   316 F.3d 1331 (Fed. Cir. 2003) ........................................................ 28

*Ormco Corp. v. Align Tech., Inc.,*
   463 F.3d 1299 (Fed. Cir. 2006) .......................................... 20, 23, 29

*Pannu v. Iolab Corp.,*
   155 F.3d 1344 (Fed. Cir. 1998) .......................................................... 5

*Penn Int'l Indus., Inc. v. New World Mfg. Inc.,*
   691 F.2d 1297 (9th Cir. 1982) ......................................................... 52

*Pfizer, Inc. v. Apotex, Inc.,*
   480 F.3d 1348 (Fed. Cir. 2007) ....................................................... 20

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.,*
   491 F.3d 1342 (Fed. Cir. 2007) ......................................................... 7

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) ....................................................... 56

*Power Mosfet Techs., LLC v. Siemens AG,*
   378 F.3d 1396 (Fed. Cir. 2004) ....................................................... 58

*Richardson-Vicks, Inc. v. Upjohn Co.,*
   122 F.3d 1476 (Fed. Cir. 1997) ....................................................... 25

*Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.,*
   459 F.3d 1311 (Fed. Cir. 2006) ....................................................... 47

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.,*
   511 F.3d 1186 (Fed. Cir. 2008), 2007 WL 869734 ........... 2, 6, 16, 36, 37, 38, 39, 40, 41, 53

*U.S. Expansion Bolt Co. v. Jordan Indus., Inc.,*
   488 F.2d 566 (3d Cir. 1973) ........................................................... 52

*Union Pac. Res. Co. v. Chesapeake Energy Corp.,*
   236 F.3d 684 (Fed. Cir. 2001) ......................................................... 34

*Uniroyal, Inc. v. Rudkin-Wiley Corp.,*
   837 F.2d 1044 (Fed. Cir. 1988) ....................................................... 51

*United States v. Potter,*
   616 F.2d 384 (9th Cir. 1979) ........................................................... 59

*Upjohn Co. v. MOVA Pharm. Corp.,*
   225 F.3d 1306 (Fed. Cir. 2000) ................................................... 8, 16

*Verdegaal Bros., Inc. v. Union Oil Co.,*
   814 F.2d 628 (Fed. Cir. 1987) ......................................................... 25

*Wechsler v. Macke Int'l Trade, Inc.*,
    486 F.3d 1286 (Fed. Cir. 2007) ...................................................... 16

*Williamson v. Consol. Rail Corp.*,
    926 F.2d 1344 (3d Cir. 1991) ........................................................ 5

*Zarow-Smith v. N.J. Transit Rail Operations*,
    953 F. Supp. 581 (D. N.J. 1997) ................................................. 46

*Zegan v. Central R. Co.*,
    266 F.2d 101 (3d Cir. 1959) ........................................................ 46

*Zenon Envlt., Inc. v. United States Filter Corp.*,
    506 F.3d 1370 (Fed. Cir. 2007) ................................................... 25

**Statutes**

35 U.S.C. § 102(b) ................................................ 6, 25, 26, 28, 36, 41

35 U.S.C. § 103 .............................................................................. 7

35 U.S.C. § 282 ............................................................................ 51

**Rules**

Fed. R. Civ. P. 50(b) ..................................................................... 5

Fed. R. Civ. P. 59(a) .................................................................... 46

Fed. R. Evid. 106 ......................................................................... 49

Fed. R. Evid. 803(8) ..................................................................... 49

## I.  NATURE AND STAGE OF THE PROCEEDINGS

On October 14, 2008, following a jury verdict and entry of judgment in favor of Plaintiff SRI International, Inc. ("SRI"), Defendants Symantec Corporation ("Symantec") and Internet Security Systems, Inc. ("ISS") timely filed renewed motions for judgment as a matter of law under Rule 50(b), and for a new trial under Rule 59(a).[1]  *See* D.I. 565, D.I. 566, D.I. 567. Pursuant to the briefing schedule approved by the Court, Symantec and ISS jointly submit this memorandum to address invalidity issues regarding U.S. Patent No. 6,484,203 ("the '203 patent") and U.S. Patent No. 6,711,615 ("the '615 patent") raised in their post-trial motions.  *See* D.I. 562.  Separate memoranda regarding non-infringement issues will be filed by both Defendants.

Defendants jointly seek judgment as a matter of law that claims 1, 13, 14 and 16 of the '615 patent and claims 1 and 12 of the '203 patent are invalid for anticipation and obviousness.[2] In addition, a new trial is warranted based upon evidentiary and other errors of the Court that unfairly influenced the verdict and severely prejudiced Defendants' presentation of their case at trial, and because the verdict is against the clear weight of the evidence.

## II.  DEFENDANTS SHOULD BE GRANTED JUDGMENT OF INVALIDITY ON ALL OF THE ASSERTED CLAIMS OF THE '203 AND '615 PATENTS AS A MATTER OF LAW

### A.  Summary of the Argument

This case is unusually suited for judgment as a matter of law.  A related patent (U.S. Patent No. 6,708,212 ("the '212 patent")) sharing the same specification and all but one of the same claim limitations was previously held by this Court to be invalid based upon the *Emerald*

---

[1] Defendants moved at trial for Rule 50(a) judgment.  The Court reserved ruling.  9/15/08 T. Tr. 2072:15-2074:19.

[2] SRI also accused ISS, but not Symantec, of infringing U.S. Patent No. 6,321,338.  ISS will be filing a memorandum for judgment as a matter of law and a new trial separately with regard to that patent.

*1997* reference (DTX-356) – one of Defendants' key references at trial. D.I. 472 (10/17/06 Order); *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186 (Fed. Cir. 2008). The Notice of Allowance for the '203 patent made clear that the original patent examiner did not understand or appreciate the teachings of the prior art *Emerald 1997* reference because his reasons for allowance contradicted this Court's subsequent adjudication regarding *Emerald 1997*. 9/12/08 T. Tr. 1929:15-1930:14. By the time of trial, both the '203 and '615 patents had been placed into reexamination, and initial office actions rejecting all of the claims as obvious had issued based upon the *Emerald 1997* reference combined with *Intrusive Activity 1991*(DTX-9).[3] Following trial, the reexamination examiner issued final office actions again rejecting all of the claims.[4]

The jury, however, knew none of these facts. The Court ruled that the jury would not be instructed on the prior adjudications regarding *Emerald 1997* and that only a statement agreed to by SRI could be admitted. 8/20/08 Pretrial Conf. Tr. 52:23-53:21. SRI exploited this ruling by eliciting testimony from its expert, Dr. Kesidis, that contradicted the prior adjudications. SRI's counsel then compounded the prejudice by arguing to the jury that SRI was "happy to admit what was known in the prior art," 9/15/08 T. Tr. 2107:14-16, when throughout this case SRI and its expert Dr. Kesidis had repeatedly denied *Emerald 1997*'s relevant, anticipatory disclosures.

Concerned about the possibility of juror confusion, the Court excluded all evidence at trial relating to the reexaminations. *See* D.I. 532 (8/28/08 Order). Again, SRI exploited this ruling by repeatedly arguing that all of the art cited by the Defendants was considered and rejected by the examiner. *See, e.g.*, 9/2/08 T. Tr. 111:20-112:12 (SRI Counsel); 9/15/08 T. Tr. 2093:11-16, 2097:10-19, 2122:15-22, 2131:9-20, 2148:7-10 (SRI Counsel). The jury never

---

[3] 11/17/08 Decl. of Renee D. Brown in Supp. of Defendants' Mem. in Supp. of Their Mot. for Post Trial Relief Regarding Invalidity of the '203 and '615 Patents, Exs. 1-4 [hereinafter "Brown Decl."].

[4] Brown Decl., Exs. 5-6.

heard that when presented with the combination of *Emerald 1997* and *Intrusive Activity 1991*, the Patent Office reconsidered its earlier decisions, declared reexaminations, and rejected all of the claims. Defendants could only sit in silence, unable to cross-examine witnesses on these points or argue to the jury that the Patent Office had reconsidered its earlier decisions or acted inconsistently with binding adjudications of this Court.

Unlike the jury, however, this Court has the benefit of the knowledge of its prior binding adjudications as well as the Patent Office's independent assessment of Defendants' invalidity defenses. Since obviousness is ultimately an issue of law, it is well-suited for judgment as a matter of law where, as here, the relevant, underlying facts are beyond any dispute. There was no dispute at trial that ***all*** of the elements of the claims were known in the prior art before the patents were filed, placing this case squarely into the scenario of a "combination of familiar elements according to known methods," which the recent *KSR* case warned merits "the need for caution." *See KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1739 (2007). Given the undisputed facts of record, this Court should conclude as a matter of law that the claimed inventions would have been obvious to a person of ordinary skill in the art reading *Emerald 1997* in light of what was already known in the field at that time.

Furthermore, Defendants proved at trial that the '203 and '615 claims were also obvious in light of the combination of *Emerald 1997* with its internally-cited reference, *Intrusive Activity 1991*.[5] There was no dispute that this combination disclosed all of the claim limitations – the only dispute was whether or not a motivation to combine existed. The Supreme Court in *KSR* has recently revised and greatly lowered the standard of proof required on this issue, rejecting the "rigid" teaching, suggestion or motivation test. *KSR.*, 127 S. Ct. at 1739. However, this is not a

---

[5] Defendants previously moved for summary judgment on this issue. *See* D.I. 297 (original summary judgment motion), D.I. 504 (renewing summary judgment request at 4/29/08 status conference).

case of mere dueling expert testimony regarding the motivation to combine. Here, the *Emerald 1997* reference contained an ***explicit*** citation, suggestion, and motivation to combine with *Intrusive Activity 1991*. Given this overwhelming evidence, the Court should enter judgment as a matter of law that the claims are invalid for obviousness.

With regard to anticipation, Defendants proved at trial that four different prior art references anticipated the claims-in-suit: the *Emerald 1997* publication (DTX-356), the RealSecure system, the *DIDS 1991* publication (DTX-21), and the *Live Traffic* publication (DTX-499).

Although anticipation is a factual issue, with regard to these references, there was only a single issue in dispute with respect to each reference. For *Emerald 1997*, the only dispute regarding the anticipation of the '615 claims was SRI's expert's testimony about a lack of "teaching" in *Emerald 1997*. Since this testimony was contrary to the law of the case, the verdict on this issue cannot stand. For RealSecure, the only dispute regarding anticipation was whether the product performed the claimed "integration" step. Given the admissions of SRI's expert, a reasonable juror could not have found in SRI's favor. For *DIDS 1991,* the only dispute was whether the publication enabled integration from multiple network monitors. Again, SRI's reliance on conclusory opinion testimony from its expert, Dr. Kesidis, is insufficient to support the verdict as a matter of law. Finally, with regard to the *Live Traffic* publication, the only dispute was whether the publication was publicly accessible. As shown below, Defendants overwhelmingly proved accessibility, and established that SRI's prior arguments for avoiding summary judgment on this reference were meritless.

SRI's entire response to Defendants' invalidity defenses relied almost exclusively upon conclusory opinions from its "expert" Dr. Kesidis, who was admittedly not one of ordinary skill in the art at the time the patents were filed. 9/12/08 T. Tr. 1907:5-14 (Kesidis). In many instances, Dr. Kesidis attempted to create disputes where none existed by reading non-existent

limitations into the claims, and in certain instances even testified contrary to the previously established law of the case in his attempts to create a factual dispute. When the record is examined, it is clear that there was no substantial evidence upon which a reasonable jury could rely to find the claims valid. Judgment as a matter of law should therefore be entered in Defendants' favor.

Furthermore, Defendants are also entitled to a new trial based upon several prejudicial errors relating to evidentiary rulings and jury instructions during the trial as well as the verdict being against the clear weight of the evidence.

### B. Judgment as a Matter of Law Legal Standard

In order to prevail on a renewed motion for judgment as a matter of law following a jury trial under Fed. R. Civ. P. 50(b), Defendants "'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (citations omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). What constitutes substantial evidence is also determined with respect to the burden of proof that the litigant bore at trial. *See Eli Lilly and Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004). In assessing the sufficiency of the evidence, the court must give the non-moving party "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991).

## C. Jury Verdict of No Obviousness is Incorrect as a Matter of Law

### 1. Background Regarding the Unusual Posture of the *Emerald 1997* Reference

The *Emerald 1997* reference, authored by one of the named inventors, is admittedly 35 U.S.C. § 102(b) prior art. JTX-1 (Statement of Facts Which are Admitted); DTX-356 (P.A. Porras & P. G. Neumann, *EMERALD: Event Monitoring Enabling Responses to Anomalous Live Disturbances*, 20th National Information Systems Security Conference, 1:353-365 (Oct. 1997)). Due to the previous rulings by this Court and the Federal Circuit invalidating SRI's '212 patent as anticipated by *Emerald 1997*, SRI was precluded from disputing much of the scope and content of *Emerald 1997*. D.I. 472 (10/17/06 Order); *SRI*, 511 F.3d 1186. These prior rulings mandated that all but one small portion of the claims of the '203 and '615 patents – the element regarding the claimed categories of network traffic data – were disclosed and enabled by *Emerald 1997*:

| Disclosed by *Emerald 1997* (from anticipated '212 Claim 1) | '615 Claim 1[6] |
|---|---|
| Method for monitoring an enterprise network, said method comprising the steps of: | A computer-automated method of hierarchical event monitoring and analysis within an enterprise network comprising: |
| deploying a plurality of network monitors in the enterprise network; | deploying a plurality of network monitors in the enterprise network; |
| detecting, by the network monitors, suspicious network activity based on analysis of network traffic data, wherein at least one of the network monitors utilizes a statistical detection method; | detecting, by the network monitors, suspicious network activity based on analysis of network traffic data |
|  | **selected from one or more of the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service** |

---

[6] '203 claim 1 is identical to '615 claim 1 except that it does not contain two of the listed network traffic data categories.

| Disclosed by *Emerald 1997* (from anticipated '212 Claim 1) | '615 Claim 1[6] |
|---|---|
|  | protocols}; |
| generating, by the monitors, reports of said suspicious activity; and | generating, by the monitors, reports of said suspicious activity; and |
| automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors. | automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors. |

Though the contested category limitation appears long, making up eight individual categories, a prior art reference actually only needs to disclose **one** of the categories to invalidate the claim—a point on which the jury expressed some confusion. D.I. 552 (9/14/08 Juror Question). Aside from the claim element highlighted above, all independent and dependent claim limitations at issue for the '203 and '615 patents were admittedly disclosed and enabled by *Emerald 1997*. JTX-1.

### 2. Obviousness is a Legal Issue for the Court and Requires Added Scrutiny Due to the Unusual Situation Presented in this Case

Pursuant to 35 U.S.C. § 103, "[a] claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art." *See In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006); 35 U.S.C. § 103. "[O]bviousness depends on (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations, including commercial success, long felt but unsolved needs, and failure of others." *Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)). At trial, defendants bore the burden of proving obviousness by clear and convincing evidence. *See Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1370 (Fed. Cir. 2007).[7]

---

[7] Although Defendants have applied this standard here, it is disputed as to whether it should apply in this particular case. *See infra* Section III.C.2 regarding Defendants' motion for a new

The ultimate conclusion of obviousness is a legal determination. *KSR*, 127 S. Ct. at 1745-46 (citing *Graham,* 383 U.S. at 17). A jury's conclusion on obviousness, a question of law, is reviewed "**without deference.**" *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1324 (Fed. Cir. 2008) (underlying findings of fact, whether explicit or implicit from the verdict, are reviewed for substantial evidence). Where the factual underpinnings of obviousness are not in material dispute, the ultimate judgment of obviousness is for the Court. *See Upjohn Co. v. MOVA Pharm. Corp.*, 225 F.3d 1306, 1310 (Fed. Cir. 2000) ("The ultimate question of obviousness vel non is reviewed as a matter of law, viewing the evidence, **when it is reasonably in dispute**, in the manner most favorable to the verdict." (emphasis added); *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008) (reversing the district court's denial of defendant's motion for JMOL as to obviousness because "the objective evidence of nonobviousness simply [could not] overcome such a strong prima facie case of obviousness").

The Supreme Court has recently addressed and modified the obviousness inquiry. *KSR*, 127 S. Ct. 1727. *KSR* reiterated that obviousness is a question of law for the Court, and amenable to resolution on summary judgment despite "conclusory" expert testimony. *Id*. at 1745-46. *KSR* also explained that combinations are obvious if they are no more than the predictable use of old elements according to their established functions. *Id*. at 1739. *KSR* also dramatically lowered the standard for motivation to combine, making it no longer necessary to show a "teaching, suggestion, or motivation" to combine in the prior art itself. *Id*. at 1739-41 (rejecting the "rigid approach" of the Court of Appeals).

### 3. No Legitimate Dispute over Factual Underpinnings of Obviousness

With regard to the issue of obviousness, there were almost no factual disputes at trial. First, there was no dispute over the level of one of ordinary skill in the art. The uncontested

---

trial arguing the burden of proof should have been lower due to the unusual circumstances in this case regarding *Emerald 1997* and the ongoing reexaminations of the patents.

definition at trial for one of ordinary skill in the art was:

> [S]omeone with an undergraduate degree in computer science, with three to five years experience in computer programming and network design, ***with an emphasis in network monitoring technology*** and intrusion detection.

9/5/08 T. Tr. 947:1-4 (Heberlein) (emphasis added); *see also* 9/8/08 T. Tr. 1090:23-1091:3

(Heberlein).

Second, there was no dispute over the differences between the claims and the prior art.

As discussed above, it was already adjudicated that *Emerald 1997* satisfied all but one element of

the claims: the categories of network traffic data. JTX-1. Thus at best, a single difference

existed between the claims-at-issue and *Emerald 1997*.[8]

Even with regard to the remaining element – the categories of network traffic data – it

was undisputed at trial that the claimed categories were not novel. The inventor and SRI's

expert admitted the claimed categories were well-known ***in the relevant art*** long before the

patents were filed:

> Q.   Now, Mr. Porras, you and Mr. Valdes didn't invent these categories; correct?
> A.   We didn't invent the categories? We didn't invent the categories. We selected, yes.
> Q.   People monitor [sic] these categories before you; right?
> A.   These various categories have been looked at by other people, sure.
> Q.   For example, people measured network packet data volume for many years before you filed your patent application; correct?
> A.   Yes, probably. Yes.

9/11/08 T. Tr. 1354:2-12 (Porras); s*ee also* 9/11/08 T. Tr. 1354:13-1356:14) (Porras – others in

the field monitored several of the claimed categories and identified suspicious network activity

using the categories before the inventors did ), 1360:1-12 (Porras – two years before the patent,

people in the field of intrusion detection already knew how to detect suspicious network activity

using the claimed network connection request category); 9/12/08 T. Tr. 1933:13-24, 1935:22-

1936:8 (Kesidis – prior art commercial systems including RealSecure monitored network traffic

---

[8] As discussed in Section II.D.2, *Emerald 1997* also anticipated the claims of the '615 patent.

using the claimed categories).  Defendants' experts also testified that the claimed categories of network traffic were well-known in the prior art.  9/5/08 T. Tr. 1014:21-1015:24, 1020:5-12 (Heberlein - prior art DIDS used several of the claimed categories); 9/8/08 T. Tr. 1081:19-1082:1 (Heberlein – categories described prior to critical date), 9/11/08 T. Tr. 1617:2-18 (Smaha - prior art RealSecure used several of the claimed categories); 9/12/08 T. Tr. 1711:17-1712:1 (Smaha – RealSecure used network connection requests to detect SYN floods).

Indeed, Dr. Kesidis admitted the claimed categories were some of the ***more common*** types of network traffic:

> Q.   Would you agree that the categories that are reflected here are some of the more common types of network traffic categories?
> A.   Sure.
> Q.   Things like network packet data volume?
> A.   Right.
> Q.   That's just looking at how many packets, the size of the packets that you are receiving?
> A.   Could be -- yeah, I would say -- where are we here? Network packet data, the data volume in the packets, yes.
> Q.   That would be a fairly common type of network traffic data category to monitor?
> A.   Sure.

9/4/08 T. Tr. 696:1-13 (Kesidis); s*ee also* 9/4/08 T. Tr. 696:14-22 (Kesidis).

Obviously a person skilled in the art with three to five years experience in network design, and an emphasis in network monitoring technology, would have been aware of one or more of the "common" categories used to monitor network traffic and would have had a reasonable expectation of success in using these categories for network monitoring.

### 4. ***Emerald 1997*** **Combined with** ***Intrusive Activity 1991*** **Rendered the Claims Obvious**

#### a)   **No Dispute that** ***Intrusive Activity 1991*** **Disclosed Several of the Claimed Categories of Network Traffic**

Defendants proved at trial that the *Emerald 1997* reference combined with *Intrusive Activity 1991* disclosed and enabled all of the limitations of the claims.  DTX-356; DTX-9 (L.T. Heberlein et al., *A Method to Detect Intrusive Activity in a Networked Environment*, 14th

National Computer Security Conference, pp. 362-371 (Oct. 1991)).  As noted previously, the disclosures of *Emerald 1997* were not disputed.  JTX-1.  Furthermore, it was ***undisputed*** at trial that *Intrusive Activity 1991* disclosed the use of at least two of the claimed categories of network traffic data—network packet data volume and network connection requests—for purposes of intrusion detection.

In ruling upon Defendants' prior motion for summary judgment regarding this combination, the Court previously expressed discomfort with granting summary judgment without some expert testimony on the "meaning of the text" of *Intrusive Activity 1991*.  D.I. 525 at 13.  Specifically, the Court requested testimony on whether the text disclosed detecting suspicious network activity using "network packet data volume" and network connection "requests" to one of ordinary skill in the art.  *Id.* at 12-13.  At trial, Defendants' expert presented testimony that *Intrusive Activity 1991* disclosed a method for detecting suspicious activity using both of these claimed categories:

> [S]ections three and four [of *Intrusive Activity 1991*] present the ***mechanisms by which our monitor detects intrusive activity***.

9/8/08 T. Tr. 1094:23-25 (Heberlein) (emphasis added).

> Q.    Which network traffic data categories does the intrusive activity 1991 paper . . . . specifically disclose?
> A.    The paper we were just talking about.  I was thinking of the EMERALD 1997 search paper.  I apologize.  Once again, we're looking at network connections and, in particular, the ***network packet data volume***.  That was sort of the primary thing I wanted to highlight in those passages.
> Q.    And, again, I think you said network connections?
> A.    Yes.
> Q.    Which of the categories is that?
> A.    Sorry.  ***Network connection requests***.  You'll see it over here as well.

9/8/08 T. Tr. 1100:20-1101:9 (Heberlein) (emphasis added*); see also* 9/8/08 T. Tr. 1095:3-1098:4 (Heberlein – further explanation of where *Intrusive Activity 1991* disclosed the claimed categories).

SRI's expert Dr. Kesidis did not dispute this testimony or claim that *Intrusive Activity*

*1991* did not disclose any of the claimed categories. The law of the case and undisputed record at trial make it clear that the combination of *Emerald 1997* and *Intrusive Activity 1991* disclosed and enabled all of the limitations of all of the claims.

>    **b)   Only Dispute Was Whether There Was a Motivation to Combine**

The only dispute at trial was whether or not a person of ordinary skill in the art would be motivated to combine *Emerald 1997* with its internally-cited reference *Intrusive Activity 1991*.

In *KSR*, the Supreme Court articulated the law of what may give a person of skill in the art a reason to combine. *KSR*, 127 S. Ct. at 1741. Though prior to *KSR*, the Federal Circuit required some teaching, suggestion, or motivation to combine, the Supreme Court recognized that the test for obviousness is far more expansive. *Id*. at 1739. It reasoned that "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 1742. The Supreme Court went on to identify several factors that inform a court's obviousness decision, such as whether a "combination was obvious to try" or where "there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions . . . ." *Id.*

These obvious reasons to combine are reflected in the record. First, while an obscure combination of disparate references may understandably warrant suspicion, in this case the *Emerald 1997* reference actually cited directly to the *Intrusive Activity 1991* reference as a place to find additional information for analyzing network packet data. DTX-356 at 364, 365. Seldom is there a better case for obviousness than where one reference actually cites to and describes the combining reference. Thus, this is not a case of dueling expert testimony over whether such issues as the "nature of the problem to be solved" provided a motivation to combine. *See, e.g., Group One Ltd. v. Hallmark Cards, Inc*., 407 F.3d 1297, 1305 (Fed. Cir. 2005). Instead, the main reference itself provided an ***explicit*** motivation to combine.

Similar facts have been found to show a strong motivation to combine. For example, in

*Comcast Cable Commc'ns Corp. v. Finisar Corp.*, 571 F. Supp. 2d 1137 (N.D. Cal. 2008), an independent claim had been previously adjudicated to be anticipated by the Gecsei reference. The Gecsei reference cited to the Tydeman reference. On summary judgment, the Court held a dependent claim obvious based upon the combination of Gecsei and Tydeman, which was found to disclose the remaining limitations. *Id*. at 1142.[9]

There was overwhelming evidence in the record of motivation to combine. For example, Mr. Heberlein explained that *Emerald 1997* **discussed and cited to** *Intrusive Activity 1991* in a section of *Emerald 1997* called "***Related Intrusion Detection Research***." 9/8/08 T. Tr. 1091:4-12 (Heberlein); *see also* DTX-356 at 364 ("the Network Security Monitor [7] seeks to analyze packet data rather than conventional audit trails") and 365 (listing reference [7] as *Intrusive Activity 1991*). *Intrusive Activity 1991* is one of only eight references cited in *Emerald 1997* under "Related Intrusion Detection Research" and the only one indicated as relating to "packet data." DTX-356 at 364.

Mr. Heberlein explained that it was common to cite to other research papers, and that such a citation told one of ordinary skill in the art that "[i]f you want to look at an example of analyzing network traffic, go look at this paper." 9/8/08 T. Tr. 1092:25-1093:1 (Heberlein); *see also* 1091:17-1093:9, 1100:20-1101:6 (Heberlein). Even one of the inventors and authors of the *Emerald 1997* paper, Mr. Porras, agreed that by citing to *Intrusive Activity 1991*, he was inviting the reader to go and read it if they were interested in further information about monitoring network packets – the exact topic of the relevant element of the claims. 9/11/08 T. Tr. 1353:1-15 (Porras).

Faced with these facts, SRI's expert Dr. Kesidis provided only conclusory and incredible testimony that the two papers "teach away" from each other. 9/12/08 T. Tr. 1850:18-25

---

[9] Coincidentally, the dependent claim had also been rejected by the PTO in a non-final office action. *Id*. at 1139-40.

(Kesidis). Dr. Kesidis stated that "I don't believe intrusive activity specifically discloses a method of doing detection" and "[a]s I said, they don't really – either of these two papers, intrusive activity or EMERALD '97 – talk about, teach detection, in my opinion." 9/12/08 T. Tr. 1851:6-8, 1854:3-5 (Kesidis). Dr. Kesidis's testimony, however, was contrary to the law of the case, as demonstrated by the parties' stipulation that *Emerald 1997* does teach "detecting suspicious network activity" via a "statistical detection method." JTX-1. Dr. Kesidis withdrew this opinion on cross-examination. 9/12/08 T. Tr. 1920:3-19 (Kesidis).[10]

In addition, because the limitation of "detecting . . . . suspicious network activity" was disclosed in *Emerald 1997*, it is irrelevant whether or not this limitation was also taught by *Intrusive Activity 1991*. Unlike an anticipation inquiry, an obviousness inquiry inherently recognizes that each reference will be missing at least one claim limitation. The only issue was whether *Intrusive Activity 1991* disclosed at least one of the categories of network traffic data, **which was undisputed,** whether *Emerald 1997* disclosed the remaining claim limitations, **which was undisputed**, JTX-1, and whether there was a reason to combine these references, which was established because *Emerald 1997* explicitly identified *Intrusive Activity 1991* as a relevant paper for monitoring network packets.

### c) SRI's Attempt to Read Additional Limitations into the Claims Does Not Create a Factual Dispute About Motivation to Combine

Dr. Kesidis also provided conclusory testimony that one would not combine the two references because *Intrusive Activity 1991* used a "monolithic" approach. 9/12/08 T. Tr. 1851:1-1852:10 (Kesidis). While unclear, this testimony appears to relate to Dr. Kesidis's argument that the intrusion detection approach used by network monitors like the Network Security Monitor

_____

[10] Furthermore, Dr. Kesidis's testimony that a reference entitled *A Method to Detect Intrusive Activity in a Networked Environment* does not teach a detection method is simply not credible. Mr. Heberlein explained at length that indeed *Intrusive Activity 1991* does teach a method for detection. 9/8/08 T. Tr. 1094-1095:2 (Heberlein).

("NSM") described in *Intrusive Activity 1991* was suitable for use only with local area networks ("LANs") and could not scale in size to some undefined level suitable for an "enterprise network." 9/12/08 T. Tr. 1827:9-18 (Kesidis). As will be discussed in the context of the *DIDS 1991* reference, *see infra* Section II.D.5, the claims **do not require** any particular network size, "scalability" or the ability to monitor any particular number of different computers. Furthermore, Dr. Kesidis was unable to ever articulate a standard to differentiate between a LAN and an enterprise network. Dr. Kesidis's internally contradictory testimony regarding LANs and enterprise networks cannot constitute substantial evidence of anything.

Dr. Kesidis's argument fails to acknowledge the relevant question – whether there was some difference between the **categories of network traffic** suitable for monitoring a LAN and those suitable for monitoring an enterprise network. In fact, the undisputed evidence showed that the categories of network traffic used for detection on LAN-based systems like the prior art NSM and DIDS systems **were the same** as those used for detection on systems where it was uncontested that they were designed for "enterprise networks" – such as the prior art RealSecure system. 9/5/08 T. Tr. 988:16-989:14, 1020:5-12 (Heberlein – prior art NSM and DIDS used one or more of the claimed categories); 9/11/08 T. Tr. 1617:2-18 (Smaha – prior art RealSecure used several of the claimed categories); 9/12/08 T. Tr. 1933:13-24 (Kesidis – prior art commercial systems including RealSecure used the claimed traffic categories).

To the extent that Dr. Kesidis was attempting to argue that *Intrusive Activity 1991* was not within the analogous prior art, his opinion again does not address the relevant question. The inquiry for determining whether art is related or relevant is quite broad. *See In re Icon Health and Fitness, Inc*., 496 F.3d 1374, 1380 (Fed. Cir. 2007) ("'A reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem.'" (quoting *In re Clay*, 966 F.2d 656, 659 (Fed.

Cir. 1992)).  *Emerald 1997* itself calls *Intrusive Activity 1991* "Related Intrusion Detection Research."  DTX-356 at 364.  It is admitted that *Emerald 1997* already "solved" the scalability issues Dr. Kesidis raised, 9/12/08 T. Tr. 1851:1-1852:10 (Kesidis), because *Emerald 1997* disclosed the "enterprise network" and "hierarchy" elements of the claims.  9/4/08 T. Tr. 579:24-580:4 (Kesidis – the problems of network scale were addressed by the hierarchy of monitors).  The relevant problem was the identification of specific categories of network traffic – a problem admittedly addressed by *Intrusive Activity 1991*, because it is undisputed that this reference disclosed several categories of network traffic suitable for use in intrusion detection.

Dr. Kesidis's conclusory opinion that *Emerald 1997* and *Intrusive Activity 1991* "teach away" from each other is insufficient by itself to avoid judgment as a matter of law.  His testimony was in part contrary to the established law of the case.  His arguments were irrelevant in light of the fact that they did not address the single element of the claims at issue – the disclosure of one or more categories of network traffic.  Conclusory expert opinion, contrary to the factual record, does not constitute substantial evidence upon which a reasonable jury could find for SRI on the issue of obviousness.  In fact, the Federal Circuit has previously rejected as a matter of law conclusory expert testimony regarding the *Emerald 1997* reference ***from this very same witness***.  *See SRI*, 511 F.3d at 1194 (Dr. Kesidis's testimony of "generalized conclusions" simply restated SRI's position and were not sufficient to defeat summary judgment); *see also Wechsler v. Macke Int'l Trade, Inc*., 486 F.3d 1286, 1294 (Fed. Cir. 2007) (expert testimony was contrary to factual record, conclusory expert testimony did not provide substantial evidence); *Upjohn Co. v. MOVA Pharm. Corp*., 225 F.3d 1306, 1311 (Fed. Cir. 2000) (finding an expert's conclusory opinion regarding obviousness was not substantial evidence to support a jury's verdict).

The evidence at trial showed that there were no material disputes of fact regarding the combination of *Emerald 1997* and *Intrusive Activity 1991*.  The determination is purely a legal

one, and judgment as a matter of law that the claims are obvious is warranted.

**5. *Emerald 1997* Combined with the Knowledge of One of Ordinary Skill in the Art Rendered the Claims Obvious**

Defendants also proved at trial that the *Emerald 1997* reference combined with the knowledge of one of ordinary skill in the art disclosed and enabled all of the limitations of the claims, rendering the inventions obvious. As *KSR* noted, the reason or motivation to combine can come from a multitude of sources especially where "the combination was 'obvious to try'" or where "there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions . . . ." *KSR*, 127 S. Ct. at 1742. As multiple witnesses including the inventor himself explained, the knowledge of the behavior and characteristics of well-known network attacks in the field of intrusion detection pointed directly to the use of these categories. 9/11/08 T. Tr. 1356:15-1360:12 (Porras – in 1996, an email he received from ISS showed how the prior art RealSecure product detected SYN floods using the claimed network connection requests category), 9/5/08 T. Tr. 970:17-971:17 (Heberlein – claimed categories were not novel, and scan attacks would tell you to look at connection requests); 9/11/08 T. Tr. 1614:19-1616:23 (Smaha – RealSecure attack signatures for known attacks dictated the use of network connection requests and well-known network service protocol categories).

Indeed, some of the strongest testimony on this point came from SRI's own expert, Dr. Kesidis. When asked why the claimed category of "network packet data volume" might be important to monitor, Dr. Kesidis specifically pointed out that a prior art "denial of service attack" was known to generate large volumes of traffic, and that this attack therefore necessitated monitoring data volume. 9/4/08 T. Tr. 606:2-12, 607:14-22 (Kesidis). He testified that "an attacker may use a vulnerability in an application protocol" which necessitated monitoring the claimed category of well-known network service protocols. 9/4/08 T. Tr. 607:23-608:14 (Kesidis). He also testified that a SYN flood attack led to monitoring the claimed categories of network connection requests, acknowledgments, and denials. 9/4/08 T. Tr. 649:18-650:12,

698:15-699:15 (Kesidis). He further testified that to detect a "ping of death attack" one had to consider the "volume of bytes," the network packet data volume category. 9/4/08 T. Tr. 698:4-14 (Kesidis).

The obviousness of monitoring one or more of these categories is further established by the fact that these categories account for an overwhelming amount of internet traffic. As the inventor acknowledged, the claimed network traffic categories analyzed included email traffic, 9/3/08 T. Tr. 389:10-23, 390:17-21 (Porras), and world wide web traffic, 9/3/08 T. Tr. 388:22-389:23, 390:17-21 (Porras), just to name a few. It would be common sense to look at categories corresponding to common network protocols like emails and web traffic. It is absurd to claim that a person skilled in the art who was taught by *Emerald 1997* how to monitor network traffic for suspicious network activity would not have chosen to monitor one or more of these common network traffic data categories which were already widely monitored by others for detecting suspicious network activity.

Thus, the evidence at trial showed that all of the elements of the claims were known in the prior art, and were being used with no change in their respective functions. This is exactly the situation that *KSR* cited as "a principle reason for declining to allow patents for what is obvious." *KSR*, 127 S. Ct. at 1739. In addition, the fact that prior art systems were already using the claimed traffic categories for the same purpose – detecting intrusions, or suspicious network activity – amply demonstrates that one of ordinary skill in the art would have had a reasonable likelihood of success in combining *Emerald 1997* with these known traffic categories. 9/12/08 T. Tr. 1933:13-24, 1935:22-1936:8 (Kesidis); 9/5/08 T. Tr. 1014:21-1015:24, 1020:5-12 (Heberlein). Similar facts have been adjudicated to evidence a strong case of obviousness. *See Muniauction,* 532 F.3d at 1325-26 (finding claims obvious over proposed modification of a prior art system to incorporate "conventional" web browser functionality).

### a) SRI's Expert's Argument Was Unclear and Not Credible

SRI's expert provided almost no testimony even addressing the combination of *Emerald 1997* with known categories of network traffic data. The entirety of Dr. Kesidis's testimony on this issue is contained at 9/12/08 T. Tr. 1846:13-1848:18 (Kesidis). The majority of his opinion on the issue addressed CERT advisories, which Defendants' experts never even raised at trial and was therefore irrelevant. In fact, as discussed above, Dr. Kesidis himself repeatedly pointed to characteristics of well-known attacks as leading to use of the claimed categories of network traffic. Furthermore, Dr. Kesidis never even addressed the fact that prior art intrusion detection systems already used the claimed traffic categories well prior to the filing of the patents. There simply is no substantial evidence in the record to support the jury's finding of no obviousness, and Defendants are entitled to judgment as a matter of law on this issue.

### 6. Weak Secondary Considerations Cannot Overcome the Strong Case of Obviousness

### a) Legal Standards for Secondary Considerations of Obviousness

Once a patent challenger presents a prima facie case of obviousness, as Defendants did here, the burden shifts to the patentee to present evidence of secondary considerations of nonobviousness. *Ashland Oil v. Delta Resins & Refractories*, 776 F.2d 281, 291-92 (Fed. Cir. 1985). In addition, "[i]f the evidence of secondary considerations is to be given substantial weight by the court in its determination of the obviousness issue [the patentee must establish] that a nexus exists between the merits of the claimed invention and such evidence." *Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*, 777 F. Supp. 330, 372 (D. Del. 1991) (citing *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)).

Secondary considerations in this case do not make up for the lack of substantial evidence regarding nonobviousness. SRI presented at best a weak case of secondary considerations, and even "substantial" evidence of secondary considerations has been held to be insufficient to overcome a strong obviousness showing. *See Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485

F.3d 1157, 1162 (Fed. Cir. 2007) (explaining "substantial evidence" of secondary considerations was "inadequate" given the "strength of the prima facie obviousness showing"); *see also Agrizap,* 520 F.3d at 1344. While each of SRI's allegations of secondary considerations will be discussed herein, the Court should not lose sight of the importance of first appreciating the strength of the obviousness case. *See, e.g., Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1293 (Fed. Cir. 2006); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007) ("Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion."); *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988) (holding that evidence of commercial success failed to overcome the strong case of obviousness).

**b)  Commercial Success**

SRI's proof of commercial success with regard to Symantec was insufficient to create a prima facie case. First, SRI introduced ***no actual evidence of sales by Symantec at all***, much less evidence of sales linked to the accused products. Dr. Kesidis admitted he didn't look at either Symantec or ISS's financial records "too carefully." 9/4/08 T. Tr. 739:16-18 (Kesidis). Indeed, beyond offering the conclusory statement that he had seen "some evidence that the products were sold" he offered no testimony on the scope or magnitude of ***any sales*** of the specific Symantec products at issue at all. 9/15/08 T. Tr. 2003:16-2004:3 (Kesidis – also noting he didn't delve into the details of direct evidence of sales); *see also* 2005:11-16 (Kesidis – stating generally his belief that "quite a bit" of the products were sold, without differentiating between products or offering any factual basis for his opinion). Furthermore, Dr. Kesidis admitted he did not have "a standard" for determining the level of sales that would constitute commercial success and admitted he was "not an expert at these kinds of issues." 9/15/08 T. Tr. 2003:16-2004:11, 2004:24-2005:6 (Kesidis). The trial record is utterly devoid of evidence sufficient to create a prima facie case that any of Symantec's accused products were commercially successful. *See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) (noting that commercial

success is "usually shown by significant sales in a relevant market").

Even assuming that SRI had proven Symantec sales sufficient to show commercial success, SRI also failed to make the requisite showing of a nexus with the claims. SRI was required to offer proof that "the sales were a direct result of the unique characteristics of the claimed invention – as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *In re DBC*, No. 2008-1120, 2008 WL 4764340, at *10 (Fed. Cir. Nov. 3, 2008) (citing *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)). SRI has claimed that the infringement allegations they have made with regard to Symantec products are sufficient to create a presumption of a nexus, and that therefore they met their burden of a prima facie case. *See* D.I. 549 (9/15/08 SRI International Inc.'s Proffer of Evidence in Support of Commercial Success). This argument ignores the fact that the accused products include far more than just the accused features.

The law states that:

> When the thing that is commercially successful is not coextensive with the patented invention – for example, if the patented invention is only a component of a commercially successful machine or process – the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold.

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). Here, the accused products included far more than just the accused features. *See, e.g.*, PTX-35 (Information Manager Functional Requirements); PTX-258 (Network Security Admin. Guide); PTX-598 (Gateway Security Solution Summary). In addition, it was undisputed that Symantec's accused SGS and Manager Products have noninfringing uses. 9/4/08 T. Tr. 724:4-21, 725:23-726:12, 739:6-22 (Kesidis). These facts, combined with Dr. Kesidis's admission that he did not do any analysis to determine the impact of other features of Defendants' products, demonstrate that SRI failed to present a prima facie case of commercial success with regard to any of the accused Symantec products. 9/15/08 T. Tr. 2008:23-2009:1 (Kesidis).

SRI's lack of nexus regarding ISS products was similarly flawed and in fact refuted by

the third party testimony of ISS's customers.  First, Dr. Kesidis based his infringement allegations on a very specific use of only one particular software component sold by ISS, the Fusion 2.0 Attack Pattern Component.  9/4/08 T. Tr. 702:7-11 (Kesidis).  However, Fusion 2.0 includes several different components, namely the Impact Analysis Component ("IAC") and the Attack Pattern Component ("APC").  9/4/08 T. Tr. 701:1-702:18 (Kesidis).  Though customers may have access to both components when they purchase Fusion 2.0, the two components are installed separately and used separately.  9/4/08 T. Tr. 702:23-703:9 (Kesidis).  Dr. Kesidis admitted that a customer's use of only the IAC feature does not infringe, yet he did no analysis or research to determine whether any commercial success was based on the IAC or APC.  9/15/08 T. Tr. 2009:19-25 (Kesidis).

In fact, the only customer evidence presented suggested that the IAC was the favored component.  During trial, the only evidence SRI presented concerning the alleged infringement of the patents by an ISS customer was the testimony of Mr. Ferrill of HealthSouth.  9/4/08 T. Tr. 690:5-18 (Kesidis).  But, Dr. Kesidis admitted that Mr. Ferrill only testified to using the IAC and that there was no evidence that HealthSouth used the accused APC.  9/4/08 T. Tr. 705:24-706:5 (Kesidis); *see also* SEALED 9/3/08 T. Tr. 15:16-16:14 (Ferrill – describing the IAC functionality of Fusion).  Indeed, Mr. Ferrill stated he was not familiar with the APC feature.  SEALED 9/3/08 T. Tr. 14:14-16 (Ferrill); 9/4/08 T. Tr. 706:3-5 (Kesidis).[11]  Dr. Kesidis further admitted that he analyzed evidence from other ISS customers, but none were presented at trial as ever using the APC.  9/4/08 T. Tr. 690:5-691:23 (Kesidis).  This contradicts SRI's argument that the APC was the reason Fusion 2.0 was commercially successful.  Logically, if SRI's argument were true, an ISS customer would at least know what the APC feature was and be using it.

---

[11] A more complete explanation of the differences between IAC and APC can be found in ISS's separately filed Brief in Support of its Mot. for Judgment as a Matter of Law on the issue of non-infringement.

"[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Ormco* at 1312. SRI did not identify any features of any Symantec or ISS product that allegedly drove demand that were not already admitted to be in the prior art. The only features that Dr. Kesidis generically pointed to as "particularly important" were "selectivity of the [ ] network traffic data" and "the correlation step." 9/12/08 T. Tr. 1858:9-15 (Kesidis). As demonstrated herein, both of these features were admittedly known in the prior art. *See infra* Section II.C.3 (categories of network traffic were well-known); JTX-1 (admitting that *Emerald 1997* disclosed correlation). This further demonstrates that SRI failed to make a prima facie showing of commercial success.

Nor did SRI establish any prima facie case of commercial success based on its own EMERALD technology. SRI's attempts to commercialize EMERALD in the United States were a failure. 9/2/08 T. Tr. 217:4-222:5; 9/3/08 T. Tr. 234:1-6, 234:19-21, 237:1-6, 242:25-243:18, 253:9-256:22, 259:23-260:4, 270:8-11 (Lincoln); DTX-562 at SRIE 0119409. Even if EMERALD had been commercially successful, there would be insufficient evidence in the record to establish that any commercial success was attributable to unique characteristics of the claimed invention as opposed to other EMERALD components, such as mCorr, eAggregate, and eBayes, which were developed after the patents were filed. 9/3/08 T. Tr. 331:6-332:7 (Valdes).

### c) Praise for the Patented Invention

SRI also alleged that the fact that the *Live Traffic* paper, PTX-17, was accepted for publication at the Symposium on Networks and Distributed System Security ("SNDSS") constitutes evidence of praise for the ***patented*** invention. 9/11/08 T. Tr. 1435:11-19 (Porras); 9/12/08 T. Tr. 1855:8-25 (Kesidis). But the record is utterly devoid of any evidence linking the review process for this paper with knowledge of the claimed invention. There was no factual testimony from anyone who actually reviewed the paper as to why it was accepted for publication. There was no factual testimony about the specific review process used within the

conference. The reviewers, of course, could not possibly have been aware of the actual patent or claims, since none of the patents had yet issued.

The only "evidence" at trial was the inventor Mr. Porras's and Dr. Kesidis's speculation that the SNDSS conference's review process was "competitive" and "selective." 9/11/08 T. Tr. 1453:11-13 (Porras); 9/12/08 T. Tr. 1855:8-25 (Kesidis). *But see* 9/11/08 T. Tr. 1466:5-19 (Porras – admitting other conferences were more selective). Dr. Kesidis then leapt to the conclusion that the unknown reviewers, who he assumed were "extraordinarily skilled in [the] art at the time" must have felt *Live Traffic* was not obvious over all other prior art. 9/12/08 T. Tr. 1855:19-25 (Kesidis). Under Dr. Kesidis's theory of peer reviewed publications, each and every published paper would constitute a new and novel invention under the patent laws. Such sheer speculation is not evidence of praise for the patented invention.

Similarly, SRI also claimed that the fact that the government organization called Defense Advanced Research Projects Agency ("DARPA") funded SRI's overall EMERALD project was evidence of novelty of the specific claims at issue in some fashion. 9/12/08 T. Tr. 1854:13-1855:7 (Kesidis). Mr. Lincoln, an SRI employee, claimed that DARPA managers would not issue requests for project proposals until they knew of all past related projects and were convinced the problem they were funding was difficult. 9/15/08 T. Tr. 2046:1-2049:20 (Lincoln). However, no one from DARPA testified about the reasons for granting funding for the EMERALD project. SRI failed to put forth anything other than sheer speculation as to the knowledge base and motivations of the people actually charged with deciding whether or not to provide EMERALD funding. As with SRI's peer-review argument, under SRI's theory, *every* DARPA funded project would constitute a new and novel invention under the patent laws.

Furthermore, there was ample evidence that the funded EMERALD project was ***not*** coextensive with the claims. It was admitted that the EMERALD project encompassed far more than just the claims of the patents-in-suit. 9/3/08 T. Tr. 334:7-335:15 (Valdes – EMERALD

project covered other patents), 352:18-23 (Porras – more than eight different contracts related to EMERALD), 364:24-365:4 (Porras – work on EMERALD continued long past the 1998 filing date of the patents). In addition, the inventor Mr. Porras admitted that the original EMERALD contract proposal requesting funding was written by someone else at SRI and ***did not contain any of his ideas or his invention at all***. 9/10/08 T. Tr. 1329:14-1333:21 (Porras). Thus, SRI failed to make a sufficient showing of a nexus between DARPA funding and the claims.

The weak and largely irrelevant secondary considerations arguments put forth by SRI do not overcome the strong obviousness case shown by Defendants. The Court must be careful not to "abdicate [its] role as the ultimate decision maker on the question of obviousness." *Richardson-Vicks, Inc. v. Upjohn Co*., 122 F.3d 1476, 1479 (Fed. Cir. 1997). The jury's verdict was not supported by substantial evidence, and Defendants are entitled to judgment as a matter of law that all of the claims were obvious.

### D. Jury Verdict of No Anticipation Was Not Supported by Substantial Evidence

#### 1. Legal Standard for Anticipation

Under 35 U.S.C. § 102(b), "[a] person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." A claim is anticipated only if each and every limitation as set forth in the claim is found, either expressly or inherently described, in a single prior art reference. *Verdegaal Bros., Inc. v. Union Oil Co*., 814 F.2d 628, 631 (Fed. Cir. 1987). Defendants bore the burden at trial of proving anticipation by clear and convincing evidence. *Zenon Envlt., Inc. v. United States Filter Corp*., 506 F.3d 1370, 1379 (Fed. Cir. 2007).

#### 2. *Emerald 1997* Anticipated the '615 Claims

##### a) *Emerald 1997* Disclosed and Enabled Use of "well-known network service protocols"

The jury's verdict was not supported by substantial evidence because the undisputed

evidence at trial established that *Emerald 1997* anticipated the claims of the '615 patent pursuant to 35 U.S.C. § 102(b).  As noted previously, the only element of the claims that was even in dispute with regard to *Emerald 1997* was the claimed categories of network traffic data. Defendants provided uncontested evidence that *Emerald 1997* disclosed at least two different types of "network packets indicative of well-known network service protocols," which is one of the claimed categories for the '615 patent.

Defendants put forth clear and convincing evidence of the relevant disclosures in *Emerald 1997*.  *Emerald 1997* disclosed monitoring SNMP traffic:

> The event stream may be derived from a variety of sources including audit data, network datagrams, **SNMP traffic**, application logs, and analysis results from other intrusion-detection instrumentation.

DTX-356 at 356 (emphasis added).  *Emerald 1997* also disclosed monitoring HTTP and FTP traffic as well:

> **Network services** include features common to many network operating systems such as mail, **HTTP, FTP**, remote login, network file systems, finger, Kerberos, and SNMP.
>
> . . . .
>
> EMERALD introduces a hierarchically layered approach to network surveillance that includes **service analysis covering the misuse of** individual components **and network services** with the boundary of a single domain.

DTX-356 at 354-55 (emphases added).

At trial, Defendants' expert Mr. Heberlein explained that these passages from *Emerald 1997* disclosed monitoring SNMP, HTTP, and FTP traffic:

> So it sort of it talks about monitoring network services.  And then if we go up into the previous paragraph there, it describes some of the network services.  So it says:  Network services include features common to many network operating systems such as mail; HTTP, that's your web traffic; FTP, that's the file transfer protocol we've talked about; remote log-in; a network file system; finger; Kerberos; and SNMP.

9/8/08 T. Tr. 1083:17-1083:25 (Heberlein).

Mr. Heberlein further explained that SNMP, HTTP, and FTP traffic were all examples of network packets indicative of well-known network service protocols, and that one of ordinary

skill in the art at the time would have understood how to monitor and analyze these protocols. 9/8/08 T. Tr. 1083:25-1085:1 (Heberlein). Indeed, the patents themselves specifically identify FTP and HTTP as "known telltale packets that are indicative of well-known network-service protocol traffic," PTX- 4 ('615 Patent col. 8:15-17), and also identify SNMP as a network service. PTX- 4 ('615 Patent col. 3:29-32)*; see also* 9/10/08 T. Tr. 1237:1-23 (Heberlein – *Emerald 1997* and patents both disclose SNMP, HTTP and FTP).

In his minimal testimony addressing the *Emerald 1997* anticipation issue, Dr. Kesidis never contested the fact that *Emerald 1997* disclosed monitoring HTTP and FTP. 9/12/08 T. Tr. 1838:17-1841:15 (Kesidis). Furthermore, Dr. Kesidis repeatedly admitted that HTTP and FTP were well-known network service protocols. 9/4/08 T. Tr. 608:10-14 (Kesidis – HTTP), 651:9-24, 700:7-25 (Kesidis – ISS sensors analyzed claimed categories such as FTP and HTTP). Thus, a reasonable juror could only find that *Emerald 1997* disclosed all of the limitations of the '615 patent claims.

SRI's only argument that *Emerald 1997* did not anticipate was a single sentence from Dr. Kesidis in response to a question from SRI's counsel as to whether *Emerald 1997* was enabled. But Dr. Kesidis's claim that "[t]here's no discussion as to specifically how to do detection [in *Emerald 1997*]" is patently false and contrary to the law of the case. 9/12/08 T. Tr. 1846:1-10 (Kesidis). As noted in the parties' stipulation, *Emerald 1997* disclosed and enabled:

> **detecting, by the network monitors, suspicious network activity** based on analysis of network traffic data, wherein at least one of the network monitors utilizes a statistical detection method

JTX-1 at 4 (emphasis added). Confronted with this contradiction, Dr. Kesidis later withdrew this opinion. 9/12/08 T. Tr. 1920:3-1921:5 (Kesidis). Thus, there simply was no evidence, let alone substantial evidence, upon which a reasonable jury could base a finding of lack of anticipation of the '615 patent by the *Emerald 1997* reference.

### 3. RealSecure Anticipated All of the Claims

In addition to *Emerald 1997,* the defendants offered overwhelming evidence that ISS's prior art RealSecure product anticipated all claims of the '203 and '615 patents pursuant to 35 U.S.C. § 102(b). Unlike *Emerald 1997*, SRI did not even attempt to dispute that RealSecure monitored the claimed network traffic data categories. Instead, SRI only argued that the hierarchical monitor in the RealSecure software did not "integrate" reports of suspicious activity as required by the hierarchical monitor limitation.

There are no genuine factual disputes regarding RealSecure. SRI conceded that the RealSecure software described in the manuals and testimony presented at trial was prior art to the patents-in-suit. 9/12/08 T. Tr. 1934:2-4 (Kesidis); JTX-1. SRI did not dispute that the ISS witnesses, Mr. Kleinwaechter (the RealSecure developer) and Mr. Smaha (ISS's expert witness), gave accurate descriptions of how the RealSecure software worked prior to the critical date. 9/12/08 T. Tr. 1934:5-1935:25 (Kesidis).

Furthermore, SRI's expert admitted that RealSecure anticipated *all other claim language* apart from the term "integrate":

> Q. Your issue was with respect to the integration work; correct?
> A. That's right.

9/12/08 T. Tr. 1936:15-17 (Kesidis). And concerning "integration," it was undisputed that prior art systems or publications described "integration" prior to the critical date. 9/12/08 T. Tr. 1939:23-1940:4 (Kesidis); JTX-1 ¶15(e); 9/10/08 T. Tr. 1294:2-1298:8 (Noonan).

The ultimate inquiry here is whether the uncontroverted facts about RealSecure meet the Court's definition of "integrate." At trial, SRI offered new and previously rejected constructions for the term integrate in order to bend the claim construction in such a way that ISS's accused product, Fusion, allegedly infringed, but ISS's prior art product, RealSecure, allegedly did not invalidate. Not only is this comparison improper, *see Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) (invalidity requires comparison of the claims to the prior art),

but SRI cannot create new limitations in the claims to avoid invalidity. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.") (citation omitted).

### a) Correlation is a Form of Integration and It Was Undisputedly Met

The simplicity of integration in the context of the Court's construction is demonstrated by the claim construction for a subset of integration, "correlation." The "correlating" limitation is found in '615 claim 14, a dependent claim:

> 14. The system of claim 13, wherein the integration comprises correlating intrusion reports reflecting underlying commonalities.

In patent law, dependent claims such as Claim 14 describe a narrower subset of the independent claim. Therefore "correlation," as used in Claim 14, describes a form of integration, and if RealSecure correlates it must also integrate. *See Callaway Golf Co. v. Acushnet Co*., Civ. No. 06-091-SLR, 2008 WL 4850755, at *17 n. 16 (D. Del. Nov. 10, 2008) (noting that if a dependent claim is invalid, then the independent claim from which it depends must also be invalid (citing *Ormco*, 498 F.3d at 1319); 9/12/08 T. Tr. 1941:17-1942:1 (Kesidis).

The Court has construed "correlation" to mean "combining the reports to reflect underlying commonalities." D.I. 550 at 20, ¶ i. SRI's expert ***agreed*** that RealSecure met the definition of this specific form of integration. He admitted that RealSecure "combines" reports, 9/12/08 T. Tr. 1936:21-1938:16 (Kesidis), and that the combinations by source IP address, destination IP address, and event type reflect underlying commonalities. 9/12/08 T. Tr. 1941:22-1942:8 (Kesidis – agreeing that RealSecure combines by commonalities, but that those combinations were not "meaningful"). *But cf.* 9/4/08 T. Tr. 706:24-707:4 (Kesidis - agreeing that Fusion infringes because it relies on commonalities such as Source IP address and Destination IP address, the same commonalities used in RealSecure). SRI's only argument was that correlation must also meet the "different end product" requirement of the "integrate"

construction. This is incorrect. "Different end product" is absent from the Court's "correlation" construction because a system that takes a collection of unorganized reports and combines them by their common features necessarily creates a "different end product."

### b) No Reasonable Jury Could Find That the RealSecure Activity Tree Was Not a "Different End Product" As the Court Has Construed Integration

There was no dispute that the RealSecure software acted as a hierarchical monitor that automatically received suspicious activity reports generated by the ISS engines. 9/12/08 T. Tr. 1935:7-1936:12 (Kesidis); DTX-2542 (RealSecure 1.0 for Windows NT 4.0) at 53. Furthermore, there was no dispute that the RealSecure software took those reports and automatically created a graphical display called the management console, reproduced below. 9/5/08 T. Tr. 798:17-799:20 (Kleinwaechter); 9/12/08 T. Tr. 1935:7-14 (Kesidis). The only disputed issue regarding RealSecure was whether it had a hierarchical monitor that was adapted to "automatically receive and *integrate* the reports of suspicious activity." 9/12/08 T. Tr. 1936:15-20 (Kesidis) (emphasis added). This Court construed that language to mean "without user intervention, receiving reports of suspicious activity and combining those reports into a different end product; i.e., something more than simply collecting and reiterating data." D.I. 550 (Jury Instructions) at 20, ¶ h. The question, then, was whether the management console was "combining those reports into a ***different end product***; i.e., something more than simply collecting and reiterating data."

\\

\\

\\

\\

**Figure 1: RealSecure Management Console (DTX-2542 at 55 Fig. 22)**



As can be seen in Figure 1, RealSecure's management console clearly satisfied this limitation. The management console was separated into two distinct parts. On the right were lists of raw events from the lower-level monitors as they were received by the Console. 9/5/08 T. Tr. 800:3-801:13 (Kleinwaechter); 9/12/08 T. Tr. 1693:17-22 (Smaha); DTX-2542 at 53, 59. Though the lists were separated by importance (*e.g.*, priority of the attack), new reports were simply added to the list in no particular order as they were received. 9/5/08 T. Tr. 800:6-801:9 (Kleinwaechter); DTX-2542 at 53, 59.[12] On the left side of the console was the Activity Tree display. 9/5/08 T. Tr. 801:14-802:2 (Kleinwaechter); 9/12/08 T. Tr. 1696:4-8 (Smaha). This display took the raw events seen on the right and combined them into a tree structure that could be organized by the attack's source, the attack's destination, or the attack type. 9/5/08 T. Tr. 801:15-802:12 (Kleinwaechter); 9/12/08 T. Tr. 1696:9-13, 1701:10-14 (Smaha); DTX-2542 at

_____

[12] Defendants contend that even separating the reports by priority is a form of correlation/integration because it combines those reports by their commonalities into the different windows shown in the console. For purposes of this discussion, however, we use the visual representation of the reports here to demonstrate how the Activity Tree on the left is combining those reports into a "different end product" as required by the claim construction.

62-65. As seen below in two examples (Figures 2 & 3), the user could even choose how to display events. For example, on the left the reports are organized by their "Source" address, and on the right the reports are organized by "Event" type. 9/5/08 T. Tr. 802:3-810:25 (Kleinwaechter – describing Activity Tree).

**Figure 2: RealSecure Activity Tree By Source (DTX-2542 at 62 Fig. 24)**     **Figure 3: RealSecure Activity Tree By Event (DTX-2542 at 64 Fig. 26)**



Instead of the relatively disorganized, real-time list, such as the right-hand priority windows, the Activity Tree combined the reports into a differently organized end product. 9/5/08 T. Tr. 802:9-12, 807:10-25, 829:23-830:5 (Kleinwaechter). The different views were helpful to a user because he could quickly and easily identify whether events were all generated from the same source (*e.g.*, one attacker) or whether they all targeted the same sensitive information (*e.g.,* the accounting department's computer server). 9/5/08 T. Tr. 802:21-803:24, 807:10-25, 809:15-20 (Kleinwaechter); 9/12/08 T. Tr. 1706:16-1707:1 (Smaha).

The Activity Tree further organized the events so that the administrator could determine what type of events were occurring. 9/5/08 T. Tr. 809:25-810:25 (Kleinwaechter). Indeed, not only did the Activity Tree integrate the reports into an overall tree structure, it combined multiple reports into a parenthetical numerical value that indicated the size and extent of the attack

(designated by red arrows in Figure 4).

**Figure 4: Activity Tree Excerpt DTX-2542 at 64 Fig. 26**



9/5/08 T. Tr. 806:4-21, 829:23-830:5 (Kleinwaechter). For example, the first arrow indicates

that "vajra" (the destination) received 3 (three) Netbios Session Request events from "bigbox"

(the source). 9/12/08 T. Tr. 1697:17-19 (Smaha).

Even SRI's expert Dr. Kesidis admitted this met the definition of "combine." 9/12/08 T.

Tr. 1936:21-1938:16 (Kesidis). Indeed, SRI's expert conceded that the Activity Tree was a

"different way" of displaying the event data from that on the right. 9/15/08 T. Tr. 2015:23

(Kesidis). Thus, the RealSecure Console integrated the suspicious activity reports into a

different and organized end product, the Activity Tree, which was something more than a simple

collection or reiteration of data, *i.e*., the raw event data on the right side of the console. 9/5/08 T.

Tr. 800:6-801:6, 807:10-14 (Kleinwaechter).

    **c)   SRI's Arguments to the Contrary Are Based on Post Hoc Limitations Not
Supported By the Claims or Claim Constructions**

    **(1)   SRI's "Meaningful" Integration Limitation is Not Supported by the Claims
and is an Indefinite Limitation**

Throughout its case, SRI suggested that in order for the hierarchical monitor to

"integrate," it must do some sort of "meaningful" intrusion detection. *See, e.g*., 9/12/08 T. Tr.

1859:5-1861:14 (Kesidis); 9/15/08 T. Tr. 2014:17 (Kesidis). No such limitation can be found in

the claim, the claim constructions, or the patent specification. The only disputed requirement for integration was that the hierarchical monitor must create a "different end product" based upon the reports it received. In other words, a disorganized collection of reports that were simply reproduced on the hierarchical monitor's computer screen would not be integration—whereas the combination of events into an organized Activity Tree would be.

SRI's meaningfulness argument is undercut by its sheer indefiniteness. A person of ordinary skill in the art should be able to "understand the scope of the claim when the claim is read in light of the rest of the specification." *Union Pac. Res. Co. v. Chesapeake Energy Corp.,* 236 F.3d 684, 692 (Fed. Cir. 2001). As self-described by SRI's expert, however, it is ***not*** meaningful to sort reports into an organized file system as RealSecure did, but instead the integration must apply some sort of "intelligence" that reduces information in a meaningful way. 9/12/08 T. Tr. 1859:8-25 (Kesidis); 9/15/08 T. Tr. 2014:9-10 (Kesidis). There is no basis for this subjective description anywhere in the patent specification. Further, there is no description in the patent or Dr. Kesidis's analyses of invalidity or infringement as to what "intelligence" is or what level is required. Instead, SRI merely chooses to draw the line where Dr. Kesidis chooses, not where the public would be on notice of the claim scope.

Even if this Court required some form of "meaningful" integration as Dr. Kesidis required, there is undisputed evidence that the integration performed by RealSecure ***is*** meaningful. Dr. Kesidis admitted that RealSecure's Activity Tree is a sorting and filing system that groups the reports, 9/12/08 T. Tr. 1937:16-19 (Kesidis); 9/15/08 T. Tr. 2015:8-2016:15 (Kesidis), and that it does so based on the commonalities of those reports. 9/12/08 T. Tr. 1941:22-1942:8 (Kesidis – agreeing that RealSecure combines by commonalities, but that those combinations were not meaningful); *cf.* 9/4/08 T. Tr. 706:24-707:4 (Kesidis). Dr. Kesidis simply concluded without support that sorting cannot be meaningful. This conclusion is illogical given any reasonable definition of sorting. Any sorting, whether of suspicious activity reports or of

files in a file cabinet, is necessarily "meaningful" to an administrator or else there is no reason to sort. 9/5/08 T. Tr. 802:21-803:24, 807:10-25, 809:15-20 (Kleinwaechter); 9/12/08 T. Tr. 1706:16-1707:1 (Smaha). Furthermore, it was plain from the figures and uncontested descriptions that the Activity Tree was not merely sorting but also reducing the information into a manageable directory tree structure with parenthetical event, source, or destination counts.

### (2) There is No Requirement That Integration Performed by the Hierarchical Monitor Must Automatically Detect System-Wide Attacks

Dr. Kesidis also argued that the RealSecure hierarchical monitor itself must automatically detect attacks through the process of integration. 9/12/08 T. Tr. 1859:8-15 (Kesidis). Again, there is no support for this narrow construction in the claims or the Court's construction. While the patent describes an enterprise network monitoring system, the claims only require that the network monitors, *not* the hierarchical monitor, detect suspicious activity and generate reports of that activity. Pursuant to the claim construction, integration only requires that those reports be combined into a different end product at the hierarchical monitor.

### (3) There is No Evidence or Requirement That Report Integration Occur Over a Certain Time Period or that the RealSecure Product Work Flawlessly

In a series of varying explanations for why RealSecure does not integrate the reports of suspicious network activity, Dr. Kesidis posited that RealSecure does not integrate because it only combines events "close in time" or similar events separated by time. *See* 9/12/08 T. Tr. 1936:25-1937:10 (Kesidis); 9/15/08 T. Tr. 2017:9 (Kesidis). Dr. Kesidis went on to speculate that the combining of similar events could not be integration because "there could be something erroneous with the [RealSecure] sensor" causing it to fire frequently on the same traffic. 9/15/08 T. Tr. 2018:13-18 (Kesidis). The claims, however, do not require that the monitors integrate events within a specified time period, or that the monitors work flawlessly. In addition, speculation about what RealSecure "could do" is not contrary evidence to what it is programmed to do and what it teaches a person of skill in the art about integrating activity reports. If SRI

wanted to so limit its claims, it could have, but it didn't. SRI cannot now redraft its claims in the middle of trial to avoid prior art.

Given Defendants' strong showing that RealSecure anticipated all of the claims, there was no substantial evidence that a reasonable jury could rely upon to find otherwise.

### 4. *Live Traffic* Anticipated All of the Claims

There is no dispute that the paper entitled *Live Traffic Analysis of TCP/IP Gateway*s satisfied all limitations of the claimed inventions in all three asserted patents ('203, '615, and '338 patents).[13] JTX-1, ¶ 17; DTX-499 (Porras, P.A. & Valdes, A., *Live Traffic Analysis of TCP/IP Gateways*, Paper submission to the 1998 ISOC Symposium on Network and Distributed System Security, pp. 1-15, Aug. 1997). The only dispute was whether the *Live Traffic* reference was publicly available before the critical date of November 9, 1997. Under 35 U.S.C. § 102(b), a printed publication must be "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *SRI*, 511 F.3d at 1194.

As this Court is aware, the *Live Traffic* dispute was addressed on summary judgment and was remanded-in-part by the Federal Circuit based on that record. *See generally id.* The Federal Circuit's opinion identified several factual disputes that it inferred in favor of SRI. However, at trial, such inferences could not be established, and there was thus no evidence for a reasonable jury to find that *Live Traffic* was not publicly available.

### a) The Undisputed Facts Regarding *Live Traffic*

It was undisputed that on August 1, 1997, over 3 months before the critical date, one of the inventors, Mr. Porras, published the *Live Traffic* paper to a File Transfer Protocol ("FTP") site, ftp.csl.sri.com, that was maintained by SRI. 9/11/08 T. Tr. 1363:10-24 (Porras); DTX-572

---

[13] SRI only asserted the '338 patent against ISS.

(Email from Porras to sndss98-submissions). The FTP site is similar to a website for the transfer of large computer files and can be accessed by a traditional web browser. 9/11/08 T. Tr. 1363:25-1364:5, 1364:18-23, 1369:13-1371:23, 1475:12-1476:10 (Porras); DTX-1965 (Index of ftp://ftp.csl.sri.com). The *Live Traffic* paper was left on the FTP site for at least one week at the following address: ftp.csl.sri.com/pub/emerald/ndss98.ps. 9/11/08 T. Tr. 1363:10-24 (Porras).[14] Further, it was not disputed that the FTP site was public and that a member of the public could access the site anonymously to download files. 9/11/08 T. Tr. 1365:5-15 (Porras). It was also undisputed that the *Live Traffic* file had no password protection or encryption. 9/11/08 T. Tr. 1365:19-1366:7, 1367:18-22 (Porras).

### b) The *Live Traffic* Trial Record Refuted Any Inferences Drawn in Favor of SRI During Summary Judgment

On appeal of this case, the Federal Circuit noted that the "record on summary judgment does not show that an anonymous user skilled in the art in 1997 would have gained access to the FTP server and would have freely navigated through the directory structure to find the Live Traffic paper." *SRI*, 511 F.3d at 1196. This decision was supported by factual inferences suggested by SRI. SRI argued on summary judgment and on appeal that the *Live Traffic* paper was not publicly available because: (1) the SRI FTP site was not navigable by members of the interested public, SRI Opening Brief, *SRI Int'l, Inc. v. Internet Sec. Sys., Inc*., 511 F.3d 1186 (Fed. Cir. 2008) (No. 2007-1065), 2007 WL 869734, at *22-23; (2) the public would not know to look for intrusion detection papers on SRI's FTP site, *id*. at *22; (3) the SRI FTP site changed between 1997 and the present that made it somehow less navigable in 1997, *id*. at *23; and (4) the "ndss98.ps" file name was obscure and would not be recognized by those interested in the art, *id*. at *22.

---

[14] The Federal Circuit has held that time periods as small as three days can serve to make a paper publicly available. *In re Klofenstein*, 380 F.3d 1345, 1347, 1351 (Fed. Cir. 2004).

At trial these purported issues of fact were not substantiated and were admitted by SRI's witnesses to be incorrect. First, SRI argued that members of the computer intrusion detection community could not navigate the FTP site. SRI Opening Br., 2007 WL 869734, at *22-23; *SRI*, 511 F.3d at 1196. However, SRI's suggestion that in order to navigate the FTP site a series of typed arcane commands was required was dispelled at trial. The inventor who posted the *Live Traffic* paper admitted that people in the intrusion detection field were "pretty savvy with computers," 9/11/08 T. Tr. 1364:10-12, 1475:4-6 (Porras), and could access ftp.csl.sri.com in 1997. 9/11/08 T. Tr. 1364:24-1365:7, 1459:21-1460:1, 1474:19-1476:10 (Porras). The public could even access it through a web browser:

> Q. And using the Netscape browser in 1997, someone could have used the browser to navigate SRI's website; right?
> A. SRI's, website, yes.
> Q. And they could use it to navigate SRI's FTP site; right?
> A. Yes.
> Q. So you didn't have to know special commands to be able to navigate the site; correct?
> A. Correct.

9/11/08 T. Tr. 1476:2-10 (Porras); *see also* 9/11/08 T. Tr. 1475:12-15 (Porras). Furthermore, Mr. Porras admitted that an interested person would know how to click through the directory structure on the browser or type commands to find documents within the directory. 9/11/08 T. Tr. 1369:5-1373:24, 1459:6-23, 1476:2-10 (Porras); *see also* DTX-1965 (FTP browser images from 2006).

The inventor also admitted that the names of the directories themselves in the FTP site were well-known pointers to relevant information about intrusion detection. Mr. Porras admitted that the "pub" directory was commonly known as the "public" directory to those who used FTP sites, 9/11/08 T. Tr. 1368:11-12, 1368:23-1369:4 (Porras), and that the EMERALD acronym for the emerald directory was known in the art. 9/11/08 T. Tr. 1373:25-1374:3, 1462:24-1463:10, 1477:24-1480:6 (Porras); DTX-60 (2/5/97 Porras EMERALD presentation); PTX-177 at 2 (7/20/97 email from Lunt to Valdes); DTX-582 (1/6/97 email from Porras to Wood).

SRI suggested that because Mr. Porras used the entire ftp address in his email submission to the NDSS conference, a person had to use the entire address to access the file instead of navigating through the site. SRI Opening Br., 2007 WL 869734, at *23; *SRI*, 511 F.3d at 1196. But this is admittedly untrue, as shown above by Mr. Porras' testimony that the SRI FTP site was accessible and navigable by a person in the intrusion detection field in 1997.

Second, both the Federal Circuit and SRI noted that the summary judgment record did not establish whether a person would know to look for intrusion detection papers at the SRI FTP site. SRI Opening Br., 2007 WL 869734, at *22; *SRI*, 511 F.3d at 1196-97. This fact, however, was established by overwhelming evidence at trial. Mr. Porras testified that: (1) it was "widely known to people in the intrusion detection field that SRI had an FTP site where they put papers and publications," 9/11/08 T. Tr: 1483:12-18 (Porras); (2) "a lot of researchers in the field would set up FTP sites" and "post documents of interest" on those sites, 9/11/08 T. Tr.1364:15-20 (Porras); (3) Mr. Porras directed people in the field to the FTP site, 9/11/08 T. Tr. 1373:25-1374:3 (Porras); (4) Mr. Porras regularly publicized the FTP site, 9/11/08 T. Tr. 1477:3-1483:18 (Porras); *see also* DTX-60 at 2; DTX-1975 at 2, 4 (4/24/94 Risks Digest); and (5) it was common for researchers to store publicly available documents in the pub directory, 9/11/08 T. Tr. 1368:23-1369:4 (Porras). Mr. Porras' testimony was not the only evidence at trial that researchers in the field knew to look for papers at SRI's FTP site. Mr. Porras noted that he was not surprised there were multiple mentions of the FTP site in internet USENET groups. DTX-1973 (Google results for ftp.csl.sri.com); 9/11/08 T. Tr. 1480:17-1482:6 (Porras). Furthermore, Mr. Smaha, Defendants' expert, testified that he used the SRI FTP server "very frequently," 9/12/08 T. Tr. 1789:10-18 (Smaha), and a third-party researcher, Mr. Jou, testified that he obtained certain SRI anomaly detection algorithms on the Internet. 9/11/08 T. Tr. 1538:16-1539:19 (Jou).

Third, SRI argued on appeal that the FTP site somehow changed between 1997 and the

present.  SRI Opening Br., 2007 WL 869734, at *23.  As the Federal Circuit noted, "[w]ithout additional evidence as to the details of the 1997 SRI FTP server accessibility" the court had to vacate and remand.  *SRI*, 511 F.3d at 1198.  No evidence that the FTP site changed between 1997 and the present was presented at trial.  The inventor, Mr. Porras, even refuted the suggestion by SRI's counsel, and admitted that the FTP site operated the same way in 1997 as it did today.  9/11/08 T. Tr. 1459:21-1460:1 (Porras).

Fourth, SRI argued and the Federal Circuit inferred that the ndss98.ps filename was obscure and that no one in the field would recognize it.  SRI Opening Br., 2007 WL 869734, at *22; *SRI*, 511 F.3d at 1197.  Again, facts established at trial disproved this inference.  The inventor admitted that the acronym stood for a well-known conference in the intrusion detection field that would be recognized by persons interested in that field.  9/11/08 T. Tr. 1362:14-24 (Porras).  As confirmation, brochures announcing the conference used the "NDSS" acronym and indicated that the conference was attended by significant groups in the field, *e.g.,* AT&T, NSA, and Cambridge University.  PTX-11.

In response to this overwhelming evidence that the FTP site was navigable and that the *Live Traffic* paper was publicly accessible, SRI's inventor, Mr. Porras, offered only speculation that the *Live Traffic* paper may not have been accessible.  For the first time in this litigation, he suggested that the "read bit" could have been set such that the ndss98.ps file would not be visible to an interested person.  9/11/08 T. Tr. 1371:22-23, 1442:13-1443:6 (Porras).  He did not know, however, whether or not the "read bit" was set in 1997.  9/11/08 T. Tr. 1443:7-9, 1476:11-24 (Porras).  This is the very definition of speculation and metaphysical doubt, and without more cannot serve to contradict the fact that the *Live Traffic* paper was accessible.  *See Jansen v. Rexall Sundown, Inc.,* 342 F.3d 1329, 1334 (Fed. Cir. 2003).

Given the facts established at trial in response to the Federal Circuit's remand, no reasonable jury could conclude that the *Live Traffic* paper was not publicly available.  Based

upon the trial record, a reasonable jury viewing all the evidence and drawing all inferences in favor of SRI could only conclude that an "anonymous user skilled in the art in 1997 would have gained access to the FTP server and would have freely navigated through the directory structure to find the *Live Traffic* paper" as required by the Federal Circuit. *SRI*, 511 F.3d at 1196.

### 5. *DIDS 1991* Anticipated All of the Claims

#### a) Background on DIDS and Undisputed Facts

The jury's verdict was not supported by substantial evidence because it was clearly established at trial that the *DIDS 1991* reference anticipated the claims of the '203 and '615 patents pursuant to 35 U.S.C. § 102(b). DTX-21 (Snapp et al., *DIDS (Distributed Intrusion Detection System) – Motivation, Architecture, and An Early Prototype*, 14th National Computer Security Conference, pp. 167-176, Oct. 1991). DIDS was an intrusion detection project that was developed by multiple organizations beginning in the summer of 1990. 9/5/08 T. Tr. 999:22-1002:6 (Heberlein). The DIDS project was documented in multiple papers and slides admitted at trial. DTX-21, DTX-22, DTX-1099 (DIDS slides), DTX-1098 (DIDS slides).

It was undisputed that the *DIDS 1991* paper was prior art pursuant to 35 U.S.C. § 102(b). JTX-1. Furthermore, it is clear from the trial record that there was no dispute that the *DIDS 1991* reference actually **disclosed** every limitation of the '203 and '615 patent claims, and that SRI's entire argument rested upon enablement grounds.

Defendants demonstrated that *DIDS 1991* disclosed every limitation of the claims. Defendants' expert Mr. Heberlein performed a detailed limitation-by-limitation analysis of how *DIDS 1991* disclosed every element of the claims, including the dependent claims. 9/5/08 T. Tr. 1004:3-1025:15 (Heberlein). He also explained that *DIDS 1991* disclosed and taught two or more lower-level network monitors and a hierarchical monitor. 9/5/08 T. Tr. 1007:3-1008:3 (Heberlein - citing *DIDS 1991* at SYM_P_0077177 [169]); 9/10/08 T. Tr. 1234:9-1235:25 (Heberlein).

It was undisputed that DIDS had a network monitor (referred to as a "LAN Monitor"), 9/12/08 T. Tr. 1915:20-1916:1 (Kesidis), and that the network monitor reported to a hierarchical monitor (the "DIDS Director"), 9/12/08 T. Tr. 1915:14-15 (Kesidis), as shown in the following figure from *DIDS 1991*:



Fig. 2. Communications Architecture

DTX-21 at 176. The text of the *DIDS 1991* publication clearly disclosed **multiple** network (LAN) monitors:

> The DIDS components include the DIDS director, a single host monitor per host, and a single LAN monitor for each LAN segment of the monitored network.

DTX-21 at 168. Confronted with this statement in *DIDS 1991*, Dr. Kesidis admitted that *DIDS 1991* disclosed the required two lower-level network monitors:

> Q.      So if you have two LAN segments, the DIDS October 1991 paper tells you to have two LAN monitors; is that right?
> A.      It says you need two. Right. If you have two LAN segments, you need two LAN monitors, yes.

9/12/08 T. Tr. 1917:2-5 (Kesidis).

### b)   SRI's Arguments Regarding Enablement Did Not Create Substantial Evidence

The only actual dispute at trial regarding whether or not the *DIDS 1991* reference anticipated all of the claims was Dr. Kesidis's conclusory argument that *DIDS 1991* did not

enable "integration" of reports from more than one lower-level network monitor.[15]  9/12/08 T.

Tr. 1866:24-1867:21, 1875:18-1876:3, 1917:6-15 (Kesidis).  Whether a prior art reference is

enabling is a question of law based on underlying factual findings.  *Novo Nordisk Pharms., Inc.*

*v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005).  Enablement requires that "the

prior art reference must teach one of ordinary skill in the art to make or carry out the claimed

invention without undue experimentation."  *Minnesota Mining and Mfg. Co. v. Chemque, Inc.*,

303 F.3d 1294, 1306 (Fed. Cir. 2002).  The determination of what level of experimentation is

"undue," so as to render a disclosure non-enabling, "is made from the viewpoint of persons

experienced in the field of the invention."  *Elan Pharms., Inc. v. Mayo Found.*, 346 F.3d 1051,

1055 (Fed. Cir. 2003).

     Defendants' expert Mr. Heberlein was very familiar with the DIDS system, having

worked on it personally and authored several different papers about it.  9/5/08 T. Tr. 1001:7-

1005:1 (Heberlein).  He testified that the *DIDS 1991* paper extensively discussed integration and

correlation of information from **multiple sources** into the DIDS hierarchical Director.  9/5/08 T.

Tr. 1010:5-1011:14, 1016:17-1018:14, 1019:12-1020:4 (Heberlein).  His testimony was

supported by text and figures in *DIDS 1991*, including the following:

> The detection of certain attacks against a networked system of computers requires
> information from multiple sources . . . .  Even if the behavior is recognized as an attack on
> the individual host, current IDS's are generally unable to correlate reports from multiple
> hosts; thus they cannot recognize the *doorknob* attack as such.  **Because DIDS**
> **aggregates and correlates data from multiple hosts and the network**, it is in a position to
> recognize the doorknob attack by detecting the pattern of repeated failed logins even
> though there may be too few on a single host to alert that host's monitor.

DTX-21 at 168 (emphasis added).

     Mr. Heberlein further testified that modifications to the DIDS design to support multiple

---

[15] This argument is only relevant under the Court's revised claim construction requiring two
lower-level monitors.  There was no dispute that *DIDS 1991* disclosed and enabled integration of
reports from a single LAN monitor (lower-level monitor) with reports at the hierarchical DIDS
Director.  Therefore, under the Court's prior claim construction, *DIDS 1991* anticipated.

LANs (multiple lower-level network monitors) would take on the order of a couple days at most – clearly not undue experimentation. 9/8/08 T. Tr. 1160:4-19 (Heberlein). In addition, Defendants' expert Mr. Smaha testified that the DIDS design was easily extensible to the use of multiple network monitors, and explained that it "does not have anything in it even at the code level that would keep it from running on two or more network segments." 9/11/08 T. Tr. 1585:12-14 (Smaha). Mr. Smaha also testified that a DIDS system supporting multiple LANs *was actually constructed* – further proof that indeed the DIDS system disclosed in *DIDS 1991* could be easily modified to support the integration of multiple network monitors on multiple LANs. 9/11/08 T. Tr. 1584:20-1585:19 (Smaha).

Dr. Kesidis's conclusory statements contesting the proof of enablement of *DIDS 1991* were insufficient to constitute substantial evidence. Dr. Kesidis simply stated there was "no teaching" in the DIDS papers of how to create a DIDS system with multiple LAN monitors, without even addressing any of the numerous passages cited by Mr. Heberlein. 9/12/08 T. Tr. 1828:11-16, 1867:10-21, 1971:6-15 (Kesidis). He also appeared to have missed Mr. Smaha's testimony that Trident Data Systems built a DIDS system with multiple network monitors, and therefore never addressed this issue. 9/12/08 T. Tr. 1828:17-20 (Kesidis – incorrectly claiming there was no such testimony). Most of Dr. Kesidis's testimony involved a discussion of why he believed it would have been hard to scale DIDS to monitor a large number of hosts, which was irrelevant to the analysis of the claimed invention, which does not require monitoring any specific number of computers. 9/12/08 T. Tr. 1867:22-1871:14 (Kesidis). Dr. Kesidis never even offered an opinion on the amount of effort that would be required to use the disclosures of *DIDS 1991* to make the claimed invention, let alone an opinion that this would constitute "undue experimentation" as is legally required. Thus, substantial evidence supporting the verdict on this issue was not presented at trial.

### c) SRI's Additional Argument Regarding Scalability Was Irrelevant Because There is No Such Limitation in the Claims

SRI also attempted to create an additional dispute with regard to *DIDS 1991* by reading a requirement for "scalability" into the claims where none exists. SRI claimed that because *DIDS 1991* referred to use on a local area network, or LAN, and not a network with thousands of computers, it somehow failed to meet one of the claim limitations. SRI repeatedly argued that DIDS could not scale to large networks of thousands of computers, or "hosts." 9/12/08 T. Tr. 1869:22-1870:3 (Kesidis – DIDS could not scale to "large" networks), 1873:23-1874:7 (Kesidis – "context" of the invention is a network of hundreds or thousands of hosts). But there is absolutely no requirement in the claims to monitor "hundreds" or "thousands" of hosts. There is no requirement in the claims that ***any*** specific number of computers, or hosts, be monitored. Under the Court's revised claim construction, the claims require ***three*** monitors – two lower-level monitors and one hierarchical monitor. There is nothing in the claims at all about the number of computers that must be monitored. Thus, Dr. Kesidis's testimony regarding the scalability of DIDS was completely irrelevant.

SRI also claimed that because DIDS was used in a LAN environment, it somehow did not meet the limitations of the claims. 9/12/08 T. Tr. 1875:18-1876:1 (Kesidis – DIDS was "restricted to a broadcast LAN. The inventions need to work in an enterprise network."). However, Dr. Kesidis himself was unable to ever offer a consistent definition of what an "enterprise network" was, let alone explain how it was distinct from a LAN. At times, Dr. Kesidis claimed that an enterprise network consisted of multiple LANs. 9/4/08 T. Tr. 579:7-16, 598:23-599:1, 729:17-731:13, 746:2-7 (Kesidis). He also appeared to state that a LAN could be a "special case" of an enterprise network. 9/4/08 T. Tr. 733:16-734:5 (Kesidis). In the end, he was incapable of offering a coherent definition of what would, and would not, constitute an enterprise network without a detailed analysis of the topology of each individual network – an analysis he never performed for either his infringement or validity opinions. 9/4/08 T. Tr. 734:6-

739:3 (Kesidis).

SRI cannot create substantial evidence of lack of anticipation by reading additional limitations into the claims.  Nor can SRI rely upon a conclusory expert opinion that the *DIDS 1991* publication failed to teach or enable a particular limitation, without offering an explanation of the factual basis for that opinion.  Given Defendants' strong showing that *DIDS 1991* anticipated all of the claims, there was no substantial evidence upon which a reasonable jury could rely to find otherwise.

## III.  <u>IN THE ALTERNATIVE TO JUDGMENT AS A MATTER OF LAW, DEFENDANTS SHOULD BE GRANTED A NEW TRIAL ON THE VERDICTS AGAINST THEM, ON SEVERAL ALTERNATIVE GROUNDS</u>

### A.  New Trial Legal Standards

The decision to grant or deny a new trial is within the sound discretion of the trial court, and the court need not view the evidence in the light most favorable to the verdict winner.  *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Zegan v. Central R. Co*., 266 F.2d 101, 104 (3d Cir. 1959).  Federal Rule of Civil Procedure 59(a) provides that "[t]he court may, on motion grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a).  New trials are commonly granted in situations where:  (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly-discovered evidence surfaces that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent.  *See Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 251 (D. Del. 2001) (citing *Zarow-Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584 (D. N.J. 1997)).

Defendants move for a new trial because the jury's verdict is against the clear weight of the evidence, and due to multiple trial errors that significantly prejudiced Defendants.  In

evaluating a motion for a new trial based on alleged trial error, the Court's inquiry is two-fold: (1) whether an error was in fact committed, and (2) whether that error was so prejudicial that denial of a new trial would be inconsistent with substantial justice. *Arthrocare Corp. v. Smith & Nephew, Inc.*, 310 F. Supp. 2d 638, 666-67 (D. Del. 2004) (citing *Finch v. Hercules Inc.*, 941 F. Supp. 1395, 1414 (D. Del. 1996)). A new trial must be granted unless "it is highly probable that [the erroneous ruling] did not affect the [objecting party's] substantial rights." *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601-02 (E.D. Pa. 1989) (quoting *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985)).

Where the basis for seeking a new trial is an alleged error in the jury instructions, the court must determine whether the erroneous instruction, viewed in light of the evidence in the case and the charge as a whole, was "capable of confusing and misleading the jury." *See Arthrocare*, 310 F. Supp. 2d at 671 (quoting *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 922 (3d Cir. 1986)). "A party seeking to alter the judgment based on erroneous jury instructions must establish that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error." *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1317 (Fed. Cir. 2006) (citing *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000)).

## B. The Verdict Was Against the Clear Weight of the Evidence, and Manifest Injustice Would Result if a New Trial is Not Granted

This Court may grant a new trial if the verdict is against the clear weight of the evidence, even when judgment as a matter of law on the issue would be inappropriate. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir. 1992). Although the Court should not substitute its own judgment of the facts for the jury's, it has been explained that "[w]here a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a verdict should be scrutinized more closely by the trial judge. . . ." *Lind v. Schenley*

*Indus., Inc.*, 278 F.2d 79, 90-91 (3d Cir. 1960). Furthermore, unlike the standard for judgment as a matter of law, "the court need not view the evidence in the light most favorable to the verdict winner." *IMX, Inc. v. Lendingtree*, 469 F.Supp.2d 203, 208 (D. Del. 2007).

In the present case, Defendants have shown that a large number of their defenses had no material facts in dispute at all. The number of inferences the jury had to draw in order to find for SRI on all of these issues merits caution. Courts have previously warned such situations may warrant a new trial:

> We must also acknowledge the extraordinary number of inferences that the jury must have drawn in order to reach the verdict that it did. Although we believe that each of the inferences that we have discussed are individually logically sound, we recognize that at some point too many inferences become mere speculation . . . .

*Fineman*, 980 F.2d at 211.

Even if Defendants' motion for judgment as a matter of law is not granted, the evidence presented in that motion demonstrate that the verdicts against Defendants are manifestly unjust and against the clear weight of the evidence. It is at least appropriate for the Court to grant a new trial.

## C. The Court's Refusal to Admit Relevant Evidence and Provide Appropriate Jury Instructions Merits a New Trial

### 1. Refusal to Admit the Reexaminations was Prejudicial Error

Both the '203 and '615 patents are currently undergoing reexamination proceedings at the Patent and Trademark Office ("PTO"). Prior to trial, both patents received Grants of Petitions for Reexamination as well as initial Office Actions by the reexamination examiner rejecting all of the claims as obvious based upon the combination of *Emerald 1997* and *Intrusive Activity 1991*. Brown Decl., Exs. 1-4. The PTO has now *twice* rejected the claims in view of the art relied upon at trial and has issued final Office Actions as well. Brown Decl., Exs. 5-6. Over Defendants' objections, 8/20/08 Pretrial Conf. Tr. 34:19-42:15; D.I. 527, the Court refused to allow this evidence to be admitted at trial. D.I. 532.

The official reexamination documents from the PTO were highly relevant evidence for a number of reasons. First, the documents were highly relevant to the validity analysis. A patent examiner is presumed to be one of ordinary skill in the art. *In re Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002). Therefore, the documents demonstrated that one of ordinary skill in the art would find the patents obvious – directly contradicting SRI's expert Dr. Kesidis's testimony. Yet Defendants were unable to impeach Dr. Kesidis with this evidence. This evidence was also highly relevant to secondary considerations of obviousness – particularly in light of its clear nexus with the patented invention, contrasted with the weak evidence put forth by SRI on this point.

The documents were admissible under several different rules of evidence. They were clearly an admissible public record under Fed. R. Evid. 803(8). The documents are also part of the patents' file histories, and were admissible under the doctrine of completeness of Fed. R. Evid. 106, since the file histories of both patents were admitted into evidence. DTX-6 ('203 file history); DTX-7 ('615 file history).

Defendants bore the burden of rebutting the presumption of validity of the patents at trial, and the PTO's Grants of Reexamination and repeated rejections of the '203 and '615 claims for obviousness were relevant, probative evidence directly rebutting the presumption. This is particularly the case where, as here, the prior art considered by the reexamination Examiner was **the same** as that offered by Defendants at trial. Despite the Court's stated concerns over potential juror confusion, 8/20/08 Pretrial Conf. Tr. 35:19-36:7, any such issue could have been cured with an appropriate limiting instruction. There was simply no reason to assume the jury could understand the initial examination process, which was repeatedly discussed at trial, 9/2/08 T. Tr. 72:13-75:25 (video re PTO process); 9/15/08 T. Tr. 2093:11-16, 2097:10-19, 2122:15-22, 2131:9-20, 2148:7-10 (SRI Counsel), yet assume the jury would somehow fail to understand the similar reexamination process. *See* Brown Decl., Ex. 7 (*Asyst Tech. v. Emtrak*, C-98-20451-JF

(N.D. Cal. 2007) T. Tr. 564:5-19 (J. Fogel) (admitting evidence of a grant of reexamination, and stating "What is wrong with telling the jury the truth? . . . . These are intelligent people. They can handle it. Why are we trying to prevent them from hearing the truth?"); *E.I. Du Pont de Nemours & Co., v. Phillips Petroleum Co.*, 656 F. Supp. 1343, 1354 (D. Del. 1987) (in a bench trial, noting that reexamination documents were "evidence the court must consider" in determining invalidity).

The Court's preclusion from evidence of the Grants of Reexamination and interim Office Actions in the reexaminations of the '203 and '615 patents substantially prejudiced Defendants such that a new trial is warranted. The prejudice suffered by Defendants on this issue is amply demonstrated by SRI's repeated arguments to the jury that all prior art raised by Defendants was considered and rejected by the examiner, with Defendants being unable to appropriately rebut the false and misleading picture presented. *See, e.g.*, 9/2/08 T. Tr. 111:20-112:12 (SRI Counsel); 9/12/08 T. Tr. 1788:12-22 (Smaha); 9/15/08 T. Tr. 2093:11-16, 2097:10-19, 2122:15-24, 2131:9-20, 2148:7-10 (SRI Counsel). The preclusion of this evidence unfairly influenced the verdict, was erroneous, and was so prejudicial that denial of a new trial would be inconsistent with substantial justice.

### 2. Refusal to Revise the Burden of Proof Standard for Invalidity was Prejudicial Error

Furthermore, in order to give due deference to the reexamination decisions by the PTO, and to fairly account for the lack of deference owed the PTO's original allowance of the '203 and '615 patents in light of the PTO's reexamination proceedings and rejections of all pending claims, an adjustment to the standard jury instructions regarding the burden of proof was warranted. Defendants proposed such alternate instructions, *see* D.I. 524 at Exs. 6, 18, 19, 23 and 25, but they were rejected by the Court. Given the circumstances of this case, the Court's jury instructions that Defendants bore the burden of proof of invalidity by clear and convincing evidence were erroneous. D.I. 550 (Jury Instructions) at 30. The Court's refusal to accept

Defendants' instructions on proving invalidity by a preponderance of the evidence with respect to those issues on which the PTO had initially rejected the claims during reexamination prejudiced Defendants, particularly since Defendants were barred from introducing evidence relating to the reexaminations. 9/15/08 T. Tr. 1990:17-1991:4 (The Court - objections to rejected instructions preserved). In addition, the Court's decision to include a jury instruction on the presumption of validity over Defendants' objections given the circumstances of this case further prejudiced Defendants. 9/11/08 T. Tr. 1625:3-1626:21 (objection to presumption language).

The presumption of validity is defined by statute, 35 U.S.C. § 282, and was codified in recognition of the then-current practice of courts. *See* H.R. Rep. No. 82-1923, at 10 (1952). The rationale for the presumption is "that the PTO, in its expertise, has approved the claim . . . ." *KSR*, 127 S. Ct. at 1745. The Federal Circuit has interpreted the presumption of validity to require that the challenger prove facts relating to invalidity by clear and convincing evidence, even though that standard is not specified in the statute. *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359-60 (Fed. Cir. 1984).

The Federal Circuit has acknowledged that:

[w]hen an attacker, in sustaining the burden imposed by § 282, produces prior art or other evidence *not* considered in the PTO, there is, however, *no reason to defer* to the PTO so far as *its* effect on validity is concerned. Indeed, new prior art not before the PTO may so clearly invalidate a patent that the burden is fully sustained merely by proving its existence and applying the proper law . . . .

*Hoist*, 725 F.2d at 1359-60. Nonetheless, the Federal Circuit has held that the presumption of validity and the clear and convincing standard of proof remain unchanged, despite the fact that the PTO may not have previously considered the prior art or evidence raised by a challenger. *Hoist*, 725 F.2d at 1360; *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050 (Fed. Cir. 1988).

In the Supreme Court's recent decision in *KSR*, however, the Court acknowledged that when a patent's validity is challenged with prior art that was not before the PTO:

> the rationale underlying the presumption—that the PTO, in its expertise, has approved the claim—seems much diminished . . . .

*KSR*, 127 S. Ct. at 1745. The Supreme Court's view is in accord with the views of the other regional circuit court of appeals before the creation of the Federal Circuit. *See, e.g.*, *Penn Int'l Indus., Inc. v. New World Mfg. Inc.*, 691 F.2d 1297, 1300-01 (9th Cir. 1982) ("The basis for the presumption—that the Patent Office has compared the claim of the patent with the prior art and used its expertise to determine validity—can no longer exist when substantial evidence of prior art not considered by the Patent Office is placed in evidence at trial."); *U.S. Expansion Bolt Co. v. Jordan Indus., Inc.*, 488 F.2d 566, 569 (3d Cir. 1973) ("Since the defendants came forward with significant prior art not considered by the Patent Office, the presumption of validity attaching to plaintiff's patent in this case is weakened.").

Here, the rationale underlying the application of a heightened burden of proof was even more diminished. This is not a case where the PTO has failed to consider particular prior art raised by a challenger. Rather, in response to a petition by the challenger, the PTO not only declared a reexamination, but also issued office actions rejecting all of the claims-in-suit as obvious. By ignoring these subsequent decisions by the PTO, the Court gave full and substantial deference to the PTO's issuance of the patents-in-suit, but absolutely no deference or acknowledgement that the same administrative agency had preliminarily determined that its prior determinations were erroneous. As one court noted, the re-examination "determination must be given deference just as other determinations by the PTO." *Amoco Corp. v. Exxon Chem. Co.*, No. C87-242A, 1987 U.S. Dist. LEXIS 14196, at *11 (N.D. Ga. 1987). "The innate function of the reexamination process is to increase the reliability of the PTO's action in issuing a patent by reexamination of patents thought 'doubtful.'" *In re Etter*, 756 F.2d 852, 857 (Fed. Cir. 1985) (quoting H.R. Rep. No. 66-1307, at 3 (1980). When a patent is subject to both reexamination and litigation, one of the auxiliary functions of the reexamination is "to free the court from any need to consider prior art without the benefit of the PTO's initial consideration." *Id.*

While Defendants are not aware of any prior court holding that the burden of proof should be diminished in light of a reexamination and rejection of claims, Defendants submit that this is the correct result in light of the Supreme Court's recent pronouncement in *KSR* and the rationale underlying the presumption of validity and burden of proof — deference to the PTO.

Defendants are aware of at least two district court decisions, decided before *KSR*, which have held that the existence of a reexamination does not affect the presumption of validity or alter the clear and convincing burden of proof. *See Du Pont*, 656 F. Supp. at 1354; *Amoco*, 1987 U.S. Dist. LEXIS 14196, at *11. However, even in those cases, the courts recognized that the rulings made during the reexamination proceedings should be considered in determining invalidity. For example, in *Du Pont*, Judge Latchum of this Court noted that "[t]he fact that the reissue/reexamination examiner rejected the claim is only one piece of the total evidence presented at trial which this Court must consider in determining whether [Defendant] has met its burden of providing invalidity." *Du Pont*, 656 F. Supp. at 1354; *see also Amoco*, 1987 U.S. Dist. LEXIS 14196 at * 11 ("Thus, the grant of the reexamination request by the PTO does not affect the statutory presumption of validity ***but simply serves as evidence which goes toward overcoming that presumption***." (emphasis added)).

The Court's erroneous jury instructions on the key issue of the burden Defendants bore for proving invalidity were clearly capable of confusing and misleading the jury. Consequently, a new trial is warranted on these grounds.

### 3. Refusal to Instruct the Jury Regarding the Law of the Case Was Prejudicial Error

This Court previously ruled that SRI's related '212 patent was invalid – a ruling that was affirmed by the Federal Circuit. D.I. 472; *SRI*, 511 F.3d 1186. Defendants requested that the Court give the jury an instruction explaining the law of the case – that the '212 patent had been held to be invalid and therefore most of the limitations of the '203 and '615 patents were disclosed and enabled by the *Emerald 1997* reference. D.I. 524, Ex. 18 at 1-4. The Court's

refusal to enter Defendants' requested instruction and subsequent decision that only a statement agreed to by SRI could be used with the jury substantially prejudiced Defendants in several ways.  8/20/08 Pretrial Conf. Tr. 52:23-53:21.

First, SRI repeatedly elicited testimony from its expert Dr. Kesidis that was contrary to the law of the case at trial.  For example, despite the prior ruling that *Emerald 1997* disclosed and enabled the '212 limitation of "detecting, by the network monitors, suspicious network activity based on analysis of network traffic data," Dr. Kesidis repeatedly testified that *Emerald 1997 **did not*** disclose monitoring of network packets or network traffic data, and that *Emerald 1997 **did not*** teach how to perform detection.  9/12/08 T. Tr. 1838:17-20, 1846:1-7, 1853:25-1854:5, 1900:7-11, 1903:15-18, 1904:12-17 (Kesidis).  Although Dr. Kesidis later withdrew these opinions on cross-examination, 9/12/08 T. Tr. 1920:11-1921:5 (Kesidis), the damage was already done.  In the absence of a proper limiting instruction from the Court instructing the jury on the law of the case, the jury was left with a confused and misleading impression about the contents of the key *Emerald 1997* reference, particularly since the Court did not instruct the jury that they were bound by the facts of the prior adjudication.

In addition, the prejudice suffered by Defendants is also demonstrated by SRI's representations to the jury that SRI was "happy to admit what was known in the prior art," when nothing could be further from the truth.  9/15/08 Trial Tr. 2107:14-16 (SRI Counsel).  SRI and its expert Dr. Kesidis have repeatedly contested the disclosures in the *Emerald 1997* reference, up to and even during trial contrary to the law of the case, and yet Defendants were unable to impeach Dr. Kesidis with this Court's and the Federal Circuit's prior rulings regarding the '212 patent as well as his prior expert opinions regarding the '212 patent that were contrary to these rulings.  Defendants were prejudiced and the verdict was unfairly influenced by the Court's refusal to enter the requested limiting instruction, and the improper conduct by SRI exploiting this refusal.  Consequently, the issue of invalidity should be retried.

**D. The Court's Incorrect and Prejudicial Revision of Claim Construction Merits a New Trial**

**1. The Court's Revised Claim Construction is Incorrect**

During trial, the Court amended its claim construction for the claim term "hierarchical monitor/hierarchically higher network monitor" to read "a network monitor that receives data from at least <u>two</u> other network monitors that are at a lower level in the analysis hierarchy, <u>so that the analysis hierarchy includes a minimum of three monitors</u>." D.I. 550 at 19-20, ¶ g (changes underlined). This change increased the minimum number of total monitors from two to three and increased the required number of lower-level monitors from one to two. This revised claim construction is not supported by the patent or its prosecution history and improperly reads new limitations into the claim language.

During trial SRI urged the Court to make explicit that the claims require a minimum of three monitors. D.I. 538; 9/15/08 T. Tr. 1964:13-23 (SRI Counsel). But the revised construction contradicts SRI's earlier proposed construction. During claim construction, SRI argued that "hierarchical monitor" should be construed as a "process or component in a network that receives reports from ***at least one*** lower-level monitor." D.I. 317 at 11-14 (SRI Claim Construction Opening Br.); D.I. 346 at 10-11 (SRI Claim Construction Response Br.) (emphasis added). SRI, faced with an anticipatory reference (DIDS), should be estopped from amending its prior position to avoid invalidity. D.I. 52, ¶ 7 (Scheduling order binding parties to their claim construction positions absent a showing of good cause); D.I. 174 at 1-2 (Joint Claim Construction Statement); *New Hampshire v. Maine*, 532 U.S. 742, 749 (U.S. 2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (citation omitted)); *see also Key Pharms. v. Hercon Lab. Corp.,* 161 F.3d 709, 715 (Fed. Cir. 1998) (condemning a party's invited error by changing claim construction positions).

Second, the revised construction added an improper and unsupported limitation into the claim language. Though a patent may describe various preferred embodiments, limitations from those embodiments cannot be imported from the specification. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."). Furthermore, there is not even one explicit example in the patent specification showing three monitors. Nothing in the specification denotes three monitors as a "preferred embodiment."

The patent describes a system of monitors deployed throughout an enterprise network. One aspect of the system is the interchangeable nature of the monitors, such that monitors can not only detect suspicious activity but also receive reports from other monitors. *See, e.g.,* PTX-4 ('615 Patent, col. 3:41-51, 3:61-63). When one monitor exists at a higher level in the network than other monitors, it is hierarchical. The hierarchical monitor's status as a higher-level monitor does not change if *one* lower level monitor, *e.g.* a service monitor, reports to it versus *fifty* lower level monitors. It is clear that all monitors described in the patent, whether lower-level service monitors or hierarchical domain or enterprise monitors, can generate, receive and send reports to other monitors in a varying series of connections. *See, e.g.,* PTX-4 ('615 Patent, cols. 4:8-56, 6:43-46). There simply is no justification in the specification for a requirement of "two" lower-level monitors, and therefore the revised claim construction is incorrect.

## 2. The Revised Claim Construction Effectively Precluded One of Defendants' Invalidity Arguments

This ruling by the Court effectively precluded one of Defendants' invalidity arguments regarding DIDS. Under the original claim construction requiring at least one lower-level network monitor, there was no dispute at trial that the DIDS system deployed at U.C. Davis anticipated all of the limitations of the claims. Mr. Heberlein testified about how the system operated, and explained that its functionality was documented in both multiple DIDS papers as

well as slides he took of the system in actual operation. 9/5/08 T. Tr. 1025:18-1038:5 (Heberlein). He also explained how this DIDS system met every limitation of the claims. 9/5/08 T. Tr. 1038:6-18 (Heberlein). SRI's only relevant challenge to whether or not the DIDS system in use at U.C. Davis anticipated was the fact that it included only a single LAN monitor (lower-level monitor), a fact that was uncontested at trial. 9/8/08 T. Tr. 1160:20-1161:9 (Heberlein). Therefore, the determination of whether or not the U.C. Davis version of the DIDS system anticipated is purely a legal issue of claim construction. Under the Court's original claim construction, the U.C. Davis DIDS system anticipated all of the claims.

Defendants were prejudiced at trial by the Court's revision of its claim construction. Had Defendants been aware of this change earlier or been on notice that it was a possibility, they could have more fully developed the record regarding the DIDS system from Trident Data Systems that supported multiple LANs. *See* 9/8/08 T. Tr. 1161:2-9 (Heberlein – U.C. Davis prototype DIDS system was given to Trident Data Systems); 9/11/08 T. Tr. 1584:20-1585:19 (Smaha – DIDS was modified by Trident Data Systems to support multiple LANs).

### 3. The Court's Unfair Surprise in Revising the Claim Construction During Trial Was Prejudicial Error

Surprise during trial is a well-established ground for granting a new trial motion. *Becton Dickinson & Co. v. Tyco Healthcare Group LP*, No. 02-1694 GMS, 2006 WL 890995, at *10 (D. Del. Mar. 31, 2006) (Sleet, J.) ("Surprise during trial, by major variance in theory of recovery or defense, undisclosed until after the trial is underway, is a long-established ground for granting a new trial motion."). A new trial based on prejudicial surprise should be granted where it deprives the movant of a fair hearing. *Id.* (citing *Brady v. Chem. Constr. Corp.*, 740 F.2d 195, 200 (2d Cir. 1984)). The movant must show reasonably genuine surprise that is inconsistent with substantial justice and resulted in actual prejudice. *Id.*; *cf. Eaton Corp. v. Rockwell Int'l Corp.*, No. 97-421-JJF, 2001 U.S. Dist. LEXIS 17054, at *65-68 (D. Del. Oct. 10, 2001) (Farnan, J.) (denying defendant's motion for new trial based on prejudicial surprise as a result of the

Court's claim construction rulings at the commencement of trial because "both parties had the benefit of having the Court's initial impressions on claim construction months in advance of trial," which were consistent with the Court's final rulings).

Defendants were genuinely surprised when the Court revised its claim construction in the middle of trial, and it resulted in actual prejudice. In October 2006, the Court issued its final claim construction ruling. D.I. 468 (10/17/06 Memorandum and Order re Disputed Claim Language). From that time through the beginning of trial, the Court never expressed to the parties that the claim construction ruling was tentative, incomplete, or subject to change. Moreover, neither party moved for clarification of the claim construction nor identified any ambiguity. *Cf. Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1414 (Fed. Cir. 2004) (allowing the claim construction to be changed at trial where "[t]he record reveals both an incomplete claim construction containing significant ambiguity and an awareness by the parties that the limited constructions that did exist were subject to further modification by the district court"). Approximately two years after issuance of the claim construction Order, Defendants reasonably relied upon the Court's final claim construction ruling to develop their trial arguments and prepare their expert witnesses.

During the sixth day of the jury trial, while Defendants' expert witness, Mr. Heberlein, was testifying on re-direct examination, the Court suddenly interrupted his testimony and recessed to "clarify" the meaning of the claims. 9/10/08 T. Tr. 1231:14-20. Specifically, over Defendants' objections, the Court revised its construction of the claim limitation "deploying a plurality of network monitors," 9/10/08 T. Tr. 1231:24-1232:1 ("The Court: I do not believe that your claim construction is consistent with what I had in mind when I construed the claims"); 9/11/08 T. Tr. 1631:13-19 (The Court proposing claim construction revision), 1631:24-1632:1 (Defendants' objection); D.I. 541.

Following the Court's unexpected recess to announce the revised claim construction, the

testimony of Defendants' expert witness abruptly changed topics, leaving the impressionable jury all-the-more confused. 9/10/08 T. Tr. 1233:18-21. The Court's conduct created jury confusion and caused Defendants to abandon invalidity positions argued in good faith, which indisputably resulted in actual prejudice. Because Defendants were genuinely surprised by the Court's revised claim construction during trial, and it resulted in actual prejudice, Defendants' motion for a new trial should be granted.

When attempting to correct the jury confusion, the Court gave the jury an unnecessary, highly prejudicial limiting instruction. *See United States v. Potter*, 616 F.2d 384, 389 n.13 (9th Cir. 1979) ("An improper limiting instruction may even enhance prejudice to a point where unfair prejudice outweighs probative value." (citation omitted)). Instead of remedying the situation by merely providing the jury with the Court's revised claim construction, *see Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 251 (D. Del. 2001) (Farnan, J.) (issuing claim construction rulings after the presentation of the evidence but before the parties' closing arguments), the Court provided the revised claim construction, styled as a "clarification" *and* a highly prejudicial limiting instruction that unfairly discredited Mr. Heberlein's testimony and manifestly tainted the jury:

> Symantec has presented evidence on the hierarchical monitoring claims through its expert, Mr. Heberlein, to suggest that the claims only require a minimum of two monitors, one serving as a network monitor and one serving as a hierarchical monitor. The Court has clarified its claim construction in that regard, thus requiring that the Enterprise network have a minimum of three monitors, two survey network monitors and one serving as a hierarchical monitor. ***Therefore, to the extent that Mr. Heberlein testified contrary to the Court's claim construction, you should disregard this testimony***.

9/15/08 T. Tr. 2085:4-14 (emphasis added).

By instructing the jury to "ignore" Mr. Heberlein's testimony, the Court telegraphed to the jury the message that the Court wholly disagreed with Defendants' position and that key elements of Defendants' invalidity defense were incorrect. Undoubtedly, the jury perceived this prejudicial limiting instruction as an indication by the Court as to who was "right" and "wrong"

in this trial.  Because Defendants plainly suffered actual prejudice by the Court's conduct, the Court should grant Defendants a new trial.

## IV.  <u>CONCLUSION</u>

Defendants respectfully request that the Court grant judgment as a matter of law under Rule 50(b) that the claims at issue in this case are invalid as obvious and anticipated, or in the alternative, order a new trial under Rule 59.


Dated:  November 17, 2008

By:___*/s/ Richard K. Herrmann*_____
    Richard K. Herrmann (#405)
    MORRIS JAMES LLP
    500 Delaware Avenue, Suite 1500
    P.O. Box 2306
    Wilmington, DE 19899-2306
    Tel: (302) 888-6800
    Fax: (302) 571-1751
    rherrmann@morrisjames.com


    Robert M. Galvin (*pro hac vice*)
    Paul S. Grewal (*pro hac vice*)
    Renee DuBord Brown (*pro hac vice*)
    Geoffrey M. Godfrey (*pro hac vice*)
    DAY CASEBEER MADRID
     & BATCHELDER LLP
    20300 Stevens Creek Blvd., Suite 400
    Cupertino, CA  95014
    Tel:  (408) 873-0110
    Fax: (408) 873-0220

    *Attorneys for Defendant*
    *SYMANTEC CORPORATION*


Dated:  November 17, 2008

By:___*/s/ David E. Moore*_____
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    POTTER ANDERSON & CORROON LLP
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Tel:  (302) 984-6000
    Fax: (302) 658-1192
    dmoore@potteranderson.com


    Holmes J. Hawkins, III (*pro hac vice*)
    Natasha H. Moffitt (*pro hac vice*)
    Charles A. Pannell, III (*pro hac vice*)
    KING & SPALDING, LLP
    1180 Peachtree Street N.E.
    Atlanta, GA  30309
    Tel: (404) 572-4600
    Fax: (404) 572-5134

    *Attorneys for Defendants*
    *INTERNET SECURITY SYSTEMS, INC*.