IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SRI INTERNATIONAL, INC., a California
Corporation,

        Plaintiff and
        Counterclaim-Defendant,

   v.

INTERNET SECURITY SYSTEMS, INC.,
a Delaware corporation, INTERNET
SECURITY SYSTEMS, INC., a Georgia
corporation, and SYMANTEC
CORPORATION, a Delaware corporation,

        Defendants and
        Counterclaim-Plaintiffs.

C. A. No. 04-1199 (SLR)

## PLAINTIFF SRI'S *OPPOSITION* TO DEFENDANTS' MOTION FOR POST-TRIAL RELIEF REGARDING VALIDITY OF THE '203 AND '615 PATENTS

FISH & RICHARDSON P.C.
Thomas L. Halkowski (#4099)
222 Delaware Avenue, 17th Floor
Wilmington, DE 19889-1114
Telephone: (302) 652-5070
Facsimile: (302) 652-0607
Email: halkowski@fr.com

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Howard G. Pollack
Katherine D. Prescott
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

**ATTORNEYS FOR PLAINTIFF/COUNTERCLAIM DEFENDANT SRI INTERNATIONAL, INC.**

Dated: January 16, 2009

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ARGUMENT ...................................................................1

II.   NOTHING ENTITLES DEFENDANTS TO A NEW TRIAL ............................3

    A.    Legal Standards for New Trial.................................................................3

    B.    The Court's Affirmation of its Claim Construction was
        Accurate and Necessary to Address Defendants'
        Improper Argument First Raised at Trial...................................................3

        1.    The Court's Affirmation that the Claims Require
            At Least Two Network Monitors was Correct
            and Consistent with the Claims and Specification.........................4

        2.    The Court's Affirmation was Necessary to
            Counteract Defendants' Improper Argument to
            the Contrary .................................................................................6

        3.    Defendants, Who First Raised This Issue at
            Trial, Suffered No Prejudice or Surprise Because
            of the Court's Appropriate Actions...............................................8

    C.    The Court Correctly Applied Longstanding Federal
        Circuit Precedent and Statutory Language Regarding the
        Presumption of Validity and Properly Excluded
        Irrelevant and Prejudicial Reexamination Evidence...............................10

        1.    The Court Properly Excluded Irrelevant and
            Prejudicial Evidence of the Interim
            Reexamination Office Actions......................................................10

         2.    The Court Correctly Rejected Defendants'
            Attempt to Undermine the Long-Established
            Statutory Presumption of Validity ...............................................13

        3.    The Court Properly Declined to Enter
            Defendants' Prejudicial and Inaccurate
            Instruction Regarding the No-Longer-At-Issue
            '212 Patent ...................................................................................15

    D.    The Verdict Was Not Contrary to the Great Weight of
        the Evidence, and No Manifest Injustice Would Result
        from the Court's Denial of a New Trial....................................................17

**Page**

III. DEFENDANTS ARE NOT ENTITLED TO A REVERSAL OF THE VERDICTS .................................................................17

    A.    Legal Standards for Judgment as a Matter of Law ...................................17

    B.    Substantial Evidence Supported the Jury Verdict of No Anticipation................................................................................18

        1.    *DIDS 1991* Did Not Anticipate the Asserted Claims ...............................................................................18

            a.    The Documentary Evidence Put Before the Jury Established that *DIDS 1991* Did Not Anticipate ...................................................19

            b.    Defendants' Experts' Conclusory Testimony About the DIDS System Did Not Cure Deficiencies of the Prior Art ...........................21

            c.    Dr. Kesidis's Testimony Confirmed DIDS's Limited Nature...............................23

        2.    *Live Traffic* Did Not Anticipate All of the Claims .....................26

            a.    Legal Standards for Printed Publications on Judgment as a Matter of Law.......................................26

            b.    Substantial Evidence Supported the Jury's Verdict that *Live Traffic* was not a Printed Publication.............................................28

                i.    *Live Traffic* was not Publicly Accessible .............................................28

                ii.    Mr. Porras's Purpose in Sending the *Live Traffic* Draft was to Submit it for Publication Consideration .......................................31

        3.    Substantial Evidence Supports the Jury's Verdict that the Prior Art RealSecure Product Does Not Anticipate the Asserted Claims...................................32

a.    The Jury Reasonably Found that the RealSecure Activity Tree at Most Collected and Reiterated Data ........................................34

b.    The Jury Reasonably Found that RealSecure Did Not Disclose Integrating or Correlating (A Specific Form of Integrating)........................................36

c.    SRI Applied the Court's Claim Construction in its Entirety........................37

    i.    Collecting and Reiterating Data is not "Meaningful" ................................38

    ii.    Dr. Kesidis Explained the Practical Differences Between Sorting and Integrating ........................38

C.    Jury Verdict of No Obviousness Was Supported by Substantial Evidence and Was Not Incorrect as a Matter of Law ........................................................................39

    1.    Legal Standards for Obviousness.................................39

    2.    Obviousness is a Legal Issue Based on Underlying Factual Findings, Which the Parties Vigorously Disputed and Which the Jury is Presumed to Have Found in Favor of SRI ....................................41

    3.    *EMERALD 1997* Did Not Render the Claims Obvious ........................................................43

        a.    Mr. Porras Highlighted the Wide Gulf Between *EMERALD 1997*'s "Vision" of an Intrusion Detection System and the Actual System Claimed in the Patents............................43

        b.    Other Evidence Corroborated Mr. Porras's Testimony About the Fundamental Difference Between *EMERALD 1997* and the Patented Invention ........................................47

4. *EMERALD 1997* Combined with *Intrusive Activity 1991* Did Not Render the Claims Obvious ........................................................................... 49

     a. *Intrusive Activity 1991* Did Not Disclose Using Appropriate Traffic Data Categories to Perform Intrusion Detection on Enterprise Networks .................................. 50

     b. Substantial Evidence Showed that a Person of Ordinary Skill in the Art Would Not Have Combined *EMERALD 1997* with *Intrusive Activity 1991* ..................................... 53

         i. *Intrusive Activity 1991* Was Among 14 Different References in One Paragraph of *EMERALD 1997* .................................................................. 53

         ii. Far from Providing a Person of Skill in the Art a Reason to Combine *EMERALD 1997* with Intrusive *Activity 1991*, the Former Taught Away from the Latter .................................................................. 54

5. SRI's Presented Ample Evidence of Secondary Considerations of Non-Obviousness Rebutting Defendants' Obviousness Case .................................... 57

     a. The Invention Enjoyed Significant Commercial Success ....................................... 57

     b. The Invention was Praised and Unexpectedly Successful .................................. 60

     c. The Patented Invention Provided a Solution for Long-Felt but Unsolved Needs ...................................................................... 63

IV. CONCLUSION ...................................................................... 64

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Abbott Labs. v. Sandoz, Inc.,
    544 F.3d 1341 (Fed. Cir. 2008).................................................................. passim

Amphenol T&M Antennas Inc. v. Centurion Int'l Inc.,
    69 USPQ 2d 1798 (N.D. Ill. 2002) ..........................................................11

Andersen Corp. v. Pella Corp.,
    2008 WL 4927431 (Fed. Cir. Nov. 19, 2008)...........................................54

Applied Med. Res. Corp. v. U.S. Surgical Corp.,
    448 F.3d 1324 (Fed. Cir. 2006)..................................................................4

Board of Regents of the Univ. of Texas Sys. v. BENQ America Corp.,
    533 F.3d 1362 (Fed. Cir. 2008)..................................................................5

Callaway Golf Co. v. Acushnet Co.,
    2008 WL 4850755 (D. Del. Nov. 10, 2008) ............................................. passim

Catalina Lighting, Inc. v. Lamps Plus, Inc.,
    295 F.3d 1277 (Fed. Cir. 2002)................................................................57

China Resource Prods. v. Fayda,
    856 F. Supp. 856 (D. Del. 1994)................................................................3

Cordis Corp. v. Medtronic Vascular, Inc.,
    2005 U.S. Dist. LEXIS 6583 (D. Del. 2005) ...........................................11

Depuy Spine v. Medtronic Sofamor Danek, Inc.,
    534 F. Supp. 2d 224 (D. Mass. 2008) ........................................................6

Dystar Textilfarben GmbH v. C.H. Patrick Co.,
    464 F.3d 1356 (Fed. Cir. 2006)...........................................................41, 42

E.I. DuPont De Nemours v. Phillips Petroleum Co.,
    656 F. Supp. 1343 (D. Del. 1987).......................................................11, 12

Eli Lilly & Co. v. Zenith Goldline Pharm.,
    471 F.3d 1369 (Fed. Cir. 2006)................................................................41

Fineman v. Armstrong World Indus., Inc.,
    980 F.2d 171 (3d Cir. 1992).................................................................3, 17

Finisar Corp. v. DirecTV Group, Inc.,
    523 F.3d 1323 (Fed. Cir. 2008)................................................................41

**Page(s)**

*Finnigan Corp. v. Int'l Trade Com'n,*
180 F.3d 1354 (Fed. Cir. 1999)...................................................................22

*Glaxo Group Ltd. v. Apotex, Inc.,*
376 F.3d 1339 (Fed. Cir. 2004)...................................................................12

*Hebert v. Lisle Corp.,*
99 F.3d 1109 (Fed. Cir. 1996).......................................................................9

*Hoechst Celanese Corp. v. BP Chems. Ltd.,*
78 F.3d 1575 (Fed. Cir. 1996).....................................................................10

*In re Kahn,*
441 F.3d 977 (Fed. Cir. 2006).....................................................................39

*In re Wyer,*
655 F.2d 221 (C.C.P.A. 1981).....................................................................32

*Joy Techs., Inc. v. Flakt, Inc.,*
820 F.Supp. 802 (D. Del 1993).....................................................................3

*KSR Int'l Co. v. Teleflex, Inc.,*
127 S. Ct. 1727 (2007)........................................................................ passim

*Lucent Techs., Inc. v. Gateway, Inc.,*
2008 WL 24911955 (S.D. Cal. June 19, 2008)....................................53, 56

*Markman v. Westview Instruments, Inc.,*
52 F.3d 967 (Fed. Cir. 1995).......................................................................36

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.,*
244 F.3d 1365 (Fed. Cir. 2001)...................................................................17

*Micro Chem., Inc. v. Lextron, Inc.,*
317 F.3d 1387 (Fed. Cir. 2003).....................................................................9

*Netscape Commc'ns Corp. v. Konrad,*
295 F.3d 1315 (Fed. Cir. 2002)...................................................................27

*Northern Telecom, Inc. v. Datapoint Corp.,*
908 F.2d 931 (Fed. Cir. 1990).....................................................................27

*Odetics, Inc. v. Storage Technology Corp.,*
185 F.3d 1259 (Fed. Cir. 1999)............................................................ passim

*Olefins Trading v. Han Yang Chem. Corp.,*
9 F.3d 282 (3d Cir. 1993).............................................................................3

*Ormco Corp. v. Align Tech., Inc.,*
463 F.3d 1299 (Fed. Cir. 2006)................................................................57

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,*
520 F.3d 1358 (Fed. Cir. 2008).........................................................40, 57

*Pause Tech., LLC v. TiVo, Inc.,*
419 F.3d 1326 (Fed. Cir. 2005)..................................................................5

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
2007 WL 2893391 (D. Del. 2007) ......................................................11, 14

*Robotic Vision Sys. v. View Eng'g,*
189 F.3d 1370 (Fed. Cir. 1999)................................................................41

*Ruiz v. A.B. Chance Co.,*
234 F.3d 654 (Fed. Cir. 2000)..................................................................57

*Sanofi-Synthelabo v. Apotex, Inc.,*
--- F.3d ----, 2008 WL 5191848 (Fed. Cir. Dec. 12, 2008)......................56

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.,*
511 F.3d 1186 (Fed. Cir. 2008)..............................................26, 27, 29, 31

*Stecyk v. Bell Helicopter Textron, Inc.,*
295 F.3d 408 (3d Cir. 2002)......................................................................16

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.,*
492 F.3d 1350 (Fed. Cir. 2007).........................................................39, 49, 54

*Taurus IP, LLC v. DaimlerChrysler Corp.,*
2008 WL 2323976 (W.D. Wis. Jun. 4, 2008) ..........................................6

*Texas Digital Sys. v. Telegenix, Inc.,*
308 F.3d 1193 (Fed. Cir. 2002)................................................................22

*Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.,*
2006 WL 2253130 (S.D. Tex. Aug. 7, 2006) ......................................29, 30

*Upjohn Co. v. MOVA Pharm. Corp.,*
225 F.3d 1306 (Fed. Cir. 2000)................................................................39

*Winner Int'l Royalty Corp. v. Wang,*
202 F.3d 1340 (Fed. Cir. 2000)................................................................58

# TABLE OF AUTHORITIES

## STATUTES

Fed. R. Civ. P. 50(a)-(b) ................................................................................................17

Fed. R. Evid. 106 ..........................................................................................................12

Fed. R. Evid. 401-403 ...................................................................................................10

35 U.S.C. § 102(b) .........................................................................................................26

35 U.S.C. § 103 ..............................................................................................................39

## OTHER AUTHORITIES

L.T. Heberlein, *A Method to Detect Intrusive Activity in a Networked Environment* ..................42

P.A. Porras & P.G. Neumann, *EMERALD: Event Monitoring Enabling Responses to Anomalous Live Disturbances* ..........................................................................................45

Porras, P.A. & Valdes, A., *Live Traffic Analysis of TCP/IP Gateways*........................................26

# I. SUMMARY OF THE ARGUMENT

At trial, SRI presented substantial evidence that Philip Porras and Alfonso Valdes conceived of a new intrusion detection system in which multiple lower-level sensors monitored particular categories of enterprise network traffic for suspicious activity, and reported that activity to a higher-level monitor that automatically integrated those reports. Defendants' new trial arguments lack merit because they suffered no prejudice from the Court's legally correct instructions to the jury and the proper exclusion of certain irrelevant and prejudicial evidence. In addition, a reasonable jury could have concluded—as the jury did in this case—that Defendants failed to meet their burden of proving by clear and convincing evidence that the prior art anticipated or rendered obvious the asserted '203 and '615 patents.

First, the Court properly confirmed its claim construction when Defendants elicited testimony from their expert that conflicted with the Court's construction. Defendants' expert argued that the claims required only a single lower-level monitor, and the Court addressed this legally incorrect argument by instructing the jury to disregard it. In addition, the Court properly excluded from the jury evidence of interim office actions in the ongoing reexaminations, as virtually every court has done in jury trials. Finally, the Court appropriately instructed the jury that issued patents are presumed valid, a proposition established by statute and long-standing Federal Circuit authority. Thus, Defendants are not entitled to a new trial.

Second, with regard to Defendants' anticipation arguments, the jury heard substantial evidence that none of Defendants' prior art references disclosed all of the limitations of any of the asserted claims. Various trial exhibits showed, SRI's expert Dr. Kesidis confirmed, and Defendants' experts even conceded, that the *DIDS 1991* paper disclosed only a single, lower-level monitor for use on a Local Area Network ("LAN"), not an enterprise network. Similarly, ample evidence established that the draft of Mr. Porras' *Live Traffic* paper was not publicly

accessible during the seven days it arguably resided on SRI's FTP server and that the purpose of placing it on SRI's server was to provide it for pre-publication review by a limited number of people. Lastly, the documents showed, Dr. Kesidis testified, and Defendants' own fact witnesses acknowledged, that RealSecure collected and reiterated reports from lower-level monitors but did not automatically integrate them, as required by the claims.

Third, with respect to Defendants' obviousness arguments, there were numerous factual disputes at trial about what the prior art references taught to one of ordinary skill, the differences between the patented invention and those references, and the relevant secondary considerations of non-obviousness. Mr. Porras, a co-author of *EMERALD 1997*, explained in detail how he and Mr. Valdes worked for nine months to take the concepts in the 1997 paper and conceive of the functional system claimed in the patents, including identifying the particular categories of traffic data that would allow the system to actually work. Dr. Kesidis as well as other independent witnesses and documents supported Mr. Porras's testimony that various data categories mentioned as potential candidates in *EMERALD 1997* proved unsuitable for use in the patented invention. Mr. Porras, Dr. Kesidis, and documentary evidence further established that the discussion in *Intrusive Activity 1991* of certain network data concerned a software syntax for collecting data for use in a LAN-based system, that the reference did not disclose how any such data could actually be used to detect suspicious activity even in the LAN environment, and that a person of ordinary skill in the art would not have been led to combine its teachings with those of *EMERALD 1997* – notwithstanding the fact that *Intrusive Activity 1991* was among 14 papers recited in the "Related Work" section of *EMERALD 1997*. Finally, SRI presented ample evidence regarding the commercial success of products embodying the patented technology, praise for and the unexpected success of the patented invention, as well as the long-felt but unsolved needs satisfied by the patented invention. For all of the reasons further detailed below,

SRI respectfully requests that the Court deny Defendants' motions for post-trial relief regarding the validity of the asserted patent claims.

## II.    NOTHING ENTITLES DEFENDANTS TO A NEW TRIAL

### A.    Legal Standards for New Trial

"District courts will generally grant [a motion for new trial] only if some grievous error occurred during trial which rendered the trial unfair. . . ." *Joy Techs., Inc. v. Flakt, Inc.*, 820 F.Supp. 802, 814 (D. Del 1993); *see also China Resource Prods. v. Fayda*, 856 F. Supp. 856, 862 (D. Del. 1994) (quoting *Cudone v. Gehret*, 828 F. Supp. 267, 269 (D. Del. 1993)) ("new trial should only be granted where a 'miscarriage of justice would result if the verdict were to stand,' the verdict 'cries out to be overturned,' or where the verdict 'shocks our conscience.'"); *Olefins Trading v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir. 1993) ("[T]he district court's power to grant a new trial motion is limited to those circumstances where a miscarriage of justice would result if the verdict were to stand.") (quotations omitted).  The district court must take care not to "substitute its judgment of the facts and the credibility of the witnesses for that of the jury." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir. 1992) (citations omitted).

### B.    The Court's Affirmation of its Claim Construction was Accurate and Necessary to Address Defendants' Improper Argument First Raised at Trial

Defendants argue that: (1) the patented invention does not require a hierarchical monitor to receive and integrate reports from more than one network monitor; (2) even if the claims did so require, the Court's "original" construction somehow precluded such a requirement; (3) the Court's affirmation of its construction during trial which made this requirement explicit was unnecessary; (4) the affirmation prejudiced Defendants; and (5) Defendants were genuinely surprised by it.  Each plank in this argument is shakier than the next:  the claims and the specification plainly require at least two network monitors reporting to a hierarchical monitor.

Defendants' argument to the contrary was misleading and confusing, and the Court properly instructed the jury to disregard any such argument. Defendants presented this legally incorrect theory for the first time at trial and, far from suffering any prejudice or surprise, bear all responsibility for their tactical decisions.

### 1. The Court's Affirmation that the Claims Require At Least Two Network Monitors was Correct and Consistent with the Claims and Specification

As the Court recognized, and as SRI pointed out in its bench memorandum (D.I. 538), which SRI incorporates in its entirety by reference herein, as a matter of law the asserted claims require at least three monitors: at least one hierarchical monitor and two or more network monitors. Claim 13 of the '615 patent is representative,[1] and provides:

> An enterprise network monitoring system comprising:
>
> [1] a plurality of network monitors deployed within an enterprise network, ***said plurality of network monitors detecting suspicious network activity based on analysis of network traffic data*** selected from one or more of the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service protocols};
>
> [2] ***said network monitors generating reports of said suspicious activity***; and
>
> [3] ***one or more hierarchical monitors*** in the enterprise network, the hierarchical monitors adapted to automatically receive and integrate the reports of suspicious activity.

(PTX-4, Claim 13 (numbering and emphasis added)[2]). The structure and terminology of the claims require more than one lower-level monitor that analyzes network traffic data. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006) ("claims

---

[1] Asserted independent claim 1 of the '615 patent and asserted independent claims 1 and 12 of the '203 patent are effectively identical in the relevant respects.

[2] Unless otherwise indicated, all bolded and italicized emphases are added.

are to be construed to preserve the patent's internal coherence.") (citation omitted). Paragraphs [1] and [2] concern the lower-level monitors, which [1] detect suspicious network behavior and [2] generate reports of said suspicious activity. These paragraphs show that the claim requires a plurality of "monitors" doing the detecting and the report generation. Paragraph [3] concerns the one or more hierarchical monitors, which receive reports from the lower-level network monitors and are distinct from them. Even under the Court's initial construction of "hierarchical monitor" (*i.e.*, "a network monitor that receives data from at least one network monitor that is at a lower level in the analysis hierarchy"), the claimed hierarchy could not comprise a single lower-level monitor and a lone hierarchical monitor because the claimed hierarchical monitors must receive and integrate reports of suspicious activity generated by a ***plurality*** of network monitors. Thus, the claim itself, as initially construed by the Court, required the use of at least three monitors.

The patentee chose to use the different terms "network monitor" and "hierarchical monitor" to reflect monitors with different functions, using the term "plurality" to modify "network monitors." Regardless of whether the related term "hierarchical monitor" also has some of the properties of a network monitor, it is the patentee's word choice, and in particular his drafting of the claim as a whole, that controls. *See Board of Regents of the Univ. of Texas Sys. v. BENQ America Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) ("Different claim terms are presumed to have different meanings.").

The specification consistently describes the "network monitors" by reference to a plurality of network monitors that directly monitor network traffic. (*See, e.g.*, PTX-4, at 3:40-50; 6:43-46; 7:43-47; 8:50-56; 9:18-21; 10:14-17; and 12:24-27.) Thus, the intrinsic evidence uniformly confirms that the claims require more than one lower-level network monitor. The Court's claim construction for a single term (hierarchical monitor) identifies certain minimum characteristics; but the structure of the claim then requires more. *See Pause Tech., LLC v. TiVo,*

*Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) ("However, proper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation."). Thus, the Court's construction requiring at least three monitors—one hierarchical and two network—was correct, and it was appropriate for the Court to provide an instruction to this effect when Defendants argued to the contrary at trial. (Heberlein Tr. at 2085:4-14).

### 2. The Court's Affirmation was Necessary to Counteract Defendants' Improper Argument to the Contrary

Courts have recently sanctioned parties for refusing to properly apply the Court's construction and distorting the meaning of the claims in a manner contrary to those constructions. For instance, in *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersys. GmbH*, "[r]ather than accept that the claims construction rulings stripped the merits from this case, counsel chose to pursue a strategy of ***distorting those rulings [and] misdirecting the jury*** to a different reading of the claim language." 2008 WL 410413, at *5 (D. Colo. Feb. 12, 2008) (awarding $4.3 million in attorneys fees). The court held that because "[p]atent law is complex and not intuitive to the average juror…[p]arties and counsel have an obligation to ***refrain from seeking to take advantage of those complexities by employing misleading strategies***." *Id.* at *9. *See also Depuy Spine v. Medtronic Sofamor Danek, Inc.*, 534 F. Supp. 2d 224, 225-227 (D. Mass. 2008) (imposing $10 million attorneys fees award on party who "demonstrated a failure to accept the claim construction governing this case," "urged the jury to adopt an interpretation of the patent claims developed by their experts instead of the construction mandated by the Federal Circuit," and "clearly sought to take advantage of the technical and legal complexities inherent in this case"); *Taurus IP, LLC v. DaimlerChrysler Corp.*, 2008 WL 2323976, at *1 (W.D. Wis. Jun. 4, 2008) (finding exceptional case and

awarding defendant $1.6 million in attorneys fees when "Taurus's decision to proceed in the face of this court's constructions prolonged the litigation in bad faith.").

At trial, Defendants similarly undermined the Court's construction and confused the jury with Mr. Heberlein's testimony that contradicted the Court's construction and the plain language of the claims.[3] (Heberlein Tr. at 1038:19-1039:4; 1230:8-1231:13.) Mr. Heberlein testified that:

> we've got dueling claim constructions here, but using the Court's claim construction, a hierarchical monitor is also considered a network monitor and the lower level monitor is called network monitor. So they're all called network monitors. All the monitors are called network monitors.

(*Id.* at 1231:5-10.) Mr. Heberlein's reference to "dueling claim constructions" was, on its own, unfounded and confusing to the jury. To the extent there were "dueling claim constructions", it was because Defendants refused to accept the Court's construction, seeking instead to try their case on the basis of a different, broader construction that aided their invalidity case. Mr. Heberlein then compounded this offense by misleadingly implying that SRI was responsible for one of those "dueling constructions" and misrepresenting the Court's—not SRI's—construction by conflating the hierarchical monitors with the lower-level monitors and arguing that the claims somehow required only a single one of each. (*Id.* at 1231:1-13.)

The Court promptly excused the jury, as well as Mr. Heberlein, to avoid any further confusion and advised Defendants that "I do not believe that your claim construction is what I had in mind when I construed the claims….[Y]ou're proceeding at your own risk. That I will specifically alert the jury to the fact that this isn't my claim construction." (Trial Tr. at 1231:24-1232:4.) Undeterred, Defendants pressed on, inquiring of the Court "does the Court intend to

---

[3] Because counsel prepare their witnesses to testify, presumably Mr. Heberlein is not solely responsible for presentation of testimony which was inconsistent with the Court's claim construction. SRI will give due consideration to moving at a later date on this ground, among others, for an award of reasonable attorneys fees.

change claim construction, the definition of the terms, or will it be the claims as a whole?" (*Id.* at 1232:15-17.) Remarkably, Defendants thus claimed that the ***Court*** was changing its construction. The Court, however, advised that Defendants' new argument was "certainly, I believe, inconsistent with the fundamental meaning of the claims, and it would not be a claim construction I would endorse." (*Id.* at 1232:22-25.) Consistent with this statement, and because Mr. Heberlein's presentation to the jury of a legally incorrect claim construction threatened to confuse the jury, the Court properly explained to the jury that its claim construction required "a minimum of three monitors, two survey [*sic*: serving as] network monitors and one serving as a hierarchical monitor." (*Id.* at 2085:8-12.) The Court further instructed the jury "to the extent that Mr. Heberlein testified contrary to the Court's claim construction, you should disregard this testimony." (*Id.* at 2085:12-14.) Any lesser instruction would have invited the jury to give weight to his confusing and legally unfounded testimony and would have rewarded counsel's attempt to try its case on a construction different from the Court's.

Thus, the Court properly curtailed Defendants' effort to advance a claim construction contrary to both the Court's construction and the plain meaning of the asserted claims.

### 3. Defendants, Who First Raised This Issue at Trial, Suffered No Prejudice or Surprise Because of the Court's Appropriate Actions

In their post-trial validity brief, Defendants assert that the ***Court*** acted improperly in explaining its construction for the jury and in rejecting Defendants' inappropriate effort to alter the plain meaning of the asserted claims. But Defendants' claim of surprise and prejudice is belied by their conduct, which amounted to little more than manufacturing an issue for appeal.

First and foremost, Mr. Heberlein advanced his novel invalidity theory regarding *DIDS 1991* for the first time at trial. While Defendants assert that SRI should be "estopped from amending its prior position," Op. Br. at 55, Defendants are the ones who espoused a brand-new

8

argument resting on an interpretation of the claims contrary to the Court's construction. As the Court recognized, nowhere in his expert report did Mr. Heberlein opine on this "two monitor" theory, nor did Defendants move for summary judgment on the basis of any such argument – much less provide SRI or the Court with notice of this theory in their pretrial filings. (*See* Trial Tr. at 1232:18-22 ("If you had presented this theory in the summary judgment motions and your expert reports, I would have addressed it in claim construction specifically. You did not, so my claim construction does not address this.")) Indeed, if, as Defendants contend, there was no dispute that the DIDS system anticipated all of the claims under the Court's construction, *see* Op. Br. at 56, their failure to include this theory among their numerous arguments and hundreds of pages of summary judgment pleadings in two separate rounds of briefing and oral argument is inexplicable. Thus, any "surprise" supposedly suffered by Defendants because of the Court's correct construction was purely of their own making.

Furthermore, Defendants cannot reasonably claim to have been prejudiced by the natural result of their own misconduct. Defendants contend that "the jury perceived this prejudicial limiting instruction as an indication by the Court as to who was 'right' and 'wrong.'" (Op. Br. at 60.) But reiterating for the jury the correct claim construction, and steering it away from improper expert witness argument and an attempt by counsel to circumvent the proper construction, is one of the Court's most fundamental gatekeeping roles. *See Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts, not only unproven science, but markedly incorrect law.") (citations omitted); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003) ("trial court acts as a 'gatekeeper' to exclude expert testimony that…does not result from the application of reliable methodologies or theories to the facts of the case."). If Defendants were truly concerned about eroding the credibility of Mr. Heberlein's

opinions, they should not have elicited testimony premised on a facially incorrect claim construction. Alternatively, Defendants could have avoided the Court's curative instruction to the jury had they properly advised the Court and SRI before trial of their new theory and sought reconsideration of the Court's claim construction in order to present that new theory at trial.

Accordingly, Defendants suffered neither surprise nor prejudice from the Court's appropriate remedy of their own improper conduct, and no new trial should be granted.

### C. The Court Correctly Applied Longstanding Federal Circuit Precedent and Statutory Language Regarding the Presumption of Validity and Properly Excluded Irrelevant and Prejudicial Reexamination Evidence

The Court acted properly in rejecting Defendants' request to present evidence of interim reexamination office actions to the jury and to ignore the long-established statutory presumption of validity. In their post-trial validity brief, Defendants recycle the same arguments the Court already rejected before trial. Defendants can point to nothing that transpired at trial that called into question the Court's decisions. Accordingly, Defendants' post-trial arguments lack merit for the same reasons that their pre-trial assertions did.

### 1. The Court Properly Excluded Irrelevant and Prejudicial Evidence of the Interim Reexamination Office Actions

As numerous courts have recognized, admitting reexamination evidence tends to confuse the jury and prejudice the patentee far more than it would be probative of any issue. *See* Fed. R. Evid. 401-403. The Federal Circuit has held that "the grant by the examiner of a request for reexamination is not probative of unpatentability. The grant of a request for reexamination . . . does not establish a likelihood of patent invalidity." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1996). Courts routinely exclude this sort of evidence because, among other things, as the Court recognized at the pre-trial conference, "there's a lot that can happen between the time a re-examination is declared and a final word is said. And it is such a

confusing process, that there's no way that a jury will ever understand what significance it has because, in fact, at this point, it has no significance." (8/21/08 Hrg. Tr. at 35:22-36:2). *See also Callaway Golf Co. v. Acushnet Co.*, C.A. 06-091-SLR (denying defendant's request to admit reexamination evidence); *Cordis Corp. v. Medtronic Vascular, Inc.*, 2005 U.S. Dist. LEXIS 6583 (D. Del. 2005) (granting motions *in limine* to exclude reexaminations); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, C.A. 04-1371-JJF( D.I. 541); and *Amphenol T&M Antennas Inc. v. Centurion Int'l Inc.*, 69 USPQ 2d 1798, 1800 (N.D. Ill. 2002) (" [T]elling the jury that the patent has been called into question by the Patent Office may significantly influence the jury's application of the presumption of validity and significantly prejudice [the patentee.] The prejudicial potential of this evidence far outweighs any probative value"). The many reasons supporting this weight of authority include the differences in the claim constructions, evidence, and burdens of proof used in the Patent Office and the district court, as well as the fact that the jury was unlikely to appreciate that the interim "rejections" in question during reexamination were subject to change once SRI submitted its responsive argument and/or any amendments or that the Patent Office decisions are then subject to a full review by the Federal Circuit. Similarly, the fact that the reexaminations proceeded to final office actions *after* trial concluded is irrelevant to the Court's correct decision not to admit reexamination evidence *during* trial.

Furthermore, both district court cases Defendants cite in support of their request for admission of reexamination evidence are factually inapposite, and they both reiterated the presumption of validity. The *DuPont* case involved a trial to the bench, not a jury, and thus the Rule 403 considerations of juror confusion and prejudice were nonexistent. In *DuPont*, the court also concluded, contrary to Defendants' argument, that reexamination evidence "does not weaken the presumption of validity or reduce [Defendant's] burden of proving invalidity by

clear and convincing evidence." *E.I. DuPont De Nemours v. Phillips Petroleum Co.*, 656 F. Supp. 1343, 1354 (D. Del. 1987). Similarly, unlike here, the *Asyst* case involved a ruling by the district court that the parties were not "to mention [the re-examination] at all unless the door is opened," which the patentee then proceeded to do. (Brown Decl., Ex. 7 (*Asyst Tech. v. Emtrak*, C-98-20451-JF (N.D. Cal. 2007) Trial Tr. at 561:10-18.) The *Asyst* court also specifically instructed the parties that it would "do whatever it has to do to make sure that there is still a presumption of validity, that the reexamination, having been granted, simply means that the Patent Office is looking at it, not that they reached any conclusions." (*Id.* at 562:16-21.) That Defendants can cite only a single jury trial in which the court admitted limited reexamination evidence (for a reason inapplicable here) only confirms the extreme rarity of such admission.

Moreover, Defendants are still unable to cite *any* authority in support of their novel theory that reexamination proceedings are relevant to secondary considerations of non-obviousness or implicate the completeness doctrine under Fed. R. Evid. 106. The reexaminations are taking place *ten years after* the PTO issued the claims following full examination and therefore cannot concern facts that bear upon contemporaneous secondary considerations such as commercial success, long-felt need, or praise by others.

Finally, SRI appropriately informed the jury that the PTO considered the *EMERALD 1997* reference in allowing the asserted claims to issue. That one of Defendants' key prior art references was already before the PTO was a highly relevant factor in the jury's validity analysis. *See Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) (noting that overcoming the presumption of validity "is 'especially difficult' when, as is the present case, the infringer attempts to rely on prior art that was before the patent examiner during prosecution"). Defendants have cited no case law supporting the proposition that the jury should have been shielded from what actually happened during the original prosecution merely because

12

interim reexamination determinations had been subsequently made by an examiner who had not yet heard SRI's side of the story. While Defendants criticize SRI's description of the initial examination process, Op. Br. at 50, SRI accurately characterized what transpired during the original prosecution: the examiner considered various prior art references and allowed the patents-in-suit to issue over them. There was nothing prejudicial or erroneous about either this description or the Court's decision to follow the overwhelming majority of district courts in declining to admit re-examination evidence before the jury.

### 2. The Court Correctly Rejected Defendants' Attempt to Undermine the Long-Established Statutory Presumption of Validity

As they did before trial, Defendants seek to reverse decades of statutory and Federal Circuit authority by arguing that the Court should have weakened the standard presumption of validity of issued patents. As the Court recognized during the jury instruction conference, however, Defendants' argument that their burden should be reduced when the prior art in question was not before the Patent Office lacks coherence: "I don't even know what that means. I mean, you either have to prove by clear and convincing or you don't. I don't use it anymore. What does that mean? I don't know." (Jury Instr. Tr. at 1650:11-14.)

While Defendants acknowledge the endurance of the statutory presumption, they contend that the Supreme Court in *KSR* overturned the presumption of validity for prior art not considered by the patent examiner. (Op. Br. at 51-52, citing *KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1745 (2007).) However, every reported patent case of which SRI is aware that has been decided since *KSR* has continued to apply the presumption, notwithstanding *KSR*'s single sentence in dictum trumpeted by Defendants. This is not surprising, given that the presumption is statutory, and, barring Constitutional problems, which Defendants do not allege, even the Supreme Court is bound to respect it. By their own admission, "Defendants are not aware of any

prior court holding that the burden of proof should be diminished in light of a reexamination and rejection of claims" and are forced to acknowledge at least two cases to the contrary. (Op. Br. at 53.) Accordingly, the Court should reject Defendants' speculative and unsupported legal theory that an issued patent can be invalidated by anything less than clear and convincing evidence.

Moreover, any such novel approach is particularly inappropriate for this case. Here, the very references addressed by the examiner during reexamination—namely *EMERALD 1997*, NSM (*i.e.*, papers related to *DIDS 1991* and *Intrusive Activity 1991*), and IDES/NIDES (upon which Ji-Nao was based)—*were* before the examiner during the original prosecution. Also, to the extent Defendants wished to argue at trial that the presumption should be overcome here because certain prior art was not considered by the Patent Office, they were free to do so, and in fact did.[4] *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2007 WL 2893391, at *1 (D. Del. 2007) ("To the extent that [Defendant] wishes to make an argument to the jury that, on the facts of this case, the prior art was not disclosed, and therefore, the presumption of validity is more easily overcome, the Court concludes that such argument would be appropriate.") (*See* Heberlein Tr. at 1042:3-1043:7 (DIDS); 1102:7-20 (*EMERALD 1997* and *Intrusive Activity 1991*).) For at least these reasons, SRI submits the Court acted properly in not disturbing the longstanding statutory presumption of validity.

---

[4] Defendants' arguments that certain prior art references were not considered by the Patent Office ignored the fact that the '203 patent was a continuation application of the '338 patent and that therefore the examiner necessarily considered, in connection with the prosecution of the '203 patent, every reference cited by SRI during prosecution of the '338 patent. Manual of Patent Examining Procedure § 707.05 (Examiner Note) (Halkowski Decl. Ex B). Their argument also ignored the fact that numerous DIDS papers were indeed before the examiner. Mr. Heberlein was forced to concede both points during cross-examination. (Heberlein Tr. at 1138:25-1141:10; 1210:21-1212:8 (DIDS and *Intrusive Activity 1991*); 1195:18-1196:17 (*EMERALD 1997.*)

### 3. The Court Properly Declined to Enter Defendants' Prejudicial and Inaccurate Instruction Regarding the No-Longer-At-Issue '212 Patent

Before trial, SRI stipulated that certain claim elements in the '203 and '615 patents were enabled by *EMERALD 1997*. (*See* JTX-1 at 3-4.) Because of the Federal Circuit's ruling that *EMERALD 1997* anticipated the '212 patent, which SRI had initially asserted against Symantec, SRI reasonably agreed not to contest that certain common elements between the '212 patent and the '203 and '615 patents were found in *EMERALD 1997*,[5] a stipulation admitted at trial as a joint exhibit (*See id.*; *see also* 8/21/08 Hrg. Tr. at 53:14-21.) Unsatisfied with the stipulation to which it agreed, Defendants pressed the Court to instruct the jury that the Federal Circuit found that the '212 patent, which was no longer part of the case, was invalidated by *EMERALD 1997*. (8/21/08 Hrg. Tr. at 42:16-17; 43:9-45:15; D.I. 524-19 at 1-4.) The Court rejected this request, expressing concern over Defendants' efforts "to bring in a patent that isn't in the case and talk about proceedings that the jury does not know anything about." (8/21/08 Hrg. Tr. at 42:23-25.)

Defendants now argue that the Court's decision to exclude mention of the '212 patent somehow prejudiced them. But the fact that the '212 patent was found invalid on summary judgment was irrelevant to the jury's consideration of the validity of the patents actually in suit. Informing the jury of these facts would only have resulted in confusion, especially given the subtle but important differences in language between the '212 claims and the asserted claims. Defendants argue that they were somehow prejudiced by SRI's argument to the jury that, while SRI conceded the contents of the stipulation regarding *EMERALD 1997*, what mattered was

---

[5] Regrettably, Defendants did not reciprocate, refusing to stipulate in a commensurate fashion that, under the Court's claim construction, all elements of the asserted claims were present in the accused devices when deployed as Defendants instructed. (*See* 8/21/08 Hrg. Tr. at 5:5-8.) Yet at trial, Defendants presented no substantive non-infringement arguments that elements of the asserted claims were missing from the asserted combinations (as opposed to whether the various accused components were combined by any customers), thus forcing SRI to waste its and the jury's time presenting evidence concerning undisputed facts.

what was *not* contained in the stipulation, *i.e.* the selection of the appropriate categories of network data for use in detecting suspicious network activity on an enterprise network. These categories of network data were not claimed in the '212 patent.

Defendants also contend they were prejudiced when SRI elicited testimony from Dr. Kesidis that was supposedly inconsistent with the stipulation. SRI did no such thing. SRI asked Dr. Kesidis whether *EMERALD 1997* disclosed and enabled specific types of "network packet data or network traffic data" (Kesidis Tr. at 1838:17-20; 1900:7-11; 1903: 15-18; 1904:12-16) and whether the paper taught how to perform detection using those measures (*Id.* at 1840:1-7; 1853:25-1854:5; 1903:15-18). These were precisely the elements *missing* from the stipulation, *i.e.* those parts of the claim that SRI showed did *not* exist in the prior art.

To the extent that Defendants believed Dr. Kesidis's testimony contradicted the stipulation, they were free to impeach him with the stipulation. In fact, Defendants attempted to do so. (*Id.* at 1900:15-19). Of course, Dr. Kesidis actually testified that the paper "didn't teach *specifically* how to do detection on hypothetical data," *i.e.*, it did not identify the categories of packet data necessary for use in detecting suspicious activity in an enterprise network, as required by the claims. (*Id.* at 1917:19-24.) But if there were any confusion in the jury's mind that Dr. Kesidis was somehow claiming that *EMERALD 1997* did not disclose detecting suspicious activity generally, Defendants had ample opportunity, and in fact did vigorously endeavor, to dispel it through impeachment on cross-examination. Accordingly, Defendants suffered no prejudice in this regard, and their motion for new trial should be denied. *See, e.g., Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 416 (3d Cir. 2002) (not error for court to exclude prejudicial evidence when other impeaching evidence was available).

**D.     The Verdict Was Not Contrary to the Great Weight of the Evidence, and No Manifest Injustice Would Result from the Court's Denial of a New Trial**

Finally, Defendants scrape together disparate pieces of their new trial and JMOL arguments in an attempt to show that the verdicts, *in toto*, were "manifestly unjust and against the clear weight of the evidence." (Op. Br. at 48.) For all of the reasons set forth above, regarding their new trial motion, and below, regarding their motion for judgment as a matter of law, Defendants' individual arguments lack merit. Stringing them together does nothing to strengthen them.[6] Defendants' arguments do not meet their burden of showing the verdicts were manifestly unjust and against the clear weight of the evidence. Thus, SRI respectfully urges the Court not to substitute its judgment for that of the jury. *Fineman*, 980 F.2d at 211.

## III.     DEFENDANTS ARE NOT ENTITLED TO A REVERSAL OF THE VERDICTS

### A.     Legal Standards for Judgment as a Matter of Law

To be granted judgment as a matter of law, Defendants must show that they provided the jury with clear and convincing evidence of anticipation or obviousness, and that no reasonable juror could conclude otherwise. Fed. R. Civ. P. 50(a)-(b). "Courts grant JMOL for the party bearing the burden of proof only in extreme cases." *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1375 (Fed. Cir. 2001). Indeed, "[t]he grant of a motion for JMOL is permissible *only* when 'there is no legally sufficient basis for a jury to find for [the non-moving] party'" *Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1269 (Fed. Cir. 1999) (*citing* FRCP 50(a)(1)). "In order to determine whether a legally sufficient basis in fact exists, 'the trial court must consider all the evidence in a light most favorable to the non-mover, must draw

---

[6]  The *Fineman* case Defendants cite in support of their argument that the inferences drawn by the jury, on the whole, could not be supported, is factually inapposite. There, unlike here, "plaintiffs' trial counsel advanced prejudicially improper arguments to the jury throughout the trial, culminating in a particularly offensive summation." *Fineman*, 980 F.2d at 211.

reasonable inferences favorable to the non-mover, must not determine the credibility of witnesses, and must not substitute its choice for that of the jury." *Id.* (*citing Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)). "If, after this analysis, substantial evidence, being that minimum quantum of evidence from which a jury might reasonably afford relief, exists to support the jury's verdict, then the motion for JMOL *must* be denied." *Odetics*, 185 F.3d at 1269. Thus, all evidence must be viewed favorably to SRI, and the jury is presumed to have resolved all fact issues in its favor. Defendants ignore this standard, as well as the ample evidence showing that they cannot meet it.

**B.      Substantial Evidence Supported the Jury Verdict of No Anticipation**

**1.      *DIDS 1991* Did Not Anticipate the Asserted Claims**

Contrary to Defendants' argument, *DIDS 1991*[7] did not disclose or enable every limitation of the asserted claims.[8] (DTX-21.) As explained above, the claims require at least three enterprise network monitors: one hierarchical monitor and at least two network monitors detecting enterprise network traffic. *DIDS 1991* disclosed only a single local area network ("LAN") monitor reporting to a DIDS "director". (*See, e.g.*, *id.* at 168, 176.) Other related documents, including later research proposals, speculated that the DIDS system might be extended from a single monitor on a single LAN segment to a larger network, which itself confirms that the original system had, at best, only one lower level monitor and thus was incapable of operating in an enterprise network as required by the claims. Mr. Heberlein's conclusory assertions to the contrary were exposed during his cross-examination as lacking

---

[7] Snapp, et al., *DIDS (Distributed Intrusion Detection System) – Motivation, Architecture, and An Early Prototype*, 14th National Computer Security Conference, pp. 167-76, Oct. 1991.

[8] Defendants assert without support that SRI's validity position revolves solely around a lack of enablement argument with respect to *DIDS 1991*. (Op. Br. at 41, *et seq.*) As set forth in detail below, the trial record is to the contrary.

support and refuted during Dr. Kesidis's rebuttal testimony. Thus, reasonable jurors could have concluded that Defendants failed to meet their burden of proving by clear and convincing evidence that *DIDS 1991* anticipated the asserted claims.

### a. The Documentary Evidence Put Before the Jury Established that *DIDS 1991* Did Not Anticipate

The *DIDS 1991* paper itself is clear in its description and illustration of how the system described therein used a single LAN monitor:



Fig. 2. Communications Architecture

(DTX-21 at 176, Fig. 2 (circled emphasis added).) As the paper describes, the DIDS system claimed to "aggregate[] and correlate[] data from multiple hosts and the network," not from multiple network monitors. (*Id.* at 168; Heberlein Tr. at 1157:7-11.) The paper further described "a single LAN monitor for each LAN segment of the monitored network," not multiple LAN monitors. (*Id.*) In fact, nowhere in the paper is there any mention of more than a single LAN monitor, nor is that monitor referred to anywhere as even being capable of use on an enterprise network. Finally, the paper concludes by predicting that "in support of the ongoing development of DIDS, we are *planning* to extend our model to a hierarchical wide area network environment," further confirming that the described system was limited to a single local area network (*Id.* at 174; Heberlein Tr. at 1157:19-24.)

19

Other documents addressed by various trial witnesses confirmed the limited nature of the DIDS system. An earlier DIDS-related paper recited that "the target environment will consist of a single physical segment of a local area network with approximately 10 hosts running at least two different secure operating systems." (DTX-22 ("February 1991 DIDS paper") at 12 (Sec. 4.2); Heberlein Tr. at 1155:8-19.) In his masters thesis describing the DIDS system, Steven Snapp, the first named author of *DIDS 1991*, stated that "the prototype environment consists of a single physical LAN segment with several hosts running the UNIX operating system" and included a figure substantially identical to Fig. 2 of *DIDS 1991*. (DTX-32 at 5; Heberlein Tr. at 1150:9-1152:11.) Mr. Snapp's thesis also indicated that the DIDS system would be limited to handling about 2,000 messages per day, or one every 50 seconds, a far smaller load than would exist on an enterprise network. (*See* DTX-32 at 12.) Another masters thesis by a different DIDS co-author, James Brentano, indicated the same target environment, the same limited load capacity for DIDS, and emphasized the "need to develop some performance metrics so that we can deal with problems of scaling and portability." (DTX-127 at 16, 52; Heberlein Tr. at 1152:12-1155:7.) Thus, substantial evidence showed that the system operated on a single LAN segment and would require major adjustments to handle enterprise network traffic.

Moreover, in May 1993, a year and a half after the *DIDS 1991* paper was published, Mr. Heberlein submitted a proposal to DARPA stating the following:

> Intrusion detection has been demonstrated on single host machines that generate audit trails…on networks through eavesdropping on network traffic, NSM, and *on single LAN distributed systems* where network traffic and audit trails are aggregated, *UC Davis's DIDS*. *To date, there has been no attempt to our knowledge to apply intrusion detection to large networks*.

(DTX-1113 at 1; Heberlein Tr. at 1162:2-1167:16.) The proposal further stated that "the architecture of the next generation Internetwork intrusion management system for a large

Internetwork will be substantially different from current intrusion detection systems which are designed to cope with intrusions within a single host or a single LAN segment and do not provide for automated responses." (*Id.* at 11.) The proposal additionally indicated that "current approaches to intrusion detection, [*DIDS 1991*], which employ distributed data collection and centralized data analysis are adequate for a small network environment. However, this technique is not scalable to large networks." (*Id.* at 19.) Thus, the 1993 proposal, like the DIDS papers, shows that the DIDS system depicted in *DIDS 1991* operated on only a single LAN segment, with a single monitor, and thus in a fundamentally different fashion from a system of multiple network monitors capable of functioning in an enterprise network. From this substantial evidence, the jury could reasonably have concluded that *DIDS 1991* did not meet the claim limitation "deploying a *plurality* of network monitors[9] in the *enterprise network*."

### b. Defendants' Experts' Conclusory Testimony About the DIDS System Did Not Cure Deficiencies of the Prior Art

Defendants maintain that Mr. Heberlein's and Mr. Smaha's testimony about the DIDS system overcame the shortcomings of the DIDS paper. But during cross-examination, Mr. Heberlein repeatedly confirmed that the DIDS prototype and implementation were limited to a "single LAN segment." (Heberlein Tr. at 1151:11-16; 1154:2-6; 1156:3-7; 1160:11-23; 1161:5-9; 1164:12-17; 1165:3-7, 21-24; 1173:5-12; 1176:14-1177:1.) He acknowledged that the DIDS papers disclosed only this single LAN monitor capable of handling a limited capacity of network traffic. (*Id.* at 1150:9-1152:11; 1152:12-1155:7; 1155:8-19; 1162:2-1167:16.) He agreed, as his

---

[9] Defendants contend that *DIDS 1991* anticipated under the Court's "prior claim construction" requiring only a single hierarchical monitor and a single lower-level monitor, *i.e.* the improper twist on claim construction that Defendants attempted to foist upon the jury. (Op. Br. at 43 n.15.) For all the reasons set forth above, Defendants' construction is legally incorrect. But even under that construction, as explained herein, DIDS did not detect intrusions on an enterprise network, and so did not anticipate for that independent reason.

21

1993 DARPA proposal showed, that "the approach shown in the October 1991 DIDS paper was not scalable to large networks." (*Id.* at 1167:6-9.) Thus, Mr. Heberlein's testimony supported SRI's argument that *DIDS 1991* lacked key elements of the patented invention.

In addition, Mr. Heberlein's testimony centered on personal memories more than a decade old. But Mr. Heberlein acknowledged that "trying to remember what you believe, you know, 12 years ago or whatever would be difficult." (*Id.* at 1219:1-3.) As Mr. Heberlein himself testified during his cross-examination, "at that time, I believed [DIDS] was probably limited to a small number of networks," although he would disagree "[i]f you ask me now." (*Id.* at 1166:6-11.) A reasonable jury could have discounted Mr. Heberlein's reconstructed recollections of the DIDS system in favor of the contemporaneous evidence and testimony, and such an inference must be drawn in SRI's favor. *Odetics*, 185 F.3d at 1269.

Finally, Defendants' arguments notwithstanding, their expert Mr. Smaha's self-serving testimony did not establish that *DIDS 1991* anticipated the asserted claims. Mr. Smaha testified based on his own recollections that one DIDS deployment involved "multiple LANs" and that "the DIDS design does not have anything in it even at the code level that would keep it from running on two or more network segments." (Smaha Tr. at 1584:20-1585:14.) But neither Mr. Smaha nor Defendants supported these personal remembrances with any documentary corroboration, and a reasonable jury could have rejected them on that ground alone. *See Texas Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1217 (Fed. Cir. 2002) ("Corroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest."); *Finnigan Corp. v. Int'l Trade Com'n*, 180 F.3d 1354, 1366-67 (Fed. Cir. 1999) ("Mere testimony concerning invalidating activities is received with further skepticism because such activities are normally documented by tangible evidence such as devices, schematics, or other materials that typically accompany the inventive process.") And that the

22

DIDS "design" did not "have anything in it" preventing it from running on multiple network segments still did not mean that *DIDS 1991* taught one of ordinary skill how to deploy the system described therein in an enterprise network.

Moreover, on cross-examination, Mr. Smaha revealed that he was not opining that DIDS invalidated the patents-in-suit. (*See id.* at 1766:8-10; 1767:15-17.) He had also previously criticized DIDS as "inherently inefficient" and "two and four orders of magnitude slower than hard-wired techniques and much too slow for real-time operation." (DTX-1719; Smaha Tr. at 1769:5-1770:19.) In a 1993 presentation entitled "DIDS Future Plans," Mr. Smaha listed "multiple LAN segment support" and "scalability" on a "DIDS Top 10 Wish List." (PTX-612 at 4; Smaha Tr. at 1772:2-1774:12.) Mr. Smaha testified that five years after *DIDS 1991*, at the a conference of which he served on the program committee, SRI personnel led a discussion at a "New Ideas" workshop about the "major challenge" of "enterprise-wide intrusion detection." (DTX-324 at 29; Trial Tr. at 1759:13-1763:23.) Thus, the evidence strongly indicated that in Mr. Smaha's own opinion (prior to being engaged by Defendants to testify), the DIDS system did not anticipate the patented invention, and as a matter of law SRI is entitled to the inference that the jury agreed. *Odetics*, 185 F.3d at 1269. In short, rather than cure the deficiencies of the DIDS system, Defendants' experts' own testimony and documents confirmed them.

### c. Dr. Kesidis's Testimony Confirmed DIDS's Limited Nature

In his rebuttal testimony, Dr. Kesidis further confirmed why *DIDS 1991* did not anticipate the patents-in-suit. Dr. Kesidis testified that the actual DIDS system involved only a single LAN monitor and that *DIDS 1991* and related literature never described a system involving multiple such monitors.[10] (Kesidis Tr. at 1828:7-20; 1866:19-1867:2; 1867:18-21;

---

[10] Defendants incorrectly assert that Dr. Kesidis "admitted that *DIDS 1991* disclosed the required two lower-level monitors." (Op. Br. at 42.) What Dr. Kesidis actually stated, in response to

1868:20-22.) Dr. Kesidis further testified that DIDS was not designed to handle the fundamental problem addressed by the patents-in-suit because DIDS operated on "smaller networks under more simplistic traffic circumstances" and could not adjust to the "dramatically larger" and "dramatically faster" networks of the late 1990's (*Id.* at 1827:9-18; 1874:1-22.) Dr. Kesidis presented a demonstrative exhibit illustrating these differences. (PDX-714; Trial Tr. 1874:23-1876:22 (In late 1990's, "there was a lot more traffic, there were a lot more hosts, there was a lot greater variety of traffic, and there was a proliferation of new threats. So even if you could run it, it's not necessarily going to work terribly well.").) In addition, Dr. Kesidis cast considerable doubt on Mr. Heberlein's testimony that extending DIDS to multiple LAN monitors would have been "trivial" by pointing to the absence of any such instruction in any of the literature and DARPA's decision to fund a proposal to explore how such an extension might be effected. (*Id.* at 1828:21-1829:12; 1867:10-1872:3 ("Q. In your experience, does DARPA fund trivial extensions of existing technology? A. Advanced research. And the answer is no.").) Thus, Dr. Kesidis demonstrated how DIDS's single LAN monitor differed fundamentally from "a plurality of network monitors deployed within an enterprise network."

Defendants argue that Dr. Kesidis improperly imported a "scalability" requirement into the claims. But in fact, it was Mr. Heberlein who repeatedly referred to scalability during his direct testimony, understanding that, to anticipate the claims, DIDS would have had to operate on a much larger network than actually disclosed—the claimed "enterprise network" rather than a single LAN segment. (Heberlein Tr. at 1039:5-1040:7 (disagreeing that DIDS "could not scale

---

Defendants' question, was that "*if* you have two LAN segments, you need two LAN monitors, yes." (Kesidis Tr. at 1917:4-5.) Nowhere in *DIDS 1991* or any other DIDS-related literature is more than one LAN segment disclosed. Furthermore, in a portion of testimony immediately following that cited by Defendants, Dr. Kesidis explained that *DIDS 1991* "doesn't teach how to hierarchically integrate [theoretical multiple monitors] into a DIDS director," which was one of the difficulties involved in scaling DIDS' lone monitor to a larger network. (*Id.* at 1917:8-9.)

beyond a small LAN" and providing "an example of scaling."); 1046:10-11 ("So our design goal was to develop an intrusion detection system that scaled the entire Internet.").) Mr. Heberlein admitted that at the time the system was devised, he "believed it was probably limited to a small number of networks." (*Id.* at 1166:6-11.) Mr. Heberlein further testified that, in a 1997 notebook entry regarding planning for DARPA, one of the development tasks he set for himself was "comprehensive real-time network-based intrusion detection capability." (*Id.* at 1167:21-1169:12.) Throughout trial, the parties and their experts used the term "scalability" as a proxy for "enterprise network," a key claim term. Thus, the jury heard testimony that six years after DIDS had been developed, Mr. Heberlein was still at work on the unfinished task of developing a real-time network-based intrusion detection system of the kind claimed in the patents-in-suit.

Dr. Kesidis, therefore, properly rebutted Mr. Heberlein's scalability arguments by describing, as set forth above, why DIDS did not satisfy the "plurality of network monitors deployed within an enterprise network" limitation. Dr. Kesidis testified, based on Defendants' own documents, that DIDS was limited to "a small network environment" and "could not scale to large networks." (Kesidis Tr. at 1869:21-1870:4 (citing DTX-1113 at 9).) By contrast, as Dr. Kesidis testified, the patented invention involved an enterprise network that could handle "a lot more hosts," "a lot more data," and "a lot more traffic"—all requirements that would have prevented the DIDS system from "work[ing] terribly well." (*Id.* at 1874:1-1876:22.)

While Defendants object to Dr. Kesidis's explanation of the importance of an "enterprise network," their own expert treated the term similarly. Mr. Smaha testified, consistent with his expert report, that an enterprise network was "typically understood to be a geographically dispersed network." (Trial Tr. at 1774:25-1776:18.) Thus, under Mr. Smaha's reasoning, *DIDS 1991*—even apart from its use of only a single network monitor—could not have met the

"enterprise network" limitation. For all of these reasons, a reasonable jury could have concluded that *DIDS 1991* did not anticipate the patented invention.

### 2. *Live Traffic* Did Not Anticipate All of the Claims

At trial, Defendants failed to meet their burden of proving by clear and convincing evidence that the draft of *Live Traffic*[11] Philip Porras submitted to Matt Bishop and his peer-review committee qualified as a printed publication. (DTX-499.) Drawing all inferences based on the trial record in SRI's favor, a reasonable jury could have found that *Live Traffic* was not a printed publication. Yet, Defendants argue without support for a new JMOL standard, *i.e.*, that SRI must "substantiate" the factual inferences that the Federal Circuit drew in its favor at the summary judgment stage.[12] (Op. Br. at 36, 38.) That is not the correct legal standard; and in any event, SRI demonstrated that the *Live Traffic* draft was not publicly accessible and that Mr. Porras placed it on the FTP server solely to submit it for publication consideration. For all of these reasons, the Court should deny Defendants' motion with respect to *Live Traffic*.

### a. Legal Standards for Printed Publications on Judgment as a Matter of Law

Under 35 U.S.C. § 102(b), "[a] person shall be entitled to a patent unless…(b) the invention was patented or described in a printed publication in this or a foreign country…more than one year prior to the date of the application for patent in the United States." As the Federal Circuit explained during the earlier appeal in this case, "whether a particular reference is a printed publication must be approached on a case-by-case basis" and depends on if the reference "has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *SRI*

---

[11] Porras, P.A. & Valdes, A., *Live Traffic Analysis of TCP/IP Gateways*, submitted on Aug. 1, 1997 to the 1998 ISOC Symposium on Network and Distributed System Security, pp. 1-15.
[12] The parties do not dispute that *Live Traffic* disclosed the patented invention. (*See* JTX-1.)

*Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194-95 (Fed. Cir. 2008) (citations omitted). The "intent to publicize" the reference and the "purpose" of its transmission are among the factors in the publication determination. *Id.* at 1196 (citing *In re Wyer*, 655 F.2d 221, 226-27 (C.C.P.A. 1981), and *In re Klopfenstein*, 380 F.3d 1345, 1347-50 (Fed. Cir. 2004)).

At trial, Defendants bore the burden of proving by clear and convincing evidence that *Live Traffic* qualified as a printed publication. *See Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002). Nothing in the case law requires, as Defendants assert, that SRI had the burden of proving that *Live Traffic* was *not* a printed publication. Defendants' attempt to march through the four inferences SRI supposedly had to substantiate at trial turns printed publication and JMOL authority on its head. (*See* Op. Br. at 37.) *See Odetics*, 185 F.3d at 1269 (upon motion for judgment as a matter of law, "the trial court must consider all the evidence in a light most favorable to the non-mover, must draw reasonable inferences favorable to the non-mover, must not determine the credibility of witnesses, and must not substitute its choice for that of the jury.") SRI had absolutely no obligation to "establish" any factual inferences. (Op. Br. at 36.) Instead, in opposing Defendants' motion for JMOL, SRI must simply show, as it does, *infra*, that a reasonable jury could have found that *Defendants* failed to meet *their* burden. *See Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 936-937 (Fed. Cir. 1990) ("The district court was unable to find that anyone could have had access to the documents [possibly marked 'confidential'] by the exercise of reasonable diligence. . . . Accordingly, we affirm that these documents were not printed publications.")

### b. Substantial Evidence Supported the Jury's Verdict that *Live Traffic* was not a Printed Publication

#### i. *Live Traffic* was not Publicly Accessible

SRI presented substantial evidence that the *Live Traffic* draft was not publicly accessible when Mr. Porras placed it on SRI's own FTP server[13] for seven days. First, Mr. Porras explained that while the FTP server generally permitted anonymous use, SRI personnel could and did restrict access to files by removing the "read bit" and restoring it for particular users:

> There are other ways to…protect files.…As an example, we would take the EMERALD directory, if we had a private file. We could unset the read bit on that directory. So somebody like Matt Bishop, if he had the full URL, he could pull that file. If you were to try to C.D. into that, into the EMERALD directory and the read bit was unset, you would not be able to…find out any information about any files that exist under the EMERALD directory.

(Porras Tr. at 1366:14-25; *see also id.* at 1367:10-17.) In other words, if the read bit were "unset," the EMERALD directory would not have been navigable. Mr. Porras testified that he could not say for certain whether or not the read bit was unset during the one week the paper was placed on the FTP server. (*Id.* at 1371:14-23; 1373:12-15, 21-24.) Because no one knows whether or not the read bit was set, Defendants cannot establish clear and convincing evidence that an anonymous user could navigate to the *Live Traffic* paper – an assumption which lies at the heart of Defendants' argument that the paper was publicly accessible.

SRI also established that in every instance that Mr. Porras directed colleagues to the FTP server, as was the case with Dr. Bishop, he provided a complete file path. (*Id.* at 1499:9-13; DTX-60.) Mr. Porras further testified that, before he temporarily placed the draft on the server, the EMERALD sub-directory in which it would ultimately reside did not even exist. (*Id.* at 1499:14-18.). Furthermore, regardless of whether the EMERALD sub-directory was navigable

---

[13] Contrary to the Defendants' repeated attorney argument, and as Mr. Porras explained at trial, there is no such thing as an "FTP website." (*See, e.g.,* Porras Tr. at 1363:15-16).

during the relevant time period,[14] other evidence established the probability that no one other than Matt Bishop and his peer-review committee could have accessed *Live Traffic*. Mr. Porras testified at length about the blind peer-review process and the importance of maintaining the confidentiality of the submissions. (*Id.* at 1440:22-1441:9 (submitted papers are "considered confidential and you don't talk about the papers that you are reviewing outside of the program committee members"); 1441:10-12 (in his experience, confidentiality is very respected).) Mr. Porras explained that he placed the paper on the FTP server and not on SRI's World Wide Website because he was unsure whether "the paper would be accepted or whether it had significant flaws" and because "somebody else could potentially take those ideas and…rewrite them in another conference." (*Id.* at 1441:13-22.) Thus, the jury heard evidence of Mr. Porras's efforts to restrict access to the *Live Traffic* draft. *See Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, 2006 WL 2253130, *5 (S.D. Tex. Aug. 7, 2006) (court should consider "whether the printed publication was the subject of confidentiality agreements. … [P]rofessional … norms [that] entitle a party to a reasonable expectation that the information displayed will not be copied can also be evidence that [it] is not a printed publication.").

Further evidence showed that those efforts were successful. Mr. Porras testified that neither Mr. Bishop nor anyone else on or outside of the peer-review committee ever indicated that they accessed the paper. (*Id.* at 1441:23-1442:6.) At the same time that he placed the *Live Traffic* draft on the FTP server, Mr. Porras also posted an abstract of the paper on SRI's website,

---

[14] Defendants expended considerable time and energy at trial, and devoted significant space in their brief, trying to demonstrate that SRI's FTP server *in general* was navigable in 1997 by a person of ordinary skill in the field of intrusion detection. (*See, e.g.*, Op. Br. at 38-39.) In fact, the relevant inquiry is whether the paper itself, not the FTP server, would have been publicly accessible, a showing that Defendants failed to make by clear and convincing evidence. *See SRI Int'l*, 511 F.3d at 1197 ("the record offers no suggestion that because people had been told that they could find other papers in the past in the /pub/emerald subdirectory, they would— unprompted—look there for an unpublicized paper with a relatively obscure filename.").

which stated: "this paper remains in limited distribution.  If you would like to read the full paper, please send e-mail to emerald@csl.sri.com and request a copy.  Otherwise, please check back in a few weeks and the paper should be available in full from this Web page." (*Id.* at 1445:10-18; PTX-208 at 1.)  He testified that he posted only the abstract of the paper on SRI's website [t]o tell people that they could not have access to the full paper." (*Id.* at 1445:19-21; PTX-208 at 1.) In fact, at least five people sent messages requesting the full paper, but Mr. Porras did not send them it until after it was accepted for publication, *i.e.*, after the critical date (*Id.* at 1446:6-1451:13 (requests); 1454:15-1456:16 (response); PTX-236; PTX-237; PTX-242; PTX-243; PTX-244; PTX-16.)  In his response email, which he sent after publishing the full paper on SRI's website (*i.e.*, after the critical date), Mr. Porras told the requesters "[s]everal weeks to several months ago, you had requested a copy of our paper, Live Traffic Analysis of TCP/IP Gateways.  FYI, the paper is now available in full on our Web page." (PTX-16; Porras Tr. at 3-9.)  Thus, the evidence showed that the paper was not publicly accessible before the critical date.

Defendants argue that Mr. Porras's "failure" to protect the paper with a password proved that the paper was, in fact, publicly accessible. (Op. Br. at 37.)  But Mr. Porras explained that in order to password-protect the *Live Traffic* draft, SRI would have had to establish an entirely new account on the FTP server for Mr. Bishop. (Porras Tr. at 1458:2-7.)  He testified that he did not do so because creating such an account for an outsider would have implicated various SRI policies. (*Id.* at 1458:8-19.)  Moreover, as set forth above, Mr. Porras did explain that a "read bit" could have been set to deny access to anyone but Mr. Bishop, to whom alone Mr. Porras sent the entire file path. (*Id.* at 1442:7-1443:14; PTX-572 (file path).)  Thus, contrary to Defendants' unsupported characterization of "Mr. Porras's testimony that the SRI FTP site was accessible and navigable" in 1997, *see* Op. Br. at 39, *see also id.* at 37, SRI presented ample evidence that the FTP server and the *Live Traffic* draft were *not* accessible.

**Mr. Porras's Purpose in Sending the *Live Traffic* Draft was to Submit it for Publication Consideration**

In addition to providing substantial evidence that the *Live Traffic* draft was not publicly accessible, SRI demonstrated that Mr. Porras did not intend to publish the paper when he placed it for seven days on SRI's FTP server. Mr. Porras testified that his purpose in sending Matt Bishop the *Live Traffic* draft was to submit it for publication consideration. (Porras Tr. at 1439:4-10.) He further stated that he placed a backup copy on SRI's FTP server because he was concerned that the attached file might not have been transmitted, a common occurrence in 1997. (*Id.* at 1439:8-10; 1439:24-1440:4.) He also testified that he placed the draft on the FTP server for exactly seven days because the Call for Papers indicated that the organizers would acknowledge receipt of the submissions within seven days. (*Id.* at 1438:13-1439:3; PTX-11.) In addition, Mr. Porras stated that he did not have "any doubt in [his] mind" that he intended to publish the paper only when he later posted it to SRI's website on November 10, 1997, *i.e.*, the critical date, ***not*** when he earlier put it on the FTP server. (*Id.* at 1440:19-21; 1457:17-22.) Finally, Mr. Porras testified that he filled out an invention disclosure form in October 1998 indicating that at the time, he believed he published the *Live Traffic* paper on November 10, 1997 when he "posted [it] to the Web." (*Id.* at 1430:19-1434:2; PTX-14 at 3-4.) As Mr. Porras explained, this contemporaneous record, made long before this litigation began and submitted to the government as a matter of course, memorialized his understanding that the web posting, not the seven-day FTP server placement, marked the first publication of *Live Traffic*. (*See id.* at 1430:19-22.) In sum, the evidence shows that Mr. Porras placed the paper on the FTP server for the purpose of submitting it to the peer-review committee for consideration and that he intended to make it publicly available only when he posted it to SRI's website. *See SRI*, 511 F.3d at 1196

(citing *Klopfenstein*, 380 F.3d at 1347-50); *Wyer*, 655 F.2d at 226-27. For all of these reasons, Defendants' motion should be denied with respect to *Live Traffic.*

### 3. Substantial Evidence Supports the Jury's Verdict that the Prior Art RealSecure Product Does Not Anticipate the Asserted Claims

The jury reasonably found that the pre-critical date versions of RealSecure did not anticipate the asserted claims of the '615 and '203 patents. Substantial evidence supports the conclusion that RealSecure does not disclose the automatic integration limitation of a "hierarchical monitor adapted to automatically receive and integrate the reports of suspicious activity."[15] This evidence includes: (1) RealSecure documents; (2) differences between descriptions of RealSecure and later ISS products; (3) Dr. Kesidis's testimony; and (4) the Examiner's consideration of RealSecure during prosecution. In seeking JMOL, Defendants simply ignore the bulk of this evidence, as well as the Court's claim construction that correlation and integration both require "combining . . . reports into a different end product, something more than simply collecting and reiterating data." (Jury Instr. Tr. at 2287:10-14.)

While ISS employee Joe Kleinwaechter and ISS expert Steven Smaha characterized RealSecure's Activity Tree Window as "correlating" and thus "integrating" events, the contemporaneous ISS literature *never* describes RealSecure in this manner. (*See* DTX-1704, DTX-1705, DTX-1706, DTX-2110, DTX-2112, DTX-2542.) Instead, that literature explains that RealSecure merely sorts events for display. (*See, e.g.*, DTX-2542 at Figure 24 ("This window shown with the "Source" tab selected, *displays* the most recent network activity *sorted by* the addresses of the systems that initiated the activity."); Figure 25 ("The "Destination" tab

---

[15] Whether other prior art described "integration" prior to the critical date (Op. Br. at 28) is irrelevant to the question of whether RealSecure *anticipates* the asserted claims. Anticipation requires that all limitations be disclosed in a single reference. *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1345 (Fed. Cir. 2008). Accordingly, Defendants' statement that "SRI's expert admitted that RealSecure anticipated all other claim language" is nonsensical. (Op. Br. at 28).

*displays* the most recent network activity *sorted by* the addresses of the systems that were the target of the activity."); Figure 26 ("The "Events" tab *displays* the most recent network activity *sorted by* the type and priority of events as recognized by the RealSecure Engines. Events are *sorted by* High, Medium, or Low priority."); DTX-1706 at ISS_00357170 (describing "a screen which *shows* a short summary of events *classified by* security priority: High, Medium, and Low").) In contrast, ISS's documentation for later-released products actually touts them as performing correlation. (*See, e.g.,* PTX-157 (mentioning correlation 15 times in a two-page document); PTX-2501 (mentioning correlation 36 times in a 32-page document).) Based on this obvious conflict between what the interested ISS witnesses said at trial and what the actual documents showed, the jury reasonably could have chosen not to credit the testimony on which Defendants now rely in their post-trial brief.

Based on RealSecure documents and testimony of ISS witnesses, Dr. Kesidis also testified that RealSecure merely sorted events and that one of ordinary skill in 1998 would not have considered RealSecure's sorted displays to involve automatic integration or correlation. (Kesidis Tr. at 1858:23-1859:10; *see also id.* at 1823:4-18 (Kesidis explaining RealSecure did not automatically integrate reports of suspicious activity because "what the [RealSecure] console simply did was repeatedly describe it as sorting. That's exactly what it is. They simply collected and reiterated the data."); 1863:16-19; 2015:14-2016:15 (explaining RealSecure "simply sorted them [events]. And that's what it describes repeatedly in the document. It sorts them into directories.").) Dr. Kesidis also noted that if, as Defendants characterized RealSecure, it automatically integrated or correlated events, there would have been no need for ISS to introduce Fusion 2.0 with correlation capabilities years later. (Kesidis Tr. at 1825:20-24; 1862:7-10; DTX-879; Griswold Tr. at 432:21-25.) Holly Stewart, a longtime ISS product manager, confirmed this by explaining that the attack pattern correlation component of Fusion,

introduced years after RealSecure, was a *new* feature and that prior to its introduction users had to manually create incidents from events. (Stewart Tr. at 452:21-453:13; 458:21-459:4.)

Weighing this evidence against the conclusory assertions of ISS's expert and Mr. Kleinwaechter, the jury could reasonably conclude that RealSecure did not anticipate the asserted claims because it only sorted events, and sorting events is merely collecting and reiterating them—precisely what is excluded from the meaning of "integrating." (Jury Instr. Tr. at 2287:10-14.) That the Patent Examiner considered RealSecure and concluded that it did not invalidate the '615 claims reinforces the reasonableness of the jury's decision. (PTX-4; DTX-1801; Kleinwaechter Tr. at 819:4-820:19 (confirming that DTX-1801 accurately describes how RealSecure worked in the same summary fashion he had described to the jury); Kesidis Tr. at 1862:13-1863:13.) In short, Defendants' argument simply ignores the Court's construction that "integration" requires more than the mere collection and reiteration of events.

### a. The Jury Reasonably Found that the RealSecure Activity Tree at Most Collected and Reiterated Data

In arguing that no reasonable jury could find the RealSecure Activity Tree was not a "Different End Product," *see* Op. Br. at 30, Defendants ignore that combining to form a "Different End Product" must involve "something more than simply collecting and reiterating data." (Jury Instr. Tr. at 2287:10-14.) Displaying sorted events in an activity tree structure may be helpful, but it does no more than reiterate the same events to a user for analysis.

The RealSecure console collects events and can then sort and display them in an Activity Tree Window. (*See, e.g.,* DTX-2542 at Figs. 24-26; DTX-1706 at ISS_00357170; Kesidis Tr. at 1858:23-1859:10; 1863:4-18; 2015:14-2016:15.) RealSecure is, however, always displaying *events*, not different end products formed by combining those events. (*See, e.g.,* Op. Br. at 32 ("the user could even choose how to *display events*") ("*reports are organized* by their "Source"

address, and . . . *reports are organized* by "Event" type"); DTX-2542 at Figs. 20, 24-26; DTX-1706 at ISS_00357170.) Displaying the same events in different ways is simply rearrangement or reiteration, which the court explicitly excluded from the scope of integration. (Kesidis Tr. at 1823:4-18; 1858:23-1859:10.) By contrast, for example, Fusion 2.0 takes multiple events and combines them to form new end products, incidents or attack patterns, that each reflect an entire collection of events and that eliminate the need to display the underlying individual events. (PTX-91 at ISS60297; PTX-157 at 2; PTX-314; McEwin Tr. at 429:8-25; Griswold Tr. at 437:25-238:7; 443:14-444:16; 448:20-449:8; Stewart Tr. at 458:21-459:4; Kesidis Tr. at 654:25-660:14.) Defendants identify no evidence, let alone clear and convincing evidence, that sorting events in the Activity Tree creates a new end product or is anything more than reiteration. The jury thus reasonably concluded that the RealSecure Activity Tree[16] did not anticipate the claims.

RealSecure also counts events. Based on RealSecure documents and ISS testimony, Dr. Kesidis explained that RealSecure counts identical events and that counting is not integrating. (Kesidis Tr. at 1823:19-1824:14; 1860:5-22.) Specifically, he testified that "what [RealSecure] would do is combine identical events that may be separated in time into a directory." (*Id.* at 1823:24-25.) While Dr. Kesidis used the word "combine" in his testimony and the Court used the word "combine" in its definition of "integration," the Court's definition of integration actually requires "combining into a different end product, something more than collecting and reiterating." Thus, contrary to the implication in Defendants' briefing, *see* Op. Br. at 42, Dr. Kesidis did not concede that counting is "integrating." Moreover, in his next breath, Dr. Kesidis

---

[16] Defendants suggest that besides the RealSecure Activity Tree display, the RealSecure priority display also somehow discloses integration. (Op. Br. at 31 n.12.) The priority display shows events sorted by priority, as opposed to by source, destination, or event type as in the Activity Tree. (DTX-2542 at Fig. 20.) The particular feature by which the events are being sorted does not change the fact that RealSecure is merely sorting the events, not integrating them.

explained that the count feature "[j]ust sort[s] [the events] into a directory." (*Id.* at 1823:25-1824:1.) Thus there was a reasonable basis for the jury to conclude that RealSecure's counting is not integrating and that RealSecure did not anticipate the asserted claims.

### b. The Jury Reasonably Found that RealSecure Did Not Disclose Integrating or Correlating (A Specific Form of Integrating)

Defendants argue that since RealSecure allegedly "groups" events by commonalities, the jury must find that RealSecure correlates. (Op. Br. at 29-30.) This argument disregards the fact that correlating is a form of integrating and therefore also requires combining events into a "different end product, something more than simply collecting and reiterating data." Dependent claim 14 of the '615 patent, the only asserted claim requiring "correlating," elaborates on the "hierarchical monitor adapted to automatically receive and integrate the reports of suspicious activity" limitation with a requirement that "the integration comprises correlating intrusion reports reflecting underlying commonalities." (PTX-4.)[17] This claim language makes clear that "correlation" is a subset of "integration." While the Court construed "[c]orrelating/correlates" to mean "[c]ombining the reports to reflect underlying commonalities," as a form of integrating, to correlate one must also integrate, that is "combin[e] those reports into a different end product; in other words, something more than simply collecting and reiterating data." (Jury Instr. Tr. at 2287:10-16.) As discussed above, RealSecure may sort based on commonalities, but sorting is not integrating. As there is ample evidence that RealSecure does not integrate, it cannot satisfy the narrower limitation of correlating.

In their attempt to argue that correlation does not require "combining into a different end product," Defendants mistakenly abbreviate Dr. Kesidis' testimony on infringement.

---

[17] Because claim 14 depends from claim 1, it necessarily contains all of its limitations, including "integrating." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 1000 (Fed. Cir. 1995) ("a dependent claim includes all of the limitations of the independent claim").

Defendants suggest that to show that the accused product correlates, Dr. Kesidis only testified that the accused product made use of event commonalities. (Op. Br. at 29; Kesidis Tr. at 706:24-707:4.) Defendants omit Dr. Kesidis' testimony just moments before the cited portion, to the effect that the accused product integrates, *i.e.*, combines events into a different end product, referred to as an incident. (Kesidis Tr. at 706:13-21.) To show correlation for purposes of infringement *or* invalidity, the Court's claim construction requires combining events into a different end product. Dr. Kesidis's testimony (and other evidence) clearly showed the accused products had this limitation;[18] other evidence equally clearly showed that RealSecure did not.

Defendants also mistakenly assert that SRI's expert agreed that RealSecure performed the claimed correlation. (*See* Op. Br. at 29.) Dr. Kesidis explained that RealSecure combines events only in the sense that it sorts and groups reports together based on commonalities. (Kesidis Tr. at 1937:11-24 ("they are grouped together.); 1942:5-6 ("combination or sorting, as the document describes it").) Dr. Kesidis did not suggest that this sorting or grouping involved combining events *into a different end product* or anything more than collecting and reiterating. Thus, Dr. Kesidis in no way admitted that RealSecure "correlates."

### c. SRI Applied the Court's Claim Construction in its Entirety

Defendants' briefing incorrectly suggests that SRI's arguments as to why RealSecure is not anticipatory are based on a claim construction different from the Court's. SRI consistently used the court's complete construction of "[a]utomatically receiving and integrating reports of suspicious activity" to mean "[w]ithout user intervention, receiving reports of suspicious activity and combining those reports into a different end product; in other words, something more than

---

[18] And of course Defendants never disputed that their products (when deployed as intended) were capable of integrating and correlating reports as claimed. (*See* SRI's concurrently filed briefs.)

simply collecting and reiterating data." Defendants, on the other hand, ignore that combining "into a different end product" involves more than collecting and reiterating the same data.

### i.    Collecting and Reiterating Data is not "Meaningful"

Defendants claim that SRI added the non-existent claim limitation of "meaningful" intrusion detection. Dr. Kesidis and SRI used the phrase "meaningful" to help explain that mere "collection and reiteration" (which the Court excluded from the definition of integration) was insufficient to meet the claim. (*See, e.g.,* Kesidis Tr. at 1942:11-17 (Q. And I think you had testified…that the correlation needed to be somehow done in a meaningful way; is that right? That's not in the claims; right, sir? A. Well, I mean, the definition of integration, it stipulates that it's not merely collecting and reiterating the data.").) It is this part of the Court's construction that Defendants consistently ignore. For example, Defendants contend that changing a disorganized collection of reports into an organized collection of those same reports is integration. (Op. Br. at 34.) But an organized collection of *events* is just a reiteration of the disorganized *events*; the events are not combined into a different end product – and, of course, would do nothing to assist an operator as the claimed invention does by automatically integrating and reducing the incredibly numerous events that have to be reviewed.

### ii.    Dr. Kesidis Explained the Practical Differences Between Sorting and Integrating

Based on the following testimony, Defendants claim Dr. Kesidis argued that to anticipate the claims RealSecure must automatically detect attacks through the process of integration:

> A. . . . So there's not intelligence here. They [events] are simply being sorted for display purposes on the console.
> Q. And by "display purposes," who is analyzing that data?
> A. So that -- the point is that there are two points. One is that a human being is required to plow through this stuff and make intrusion detection decisions. They, you know, repeatedly talk about someone can drill down in. . . .

(Kesidis Tr. at 1859:8-15; Op. Br. at 35.) Dr. Kesidis was simply describing RealSecure's sorting by explaining its limited practical usefulness in intrusion detection. Defendants also claim that SRI somehow argued that the claims require that events be integrated within a specified time period and/or that monitors work flawlessly. (Op. Br. at 35-36). But this again confuses Dr. Kesidis' explanation of the functional realities underlying how the RealSecure system worked and the practical implications of sorting as opposed to integrating (Kesidis Tr. at 1936:25-1937:10; 2017:19; 2018:13-18) with an argument as to the claims' scope.

Thus, for all of the foregoing reasons, RealSecure did not anticipate the asserted claims.

### C. Jury Verdict of No Obviousness Was Supported by Substantial Evidence and Was Not Incorrect as a Matter of Law

#### 1. Legal Standards for Obviousness

Under 35 U.S.C. § 103, "[a] claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art." *See In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006). The evidentiary burden to show facts supporting a conclusion of obviousness is one of clear and convincing evidence. *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007). "The ultimate question of obviousness *vel non* is reviewed as a matter of law, viewing the evidence, when it is reasonably in dispute, in the manner most favorable to the verdict." *Upjohn Co. v. MOVA Pharm. Corp.*, 225 F.3d 1306, 1310 (Fed. Cir. 2000). On a motion for JMOL following a jury finding of non-obviousness, a challenger must show an absence of facts necessary to support the verdict, such that no reasonable jury could conclude that defendant failed to meet its high burden of proof. *Callaway Golf Co. v. Acushnet Co.*, 2008 WL 4850755, at *5 (D. Del. Nov. 10, 2008).

In *KSR*, the Supreme Court reaffirmed its prior statements regarding obviousness, in particular cautioning that in conducting an obviousness analysis, "[a] factfinder should be aware . . . of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." 127 S.Ct. 1727, 1742 (2007) (citing *Graham*, 383 U.S. at 17-18). Consistent with this, the Federal Circuit clarified that *KSR* does not discard the "teaching-suggestion-motivation" ("TSM") test, but rather counsels against its rigid application. *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) (affirming grant of partial summary judgment of non-obviousness and holding that "a flexible TSM test remains the primary guarantor against a non-statutory hindsight analysis"). Indeed, the *KSR* court itself acknowledged that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does," because patented inventions almost always rely on combinations of elements that are already known. 127 S.Ct. at 1741.

As the Federal Circuit has explained, under *KSR*, "when the problem is known, the possible approaches to solving the problem are known and finite, and the solution is predictable through use of a known option, then the pursuit of the known option may be obvious even absent a 'teaching, suggestion, or motivation' concerning that option." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1351 (Fed. Cir. 2008) (affirming entry of preliminary injunction in part because patentee was likely to prevail on defendant's obviousness claim). But, in *Sandoz*, the Federal Circuit cautioned against interpreting "obvious to try" too broadly:

> The Court in *KSR did not create a presumption that all experimentation in fields where there is already a background of useful knowledge is "obvious to try,"* without considering the nature of the science or technology. The methodology of science and the advance of technology are founded on the investigator's educated application of what is known, to intelligent exploration of what is not known. Each case must be decided in its particular context, including the characteristics of the science or technology, its state of advance, the nature of the known choices,

the specificity or generality of the prior art, and the predictability of results in the area of interest.

*Id.*

### 2. Obviousness is a Legal Issue Based on Underlying Factual Findings, Which the Parties Vigorously Disputed and Which the Jury is Presumed to Have Found in Favor of SRI

Obviousness is a legal conclusion based upon underlying findings of fact. *See, e.g., Robotic Vision Sys. v. View Eng'g*, 189 F.3d 1370, 1376 (Fed. Cir. 1999); *Eli Lilly & Co. v. Zenith Goldline Pharm.*, 471 F.3d 1369, 1377 (Fed. Cir. 2006). "[O]bviousness depends on (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations, including commercial success, long felt but unsolved needs, and failure of others," all of which are heavily factual. *Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)). A jury's underlying findings of fact, whether explicit or implicit in the verdict form, are reviewed for substantial evidence. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1338 (Fed. Cir. 2008). A showing of absence of facts necessary to support a jury verdict of non-obviousness "is nearly unattainable" where a patentee's expert testified regarding both the scope of the prior art and the lack of a motivation to combine. *Callaway Golf*, 2008 WL 4850755, at *5 (citing *Group One Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1304 (Fed. Cir. 2006) ("Expert testimony of a lack of motivation to combine and the use of hindsight by opposing experts constitutes substantial evidence of nonobviousness.")).

Contrary to Defendants' conclusory suggestion, *see* Op. Br. at 8-12, the parties at trial vigorously disputed the factual issues underpinning the obviousness analysis. First and foremost, Defendants took an extremely broad view of the scope of the prior art and an unsupportably

narrow view of the differences between it and the patented invention. *See Dystar,* 464 F.3d at 1360. As SRI showed at trial, and as explained *supra,* Sec. IV.B.2 (DIDS), nothing in the prior art disclosed the unique combination of multiple monitors detecting suspicious enterprise network traffic based on specific and particularly appropriate data categories, coupled with reporting that suspicious activity to a hierarchical monitor that could automatically receive and integrate the reports. In the context of Defendants' obviousness combinations, and as was clear from the stipulation that the parties agreed to put before the jury, *EMERALD 1997*—a conceptual overview of the EMERALD system that was then in the process of development—did not disclose the particular categories of traffic data necessary for the patented invention to function properly. (JTX-1.) In addition, *Intrusive Activity 1991*[19] operated only on LANs, whose fundamental difference from the enterprise networks in the claims SRI explained above in the context of DIDS. (DTX-9.) *Intrusive Activity 1991* also discussed certain traffic data categories only in the context of describing a language syntax, not in the context of applying any particular data to detect suspicious activity. Therefore a skilled artisan would not have been motivated to combine its disclosure with *EMERALD 1997*. Thus, SRI presented evidence of the scope and content of the prior art that differed sharply from Defendants' beliefs.

Second, the parties also disputed the differences between the patented invention and the prior art. While Defendants minimized the selection of appropriate network traffic data categories, including by calling the categories themselves "not novel," *see* Op. Br. at 9, the patented invention, unlike anything else in the prior art, included the use of those categories in a hierarchical system to detect suspicious network activity on an enterprise network. As set forth in detail below, this critical difference between the patented invention and the prior art precludes

---

[19] L.T. Heberlein, *A Method to Detect Intrusive Activity in a Networked Environment,* 14th National Computer Security Conference, pp. 362-371 (Oct. 1991).

any obviousness determination. Finally, to the extent Defendants presented a *prima facie* case of obviousness, SRI rebutted it with compelling evidence of secondary considerations of non-obviousness, including commercial success, praise for the patented invention, and long-felt, unsolved needs. For all of these reasons, a reasonable juror could have concluded that Defendants failed to meet their burden of showing by clear and convincing evidence that the patents-in-suit were obvious.

### 3. *EMERALD 1997* Did Not Render the Claims Obvious

SRI presented substantial evidence at trial that *EMERALD 1997* did not render the asserted claims obvious. Significant differences exist between the disclosure of *EMERALD 1997* and the patented invention, as reflected by the nine months of hard work that the inventors undertook to get from the *EMERALD 1997* paper to the completion of the *Live Traffic* paper – a period during which the inventors transformed the conceptual framework of the former into the functional implementation of the latter. Because *EMERALD 1997* did not suggest to one of ordinary skill in the art the specific network traffic categories necessary for the invention to function, let alone disclose them outright or explain how they could be implemented in a functioning network-based intrusion detection system, it did not render the invention obvious.

#### a. Mr. Porras Highlighted the Wide Gulf Between *EMERALD 1997*'s "Vision" of an Intrusion Detection System and the Actual System Claimed in the Patents

At trial, Defendants' counsel repeatedly argued that because certain individual elements of the asserted claims were supposedly found in various places in the prior art, combining them together in the unique way claimed in the invention would have been obvious. But during their examinations, and in numerous key documents they authored, the named inventors emphasized that at no time before they conceived their invention—including in *EMERALD 1997*—had

anyone combined all of the particular elements of the claims into the unique invention they devised. The following example from Mr. Porras's adverse direct examination is illustrative:

> Q. Were you and Mr. Valdes the first to employ hierarchical network monitors?
>
> A. I think in the context of this claim, where you have the plurality of sensors that are using that particular data, they're generating suspicious reports and they are reporting that to a hierarchical monitor for automatically processing and from that generating suspicious reports…that claim is a unique thing that we were doing.

(Porras Tr. at 1336:8-15.) This is an apt summary of the patented invention.

Mr. Porras testified at length about the substantial time and effort involved in implementing an approach that would allow the high-level concepts described in *EMERALD 1997* to actually work in a full-fledged intrusion detection system such as was claimed in the patents. He testified that SRI hired him in 1996 to expand intrusion detection from "something that would work inside of the host and be monolithic" to "networks connected to networks, whole organizations having to manage a lot of different subnetworks." (Porras Tr. at 354:22-355:7.) This concept of "scaling up" intrusion detection proved challenging because "[i]f you begin to want to expand [smaller systems] and have them cover many networks," they need to "scale up…in terms of performance, in terms of the volume of information that we provide to humans…such that as the network gets larger, we are not overwhelmed by it." (*Id.* at 358:15-359:1.) At that time, while people in the field "had just broad ideas of the kinds of data that we would be interested in," no one yet knew what type of data to look at or how to analyze that data effectively. (*Id.* at 356:13-20.) It was therefore not "obvious to try" particular data categories. *See KSR*, 127 S.Ct. at 1742 (cautioning against "the distortion caused by hindsight bias"); *Sandoz*, 544 F.3d at 1352 ("*KSR* did not create a presumption that all experimentation in fields where there is already a background of useful knowledge is 'obvious to try'").

In late 1996, Mr. Porras wrote *EMERALD 1997* as his "vision for EMERALD" and an "early explanation of what he was envisioning." (*Id.* at 361:14-17; DTX-356[20]; *see also* DTX-536 (independent peer-review of *EMERALD 1997*) at 5 and Porras Tr. at 1495:21-1496:4 ("this is just a starting point for a fruitful thread of research. I feel it is a great research proposal.").) At that point, he and his co-inventor "didn't know what sort of protocols we'd be doing, how we'd be encoding the data, how we would do the analysis, and what kind of instrumentation we'd take out of the network, how we would analyze that." (*Id.* at 361:22-25.) He testified that in order to answer those questions and fulfill the vision set forth in *EMERALD 1997*, he had to "actually work out an implementation that would provide us the kinds of infrastructure that could" actually detect intrusions on an enterprise network. (*Id.* at 361:18-25.) Mr. Porras explained that he had to "develop out this architectural design," perform "the analysis of the data itself," and iron out "all the other problems that would occur in trying to develop out a scalable system that could scale up to very large networks." (*Id.* at 362:4-13.) This work took nine months to complete, at which time he and Mr. Valdes completed a draft of the *Live Traffic* paper that formed the basis for the patents-in-suit. (*Id.* at 362:14-22.)

Mr. Porras testified about the specific, important differences between the disclosures in *EMERALD 1997* on the one hand and *Live Traffic* on the other. He stated that when he wrote *EMERALD 1997* (in 1996), he did not know: (1) that he would end up focusing on network traffic data; (2) what *kind* of network traffic data he would focus on; (3) how to *measure* the selected traffic data; or (4) how data would be *reported* from lower-level monitors to hierarchical monitors and *correlated*. (*Id.* at 366:1-20.) While *EMERALD 1997* discussed certain potential sources of data that the inventors experimented with—including "audit data,

[20] P.A. Porras & P.G. Neumann, *EMERALD: Event Monitoring Enabling Responses to Anomalous Live Disturbances*, 20th Nat'l Info. Sys. Security Conference, 1:353-365 (Oct. 1997).

network datagrams, SNMP traffic, application logs, and, finally, analysis results from other intrusion detection instrumentation"—*none* of them as described in the '97 paper actually ended up proving appropriate for, or wound up being used in, the patented invention. (DTX-356 at 356; Porras Tr. at 367:18-368:5; 368:11-369:24 ("SNMP" traffic captures only summary statistics after the fact and was thus unsuitable for the patented invention, which required live traffic analysis); 369:25-371:22 ("application logs" provided data that was too general and unreliable for use in real-time intrusion detection); 371:23-376:7 ("network datagrams" or packets contained too much information for appropriate analysis, and efforts to profile users through FTP sessions or other network packets proved unsuccessful).) Mr. Valdes confirmed Mr. Porras's recollections, testifying that in late 1996, they had not "settled on the idea of looking specifically at network traffic data instead of things like audit logs." (Valdes Tr. at 291:14-25; *see also* PTX-178 (Sept. 10, 1996 email from Peter Neumann re EMERALD).) Selecting the appropriate type of data to look at, let alone specific subcategories of that data, was thus not predictable at the time of *EMERALD 1997*. *See Sandoz*, 544 F.3d at 1352.

Instead, Mr. Porras testified that nine months of hard work and experimentation after drafting *EMERALD 1997* led him and Mr. Valdes to identify "isolated specific attributes of network traffic that [they] thought would be useful for detecting problems" inside an enterprise network. (Porras Tr. at 376:8-16.) After narrowing the universe down to "a dozen or more attributes," they arrived at the specific measures claimed in the patents, *i.e.* network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service protocols. (*Id.* at 376:22-378:8; PTX-1, claim 1.) Mr. Porras explained that the selected categories "represent a small subset of what one could extract out of network data." (*Id.* at

46

378:9-12.) He further testified that, during the nine months between the drafting of *EMERALD 1997* and *Live Traffic*, he expended considerable energy on figuring out how to analyze the appropriate data and assembling the hierarchical structure of the system. (*Id.* at 378:12-380:2.)

On cross-examination, Mr. Porras reinforced his prior testimony, explaining that there were a number of other potential traffic data categories that were not included in the patented invention. (*Id.* at 386:6-390:21 (discussing packet entry peaks, statistics within packets, session-oriented information, packet entropy, URLs, multi-cast IGMP, and authentication errors).) Thus, Mr. Porras presented to the jury substantial evidence that the patented invention was the unpredictable result of extensive experimentation. *See KSR*, 127 S.Ct. at 1740 (invention unlikely to be obvious if "the improvement is more than the predictable use of prior art elements according to their established functions"); *see also Sandoz*, 544 F.3d at 1352 (obviousness analysis requires consideration of "the predictability of results in the area of interest").

**b.  Other Evidence Corroborated Mr. Porras's Testimony About the Fundamental Difference Between *EMERALD 1997* and the Patented Invention**

Other evidence corroborated Mr. Porras's testimony that the patented invention differed in important aspects from *EMERALD 1997*, in particular because the paper did not disclose data categories appropriate for detecting intrusions in large networks. Dr. Kesidis testified that *EMERALD 1997* did not render the asserted claims obvious because it was "missing the selection of network packet data, which is the basis of intrusion detection, as well as the features that are extracted from that kind of data." (Kesidis Tr. at 1820:1-9.) He further stated that "using packet data and the specific features of network traffic data recited in the claims" were not suggested by *EMERALD 1997*. (*Id.* at 1820:10-13.) He additionally testified that the combination of a person of ordinary skill's knowledge of certain types of network attacks and *EMERALD 1997* would not have rendered the claims obvious because "[i]t's clear from the

paper itself that there are different ways of detecting intrusions." (*Id.* at 1820:19-25.) Moreover, he stated that there were "lots of smart people working" on the "problem of detecting intrusions in an enterprise network" and if it had been "just a matter of assembling stuff together, it would have been done already by one of them." (*Id.* at 1821:23-1822:6.)

Specifically, Dr. Kesidis pointed to three key figures and portions of six columns of disclosure in the patents that, by Defendants' own admission, were not disclosed in *EMERALD 1997*. (*Id.* at 1835:1-1836:23; 1838:7-9, citing PTX-609 (Heberlein invalidity expert report) at (unhighlighted) Figs. 4, 5, and 6 and at cols. 5-8 and 13-14.) This disclosure included the discussion of the importance of the selection of appropriate packet information. (Kesidis Tr. at 1837:8-19; 1838:24-1839:6, citing PTX-609 at cols. 4-5.) He further testified that the "potential data types" recited in *EMERALD 1997* neither teach the detecting element of the claims nor correspond to the claimed traffic data categories. (Kesidis Tr. at 1839:13-16; 1839:20-1841:15 ("SNMP" is a management protocol, not a network service protocol, and is not useful for intrusion detection); 1841:16-1842:9 ("network datagram" is an antiquated term for a network packet and has too many features for useful analysis and does not specify "network packet *volume*," as required by the claims); 1842:10-1845:25 ("application logs" have only a weak relationship to firewall logs, which in any event are not used for intrusion detection, and logs of dropped packets do not correspond to "network connection denials," as required by the claims, because "packets could be dropped for a variety of reasons"; overall, a skilled artisan would not "make this chain of inferences based on reading *EMERALD 1997*") [21].) Finally, Dr. Kesidis

---

[21] For the same reasons, *EMERALD 1997*, *a fortiori*, did not **anticipate** the patents-in-suit, as Defendants argue. (*See* Op. Br. at 25-27.). Defendants contend that *EMERALD 1997* anticipates because it mentions HTTP and FTP, which Defendants argue qualify as "network packets indicative of well-known network service protocols." (*Id.* at 26-27.) This argument is misplaced for numerous reasons. First, Mr. Porras testified that the claimed categories did not encompass all of HTTP but rather only the specific header information in an HTTP or email

testified that since *EMERALD 1997* contained "no discussion as to specifically how to do detection" on an enterprise network, it would neither have taught a person of ordinary skill how to practice the patented invention nor rendered it obvious. (*Id.* at 1846:1-7; 1848:5-18.) Dr. Kesidis's testimony, which the jury is presumed to have credited, is itself sufficient to defeat Defendants' motion. *See Callaway Golf*, 2008 WL 4850755, at *5.

Other independent documents and testimony confirmed the critical challenge of selection of appropriate network traffic categories. In evaluating the DIDS system, an independent report a government consulting firm, stated that "[t]he challenge presented by these products is to determine the appropriate data to be collected. Collecting all possible data would render these tools useless. Collecting all possible data would constrain these products due to the limitations of storage space." (DTX-2204; Kesidis Tr. at 1877:10-1878:20.) In addition, Mr. Smaha conceded that "two of the major problems" with analyzing audit trails were identifying "exactly what kind of activity should be audited" and "how to do the analysis." (Smaha Tr. at 1753:15-1754:23.) This, of course, was precisely the information that the named inventors spent nine months investigating *after* they had written *EMERALD 1997*. Thus, substantial evidence supported the jury's verdict that *EMERALD 1997* did not render the patents-in-suit obvious.

### 4. *EMERALD 1997* Combined with *Intrusive Activity 1991* Did Not Render the Claims Obvious

Defendants also argue that combining *EMERALD 1997* with *Intrusive Activity 1991* would have rendered the asserted claims obvious. However, as the evidence showed, *Intrusive*

---

packet. (Porras Tr. at 414:16-416:11.) In addition, Mr. Porras stated that he and Mr. Valdes experimented with profiling users of FTP services, but that effort foundered because typical users did not participate in FTP sessions consistently enough to generate a useful profile. (Porras Tr. at 375:2-376:7.) Thus, at best, the concepts outlined in EMERALD 1997 might have directed one of ordinary skill in the art to try to use the FTP protocol in some way to help develop a system—an approach that the inventors later determined would not work. *See Takeda,*

*Activity 1991*, like *DIDS 1991*, disclosed performing intrusion detection on a Local Area

Network (LAN), not an enterprise network, as required by the claims. Moreover, while *Intrusive*

*Activity 1991* mentions certain of the claimed traffic categories that Defendants acknowledge are

missing from *EMERALD 1997*, it does so in the context of developing a software code syntax,

and does not provide any teaching of using them to detect suspicious activity. Finally, far from

motivating a person of ordinary skill in the art to seek out and combine *Intrusive Activity 1991*

with its teachings, *EMERALD 1997*, which discusses a conceptual enterprise network intrusion

detection system, actually teaches away from *Intrusive Activity 1991*, which describes

monitoring traffic on much smaller networks.

### a. *Intrusive Activity 1991* Did Not Disclose Using Appropriate Traffic Data Categories to Perform Intrusion Detection on Enterprise Networks

As explained above with respect to the related *DIDS 1991* paper, *Intrusive Activity 1991*

described a system operating on a LAN, not an enterprise network. *Intrusive Activity 1991* in

fact discloses the same network monitor used in the DIDS system. (Heberlein Tr. at 944:14-21;

1210:18-24; 1211:5-13.) Like DIDS, the system described in *Intrusive Activity 1991* was

specifically designed for use on a LAN. (DTX-9 at 363, 370 ("We monitored the Electrical

Engineering and Computer Science LAN at UCD"); Heberlein Tr. at 1098:5-9.) The paper itself

described the shortcomings in such a limited analysis when it stated that "a major drawback

quickly became apparent: the information available from simple network packet analysis was at

a level much too low to detect subtle intrusive activity." (DTX-9 at 363; Heberlein Tr. at

1212:19-25.) Dr. Kesidis confirmed this key difference when he contrasted the "very complex,

distributed network" in which the *EMERALD 1997* concepts would operate with the LAN

---

492 F.3d at 1359 ("the closest prior art . . . exhibited negative properties that would have directed one of ordinary skill in the art away from that compound.")

context of *Intrusive Activity 1991*, which, like the related DIDS system, would have serious "scalability problems." (Kesidis Tr. at 1851:1-6; 1852:7-10 (approach in *Intrusive Activity 1991* "could not scale and function well in this [enterprise network] context.").)

This difference was also highlighted in the different language used by the patent and the paper: the patent specification refers to "the volume of data transfers over a period of time, and network traffic measures (number of packets and number of **kilobytes**)," while *Intrusive Activity 1991* discussed the "number of **bytes** in all the packets exchanged." (*Compare* PTX-1 at 6:11-14 *with* DTX-9 at 368.) Mr. Heberlein acknowledged this critical difference during his testimony, but he downplayed it, stating "they're talking about the number of packets, the number of kilobytes. We're talking about the number of bytes, number of packets, number of bytes. A kilo bytes [*sic*] is just a thousand bytes." (Heberlein Tr. at 1100:6-10.) But this thousand-fold, several-order-of-magnitude difference between the volumes of traffic analyzed in the patented invention and in the *Intrusive Activity 1991*-DIDS system highlights an important distinction between a LAN and an enterprise network, between a trickle of data and a torrent.[22]

In addition, the jury heard evidence that *Intrusive Activity 1991* described the category of network connections **only** in the context of constructing a "System Description Language," or high-level software syntax. (DTX-9 at 368 (describing how a "complex object type" would include "the number of packets exchanged" in a section entitled "System Description Language");

---

[22] As they do in arguing that *DIDS 1991* anticipated the asserted claims, Defendants attempt to read out the "enterprise network" limitation from the patents by contending that the patented invention does not "require any particular network size." (Op. Br. at 15.) As set forth above in the context of *DIDS 1991*, the enterprise network limitation is a critical component of the inventive solution devised by the named inventors to address the late-1990's problem of suspicious activity on the Internet. Furthermore, that RealSecure detected such activity on enterprise networks using certain of the claimed categories—albeit without "integrating" reports of suspicious activity, *see supra.* Sec. IV.B.4—does not, as Defendants argue, relate in any way to the teachings of *Intrusive Activity 1991* in the LAN context. (*See* Op. Br. at 15.)

Kesidis Tr. at 1852:11-1853:6.) As Dr. Kesidis testified, this discussion concerned a general "flow of traffic between sources," had nothing to do with detecting suspicious network traffic, and "mean[t] something completely different" from what was claimed in the patents-in-suit. (*Id.* at 1852:25-1853:6.) Dr. Kesidis further testified that he did not believe that "*Intrusive Activity 1991* specifically discloses a method of doing detection." (*Id.* at 1851:6-8; 1853:25-1854:5.) On adverse direct, Mr. Porras testified that *EMERALD 1997* mentioned *Intrusive Activity 1991* for the benefit of readers "interested in further information on *monitoring network packets*," not in detecting suspicious activity. (Porras Tr. at 1353:11-15.)

In arguing to the contrary, *see* Op. Br. at 11, Defendants splice together pieces of the paper and Mr. Heberlein's testimony that ignore the context in which the categories are mentioned in the paper. When Mr. Heberlein testified that the paper disclosed network connection requests, he was presumably referring to the portion of the paper concerning the construction of a system development language, since the section on "Detecting Behavior in Systems" contains no mention of the claimed categories. (DTX 9 at 368-69; Heberlein Tr. at 1100:20-1101:9.)[23] In fact, Mr. Heberlein described the context of the network connection request section as the development of a software language: "it's just basically giving a particular methodology for calculating this. It's basically the recipe and it was written in a formal language that computer scientists use." (*Id.* at 1099:2-7.)

Contrary to Defendants' argument, *see* Op. Br. at 14, Dr. Kesidis did *not* withdraw his opinion that *Intrusive Activity 1991* did not disclose an actual method of detecting suspicious

---

[23] The Court denied Defendants' renewed summary judgment motion concerning *Intrusive Activity 1991* noting that "the meaning of the text to a person having ordinary skill in the art is unclear." (D.I. 525 at 13.) At trial, Mr. Heberlein's testimony did little to clarify the language of the paper, and Dr. Kesidis rebutted his conclusory statements that *Intrusive Activity 1991* disclosed using the claimed categories to detect suspicious activity.

activity. Also contrary to Defendants' suggestion, *see id.*, the context in which the 1991 paper

mentions a particular traffic category **does** matter because it would have required more than

mere ordinary skill for someone to apply the teachings of *Intrusive Activity 1991* to the entirely

different and unpredictable context of actually detecting intrusions in an enterprise network. *See*

*Sandoz*, 544 F.3d at 1352 ("Each case must be decided in its particular context, including the

characteristics of the science or technology, its state of advance, the nature of the known choices,

the specificity or generality of the prior art, and the predictability of results in the area of

interest."). Thus, a reasonable jury could have concluded that while *Intrusive Activity 1991*

arguably mentioned one of the claimed categories of data, it did not do so in the context of

detecting suspicious network activity, as required by the claims.

> **b.** **Substantial Evidence Showed that a Person of Ordinary Skill in the Art Would Not Have Combined *EMERALD 1997* with *Intrusive Activity 1991***
>
> **i.** ***Intrusive Activity 1991* Was Among 14 Different References in One Paragraph of *EMERALD 1997***

In the "Related Work" section of *EMERALD 1997* in which *Intrusive Activity 1991* is

mentioned, 13 other references are also listed. (DTX-356 at 364; Heberlein Tr. at 1215:11-22.)

On cross-examination, Mr. Heberlein acknowledged this but nevertheless maintained his belief

that a person of ordinary skill would have chosen to combine *EMERALD 1997* with **only** the

1991 paper, not with any of the other 13 cited references. (*Id.* at 1215:23-1216:5.) Dr. Kesidis

rebutted this strained argument by emphasizing that *Intrusive Activity 1991* was only one of "a

laundry list of references" mentioned in *EMERALD 1997* and that a skilled artisan would not

have been motivated to combine the teachings. (Kesidis Tr. at 1822:13-20; 1849:9-1850:10.)

*See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 2008 WL 24911955, at *7 (S.D. Cal. June 19,

2008) (citing *KSR* and reversing jury verdict of obviousness because "[t]hough Document 103R

cites to Document 81, *it does so as one among many documents* in the context of an industry organization exploring many possible options" and described the second document "*merely as one option* in the overall context of a complex, multifaceted standardization effort."). Thus, the jury heard evidence that the sheer volume of references cited in the relevant portion of *EMERALD 1997* made it unlikely that a person of ordinary skill would have been motivated to combine it with the particular *Intrusive Activity 1991* reference.

### ii. Far from Providing a Person of Skill in the Art a Reason to Combine *EMERALD 1997* with Intrusive *Activity 1991*, the Former Taught Away from the Latter

Under *KSR*, "[a] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 127 S.Ct. at 1741. A combination is likely nonobvious if the elements work together "in an unexpected and fruitful manner." *Id.* at 1740. Moreover, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *Id.* Evidence teaching away from a claimed invention remains relevant to the obviousness inquiry. *Andersen Corp. v. Pella Corp.*, 2008 WL 4927431 (Fed. Cir. Nov. 19, 2008) (vacating summary judgment of obviousness, citing evidence teaching away from a claimed combination, and distinguishing the *KSR* Court's finding that the patent challenger "ha[d] not shown anything in the prior art that taught away from the [combination of prior art references]"); *Takeda*, 492 F.3d at 1359 (affirming judgment of non-obviousness, noting that "the closest prior art . . . exhibited negative properties that would have directed one of ordinary skill in the art away from that compound").

At trial, the jury heard ample evidence that the teachings of *EMERALD 1997* and *Intrusive Activity 1991* concerned fundamentally different contexts: the former was a vision for detecting intrusion in an enterprise network while the latter presented a conceptual software

language for operation on a LAN. Dr. Kesidis supported his argument that a skilled artisan would not have combined *EMERALD 1997* with *Intrusive Activity 1991* by testifying that "the two papers teach away from each other" because "someone of ordinary skill would not think [*Intrusive Activity 1991*'s approach] would be a good approach to the problem *EMERALD '97* was trying to address." (Kesidis Tr. at 1822:21-1823:2; 1850:18-25.) Dr. Kesidis elaborated by explaining that a "Related Work" section of a paper typically contrasts the new approach the authors take from the older methods of the past. (*Id.* at 1850:11-17 ("you want to try to convey what you are doing in your current paper as being new or novel, so you describe the novelty of what you are doing with respect to what has gone on in the past, by the authors").)

Specifically, Dr. Kesidis testified that while "*EMERALD [1997]* is trying to deal with a very large communication network, very complex, distributed network," by contrast, "*Intrusive Activity [1991]*, in my opinion, would have scalability problems." (*Id.* at 1851:1-6.) In other words, because *Intrusive Activity 1991* involved a LAN environment, its approach would not be appropriate for the taxing demands of an enterprise network. He further explained that, given the exigencies of detecting intrusions in massive networks, the authors of *EMERALD 1997* "had to be selective" and "were very concerned that the sensors, the monitors of any kind, the lower level or the hierarchical monitors, were scalable to the situation." (*Id.* at 1852:1-6.) By contrast, *Intrusive Activity 1991* disclosed an approach that, like the related DIDS system, "could not scale and function well in this context." (*Id.* at 1852:7-10.) Dr. Kesidis's testimony, which again the jury is presumed to have credited, itself was sufficient to defeat Defendants' motion. *See Callaway Golf*, 2008 WL 4850755, at *5 (citing *Group One Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1304 (Fed. Cir. 2006)).[24]

---

[24] Defendants wrongly fault Dr. Kesidis for supposedly "not address[ing] the single element of the claims at issue," *i.e.*, the claimed categories of traffic data. (Op. Br. at 16; *see also id.* at 14

The only testimony Defendants claim supports their argument was Mr. Heberlein's

statement that a person of ordinary skill in the art would have been motivated to combine

*Intrusive Activity 1991* with *EMERALD 1997* because the latter "talked about looking at network

traffic" and explained that "there's work being done and [*sic*] analyzing network traffic" while

citing to the former. (Heberlein Tr. 1101:20-1102:6.) When asked on direct why a skilled

artisan would combine *Intrusive Activity 1991*, which "only dealt with monitoring a LAN," with

*EMERALD 1997*, he responded that the 1991 paper "talked about…monitoring network packets

in general" and that the 1997 paper "talked about having the lower level monitors and analyzing

traffic within a domain," which *Intrusive Activity 1991* also disclosed. (*Id.* at 1102:21-1103:6.)

This testimony, however, ignored the fundamental difference between the operating

environments of the two papers, *i.e.* a LAN versus an enterprise network. *See Sandoz*, 544 F.3d

at 1352. Both the papers themselves and Dr. Kesidis's testimony refuted Mr. Heberlein's

speculative explanation of superficial similarities between the papers.

Thus, the jury could reasonably have accepted Dr. Kesidis's testimony and rejected Mr.

Heberlein's in order to conclude that *EMERALD 1997* differed fundamentally and taught away

from *Intrusive Activity 1991*. *See, e.g., Lucent*, 2008 WL 24911955, at *7 (denying defendant's

motion for JMOL of obviousness of a second patent in light of *KSR* because jury could

---

("[t]he only issue was whether *Intrusive Activity 1991* disclosed at least one of the categories of network traffic data"). However, Dr. Kesidis did testify that *Intrusive Activity 1991* failed to disclose the claimed categories in its discussion of intrusion detection. Moreover, Defendants' premise is fundamentally flawed. Defendants were required to show that the invention *as a whole* would have been obvious. *Sanofi-Synthelabo v. Apotex, Inc.*, --- F.3d ----, 2008 WL 5191848, at *9 (Fed. Cir. Dec. 12, 2008) (in affirming preliminary injunction and the finding that patents were not obvious, holding that "[t]he determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim," citing *KSR*.) Ignoring the context of the prior art and the specificity of its disclosure in favor of focusing on specific bits of the claim, as Defendants do, is precisely what the Federal Circuit has repeatedly cautioned against. *See Sandoz*, 544 F.3d at 1352.

reasonably have accepted patentee's expert's testimony that "adapting KMM to a mouse-driven graphical interface would not have been an obvious or trivial undertaking" while "rejecting that [testimony] of Defendants' expert"). For these reasons, the Court should deny Defendants' motion with respect to *EMERALD 1997* combined with *Intrusive Activity 1991*.

### 5. SRI's Presented Ample Evidence of Secondary Considerations of Non-Obviousness Rebutting Defendants' Obviousness Case

In addition to the substantial evidence of non-obviousness detailed above, SRI presented ample evidence of secondary considerations of non-obviousness. Objective indicia of non-obviousness must be considered in assessing obviousness. *See Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 664 (Fed. Cir. 2000). The purpose of identifying objective indicia is to avoid the use of hindsight and to present sufficient "express and necessarily implied findings" for appellate review. *Ruiz*, 234 F.3d at 664 (citations omitted). "Objective indicia may often be the most probative and cogent evidence of nonobviousness in the record." *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1288 (Fed. Cir. 2002); *see also Ortho-McNeil*, 520 F.3d at 1365 (affirming district court finding of non-obviousness in part because of strong objective criteria of non-obviousness). SRI demonstrated at trial that products embodying the patented invention were extremely commercially successful, that the patented invention won wide praise, and that it satisfied a long-felt, unresolved need.

### a. The Invention Enjoyed Significant Commercial Success

SRI presented substantial evidence at trial of the commercial success of the patented invention as embodied in Defendants' infringing products, which the jury found to practice all asserted claims. SRI further demonstrated that the commercial success of these products—on the order of hundreds of millions of dollars in revenue (PTX- 302, 302A, 614, and 615)— derived from their infringing features. *See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299,

1311-12 (Fed. Cir. 2006) ("commercial success or other secondary considerations may presumptively be attributed to the patented invention only where the marketed product embodies the claimed features, and is coextensive with them") (citations omitted).[25] The jury held that all of Defendants' accused products infringed the patents-in-suit, thereby shifting the burden to Defendants to prove otherwise, which they failed to do. *See Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1350 (Fed. Cir. 2000) (when patentee establishes that "the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention").

SRI presented further evidence of the nexus between the patented invention and the commercial success of the infringing products. As explained in detail in its proffer of evidence, *see* D.I. 559, both Defendants touted the infringing features of these products. Symantec's product literature emphasized the pyramidal structure of its correlation-based engine,[26] and

---

[25] The Court permitted SRI to present PTX-302—Symantec's sales of infringing "manager products" and SGS products to the same customers, as well as sales of infringing ManHunt products—to the jury only as a demonstrative, which SRI did during closing arguments. (Trial Tr. at 2146:13-25). In its concurrently filed opposition to Symantec's JMOL motion for non-infringement, SRI notes that, to the extent that the Court is otherwise inclined to grant any post-trial relief to Defendants on the issue of, *inter alia*, validity, SRI respectfully urges that the exclusion of Symantec's sales data in PTX 302 and/or 302A (*see* Exhibit A to Declaration of Thomas L. Halkowski filed herewith) was prejudicial error such that SRI should be granted a new trial.

[26] Defendants assert that correlation cannot form the basis for commercial success because it was "admitted to be in the prior art." (Op. Br. at 23, citing *Ormco*, 463 F.3d at 1312.) Yet as explained in great detail, *supra*, correlation of the reports of suspicious activity generated based on analysis of particular network traffic data conducive to analysis in an enterprise network— required by the patents and necessary for the infringing products to function properly—was *not* present in the prior art. Commercial success is assessed with respect to the *combination* of the patented features (including correlation).

Dr. Kesidis[27] explained to the jury that the selective monitoring and integration of reams of sensor data constituted the essence of the patented invention. (*See* PTX-33 at SYM_P_00286102; Kesidis Tr. at 595:1-596:18.) Other Symantec technical and marketing documents highlighted the same infringing features to its customers. (*See* PTX-60 at SYM_P_00037109 (Correlation Analysis Framework was main component of infringing ManHunt product); PTX-33 at SYM_P_00286128; PTX-167 at SYM_P_00283912; and Kesidis Tr. at 629:5-16 and 631:1-8 (infringing manager products are at the "heart" of Symantec architecture and receive and process events from sensors below); PTX-30 ("Symantec's strategy is to use these [correlation] technologies as the building blocks" for enterprise customers); PTX-34, Kesidis Tr. at 632:23-633:15 (hierarchical structure drove presentation to potential customer JPMorganChase).) The jury also heard evidence from Marsh Inc., a Symantec customer, that correlation was the "primary service" it sought in purchasing Symantec products. (Sealed 9/4/08 Allen Tr. at 12:19-23.) SRI likewise introduced similar evidence that ISS's products derived their value from the patented invention. (*See* PTX-157 (infringing Fusion product brochure featuring funnel diagram and touting "automated and advanced correlation techniques"); PTX-148 (Fusion data sheet emphasizing automation of incident creation); PTX-162 (marketing presentation highlighting commercial value of automatically correlating events); Stewart Tr. at

---

[27] Defendants fault Dr. Kesidis for failing to perform a detailed analysis of their sales data. (Op. Br. at 20.) Yet, Dr. Kesidis testified that he reviewed the data and that they revealed that Defendants sold a large number of infringing products. (Kesidis Tr. at 2003:16-2004:3; 2005:11-16). Moreover, Defendants' own expert, Mr. Heberlein, admitted that he did not consider evidence of the commercial success of Defendants' products, even though he acknowledged that it was "a contributing factor" in the analysis if the jury found that those products infringed. (Heberlein Tr. at 1216:6-1217:9.) When presented with the large stack of documents Symantec prepared in response to SRI's interrogatory about sales of the accused products, Mr. Heberlein testified he was "vaguely aware" of that information but that he did not consider it as part of his obviousness analysis. (Heberlein Tr. at 1215:14-16, 1215:25-1217:2.)

457:13-458:6 (intent of Fusion was to "automate analysis" and "correlat[e] intrusion events").)[28] Thus, SRI presented ample evidence of nexus, and Defendants failed to rebut it during trial.

SRI also presented evidence that it successfully licensed the patented technology to third parties. (Lincoln Tr. at 253:20-254:7 (license to Oki in Japan).) SRI presented additional testimony that it attempted to license EMERALD to several other companies, and that it spun off a commercial entity to market the patented technology, but that those efforts failed because the "dot-com" bubble burst in 2000, not because of any shortcomings in the patented technology. (*Id.* at 216:8-217:9; 255:12-258:12.) Thus, the jury heard that SRI itself successfully licensed the patented technology, further substantial evidence of commercial success presented by SRI.

### b.  The Invention was Praised and Unexpectedly Successful

Numerous witnesses and documents demonstrated that the patented invention earned broad praise from various people and institutions. First, SRI showed that the *Live Traffic* paper, which the parties agreed disclosed all limitations of the asserted claims, was accepted with acclaim after a rigorous, blind peer-review process, about which Mr. Porras testified extensively. He stated that, after reviewing a stack of submitted papers and providing technical comments, the program organizers "provide scoring for different issues, like is it very novel? Is it applicable to the conference? ...[S]cores that are used to then decide whether a paper should be published ultimately." (*Id.* at 1434:24-1435:3.) The review process was blind, and submitters had to omit their names, affiliations, and other identifying information. (*Id.* at 1437:23-1438:6; PTX-11.) When *Live Traffic* was accepted for publication, it was one of only 12 papers out of a total of 41 submitted that was selected. (*Id.* at 1451:17-1453:10; PTX-15.) Mr. Porras further

---

[28] Defendants contend that ISS's customers "refuted" this nexus argument. (Op. Br. at 21-22.) On the contrary, as set forth in SRI's concurrently filed opposition to ISS's motion for judgment as a matter of law of noninfringement, SRI presented evidence that HealthSouth, an ISS customer, deployed the Fusion product with the particular infringing module installed.

testified that the SNDSS conference that accepted *Live Traffic* was "one of the more selective ones in the field." (*Id.* at 11-13.) Thus, the ideas contained in the patented invention won praise through their acceptance in a discerning, blind peer-review process.

Patrick Lincoln, the director of SRI's Computer Science Laboratory during the development of EMERALD, also testified extensively about the success of and praise for the patented invention.[29] First, the Defense Advanced Research Projects Agency ("DARPA"), on certain of whose projects Dr. Lincoln also acts as a principal investigator, funded SRI with millions of research dollars, a significant portion of which went to EMERALD. (Lincoln Tr. 215:22-216:7.) In particular, Colonel Timothy Gibson, a DARPA project manager who supervised part of the EMERALD project, thought highly of the patented EMERALD technology. Col. Gibson testified that "comments from the users in the field were always uniformly very positive about the EMERALD product" and that DARPA "always thought that the EMERALD product was a quality product that would be useful to get into the military networks." (Gibson Tr. at 1278:1-17; Lincoln Tr. at 269:12-270:2.) Col. Gibson further testified that he valued EMERALD so highly, he was willing to extend SRI's funding to secure its certification for military deployment. (DTX-562; Gibson Tr. at 1274:4-15.) Dr. Lincoln, who interacted directly with Col. Gibson regarding EMERALD, testified that Col. Gibson on many occasions expressed his belief that EMERALD was "great." (Lincoln Tr. at 269:3-15.)[30]

---

[29] Other witnesses testified that the inventors and other SRI personnel developed related intrusion detection ideas that were widely praised. Mr. Smaha acknowledged that, during his time on the program committee for the Recent Advances in Intrusion Detection ("RAID") conference, an SRI paper co-authored by Mr. Valdes was accepted for publication. (DTX-597; Smaha Tr. at 1757:5-1759:5.)

[30] The evidence showed that Col. Gibson's frustration with SRI personnel regarding EMERALD concerned disputes about overhead and SRI's inability to commercialize in the U.S., not the value of the underlying technology. (Gibson Tr. at 1278:1-17; Lincoln Tr. at 269:12-270:2.)

Mr. Porras echoed this testimony when he stated that Mike Skroch, another DARPA program manager, considered EMERALD "a very effective system." (Porras Tr. at 411:6-13.)

Further testimony demonstrated that various testing and deployments of the patented EMERALD system[31] enjoyed great success. During a 1999 test conducted by the Massachusetts Institute of Technology Lincoln Laboratories, EMERALD "did very well," and "won those tests." (Lincoln Tr. at 248:1-6; 252:22-253:8.) Mr. Valdes confirmed that EMERALD "was the best of the research systems" deployed during the Lincoln Lab tests. (Valdes Tr. at 302:7-16.) It also successfully detected attacks during 2002 tests with the U.S. Army in Mannheim, Germany, Fort Belvoir, Virginia, and Fort Huachuca, Arizona. (*Id.* at 302:7-304:16.) Mr. Valdes further testified that at the end of the Mannheim exercise, the command "wanted to 'fast track EMERALD'" and wanted SRI to "leave the box." (*Id.* at 306:2-14.) EMERALD was further deployed with the Navy's Pacific Fleet in 2003 and successfully identified suspicious network traffic there as well. (*Id.* at 308:8-24.) In addition, EMERALD detected attacks during the U.S. Northern Command's Joint War Fighter Interoperability Demonstration in 2004, as well as in an international Coalition War Fighter Interoperability Demonstration in 2005, in which EMERALD was unexpectedly able to detect an "extremely suspicious attack." (*Id.* at 309:6-310:16-7.) The coalition results constituted "success above what we were expected to do and unexpected success and something useful for the military." (*Id.* at 311:8-12.) Finally, Mr. Valdes testified that EMERALD has been deployed by numerous government agencies,

---

[31] Defendants suggest that these deployments are irrelevant because the EMERALD software involved "more than just the claims of the patents-in-suit." (Op. Br. at 24.) However, the later EMERALD projects indisputably embodied the asserted claims. (*See, e.g.*, Valdes Tr. at 305:10-14 ("Distributed hierarchical correlation was demonstrated in this exercise, yes.").) Moreover, Defendants offer no support for their argument that they somehow shifted the burden to SRI to demonstrate congruence between the patent and the praised products.

including the National Security Agency and the Department of Energy. (*Id.* at 311:12-312:8.) Thus, SRI presented ample evidence of praise for the invention and its unexpected success.

### c. The Patented Invention Provided a Solution for Long-Felt but Unsolved Needs

At trial, SRI additionally presented substantial evidence that the patented invention resolved a long-felt but unsolved problem in intrusion detection. Dr. Lincoln described in detail the process by which DARPA issues a "broad area announcement" ("BAA") for a creative solution to a difficult problem. Dr. Lincoln testified that, in general, DARPA funds only "revolutionary and breakthrough research." (Lincoln Tr. at 191:9-11.) He further stated that a BAA is a public announcement that "describes a problem...the government sees and is asking for proposals to try to address that problem." (*Id.* at 193:5-14.) Before issuing a BAA, DARPA personnel are required to ask a number of questions, known as the Hellmyer Catechism, that assess the nature of the problem to be solved and the limitations of the current practice. (*Id.* at 2047:17-2048:11.) Dr. Lincoln further testified that the agency funds only projects designed to resolve "DARPA hard" problems, *i.e.* challenges that "only an organization with the resources of DARPA and bringing together the best and the brightest minds in the U.S. could solve" because "DARPA doesn't go to work on trivial problems." (*Id.* at 2048:21-2049:10.)

Dr. Lincoln also testified that DARPA would not issue a BAA for problems requiring "minor modification" or "assembl[ing] existing components in a simple way" because "you wouldn't launch a multi-million dollar research effort on that." (*Id.* at 2049:11-20.) Instead, when various companies and research institutions prepare proposals in response to the BAA, the DARPA selection committee considers, first and foremost, "how good the idea is" as well as the "reputation and the past performance" of the people proposing the project. (*Id.* at 194:18-195:4.)

That DARPA funded EMERALD[32] amounted to strong evidence that the problems resolved by the inventors in their patented invention indeed qualified as "DARPA hard." At a minimum, it supports a conclusion that solutions to the problems addressed by EMERALD were not obvious.

In addition, as set forth above, the independent MITRE consulting firm identified the key challenge as being that of selecting the "appropriate data to be collected." (DTX-2204; Trial Tr. at 1877:10-1878:20.) Moreover, Mr. Smaha conceded that "two of the major problems" with analyzing audit trails were identifying "exactly what kind of activity should be audited" and "how to do the analysis." (Smaha Tr. at 1753:15-1754:23.) In addition, Dr. Frank Jou, a third party who wrote the Ji-Nao report, testified that correlating network traffic on a distributed system was "the main technical challenge" and the key "open question" before the critical date. (Jou Tr. at 1561:7-1562:1.) These were precisely the problems resolved by the patented invention. Thus, the jury had ample evidence that the patented invention satisfied a long-felt but unsolved need in the intrusion detection field. Accordingly, because SRI presented substantial evidence of secondary considerations of non-obviousness, the Court should deny Defendants' motion for judgment as a matter of law that the patents are obvious.

## IV.    CONCLUSION

For the foregoing reasons, SRI respectfully requests that the Court deny Defendants' motion for post-trial relief regarding invalidity of the '203 and '615 patents.

---

[32] Defendants suggested that when Ms. Lunt worked at DARPA, she improperly steered the EMERALD contract to SRI. (*See, e.g.,* Staniford Tr. at 918:13-19.) In fact, Ms. Lunt testified that she "had to recuse [herself] from anything having to do with SRI." (Lunt Tr. at 1249:17-1250:4; 1257:12-17.) Dr. Lincoln confirmed this testimony as well. (Lincoln Tr. at 2049:21-2052:10 ("Teresa Lunt was walled off from any decision involving SRI proposals.").) The evidence showed that EMERALD earned significant DARPA funding solely on its own merits.

Dated: January 16, 2009

FISH & RICHARDSON P.C.

By: _/s/ Thomas L. Halkowski_
Thomas L. Halkowski (#4099)
222 Delaware Avenue, 17th Floor
Wilmington, DE 19889-1114
Telephone: (302) 652-5070
Facsimile: (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Howard G. Pollack / Katherine D. Prescott
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

**ATTORNEYS FOR PLAINTIFF/COUNTERCLAIM DEFENDANT SRI INTERNATIONAL, INC.**

# CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2009, I electronically filed with the Clerk of Court the attached **PLAINTIFF SRI'S OPPOSITION TO DEFENDANTS' MOTION FOR POST-TRIAL RELIEF REGARDING VALIDITY OF THE '203 AND '615 PATENTS** using CM/ECF which will send electronic notification of such filing(s) to the following Delaware counsel:

| | |
|---|---|
| Richard L. Horwitz<br>David E. Moore<br>Potter Anderson & Corroon LLP<br>Hercules Plaza<br>1313 North Market Street, 6th Floor<br>P.O. Box 951<br>Wilmington, DE 19899<br>rhorwitz@potteranderson.com<br>dmoore@potteranderson.com | *Attorneys for*<br>*Defendant/Counterclaim Plaintiffs*<br>*Internet Security Systems, Inc., a*<br>*Delaware corporation, and Internet*<br>*Security Systems, Inc., a Georgia*<br>*corporation* |
| Richard K. Herrmann<br>Morris James Hitchens & Williams LLP<br>500 Delaware Avenue, 15th Floor<br>P.O. Box 2306<br>Wilmington, DE 19899-2306<br>rherrmann@morrisjames.com | *Attorneys for*<br>*Defendant/Counterclaim Plaintiff*<br>*Symantec Corporation* |

I also certify that on January 16, 2009, I electronically mailed the above document(s) to the following non-registered participants:

| | |
|---|---|
| Paul S. Grewal<br>Renee DuBord Brown<br>Day Casebeer Madrid & Batchelder, LLP<br>20300 Stevens Creek Boulevard, Suite 400<br>Cupertino, CA 95014<br>pgrewal@daycasebeer.com<br>rbrown@daycasebeer.com | *Attorneys for*<br>*Defendant/Counterclaim Plaintiff*<br>*Symantec Corporation* |

Holmes J. Hawkins, III
Natasha H. Moffitt
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309
hhawkins@kslaw.com
nmoffitt@kslaw.com

*Attorneys for*
*Defendant/Counterclaim Plaintiffs*
*Internet Security Systems, Inc., a*
*Delaware corporation, and Internet*
*Security Systems, Inc., a Georgia*
*corporation*

_____*/s/ Thomas L. Halkowski*_____
Thomas L. Halkowski