# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SRI INTERNATIONAL, INC.,<br>a California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>INTERNET SECURITY SYSTEMS, INC.,<br>a Delaware Corporation,<br>INTERNET SECURITY SYSTEMS, INC.,<br>a Georgia Corporation, and<br>SYMANTEC CORPORATION, a<br>Delaware Corporation,<br><br>Defendants. | C.A. No. 04-1199 (SLR) |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTIONS FOR POST-TRIAL RELIEF REGARDING INVALIDITY OF THE '203 AND '615 PATENTS

Richard K. Herrmann (#405)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1751

OF COUNSEL:

Robert M. Galvin *(pro hac vice)*
Paul S. Grewal *(pro hac vice)*
Renee DuBord Brown *(pro hac vice)*
Geoffrey M. Godfrey *(pro hac vice)*
DAY CASEBEER MADRID & BATCHELDER, LLP
20300 Stevens Creek Blvd., STE 400
Cupertino, CA 95014
Tel: (408) 873-0110
Fax: (408) 873-0220

*Attorneys for Defendant*
*SYMANTEC CORPORATION*


Richard L. Horwitz (#2246)
David E. Moore (#3983)
D. Fon Muttamara-Walker (#4646)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
Fax: (302) 658-1192

OF COUNSEL:

Holmes J. Hawkins, III *(pro hac vice)*
Natasha H. Moffitt *(pro hac vice)*
Charles A. Pannell, III *(pro hac vice)*
KING & SPALDING LLP *(pro hac vice)*
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Tel: (404) 572-4600
Fax: (404) 572-5134

*Attorneys for Defendants*
*INTERNET SECURITY SYSTEMS, INC.*


Dated: February 17, 2009

# TABLE OF CONTENTS

Page No.

I.  INTRODUCTION ..........................................................................................1

II. JURY'S CONCLUSION OF NO OBVIOUSNESS WAS ERRONEOUS AS A
    MATTER OF LAW AND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ..........2

    A.  Emerald 1997 Alone Rendered the Claims Obvious to a Person of
        Ordinary Skill in the Art. ...............................................................2

    B.  Emerald 1997 in Combination with Intrusive Activity 1991 Rendered the
        Claims Obvious to a Person of Ordinary Skill in the Art. ..........................8

        1.  Intrusive Activity 1991 Discloses One or More of the Claimed
            Network Traffic Data Categories............................................8

        2.  One Skilled in the Art Would Have Been Motivated to Combine
            Emerald 1997 and Intrusive Activity 1991................................10

    C.  SRI's Weak Evidence of Secondary Considerations Cannot Overcome the
        Strong, Direct Evidence of Obviousness. ..........................................12

III. JURY'S VERDICT OF NO ANTICIPATION WAS NOT SUPPORTED BY
     SUBSTANTIAL EVIDENCE .........................................................................15

    A.  RealSecure Anticipated All of the Claims, and No Reasonable Juror Could
        Find That It Did Not Satisfy the "Integrate" Limitation............................15

        1.  Because SRI admits RealSecure satisfied the dependent
            "correlation" limitation, it follows as a matter of law that
            RealSecure satisfied the "integration" limitation from which it
            depends. ..................................................................16

        2.  SRI Improperly Compares the Prior Art RealSecure Product to the
            Accused Fusion 2.0 Product ..............................................17

        3.  SRI Cannot Rewrite the Court's Claim Construction to Prevent
            Invalidity .................................................................19

    B.  SRI's Speculation Does Not Rebut Defendants' Prima Facie Case that
        Live Traffic Anticipated All of the Claims Because It Was Publicly
        Accessible. ..........................................................................21

        1.  Defendants Demonstrated a Prima Facie Case of Anticipation................22

    2.  SRI Failed to Meet Its Burden of Production ..............................................23

  C.  DIDS 1991 Anticipated All of the Claims............................................................26

IV. IN THE ALTERNATIVE, DEFENDANTS HAVE SHOWN THAT A NEW TRIAL SHOULD BE GRANTED .................................................................................28

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page No.**

*Amazon.com, Inc. v. BarnesandNoble.com, Inc.,*
    239 F.3d 1342 (Fed. Cir. 2001) ................................................................. 16

*Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.,*
    No. 2008-1333, 2009 WL 291184 (Fed. Cir. Feb. 9, 2009) ................... 4, 5, 13

*Boston Scientific SciMed, Inc. v. Cordis Corp.,*
    No. 2008-1073, 2009 WL 89246 (Fed. Cir. Jan. 15, 2009) ................. 4, 5, 9, 12

*Callaway Golf Co. v. Acushnet Co.,*
    585 F. Supp. 2d 600 (D. Del. 2008) ........................................................... 17

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,*
    851 F.2d 1387 (Fed. Cir. 1988) ................................................................. 13

*Dynacore Holdings Corp. v. U.S. Philips Corp.,*
    363 F.3d 1263 (Fed. Cir. 2004) ................................................................. 20

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.,*
    802 F.2d 1367 (Fed. Cir. 1986) ................................................................. 18

*In re DBC,*
    545 F.3d 1373 (Fed. Cir. 2008) ................................................................. 13

*In re Hall,*
    781 F.2d 897 (Fed. Cir. 1986) ............................................................. 24, 25

*In re Klopfenstein,*
    380 F.3d 1345 (Fed. Cir. 2004) ................................................................. 24

*In re Wyer,*
    655 F.2d 221 (C.C.P.A. 1981) ................................................................... 25

*KSR Int'l Co. v. Teleflex, Inc.,*
    127 S. Ct. 1727 (2007) ........................................................................... 1, 5

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.,*
    485 F.3d 1157 (Fed. Cir. 2007) ................................................................. 12

*Lough v. Brunswick Corp.,*
    86 F.3d 1113 (Fed. Cir. 1996) ............................................................. 25-26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................... 23

*Moore U.S.A., Inc. v. Standard Register Co.*,
    229 F.3d 1091 (Fed. Cir. 2000) ............................................. 23

*Netscape Commc'ns Corp. v. Konrad*,
    295 F.3d 1315 (Fed. Cir. 2002) ............................................. 23

*New Hampshire v. Maine*,
    532 U.S. 742 (2001).................................................................. 29

*Oakley, Inc. v. Sunglass Hut Int'l*,
    316 F.3d 1331 (Fed. Cir. 2003) ............................................. 17

*Ormco Corp. v. Align Tech., Inc.*,
    498 F.3d 1307 (Fed. Cir. 2007) ............................................. 17

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 2430 (2008).................................... 12

*Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*,
    411 F.3d 1332 (Fed. Cir. 2005) ............................................... 4

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
    511 F.3d 1186 (Fed. Cir. 2008) ......................................*passim*

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
    456 F. Supp. 2d 623 (D. Del. 2006),
    *aff'd in relevant part*, 511 F.3d 1186 (Fed. Cir. 2008) ............... 12

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
    No. 2007-1065, 2007 WL 869734 (Fed. Cir. Jan. 23, 2007)................... 24

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008) .......................................... 21, 23

*TiVo, Inc. v. Echostar Commc'ns Corp*,
    516 F.3d 1290 (Fed. Cir. 2008) ............................................. 17

*Upjohn Co. v. MOVA Pharm. Corp.*,
    225 F.3d 1306 (Fed. Cir. 2000 ............................................... 12

*Upsher-Smith Labs. v. Pamlab, L.L.C.*,
    412 F.3d 1319 (Fed. Cir. 2005) ............................................. 21

*Weschler v. Macke Int'l Trade, Inc.*,
    486 F.3d 1286 (Fed. Cir. 2007) ............................................. 12

**Statutes**

35 U.S.C. § 102(b) ............................................................................ 20

35 U.S.C. § 103(a) ............................................................................ 9

# I.  **INTRODUCTION**

The jury's verdict of no invalidity should be set aside and judgment entered in Defendants' favor because the claims are obvious as a matter of law. Obviousness is ultimately a question of law, and the Court, not the jury, is the ultimate decision maker on the question of obviousness. At trial, it was undisputed that all of the elements of the claimed inventions were known in the prior art before the patents were filed. Because the claimed inventions were based upon the "combination of familiar elements according to known methods," the Supreme Court has warned of "the need for caution" when assessing the validity of such claims. *KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1739 (2007). That need for caution is further magnified here by the Patent Office's final rejection of all of the claims for obviousness during the co-pending reexamination proceedings.

The prior art *Emerald 1997* publication (DTX-356) coupled with either the knowledge of one of ordinary skill in the art or the *Intrusive Activity 1991* article (DTX-9) cited in *Emerald 1997* render the claims obvious. Despite SRI's protestations, the undisputed facts of record establish the obviousness of the claimed inventions, and there is not substantial evidence to support a finding of non-obviousness.

Defendants also have shown that the prior art—RealSecure (DTX-2542), *Live Traffic* (DTX-499), and *DIDS 1991* (DTX-21)—anticipate the claims-in-suit. In its opposition, SRI fails to show that there is substantial evidence to support the jury's verdict of no anticipation in light of the undisputed facts and admissions of record.

Finally, if the Court declines to enter judgment as a matter of law of invalidity in favor of Defendants, the Court should set aside the verdicts and order a new trial because Defendants have, at a minimum, shown that the verdicts are manifestly unjust and against the clear weight of the evidence.

## II. JURY'S CONCLUSION OF NO OBVIOUSNESS WAS ERRONEOUS AS A MATTER OF LAW AND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

In its attempt to defend the verdict regarding obviousness, SRI repeatedly ignores or mischaracterizes the Court's prior judgment, affirmed on appeal by the Federal Circuit, regarding the disclosure and teaching of the *Emerald 1997* reference. This Court previously held that *Emerald 1997* described and enabled the limitations in the asserted claims of the '203 and '615 patents, including "***detecting***, by the network monitors, ***suspicious network activity based on analysis of network traffic data.***" JTX 1 at 4 (emphasis added). The only limitation not adjudicated by the Court was the single element requiring the selection of one or more of the claimed categories of network traffic data. Thus, the obviousness inquiry here is very focused, and the only question that must be answered is: If a person of ordinary skill in the art had read *Emerald 1997*, would it have been obvious to analyze one of the categories of network traffic data listed in the '203 and '615 claims? As the trial record demonstrates, the answer is clearly yes based upon the prior art references and the admissions of SRI's own witnesses.

### A. *Emerald 1997* Alone Rendered the Claims Obvious to a Person of Ordinary Skill in the Art.

Even assuming that *Emerald 1997* does not describe the claimed network traffic data categories,[1] it would have been obvious to a person of ordinary skill in the art to analyze at least one of those categories.

The categories in the '203 and '615 claims include: "network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection

---

[1] As Defendants showed in their opening brief, *Emerald 1997* did explicitly describe and enable monitoring one of the recited network traffic data categories of the '615 claims—"network packets indicative of well-known service protocols," thereby also anticipating the '615 claims. *See* Defs.' Mem. in Supp. of their Mots. For Post Trial Relief Regarding Invalidity of the '203 and '615 Patents (D.I. 573) at 25-27 [hereinafter "Opening Brief"].

requests, network connection denials, [and] error codes included in a network packet." The categories themselves were not novel. SRI's expert agreed that "the categories that are reflected here are *some of the more common types of network traffic categories*." 9/4/08 T. Tr. 696:1-4 (Kesidis) (emphasis added). Moreover, the inventor and SRI's expert both confirmed that the categories were not only well-known in the field, but, in fact, were monitored by others to detect suspicious network activity *before* the patents were filed. *See* 9/11/08 T. Tr. 1354:2-1356:14, 1360:1-12 (Porras); 9/12/08 T. Tr. 1933:13-24, 1935:22-1936:8 (Kesidis).

At trial, the inventor acknowledged receiving a widely circulated email authored by Christopher Klaus, the founder of ISS, more than two years before the filing of the patents-in-suit. *See* 9/11/08 T. Tr. 1356:15-1358:4 (Porras); DTX-561. The email described monitoring network connection requests (SYN packets) in order to detect suspicious network activity (a SYN flood attack) used by attackers to deny services over the Internet by flooding the target system with connection requests. *See* DTX-561 at SRIE 0049930. Under cross-examination, the inventor admitted:

> Q. Now, Mr. Porras, doesn't this paragraph indicate that ISS RealSecure product, as of September 1996, could detect suspicious network activity based on analyzing a network connection request?
>
> A. This particular kind of SYN flood attack, they could detect it, yes.
>
> Q. *So two years before you filed your patent application, people in the field of intrusion detection already knew how to detect suspicious network activity by analyzing at least one of your network traffic data categories, network connection requests; correct?*
>
> A. *Correct.*

9/11/08 T. Tr. 1360:1-12 (Porras) (emphasis added).

Given the problem of detecting suspicious network activity, one or more of the recited categories were among the most obvious ones to try. For example, just as common sense would suggest placing burglar alarms on windows and doors, if you were trying to detect a computer

hacker entering your computer network in 1997, monitoring network connection requests or denials was an obvious place to start. *See Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 2009 WL 291184, at *7 (Fed. Cir. Feb. 9, 2009) (finding obviousness because "the combination would have been entirely predictable and grounded in common sense"); *see also Boston Scientific SciMed, Inc. v. Cordis Corp.*, No. 2008-1073, 2009 WL 89246, at *8 (Fed. Cir. Jan. 15, 2009) ("Combining two embodiments disclosed adjacent to each other in a prior art patent does not require a leap of inventiveness."). In fact, it is undisputed that monitoring one of the claimed categories to detect suspicious network activity had been done years before the patents were filed. When asked why the claimed category of "network packet data volume" might be important to monitor, SRI's expert even noted that a prior art "denial of service attack" was known to generate large volumes of traffic, and that this attack therefore necessitated monitoring data volume. *See* 9/4/08 T. Tr. 606:2-12, 607:14-22 (Kesidis). "In other words, the nature of the problem called for exactly the solutions in the prior art." *Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1339 (Fed. Cir. 2005) (finding claim obvious).

Here, the level of skill in the art further confirms the obviousness of selecting one or more of the recited network traffic data categories. SRI did not dispute that a person of ordinary skill in the art would have had "an undergraduate degree in computer science, with three to five years experience in computer programming and network design, ***with an emphasis in network monitoring technology and intrusion detection***." 9/5/08 T. Tr. 947:1-4 (Heberlein) (emphasis added). A person skilled in the art with years of experience in "network monitoring technology" who was taught by *Emerald 1997* how to detect suspicious network activity using hierarchical monitors in an enterprise network based on an analysis of network traffic data surely would have had a reasonable expectation of success in selecting one or more of the known categories of network traffic data. The fact that persons skilled in the art had already monitored one or more

of these categories to detect suspicious network activity further confirms the predictability of this combination. SRI presented no evidence of failure or unpredictability using these known categories.

As the Supreme Court observed in *KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1740 (2007), "If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability." Here, monitoring one or more of the claimed network traffic data categories, which had already been successfully monitored by others to detect suspicious network activity, was simply the "predictable use of prior art elements according to their established functions," and therefore an obvious combination.[2] *See KSR*, 127 S. Ct. at 1740; *see also Ball Aerosol,* 2009 WL 291184, at *7 (finding obviousness due to a predictable combination of prior art references); *Boston Scientific*, 2009 WL 89246, at *8.

Unable to rebut this clear conclusion, SRI tries to muddy the waters with irrelevant points contradicted by this Court's prior, binding adjudications regarding *Emerald 1997*.

In particular, SRI repeatedly claims that *Emerald 1997* was merely "a conceptual overview," a "vision," and an "early explanation of what [SRI] was envisioning," and that it took months of work for Porras to "'actually work out an implementation that could' actually detect intrusions on an enterprise network." Pl. SRI's Opp'n to Defs.' Mot. for Post-Trial Relief Regarding Validity of the '203 and '615 Patents (D.I. 578) at 42-43, 45 [hereinafter "Opp."]. SRI also claims that the inventors had not even decided to focus on network traffic data at the time *Emerald 1997* was written. *See* Opp. at 45 (Porras did not know he "would end up focusing

---

[2] In fact, in December 1996, one of the inventors wrote, "Probably everything I point to below, you can point to other research areas that have been using these techniques for a long time, so EMERALD may not seem particularly innovative. However, I think a perfectly fine way to achieve innovation is to apply and extend solutions to problems where the solutions have simply not been applied." DTX-559; 9/3/08 T. Tr. 395:4-18 (Porras).

on network traffic data" when he wrote *Emerald 1997*); Opp. at 46 (Valdes said they had not "settled on the idea of looking specifically at network traffic data" at the time of writing *Emerald 1997*). At trial, SRI's expert claimed, contrary to the Court's prior adjudication, that *Emerald 1997* did not teach how to look at network traffic data:

> Q. So this is examples of Claims 1 and 13 of the '615 patent. What do the claims require that's missing, in your view, from the EMERALD '97 paper?
>
> **A. It's principally looking at—it's looking at network packet data or network traffic data.**
>
> Q. Okay.
>
> A. And the specific features that you're extracting from that data to perform intrusion detection.

9/12/08 T. Tr. 1838:15-23 (Kesidis) (emphasis added).

But this Court previously held, and was affirmed on appeal by the Federal Circuit, that the *Emerald 1997* reference described ***and enabled*** a "method for monitoring an ***enterprise network***," which included, among other things, "detecting, by the network monitors, suspicious network activity based on ***analysis of network traffic data***." D.I. 472 (10/17/06 Order); *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1193-94 (Fed. Cir. 2008) (emphasis added). SRI is simply re-packaging and re-arguing its rejected arguments regarding whether *Emerald 1997* was enabling.

Nothing in the record suggests that a person of ordinary skill in the art would be unable to analyze categories like "network packet data volume" or "network connection requests." It is undisputed that the prior art had successfully monitored those categories for suspicious network activity. Accordingly, it is not necessary for the *Emerald 1997* reference itself to describe how to analyze these categories in order to render the claims obvious. Also, the lack of technical detail in the patent specification itself confirms that one of ordinary skill in the art already knew how to monitor the claimed network data categories at the time of filing. The patent

specification provides little detail beyond mentioning the network traffic data categories and explaining how certain categories correspond to certain known prior art attacks, like the SYN flood attack. *See* PTX-1 at col. 13:30-37, 13:60-63. At trial, SRI did not identify with specificity any technical detail in the patent specification that would have been necessary to enable a person of ordinary skill to analyze at least one of the network traffic data categories. *See SRI*, 511 F.3d at 1194 ("[T]he 1997 publication with its similarities in technical scope and description to the specification of the '212 patent meets the enabling hurdle for a prior art reference.").[3]

SRI claims that the categories recited in the claims are a "small subset of what one could extract out of network data." Opp. at 46 (quoting T. Tr. 378:9-12). However, since the claims only require the selection of one of the recited categories rather than the entire set, each and every one of the categories must be novel and non-obvious in combination with the other claim elements. There is nothing in the record to suggest that it was difficult or required undue experimentation to select and use at least one of the categories. As noted previously, SRI admitted that such use had already been done by persons in the art. 9/11/08 T. Tr. 1360:1-12 (Porras). Moreover, Mr. Porras testified that he focused on "maybe a dozen or more attributes" for which he performed experimentation. 9/3/08 T. Tr. 376:22-377:10 (Porras). From the approximately twelve categories that were investigated, eight categories are listed in '615 claim 1. 9/3/08 T. Tr. 377:16-378:8 (Porras); PTX-4 at col. 15:10-16. Again, the fact that a

---

[3] SRI also argues that *Emerald 1997's* references to well-known service protocols like FTP or HTTP did not anticipate the '615 claims which included the network traffic data category, "network packets indicative of well-known network service protocols." Opp. at 48-50 at n.21. SRI does not contest that FTP is a well-known network service protocol. Instead, SRI claims that the inventors eventually gave up on trying to monitor FTP. But that is simply irrelevant. Whether or not the inventors chose to practice an embodiment that monitored FTP, it is within the scope of the claims, and the inventors did not disclaim it, despite the alleged difficulties.

person of ordinary skill in the art knew how to analyze at least one, if not more, of these categories renders the claims obvious in light of this Court's prior adjudication regarding *Emerald 1997*.

**B.    *Emerald 1997* in Combination with *Intrusive Activity 1991* Rendered the Claims Obvious to a Person of Ordinary Skill in the Art.**

Not only would the claims have been obvious to a person of ordinary skill in the art reading *Emerald 1997* alone, Defendants also proved by clear and convincing evidence that the claims were obvious in light of the combination of *Emerald 1997* with its internally-cited reference, *Intrusive Activity 1991*.[4]

In its opposition, SRI makes two arguments. First, while SRI admits *Intrusive Activity 1991* mentions the claimed traffic categories, it claims that *Intrusive Activity 1991* does not disclose using the categories to detect suspicious activity in an enterprise network. Second, SRI argues that *Emerald 1997* teaches away from *Intrusive Activity*. As shown below, these arguments fail because they are either legally irrelevant or not supported by substantial evidence that would allow a reasonable juror to make such a finding.

**1.    *Intrusive Activity 1991* Discloses One or More of the Claimed Network Traffic Data Categories.**

No reasonable juror could find that *Intrusive Activity 1991* did not disclose the use of at least one of the network traffic data categories to detect suspicious network activity in an enterprise network. SRI concedes that "*Intrusive Activity 1991* mentions certain of the claimed

---

[4] The Patent Office's decision to not only declare a reexamination, but also issue a final office action (after trial) rejecting all of the claims based upon this combination, independently confirms the obviousness of the claims. *See* 11/17/08 Brown Decl. (D.I. 574), Exs. 5-6. The Court, out of concern for juror confusion, excluded from evidence the reexamination declarations and rejections. However, since obviousness is ultimately a question of law for the Court, Defendants submit that the Court should consider the Patent Office's decisions as part of its obviousness analysis.

traffic categories." Opp. at 50.[5] The full title of the article is "A Method to Detect Intrusive Activity in a Networked Environment." DTX-9 at 362. Its abstract states, "This paper discusses some of the benefits and drawbacks of trying to detect intrusive activity by analyzing network traffic . . . ." *Id.* Since the Court previously held that *Emerald 1997* satisfied the remaining limitations of the claims, the combination of *Emerald 1997* and *Intrusive Activity 1991* necessarily satisfies all of the limitations of the claims, and SRI should be precluded from arguing otherwise.

SRI claims, however, that "while *Intrusive Activity 1991* arguably mentioned one of the claimed categories of data, it did not do so in the context of detecting suspicious network activity, as required by the claims."[6] Opp. at 53. However, a patentee cannot establish non-obviousness by pointing to limitations not present in the reference. The underlying presumption for every obviousness argument is that each prior art reference lacks at least one of the claim limitations. *See* 35 U.S.C. § 103(a) ("A patent may not be obtained though the invention is ***not identically disclosed*** or described as set forth in section 102 of this title . . . ." (emphasis added)). Defendants only needed to show that the combination of *Emerald 1997* and *Intrusive Activity*

---

[5] *See* DTX-9 at 368, 369 (analyzing number of bytes, which corresponds to network packet data volume); 9/8/08 T. Tr. 1096:10-18 (Heberlein). SRI tries to make something of the fact that *Intrusive Activity 1991* refers to "number of bytes," while the patents refer to "number of kilobytes." Opp. at 51. SRI does not dispute, however, that both are measures of network packet data volume, just like a measurement of 3000 meters can be expressed as 3 kilometers.

[6] SRI also claims that the description of network connection requests in *Intrusive Activity 1991* only appears in the "System Description Language" section of the paper discussing "software syntax," and does not appear in the section entitled "Detecting Behavior in Systems." Opp. at 51-52. But the fact that this disclosure appears under one heading of a 9-page paper rather than under another does not mean that the disclosures cannot be combined for obviousness purposes. *See Boston Scientific*, 2009 WL 89246, at *8 ("Combining two embodiments disclosed adjacent to each other in a prior art patent does not require a leap of inventiveness."). Moreover, the article states that "Sections three [System Description Language] ***and*** four [Detecting Behaviors in Systems] present ***the mechanisms by which our monitor detects intrusive activity***." DTX-9 at 363 (emphasis added).

*1991* satisfied all of the limitations and that there was a reason to combine these references. The limitation "detecting . . . suspicious network activity based on analysis of network traffic data" was disclosed by *Emerald 1997. Intrusive Activity 1991* did not need to also teach that same limitation. Similarly, SRI's argument that *Intrusive Activity 1991* does not describe an "enterprise network" as recited in the claims is also legally irrelevant because it cannot be disputed that *Emerald 1997* described a "method for monitoring an enterprise network." (JTX-1 at 3).

Even if one accepts SRI's argument that a single LAN is not an enterprise network,[7] SRI's expert admitted that an enterprise network consists of multiple LANs, and each LAN would have its own network monitor. 9/4/08 T. Tr. 579:7-16, 598:23-599:1, 729:17-731:13, 746:2-7 (Kesidis). Therefore, since the enterprise network is comprised of multiple LANs, the network traffic found on the LAN is the same type of network traffic and categories found on an enterprise network.

### 2. One Skilled in the Art Would Have Been Motivated to Combine *Emerald 1997* and *Intrusive Activity 1991*.

The evidence at trial supporting a motivation to combine *Emerald 1997* and *Intrusive Activity 1991* was overwhelming. *Emerald 1997* discussed and cited to *Intrusive Activity 1991* in a section called *"Related Intrusion Detection Research."* DTX-356 at 364, 365 (emphasis added). *Intrusive Activity 1991* is the only reference cited as relating to the analysis of packet data (*i.e.,* network traffic data). *Id.* The inventor, Mr. Porras, admitted that by citing *Intrusive Activity 1991*, he was inviting the reader to read it if they were interested in further information

---

[7] SRI's expert, however, admitted that a single LAN could be a "special case" of an enterprise network. 9/4/08 T. Tr. 733:16-734:5 (Kesidis).

about monitoring network packets—the relevant element of the claims "missing" from *Emerald 1997*. 9/11/08 T. Tr. 1353:1-15 (Porras).

SRI argues that since thirteen other references are listed in the "Related Work" section of *Emerald 1997*, it was unlikely that a person of ordinary skill in the art would have been motivated to combine *Emerald 1997* with just *Intrusive Activity 1991* (Opp. at 53). Of course, SRI ignores the fact that the relevant sub-section "Related Intrusion Detection Research" only cites 8 references, and *Intrusive Activity 1991* is the **only reference** cited as relating to the analysis of packet data (*i.e.*, network traffic data). DTX-356 at 364; 9/8/08 T. Tr. 1091:4-12, 1092:25-1093:1 (Heberlein). Thus, the argument that a person skilled in the art would have to blindly select from a long list of references is simply not supported by the reference or any other substantial evidence. *See KSR*, 127 S. Ct. at 1742 (noting obviousness may be established where it was "obvious to try" a "finite number of identified, predictable solutions").

SRI's claim that *Emerald 1997* teaches away from combining the teaching of *Intrusive Activity 1991* is not supported by substantial evidence. The only evidence that SRI offered in support of this claim was the conclusory testimony of its expert. Dr. Kesidis opined that "someone of ordinary skill would not think that [*Intrusive Activity 1991*'s approach] would be a good approach to the problem EMERALD '97 was trying to address," because *Emerald 1997* was "trying to deal with a very large communication network" and, in his opinion, *Intrusive Activity 1991* would have "scalability problems" since it was designed for a LAN environment, not an enterprise network. 9/12/08 T. Tr. 1822:21-1823:2, 1850:18-25, 1851:1-6 (Kesidis). In short, SRI's "substantial evidence" is simply the conclusory opinion of Dr. Kesidis that *Emerald 1997* taught away from combining *Intrusive Activity*.

The Federal Circuit, however, has made clear that conclusory expert testimony that contradicts the factual record does not constitute substantial evidence sufficient to support a

jury's verdict. *See Weschler v. Macke Int'l Trade, Inc.,* 486 F.3d 1286, 1294 (Fed. Cir. 2007);

*Upjohn Co. v. MOVA Pharm. Corp.,* 225 F.3d 1306, 1311 (Fed. Cir. 2000). Here, Dr. Kesidis'

opinion contradicts the plain text of *Emerald 1997. Emerald 1997* cites *Intrusive Activity 1991*

as related intrusion detection research addressing the analysis of network packet data—the very

element "missing" from *Emerald 1997.* Merely offering a conclusory opinion that contradicts

the text of the prior art references is not sufficient to support the jury's verdict, particularly

where this Court and the Federal Circuit have previously rejected as a matter of law conclusory

expert testimony from this same witness (Dr. Kesidis) regarding the same reference (*Emerald*

*1997*). *See SRI,* 511 F.3d at 1194. Moreover, the "scalability" issues identified by Dr. Kesidis

regarding *Intrusive Activity 1991* are irrelevant because this Court has already held that *Emerald*

*1997* described and enabled a method for monitoring an enterprise network using network

monitors and hierarchical monitors. *See SRI Int'l, Inc. v. Internet Sec. Sys., Inc.,* 456 F. Supp. 2d

623, 632-35 (D. Del. 2006), *aff'd in relevant part,* 511 F.3d 1186, 1194 (Fed. Cir. 2008). Since

*Emerald 1997* "solved" this scalability problem, one skilled in the art would not have needed

*Intrusive Activity 1991* to solve it as well.

    **C.**    **SRI's Weak Evidence of Secondary Considerations Cannot Overcome the Strong, Direct Evidence of Obviousness.**

The evidence cited by SRI regarding alleged commercial success, praise of the invention,

and long-felt but unsolved need is insufficient as a matter of law to overcome the strong showing

of obviousness in this case. "Although secondary considerations must be taken into account,

they do not necessarily control the obviousness conclusion." *Pfizer, Inc. v. Apotex, Inc.,* 480

F.3d 1348, 1372 (Fed. Cir. 2007). Indeed, as the Federal Circuit explained, even "***substantial***

evidence of commercial success, praise, and long-felt need" is "inadequate" to overcome a

strong prima facie obviousness showing. *Leapfrog Enters., Inc. v. Fisher-Price, Inc.,* 485 F.3d

1157, 1162 (Fed. Cir. 2007) (emphasis added); *see also Boston Scientific,* 2009 WL 89246 at *9;

*Ball Aerosol,* 2009 WL 291184, at *15 ("The minimal indications of commercial success . . . do not outweigh the clear indication of obviousness apparent from the prior art.").

It was not enough for SRI to merely point to sales of the accused infringing products as evidence of "commercial success." SRI was required to offer proof of a nexus with the claimed invention by showing that "the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patent subject matter." *In re DBC,* 545 F.3d 1373, 1384 (Fed. Cir. 2008). Since the accused products included more than just the accused features, SRI was required to make a prima facie showing that the commercial success was attributable to the claimed inventions. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392 (Fed. Cir. 1988). It did not. To the contrary, SRI's expert admitted that the accused products had non-infringing uses, and that he did not perform any analysis to determine the impact of non-accused functionality on the commercial success of the accused products. *See* 9/4/08 T. Tr. 724:4-21, 725:23-726:12, 739:6-22 (Kesidis); 9/15/08 T. Tr. 2009:19-25 (Kesidis).

SRI's citations to Defendants' marketing materials prove only that Defendants discussed certain accused functionality; they do not establish that the claimed inventions were driving commercial success. SRI's own attempts to commercialize EMERALD in the United States were a failure. 9/2/08 T. Tr. 217:4-222:5 (Lincoln); 9/3/08 T. Tr. 234:1-6, 234:19-21, 237:1-7, 242:25-243:18, 253:9-256:22, 259:23-260:4, 270:8-11 (Lincoln); DTX-562 at SRIE 0119409. SRI's reliance on its licensing of the EMERALD technology to Oki Electric is equally unavailing. Since EMERALD included other components, such as mCorr, eAggregate, and eBayes, that were developed after the patents were filed, SRI failed to establish that it was able to attribute the license of EMERALD because of the unique characteristics of the claimed inventions. *See* 9/3/08 T. Tr. 331:6-332:7 (Valdes).

Similarly, the acceptance of the *Live Traffic* paper for publication and the DARPA funding for the EMERALD program are not strong evidence of praise for the patented invention. Not every paper is accepted for peer-review publication and not every DARPA funded project necessarily describes or encompasses a new, non-obvious invention. In fact, while SRI trumpets the fact that the *Live Traffic* paper was one of twelve papers selected out of forty-one submissions by the SNDSS conference, SRI ignores that Mr. Porras admitted that an earlier paper describing EMERALD was previously rejected by the "top tier" IEEE Symposium on Security and Privacy because the reviewers said "similar architectures have been proposed by a few others as well." 9/11/08 T. Tr. 1465:23-1467:20 (Porras).

SRI failed to establish that such "praise" was directly related to just the claimed inventions. Indeed, both the acceptance of the *Live Traffic* paper and the funding by DARPA related to more than just the claimed inventions. For example, the EMERALD project covered other patents, 9/3/08 T. Tr. 334:7-335:15 (Valdes), as well as work that continued long past the filing date for the patents. 9/3/08 T. Tr. 364:24-365:4 (Porras). And the original DARPA contract proposal from SRI was not even written by the inventor (Mr. Porras), so DARPA's decision to fund could not have been attributable to the features of the claimed invention. 9/10/08 T. Tr. 1329:14-1333:21 (Porras). Even the inventor agrees that the EMERALD project did not revolutionize the field as SRI now appears to portray it. 9/3/08 T. Tr. 393:17-20 (Porras).

SRI's claim that DARPA funding is proof of a long-felt need for the claimed inventions is fatally flawed. SRI submitted the grant proposal for the work of what became EMERALD to DARPA in 1995. PTX-599; 9/10/08 T. Tr. 1329:14-1330:16. The inventor admitted that the ideas expressed in the DARPA proposal were not his ideas or his invention. 9/10/08 T. Tr. 1333:19-21. As a result of that DARPA funding, Mr. Porras authored and then published *Emerald 1997*, which disclosed to the public details regarding a "solution" to the problems that

SRI had been investigating as part of the EMERALD grants from DARPA. SRI having

disclosed, at a minimum, all but one of the elements of the claimed inventions in the *Emerald*

*1997* paper, the relevant question for the Court is whether the claimed inventions were obvious

in light of *Emerald 1997*, not whether DARPA believed back in 1995 that it was funding

research relating to problems that had not yet been solved. SRI wants to pretend that *Emerald*

*1997*, which described the inventor's "solution" to the problem of enterprise network monitoring,

was not part of the prior art. But it cannot.

SRI's weak evidence of secondary considerations cannot overcome the strong

obviousness case established by Defendants. The Court should therefore enter judgment as a

matter of law that the claims of the '203 and '615 patents are invalid for obviousness.

## III. JURY'S VERDICT OF NO ANTICIPATION WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

### A. RealSecure Anticipated All of the Claims, and No Reasonable Juror Could Find That It Did Not Satisfy the "Integrate" Limitation.

Neither SRI nor its expert dispute how the RealSecure prior art product functioned in

1997. *See generally* Opp. at 32-39; 9/15/08 T. Tr. 1934:2-1935:6 (Kesidis). Instead, SRI

focuses its opposition on an irrelevant and improper comparison between how ISS's accused

Fusion product and its earlier RealSecure product purportedly differ. SRI ignores not only this

Court's constructions but its original claim construction arguments that requested the broad and

ordinary meaning of the disputed term "integrate."

In its infringement case, SRI eagerly applied the Court's construction of "integrate." But,

in its effort to distinguish the prior art RealSecure product, SRI now attempts to insert new

limitations into the claim, such as "meaningful" and "intelligent," and tries to rewrite this Court's

construction from requiring a "*different* end product" (9/16/08 T. Tr. 2287:13) (emphasis

added)) to now requiring a "*new* end product." Opp. at 35. However, "[a] patent may not, like a

'nose of wax,' be twisted one way to avoid anticipation and another to find infringement."
*Amazon.com, Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1342, 1351 (Fed. Cir. 2001) (citation omitted). Stripped of this artifice, it is clear that RealSecure anticipates the claims, and the jury's verdict to the contrary is not supported by substantial evidence.

> 1. **Because SRI admits RealSecure satisfied the dependent "correlation" limitation, it follows as a matter of law that RealSecure satisfied the "integration" limitation from which it depends.**

SRI agrees that "correlation" as used in the claims of the '203 and '615 patents is a subset of "integration." Opp. at 36; *see* PTX-4 '615 claim 14 ("wherein the ***integration comprises correlating*** intrusion reports reflecting underlying commonalities") (emphasis added). Therefore, as a matter of law, if a prior art reference "correlates" intrusion reports within the context of the patent claims, it must necessarily "integrate" those reports.

The Court construed "correlating" to mean "[c]ombining the reports to reflect underlying commonalities." 9/16/08 T. Tr. 2287:15-16 (Jury Instructions). SRI and Dr. Kesidis admit that RealSecure combined events to reflect underlying commonalities such as source, destination, and event type. Opp. at 36-37; 9/12/08 T. Tr. 1936:21-1938:16, 1941:22-1942:8 (Kesidis). Defendants contend this admission establishes, as a matter of law, that RealSecure also satisfies the "integration" limitation from which the "correlation" limitation depends. SRI, however, argues that even though RealSecure satisfied the "correlation" requirement of the dependent claims, it nonetheless did not satisfy the "integration" limitation of the independent claims because it failed to meet the "different end product" requirement of "integrate." Opp. at 36-37. Consequently, whether or not RealSecure anticipates as a matter of law rests upon a purely legal question for the Court's resolution: whether prior art that anticipates a dependent claim term necessarily anticipates the broader independent claim.

16

Case precedent answers this question in the affirmative and requires that when a dependent claim term is invalid, then the independent claim must also be invalid. *See Callaway Golf Co. v. Acushnet Co.*, 585 F. Supp. 2d 600, 614 n.16 (D. Del. 2008) (citing *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 2430 (2008)). While integration is certainly a broader term in the context of the '203 and '615 patents, it necessarily includes correlating intrusion reports reflecting underlying commonalities according to the claim language.

The Court's construction of "correlation" does not explicitly contain the "different end product" requirement because it does not have to. Combining intrusion reports reflecting underlying commonalities (i.e., "correlating") necessarily involves doing something more than just "collecting and reiterating" data. Therefore, RealSecure not only "correlated" intrusion reports to reflect underlying commonalities, it also "integrated" those reports by combining them into a different end product. Accordingly, RealSecure anticipates the claims.

### 2. SRI Improperly Compares the Prior Art RealSecure Product to the Accused Fusion 2.0 Product

In an effort to capture ISS's accused Fusion 2.0 product but at the same time avoid the prior art RealSecure product, SRI seeks to attribute any difference between Fusion 2.0 and RealSecure as "proof" that RealSecure did not perform "integration." SRI argues that because Fusion is more advanced than and different from the prior art RealSecure product, RealSecure must not have performed correlation or integration because if it did "there would have been no need for ISS to introduce Fusion 2.0 . . . years later." Opp. at 33.

Not only is this comparison legally improper, it is a red herring. First, it is well settled that SRI must compare the prior art to the claims as construed, not to the product accused of infringement. *See TiVo, Inc. v. Echostar Commc'ns. Corp.*, 516 F.3d 1290, 1311 (Fed. Cir. 2008); *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). Second, the fact

17

that the Fusion 2.0 product was later introduced and included more advanced features does not mean that RealSecure failed to meet the "integrate" and "correlate" limitations as construed by the Court.

Ironically, the Fusion documents that SRI cites actually demonstrate that the "integration" and "correlation" capabilities were not "added" to the Fusion 2.0 product, as SRI claims. Rather, the documents show that Fusion 2.0 merely enhanced and extended the basic integration and correlation functionality found in earlier ISS products. For example, SRI focuses on PTX-157 and its description of the Fusion Module as containing an advanced technique that correlates attack patterns. Opp. at 33, 35. However, that is not the only use of the word "correlate" in this document. The funnel on the front of the brochure describes other forms of correlation present in ISS's SiteProtector product and the non-accused components of Fusion 2.0,[8] such as correlating security events "into groups that have business context," "attack impact" correlation, and "attack prevention" correlations. PTX-157. The text even notes that Fusion "*enhances and extends* Site Protector's *correlation* capabilities" and that Fusion provides "two *additional correlation* techniques." *Id.* at 1, ¶¶ 2, 4 (emphasis added); *see Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986) ("[I]f documents or objective evidence contradict the witness's story, clear error may be found even in a finding purportedly based on a credibility determination."). While ISS witnesses acknowledged that the advanced correlation functionality of combining attack patterns and creating incidents was added to Fusion 2.0, 9/3/08 T. Tr. 458:8-459:4, 459:16-460:12 (Stewart); 9/5/08 T. Tr. 829:14-830:5 (Kleinwaechter), the testimony was consistent and undisputed that the prior art RealSecure

---

[8] SRI does not accuse SiteProtector or the Fusion Impact Analysis Component in Fusion 2.0 of infringement. D.I. 570 at 9; 9/4/08 T. Tr. 686:19-25, 702:12-14 (Kesidis); 9/15/08 T. Tr. 2009:2-8 (Kesidis).

product performed "correlation" as construed by the Court, even if it did not perform the "advanced" correlation implemented in the later Fusion product.[9]

### 3. SRI Cannot Rewrite the Court's Claim Construction to Prevent Invalidity

As construed by the Court, "integrate" requires "combining [the reports of suspicious activity] into a different end product; in other words, something more than simply collecting and reiterating data." 9/16/08 T. Tr. 2287:12-14 (Jury Instructions). Although Dr. Kesidis agreed that RealSecure combined intrusion reports based on underlying commonalities, *see* 9/12/08 T. Tr. 1938:13-16, 1941:22-1942:2 (Kesidis); *see also* Opp. at 37, SRI contends that RealSecure did not combine them into a "different end product." Opp. at 34-38. This position, however, is contradicted by SRI's own admissions and the admissions of Dr. Kesidis. During trial, Dr. Kesidis admitted that the RealSecure Activity Tree combined and sorted the raw events on the right in "a **different** way." 9/15/08 T. Tr. 2015:21-23 (Kesidis) (emphasis added). Even SRI admits in its brief that RealSecure displayed the events in "**different** ways." Opp. at 35 (emphasis added).

To explain away these admissions, SRI tries to argue that RealSecure "always display[ed] events" and therefore did not integrate or correlate. Opp. at 34 (emphasis omitted). SRI claims that, unlike Fusion, RealSecure did not "form **new** end products, incidents or attack patterns, that each reflect an entire collection of events and that eliminate the need to display the underlying

---

[9] SRI notes that Holly Stewart, an ISS employee, confirmed that correlation was a new feature in Fusion 2.0 that created incidents automatically, unlike the prior manual systems. Opp. at 33-34. However, this is a gross mischaracterization of her testimony. Ms. Stewart testified "pattern recognition was a new feature of Fusion 2.0," 9/3/08 T. Tr. 458:21-22, and she clearly testified that Fusion 2.0 did not add "correlation," as it is broadly defined, it only added a specific type of correlation, *see id.* at 459:16-460:12 (Stewart). The Court's constructions of "integration" or "correlation" do not require pattern recognition or the creation of incidents. Integration only requires a "different end product."

individual events." Opp. at 35 (emphasis added). SRI's argument is legally flawed and not supported by substantial evidence.[10]

First, SRI's argument rests on changing the Court's construction of "integration" from a "*different* end product" (9/16/08 T. Tr. 2287:13) (emphasis added) to a "*new* end product." Opp. at 35 (emphasis added). However, SRI's interpretation of the Court's construction "in ways that contradict their plain meaning" is not allowed, especially where SRI argued for that broad plain meaning during claim construction.[11] *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004).

Second, the Activity Tree clearly did not display on the right side the same raw events. A user could expand the tree to view additional information about the type of events and the number of occurrences. 9/5/08 T. Tr. 802:13-807:25 (Kleinwaechter - describing Activity Tree

---

[10] Contrary to SRI's suggestion, the Patent Office's consideration of a seven-page, third-party article that compares five different intrusion detection systems was not a determination by the Patent Examiner that RealSecure did not anticipate. DTX-1801 at ISS03496. First, the brief eight-line marketing description of RealSecure does not describe the network setup or even show pictures of the Activity Tree. *See, e.g.*, DTX-2542; DTX-2110. Second, the article is dated July 1998, which falls after the § 102(b) critical date of November 1997. Third, the article describes RealSecure version 2.0 that was released around March 1998, not the version 1.0 presented at trial. DTX-1801 at ISS03491-92; DTX-2542; DTX-879. Fourth, ISS's witness, Mr. Kleinwaechter, only testified that the article gave an accurate *summary* of RealSecure, not a full enabling disclosure as SRI suggests. *See* 9/5/08 T. Tr. 820:6-19 (Kleinwaechter). Fifth, to the extent this article is considered, it confirms that RealSecure integrates under even SRI's narrow "new end product" definition by creating a "single notification." DTX-1801 at ISS03496.

[11] SRI's further attempt to rewrite the Court's construction by arguing that "integration" must be "meaningful" or "intelligent," Opp. at 38-39 and "reduc[e]" the events, *id.* at 38, conflicts with the broad definitions proposed during claim construction. Because the patent does not describe "integration," all parties relied on broad dictionary definitions to assign a plain meaning to the term. *See SRI Claim Construction Br.*, D.I. 317 at 15 (defining "integrate" to mean "To make part of a larger unit"; "to make up, combine, or complete to produce whole or a larger unit, as parts do"; "to form, coordinate, or blend into a functioning or unified whole: UNITE"; "to incorporate into a larger unit."). None of these definitions require "integration" to be "meaningful," "intelligent," or "reduce" information in some way. *Cf.* 9/12/08 T. Tr. 1942:25-1943:1 (Kesidis - noting that a person "could integrate or correlate things for *no purpose*."(emphasis added)).

view in DTX-2542 at ISS_02126187A-90A); 9/12/08 T. Tr. 1696:4-1699:18 (Smaha). The raw

events on the right were never repeated or even shown within the Activity Tree. *See* DTX-2542

at ISS_02126187A-89A. The Activity Tree reduced and consolidated the raw events as

represented by the display of a parenthetical number in the Activity Tree. 9/5/08 T. Tr. 802:9-

12, 829:23-830:5, 838:2-22 (Kleinwaechter); 9/12/08 T. Tr. 1697:17-23 (Smaha).

Finally, SRI attempts to distinguish RealSecure by stating that "an organized collection

of *events* is just a reiteration of the disorganized *events*" that "are not combined into a different

end product" and do not "reduc[e] the incredibly numerous events that have to be reviewed."

Opp. at 38 (emphasis in original). The Activity Tree, however, clearly "reduced" the number of

events by organizing them by source, destination, and event type into a tree structure that could

be expanded as needed and by reducing events to a parenthetical count. Moreover, SRI's

argument also contradicts its own admission that RealSecure's combination of "sorted events in

an activity tree structure may be *helpful* . . . ." Opp. at 34 (emphasis added).

## B. SRI's Speculation Does Not Rebut Defendants' Prima Facie Case that *Live Traffic* Anticipated All of the Claims Because It Was Publicly Accessible.

SRI's argument regarding the *Live Traffic* paper boils down to a fundamental

misunderstanding of the shifting burdens associated with any affirmative case. While

Defendants always have the ultimate burden of proving invalidity by clear and convincing

evidence, once they establish a prima facie case of anticipation, the burden of production shifts

to SRI to come forward with "additional evidence [or] . . . persuasive argument based on new

evidence or evidence already of record." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316,

1327 (Fed. Cir. 2008); *accord Upsher-Smith Labs. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322-23

(Fed. Cir. 2005) ("Pamlab presented a prima facie case of anticipation, and the district court

properly placed the burden on Upsher-Smith to present rebuttal evidence sufficient to raise a

genuine issue of material fact of no anticipation . . . ."). In this instance, Defendants presented

uncontroverted testimony of SRI's witnesses establishing a prima facie case of invalidity. SRI failed to put forward anything other than speculation and inconclusive evidence to the contrary.

### 1. Defendants Demonstrated a Prima Facie Case of Anticipation

There is no dispute that *Live Traffic* anticipates the patents if it was publicly accessible before the critical date.[12] The only issue to be tried was whether Mr. Porras's posting of the *Live Traffic* paper to SRI's FTP server resulted in the paper being "made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *SRI Int'l*, 511 F.3d at 1194 (citation omitted). As Defendants demonstrated in their Opening Brief, SRI's own witnesses admitted the facts to establish a prima facie case of public availability. Opening Br. at 36-40.

There was no dispute that the *Live Traffic* paper was "made available" to the public. *SRI Int'l*, 511 F.3d at 1194. The inventor who placed it there admitted (1) the paper was posted on the FTP site for at least a week, (2) it lacked any password protection or encryption, and (3) any member of the public could access and download it. Opening Br. at 37.

Furthermore, "persons interested and ordinarily skilled in [computer intrusion detection] exercising reasonable diligence, [could] locate it." *SRI Int'l*, 511 F.3d at 1194; Opening Br. at 36. Mr. Porras again admitted that persons interested and ordinarily skilled in the intrusion detection field in 1997 (1) knew how to access the SRI FTP site, *id.* at 38; (2) knew how to and could navigate the directories by clicking through them on a web browser, *id.*; (3) knew what the directory names (e.g., pub and emerald) represented, *id.*; (4) knew to look for intrusion detection papers on that FTP site, *id.* at 39; and (5) would recognize the ndss98.ps file name, *id* at 40.

Unlike the summary judgment record, SRI cannot rely on inferences that the FTP site was not navigable. Mr. Porras admitted that the FTP site was navigable, and a reasonable juror

could not conclude otherwise. Thus, Defendants established a prima facie case of anticipation through undisputed facts.

## 2. SRI Failed to Meet Its Burden of Production

SRI does not take issue with these admissions in its brief. Opp. at 26-32. Therefore, the burden of production shifted and required SRI to come forward with additional evidence or persuasive argument against this prima facie case. But this burden of production requires something more than mere speculation, conclusory statements, or metaphysical doubt. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden . . . , its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *Tech. Licensing*, 545 F.3d at 1327 (noting that the burden of production at trial requires "sufficient evidence and argument"); *cf. Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1320-21 (Fed. Cir. 2002) ("[O]nce [the accused infringer] present[s] facts sufficient to establish a prima facie case of public use, it [falls] to [the patentee] to come forward with some evidence raising a genuine issue of material fact to the contrary."); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000) ("A party may not overcome a grant of summary judgment by merely offering conclusory statements.").

In its opposition brief, SRI suggests this production was met because its witness speculated for the first time that a "read bit" could have been removed, that there was no evidence a user actually accessed the paper, and that Mr. Porras did not intend to publish the paper. None of these arguments constitute substantial evidence sufficient to support the verdict.

First, at trial, Mr. Porras speculated that a person could unset a read bit from an FTP file or directory in order to hide that file from public users. Opp. at 28. However, when he was

---

[12] SRI conceded that *Live Traffic* discloses all accused claim limitations. JTX-1 at 4.

questioned further, he indicated that he did not recall whether he set or unset the read bit after posting the *Live Traffic* paper to the SRI FTP site. 9/11/08 T. Tr. 1443:7-9, 1476:18-1477:2 (Porras). SRI states then that "[b]ecause no one knows whether or not the read bit was set, Defendants cannot establish [by] clear and convincing evidence" the paper was publicly accessible. Opp. at 28. This statement is the precise reason why there is a burden of production. While Defendants agree they must ultimately prove invalidity by clear and convincing evidence, SRI's burden of production cannot be satisfied by Mr. Porras's pure speculation about what could have been. If that were the case, every patentee could present "substantial evidence" by simply stating without support that it is possible a library book was never on the shelf, *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986) (noting that applicant failed to present rebuttal evidence), or that an invalidating presentation used blank slides, *see In re Klopfenstein*, 380 F.3d 1345, 1349-51 (Fed. Cir. 2004). Even though the burden of production is a low hurdle, it still requires more than a scintilla of evidence, *i.e.,* something more than Mr. Porras's speculation that he may or may not have unset a read bit.

Second, SRI argues that because Mr. Porras used an exact address in his email to Mr. Bishop and only sent the address to a confidential peer-review committee, the jury could infer that the FTP site was somehow not navigable or inaccessible. Opp. at 28-29. However, this "exact address" inference is a remnant from the summary judgment record, *see, e.g.,* SRI Opening Appeal Brief, *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, No. 2007-1065, 2007 WL 869734, at *22-23 (Fed. Cir. Jan. 23, 2007) ("But most importantly, there was no evidence that in 1997, at the time the draft was supposedly placed on the server for one week, SRI's FTP server was structured to allow an anonymous user to navigate through directories and sub-directories to find a specific file without knowing its specific, complete address."), and contradicts Mr. Porras's testimony at trial that an interested person would have known of the

FTP site and how to navigate the directories to find the paper without having to enter an exact address. 9/11/08 T. Tr. 1364:10-1365:15, 1368:4-1374:3, 1474:24-1476:10 (Porras). Moreover, Mr. Porras recalled pointing people to the general FTP site at ftp.csl.sri.com when they asked for information on EMERALD. 9/11/08 T. Tr. 1373:25-1374:3 (Porras). The law only requires that the paper be publicly accessible. *SRI Int'l*, 511 F.3d at 1194. Defendants did not need to prove by clear and convincing evidence that someone actually accessed the file. *See, e.g., In re Hall*, 781 F.2d at 899.

Third, in a related argument, SRI contends that because Mr. Porras received requests for the paper after an abstract was viewed on the website, the paper was not accessible on the FTP site. Opp. at 29-30. Again, this is speculation without evidence. As SRI points out in its brief, the SRI FTP site is not the same as the SRI website, so this is not evidence that these persons were unable to access the paper on the FTP site. Opp. at 28 n. 13. Indeed, SRI has no records to indicate whether anyone actually accessed or did not access the FTP paper. 9/11/08 T. Tr. 1476:25-1477:2 (Porras). Furthermore, the assertion is illogical. While a person searching the *website* for the paper may have contacted Mr. Porras as the abstract instructed, a person searching the ***FTP site*** for the paper would have no reason to contact Mr. Porras if they actually located the paper on that site when it was posted. If anything, the email traffic confirms that persons skilled in the art were regularly searching SRI's online publications for intrusion detection papers.

Fourth, SRI contends that Mr. Porras's intent not to publish is evidence he in fact did not make *Live Traffic* publicly available. Intent to publish may be a consideration, but it alone is not conclusive. *See In re Wyer*, 655 F.2d 221, 227 (C.C.P.A. 1981) ("While intent to make public . . . may aid in determining whether an item may be termed a 'printed publication,' they are neither always conclusive nor requisite."); *see also Lough v. Brunswick Corp.*, 86 F.3d 1113, 1122 (Fed.

Cir. 1996) (overturning jury verdict of validity where an inventor's "subjective intent to experiment, particularly after institution of litigation, is generally of minimal value" (citation omitted)). Rather, § 102(b) protects the public interest by, among other things, "discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available" and "prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time." *Lough*, 86 F.3d at 1119 (citation omitted). No matter how strongly an author asserts his intent not to publish a paper, if it has been relinquished to the public domain, it cannot be removed.

### C. *DIDS 1991* Anticipated All of the Claims.

SRI claims that there is substantial evidence in the record that would have allowed a reasonable juror to conclude that *DIDS 1991* did not describe "deploying a plurality of network monitors in the enterprise network." According to SRI, *DIDS 1991* only described the use of a single network monitor (LAN monitor) reporting to a single hierarchical monitor (DIDS Director). Opp. at 19. SRI is wrong.

While citing Figure 2 of the paper, SRI completely ignores the text of *DIDS 1991* that clearly discloses the use of multiple network (LAN) monitors for each LAN segment:

> The DIDS components include the DIDS director, a single host monitor per host, and *a single LAN monitor for each LAN segment* of the monitored network.

DTX-21 at 168 (emphasis added). SRI's own expert admitted that *DIDS 1991* taught using two LAN monitors if the network had two LAN segments:

> Q.     So if you have two LAN segments, the DIDS October 1991 paper tells you to have two LAN monitors; is that right?
>
> A.     It says you need two. Right. If you have two LAN segments, you need two LAN monitors, yes.

9/12/08 T. Tr. 1917:2-5 (Kesidis). SRI attempts to explain away this critical admission by arguing that *DIDS 1991* did not actually disclose more the one LAN segment, so it therefore did

not disclose using more than one network (LAN) monitor. *See* Opp. at 23-24 n.10. But SRI's

argument ignores what *DIDS 1991* teaches. *DIDS 1991* showed a diagram for the deployment of

one LAN monitor when monitoring one LAN segment, and explicitly stated that one LAN

monitor was needed "for each LAN segment of the monitored network." DTX-21 at 168. SRI's

attempt to obfuscate this clear text should be rejected.

Rather than addressing these undisputed facts regarding the text of the *DIDS 1991*

reference, SRI strings together citations to earlier DIDS related papers and theses as well as a

later DARPA proposal. *See* Opp. at 20. However, for anticipation, the only relevant inquiry is

what the *DIDS 1991* paper disclosed, not what other papers said or did not say. Based upon that

evidence, a reasonable juror could not find that *DIDS 1991* failed to disclose deploying a

plurality of network monitors in an enterprise network.

SRI also points to testimony from its expert, Dr. Kesidis, that *DIDS 1991* "doesn't teach

how to hierarchically integrate [multiple LAN monitors] into a DIDS Director." *See* 9/12/08 T.

Tr. 1917:6-12 (Kesidis); Opp. at 23-24 n. 10. Dr. Kesidis's conclusory opinion was not

supported by substantial evidence. He ignored the text of *DIDS 1991* that stated that DIDS

aggregated and correlated data from multiple monitors: "Because ***DIDS aggregates and***

***correlates data from multiple hosts and the network* . . . .**" DTX-21 at 168 (emphasis added).

He also did not address other passages, which Mr. Heberlein pointed to as proof that *DIDS 1991*

integrated and correlated information from multiple sources into the DIDS Director. 9/5/08 T.

Tr. 1010:5-1011:14, 1016:17-1018:14, 1019:12-1020:4 (Heberlein). He incorrectly claimed that

there was no testimony that Trident Data Systems built a DIDS system with multiple network

monitors, even though Mr. Smaha had testified to those facts. *Compare* 9/12/08 T. Tr. 1828:17-

20 (Kesidis) *with* 9/11/08 T. Tr. 1584:20-1585:19 (Smaha). Given this evidence and Dr.

Kesidis's failure to offer any opinion that the work required to integrate multiple network

monitors with the DIDS Director would have constituted "undue experimentation," which is the controlling legal standard, substantial evidence supporting a verdict of no anticipation based on *DIDS 1991* was not presented at trial.

## IV. IN THE ALTERNATIVE, DEFENDANTS HAVE SHOWN THAT A NEW TRIAL SHOULD BE GRANTED

If the Court does not grant judgment as a matter of law of invalidity, the Court should at least grant a new trial on invalidity. Defendants have shown that the verdict is manifestly unjust and against the clear weight of the evidence. Granting a new trial is particularly appropriate here, given the Patent Office's recent final rejection during the reexamination proceedings of all of the claims-in-suit for obviousness. If the verdict stands, Defendants could find themselves liable for infringing patents that are likely to be cancelled by the Patent Office following the completion of SRI's appeal of the Examiner's final rejections of the claims. Setting aside the verdict, granting a new trial, and staying further proceedings pending resolution of SRI's appeal of the final rejections would avoid such an unfortunate and unnecessary result.

Defendants identified other bases for granting a new trial in its opening brief, and continue to request that the Court consider granting relief on those bases.

SRI contends that the Court's revised claim construction of "hierarchical monitor" during Defendants' case-in-chief was not erroneous, did not prejudice or surprise Defendants, and was necessary to counteract "improper argument" by Defendants. Opp. at 3-10. But the record reveals that the Court's original construction was correct, Defendants were genuinely surprised and prejudiced by the change during trial, and Defendants did not make any improper arguments.

First, SRI mischaracterizes the new construction of "hierarchical monitor" introduced during trial as either (1) a "confirmation" (*id.* at 1), (2) an "affirmation," (*id.* at 3) or (3) a "reiteration" of the original claim construction. But the construction of "hierarchical monitor" was fundamentally changed:

| Original Construction | Amended Construction |
|---|---|
| "a network monitor that receives data from at least one network monitor that is at a lower level in the analysis hierarchy"<br><br>10/17/06 Claim Construction Order (D.I. 468) at 3. | "a network monitor that receives data from at least <u>two</u> other network monitors that are at a lower level in the analysis hierarchy, <u>so that the analysis hierarchy includes a minimum of three monitors</u>" (changes underlined).<br><br>9/16/08 T. Tr. 2287:5-9 (Jury Instructions). |

Changing "one" to "two," and establishing a "minimum of three monitors" for the hierarchy where no such minimum was required previously was a substantial change made during trial that prejudiced Defendants.

Second, SRI ignores the fact that it was SRI that urged the original construction upon the Court. (D.I. 317 at 11-14 (SRI Claim Construction Opening Br.); D.I. 346 at 10-11 (SRI Claim Construction Response Br.)). Under these circumstances, where SRI urged the very construction two years earlier that was later discarded in the middle of trial, the prejudice to Defendants is even more substantial. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

Finally, SRI argues that the original construction of "hierarchical monitor" merely "defined certain minimum characteristics" that ultimately "require[d] more." Opp. at 5. But even if claim construction were appropriately an iterative exercise, the changes to this construction during trial did more than simply add to the construction of "hierarchical monitor." By requiring two, rather than one, network monitor, for a total of three, rather than two, monitors in the hierarchy, the new construction undeniably changed the fundamental requirements of the old construction, in a manner inconsistent with the asserted patents' specification. *See* PTX-4 ('615 Patent cols. 4:8-56, 6:43-46). Defendants respectfully contend that the amended construction was therefore erroneous, justifying a new trial.

Respectfully submitted,

Dated: February 17, 2009

Dated: February 17, 2009

By: /s/ Richard K. Herrmann
    Richard K. Herrmann (#405)
    MORRIS JAMES LLP
    500 Delaware Avenue, Suite 1500
    Wilmington, DE 19801
    Tel: (302) 888-6800
    Fax: (302) 571-1751
    rherrmann@morrisjames.com

    OF COUNSEL:
    Robert M. Galvin *(pro hac vice)*
    Paul S. Grewal *(pro hac vice)*
    Renee DuBord Brown *(pro hac vice)*
    Geoffrey M. Godfrey *(pro hac vice)*
    DAY CASEBEER MADRID & BATCHELDER, LLP
    20300 Stevens Creek Blvd., STE 400
    Cupertino, CA 95014
    Tel: (408) 873-0110
    Fax: (408) 873-0220

***Attorneys for Defendant***
***SYMANTEC CORPORATION***

By: /s/ Richard L. Horwitz
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    D. Fon Muttamara-Walker (#4646)
    POTTER ANDERSON & CORROON LLP
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Tel: (302) 984-6000
    Fax: (302) 658-1192
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com
    fmuttamara-walker@potteranderson.com

    OF COUNSEL:
    Holmes J. Hawkins, III *(pro hac vice)*
    Natasha H. Moffitt *(pro hac vice)*
    Charles A. Pannell, III *(pro hac vice)*
    KING & SPALDING LLP *(pro hac vice)*
    1180 Peachtree Street, N.E.
    Atlanta, GA 30309
    Tel: (404) 572-4600
    Fax: (404) 572-5134

***Attorneys for Defendants***
***INTERNET SECURITY SYSTEMS, INC.***

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on February 17, 2009, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on February 17, 2009, the attached document was Electronically Mailed to the following person(s):

Thomas L. Halkowski
Kyle Wagner Compton
Fish & Richardson P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114
halkowski@fr.com
kcompton@fr.com

Richard K. Herrmann
Mary B. Matterer
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Howard G. Pollack
Steven C. Carlson
John N. Farrell
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
pollack@fr.com
steven.carlson@fr.com
jfarrell@fr.com

Paul S. Grewal
Renee DuBord Brown
Katie J.L. Scott
Day Casebeer Madrid & Batchelder LLP
20300 Stevens Creek Blvd, Suite 400
Cupertino, CA 95014
pgrewal@daycasebeer.com
rbrown@daycasebeer.com
kscott@daycasebeer.com

*/s/ Richard L. Horwitz*
Richard L. Horwitz
David E. Moore
D. Fon Muttamara-Walker
POTTER ANDERSON & CORROON LLP
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
fmuttamara-walker@potteranderson.com