IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SRI INTERNATIONAL INC., a California corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civ. No. 04-1199-SLR |
| INTERNET SECURITY SYSTEMS, INC., a Georgia corporation, SYMANTEC CORPORATION, a Delaware corporation, and INTERNET SECURITY SYSTEMS, INC., a Delaware corporation, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM ORDER**

At Wilmington this 31st day of October, 2011, having reviewed the parties' submissions and heard argument at the pretrial conference regarding several outstanding issues in the case, I find as follows:

1. **Government and foreign sales.** Symantec argues that its infringement liability as it relates to customers of the ManHunt products was "necessarily based on inducing those customers to directly infringe SRI's claims by deploying the ManHunt products in an enterprise network in the United States." (D.I. 704, ex. 13 at 5) Symantec further argues that, because it does not sell its ManHunt products already "deployed" in a network, its sales to the government and foreign customers cannot be deemed infringing sales for purposes of calculating damages. Finally, Symantec contends that it cannot induce the government to infringe because the government has a license to the patents-in-suit and cannot infringe when it deploys and uses

Symantec's ManHunt products. (*Id.*)

2. I need not address the latter point, insofar as the jury in the liability trial held that the ManHunt products directly infringe claims 1, 13, 14 and 16 of the '615 patent and claims 1 and 12 of the '203 patent.[1] (D.I. 558) Symantec did not move for JMOL of noninfringement on this basis. (D.I. 609 at 23) ("Because Symantec did not challenge the jury's finding that its ManHunt products infringe the '203 and '615 patents, the court affirms the judgment for plaintiff in this regard.") Thus, Symantec cannot now argue that the actual evidence at trial did not distinguish between the asserted apparatus and method claims, i.e., that the jury verdict of direct infringement was not proper as to one claim type. In sum, Symantec is liable for damages for direct infringement relating to its making and/or selling the ManHunt products, irrespective of the buyer, and any license rights held thereby.[2]

3. **Prior art relevant to the hypothetical negotiation**. For prior art to be relevant to damages, the prior art must have been available for use at the time of the invention, whether commercially available or not. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1117, 1120 (S.D.N.Y 1970) (factor 9 is "the utility and

---

[1] The jury separately found that SRI proved, by a preponderance of the evidence, that Symantec induces literal infringement by its customers of those claims through sales of the ManHunt products.

[2] Symantec made clear at the pretrial conference that it does not seek to transfer infringement liability to the government pursuant to 28 U.S.C. § 1498. Symantec agrees that, if liability for direct infringement lies in its selling of ManHunt (regardless of "deployment"), it is liable for both government and foreign sales. (D.I. 714 at 12) Additionally, I note that the record does not support Symantec's argument that the government's license would have precluded its liability; the terms and applicability of the license have not been presented to me.

2

advantages of the patent property over the old modes or devices, if any, that had been **used** for working out similar results") (emphasis added).  The parties agree that the prior art RealSecure was one such system.  Symantec also points to testimony establishing that the DIDS systems were "used" before the effective filing dates of SRI's patents and, upon review, the foregoing provides sufficient basis for allowing Symantec to discuss DIDS at trial in this context. (D.I. 704, ex. 13 at 12 n.26)

    4. **Noninfringing alternatives**.  Generally, noninfringing alternatives include any products found to be noninfringing or products not accused of infringement.  This principle is clarified below to reflect the record at bar.

        a. The jury found that ISS infringed the '203 and '615 patents.  Indeed, ISS admitted that the patents were infringed where ISS Sensors, SiteProtector, and Fusion 2.0 are deployed in an enterprise network and Fusion 2.0's "Attack Pattern Component" ("ARC") is enabled and used.  SRI, however, did not demonstrate that ISS itself actually deployed or used the accused products in an infringing manner, nor did it identify any specific instances of a customer's use of the APC feature in an infringing manner. (D.I. 609 at 24-31)  Consequently, although the jury found that ISS Sensors, SiteProtector, and Fusion 2.0 deployed with ARC infringed, I reversed the verdict based on the sufficiency of SRI's evidence.  On this record, Symantec may not characterize these products as noninfringing alternatives.

        b. Similarly, the jury found that Symantec's SGS/Manager products infringe the patents-in-suit.  On Symantec's JMOL motion, I held that plaintiff did not identify specific instances of direct infringement involving Symantec's SGS/Manager

3

products and vacated the jury's finding that SGS with Manager infringes. (*Id.* at 17-21) The parties agreed that the SGS and Manager products can be used together (deployed in a network) in either an infringing or noninfringing manner. (*Id.*) The combination found to be infringing by the jury may not be relied upon by Symantec as a noninfringing alternative in the damages trial. Other noninfringing configurations may be relied upon with the proper foundation.

    c. SRI disputes Symantec's ability to rely on ManHunt 2.0 as a noninfringing alternative. SRI states that it did not accuse ManHunt 2.0 as infringing in this litigation only because it was not sold within the damages period. (D.I. 604, ex. 12 at 5) "The critical time period for determining availability of an alternative is the period of infringement for which the patent owner claims damages, i.e., the 'accounting period.'" *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999) (citations omitted). Because there is no record upon which I can conclude that ManHunt 2.0 (like ManHunt 3.0) meets each of the limitations of the claims (and, therefore, is not a "noninfringing" alternative), I will allow Symantec to rely on ManHunt 2.0 if it has evidence from which a reasonable jury could conclude that ManHunt 2.0 was, in fact, sold within the damages period. Absent such foundation, Symantec may not rely on ManHunt 2.0.

    5. **Design arounds**. Having reviewed the relevant portions of Dr. Bishop's report (D.I. 695, ex. A at ¶¶ 47-50), I conclude that Dr. Bishop's proffered testimony regarding possible "design arounds" as alternatives to the patented technology is wholly speculative and, consequently, not helpful to the trier of fact. *F.R.E.* 702. There is no

4

indication that any of the technical alternatives proposed by Dr. Bishop would work. Dr. Bishop admitted as much at his deposition. (D.I. 695, ex. D at 69:13-70:11) ("I have no idea whether or not they would be commercially viable.")

6. **Symantec's patents and improvements, and the development of ManHunt**. Symantec may present evidence on the above subjects through its fact witness having personal knowledge, Brian Hernacki, who may be cross-examined regarding any alleged inconsistencies with his March 2006 testimony.[3] Although an expert witness may offer an opinion incorporating proffered facts, because Dr. Bishop did nothing more than reiterate the lay testimony and provide a conclusory opinion based on the lay testimony, he may not testify on these subjects. Further, I find Dr. Bishop's opinions too speculative to be helpful to the jury on the issue of *Georgia-Pacific* factor 13, that is, Dr. Bishop did not analyze the accused products or the patented technology to provide a helpful opinion on "the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer."[4] As such, he may not opine regarding this factor. *F.R.E.* 702.

7. **RSA patent**. According to Dr. Bishop, the RSA patent[5] "covered a

---

[3]There is no dispute that Dr. Bishop learned of the facts solely through Mr. Hernacki (or Symantec's lawyers). (D.I. 695, ex. D at 39:13-40:1) SRI does not object to Mr. Hernacki's testimony regarding Symantec's contributions to the technology (*see infra* ¶ 11 of this order) so long as Mr. Hernacki lays the appropriate foundation regarding Symantec's development efforts. (D.I. 714 at 59) Mr. Hernacki may not opine (as a lay witness) regarding the patents' coverage.

[4]An issue better presented by a financial (rather than technical) expert.

[5]U.S. Patent No. 4,405,829.

5

pathbreaking invention in the field of network security relating to public key cryptography." (D.I. 695, ex. A at ¶ 52) Dr. Bishop states that the RSA patent disclosed an algorithm that "became a standard used in securing internet transactions, email, and other applications" that has since been incorporated into internet standard protocols. (*Id.*) There is no substantive comparison to the invention of the '203 and '615 patents[6] and, consequently, I agree with SRI that there is no foundation for reliance on the RSA patent in the damages analysis. *See, e.g., Utah Medical Products, Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1385-86 (Fed. Cir. 2003) (district court did not abuse its discretion in disallowing expert testimony purporting to establish a reasonable royalty rate based on license agreements that were not "in any way comparable to the [asserted] patent" as this "would mislead and confuse the jury, as it [is] not a reliable means of calculating a reasonable royalty for the technology of the [asserted] patent").

8. **Dr. Bishop's testimony regarding ManHunt**. SRI seeks to preclude Dr. Bishop's opinion testimony regarding which ManHunt features allegedly are or are not covered by the patents-in-suit. I agree with SRI that Dr. Bishop offered only conclusory testimony in this regard[7] and took no account of the infringement evidence presented at

---

[6]In fact, Dr. Bishop conceded at his deposition that cryptography and network intrusion detection are related, though independent fields, as you can have a network intrusion detection system that does not involve cryptography, and you can have cryptography that does not involve network intrusion detection. (D.I. 695, ex. D at 30:20-32:14)

[7]For example, Dr. Bishop states (without citation) that "ManHunt's protocol anomaly detection functionality does not detect suspicious network activity based on direct examination of **network packets** as the asserted claims require." (D.I. 695, ex. A at ¶ 44) (emphasis added) The asserted claims of the '203 and '615 patents specify

6

trial. (D.I. 695, ex. A at ¶ 44) Dr. Bishop's proffered testimony is not helpful to the jury and directly contravenes the trial evidence as well as the direct infringement verdict. As such, it will be precluded. *F.R.E.* 702.

9. **Dr. Bishop's testimony that the inventions added minimal value.** Dr. Bishop wishes to opine that, while patentable, the inventions at bar offered only a minor incremental improvement over what was known in the art and, therefore, the value of the inventions is negligible. (D.I. 714 at 34-36) SRI argues that Dr. Bishop's opinion in this regard is nothing more than a reiteration of Symantec's failed obviousness arguments. (*Id.* at 36-38)

10. Through its damages expert, Brian W. Napper, SRI seeks to demonstrate that the patent-related features of ManHunt were the basis for customer demand. (D.I. 702, ex. A); (D.I. 701 at 13); *see, e.g., Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995). Symantec's rebuttal evidence, therefore, should be directed to the overall value of ManHunt. It is not appropriate for Dr. Bishop to simply identify a few features and state that they would have little value, as he has done in his report. (D.I. 695, ex. A at ¶ 26 (patented technology was "a minor, incremental" and "negligible" improvement); *id.* at ¶ 30 (missing prior art element was "well known"[8]); *id.* at ¶ 35

---

types of network packet data. Accordingly, SRI's expert (Dr. Kesidis) opined, *inter alia*, that "[t]he detection components included in each of the eight sensors within a ManHunt network monitor detect suspicious network activity based on analysis of **network packet data transfer commands**." (Kesidis infringement report at ¶ 121) The verdict for SRI implicates "a presumption that the jury found the facts and researched the legal conclusions undergirding its verdict." *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1546 (Fed. Cir. 1983).

[8]While Dr. Bishop's report has some differences vis a vis Dr. Heberlein's original invalidity report, I agree with SRI that Dr. Bishop's report reads dangerously close to an

(modification would have "added little benefit to the product's value"); *id.* at ¶ 38 (concluding that modifications would not have provided "much benefit beyond that provided by the existing art")) To the extent that Dr. Bishop's opinions are specific to commercial value, they are excluded as his observations are conclusory and not based on the use of the patented technology (as a combination of elements) in ManHunt. *F.R.E.* 702.

11. **Duplicative sales data**. Symantec states that the sales data it produced in 2006 mistakenly included duplicate entries, and that revised data was provided in May 2011 and considered by SRI's financial expert. (D.I. 74, ex. 13 at 2) SRI does not dispute that its expert has considered the May 2011 data, but argues that the jury should adjudge the accuracy of the 2011 sales data vis a vis the 2006 sales data. (*Id.*, ex. 12 at 14-15) I disagree, and exclude the inaccurate 2006 sales data as confusing and misleading to the jury.[9] *F.R.E.* 403.

12. **Recourse (Symantec's predecessor)**. SRI may not offer evidence regarding Symantec's purchase price for Recourse (which price included intellectual property) insofar as Mr. Napper did not perform any apportionment of this value to ManHunt. I will consider a proffer by SRI at trial regarding meetings between SRI and Recourse purportedly evidencing that the patents-in-suit were valuable (despite no deal

---

obviousness opinion. Symantec's witnesses, to the extent not excluded by this opinion, must acknowledge the patents' validity, i.e., it is not appropriate to opine that a system/method having all of the patented features was concurrently in use in the prior art.

[9]In this regard, I have conferred with Judge Thynge and am satisfied that SRI had sufficient access to the underlying data for purposes of securing a level playing field.

8

having been brokered).

13. **Managed Security Services**. As discussed at the pretrial conference (D.I. 714 at 63-64), I will allow Symantec to admit what it describes as a contemporaneous industry analyst's report stating that the intrusion detection market was faltering. Symantec, however, may not tie its decision to cease selling ManHunt (in favor of Managed Security Services) to ManHunt's being a commercial failure without contemporaneous documents supporting that notion. Without such evidence, the introduction of this fact is both irrelevant and prejudicial. *F.R.E.* 403.

14. **Verdict form**. I agree with SRI that the verdict form should specify a royalty rate; to allow the jury to opine on damages without obtaining this valuation (if reached) is nonsensical.

15. **Reexamination**. The parties are precluded from discussing the reexamination of the patents-in-suit. *F.R.E.* 403.

NOW, THEREFORE, IT IS ORDERED, in view of the foregoing, that:

16. SRI's motion to preclude improper damages testimony by Dr. Bishop and Ms. Rinke (D.I. 693) is hereby granted in part and denied in part, consistent with the above discussion.

17. Symantec's motion fo limit the testimony of Mr. Napper (D.I. 690) is granted in part and denied in part, as follows:

    a. Mr. Napper cannot rely on the incorrect 2006 sales data.

    b. Mr. Napper may rely on government and foreign sales.

    c. Bypass Units and Professional Services are excluded, as conceded by

SRI.

    d. Dr. Kesidis's trial testimony was consistent with including Smart Agents as components of the infringing ManHunt products and, therefore, Mr. Napper may testify commensurately. (D.I. 702, ex. F at 621:20-625:4)

    e. Mr. Napper may not include the value of renewal maintenance contracts in the royalty base (as opposed to initial maintenance contracts).

    f. The Oki 2003 license is fodder for cross-examination, not the exclusion of Mr. Napper's testimony.

_____
United States District Judge